1  NOAH G. BLECHMAN (State Bar No. 197167)
   noah.blechman@mcnamaralaw.com
2  McNAMARA, NEY, BEATTY, SLATTERY,
   BORGES & AMBACHER LLP
3  3480 Buskirk Avenue, Suite 250
   Pleasant Hill, CA 94523
4  Telephone: (925) 939-5330
   Facsimile:  (925) 939-0203
5
6  Attorneys for Defendants
   CITY OF PLEASANTON; BRADLEE MIDDLETON;
7  JONATHAN CHIN; RICHARD TROVAO; STEVEN
   BENNETT; ALEX KOUMISS; JASON KNIGHT; MARTY
   BILLDT; and DAVE SPILLER
8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12
   JOHN BAUER, an individual and as          Case No. C19-04593 LB
13 Successor in Interest of Jacob Bauer,
   deceased; ROSE BAUER, an individual       **DECLARATION OF NOAH G.**
14 and as Successor in Interest of Jacob Bauer, **BLECHMAN, ESQ., IN SUPPORT OF**
   deceased,                                 **DEFENDANTS' MOTION FOR**
15                                           **SUMMARY JUDGMENT/PARTIAL**
                Plaintiffs,                  **SUMMARY JUDGMENT**
16
        vs.                                  Date:       April 8, 2021
17                                           Time:       9:30 a.m.
   CITY OF PLEASANTON; CITY OF               Dept:       Floor 15, Ctrm. B (S.F.)
18 PLEASANTON; BRADLEE                       Judge:      Hon. Laurel Beeler
   MIDDLETON; JONATHAN CHIN;                 Trial Date: July 19, 2021
19 RICHARD TROVAO; STEVEN
   BENNETT; ALEX KOUMISS; JASON
20 KNIGHT; MARTY BILLDT; and DAVE
   SPILLER; and DOES 1 to 90 INCLUSIVE,
21
                Defendants.
22

23

24

25

26

27

28

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

I, Noah G. Blechman, declare as follows:

1.      I have personal knowledge of each matter stated herein for the following reasons: I am an attorney at law duly licensed to practice before the courts of the State of California and am a partner at the law firm of McNamara, Ney, Beatty, Slattery, Borges & Ambacher, LLP; attorneys of record for the Defendants in this action.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the Pleasanton Police Department CAD log printout from August 1, 2018.

3.      Attached hereto as **Exhibit B** are true and correct copies of the Pleasanton Police Department Dispatch Audio File and Transcription from August 1, 2018.

4.      Attached hereto as **Exhibit C** is a true and correct copy of Mr. Robert McFarlane's Summary Report of Audio/Video Evidence.  Attached to Mr. McFarlane's report are true and correct copies of Video Matrix 1, Video Matrix 1 with Bystander Video, Video Matrix 2, and the accompanying source evidence videos and documents.  See Ex. C-1 for Video Matrix 1.  See Ex. C-1(b) for Video Matrix 1 with Bystander Video.  See Ex. C-2 for Video Matrix 2.

5.      Attached hereto as **Exhibit D** is a true and correct copy of selected portions of the Deposition of Officer Bradlee Middleton.

6.      Attached hereto as **Exhibit E** is a true and correct copy of selected portions of the Deposition of Officer Jonathan Chin.

7.      Attached hereto as **Exhibit F** is a true and correct copy of selected portions of the Deposition of Officer Steven Bennett.

8.      Attached hereto as **Exhibit G** is a true and correct copy of selected portions of the Deposition of Officer Alex Koumiss.

9.      Attached hereto as **Exhibit H** is a true and correct copy of selected portions of the Deposition of Officer Richard Trovao.

10.     Attached hereto as **Exhibit I** is a true and correct copy of selected portions of the Deposition of Sergeant Marty Billdt.

11.     Attached hereto as **Exhibit J** is a true and correct copy of selected portions of the Deposition of Sergeant Jason Knight.

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

12.     Attached hereto as **Exhibit K** is a true and correct copy of selected portions of the Deposition of LPFD Captain James Smith.

13.     Attached hereto as **Exhibit L** is a true and correct copy of selected portions of the Deposition of LPFD Captain Jorge Diaz.

14.     Attached hereto as **Exhibit M** is a true and correct copy of selected portions of the Deposition of LPFD Engineer Patrick Thomson.

15.     Attached hereto as **Exhibit N** is a true and correct copy of selected portions of the Deposition of Dr. Michael Ferenc.  Attached to Dr. Ferenc's Deposition are true and correct copies of Autopsy Report and the Toxicology report.  See Ex. N-1 for the Autopsy Report.  See Ex. N-2 for the Toxicology Report.

16.     Attached hereto as **Exhibit O** is a true and correct copy of selected portions of the Deposition of Sergeant Eric Gora.

17.     Attached hereto as **Exhibit P** is a true and correct copy of selected portions of the Deposition of Retired Chief David Spiller.

18.     Attached hereto as **Exhibit Q** are true and correct copies of Pleasanton Police Department Polices 300, 306, 308, and 309.

19.     Attached hereto as **Exhibit R** are true and correct copies of the Pleasanton Police Department Training Record Logs for Bennett, Billdt, Chin, Knight, Koumiss, Middleton, Spiller, and Trovao.

20.     The undersigned attests that permission in the filing of this document(s) has been obtained from the signatory below which shall serve in lieu of the actual signatures on the document(s).

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 4, 2021, at Pleasant Hill, California.

By: ___/s/ Blechman, Noah G._____
Noah G. Blechman
Declarant

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

## Bauer v. City of Pleasanton, et al.
### Case No. C19-04593 LB

### INDEX OF EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| Ex. No. | Description |
|---------|-------------|
| A. | CAD Log (Dispatch) Printout |
| B. | Dispatch Audio File and Transcription |
| C. | Video Expert Report (Ex. C) and Source Materials, along with key matrixes:<br>▪ Ex. C-1 – Video Matrix 1<br>▪ Ex. C-1(b) – Video Matrix 1 with Bystander Video<br>▪ Ex. C-2 – Video Matrix 2 |
| D. | Selected portions from the Deposition of Officer Bradlee Middleton |
| E. | Selected portions from the Deposition of Officer Jonathan Chin |
| F. | Selected portions from the Deposition of Officer Steven Bennett |
| G. | Selected portions from the Deposition of Officer Alex Koumiss |
| H. | Selected portions from the Deposition of Officer Richard Trovao |
| I. | Selected portions from the Deposition of Sergeant Eric "Marty" Billdt |
| J. | Selected portions from the Deposition of Sergeant Jason Knight |
| K. | Selected portions from the Deposition of LPFD Captain James Smith |
| L. | Selected portions from the Deposition of LPFD Captain Jorge Diaz |
| M. | Selected portions from the Deposition of LPFD Engineer Patrick Thomson |
| N. | Selected portions from the Deposition of Dr. Ferenc (Ex. N), along with key reports<br>▪ Ex. N-1 – Coroner's Report<br>▪ Ex. N-2 – Toxicology Report |
| O. | Selected portions from the Deposition of Sergeant Eric Gora |
| P. | Selected portions from the Deposition Retired Chief David Spiller |
| Q. | Pleasanton Police Department Polices 300, 306, 308, and 309 |
| R. | Pleasanton Police Department Training Record Logs for Bennett, Billdt, Chin, Knight, Koumiss, Middleton, Spiller, and Trovao |

# EXHIBIT A



Pleasanton Police Department

## Call For Service Detail Report - CFS 287

| Address | 5420 SUNOL BL, PLS | | | | |
|---|---|---|---|---|---|
| Common Name | RALEYS | | | | |
| Custom Layer | | Census Tract | | | |
| Beat | 3 | Quadrant | | District | 8211 |
| Caller Name | KAREN, MANAGER | Caller Phone | (925) 846-4471 | Call Taker | CTYPLS\MParwes |
| Create Date | 8/1/2018 2:42:16 PM | Clear Date | 8/2/2018 3:20:07 AM | Nature Of Call | |

### Agencies

| Call Type | Status | Priority | Dispatcher | Created Date |
|---|---|---|---|---|
| 1066 | OTHER | 5 | CTYPLS\MParwes | 8/1/2018 2:42:16 PM |

### Call Narrative

**\*\*\* 8/1/2018 \*\*\***

| Time | Description | User | Unit # | Machine |
|---|---|---|---|---|
| 9:27:47 PM | CORONER AND P+ ARE CLEAR FROM VCM | Rainwater,Rebecca | | PDDISP11CDSXM2 |
| 9:04:14 PM | crime scene lab onscene | Rainwater,Rebecca | | PDDISP11CDSXM2 |
| 8:45:14 PM | COMPLETED CRIME SCENE LOG. | Bradley,Michael | | PDMDC479SNV1246 |
| 8:41:43 PM | CH05 ENR STA AS WELL | Rainwater,Rebecca | | PDDISP11CDSXM2 |
| 8:36:22 PM | CRIME SCENE ON MISSION BROKEN DOWN AT 2036 HRS | Rainwater,Rebecca | | PDDISP11CDSXM2 |
| 8:31:33 PM | CORRECTION CORONER | Rainwater,Rebecca | | PDDISP11CDSXM2 |
| 8:31:13 PM | COCORNER/FAMILY/ CRIME LAB HAVE COMPLETED AND LEFT SCENE | Rainwater,Rebecca | | PDDISP11CDSXM2 |
| 8:05:25 PM | MEDIA 97 CH05 | Rainwater,Rebecca | | PDDISP11CDSXM2 |
| 6:41:51 PM | OFC TUJAGUE ENR STA | Rainwater,Rebecca | | PDDISP11CDSXM2 |
| 6:34:42 PM | S9 ENR STA | Rainwater,Rebecca | | PDDISP11CDSXM2 |
| 6:15:19 PM | OFC BARCELO 97 STA | Phillips,Krista | | PDDISP31CFPXM2 |
| 6:07:43 PM | ACSO CRIME LAB TECHS ON SCENE - S4 | Phillips,Krista | | PDDISP31CFPXM2 |
| 6:04:21 PM | DA INVESTIGATOR ON SCENE- S4 | Phillips,Krista | | PDDISP31CFPXM2 |
| 5:59:22 PM | OFC JOHNSTON RESPONDING ETA 45 | Phillips,Krista | | PDDISP31CFPXM2 |
| 5:56:44 PM | S13 ENR STA WITH K31 | Phillips,Krista | | PDDISP31CFPXM2 |
| 5:56:31 PM | RECORDS CALLED S9/JOHNSTON/MARTENS/ TUJAGUE..LEFT VM | Rainwater,Rebecca | | PDDISP11CDSXM2 |
| 5:06:03 PM | SURVEILANCE CAMERAS AT HERITAGE DONUTS WILL NEED TO FOLLOW UP WITH MGMT-K11 | Phillips,Krista | | PDDISP31CFPXM2 |
| 5:00:46 PM | PROPERTY OWNER STATES HIS LANDSCAPER IS JAVIER | Medeiros,Brandy | | PDDISP41CFRXM2 |

| | GARCIA OUT OF LIVERMORE. STATES ALL HIS INFO IS AT HIS OFFICE AND HE CAN GET IT TOMORROW MORNING IF WE CALL HIM AT 846-4980 AFTER 0830 HRS | | |
|---|---|---|---|
| 4:57:35 PM | JACK BRAS PH/ 925.846.5198 - POSS PROPERTY OWNER. ATTEMPTING A CALL TO ASCERTAIN INFO ON LANDSCAPING. | Medeiros,Brandy | PDDISP41CFRXM2 |
| 4:49:35 PM | CORRECTION ON GRANADOS (K11) COMMENT AT 1604 HRS. MADE CONTACT WITH RUSSELL CHIROPRACTIC AT 60 MISSION DR. | Medeiros,Brandy | PDDISP41CFRXM2 |
| 4:45:34 PM | 60 MISSION DR PROP MANAGMENT COMPANY TO GET IN CONTACT W/ LANDSCAPE COMPANY | Horner,Heidi | PDDISP21CFQXM2 |
| 4:42:01 PM | L/V FOR MCNEFF | Rainwater,Rebecca | PDDISP11CDSXM2 |
| 4:38:22 PM | K. LEONARDO ENR ... ETA IS 1 HOUR | Medeiros,Brandy | PDDISP41CFRXM2 |
| 4:30:32 PM | VIP FOR CSO5 COME THE BACK SIDE OF RALEYS ON MISSION TO AVOID CRIME SCENE | Horner,Heidi | PDDISP21CFQXM2 |
| 4:29:28 PM | LEFT V/M FOR JEWELL/WHITE/EVANS/CERRI | Rainwater,Rebecca | PDDISP11CDSXM2 |
| 4:29:03 PM | KELLY O'NEAL OUT OF TOWN UNTIL AUG 7TH | Medeiros,Brandy | PDDISP41CFRXM2 |
| 4:28:37 PM | HAVE VIPS RESPOND 1 TO SR1 MISSION/MONACO AND 2 TO CSO5 MISSION/DOLORES | Horner,Heidi | PDDISP21CFQXM2 |
| 4:19:48 PM | LEFT MSGS FOR GRAVEYARDS..BARCELO ENR...UTL ON ONEAL CELL PHONE # | Rainwater,Rebecca | PDDISP11CDSXM2 |
| 4:16:33 PM | K12 -  SUSPECT WAS PRONOUNCED AT 1615 HRS | Medeiros,Brandy | PDDISP41CFRXM2 |
| 4:14:33 PM | S13 TRANSPORTING K31 AND K22 TO VCM | Medeiros,Brandy | PDDISP41CFRXM2 |
| 4:13:35 PM | CSO5 HAS A POSSIBLE WITNESS AT 104 DOLORES. NEED SOMEONE TO MAKE CONTACT W/ RESIDENT FOR FURTHER | Medeiros,Brandy | PDDISP41CFRXM2 |
| 4:11:35 PM | K11 - K11 MADE CONTACT CHA AND ASSOC TAX PLANNING CONSTULTANTS. 60 MISSION UNIT #B | Medeiros,Brandy | PDDISP41CFRXM2 |
| 4:04:36 PM | K11 - CHECKING CHIROPRACTIC OFFICE (WALSH) 5480 SUNOL #3 | Medeiros,Brandy | PDDISP41CFRXM2 |
| 4:01:20 PM | SGT LEWELLYN WILL CALL IN GRAVEYARD | Medeiros,Brandy | PDDISP41CFRXM2 |
| 3:52:08 PM | K11 - YAT SING CHINESE FOOD - EMPLOYEE GAVE INFO. HERITAGE DONUT IS CLOSED | Medeiros,Brandy | PDDISP41CFRXM2 |
| 3:51:35 PM | I53 ON SCENE | Medeiros,Brandy | PDDISP41CFRXM2 |
| 3:49:58 PM | K11 CONTACTED EMPLOYEE AT JIMS.     CONTACTING EMPLOYEES AT CHINESE RESTAURANT | Medeiros,Brandy | PDDISP41CFRXM2 |
| 3:48:10 PM | Crime scene tape fully applied. | Trovao,Richard | PDMDC488SNV1270 |
| 3:43:16 PM | CPR STILL IN PROGRESS.  97 AT VCM | Medeiros,Brandy | PDDISP41CFRXM2 |
| 3:42:23 PM | S12 WILL BE IN CONTROL COMM AT 44 MISSION // S10 WILL BE IN CONTROL AT VCM | Horner,Heidi | PDDISP21CFQXM2 |
| 3:35:51 PM | ENR TO VCM | Horner,Heidi | PDDISP21CFQXM2 |
| 3:35:14 PM | TEAM 1 IS NOT CLEAR FOR 10-10 | Horner,Heidi | PDDISP21CFQXM2 |
| 3:34:52 PM | LENGEL, SOCHA, PALMQUIST IN PP VEH | Horner,Heidi | PDDISP21CFQXM2 |
| 3:34:30 PM | PP DEPARTING TO ENR TO VCM CD 3 | Horner,Heidi | PDDISP21CFQXM2 |
| 3:34:14 PM | PATIENT STILL IN BACK OF THE AMB | Horner,Heidi | PDDISP21CFQXM2 |
| 3:34:04 PM | CPR STILL BEING PERFORMED | Horner,Heidi | PDDISP21CFQXM2 |
| 3:33:42 PM | WRAP IS REMOVING LOWER RESTRAINT STILL ON AT 1533 | Horner,Heidi | PDDISP21CFQXM2 |
| 3:32:49 PM | START A WC | Horner,Heidi | PDDISP21CFQXM2 |
| 3:32:43 PM | NEED CSO TO BLOCK OFF MISSION / DOLORES // MISSION BLOCK OFF DRIVEWAY INTO RALEYS SHOPPING CENTER | Horner,Heidi | PDDISP21CFQXM2 |
| 3:31:42 PM | SUBJ IS CODING OUT // TRANSPORTING TO THE HOSPITAL // CPR HAS BEGUN //WRAP STILL APPLIED TRYING TO TAKE IT OFF NOW | Horner,Heidi | PDDISP21CFQXM2 |

| Time | Description | User | Machine |
|------|-------------|------|---------|
| 3:18:50 PM | C4 WORKING ON SUBJ TO GET ON THE GERNY | Horner,Heidi | PDDISP21CFQXM2 |
| 3:11:10 PM | FIRE ENRT | Mohammad Parwes,Mojgan | PDDISP31CFPXM2 |
| 3:10:54 PM | HAVE FIRE ROLL IN | Horner,Heidi | PDDISP21CFQXM2 |
| 3:09:12 PM | SUBJ ACTIVELY RESISTING APPLYING FACE MASK AND WRAP | Horner,Heidi | PDDISP21CFQXM2 |
| 3:05:35 PM | FIRE TO STAGE EAST OF SENIOR CENTER | Mohammad Parwes,Mojgan | PDDISP31CFPXM2 |
| 3:05:25 PM | NOTHING SIG IN HOUSE, PRIOR CITE FOR CELL PHONE IN 2015 | Mohammad Parwes,Mojgan | PDDISP31CFPXM2 |
| 3:03:51 PM | FIRE STAGE AT SENIOR CENTER | Horner,Heidi | PDDISP21CFQXM2 |
| 3:03:01 PM | FIRE ENRT UNK MEFD | Mohammad Parwes,Mojgan | PDDISP31CFPXM2 |
| 3:02:32 PM | START MEDICAL | Horner,Heidi | PDDISP21CFQXM2 |
| 3:02:23 PM | MED REQUEST | Medeiros,Brandy | PDDISP41CFRXM2 |
| 3:02:19 PM | CUFFS ON DETAINED WORKING ON A WRAP | Horner,Heidi | PDDISP21CFQXM2 |
| 3:02:18 PM | SUBJ DETAINED IN CUFFS.  WORKING ON APPLYING A WRAP | Medeiros,Brandy | PDDISP41CFRXM2 |
| 3:00:47 PM | s10 ADVISING ALL INCOMING UNITS CAN REDUCE. TRYING TO TAKE SUBJ INTO CUSTODY | Medeiros,Brandy | PDDISP41CFRXM2 |
| 3:00:20 PM | REDUCING | Horner,Heidi | PDDISP21CFQXM2 |
| 2:58:35 PM | WATCH COMMANDER/ SILACCI ADVISED | Medeiros,Brandy | PDDISP41CFRXM2 |
| 2:58:23 PM | SPEE DEE OIL CHANGE IS 44 MISSION DR | Medeiros,Brandy | PDDISP41CFRXM2 |
| 2:58:16 PM | CD3 HOPYARD/VALLEY | Horner,Heidi | PDDISP21CFQXM2 |
| 2:57:59 PM | CD 3 FRNAKLIN/JOHNSON | Horner,Heidi | PDDISP21CFQXM2 |
| 2:54:34 PM | BAUER, JACOB 062780 M | Horner,Heidi | PDDISP21CFQXM2 |
| 2:53:06 PM | OFF W/ SUBJ MISSION/SUNOL | Horner,Heidi | PDDISP21CFQXM2 |
| 2:47:17 PM | NEG WEAPONS | Mohammad Parwes,Mojgan | PDDISP31CFPXM2 |
| 2:47:13 PM | SUBJ IS WALKING AROUND STORE AND ASST DIRECTOR IS TRAILING | Mohammad Parwes,Mojgan | PDDISP31CFPXM2 |
| 2:46:12 PM | HE HAS BEEN ASKED TO LEAVE BUT IS REFUSING | Mohammad Parwes,Mojgan | PDDISP31CFPXM2 |
| 2:45:57 PM | RP REQ ASST W/ ESCORTING HIM OUT OF STORE | Mohammad Parwes,Mojgan | PDDISP31CFPXM2 |
| 2:45:35 PM | SUBJ IS RANTING TO HIMSELF | Mohammad Parwes,Mojgan | PDDISP31CFPXM2 |
| 2:44:45 PM | WMA W/ MED LENGTH STRAIGHT BRO MULTI COLORED HAIR, 30-35 YOA, 6'0, 220, BEARD, LSW TIE DIED TSHIRT, JEANS W/ BEADING ON POCKETS | Mohammad Parwes,Mojgan | PDDISP31CFPXM2 |

## EMD Narrative

| Time | Description | User |
|------|-------------|------|

## Call Persons

| Name | Date of Birth | Contact Phone | Machine |
|------|---------------|---------------|---------|
| KAREN,MANAGER | | (925) 846-4471 | PDDISP31CFPXM2 |
| BAUER,JACOB | 6/27/1980 | | PDDISP31CFPXM2 |
| BAUER,JILLIAN | 1/1/1987 | | PDDISP11CDSXM2 |
| BAUER,JOHN | 3/17/1959 | | PDDISP11CDSXM2 |
| BAUER,ROSE | 9/27/1960 | | PDDISP11CDSXM2 |
| BAUER,JILLIAN | 1/6/1987 | | PDDISP11CDSXM2 |

PPD002470

## Call Vehicles

| Vehicle Type | Make | Model | Role | Year | License State | License Number |
|---|---|---|---|---|---|---|

## Call Dispositions

| Name | Count |
|---|---|
| SUPP | 1 |
| RPT | 2 |
| NR | 1 |

## Unit Dispositions

| Name | Unit Number | Disposition Date |
|---|---|---|
| SUPP | M4 | 8/14/2018 10:57:28 AM |
| NR | J11 | 8/1/2018 4:08:04 PM |
| NR | J11 | 8/1/2018 8:45:14 PM |

## Call Log

**\*\*\* 8/14/2018 \*\*\***

| Time | Action | Description | Name | Machine |
|---|---|---|---|---|
| 10:57:28 AM | Call Cleared | Close Call | Lora Howell | PDDISP21CFQXM2 |
| 10:57:28 AM | Disposition Changed | Added: *SUPP Count 1,*NR Count 1 | Lora Howell | PDDISP21CFQXM2 |
| 10:57:28 AM | Unit Status Action | Unit M4 AVAIL | Lora Howell | PDDISP21CFQXM2 |
| 10:15:44 AM | Unit Location | Unit M4 Secondary Location: STATION | Lora Howell | PDDISP21CFQXM2 |
| 10:15:41 AM | Unit Status Action | Unit M4 AS | Lora Howell | PDDISP21CFQXM2 |
| 10:15:38 AM | Unit Location | Unit M4 Secondary Location: Secondary Location Cleared | Lora Howell | PDDISP21CFQXM2 |
| 10:15:38 AM | Unit Status Action | Unit M4 DISP | Lora Howell | PDDISP21CFQXM2 |
| 10:15:33 AM | Alerts Retrieval | Alerts Were Successfully Gathered For Location At Address 5420 SUNOL BL | cad testing | TYLERNWCADENT |
| 10:15:33 AM | Call Reactivated | | Lora Howell | PDDISP21CFQXM2 |

**\*\*\* 8/2/2018 \*\*\***

| Time | Action | Description | Name | Machine |
|---|---|---|---|---|
| 3:38:36 AM | Call Cleared | Close Call | Teri Timmerman | PDDISP11CDSXM2 |
| 3:38:36 AM | Disposition Changed | Added: *NR Count 1 | Teri Timmerman | PDDISP11CDSXM2 |
| 3:38:36 AM | Unit Status Action | Unit H31 AVAIL | Teri Timmerman | PDDISP11CDSXM2 |
| 3:38:36 AM | Disposition Changed | Changed: *RPT Count 2 | Teri Timmerman | PDDISP11CDSXM2 |
| 3:38:24 AM | Associated Calls | Call Number 336 was Associated, Incident(s) : 2018-00030277 Moved, Call Type: F UP, Location: 1600 OAK VISTA WY, Name: | Teri Timmerman | PDDISP11CDSXM2 |
| 3:37:31 AM | Alerts Retrieval | Alerts Were Successfully Gathered For Location At Address 5420 SUNOL BL | cad testing | TYLERNWCADENT |
| 3:37:30 AM | Call Reactivated | | Teri Timmerman | PDDISP11CDSXM2 |
| 3:20:07 AM | Call Cleared | Close Call | Lisa Rhee | PDDISP41CFRXM2 |
| 3:20:07 AM | Disposition Changed | Added: *NR Count 1 | Lisa Rhee | PDDISP41CFRXM2 |
| 3:20:07 AM | Unit Status Action | Unit T1 AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:20:07 AM | Disposition Changed | Added: *RPT Count 1 | Lisa Rhee | PDDISP41CFRXM2 |
| 3:19:55 AM | Unit Status Action | Unit I54 AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:19:55 AM | Unit Status Action | Unit I53 AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:19:55 AM | Unit Status Action | Unit I52 AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:19:49 AM | Unit Status Action | Unit K31 AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:19:44 AM | Unit Status Action | Unit K22 AVAIL | Lisa Rhee | PDDISP41CFRXM2 |

| Time | Action | Description | Officer | Unit ID |
|---|---|---|---|---|
| 12:45:53 AM | Unit Status Action | Unit A26 AVAIL | Teri Timmerman | PDDISP11CDSXM2 |
| 12:44:58 AM | Unit Status Action | Unit J31 AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| **\*\*\* 8/1/2018 \*\*\*** | | | | |
| 11:39:42 PM | Unit Status Action | Unit S13 AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 11:36:36 PM | Person Added | Name: BAUER, JILLIAN | Rebecca Rainwater | PDDISP11CDSXM2 |
| 11:36:16 PM | Person Added | Name: BAUER, ROSE | Rebecca Rainwater | PDDISP11CDSXM2 |
| 11:35:50 PM | Person Added | Name: BAUER, JOHN | Rebecca Rainwater | PDDISP11CDSXM2 |
| 11:34:49 PM | Person Added | Name: BAUER, JILLIAN | Rebecca Rainwater | PDDISP11CDSXM2 |
| 11:24:39 PM | Unit Status Action | Unit A21 AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:39:53 PM | Unit Status Action | Unit S10 AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:39:47 PM | Unit Status Action | Unit S12 AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:39:29 PM | Unit Status Action | Unit S4 AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:39:15 PM | Unit Status Action | Unit K21 AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:39:00 PM | Unit Status Action | Unit K11 AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:38:54 PM | Unit Status Action | Unit M2 AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:38:47 PM | Unit Status Action | Unit J22 AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:38:23 PM | Unit Status Action | Unit K12 AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:37:59 PM | Unit Status Action | Unit J21 AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:20:28 PM | Unit Location | Unit J22 Secondary Location Updated: STATION | Lisa Rhee | PDDISP41CFRXM2 |
| 9:57:18 PM | Unit Location | Unit S10 Secondary Location Updated: STA | Teri Timmerman | PDDISP21CFQXM2 |
| 9:27:47 PM | Narrative Added | CORONER AND P+ ARE CLEAR FROM VCM | Rebecca Rainwater | PDDISP11CDSXM2 |
| 9:24:49 PM | Unit Location | Unit S10 Secondary Location Updated: ENR STA | Rebecca Rainwater | PDDISP11CDSXM2 |
| 9:05:34 PM | Unit Location | Unit S13 Secondary Location Updated: STA | Rebecca Rainwater | PDDISP11CDSXM2 |
| 9:05:22 PM | Unit Location | Unit A26 Secondary Location Updated: STA | Rebecca Rainwater | PDDISP11CDSXM2 |
| 9:04:14 PM | Narrative Added | crime scene lab onscene | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:59:43 PM | Unit Status Action | Unit M5 AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:59:38 PM | Unit Location | Unit K22 Secondary Location Updated: STA | Teri Timmerman | PDDISP21CFQXM2 |
| 8:59:38 PM | Unit Location | Unit K31 Secondary Location Updated: STA | Teri Timmerman | PDDISP21CFQXM2 |
| 8:47:03 PM | Unit Status Action | Unit V2 AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:47:01 PM | Unit Status Action | Unit V1 AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:45:14 PM | Unit Status Action | Unit J11 AVAIL | Michael Bradley | PDMDC479SNV1246 |
| 8:45:14 PM | Narrative Added | COMPLETED CRIME SCENE LOG. | Michael Bradley | PDMDC479SNV1246 |
| 8:44:10 PM | Unit Location | Unit S4 Secondary Location Updated: STA | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:41:43 PM | Narrative Added | CH05 ENR STA AS WELL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:41:30 PM | Unit Location | Unit S4 Secondary Location Updated: ENR STA | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:41:05 PM | Unit Location | Unit J31 Secondary Location Updated: STA | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:40:14 PM | Unit Location | Unit A21 Secondary Location Updated: STA | Teri Timmerman | PDDISP21CFQXM2 |
| 8:37:54 PM | Unit Location | Unit M5 Secondary Location Updated: STA | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:36:35 PM | Unit Location | Unit V2 Secondary Location Updated: ENR STA | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:36:27 PM | Unit Location | Unit V1 Secondary Location Updated: ENR STA | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:36:22 PM | Narrative Added | CRIME SCENE ON MISSION BROKEN DOWN AT 2036 HRS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:31:33 PM | Narrative Added | CORRECTION CORONER | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:31:13 PM | Narrative Added | COCORNER/FAMILY/ CRIME LAB HAVE COMPLETED AND LEFT SCENE | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:05:25 PM | Narrative Added | MEDIA 97 CH05 | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:02:17 PM | Unit Location | Unit M2 Secondary Location Updated: STA | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:01:27 PM | Unit Location | Unit M2 Secondary Location Updated: 1019 IN 438 | Rebecca Rainwater | PDDISP11CDSXM2 |
| 7:56:16 PM | Unit Location | Unit M2 Secondary Location Updated: 44 MISSION | Rebecca Rainwater | PDDISP11CDSXM2 |
| 7:56:11 PM | Unit Location | Unit S4 Secondary Location Updated: 44 MISSION | Rebecca Rainwater | PDDISP11CDSXM2 |
| 7:45:25 PM | Unit Status Action | Unit H32 AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |

| Time | Action | Description | Name | Unit |
|---|---|---|---|---|
| 7:38:50 PM | Unit Location | Unit K21 Secondary Location: STA | Rebecca Rainwater | PDDISP11CDSXM2 |
| 7:16:22 PM | Unit Location | Unit H32 Secondary Location: VCM | Heidi Horner | PDDISP21CFQXM2 |
| 7:16:22 PM | Unit Status Action | Unit H32 AS | Heidi Horner | PDDISP21CFQXM2 |
| 7:16:01 PM | Unit Location | Unit H32 Secondary Location: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 7:16:01 PM | Unit Status Action | Unit H32 DISP | Heidi Horner | PDDISP21CFQXM2 |
| 6:51:19 PM | Unit Location | Unit I53 Secondary Location Updated: STA | Krista Phillips | PDDISP31CFPXM2 |
| 6:51:11 PM | Unit Location | Unit M2 Secondary Location Updated: STA | Krista Phillips | PDDISP31CFPXM2 |
| 6:50:26 PM | Unit Location | Unit J21 Secondary Location Updated: STA | Krista Phillips | PDDISP31CFPXM2 |
| 6:47:50 PM | Unit Location | Unit J22 Secondary Location Updated: ENR STA | Krista Phillips | PDDISP31CFPXM2 |
| 6:46:42 PM | Unit Location | Unit K11 Secondary Location Updated: STA | Krista Phillips | PDDISP31CFPXM2 |
| 6:46:26 PM | Unit Location | Unit S4 Secondary Location Updated: STA | Krista Phillips | PDDISP31CFPXM2 |
| 6:44:28 PM | Unit Location | Unit I53 Secondary Location Updated: ENR STA | Krista Phillips | PDDISP31CFPXM2 |
| 6:44:12 PM | Unit Location | Unit J21 Secondary Location Updated: ENR STA | Krista Phillips | PDDISP31CFPXM2 |
| 6:44:12 PM | Unit Location | Unit S4 Secondary Location Updated: ENR STA | Krista Phillips | PDDISP31CFPXM2 |
| 6:44:12 PM | Unit Location | Unit K11 Secondary Location Updated: ENR STA | Krista Phillips | PDDISP31CFPXM2 |
| 6:43:51 PM | Unit Location | Unit I54 Secondary Location Updated: STA | Krista Phillips | PDDISP31CFPXM2 |
| 6:41:51 PM | Narrative Added | OFC TUJAGUE ENR STA | Rebecca Rainwater | PDDISP11CDSXM2 |
| 6:40:11 PM | Unit Location | Unit I54 Secondary Location Updated: ENR STA WITH J31 | Krista Phillips | PDDISP31CFPXM2 |
| 6:34:42 PM | Narrative Added | S9 ENR STA | Rebecca Rainwater | PDDISP11CDSXM2 |
| 6:15:19 PM | Narrative Added | OFC BARCELO 97 STA | Krista Phillips | PDDISP31CFPXM2 |
| 6:07:43 PM | Narrative Added | ACSO CRIME LAB TECHS ON SCENE - S4 | Krista Phillips | PDDISP31CFPXM2 |
| 6:05:17 PM | Unit Location | Unit I54 Secondary Location: 44 MISSION | Krista Phillips | PDDISP31CFPXM2 |
| 6:05:06 PM | Unit Location | Unit I54 Secondary Location: Secondary Location Cleared | Krista Phillips | PDDISP31CFPXM2 |
| 6:05:06 PM | Unit Status Action | Unit I54 AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:04:34 PM | Unit Location | Unit A21 Secondary Location: VCM | Krista Phillips | PDDISP31CFPXM2 |
| 6:04:30 PM | Unit Location | Unit A21 Secondary Location: Secondary Location Cleared | Krista Phillips | PDDISP31CFPXM2 |
| 6:04:30 PM | Unit Status Action | Unit A21 AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:04:21 PM | Narrative Added | DA INVESTIGATOR ON SCENE- S4 | Krista Phillips | PDDISP31CFPXM2 |
| 6:03:35 PM | Unit Location | Unit I53 Secondary Location Updated: STA | Krista Phillips | PDDISP31CFPXM2 |
| 6:03:35 PM | Unit Location | Unit T1 Secondary Location Updated: STA | Krista Phillips | PDDISP31CFPXM2 |
| 5:59:22 PM | Narrative Added | OFC JOHNSTON RESPONDING ETA 45 | Krista Phillips | PDDISP31CFPXM2 |
| 5:56:44 PM | Narrative Added | S13 ENR STA WITH K31 | Krista Phillips | PDDISP31CFPXM2 |
| 5:56:35 PM | Unit Location | Unit S13 Secondary Location Updated: ENR STA WITH K31 | Krista Phillips | PDDISP31CFPXM2 |
| 5:56:31 PM | Narrative Added | RECORDS CALLED S9/JOHNSTON/MARTENS/ TUJAGUE..LEFT VM | Rebecca Rainwater | PDDISP11CDSXM2 |
| 5:56:19 PM | Unit Location | Unit T1 Secondary Location Updated: ENR STA | Krista Phillips | PDDISP31CFPXM2 |
| 5:51:10 PM | Unit Status Action | Unit I56 AVAIL | Krista Phillips | PDDISP31CFPXM2 |
| 5:49:15 PM | Unit Location | Unit I52 Secondary Location: VCM | Krista Phillips | PDDISP31CFPXM2 |
| 5:49:10 PM | Unit Location | Unit I52 Secondary Location: Secondary Location Cleared | Krista Phillips | PDDISP31CFPXM2 |
| 5:49:10 PM | Unit Status Action | Unit I52 AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:47:59 PM | Unit Location | Unit T1 Secondary Location: VCM | Krista Phillips | PDDISP31CFPXM2 |
| 5:47:55 PM | Unit Location | Unit T1 Secondary Location: Secondary Location Cleared | Krista Phillips | PDDISP31CFPXM2 |
| 5:47:55 PM | Unit Status Action | Unit T1 AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:21:24 PM | Unit Status Action | Unit SR1 AVAIL | Krista Phillips | PDDISP31CFPXM2 |
| 5:20:19 PM | Unit Status Action | Unit V2 AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:15:26 PM | Unit Location | Unit V2 Secondary Location: DOLORES / MISSION | Krista Phillips | PDDISP31CFPXM2 |

PPD002473

| Time | Action | Description | Operator | ID |
|------|--------|-------------|----------|-----|
| 5:13:53 PM | Unit Location | Unit V2 Secondary Location: Secondary Location Cleared | Krista Phillips | PDDISP31CFPXM2 |
| 5:13:53 PM | Unit Status Action | Unit V2 DISP | Krista Phillips | PDDISP31CFPXM2 |
| 5:12:32 PM | Unit Status Action | Unit CSO5 AVAIL | Krista Phillips | PDDISP31CFPXM2 |
| 5:06:03 PM | Narrative Added | SURVEILANCE CAMERAS AT HERITAGE DONUTS WILL NEED TO FOLLOW UP WITH MGMT-K11 | Krista Phillips | PDDISP31CFPXM2 |
| 5:00:46 PM | Narrative Added | PROPERTY OWNER STATES HIS LANDSCAPER IS JAVIER GARCIA OUT OF LIVERMORE. STATES ALL HIS INFO IS AT HIS OFFICE AND HE CAN GET IT TOMORROW MORNING IF WE CALL HIM AT 846-4980 AFTER 0830 HRS | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:57:35 PM | Narrative Added | JACK BRAS  PH/ 925.846.5198 - POSS PROPERTY OWNER.   ATTEMPTING A CALL TO ASCERTAIN INFO ON LANDSCAPING. | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:56:40 PM | Unit Location | Unit SR1 Secondary Location Updated:  ENR 10-19 FOR EQUIP | Heidi Horner | PDDISP21CFQXM2 |
| 4:55:04 PM | Unit Status Action | Unit V1 AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:55:00 PM | Unit Location | Unit V1 Secondary Location: MONACO/MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 4:51:19 PM | Unit Location | Unit I56 Secondary Location: VCM | Heidi Horner | PDDISP21CFQXM2 |
| 4:51:19 PM | Unit Status Action | Unit I56 AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:49:35 PM | Narrative Added | CORRECTION ON GRANADOS (K11) COMMENT AT 1604 HRS.  MADE CONTACT WITH RUSSELL CHIROPRACTIC AT 60 MISSION DR. | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:48:10 PM | Unit Status Action | Unit V1 DISP | Heidi Horner | PDDISP21CFQXM2 |
| 4:48:10 PM | Unit Location | Unit V1 Secondary Location: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 4:45:34 PM | Narrative Added | 60 MISSION DR PROP MANAGMENT COMPANY TO GET IN CONTACT W/ LANDSCAPE COMPANY | Heidi Horner | PDDISP21CFQXM2 |
| 4:42:01 PM | Narrative Added | L/V FOR MCNEFF | Rebecca Rainwater | PDDISP11CDSXM2 |
| 4:39:44 PM | Unit Location | Unit K31 Secondary Location Updated: VCM | Heidi Horner | PDDISP21CFQXM2 |
| 4:39:44 PM | Unit Location | Unit K22 Secondary Location Updated: VCM | Heidi Horner | PDDISP21CFQXM2 |
| 4:39:44 PM | Unit Location | Unit S13 Secondary Location Updated: VCM | Heidi Horner | PDDISP21CFQXM2 |
| 4:39:27 PM | Unit Location | Unit A26 Secondary Location Updated: ENR 1019 | Heidi Horner | PDDISP21CFQXM2 |
| 4:38:22 PM | Narrative Added | K. LEONARDO ENR ... ETA IS 1 HOUR | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:37:30 PM | Unit Location | Unit J11 Secondary Location: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 4:37:30 PM | Unit Location | Unit I53 Secondary Location: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 4:37:19 PM | Unit Location | Unit M5 Secondary Location: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 4:30:32 PM | Narrative Added | VIP FOR CSO5 COME THE BACK SIDE OF RALEYS ON MISSION TO AVOID CRIME SCENE | Heidi Horner | PDDISP21CFQXM2 |
| 4:29:28 PM | Narrative Added | LEFT V/M FOR JEWELL/WHITE/EVANS/CERRI | Rebecca Rainwater | PDDISP11CDSXM2 |
| 4:29:22 PM | Unit Status Action | Unit M5 AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:29:03 PM | Narrative Added | KELLY O'NEAL OUT OF TOWN UNTIL AUG 7TH | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:28:37 PM | Narrative Added | HAVE VIPS RESPOND 1 TO SR1 MISSION/ MONACO AND 2 TO CSO5 MISSION/DOLORES | Heidi Horner | PDDISP21CFQXM2 |
| 4:23:06 PM | Unit Location | Unit K31 Secondary Location Updated: ENR VCM | Heidi Horner | PDDISP21CFQXM2 |
| 4:23:06 PM | Unit Location | Unit K22 Secondary Location Updated: ENR VCM | Heidi Horner | PDDISP21CFQXM2 |
| 4:22:21 PM | Unit Location | Unit A26 Secondary Location Updated: VCM | Heidi Horner | PDDISP21CFQXM2 |
| 4:19:48 PM | Narrative Added | LEFT    MSGS    FOR    GRAVEYARDS..BARCELO ENR...UTL ON ONEAL CELL PHONE # | Rebecca Rainwater | PDDISP11CDSXM2 |
| 4:19:20 PM | Unit Status Action | Unit M5 DISP | Heidi Horner | PDDISP21CFQXM2 |
| 4:19:20 PM | Unit Location | Unit M5 Secondary Location: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 4:17:33 PM | Unit Location | Unit J11 Secondary Location: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 4:17:33 PM | Unit Status Action | Unit J11 AS | Heidi Horner | PDDISP21CFQXM2 |

| Time | Action | Description | Name | Unit ID |
|---|---|---|---|---|
| 4:16:54 PM | Unit Location | Unit S13 Secondary Location: ENR VCM | Rebecca Rainwater | PDDISP11CDSXM2 |
| 4:16:33 PM | Narrative Added | K12 - SUSPECT WAS PRONOUNCED AT 1615 HRS | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:14:33 PM | Narrative Added | S13 TRANSPORTING K31 AND K22 TO VCM | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:13:56 PM | Unit Status Action | Unit S13 AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:13:53 PM | Unit Status Action | Unit S13 DISP | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:13:53 PM | Unit Location | Unit S13 Secondary Location: Secondary Location Cleared | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:13:35 PM | Narrative Added | CSO5 HAS A POSSIBLE WITNESS AT 104 DOLORES. NEED SOMEONE TO MAKE CONTACT W/ RESIDENT FOR FURTHER | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:11:35 PM | Narrative Added | K11 - K11 MADE CONTACT CHA AND ASSOC TAX PLANNING CONSTULTANTS. 60 MISSION UNIT #B | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:10:55 PM | Unit Location | Unit A26 Secondary Location Updated: ENR VCM | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:08:04 PM | Unit Status Action | Unit J11 AVAIL | Michael Bradley | PDMDC479SNV1246 |
| 4:04:36 PM | Narrative Added | K11 - CHECKING CHIROPRACTIC OFFICE (WALSH) 5480 SUNOL #3 | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:01:20 PM | Narrative Added | SGT LEWELLYN WILL CALL IN GRAVEYARD | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:52:25 PM | Unit Location | Unit S10 Secondary Location Updated: VCM | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:52:08 PM | Narrative Added | K11 - YAT SING CHINESE FOOD - EMPLOYEE GAVE INFO. HERITAGE DONUT IS CLOSED | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:51:35 PM | Narrative Added | I53 ON SCENE | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:51:18 PM | Unit Status Action | Unit I53 AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:50:55 PM | Unit Status Action | Unit I53 DISP | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:50:55 PM | Unit Location | Unit I53 Secondary Location: Secondary Location Cleared | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:49:58 PM | Narrative Added | K11 CONTACTED EMPLOYEE AT JIMS. CONTACTING EMPLOYEES AT CHINESE RESTAURANT | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:49:44 PM | Unit Location | Unit CSO5 Secondary Location Updated: MISSION / DOLORES | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 3:49:14 PM | Unit Location | Unit A26 Secondary Location Updated: 44 MISSION | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 3:48:57 PM | Unit Status Action | Unit A26 AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:48:10 PM | Narrative Added | Crime scene tape fully applied. | Richard Trovao | PDMDC488SNV1270 |
| 3:46:51 PM | Unit Location | Unit SR1 Secondary Location Updated: MISSION/ MONACO | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:46:41 PM | Unit Status Action | Unit SR1 AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:44:20 PM | Unit Location | Unit K21 Secondary Location Updated: VCM | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:44:17 PM | Unit Location | Unit K12 Secondary Location Updated: VCM | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:43:16 PM | Narrative Added | CPR STILL IN PROGRESS. 97 AT VCM | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:42:32 PM | Unit Location | Unit J11 Secondary Location: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 3:42:23 PM | Narrative Added | S12 WILL BE IN CONTROL COMM AT 44 MISSION // S10 WILL BE IN CONTROL AT VCM | Heidi Horner | PDDISP21CFQXM2 |
| 3:42:09 PM | Unit Status Action | Unit J11 AS | Michael Bradley | PDMDC479SNV1246 |
| 3:41:30 PM | Unit Location | Unit A26 Secondary Location: ENR 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 3:41:23 PM | Unit Location | Unit A26 Secondary Location Updated: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 3:41:23 PM | Unit Status Action | Unit A26 DISP | Heidi Horner | PDDISP21CFQXM2 |
| 3:40:50 PM | Unit Location | Unit K21 Secondary Location Updated: ENR VCM | Heidi Horner | PDDISP21CFQXM2 |
| 3:40:50 PM | Unit Location | Unit K12 Secondary Location Updated: ENR VCM | Heidi Horner | PDDISP21CFQXM2 |
| 3:40:36 PM | Unit Location | Unit S10 Secondary Location Updated: ENR VCM | Heidi Horner | PDDISP21CFQXM2 |
| 3:40:04 PM | Unit Status Action | Unit CSO5 AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:40:02 PM | Unit Location | Unit CSO5 Secondary Location: MISSION/ | Heidi Horner | PDDISP21CFQXM2 |

| Time | Action | Description | User | ID |
|---|---|---|---|---|
| | | DELORES | | |
| 3:39:37 PM | Unit Location | Unit SR1 Secondary Location: MISSION/ MONTICO | Heidi Horner | PDDISP21CFQXM2 |
| 3:39:12 PM | Unit Location | Unit SR1 Secondary Location Updated: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 3:39:12 PM | Unit Status Action | Unit SR1 DISP | Heidi Horner | PDDISP21CFQXM2 |
| 3:37:40 PM | Unit Status Action | Unit J11 ENR | Michael Bradley | PDMDC479SNV1246 |
| 3:35:51 PM | Narrative Added | ENR TO VCM | Heidi Horner | PDDISP21CFQXM2 |
| 3:35:44 PM | Unit Location | Unit CSO5 Secondary Location: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 3:35:44 PM | Unit Status Action | Unit CSO5 DISP | Heidi Horner | PDDISP21CFQXM2 |
| 3:35:35 PM | Narrative Criticality Updated | BAUER, JACOB 062780 M (Narrative changed from 'Normal' to 'Critical') | Heidi Horner | PDDISP21CFQXM2 |
| 3:35:22 PM | Unit Location | Unit J11 Secondary Location: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 3:35:22 PM | Unit Status Action | Unit J11 DISP | Heidi Horner | PDDISP21CFQXM2 |
| 3:35:14 PM | Narrative Added | TEAM 1 IS NOT CLEAR FOR 10-10 | Heidi Horner | PDDISP21CFQXM2 |
| 3:34:52 PM | Narrative Added | LENGEL, SOCHA, PALMQUIST IN PP VEH | Heidi Horner | PDDISP21CFQXM2 |
| 3:34:30 PM | Narrative Added | PP DEPARTING TO ENR TO VCM CD 3 | Heidi Horner | PDDISP21CFQXM2 |
| 3:34:14 PM | Narrative Added | PATIENT STILL IN BACK OF THE AMB | Heidi Horner | PDDISP21CFQXM2 |
| 3:34:04 PM | Narrative Added | CPR STILL BEING PERFORMED | Heidi Horner | PDDISP21CFQXM2 |
| 3:33:42 PM | Narrative Added | WRAP IS REMOVING LOWER RESTRAINT STILL ON AT 1533 | Heidi Horner | PDDISP21CFQXM2 |
| 3:32:49 PM | Narrative Added | START A WC | Heidi Horner | PDDISP21CFQXM2 |
| 3:32:43 PM | Narrative Added | NEED CSO TO BLOCK OFF MISSION / DOLORES // MISSION BLOCK OFF DRIVEWAY INTO RALEYS SHOPPING CENTER | Heidi Horner | PDDISP21CFQXM2 |
| 3:31:42 PM | Narrative Added | SUBJ IS CODING OUT // TRANSPORTING TO THE HOSPITAL // CPR HAS BEGUN //WRAP STILL APPLIED TRYING TO TAKE IT OFF NOW | Heidi Horner | PDDISP21CFQXM2 |
| 3:18:50 PM | Narrative Added | C4 WORKING ON SUBJ TO GET ON THE GERNY | Heidi Horner | PDDISP21CFQXM2 |
| 3:11:10 PM | Narrative Added | FIRE ENRT | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 3:10:54 PM | Narrative Added | HAVE FIRE ROLL IN | Heidi Horner | PDDISP21CFQXM2 |
| 3:10:05 PM | Alerts Accessed | Viewed Alerts Tab | Heidi Horner | PDDISP21CFQXM2 |
| 3:09:12 PM | Narrative Added | SUBJ ACTIVELY RESISTING APPLYING FACE MASK AND WRAP | Heidi Horner | PDDISP21CFQXM2 |
| 3:08:00 PM | Unit Location | Unit K21 Secondary Location: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 3:08:00 PM | Unit Status Action | Unit K21 AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:07:51 PM | Unit Status Action | Unit J31 AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:07:51 PM | Unit Location | Unit J31 Secondary Location Updated: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 3:06:42 PM | Unit Location | Unit K11 Secondary Location: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 3:06:37 PM | Unit Location | Unit K11 Secondary Location: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 3:06:37 PM | Unit Status Action | Unit K11 AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:06:23 PM | Unit Status Action | Unit J11 AVAIL | Heidi Horner | PDDISP21CFQXM2 |
| 3:05:35 PM | Narrative Added | FIRE TO STAGE EAST OF SENIOR CENTER | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 3:05:25 PM | Narrative Added | NOTHING SIG IN HOUSE, PRIOR CITE FOR CELL PHONE IN 2015 | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 3:03:51 PM | Narrative Added | FIRE STAGE AT SENIOR CENTER | Heidi Horner | PDDISP21CFQXM2 |
| 3:03:40 PM | Unit Location | Unit S4 Secondary Location: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 3:03:33 PM | Unit Location | Unit S4 Secondary Location: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |

| Time | Action | Details | Person | ID |
|---|---|---|---|---|
| 3:03:33 PM | Unit Status Action | Unit S4 AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:03:01 PM | Narrative Added | FIRE ENRT UNK MEFD | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 3:02:48 PM | Unit Status Action | Unit J11 ENR | Michael Bradley | PDMDC479SNV1246 |
| 3:02:32 PM | Narrative Added | START MEDICAL | Heidi Horner | PDDISP21CFQXM2 |
| 3:02:23 PM | Narrative Added | MED REQUEST | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:02:19 PM | Narrative Added | CUFFS ON DETAINED WORKING ON A WRAP | Heidi Horner | PDDISP21CFQXM2 |
| 3:02:18 PM | Narrative Added | SUBJ DETAINED IN CUFFS. WORKING ON APPLYING A WRAP | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:01:31 PM | Unit Location | Unit S12 Secondary Location: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 3:01:24 PM | Unit Location | Unit S12 Secondary Location: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 3:01:24 PM | Unit Status Action | Unit S12 AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:47 PM | Narrative Added | s10 ADVISING ALL INCOMING UNITS CAN REDUCE. TRYING TO TAKE SUBJ INTO CUSTODY | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:00:39 PM | Unit Location | Unit K12 Secondary Location: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:39 PM | Unit Location | Unit S10 Secondary Location: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:28 PM | Unit Location | Unit S10 Secondary Location: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:28 PM | Unit Status Action | Unit S10 AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:24 PM | Unit Status Action | Unit K12 AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:20 PM | Narrative Added | REDUCING | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:16 PM | Unit Status Action | Unit S10 AVAIL | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:47 PM | Call Updated | Police Priority changed from 2 to 5 | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:37 PM | Unit Location | Unit J22 Secondary Location: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:37 PM | Unit Location | Unit J21 Secondary Location: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:37 PM | Unit Location | Unit S10 Secondary Location: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:17 PM | Unit Location | Unit S10 Secondary Location Updated: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:17 PM | Unit Status Action | Unit S10 AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:14 PM | Unit Status Action | Unit J21 AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:14 PM | Unit Status Action | Unit J22 AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:03 PM | Unit Status Action | Unit J22 DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:03 PM | Unit Location | Unit J22 Secondary Location Updated: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:03 PM | Unit Location | Unit J21 Secondary Location Updated: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:03 PM | Unit Status Action | Unit J21 DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:58:43 PM | Unit Location | Unit K22 Secondary Location Updated: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 2:58:43 PM | Unit Location | Unit K31 Secondary Location Updated: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 2:58:35 PM | Narrative Added | WATCH COMMANDER/ SILACCI ADVISED | Brandy Medeiros | PDDISP41CFRXM2 |
| 2:58:34 PM | Unit Location | Unit M2 Secondary Location: 44 MISSION | Heidi Horner | PDDISP21CFQXM2 |
| 2:58:28 PM | Unit Status Action | Unit M2 AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:58:23 PM | Narrative Added | SPEE DEE OIL CHANGE IS 44 MISSION DR | Brandy Medeiros | PDDISP41CFRXM2 |
| 2:58:19 PM | Unit Status Action | Unit M2 DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:58:19 PM | Unit Location | Unit M2 Secondary Location Updated: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 2:58:16 PM | Narrative Added | CD3 HOPYARD/VALLEY | Heidi Horner | PDDISP21CFQXM2 |
| 2:57:59 PM | Narrative Added | CD 3 FRNAKLIN/JOHNSON | Heidi Horner | PDDISP21CFQXM2 |
| 2:57:46 PM | Unit Location | Unit J11 Secondary Location: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 2:57:46 PM | Unit Status Action | Unit J11 DISP | Heidi Horner | PDDISP21CFQXM2 |

| 2:57:16 PM | Unit Location | Unit K12 Secondary Location: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 2:57:16 PM | Unit Status Action | Unit K12 DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:54:48 PM | Person Added | Name: BAUER, JACOB | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 2:54:34 PM | Narrative Added | BAUER, JACOB 062780 M | Heidi Horner | PDDISP21CFQXM2 |
| 2:53:06 PM | Narrative Added | OFF W/ SUBJ MISSION/SUNOL | Heidi Horner | PDDISP21CFQXM2 |
| 2:52:57 PM | Unit Location | Unit K22 Secondary Location: MISSION/SUNOL | Heidi Horner | PDDISP21CFQXM2 |
| 2:52:57 PM | Unit Location | Unit K31 Secondary Location: MISSION/SUNOL | Heidi Horner | PDDISP21CFQXM2 |
| 2:50:53 PM | Unit Status Action | Unit K22 AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:50:53 PM | Unit Status Action | Unit K31 AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:47:17 PM | Narrative Added | NEG WEAPONS | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 2:47:13 PM | Narrative Added | SUBJ IS WALKING AROUND STORE AND ASST DIRECTOR IS TRAILING | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 2:47:07 PM | Unit Location | Unit K22 Secondary Location: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 2:47:07 PM | Unit Status Action | Unit K22 DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:47:07 PM | Unit Location | Unit K31 Secondary Location: Secondary Location Cleared | Heidi Horner | PDDISP21CFQXM2 |
| 2:47:07 PM | Unit Status Action | Unit K31 DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:46:45 PM | Person Updated | Name: KAREN, MANAGER , Contact Phone: (925) 846-4471 | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 2:46:45 PM | Call Updated | Caller Phone Changed To (925) 846-4471 | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 2:46:23 PM | Person Added | Name: KAREN, MANAGER | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 2:46:12 PM | Narrative Added | HE HAS BEEN ASKED TO LEAVE BUT IS REFUSING | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 2:45:57 PM | Narrative Added | RP REQ ASST W/ ESCORTING HIM OUT OF STORE | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 2:45:35 PM | Narrative Added | SUBJ IS RANTING TO HIMSELF | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 2:45:04 PM | Call Ready for Dispatch | Call marked ready for dispatch | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 2:44:45 PM | Narrative Added | WMA W/ MED LENGTH STRAIGHT BRO MULTI COLORED HAIR, 30-35 YOA, 6'0, 220, BEARD, LSW TIE DIED TSHIRT, JEANS W/ BEADING ON POCKETS | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 2:42:31 PM | Call Type | Police Call Type Changed From <<NEW CALL>> To CallType: 1066, Status: OTHER, Priority: 2 | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 2:42:28 PM | Alerts Retrieval | Alerts Were Successfully Gathered For Location At Address 5420 SUNOL BL | cad testing | TYLERNWCADENT |
| 2:42:28 PM | Location | Call Location Changed from <UNKNOWN> to 5420 SUNOL BL, PLS (RALEYS) | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 2:42:28 PM | Address Verified | Call Location Changed from Unverified To Verified | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 2:42:16 PM | Incident Created | Added Incident Number, ORI: CA0011100, Number: 2018-00030256 | Heidi Horner | |
| 2:42:16 PM | Call Created | New call created. Call Type: <<NEW CALL>>, Location: <UNKNOWN> | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |

**Unit Log**

*** 8/14/2018 ***

| Time | Action | Description | Unit | Status | Name | Machine |
|------|--------|-------------|------|--------|------|---------|
| 10:57:28 AM | Unit Status Change | AVAIL | M4 | AVAIL | Lora Howell | PDDISP21CFQXM2 |
| 10:57:28 AM | Unit Cleared | Unit Cleared From Call | M4 | AVAIL | Lora Howell | PDDISP21CFQXM2 |
| 10:57:28 AM | Disposition Added | Added: *SUPP Count 1 | M4 | AS | Lora Howell | PDDISP21CFQXM2 |
| 10:15:44 AM | Unit Location | STATION | M4 | AS | Lora Howell | PDDISP21CFQXM2 |
| 10:15:41 AM | Unit Status Change | AS | M4 | AS | Lora Howell | PDDISP21CFQXM2 |
| 10:15:41 AM | Unit Location | 5420 SUNOL BL, PLS | M4 | AS | Lora Howell | PDDISP21CFQXM2 |
| 10:15:38 AM | Unit Location | Secondary Location Cleared | M4 | DISP | Lora Howell | PDDISP21CFQXM2 |
| 10:15:38 AM | Unit Status Change | DISP   Call   Number:   287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | M4 | DISP | Lora Howell | PDDISP21CFQXM2 |
| **\*\*\* 8/2/2018 \*\*\*** | | | | | | |
| 3:38:36 AM | Unit Status Change | AVAIL | H31 | AVAIL | Teri Timmerman | PDDISP11CDSXM2 |
| 3:38:36 AM | Unit Cleared | Unit Cleared From Call | H31 | AVAIL | Teri Timmerman | PDDISP11CDSXM2 |
| 3:38:24 AM | Unit Status Change | DISP   Call   Number:   287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | H31 | DISP | Teri Timmerman | PDDISP11CDSXM2 |
| 3:20:07 AM | Unit Status Change | AVAIL | T1 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:20:07 AM | Unit Cleared | Unit Cleared From Call | T1 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:19:55 AM | Unit Status Change | AVAIL | I54 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:19:55 AM | Unit Cleared | Unit Cleared From Call | I54 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:19:55 AM | Unit Status Change | AVAIL | I53 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:19:55 AM | Unit Cleared | Unit Cleared From Call | I53 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:19:55 AM | Unit Status Change | AVAIL | I52 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:19:55 AM | Unit Cleared | Unit Cleared From Call | I52 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:19:49 AM | Unit Status Change | AVAIL | K31 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:19:49 AM | Unit Cleared | Unit Cleared From Call | K31 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:19:44 AM | Unit Status Change | AVAIL | K22 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 3:19:44 AM | Unit Cleared | Unit Cleared From Call | K22 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 12:45:53 AM | Unit Status Change | AVAIL | A26 | AVAIL | Teri Timmerman | PDDISP11CDSXM2 |
| 12:45:53 AM | Unit Cleared | Unit Cleared From Call | A26 | AVAIL | Teri Timmerman | PDDISP11CDSXM2 |
| 12:44:58 AM | Unit Status Change | AVAIL | J31 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 12:44:58 AM | Unit Cleared | Unit Cleared From Call | J31 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| **\*\*\* 8/1/2018 \*\*\*** | | | | | | |
| 11:59:17 PM | Timer Override | Override time = 10368000 | T1 | AS | Lisa Rhee | PDDISP41CFRXM2 |
| 11:59:15 PM | Timer Override | Override time = 10368000 | I54 | AS | Lisa Rhee | PDDISP41CFRXM2 |
| 11:59:12 PM | Timer Override | Override time = 10368000 | I53 | AS | Lisa Rhee | PDDISP41CFRXM2 |
| 11:59:09 PM | Timer Override | Override time = 10368000 | I52 | AS | Lisa Rhee | PDDISP41CFRXM2 |
| 11:59:06 PM | Timer Override | Override time = 10368000 | K31 | AS | Lisa Rhee | PDDISP41CFRXM2 |
| 11:59:04 PM | Timer Override | Override time = 10368000 | J31 | AS | Lisa Rhee | PDDISP41CFRXM2 |
| 11:59:01 PM | Timer Override | Override time = 10368000 | K22 | AS | Lisa Rhee | PDDISP41CFRXM2 |
| 11:58:58 PM | Timer Override | Override time = 2592000 | A26 | AS | Lisa Rhee | PDDISP41CFRXM2 |
| 11:39:42 PM | Unit Status Change | AVAIL | S13 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 11:39:42 PM | Unit Cleared | Unit Cleared From Call | S13 | AVAIL | Lisa Rhee | PDDISP41CFRXM2 |
| 11:36:36 PM | NCIC Request | Request #481 - Last: BAUER; FIRST NAME: JILLIAN; Dob: 01061987; Sex: F; | K31 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 11:36:16 PM | NCIC Request | Request #480 - Last: BAUER; FIRST NAME: ROSE; Dob: 09271960; Sex: F; | K31 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 11:35:50 PM | NCIC Request | Request #479 - Last: BAUER; FIRST NAME: JOHN; Dob: 03171959; Sex: M; | K31 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 11:34:49 PM | NCIC Request | Request #477 - Last: BAUER; | K31 | AS | Rebecca | |

| | | FIRST NAME: JILLIAN; Dob: 01011987; Sex: F; | | | Rainwater | |
|---|---|---|---|---|---|---|
| 11:24:39 PM | Unit Status Change | AVAIL | A21 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 11:24:39 PM | Unit Cleared | Unit Cleared From Call | A21 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:39:53 PM | Unit Status Change | AVAIL | S10 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:39:53 PM | Unit Cleared | Unit Cleared From Call | S10 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:39:47 PM | Unit Status Change | AVAIL | S12 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:39:47 PM | Unit Cleared | Unit Cleared From Call | S12 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:39:29 PM | Unit Status Change | AVAIL | S4 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:39:29 PM | Unit Cleared | Unit Cleared From Call | S4 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:39:15 PM | Unit Status Change | AVAIL | K21 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:39:15 PM | Unit Cleared | Unit Cleared From Call | K21 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:39:00 PM | Unit Status Change | AVAIL | K11 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:39:00 PM | Unit Cleared | Unit Cleared From Call | K11 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:38:54 PM | Unit Status Change | AVAIL | M2 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:38:54 PM | Unit Cleared | Unit Cleared From Call | M2 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:38:47 PM | Unit Status Change | AVAIL | J22 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:38:47 PM | Unit Cleared | Unit Cleared From Call | J22 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:38:23 PM | Unit Status Change | AVAIL | K12 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:38:23 PM | Unit Cleared | Unit Cleared From Call | K12 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:37:59 PM | Unit Status Change | AVAIL | J21 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:37:59 PM | Unit Cleared | Unit Cleared From Call | J21 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 10:20:28 PM | Unit Location | STATION | J22 | AS | Lisa Rhee | PDDISP41CFRXM2 |
| 9:57:18 PM | Unit Location | STA | S10 | AS | Teri Timmerman | PDDISP21CFQXM2 |
| 9:24:49 PM | Unit Location | ENR STA | S10 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 9:05:34 PM | Unit Location | STA | S13 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 9:05:22 PM | Unit Location | STA | A26 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:59:43 PM | Unit Status Change | AVAIL | M5 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:59:43 PM | Unit Cleared | Unit Cleared From Call | M5 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:59:38 PM | Unit Location | STA | K22 | AS | Teri Timmerman | PDDISP21CFQXM2 |
| 8:59:38 PM | Unit Location | STA | K31 | AS | Teri Timmerman | PDDISP21CFQXM2 |

| Time | Event | Description | Unit | Status | Operator | Terminal |
|---|---|---|---|---|---|---|
| 8:47:03 PM | Unit Status Change | AVAIL | V2 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:47:03 PM | Unit Cleared | Unit Cleared From Call | V2 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:47:01 PM | Unit Status Change | AVAIL | V1 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:47:01 PM | Unit Cleared | Unit Cleared From Call | V1 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:45:14 PM | Unit Status Change | AVAIL | J11 | AVAIL | Michael Bradley | PDMDC479SNV1246 |
| 8:45:14 PM | Unit Cleared | Unit Cleared From Call | J11 | AVAIL | Michael Bradley | PDMDC479SNV1246 |
| 8:45:14 PM | Disposition Added | Added:     *NR     Count     1 Performed by Mobile Unit J11 | J11 | AS | Michael Bradley | PDMDC479SNV1246 |
| 8:44:10 PM | Unit Location | STA | S4 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:41:30 PM | Unit Location | ENR STA | S4 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:41:05 PM | Unit Location | STA | J31 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:40:14 PM | Unit Location | STA | A21 | AS | Teri Timmerman | PDDISP21CFQXM2 |
| 8:37:54 PM | Unit Location | STA | M5 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:36:35 PM | Unit Location | ENR STA | V2 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:36:27 PM | Unit Location | ENR STA | V1 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:02:17 PM | Unit Location | STA | M2 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 8:01:27 PM | Unit Location | 1019 IN 438 | M2 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 7:56:16 PM | Unit Location | 44 MISSION | M2 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 7:56:11 PM | Unit Location | 44 MISSION | S4 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 7:45:25 PM | Unit Status Change | AVAIL | H32 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 7:45:25 PM | Unit Cleared | Unit Cleared From Call | H32 | AVAIL | Rebecca Rainwater | PDDISP11CDSXM2 |
| 7:38:50 PM | Unit Location | STA | K21 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 7:16:22 PM | Unit Location | VCM | H32 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 7:16:22 PM | Unit Status Change | AS | H32 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 7:16:22 PM | Unit Location | 5420 SUNOL BL, PLS | H32 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 7:16:01 PM | Unit Location | Secondary Location Cleared | H32 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 7:16:01 PM | Unit Status Change | DISP     Call     Number:     287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | H32 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 6:51:19 PM | Unit Location | STA | I53 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:51:11 PM | Unit Location | STA | M2 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:50:26 PM | Unit Location | STA | J21 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:47:50 PM | Unit Location | ENR STA | J22 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:46:42 PM | Unit Location | STA | K11 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:46:26 PM | Unit Location | STA | S4 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:44:28 PM | Unit Location | ENR STA | I53 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:44:12 PM | Unit Location | ENR STA | J21 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:44:12 PM | Unit Location | ENR STA | S4 | AS | Krista Phillips | PDDISP31CFPXM2 |

| Time | Action | Description | Unit | Status | Name | ID |
|---|---|---|---|---|---|---|
| 6:44:12 PM | Unit Location | ENR STA | K11 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:43:51 PM | Unit Location | STA | I54 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:41:51 PM | Update Unit | Assigned Personnel: 206 - Munayer , Maria; | A21 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 6:40:11 PM | Unit Location | ENR STA WITH J31 | I54 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:05:17 PM | Unit Location | 44 MISSION | I54 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:05:06 PM | Unit Location | Secondary Location Cleared | I54 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:05:06 PM | Unit Status Change | AS | I54 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:05:06 PM | Unit Status Change | Dispatched Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | I54 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:05:06 PM | Unit Location | 5420 SUNOL BL, PLS | I54 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:04:34 PM | Unit Location | VCM | A21 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:04:30 PM | Unit Location | Secondary Location Cleared | A21 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:04:30 PM | Unit Status Change | AS | A21 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:04:30 PM | Unit Status Change | Dispatched Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | A21 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:04:30 PM | Unit Location | 5420 SUNOL BL, PLS | A21 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:03:35 PM | Unit Location | STA | I53 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 6:03:35 PM | Unit Location | STA | T1 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:56:35 PM | Unit Location | ENR STA WITH K31 | S13 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:56:19 PM | Unit Location | ENR STA | T1 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:51:10 PM | Unit Status Change | AVAIL | I56 | AVAIL | Krista Phillips | PDDISP31CFPXM2 |
| 5:51:10 PM | Unit Cleared | Unit Cleared From Call | I56 | AVAIL | Krista Phillips | PDDISP31CFPXM2 |
| 5:49:15 PM | Unit Location | VCM | I52 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:49:10 PM | Unit Location | Secondary Location Cleared | I52 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:49:10 PM | Unit Status Change | AS | I52 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:49:10 PM | Unit Status Change | Dispatched Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | I52 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:49:10 PM | Unit Location | 5420 SUNOL BL, PLS | I52 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:47:59 PM | Unit Location | VCM | T1 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:47:55 PM | Unit Location | Secondary Location Cleared | T1 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:47:55 PM | Unit Status Change | AS | T1 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:47:55 PM | Unit Status Change | Dispatched Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | T1 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:47:55 PM | Unit Location | 5420 SUNOL BL, PLS | T1 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:21:24 PM | Unit Status Change | AVAIL | SR1 | AVAIL | Krista Phillips | PDDISP31CFPXM2 |
| 5:21:24 PM | Unit Cleared | Unit Cleared From Call | SR1 | AVAIL | Krista Phillips | PDDISP31CFPXM2 |
| 5:20:19 PM | Unit Status Change | AS | V2 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:20:19 PM | Unit Location | 5420 SUNOL BL, PLS | V2 | AS | Krista Phillips | PDDISP31CFPXM2 |
| 5:15:26 PM | Unit Location | DOLORES / MISSION | V2 | DISP | Krista Phillips | PDDISP31CFPXM2 |
| 5:13:53 PM | Unit Location | Secondary Location Cleared | V2 | DISP | Krista Phillips | PDDISP31CFPXM2 |
| 5:13:53 PM | Unit Status Change | DISP Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | V2 | DISP | Krista Phillips | PDDISP31CFPXM2 |
| 5:12:32 PM | Unit Status Change | AVAIL | CSO5 | AVAIL | Krista Phillips | PDDISP31CFPXM2 |
| 5:12:32 PM | Unit Cleared | Unit Cleared From Call | CSO5 | AVAIL | Krista Phillips | PDDISP31CFPXM2 |
| 4:56:40 PM | Unit Location | ENR 10-19 FOR EQUIP | SR1 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:55:04 PM | Unit Status Change | AS | V1 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:55:04 PM | Unit Location | 5420 SUNOL BL, PLS | V1 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:55:00 PM | Unit Location | MONACO/MISSION | V1 | DISP | Heidi Horner | PDDISP21CFQXM2 |

PPD002482

| Time | Event | Details | Unit | Status | Operator | Terminal |
|---|---|---|---|---|---|---|
| 4:51:19 PM | Unit Location | VCM | I56 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:51:19 PM | Unit Status Change | AS | I56 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:51:19 PM | Unit Status Change | Dispatched Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | I56 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:51:19 PM | Unit Location | 5420 SUNOL BL, PLS | I56 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:48:10 PM | Unit Location | Secondary Location Cleared | V1 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 4:48:10 PM | Unit Status Change | DISP Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | V1 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 4:40:29 PM | NCIC Request | Person - Last Name: deitrich; First Name: micheal; DOB: 5/8/1968; Sex: MALE | K11 | AS | Rudy Granados | PDMDC483SNV1258 |
| 4:39:44 PM | Unit Location | VCM | K31 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:39:44 PM | Unit Location | VCM | K22 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:39:44 PM | Unit Location | VCM | S13 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:39:27 PM | Unit Location | ENR 1019 | A26 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:37:30 PM | Unit Location | 44 MISSION | J11 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:37:30 PM | Unit Location | 44 MISSION | I53 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:37:19 PM | Unit Location | 44 MISSION | M5 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:29:22 PM | Unit Status Change | AS | M5 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:29:22 PM | Unit Location | 5420 SUNOL BL, PLS | M5 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:23:06 PM | Unit Location | ENR VCM | K31 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:23:06 PM | Unit Location | ENR VCM | K22 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:22:21 PM | Unit Location | VCM | A26 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:19:20 PM | Unit Location | Secondary Location Cleared | M5 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 4:19:20 PM | Unit Status Change | DISP Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | M5 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 4:17:33 PM | Unit Location | Secondary Location Cleared | J11 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:17:33 PM | Unit Status Change | AS | J11 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:17:33 PM | Unit Status Change | Dispatched Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | J11 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:17:33 PM | Unit Location | 5420 SUNOL BL, PLS | J11 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 4:16:54 PM | Unit Location | ENR VCM | S13 | AS | Rebecca Rainwater | PDDISP11CDSXM2 |
| 4:13:56 PM | Unit Status Change | AS | S13 | AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:13:56 PM | Unit Location | 5420 SUNOL BL, PLS | S13 | AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:13:53 PM | Unit Location | Secondary Location Cleared | S13 | DISP | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:13:53 PM | Unit Status Change | DISP Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | S13 | DISP | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:10:55 PM | Unit Location | ENR VCM | A26 | AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 4:08:04 PM | Unit Status Change | AVAIL | J11 | AVAIL | Michael Bradley | PDMDC479SNV1246 |
| 4:08:04 PM | Unit Cleared | Unit Cleared From Call | J11 | AVAIL | Michael Bradley | PDMDC479SNV1246 |
| 4:08:04 PM | Disposition Added | Added: *NR Count 1 Performed by Mobile Unit J11 | J11 | AS | Michael Bradley | PDMDC479SNV1246 |
| 3:52:25 PM | Unit Location | VCM | S10 | AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:51:18 PM | Unit Status Change | AS | I53 | AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:51:18 PM | Unit Location | 5420 SUNOL BL, PLS | I53 | AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:50:55 PM | Unit Location | Secondary Location Cleared | I53 | DISP | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:50:55 PM | Unit Status Change | DISP Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | I53 | DISP | Brandy Medeiros | PDDISP41CFRXM2 |

| Time | Type | Location | Unit | Status | Officer | Terminal |
|---|---|---|---|---|---|---|
| 3:49:44 PM | Unit Location | MISSION / DOLORES | CSO5 | AS | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 3:49:14 PM | Unit Location | 44 MISSION | A26 | AS | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 3:48:57 PM | Unit Status Change | AS | A26 | AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:48:57 PM | Unit Location | 5420 SUNOL BL, PLS | A26 | AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:46:51 PM | Unit Location | MISSION/MONACO | SR1 | AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:46:41 PM | Unit Status Change | AS | SR1 | AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:46:41 PM | Unit Location | 5420 SUNOL BL, PLS | SR1 | AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:44:20 PM | Unit Location | VCM | K21 | AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:44:17 PM | Unit Location | VCM | K12 | AS | Brandy Medeiros | PDDISP41CFRXM2 |
| 3:42:32 PM | Unit Location | 44 MISSION | J11 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:42:09 PM | Unit Status Change | AS | J11 | AS | Michael Bradley | PDMDC479SNV1246 |
| 3:42:09 PM | Unit Location | 5420 SUNOL BL, PLS | J11 | AS | Michael Bradley | PDMDC479SNV1246 |
| 3:41:30 PM | Unit Location | ENR 44 MISSION | A26 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 3:41:23 PM | Unit Location | Secondary Location Cleared | A26 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 3:41:23 PM | Unit Status Change | DISP   Call   Number:   287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | A26 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 3:40:50 PM | Unit Location | ENR VCM | K21 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:40:50 PM | Unit Location | ENR VCM | K12 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:40:36 PM | Unit Location | ENR VCM | S10 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:40:04 PM | Unit Status Change | AS | CSO5 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:40:04 PM | Unit Location | 5420 SUNOL BL, PLS | CSO5 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:40:02 PM | Unit Location | MISSION/DELORES | CSO5 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 3:39:37 PM | Unit Location | MISSION/MONTICO | SR1 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 3:39:12 PM | Unit Location | Secondary Location Cleared | SR1 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 3:39:12 PM | Unit Status Change | DISP   Call   Number:   287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | SR1 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 3:37:40 PM | Unit Status Change | ENR | J11 | ENR | Michael Bradley | PDMDC479SNV1246 |
| 3:35:44 PM | Unit Location | Secondary Location Cleared | CSO5 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 3:35:44 PM | Unit Status Change | DISP   Call   Number:   287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | CSO5 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 3:35:22 PM | Unit Location | Secondary Location Cleared | J11 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 3:35:22 PM | Unit Status Change | DISP   Call   Number:   287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | J11 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 3:08:00 PM | Unit Location | 44 MISSION | K21 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:08:00 PM | Unit Status Change | AS | K21 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:08:00 PM | Unit Status Change | Dispatched Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | K21 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:08:00 PM | Unit Location | 5420 SUNOL BL, PLS | K21 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:07:51 PM | Unit Location | 44 MISSION | J31 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:07:51 PM | Unit Status Change | AS | J31 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:07:51 PM | Unit Status Change | Dispatched Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | J31 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:07:51 PM | Unit Location | 5420 SUNOL BL, PLS | J31 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:06:42 PM | Unit Location | 44 MISSION | K11 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:06:37 PM | Unit Location | Secondary Location Cleared | K11 | AS | Heidi Horner | PDDISP21CFQXM2 |

| Time | Event | Detail | Unit | Status | Operator | System |
|---|---|---|---|---|---|---|
| 3:06:37 PM | Unit Status Change | AS | K11 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:06:37 PM | Unit Status Change | Dispatched Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | K11 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:06:37 PM | Unit Location | 5420 SUNOL BL, PLS | K11 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:06:23 PM | Unit Status Change | AVAIL | J11 | AVAIL | Heidi Horner | PDDISP21CFQXM2 |
| 3:06:23 PM | Unit Cleared | Unit Cleared From Call | J11 | AVAIL | Heidi Horner | PDDISP21CFQXM2 |
| 3:03:40 PM | Unit Location | 44 MISSION | S4 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:03:33 PM | Unit Location | Secondary Location Cleared | S4 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:03:33 PM | Unit Status Change | AS | S4 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:03:33 PM | Unit Status Change | Dispatched Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | S4 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:03:33 PM | Unit Location | 5420 SUNOL BL, PLS | S4 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:02:48 PM | Unit Status Change | ENR | J11 | ENR | Michael Bradley | PDMDC479SNV1246 |
| 3:01:31 PM | Unit Location | 44 MISSION | S12 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:01:24 PM | Unit Location | Secondary Location Cleared | S12 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:01:24 PM | Unit Status Change | AS | S12 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:01:24 PM | Unit Status Change | Dispatched Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | S12 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:01:24 PM | Unit Location | 5420 SUNOL BL, PLS | S12 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:39 PM | Unit Location | 44 MISSION | K12 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:39 PM | Unit Location | 44 MISSION | S10 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:28 PM | Unit Location | Secondary Location Cleared | S10 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:28 PM | Unit Status Change | AS | S10 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:28 PM | Unit Status Change | Dispatched Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | S10 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:28 PM | Unit Location | 5420 SUNOL BL, PLS | S10 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:24 PM | Unit Status Change | AS | K12 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:24 PM | Unit Location | 5420 SUNOL BL, PLS | K12 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:16 PM | Unit Status Change | AVAIL | S10 | AVAIL | Heidi Horner | PDDISP21CFQXM2 |
| 3:00:16 PM | Unit Cleared | Unit Cleared From Call | S10 | AVAIL | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:37 PM | Unit Location | 44 MISSION | J22 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:37 PM | Unit Location | 44 MISSION | J21 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:37 PM | Unit Location | 44 MISSION | S10 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:17 PM | Unit Location | Secondary Location Cleared | S10 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:17 PM | Unit Status Change | AS | S10 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:17 PM | Unit Status Change | Dispatched Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | S10 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:17 PM | Unit Location | 5420 SUNOL BL, PLS | S10 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:14 PM | Unit Status Change | AS | J21 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:14 PM | Unit Location | 5420 SUNOL BL, PLS | J21 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:14 PM | Unit Status Change | AS | J22 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:14 PM | Unit Location | 5420 SUNOL BL, PLS | J22 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:03 PM | Unit Location | Secondary Location Cleared | J22 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:03 PM | Unit Status Change | DISP Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | J22 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:03 PM | Unit Location | Secondary Location Cleared | J21 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:59:03 PM | Unit Status Change | DISP Call Number: 287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | J21 | DISP | Heidi Horner | PDDISP21CFQXM2 |

| Time | Event | Details | Unit | Status | Operator | System |
|------|-------|---------|------|--------|----------|--------|
| 2:58:43 PM | Unit Location | 44 MISSION | K22 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:58:43 PM | Unit Location | 44 MISSION | K31 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:58:34 PM | Unit Location | 44 MISSION | M2 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:58:28 PM | Unit Status Change | AS | M2 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:58:28 PM | Unit Location | 5420 SUNOL BL, PLS | M2 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:58:19 PM | Unit Location | Secondary Location Cleared | M2 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:58:19 PM | Unit Status Change | DISP   Call   Number:   287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | M2 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:57:46 PM | Unit Location | Secondary Location Cleared | J11 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:57:46 PM | Unit Status Change | DISP   Call   Number:   287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | J11 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:57:16 PM | Unit Location | Secondary Location Cleared | K12 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:57:16 PM | Unit Status Change | DISP   Call   Number:   287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | K12 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:54:48 PM | NCIC Request | Request #450 - Last: BAUER; FIRST   NAME:   JACOB;   Dob: 06271980; Sex: M; | K31 | AS | Mojgan Mohammad Parwes | PDDISP31CFPXM2 |
| 2:52:57 PM | Unit Location | MISSION/SUNOL | K22 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:52:57 PM | Unit Location | MISSION/SUNOL | K31 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:50:53 PM | Unit Status Change | AS | K22 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:50:53 PM | Unit Location | 5420 SUNOL BL, PLS | K22 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:50:53 PM | Unit Status Change | AS | K31 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:50:53 PM | Unit Location | 5420 SUNOL BL, PLS | K31 | AS | Heidi Horner | PDDISP21CFQXM2 |
| 2:47:07 PM | Unit Location | Secondary Location Cleared | K22 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:47:07 PM | Unit Status Change | DISP   Call   Number:   287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | K22 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:47:07 PM | Unit Location | Secondary Location Cleared | K31 | DISP | Heidi Horner | PDDISP21CFQXM2 |
| 2:47:07 PM | Unit Status Change | DISP   Call   Number:   287, Location: 5420 SUNOL BL, PLS, Call Type: 1066 | K31 | DISP | Heidi Horner | PDDISP21CFQXM2 |

## Incidents

| Incident Number | ORI | | Type |
|-----------------|-----|---|------|
| 2018-00030256 | CA0011100: DEPARTMENT | PLEASANTON | POLICE SUSPICIOUS PERSON |
| 2018-00030277 | CA0011100: DEPARTMENT | PLEASANTON | POLICE FOLLOW UP |

PPD002486

# EXHIBIT B

# SEE FLASHDRIVE

# EXHIBIT C

# SEE FLASHDRIVE

# EXHIBIT D

1              UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF CALIFORNIA
3                SAN FRANCISCO DIVISION
4                      --oOo--
5    JOHN BAUER, an individual
     and as Successor in Interest
6    of Jacob Bauer, deceased;
     ROSE BAUER, an individual
7    and as Successor in Interest
     of Jacob Bauer, deceased;
8
                        Plaintiffs,
9
     vs.                          Case No.
10                                3:19-cv-04593-LB
     CITY OF PLEASANTON; BRADLEE
11   MIDDLETON; JONATHAN CHIN;
     RICHARD TROVAO; STEVEN
12   BENNETT; ALEX KOUMISS; JASON
     KNIGHT; MARTY BILLDT; DAVID
13   SPILLER; and DOES 1 to 50,
     inclusive;
14
                        Defendants.
15   _____/
16
17
18      CONTAINS CONFIDENTIAL MATERIAL WHERE NOTED
19
20   VIDEO-RECORDED DEPOSITION OF BRADLEE MIDDLETON
21            WEDNESDAY, SEPTEMBER 2, 2020
22
23   Reported by:
24   Anrae Wimberley, CSR No. 7778
25   Job No.  4227606

                                      Page 1

1    Q.   So you would have been the lead responding      10:33:44

2    officer to the scene?

3    A.   Yes.

4    Q.   How is it that you were dispatched to

5    Raley's on August 1st, 2018?                          10:33:52

6    A.   I received a radio dispatch regarding an

7    individual inside Raley's that was refusing to leave

8    and acting somewhat erratic.

9    Q.   You arrive at Raley's.  Did you have an

10   opportunity to view the video of your interactions    10:34:09

11   with the Raley's employees before this deposition?

12   A.   Yes.

13   Q.   So we don't need to review that again?

14   A.   No.

15   Q.   What is it that you knew from the Raley's         10:34:19

16   employees -- what is it that the Raley's employees

17   told you when you responded on August 1st, 2018 to

18   the call regarding Jacob Bauer?

19   A.   That there was a subject inside the store

20   acting somewhat aggressively, breaking items and      10:34:33

21   initially refused to leave and then had left the

22   store, and they gave a general description and

23   direction.

24   Q.   They also said he was talking to himself;

25   right?                                                 10:34:48

Page 30

```
 1       A.   Yes.                                          10:34:49

 2       Q.   They said he's either intoxicated or

 3  crazy; right?

 4       A.   Correct.

 5       Q.   They said he's either on really heavy         10:34:56

 6  drugs or he's crazy; you recall that?

 7       A.   Yes.

 8       Q.   And you recall you said to him, "It's an

 9  option if you want to press charges for the

10  vandalism," and the manager said to you, "It's not     10:35:12

11  much"; right?

12       MR. BLECHMAN:  Hold on.

13            I think that misstates the video and the

14  evidence.

15            But you can respond.                          10:35:21

16       THE WITNESS:  The initial subject who I

17  contacted, when I asked if he wanted him arrested,

18  he told me yes.  The second manager or individual

19  who was in the middle of the three, he stated that

20  it wasn't much.  And then the third was the female.    10:35:35

21  I don't know.  She didn't have a role in it.

22  BY MS. WALKER:

23       Q.   So the person that you said, "Do you want

24  him arrested?"  He said, "If he's destroying the

25  stuff, he's intoxicated, then yeah, public             10:35:49
```

Page 31

1    nuisance," or something --                          10:35:52

2         A.    Something like that.

3         Q.    -- right?

4              And you said at some point, "Well, it's

5    one option if you want to press charges for the      10:35:56

6    vandalism," and the manager said, "It's not much";

7    is that right?

8         A.    Yes.

9         Q.    At that point, did you suspect that you

10   were dealing with somebody who may be mentally ill?   10:36:06

11        MR. BLECHMAN:   Calls for speculation and lacks

12   foundation.

13             Go ahead.

14   BY MS. WALKER:

15        Q.    I'm asking what was in your mind at the    10:36:13

16   time.

17        MR. BLECHMAN:   I understand, but he never met

18   the guy, so that was my objection.

19        THE WITNESS:   Based on the information I had,

20   it was either that this individual was high or there  10:36:21

21   was an issue going on.

22   BY MS. WALKER:

23        Q.    An issue, meaning that he was mentally

24   ill?

25        A.    Correct.                                   10:36:31

                                                          Page  32

| | | |
|---|---|---|
| 1 | Q.   So you knew before you ever responded to | 10:36:32 |
| 2 | Jacob Bauer or had contact with him that this is a | |
| 3 | possibility that someone was seriously mentally ill? | |
| 4 | A.   No. | |
| 5 | MR. BLECHMAN:  Hold on. | 10:36:42 |
| 6 | Objection, calls for speculation, lacks | |
| 7 | foundation, argumentative as to "seriously mentally | |
| 8 | ill." | |
| 9 | Go ahead. | |
| 10 | BY MS. WALKER: | 10:36:50 |
| 11 | Q.   Your answer was no.  So my question -- on | |
| 12 | what basis can you answer no, that you knew -- | |
| 13 | A.   'Cause I didn't know. | |
| 14 | Q.   Well, my question was:  Before you ever | |
| 15 | contacted Jacob Bauer, you knew it was a possibility | 10:36:59 |
| 16 | that you were dealing with someone who was mentally | |
| 17 | ill? | |
| 18 | A.   Yes. | |
| 19 | Q.   Yes. | |
| 20 | Okay.  At that point, Officer Chin was | 10:37:08 |
| 21 | with you; right? | |
| 22 | A.   Correct. | |
| 23 | Q.   And you go to contact Jacob Bauer.  Did | |
| 24 | you have any discussions with Officer Chin about how | |
| 25 | you were going to approach this individual or deal | 10:37:20 |

Page 33

1   with somebody who was possibly mentally ill?                10:37:22

2       A.   No.

3       Q.   Based on your experience with the John

4   Deming, Jr. case and your subsequent training in

5   crisis intervention techniques, didn't you think it        10:37:35

6   was a good idea to formulate a plan of how you were

7   going to deal with someone who was possibly mentally

8   ill?

9       MR. BLECHMAN:  Argumentative as phrased,

10  incomplete hypothetical.                                   10:37:45

11          But go ahead.

12      THE WITNESS:  It's always a possibility that an

13  individual we contact is going to have a mental

14  illness.  We didn't know that was this incident.

15  BY MS. WALKER:                                             10:37:57

16      Q.   And so if it's always a possibility that

17  somebody you contact may have a mental illness, do

18  you try to accommodate that in your response to that

19  person?

20      MR. BLECHMAN:  Incomplete hypothetical.                10:38:15

21          Go ahead.

22      THE WITNESS:  Can you restate the question?

23  BY MS. WALKER:

24      Q.   Sure.  You said it's always a possibility

25  that someone you contact may have a mental illness.        10:38:21

                                                           Page 34

Aiken Welch, A Veritext Company
510-451-1580

```
 1    BY MS. WALKER:                                    10:47:51

 2        Q.   When you contacted Jacob Bauer, did you

 3    make a preliminary determination whether he was in a

 4    mental health crisis?

 5        MR. BLECHMAN:   Vague as to time, calls for      10:48:11

 6    speculation and lacks foundation.

 7            But go ahead.

 8        THE WITNESS:  I didn't have enough information

 9    to make that determination, no.

10    BY MS. WALKER:                                    10:48:21

11        Q.   You certainly thought that he was acting

12    strange when you first encountered him; right?

13        A.   When I first encountered him?

14        Q.   Yes.

15        A.   During our conversation, yes.              10:48:30

16        Q.   He mentioned something to you about he

17    found a glass that someone stole from his home.  Do

18    you recall that?

19        A.   Something to that effect, yes.

20        Q.   And he was upset about it?                 10:48:42

21        A.   Yes.

22        Q.   And you thought that was odd, didn't you?

23        A.   Yes.

24        Q.   Have you had any training on encountering

25    a person with a suspected thought disorder?         10:49:38
```

Page 43

```
 1   disorders, based on their encounters with police;          10:51:44

 2   right?

 3        MR. BLECHMAN:  Calls for speculation and lacks

 4   foundation in this witness, may call for expert

 5   testimony.                                                 10:51:53

 6            Go ahead.

 7   BY MS. WALKER:

 8        Q.   I'm not asking for your expert opinion.

 9   I'm just asking what you've been trained in the --

10   all the training you've had from CIT, from POST.          10:52:01

11   Okay?  So just to be clear on that.

12            Just based on your own training and

13   experience, do you recall, from that training, that

14   there's an increased risk of death for people

15   experiencing thought disorders or schizophrenia-like      10:52:15

16   mental illnesses when they encounter the police?

17        MR. BLECHMAN:  Same objections, and it's also

18   overbroad.

19            Go ahead.

20        THE WITNESS:  I don't recall specifically that,      10:52:26

21   no.

22   BY MS. WALKER:

23        Q.   When you first made contact with Jacob

24   Bauer on August 1st, 2018, he was calm; is that

25   right?                                                     10:52:33
```

Page 46

```
 1       A.   Yes.                                    10:52:33

 2       Q.   He cooperated with you, he answered your

 3   questions?

 4       A.   Yes.

 5       Q.   Did you have any reason to believe he    10:52:39

 6   wasn't who he said he was?

 7       MR. BLECHMAN:   Calls for speculation and lacks

 8   foundation.

 9            Go ahead.

10       THE WITNESS:   Other than not seeing a photo ID, 10:52:48

11   he verbally identified himself.

12   BY MS. WALKER:

13       Q.   He gave you his name and date of birth?

14       A.   Yes.

15       Q.   And the radio came back he was clear and  10:52:56

16   valid; right?

17       A.   Correct.

18       Q.   What does that mean?

19       A.   That the individual that they ran was

20   clear of any warrants in the system or any probation 10:53:05

21   and had a valid driver's license.

22       Q.   And then you asked him specifically if he

23   had anything illegal on him; right?

24       A.   Yes.

25       Q.   At that time, you already knew from the    10:53:19
```

Page 47

1    radio that he was negative for weapons; true?          10:53:21

2         MR. BLECHMAN:  Hold on.

3              Calls for speculation, lacks foundation.

4              Go ahead.

5         MS. WALKER:  Let's mark this as Exhibit 8.        10:53:33

6              (Discussion off the record.)

7    BY MS. WALKER:

8         Q.   At the time you contacted Jacob Bauer and

9    you spoke with him and he gave you his

10   identification, at that time you knew he was           10:53:55

11   negative for weapons; isn't that true?

12        MR. BLECHMAN:  Same objections.

13             Go ahead.

14        THE WITNESS:  No.

15             (Plaintiffs' Exhibit 8 was marked.)          01:41:32

16   BY MS. WALKER:

17        Q.   I put in front of you what's Exhibit 8.

18   It says Call For Service Detail Report.  Do you know

19   what this is?

20        A.   Yes.                                          10:54:17

21        Q.   What is it?

22        A.   These are the dispatch notes that are

23   entered into our computer aided dispatch system.

24        Q.   Okay.  And if you turn to page -- see,

25   there's little Bates numbers on the bottom?            10:54:28

                                                    Page 48

```
 1        A.    Yes.                                        10:54:30

 2        Q.    Turn to page TPD2470.  Go down to

 3   2:47:17 p.m.  It says negative weapons?

 4        A.    I see that.

 5        Q.    Do you see that?                            10:54:48

 6              And it's entered by Mohammad Parwes -- or

 7   I'm not sure.  Is it Mojgan?  I'm not sure of the

 8   name.

 9              Do you know who that person is?

10        A.    That is one of our dispatchers, yes.       10:54:58

11        Q.    Can you tell me how you say his name?

12        A.    Her name.  It's Mojgan.

13        Q.    Mojgan, M-o-j-g-a-n.

14              This also says subject is walking around

15   store, assistant director is trailing, he has been   10:55:17

16   asked to leave, but refusing, RP requests assistance

17   with escorting him out of the store, subject is

18   ranting to himself.

19              Does that summarize what you knew at the

20   time that you contacted Jacob Bauer?                  10:55:31

21        A.    No.

22        Q.    Why not?

23        A.    At the time I contacted Jacob Bauer, I had

24   more information from the Raley's employees.

25        Q.    Okay.  But you knew this information as    10:55:40
```

Page 49

```
 1    well, didn't you?                               10:55:42

 2         A.   Yes.

 3         Q.   What does it mean if it's entered into the

 4    CAD notes that he's negative for weapons?

 5         A.   That means that he's --               10:56:08

 6         MR. BLECHMAN:  Hold on a second.

 7              Calls for speculation, lacks foundation,

 8    assumes facts not in evidence.

 9         Go ahead.

10    THE WITNESS:  That could mean a number of        10:56:17

11    things.  I don't know if that was a question asked

12    by employees, if they had seen a weapon, or if that

13    they ran him for -- well, they couldn't have ran

14    him.  They didn't have his information then,

15    so . . .                                         10:56:29

16              Sometimes negative weapons will be if they

17    run him for weapons registered to, if he's got any

18    firearms registered to him.  But in this instance,

19    it looks like, because of the timing, that this was

20    the dispatcher asking if they had seen any weapons.  10:56:41

21    BY MS. WALKER:

22         Q.   And the Raley's people didn't tell you

23    they had seen any weapons; right?

24         A.   Correct.

25         Q.   So you didn't have any indication, when   10:56:49
```

Page 50

```
 1   you contacted Jacob Bauer, that he had any weapons;      10:56:51

 2   right?

 3        A.   Or that he did not, correct.

 4        Q.   And he didn't -- there wasn't anything

 5   that you could articulate specifically about his         10:56:56

 6   person, bulges in his pockets, things like that,

 7   that would indicate to you that he had weapons; is

 8   that true?

 9        MR. BLECHMAN:  Calls for speculation and lacks

10   foundation.                                              10:57:05

11        But go ahead.

12        THE WITNESS:  One more time?

13   BY MS. WALKER:

14        Q.   There wasn't anything that you could

15   specifically articulate about seeing him or his         10:57:13

16   person, that there were bulges in his pocket or

17   anything like that, that would indicate to you that

18   he had weapons?

19        A.   Other than --

20        MR. BLECHMAN:  Same objections.                     10:57:22

21        Go ahead.

22        THE WITNESS:  -- not being searched.

23   BY MS. WALKER:

24        Q.   The answer to my question is no, there

25   wasn't anything that would indicate to you that he      10:57:34
```

Page 51

1    had weapons?                                    10:57:35

2        A.   The fact that he didn't answer if he had

3    anything illegal on him.

4        Q.   What did you mean by "illegal"?  When you

5    asked him if he had --                          10:57:47

6        A.   Weapons or drugs.

7        Q.   At that stage, when you asked him if he

8    had anything illegal on him, what did he do?

9        A.   Stopped responding.

10       Q.   He stared off into space; right?         10:58:06

11       A.   Correct.

12       Q.   He didn't move?

13       A.   Correct.

14       Q.   He didn't flee?

15       A.   Correct.                                 10:58:12

16       Q.   He just stared off into space?

17       A.   Correct.

18       Q.   He didn't answer your question?

19       A.   Nope.

20       Q.   At that stage, wasn't it clear to you that  10:58:18

21   you were dealing with someone who was seriously

22   mentally ill?

23       MR. BLECHMAN:  Calls for speculation and lacks

24   foundation, argumentative, vague and ambiguous as to

25   "seriously mentally ill" and may call for expert     10:58:27

                                                 Page 52

```
 1    was -- there was an exigent safety concern, was        11:13:39

 2    there?

 3        MR. BLECHMAN:  That's three questions, so it's

 4    compound.

 5            Answer the last question about the             11:13:46

 6    exigency.

 7    BY MS. WALKER:

 8        Q.   I'll ask it again.  There's no specific

 9    articulable facts that you can say that there was an

10    exigent safety concern?                                11:13:57

11        MR. BLECHMAN:  Vague as to time.

12            Go ahead.

13        THE WITNESS:  The concern from the Raley's

14    employees, yes, that he was aggressive, breaking

15    things, and somebody was concerned for the safety of   11:14:07

16    him -- somebody else or himself.  I can't recall

17    exactly what she told me.

18    BY MS. WALKER:

19        Q.   You mentioned this vandalism issue.

20    Certainly if there's a vandalism, you're aware that    11:14:20

21    there has to be some sort of malicious intent;

22    right?

23        A.   Right.

24        Q.   Do you think someone who was seriously

25    mentally ill had the malicious intent to commit a      11:14:32
```

Page 67

1    training that people are -- and your experience that          11:34:06

2    people who are mentally ill often abuse controlled

3    substances; isn't that true?

4        A.    Yes.

5        Q.    You certainly know from your experience            11:34:17

6    that people in a mental health crisis are often in

7    an aggravated state; true?

8        A.    True.

9        Q.    So why is it that those factors would

10   cause you to treat it any differently?                        11:34:27

11       A.    The fact that . . .?   Sorry.

12       Q.    You said if I knew he wasn't under the

13   influence of a controlled substance, if he wasn't in

14   an aggravated state and causing a vandalism, if it

15   was the only factor, that he was in a mental health          11:34:42

16   crisis, of course you would treat it differently;

17   right?

18       A.    Right.

19       Q.    That was your testimony; I just read it?

20       A.    Right.                                              11:34:51

21       Q.    Okay.   My question is -- and then you said

22   certainly, from your experience that people who are

23   mentally ill are often on controlled substances, you

24   said yes.   I said certainly, from your experience,

25   people who are mentally ill or in a mental health           11:35:02

                                                        Page 71

1  crisis are in an aggravated state, and you said yes.                11:35:05

2  So then my question is, then why would you treat

3  that differently than somebody simply in a mental

4  health crisis?

5      MR. BLECHMAN:  Overbroad and incomplete                          11:35:17

6  hypothetical.

7          Go ahead.

8  BY MS. WALKER:

9      Q.   So you keep looking at your attorney, but

10  he can't answer the questions for you.                              11:35:22

11      A.   I'm not asking him to.  I was going to

12  wait for his response.

13      MR. BLECHMAN:  Go ahead if you can answer.

14      THE WITNESS:  That wasn't -- like I said, there

15  were more factors at play.  In this particular                      11:35:33

16  instance, we knew that he was aggravated.  We were

17  told that somebody was concerned that he might hurt

18  somebody and that he had vandalized some property,

19  so we had a duty to contact him and continue our

20  investigation.  So that's where we were.                            11:35:55

21  BY MS. WALKER:

22      Q.   What exactly did you need to determine

23  when you contacted Jacob Bauer to determine if he

24  was somebody in a mental health crisis of which you

25  should employ the CIT tactics upon which you had                    11:36:11

Page 72

```
 1   been trained?                                      11:36:14

 2        MR. BLECHMAN:  Incomplete hypothetical.

 3             Go ahead.

 4        THE WITNESS:  I'm not even sure what the

 5   question was.                                       11:36:20

 6        MS. WALKER:  Can you read it back.

 7             (Record read by reporter as follows:

 8             "Question:  What exactly did you need to

 9             determine when you contacted Jacob Bauer

10             to determine if he was somebody in a      11:36:36

11             mental health crisis of which you should

12             employ the CIT tactics upon which you had

13             been trained?")

14        THE WITNESS:  That wasn't my intent at the

15   time.                                               11:36:39

16   BY MS. WALKER:

17        Q.   It wasn't your intent to deploy CIT

18   tactics?

19        A.   No.

20        MR. BLECHMAN:  Misstates the witness'          11:36:44

21   testimony.

22             Go ahead.

23        THE WITNESS:  No.  To determine that he was, in

24   fact, in a mental health crisis.

25   BY MS. WALKER:                                      11:36:51
```

Page 73

1      Q.   It wasn't your intent to even determine if          11:36:54

2  he was in a mental health crisis?

3      A.   No.   It was to investigate a possible

4  crime.

5      Q.   Anytime you're investigating a person          11:37:01

6  ranting to himself that had possibly committed a

7  minor crime, don't you want to determine if that

8  person is in a mental health crisis?

9      MR. BLECHMAN:   Vague and ambiguous as to "minor

10  crime," incomplete hypothetical as phrased,          11:37:16

11  misstates the record.

12          Go ahead.

13      THE WITNESS:   It's a factor that could come

14  into play later during the investigation, yes.

15  BY MS. WALKER:          11:37:29

16      Q.   What do you mean "later in the

17  investigation"?   What else do you need to do to

18  determine that you're dealing with somebody in a

19  mental health crisis?

20      MR. BLECHMAN:   It's vague and ambiguous, it's          11:37:38

21  an incomplete hypothetical.

22          Go ahead.

23      THE WITNESS:   In this particular instance, we

24  needed to ensure the safety of everybody involved.

25  That was our initial intent at that time; to detain          11:37:48

Page 74

```
1    I had at the time, I felt it was necessary to detain       11:38:55

2    Mr. Bauer in handcuffs.

3    BY MS. WALKER:

4         Q.   What information did you have at the time

5    that made you feel it was appropriate to detain            11:39:06

6    Mr. Bauer in handcuffs?

7         A.   The fact that he was a suspect in a

8    crime --

9         Q.   That -- committed outside of your

10   presence; right?                                           11:39:15

11       MR. BLECHMAN:  Can you just let him answer the

12   questions before you ask a follow-up?  I think

13   you're interrupting him a little bit.

14            Go ahead and finish.

15       THE WITNESS:  The fact that he was a suspect in        11:39:28

16   a crime who had been seen acting erratically,

17   aggressive.  Obviously, he scared some of the

18   employees there.  The fact that he's bigger than a

19   lot of individuals who we contact.  He was well over

20   200 pounds and bigger than myself or Officer Chin.         11:39:48

21   The fact that he had not been searched.

22   BY MS. WALKER:

23       Q.   Anything else?

24       A.   No.

25       Q.   Okay.  You said in preparation for your           11:40:05
```

Page 76

Aiken Welch, A Veritext Company
510-451-1580

```
 1    articulate any specific facts that caused you to        11:44:39

 2    believe Jacob Bauer was carrying a weapon?

 3         A.   No, I do not agree with that.

 4         Q.   What specific facts would cause you to

 5    reasonably believe Jacob Bauer was carrying a           11:44:49

 6    weapon?

 7         A.   As I explained earlier, he had not been

 8    searched.

 9         Q.   That's the only thing?

10         A.   Yes.                                           11:45:00

11         Q.   Why didn't you ask him if he had a weapon?

12         A.   I asked him if he had anything illegal on

13    him.  To what he understood that as, I don't know.

14    But that made me concerned that he could possibly

15    have a weapon on him.                                   11:45:21

16         Q.   You never said -- you gave an interview

17    about this in the investigation the following day;

18    right?

19         A.   Um-hum.  Yes.

20         Q.   And you wanted to be completely truthful      11:45:30

21    and accurate in that interview, didn't you?

22         A.   Yes.

23         Q.   You had a lawyer present; right?

24         A.   Yes.

25         Q.   Did you say anything about him -- you         11:45:37
```

Page 81

```
 1    BY MS. WALKER:                                      12:08:45

 2         Q.    Based on your training and experience.

 3         A.    I wouldn't know.

 4         Q.    Do you suspect that they were?

 5         MR. BLECHMAN:  Same objections.                12:08:53

 6             Go ahead.

 7         THE WITNESS:  No, I had no -- I had no reason

 8    to believe so.

 9    BY MS. WALKER:

10         Q.    Okay.  This says if a person is not      12:09:00

11    immediate threat or flight risk, avoid Taser use for

12    pain compliance if pain foreseeably ineffective due

13    to tolerance from drugs, alcohol or psychosis.

14             Do you see that?

15         A.    Yes.                                      12:09:14

16         Q.    But you didn't follow that, right, because

17    you repeatedly used the Taser even though you had

18    determined it was ineffective?

19         MR. BLECHMAN:  Argumentative, lacks foundation.

20             You can respond.                            12:09:24

21         THE WITNESS:  I didn't know if it was

22    ineffective because of his drug influence or what

23    was -- why it was ineffective.

24    BY MS. WALKER:

25         Q.    So you just kept doing it?                12:09:39
```

Page 104

```
 1          MR. BLECHMAN:  Hold on.                    12:09:41

 2              That's argumentative.

 3              Go ahead.

 4          THE WITNESS:  The reason I deployed or used my

 5     Taser, initiated the cycle, several times was trying  12:09:46

 6     to complete the circuit to make the -- to get the

 7     desired effect of the Taser itself.  That was during

 8     a struggle as well, so I don't know if it even made

 9     contact four times.  The trigger was pulled four

10     times.                                        12:10:09

11     BY MS. WALKER:

12          Q.   Is there --

13          A.   I can see that, but . . .

14          Q.   Okay.  Are you finished?

15          A.   Yes.                                 12:10:13

16          Q.   Is there a reason that you told the

17     investigators that you deployed it and used a drive

18     stun that would be two times, rather than the four

19     times you actually did it?

20          MR. BLECHMAN:  Vague and ambiguous.  I think it  12:10:26

21     lacks foundation, misstates the records.

22              Go ahead.

23          THE WITNESS:  Because that's what I recall

24     actually making contact after the initial probes.

25     That would have been the first initial -- one     12:10:36
```

Page 105

Aiken Welch, A Veritext Company
510-451-1580

```
 1   trigger pull.  Then trying to make a connection when        12:10:40

 2   I moved up to his shoulder to complete the circuit,

 3   that would have been another.  And that's the only

 4   time that I remember pulling the trigger while

 5   having the Taser on Mr. Bauer.                               12:10:51

 6            Now, again, this was during a struggle.

 7   It could have been pulled while it was in my hand.

 8   I know at one point he grabbed my arm.  It could

 9   have -- not necessarily that it was on -- making

10   contact, but the trigger could have been pulled           12:11:07

11   during the struggle.

12   BY MS. WALKER:

13        Q.   By you.

14        A.   By me.  I -- he -- I don't think he pulled

15   it.  I don't think he actually made contact with the      12:11:16

16   Taser, so I would say yes, that was me.

17        Q.   Turn to the next page, please.

18        A.   Yes.

19        Q.   Smart Use Considerations.  When

20   objectively reasonable and as practical.  The third       12:11:36

21   bullet says:  "Physical resistance or mental illness

22   alone does not indicate immediate threat."

23            So my question to you is,

24   Officer Middleton, you go -- you got this guy, you

25   certainly have indication that he's possibly              12:11:53
```

Page 106

```
1    mentally ill.  We agree on that.  And you go to          12:11:56
2    handcuff him and he starts to resist.  He's bigger
3    than you.  You've mentioned his size was a factor.
4    Why didn't you consider backing off, passively
5    monitoring the situation and deescalating it, rather    12:12:14
6    than continuing to try to take him down?
7         MR. BLECHMAN:  Incomplete hypothetical,
8    objection and move to strike all the statements
9    prior to the question.
10        You can respond.                                   12:12:29
11        THE WITNESS:  At that point, again, my concern
12   was the safety of myself, Officer Chin, and
13   Mr. Bauer, to put him in handcuffs, not knowing if
14   he did have a weapon, I'm not going to let go, the
15   fact that he was being detained for a possible         12:12:49
16   crime.  We don't have a duty to back away in that
17   instance.  We have the right to detain him and
18   that's what we were trying to do.
19   BY MS. WALKER:
20        Q.   Certainly you completed 40 hours of CIT       12:13:06
21   training?
22        A.   Yes.
23        Q.   You had an eight- or a ten-hour update to
24   CIT training.  Certainly, did you hear in that
25   training at all that it was recommended that you try    12:13:16
```

```
 1    I'm not aware.                                    01:07:21

 2        Q.   Officer Middleton, just to go back to one

 3    issue.

 4        MR. BLECHMAN:  Do you want to be out of

 5    confidential now?                                 01:08:02

 6        MS. WALKER:  Yes, please, thank you.

 7            (The following testimony is

 8            non-confidential:)

 9                        * * *

10    BY MS. WALKER:                                    01:08:05

11        Q.   Officer Middleton, just to go back to one

12    issue, you talked about how you needed to conduct a

13    further investigation and Jacob Bauer had stopped

14    responding to your questions.  What were you going

15    to do?  What was your plan at that point?         01:08:18

16        A.   My plan was to detain him and conduct an

17    in-field show-up of the Raley's employees to verify

18    that Jacob was responsible for the vandalism, get a

19    signed citizen's arrest for him, and proceed from

20    there.                                            01:08:36

21        Q.   So at the time that you went to handcuff

22    him --

23        A.   Yes.

24        Q.   And when you say "detain," is detain and

25    handcuff the same in your mind?                   01:08:42
```

Page 141

```
 1        A.    Depends on --                              01:08:43

 2        MR. BLECHMAN:   Sorry.

 3              Calls for a legal conclusion, vague and

 4    ambiguous.

 5              Go ahead.                                   01:08:48

 6        THE WITNESS:   It depends on the situation.

 7    BY MS. WALKER:

 8        Q.    So you can have a detention without

 9    handcuffing someone; right?

10        A.    Correct.                                    01:08:53

11        Q.    And you often do that; true?

12        A.    Correct.

13        Q.    You don't handcuff every detention; right?

14        A.    No.

15        Q.    What are the reasons that you would         01:08:59

16    handcuff somebody in detention?

17        A.    For what I described earlier, it depends

18    on the factors that -- or the information that we

19    have leading up to the contact, the fact that he

20    was, in this case, acting aggressive, breaking        01:09:12

21    items.  Again, his size, stature, and the fact he

22    wasn't answering my questions.  The concern that

23    although nobody had seen any weapons, that doesn't

24    mean that a weapon couldn't be concealed on his

25    person.  I take all those considerations -- or all    01:09:34
```

Page 142

| | | |
|---|---|---|
| 1 | those factors into consideration before determining | 01:09:35 |
| 2 | that. | |
| 3 |     Q.   And you've mentioned you were concerned | |
| 4 | for -- you know, there was a safety of Jacob or the | |
| 5 | safety of the Raley's people; is that right? | 01:09:51 |
| 6 |     A.   Everybody involved, yes. | |
| 7 |     Q.   What do you mean when you say "everybody | |
| 8 | involved"? | |
| 9 |     A.   The public.  There were obviously patrons | |
| 10 | at the store.  The individual -- the last reporting | 01:10:04 |
| 11 | party that I spoke to mentioned that she was afraid | |
| 12 | that he might hurt somebody.  So that's where | |
| 13 | I . . . | |
| 14 |     Q.   And you certainly made that a big part of | |
| 15 | this deposition, that you were concerned about | 01:10:19 |
| 16 | safety; right? | |
| 17 |     A.   Correct. | |
| 18 |     Q.   But you didn't say that in your | |
| 19 | administrative interview; right? | |
| 20 |     MR. BLECHMAN:  Vague and ambiguous as to | 01:10:28 |
| 21 | "that." | |
| 22 |         Go ahead. | |
| 23 | BY MS. WALKER: | |
| 24 |     Q.   You didn't say anything about you being | |
| 25 | concerned about anyone's safety in your | 01:10:32 |

Page 143

```
1            I, the undersigned, a Certified Shorthand
2   Reporter of the State of California, do hereby
3   certify:
4            That the foregoing proceedings were taken
5   before me at the time and place herein set forth;
6   that any witnesses in the foregoing proceedings,
7   prior to testifying, were administered an oath; that
8   a record of the proceedings was made by me using
9   machine shorthand which was thereafter transcribed
10  under my direction; that the foregoing transcript is
11  a true record of the testimony given.
12           Further, that if the foregoing pertains to
13  the original transcript of a deposition in a Federal
14  Case, before completion of the proceedings, review
15  of the transcript ( ) was (X) was not requested.
16           I further certify that I am neither
17  financially interested in the action nor a relative
18  or employee of any attorney of any party to this
19  action.
20           IN WITNESS WHEREOF, I have this date
21  subscribed my name.
22  Dated:  September 17, 2020
23
24
25           ANRAE WIMBERLEY, CSR No. 7778
```

Page 147

# EXHIBIT E

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4                       --oOo--
 5   JOHN BAUER, an individual
     and as Successor in Interest
 6   of Jacob Bauer, deceased;
     ROSE BAUER, an individual
 7   and as Successor in Interest
     of Jacob Bauer, deceased;
 8
                      Plaintiffs,
 9
     vs.                            Case No.
10                                  3:19-cv-04593-LB
     CITY OF PLEASANTON; BRADLEE
11   MIDDLETON; JONATHAN CHIN;
     RICHARD TROVAO; STEVEN
12   BENNETT; ALEX KOUMISS; JASON
     KNIGHT; MARTY BILLDT; DAVID
13   SPILLER; and DOES 1 to 50,
     inclusive;
14
                      Defendants.
15   _____/
16
17
18      CONTAINS CONFIDENTIAL MATERIAL WHERE NOTED
19
20      VIDEO-RECORDED DEPOSITION OF JONATHAN CHIN
21            TUESDAY, SEPTEMBER 1, 2020
22
23   Reported by:
24   Anrae Wimberley, CSR No. 7778
25   Job No.  4227597
```

Page 1

1      Q.   So at the time that you approached Jacob          10:35:03

2   Bauer, did you -- what did you think about him?  Did

3   you think that he was under the influence?  Did you

4   think that he was mentally ill?  What was your

5   thought process there?                                   10:35:18

6        MR. BLECHMAN:  Overbroad, compound.

7           But go ahead.

8        THE WITNESS:  Would that be at the time that we

9   contacted him on Mission?

10  BY MS. WALKER:                                           10:35:26

11       Q.   Yes.

12       A.   Okay.  We contacted him.  He seemed

13  forthcoming with information.  When asked, he would

14  answer the questions coherently.  He put a -- I

15  believe it was a glass -- a shot glass, commonly        10:35:39

16  referred to, down on the ground right when we

17  arrived.  He identified himself verbally to us when

18  asked.

19       Q.   Okay.  He was calm?

20       A.   He was calm, yes, ma'am.                       10:35:55

21       Q.   He was cooperative?

22       A.   Yes, ma'am.

23       Q.   Did you suspect at the time that he may

24  have some sort of mental disorder?

25       A.   No, ma'am.                                     10:36:03

Page 26

```
 1        A.   Yes, ma'am.                          10:43:15

 2        Q.   -- of your initial contact with the

 3   Raley's people.  Okay?  Let's make sure we can hear.

 4             (Video played.)

 5   BY MS. WALKER:                                 10:43:47

 6        Q.   Can you hear?

 7        A.   The majority of it.  I can't hear some

 8   stuff, but I can hear the majority of it.

 9             (Video played.)

10   BY MS. WALKER:                                 10:44:16

11        Q.   Okay.  So that was the initial contact

12   that you had with the people at Raley's.

13             Did you hear them say that he might be

14   intoxicated?

15        A.   Yes, ma'am.                          10:44:23

16        Q.   Did you hear them say he might be crazy?

17        A.   Yes, ma'am.

18        Q.   Okay.  Did you hear them say that the

19   vandalism or whatever happened wasn't much?

20        A.   I believe so.  I heard more of           10:44:34

21   Officer Middleton say, "even though it wasn't

22   much" -- but I can't really tell.  I couldn't really

23   hear the voices through here.

24        Q.   So Officer Middleton said, "If you want to

25   press charges for the vandalism, that's an option."  10:44:49

                                                Page 33
```

```
 1   You heard him say that?                          10:44:51

 2        A.   Yes, ma'am.

 3        Q.   And the guy responded, "it's not much."

 4   Okay?

 5        A.   Yes, ma'am.                            10:44:54

 6        Q.   Anything else you heard in there that I

 7   missed?

 8        MR. BLECHMAN:  Hold on.

 9            I think that misstates the record.  Lacks

10   foundation.                                      10:45:00

11            Go ahead.  You can respond.

12        THE WITNESS:  None that I can know right now.

13   BY MS. WALKER:

14        Q.   Okay.  So earlier when I asked you what

15   you knew when you first contacted Jacob Bauer, you  10:45:08

16   said something about he's acting erratically, which

17   we can probably get from Raley's and from the radio;

18   right?

19        A.   Um-hum.

20        Q.   But you also said he was breaking bottles  10:45:19

21   of alcohol and throwing a shopping cart.  So now

22   that we reviewed the radio traffic and your initial

23   contact with the Raley's people, at the time you

24   first contacted Jacob Bauer, you didn't know

25   anything about breaking bottles of alcohol or       10:45:30
```

Page 34

| | | |
|---|---|---|
| 1 | throwing a shopping cart, did you? | 10:45:33 |
| 2 | MR. BLECHMAN:  Asked and answered. | |
| 3 | But go ahead. | |
| 4 | THE WITNESS:  No, ma'am. | |
| 5 | BY MS. WALKER: | 10:45:38 |
| 6 | Q.   Okay.  You found that out later? | |
| 7 | A.   Yes, ma'am. | |
| 8 | Q.   Okay.  So from what we've just reviewed, | |
| 9 | the radio traffic, that you have an individual | |
| 10 | acting -- ranting to himself, you have this whatever | 10:45:45 |
| 11 | you heard from the Raley's people, did you have any | |
| 12 | discussions with Officer Middleton about anything he | |
| 13 | knew that you didn't know between the time you | |
| 14 | pulled up to talk to Raley's and the time you talked | |
| 15 | to Jacob Bauer, or initially contacted Jacob Bauer? | 10:45:59 |
| 16 | A.   Other than a possible location of him, no. | |
| 17 | Q.   Okay.  So based on this information that | |
| 18 | you've got an individual ranting to himself, | |
| 19 | possibly intoxicated, not much vandalism in the | |
| 20 | store, what were you -- what were you thinking at | 10:46:14 |
| 21 | that time?  Are you thinking this could be somebody | |
| 22 | who's mentally ill? | |
| 23 | MR. BLECHMAN:  Asked and answered, lacks | |
| 24 | foundation, calls for speculation. | |
| 25 | You can respond. | 10:46:26 |

Page 35

1    Q.   But you had no indication at the time when     10:52:03

2    you asked him that, that he did have a weapon, did

3    you?

4    A.   None that was told to us and none that we

5    could see outright, but he had not been searched at     10:52:13

6    that time.

7    Q.   Well, Jacob Bauer verified his identity to

8    you when you first contacted him; true?

9    A.   Verbally.  We couldn't verify that because

10   he didn't have any documents in his possession that     10:52:44

11   he presented to us.

12   Q.   Well, Officer Middleton said it over the

13   radio and he gave his name and date of birth, yes?

14   A.   He gave a name and date of birth.  I was

15   not sure if that was him or not.     10:52:56

16   Q.   Came back over the radio that he was clear

17   and valid?

18   A.   The name and date of birth did, yes.

19   Q.   What does it mean to be clear and valid?

20   A.   That means he's clear of any wants, as in     10:53:08

21   warrants, or wanted for any crime, and valid, as

22   having a valid driver's license in the State of

23   California or any other state, depending on what is

24   noted.

25   Q.   And what was he suspected of doing at that     10:53:28

Page 41

1        Q.    In this situation that you had, okay,          11:40:11

2    where you have Jacob Bauer, there's indications that

3    he may be suffering from mental illness, it's been

4    reported to you that he's talking to himself, he's

5    either intoxicated or crazy, he's committed a minor    11:40:23

6    vandalism, did you consider using any other

7    deescalation tactics before you put your hands on

8    him to try to handcuff him?

9        MR. BLECHMAN:  Hold on.

10           Overbroad.  There was a lot of statements        11:40:38

11   in there prior to the question.  May misstate the

12   record.

13           But go ahead.

14       THE WITNESS:  We attempted to.  We asked him

15   questions and we were having a coherent conversation    11:40:49

16   with him.  We would ask a question, he would answer

17   without delay, once he was able to hear the

18   question.

19           Once he -- once it was asked whether or

20   not he had any weapons on him, that was when he did    11:41:03

21   not answer, and in my training and experience,

22   sometimes people that do have weapons on them, they

23   may not answer a question immediately if they have a

24   weapon on them or if they're thinking of a response

25   that would not be truthful.  Or because he was not     11:41:22

Page 70

```
 1    looking at us at the time and he was looking          11:41:27

 2    straight forward and not physically and visually

 3    responding to our questioning, we didn't know if he

 4    was going to try to flee or not.

 5    BY MS. WALKER:                                         11:41:40

 6        Q.   But he didn't try to flee.  There was no

 7    indication that he was going to try to flee, did he?

 8        A.   Other than refusing to answer our

 9    questions and no longer cooperating with our

10    questioning.                                           11:41:49

11        Q.   So that wasn't trying to flee; right?

12        A.   At that point, it would be no longer

13    cooperative.

14        Q.   Okay.  But I didn't ask if he was

15    cooperating.  I asked if he was trying to flee.        11:41:56

16        MR. BLECHMAN:  Vague as to time.

17          Go ahead.

18        THE WITNESS:  At that time, he did not show any

19    visible signs that he was trying to flee, as far as

20    body movements or anything like that.  He was --       11:42:10

21    like I said, in my training and experience,

22    sometimes people who are preparing to flee are

23    looking at open space that they can flee to.  And he

24    was not looking at us, he was looking straight

25    ahead, which was open space between me and            11:42:23
```

Page 71

```
 1    Officer Middleton.                                    11:42:26

 2    BY MS. WALKER:

 3        Q.   Before you put your hands on him, he did

 4    not move from the space that he was in, did he?

 5        A.   In that process, no, ma'am.                  11:42:33

 6        Q.   And you mentioned in your training and

 7    experience, sometimes people that have weapons may

 8    not answer a question immediately.

 9             That's not what you said in your interview

10    that you gave right after this incident.  You said   11:42:55

11    normally, in your experience, people either answer

12    the question or they lie to you; right?  So this was

13    unusual, what Jacob Bauer was doing, wasn't it?

14        MR. BLECHMAN:  Hold on.

15             It's compound, there's four or five          11:43:09

16    questions in there and statements as well.

17             You can answer the last question, which

18    was, what Mr. Bauer was doing was unusual.

19        THE WITNESS:  Yes, it was unusual.

20    BY MS. WALKER:                                        11:43:19

21        Q.   And so at that point, did you consider

22    whether you should just ask him if you could pat him

23    down for weapons?

24        MR. BLECHMAN:  Asked and answered.

25             But go ahead.                                11:43:35
```

Page 72

```
 1         THE WITNESS:  No, ma'am.  When he refused to        11:43:38

 2    answer whether or not he had any weapons on him, it

 3    was assumed that he may have a weapon him at that

 4    time.

 5    BY MS. WALKER:                                           11:43:46

 6         Q.   And so you decided to handcuff him; you

 7    didn't consider any other techniques or options that

 8    you had?

 9         MR. BLECHMAN:  Argumentative, misstates the

10    witness' prior testimony.                               11:43:57

11             Go ahead.

12         THE WITNESS:  Because we had a legal authority

13    to detain him at that time, we decided to handcuff

14    him.

15    BY MS. WALKER:                                           11:44:05

16         Q.   All right.

17             So I think what I want to do is just show

18    you a little bit -- I want to show you the initial

19    interaction and then I'm going to skip to another

20    part of it once you kind of take him to the ground.     11:44:38

21    Okay?

22         A.   Yes, ma'am.

23             (Plaintiffs' Exhibit 3 was marked.)

24    BY MS. WALKER:

25         Q.   So let's watch the initial interaction and    11:44:42
```

```
 1        THE WITNESS:  Depending on the situation.  If I      11:55:47

 2   was by myself, it would depend on the situation.

 3   BY MS. WALKER:

 4        Q.   So if you were by yourself, you may employ

 5   some deescalation tactics?                               11:56:00

 6        A.   There may be some further actions,

 7   depending on the subject and the time of day and the

 8   situation surrounding.  I may have to reassess on

 9   his level of resistance and my abilities at that

10   time and his physical stature.                           11:56:16

11        Q.   When you encounter someone who's possibly

12   mentally ill, you understand that they may not be

13   acting rationally.  Did you ever -- have you had any

14   training on whether to consider the fact that they

15   can't rationally follow your commands and techniques     11:56:33

16   that you may employ to deescalate the situation,

17   rather than escalate it?

18        MR. BLECHMAN:  Argumentative, it's an

19   incomplete hypothetical.

20        THE WITNESS:  I'm sorry --                           11:56:57

21   BY MS. WALKER:

22        Q.   Do you need the question back?

23        A.   -- is that a go ahead?  No, I didn't know

24   if I was supposed to answer or not.

25        Q.   So unless he tells you don't answer, you       11:57:01
```

Page 81

```
 1   still answer.                                              11:57:03

 2        A.   As far as a mental health issue, until we

 3   can confirm it is specifically a crisis moment or if

 4   the person is under the influence of a controlled

 5   substance or alcohol, we are to -- for officer          11:57:12

 6   safety reasons, we're to make the scene safe first.

 7        Q.   And when you say "make the scene safe,"

 8   that's physically detain them in handcuffs and

 9   search for weapons?

10        A.   In this situation, yes, ma'am.                 11:57:27

11        Q.   And in this situation, when Jacob Bauer

12   resisted putting his hands behind his back and being

13   handcuffed, you never considered whether you and

14   Officer Middleton should step back and try to

15   deescalate the situation?                                11:57:45

16        MR. BLECHMAN:   It's asked and answered.

17             But go ahead.

18   BY MS. WALKER:

19        Q.   And I think that's just a yes or no.

20             So do you want me to repeat the question?      11:57:51

21        A.   Yes, please.

22        Q.   In this situation, when Jacob Bauer

23   resisted putting his hands behind his back and being

24   handcuffed, you never considered whether you and

25   Officer Middleton should step back and deescalate        11:58:01
```

Page 82

| | | |
|---|---|---|
| 1 | the situation? | 11:58:04 |
| 2 | MR. BLECHMAN:  Asked and answered. | |
| 3 | MS. WALKER:  Yes, you did or no, you didn't. | |
| 4 | MR. BLECHMAN:  But go ahead and tell her again. | |
| 5 | THE WITNESS:  Based off of what we had, no, we | 11:58:11 |
| 6 | did not. | |
| 7 | BY MS. WALKER: | |
| 8 | Q.   And at any point during your interaction | |
| 9 | with Jacob Bauer, between the time you first tried | |
| 10 | to put his hands behind his back and the time you're | 11:58:45 |
| 11 | getting the wrap onto him, did you ever consider | |
| 12 | that we should deescalate the situation? | |
| 13 | MR. BLECHMAN:  Vague and ambiguous as to | |
| 14 | "deescalate the situation," vague as to time. | |
| 15 | Go ahead. | 11:59:03 |
| 16 | THE WITNESS:  I think that we did.  We made | |
| 17 | numerous comments for him to just calm down and stop | |
| 18 | resisting.  I believe Officer Middleton at one point | |
| 19 | said, you're being detained at this point, so he was | |
| 20 | clearly explaining what was going on. | 11:59:17 |
| 21 | You know, we tried to communicate with | |
| 22 | him.  There was no verbal response back from him to | |
| 23 | us that after multiple attempts, he was complying | |
| 24 | with what we were saying. | |
| 25 | BY MS. WALKER: | 11:59:36 |

Page 83

1          Q.     Do you understand what I mean when I say          11:59:38

2     "deescalate the situation"?

3          A.    I believe so, but maybe I should get your

4     definition of it.

5          Q.    Well, your attorney keeps objecting that          11:59:48

6     it's vague.  So I just want to see if we're on the

7     same page.

8               Why don't you tell me what -- when I say

9     "deescalate the situation," based on your training,

10    what does that mean to you?                                 11:59:57

11         A.    Our training is to continue to communicate

12    with the person and try to get some kind of

13    compliance from them with our communication.  But at

14    some point, the deescalation would be unsuccessful

15    that we still -- officer safety is still paramount        12:00:14

16    in our actions.

17         Q.    Other than communicating with the person,

18    is there anything else that you do to deescalate a

19    situation?

20         MR. BLECHMAN:  Overbroad, incomplete                  12:00:30

21    hypothetical.

22              Go ahead.

23         THE WITNESS:  For what we do, I mean, it would

24    be communication with him, verbal communication for

25    our job duties.                                            12:00:39

                                                            Page 84

```
 1    anything else that we would need.              12:05:21

 2        Q.   Okay.  You instructed -- or suggested to

 3    Officer Middleton that he deploy his Taser on Jacob

 4    Bauer; is that true?

 5        A.   Yes, ma'am.                            12:05:34

 6        Q.   How many times did Officer Middleton

 7    deploy his Taser on Jacob Bauer?

 8        MR. BLECHMAN:  Calls for speculation and lacks

 9    foundation of this witness.

10            Go ahead.                               12:05:41

11    BY MS. WALKER:

12        Q.   That you witnessed or you're aware of.

13        A.   I'm uncertain of the exact number.  I can

14    confirm once at least, mainly because I felt the

15    effects of the Taser myself.                    12:05:50

16        Q.   Rather than using the Taser on Jacob

17    Bauer, did you ever consider that you and

18    Officer Middleton should hold him and wait for

19    backup?

20        A.   We attempted --                        12:06:04

21        MR. BLECHMAN:  Hold on a second.

22            Calls for speculation, incomplete

23    hypothetical.

24            Go ahead.

25        THE WITNESS:  We attempted to in the beginning, 12:06:12
```

Page 89

1   once Mr. Bauer was on the ground.  We'd asked for          12:06:13

2   Code 3 cover, but once he resisted more and broke

3   free of Officer Middleton's hold, that's when we

4   knew, off of what we had, just our hands in itself,

5   we couldn't overcome his resistance at that time.          12:06:33

6   BY MS. WALKER:

7       Q.   Did it ever occur to you that he was

8   experiencing excited delirium?

9       A.   That would be a possibility.  We wouldn't

10  know until we could determine whether or not he was        12:06:48

11  under the influence of a controlled substance or if

12  he was having a crisis moment at that time.

13      Q.   In the moment that you were contacting him

14  and he was resisting and yelling things that he was

15  yelling, did it ever occur to you at that time that        12:07:04

16  this could be a person who's experiencing excited

17  delirium?

18      A.   That would depend on up to what point

19  during the struggle you'd be referring to.  Until

20  the other units arrived on scene, he kept asking,          12:07:23

21  "What are you doing?  What are you doing?  Let me

22  go."  Which is common amongst people that we are

23  trying to physically detain.

24      Q.   He also said, "It's burning, it's

25  burning."  Did you know what he was referring to           12:07:41

Page 90

```
 1        A.   No, ma'am.                                12:20:15

 2        Q.   Did you see Officer -- is it Trovao?  Is

 3   that how you say his name?

 4        A.   Trovao.

 5        Q.   Trovao.                                   12:20:21

 6             Did you see Officer Trovao deploy his

 7   Taser on Jacob Bauer?

 8        A.   I did not.

 9        Q.   Were you aware that he did at the time?

10        A.   At the time, no.                          12:20:33

11        Q.   You know now that he did?

12        A.   Yes, ma'am.

13        Q.   Did you see Officer Trovao hit Jacob Bauer

14   with his baton?

15        MR. BLECHMAN:  Assumes facts not in evidence.  12:20:49

16             But go ahead.

17        THE WITNESS:  During the incident, no.

18   BY MS. WALKER:

19        Q.   Okay.  Did you hit Jacob Bauer with your

20   baton?                                              12:20:56

21        A.   No, ma'am.

22        Q.   Did you hit Jacob Bauer with your fist?

23        A.   Yes, ma'am.

24        Q.   Why did you do that?

25        A.   At the time when I did that, he was        12:21:06
```

Page 102

1    scratching and clawing at my hands that were on his          12:21:10

2    hands to the point where they were bleeding.  To get

3    him to stop, I verbally told him not to do it.  He

4    continued.  So I gave him two distractionary blows,

5    if I remember correctly.                                     12:21:31

6         Q.   What does that mean, "distractionary

7    blows"?

8         A.   So that would pull his attention from --

9    they're designed to pull your attention from what

10   you are doing at that time to possibly recognize            12:21:41

11   some other stimulus to stop momentarily of what

12   they're doing.

13        Q.   Is that something that's part of your

14   training?

15        A.   Yes, ma'am.                                        12:21:56

16        Q.   Is that something that's provided for POST

17   training?

18        A.   In the academy.  In the basic academy, it

19   is.

20        Q.   Were you angry when you hit Jacob Bauer?           12:22:07

21        A.   No.

22        Q.   Were you frustrated?

23        A.   No.

24        Q.   It was another pain compliance mechanism?

25        A.   It wasn't pain compliance.  It was just           12:22:20

Page 103

```
 1              I, the undersigned, a Certified Shorthand
 2    Reporter of the State of California, do hereby
 3    certify:
 4              That the foregoing proceedings were taken
 5    before me at the time and place herein set forth;
 6    that any witnesses in the foregoing proceedings,
 7    prior to testifying, were administered an oath; that
 8    a record of the proceedings was made by me using
 9    machine shorthand which was thereafter transcribed
10    under my direction; that the foregoing transcript is
11    a true record of the testimony given.
12              Further, that if the foregoing pertains to
13    the original transcript of a deposition in a Federal
14    Case, before completion of the proceedings, review
15    of the transcript ( ) was (X) was not requested.
16              I further certify that I am neither
17    financially interested in the action nor a relative
18    or employee of any attorney of any party to this
19    action.
20              IN WITNESS WHEREOF, I have this date
21    subscribed my name.
22    Dated:  September 18, 2020
23
24
25         ANRAE WIMBERLEY, CSR No. 7778
```

Page 165

# EXHIBIT F

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4                  ---oOo---

5    JOHN BAUER, an individual and as
     Successor in Interest of Jacob
6    Bauer, deceased; ROSE BAUER, an
     individual and as Successor in
7    Interest of Jacob Bauer,
     deceased,

8
             Plaintiffs,
9
     vs.                           No. 3:19-cv-04593-LB
10
     CITY OF PLEASANTON; BRADLEE
11   MIDDLETON; JONATHAN CHIN;
     RICHARD TROVAO; STEVEN BENNETT;
12   ALEX KOUMISS; JASON KNIGHT;
     MARTY BILLDT; DAVID SPILLER; and
13   DOES 1 to 50, inclusive,
14           Defendants.
     _____/
15

16

17   VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF STEVEN BENNETT

18

19                  January 13, 2021

20

21

22

23   Taken before Janice H. Dispo, CSR No. 13299

24   Job No. 4388811

25   Pages 1 to 71

                                              Page 1

1      Q.  The time lines I have indicates that you

2  originally arrived at the scene at 14:58 and

3  35 seconds, which would be 2:58 and 35 seconds.

4  Does that sound right to you?

5      A.  I suppose.                              10:37:57

6      Q.  And how much -- and as I understand it,

7  Officer Koumiss came very shortly after you arrived

8  at the scene; is that your understanding?

9      A.  Yes, sir.

10     Q.  And according to the thing, he arrived    10:38:04

11  about ten, fifteen seconds later.  Does that square

12  with your recollection that was -- had come on the

13  scene ten or fifteen seconds after you?

14     A.  I would say within that time frame, yes.

15     Q.  Let me -- I want to ask you some general   10:38:21

16  questions rather than going through every single

17  thing that you did, because I reviewed your video

18  cam and the others.

19         But at the time you first arrived and you

20  went in to try and assist, did you know the -- who   10:38:35

21  the officers were, that they were Chin and

22  Middleton that were trying to subdue Mr. Bauer?

23     A.  I recognized Chin when I arrived on scene.

24  I didn't -- and then I had also recognized

25  Middleton.  As far as them being the primary        10:38:52

Page 27

1    officers attached to the call, I -- I don't think I

2    was really paying attention to who was being

3    dispatched to it.  As a traffic officer, my role

4    is, mostly, traffic enforcement and collision

5    investigation.                                    10:39:06

6        Q.   Okay.  Well, let me ask you this general

7    question.  How long was it after you first arrived

8    at the scene before you had some understanding of

9    why they were trying to arrest Mr. Bauer?

10       A.   I would -- I would venture to say that it   10:39:23

11   wasn't until he was in custody that I understood

12   why they were attempting to detain him.

13       Q.   When you say he was in custody, can you be

14   more specific about exactly when that was in the

15   sequence of events?  Because I know the sequence of   10:39:40

16   events of them, you know, trying to handcuff him

17   and putting on the wraps and putting on the face

18   mask and all that.

19       A.   I would say it wasn't until the restraint

20   was placed around the lower portion of the legs,   10:39:54

21   and I backed away from the attempt to put on the

22   rest of the wrap is when I realized or was

23   instructed to go find out other reasons why -- or

24   correction -- to go contact other witnesses.

25           So once I made contact with the witnesses   10:40:13

Page 28

1    across the street and then came back and made

2    contact with the staff at Raley's is when I began

3    to understand the full extent of what the incident

4    was.

5        Q.  Okay.  About how long had you been at the          10:40:25

6    scene -- give me your best estimate in terms of

7    minutes and seconds, if you can.  How long would

8    you say you had been at the scene before you

9    learned anything about why he had been detained or

10   arrested?                                                   10:40:42

11       A.  I would say, it's possible, up to

12   20 minutes.

13       Q.  Okay.  And tell me, what was the very

14   first thing you learned about why he was either

15   being detained or arrested?                                 10:40:56

16       A.  That would have been talking to the

17   witness across the street, who identified himself

18   as a Mr. Gibson.  He made mention that he had been

19   running from the officers.  Whether or not that was

20   accurate, I'm not certain.  That's just the                10:41:11

21   information that was provided to me from him.

22           When I returned across the street and

23   spoke with Raley's staff is when I learned that he

24   was causing some form of disturbance inside the

25   business, which prompted them to call the police.          10:41:24

Page 29

1    that had caused Chin and Middleton to -- to take

2    him to the ground?

3            MR. BLECHMAN:  Calls for speculation and

4    lacks foundation of this witness.  Incomplete

5    hypothetical.                                    10:44:40

6            Go ahead.

7            THE WITNESS:  At that time, the only

8    information that I had was that they were involved

9    in a struggle and were requesting Code 3 cover.

10   BY MR. GWILLIAM:                                 10:44:51

11       Q.  Okay.  Just for the record, your counsel

12   will make objections from time to time, which is

13   perfectly fine.  That's fine.  Unless he instructs

14   you not to answer, we will just move forward with

15   the -- with it.                                  10:45:02

16           So -- so let me ask you this question,

17   Officer Bennett.  In the time that you -- from the

18   time you first arrived, when you were trying to

19   assist him -- as I understand it, you were working

20   trying to hold down his legs, and they were trying 10:45:22

21   to handcuff him.

22           At that point, in this first ten minutes

23   or so, did you have any impression in your mind as

24   to whether this guy was dangerous or a criminal or

25   have any idea about who Bauer was?               10:45:40

                                                    Page 33

```
 1        A.  So to answer your question about whether

 2   he was dangerous, I would argue that anybody who

 3   chooses to fight with the police does represent

 4   some form of danger, whether it be to themselves or

 5   to the officers or to the public at large.          10:45:58

 6            As far as him being a criminal, the

 7   investigation would have been required to reveal

 8   the extent of any vandalism, if -- had any

 9   occurred, which I -- obviously, I'm speaking after

10   the fact -- is what I found out that they were      10:46:11

11   investigating.

12            And there was a third part to your

13   question, if you could restate it.

14        Q.  No, I think you have answered it.  Thank

15   you.  When you first arrived, he was prone; he was  10:46:21

16   on his stomach, right?

17        A.  He was not.

18        Q.  Was he on his back?

19        A.  I would say he was laying on his left

20   side.                                               10:46:32

21        Q.  Okay.  And then at some stage, not too

22   long after you got there, did they -- were they

23   able to roll him over and put him on his stomach?

24        A.  When I arrived, I was able to take hold of

25   his legs and put him in the prone position.         10:46:45
```

                                              Page 34

```
 1        Q.  All right.  So did he remain in a prone
 2   position up until the time you separated from the
 3   scene and went across the street to interview the
 4   witness?
 5        A.  I believe so.                          10:46:55
 6            MR. BLECHMAN:  Just a belated objection.
 7   Vague as to time.
 8   BY MR. GWILLIAM:
 9        Q.  Were you involved in trying to put a body
10   wrap on him?                                    10:47:22
11        A.  I was involved in assisting with putting
12   the lower extremity portion of the wrap, which
13   consisted of the Velcro strap that goes around the
14   lower shins and upper ankles and with the -- I
15   guess you would call it the restraint that goes   10:47:37
16   around the knees and thighs.
17        Q.  And that was before you separated and went
18   over to -- across the street?
19        A.  Correct.
20        Q.  Who else was trying to put him into a body  10:47:46
21   wrap besides you?
22        A.  I believe Officer Koumiss assisted with
23   that.  I believe -- I want to say Officer
24   Middleton.  It's -- at that point, I don't recall,
25   exactly, everybody.                             10:48:04
```

                                              Page 35

1       Q.  At the time this incident happened, what

2    experience, if any, had you had, Officer Bennett,

3    with putting a body wrap on a suspect?

4       A.  We have had numerous trainings, which

5    included advanced officer training, as well as in      10:48:19

6    briefing training, when we would go through the

7    process of putting on the wrap in briefing.  I have

8    been placed in the wrap myself, numerous times.

9       Q.  You have done it -- you placed the wrap on

10   people in the field?                                    10:48:34

11      A.  Yeah, as -- in the field, I have assisted

12   with placing the wrap.  Correct.

13      Q.  How many times -- tell me more about your

14   experience in the field with placing the wrap on a

15   suspect.                                                10:48:44

16      A.  I would say, at least two times that I can

17   recall.  As far as the specific nature of those

18   calls, I believe one was an intoxicated subject.

19   As far as the second, I -- maybe it was a domestic

20   violence call.  I can't be for sure, but,              10:49:00

21   typically, when somebody is combative, who remains

22   combative, we put them in the wrap.

23      Q.  In the two instances that you have had in

24   the field, were the suspects actively avoiding or

25   trying to keep you from putting the wrap on?           10:49:23

Page 36

1        A.   Correct.

2        Q.   Did you do it yourself, or did you have

3    assistance in these two events -- two experiences

4    you had?

5        A.   Always with assistance.                    10:49:32

6        Q.   What was the purpose, to your knowledge,

7    of putting the body wrap on Jacob Bauer?

8        A.   The purpose would have been to maintain

9    positive control of the situation, to restrain and

10   prevent any more struggle, to prevent him from        10:49:52

11   kicking or fleeing, I would say.

12       Q.   From taking what -- I missed that last

13   part, taking what?

14       A.   I would say it was to prevent him from --

15   I don't know if it's -- maybe it's this               10:50:04

16   (indicating).  I would say it was to prevent him

17   from fleeing or causing any further struggle in the

18   confrontation.

19       Q.   From the time that you and Koumiss

20   arrived, and shortly thereafter, other officers       10:50:14

21   arrived, were you really concerned that he might

22   flee the scene?

23       A.   Well, it's possible.  If someone is able

24   to -- especially with only one handcuff on.  And

25   I've seen it before.  If somebody is able to slip     10:50:29

Page 37

```
 1    their cuffs or gain an advantage and, you know,

 2    basically remove themselves from the attempt to

 3    take them into custody, absolutely.  We have

 4    numerous times we have had suspects flee.

 5        Q.  You think that in this circumstance with      10:50:42

 6    at least four, five officers present with guns, and

 7    around him, you think that he would have been able

 8    to flee from your custody at that time?

 9            MR. BLECHMAN:  I will just object.  I'm

10    going to object as argumentative.  Incomplete        10:50:56

11    hypothetical.  Calls for speculation.

12            Go ahead.

13    BY MR. GWILLIAM:

14        Q.  Officer Bennett, do you think it was

15    realistic that by the time you had had at least      10:51:04

16    five or six officers there and he was prone on the

17    ground, that there was any realistic chance that he

18    could flee the scene?

19            MR. BLECHMAN:  Same objections.

20            Go ahead --                                   10:51:18

21            Same objections.  Go ahead.

22            THE WITNESS:  There is always that

23    possibility.

24    BY MR. GWILLIAM:

25        Q.  I'm just asking you, under these             10:51:25
```

                                                     Page 38

1     circumstances, whether you thought that was

2     realistic, a realistic possibility.

3          A.   So under the circumstances, I felt that if

4     he were able to get free, yes, he would flee.

5          Q.   Why did you feel that way?                    10:51:40

6          A.   Based on his behavior and to the level of

7     which he was struggling to prevent his -- prevent

8     either being placed in the wrap or having cuffs

9     placed on him.

10         Q.   During the time that you were there trying   10:51:52

11    to assist on subduing and putting a wrap on him,

12    did you have any impression that he might be

13    mentally ill?

14         A.   At that time --

15              MR. BLECHMAN:  Hold on a second.  Hold on     10:52:06

16    a second.

17              Objection.  Calls for speculation.  Lacks

18    foundation.  Vague and ambiguous as to "mentally

19    ill."  Calls for expert medical opinion.

20              You can respond.                              10:52:14

21    BY MR. GWILLIAM:

22         Q.   At that time, it's -- it's an unknown

23    factor.  In my mind, what we have -- or what I had

24    presented to me at the time was somebody who was

25    struggling with the police in trying to evade or       10:52:25

                                                    Page 39

```
 1                    REPORTER'S CERTIFICATE

 2

 3

 4          I, JANICE H. DISPO, a Shorthand Reporter, State

 5     of California, do hereby certify:

 6          That STEVEN BENNETT, in the foregoing deposition

 7     named, was present and by me sworn as a witness in the

 8     above-entitled action at the time therein specified;

 9          That said deposition was taken before me at said

10     time, and was taken down in shorthand by me, a Certified

11     Shorthand Reporter of the State of California, and was

12     thereafter transcribed into typewriting, and that the

13     foregoing transcript constitutes a full, true and correct

14     report of said deposition and of the proceedings that

15     took place;

16          That before completion of the proceedings,

17     review of the transcript was requested.

18          IN WITNESS WHEREOF, I have hereunder subscribed

19     my hand this 4th day of February, 2021.

20

21

22          JANICE H. DISPO, CSR NO. 13299

23          State of California

24

25
```

Page 71

# EXHIBIT G

1                 UNITED STATES DISTRICT COURT
2                 NORTHERN DISTRICT OF CALIFORNIA
3                   SAN FRANCISCO DIVISION
4                        ---oOo---
5    JOHN BAUER, an individual and
     as Successor in Interest of
6    Jacob Bauer, deceased; ROSE
     BAUER, an individual and as
7    Successor in Interest of Jacob
     Bauer, deceased,
8
             Plaintiffs,
9
     vs.                              No. 3:19-cv-04593-LB
10
     CITY OF PLEASANTON; BRADLEE
11   MIDDLETON; JONATHAN CHIN;
     RICHARD TROVAO; STEVEN BENNETT;
12   ALEX KOUMISS; JASON KNIGHT;
     MARTY BILLDT; DAVID SPILLER;
13   and DOES 1 to 50, inclusive,
14           Defendants.
     _____/
15
16
17    VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF ALEX KOUMISS
18
19                   January 13, 2021
20
21
22
23   Taken before Janice H. Dispo, CSR No. 13299
24   Job No. 4388811
25   Pages 1 to 68

                                            Page 1

1      A.   No.   I believe I was interviewed the next

2   day, because they ran out of time, and they had us

3   come back the next day.

4      Q.   Okay.   So then you would have been

5   interviewed on August 2nd, '18, right?                    01:16:33

6      A.   Yes.

7      Q.   I can't tell, from this interview, what

8   time it was.   Do you remember what time it was in

9   the day?

10      A.   If you give me -- okay.   So this is based    01:16:42

11   on the actual detective report.   He stated that on

12   August 2nd, 2018, at 1702 hours, he interviewed me.

13      Q.   All right.   Thank you very much.

14   Appreciate that.   That helps that.   Okay.   We will

15   come to the -- to the interview in a minute.   And    01:17:06

16   incidentally, if you think you need to refresh your

17   memory with something from the interview, feel

18   free -- feel free to do that.

19      A.   Thank you.

20      Q.   So tell me what -- what, exactly, did you    01:17:16

21   observe when you first arrived at the scene?   By

22   "the scene," I mean, where Mr. Bauer was and where

23   Chin and Middleton were.

24      A.   Yeah.   When I first got on scene, I saw

25   the officers on the ground.   It looked like it was    01:17:39

Page 19

1   pretty dynamic, rapidly unfolding, looked like

2   there was a violent struggle going on with a large

3   gentleman.

4       I saw Officer Bennett arrive just before I

5   did.  He went over to assist, and by the time I got          01:17:57

6   out of my vehicle, I went over to do what I can to

7   assist as well.

8       Q.  Okay.  So by the time you got up to where

9   Jacob Bauer was on the ground there, there were

10  three officers there, Chin, Middleton, and Bennett,          01:18:17

11  correct?

12      A.  Yes.

13      Q.  Okay.  And who was the next person that

14  arrived after you came by, Officer Koumiss?

15      A.  I would have to believe it was Officer          01:18:30

16  Trovao.

17      Q.  I think that's right, at the time.  Have

18  you reviewed the time line that the police

19  department did about who arrived when and that sort

20  of thing?                                                    01:18:45

21      A.  Not a time line.  I think it was just

22  reviewing reports.

23      Q.  Okay.  All right.  About how long was it

24  after you arrived did Officer Trovao arrive?

25      A.  Less than a minute, probably seconds,          01:18:59

Page 20

```
1    because we were both at the station together

2    responding, so I would imagine it was right after.

3        Q.  So when you arrived, what was the first

4    thing you did, Officer Koumiss?

5        A.  I observed a violent struggle, and I went      01:19:12

6    over there to see what I could do to gain control

7    of the situation.

8        Q.  Okay.  And you were -- would you describe

9    yourself as the senior officer on the scene in

10   terms of your seniority?                              01:19:29

11       A.  Yes.

12       Q.  Did you --

13           MR. BLECHMAN:  Vague as to time.  I'm

14   sorry.  Objection.  Belated objection.  Vague as to

15   time.                                                 01:19:37

16       Go ahead.

17   BY MR. GWILLIAM:

18       Q.  When you first arrived, you were the

19   senior officer on the scene?

20       A.  Yes.                                          01:19:42

21       Q.  Did you ever consider yourself to be in

22   any supervisory role because of your years of

23   experience at the police department?

24       A.  At that point, that did not cross my mind.

25   What was imperative to me was to gain control of      01:19:57
```

Page 21

```
 1    the struggle.
 2        Q.  Okay.  What exactly -- when you say it was
 3    a violent struggle, can you be a little more
 4    specific about what you observed with regard to
 5    Mr. Bauer?                                    01:20:11
 6        A.  I knew Officer Chin to be a very fit
 7    person.  I was one of his training officers.  I
 8    just know him, working shifts with him.  When I
 9    initially heard him call for Code 3 cover, I could
10    hear the stress in his voice.                 01:20:29
11            Code 3 cover is not something we use very
12    often, and the rare occasions it's used, it's
13    obviously taken seriously.  And just me,
14    personally, knowing Chin and hearing the -- his
15    voice calling for Code 3 cover, the stress, and 01:20:44
16    when I arrived, seeing the struggle he was in, my
17    number one priority is to try to help and try to
18    get -- gain control of that situation.
19        Q.  Okay.  But tell me exactly what you
20    observed in terms of -- of Bauer on the ground.  01:20:59
21    Was he prone by -- was he on his stomach by the
22    time you arrived?
23        A.  Yeah.  Once I arrived and was approaching
24    them, I noticed he was on his stomach.  Officer
25    Chin was -- if he -- if Mr. Bauer -- as Mr. Bauer's 01:21:15
```

Page 22

1   laying down, facing the -- on the grass, I believe

2   Officer Chin was on his right side, had handcuffs

3   on his right wrist.

4        I noticed that his -- Mr. Bauer's left arm

5   and left hand was underneath his -- near his          01:21:33

6   waistband.  And just from my training and

7   experience, I know that's a dangerous area for

8   someone's hands to be, while they are resisting

9   police, because there may be weapons there that

10  they are trying to gain access to, so my number one   01:21:48

11  concern was to try to get that left arm removed and

12  under control.

13      Q.   Did anybody, at the time that you were

14  trying to get the left arm under control, say

15  anything about whether they thought he had a          01:21:59

16  weapon?

17      A.   No, I did not hear that.  I heard plenty

18  of orders of "stop resisting," and "relax," and,

19  "stop scratching me," things of that sort.  But

20  again, based on my years of experience and, mostly,   01:22:15

21  being out in the field, I do know that suspects do

22  reach for weapons in their waistband.

23      Q.   All right.  And have you subsequently

24  reviewed Chin and/or Middleton's body cam of their

25  initial meeting with Mr. Bauer?                       01:22:33

Page 23

1     A.   Not their body cam.   I read their

2   depositions.

3     Q.   Okay.   Were commands given to Mr. Bauer to

4   remove his left arm from his body?

5     A.   I can't remember if it's -- I can't          01:22:59

6   remember if, specifically, it was stated to remove

7   his left hand.   I do remember hearing, multiple

8   times, "stop resisting," "relax," "stop scratching

9   me," things of that sort.

10    Q.   I think when I was either reviewing your       01:23:19

11  body cam or the other ones, I heard, very

12  distinctly, a command to him to "get your left arm

13  out," and him saying "I can't."   Do you recall

14  that?

15    A.   I don't recall that dialogue.   Yeah, I       01:23:32

16  don't recall that part.

17    Q.   Do you know whether the problem you were

18  having in getting his arm out from under him was

19  that it was trapped underneath his body?

20    A.   No.                                           01:23:48

21    Q.   And what did you do to try and get his

22  left arm so that you could handcuff him?

23    A.   So when I observed that, as I was

24  approaching the scene, I got onto Mr. Bauer's right

25  side.   I knelt down on the right side of his body.   01:24:06

Page 24

1    I reached over and tried to push and grab onto his

2    left arm.  And I could feel his resistance of not

3    allowing me to, so then I did not think that would

4    work.

5         It was a hot day.  We were all sweating.          01:24:23

6    He was very sweaty.  It was hard to get a good

7    grasp of him, so I went to the next step of trying

8    to get his arm removed.

9         Q.  What was the next step?

10        A.  In my process -- thought process at the      01:24:36

11   time, I thought of using my baton as an improvised

12   device.  Because I was on the opposite side of him,

13   I thought I could wedge it between his elbow and

14   his body and lock it with that leverage, use that

15   leverage to get his arm removed.                      01:24:55

16        Q.  Is that what you tried to do?

17        A.  I did try to do that.

18        Q.  And at that time, were you -- were you

19   kneeling on his body?

20        A.  No.  My knees were on the ground, and I      01:25:03

21   was over -- hovering over his body while I reached

22   around to insert the baton into his -- between his

23   left elbow and his body.

24        Q.  Was anybody else trying to use the baton

25   at that time, to your knowledge?                      01:25:21

Page 25

Aiken Welch, A Veritext Company
510-451-1580

```
 1        A.  I did see another baton trying to  be used,

 2    and I believe it was from Officer Trovao.

 3        Q.  Did you see anybody use any

 4    distractionary strikes with a baton?

 5        A.  No.                                      01:25:37

 6        Q.  Are you aware that distractionary strikes

 7    were done with the baton, now that you've reviewed

 8    the -- more information on the case?

 9            MR. BLECHMAN:  Hold on a second.  Hold on

10    a second.  Lacks foundation.  Vague and ambiguous   01:25:47

11    as to "strikes."  Assumes facts not in evidence.

12            Go ahead.

13            THE WITNESS:  I learned it through

14    reviewing police reports, yes.

15    BY MR. GWILLIAM:                                   01:25:57

16        Q.  But you didn't see Trovao try and hit him

17    with his baton?

18        A.  No.

19        Q.  Did you see --

20            MR. BLECHMAN:  Argumentative -- hold on.    01:26:05

21    Argumentative as to "hit."  And misstates the

22    testimony in the video.

23            Go ahead.

24    BY MR. GWILLIAM:

25        Q.  Did you see Chin hit Bauer with his fist?   01:26:14
```

Page 26

1      A.  No.

2      Q.  Are you aware that that happened now that

3   you reviewed other things or --

4      A.  Yes.

5      Q.  But you were there when that happened; you      01:26:24

6   just didn't see it?

7      A.  I didn't see it.  My concern, again, was I

8   was laser focused on trying to get that arm

9   underneath.  I wasn't looking at those things.

10     Q.  How long did it take you from the time you      01:26:38

11  got your baton in there to get his arm out?

12     A.  I was unsuccessful getting his arm out

13  with my baton.  I tried a couple times.  I believe,

14  because of, again, him being so sweaty, my baton

15  kept slipping out, and so I wasn't able to be        01:26:54

16  successful at that.

17     Q.  So what happened next, then, in terms of

18  getting his arm out from under him?

19     A.  By now, there were several other officers

20  on scene.  I had disengaged to try to reassess on     01:27:07

21  what else I could do.  And when I disengaged, I

22  realized I did not have my medical gloves on.

23        I put those on, and by the time I was

24  standing by Mr. Bauer's feet at that time, I --

25  once I reassessed the situation, they were already     01:27:30

Page 27

```
 1    time you arrived at the scene, right?

 2        A.  Yes.

 3        Q.  And what, if anything, did you do once you

 4    kind of thought it was excited delirium?  Did you

 5    feel that there was any action you needed to take      01:33:52

 6    in order to follow the policy manual of what

 7    happens with excited delirium?

 8            MR. BLECHMAN:  Hold on.  I'm going to

 9    object as lacks foundation.  It's argumentative as

10    phrased.  Misstates the witness's testimony.           01:34:06

11            You can respond.

12            THE WITNESS:  Yeah.  At that point, we

13    had, I believe, at least three supervisors at the

14    scene, and we had medical staging around the

15    corner.                                                01:34:23

16            And again, after our number one goal of

17    getting control of Mr. Bauer was accomplished, I

18    believe one of the supervisors flagged in the fire

19    department and ambulance to come into the scene.

20    BY MR. GWILLIAM:                                       01:34:38

21        Q.  Well, if I read your statement

22    correctly -- let's stick with this page of 13 --

23    you said you were thinking, immediately, excited

24    delirium.  I assume you were concerned about

25    excited delirium when you first saw him and the        01:34:52
```

Page 33

```
 1                    REPORTER'S CERTIFICATE

 2

 3

 4         I, JANICE H. DISPO, a Shorthand Reporter, State

 5    of California, do hereby certify:

 6         That ALEX KOUMISS, in the foregoing deposition

 7    named, was present and by me sworn as a witness in the

 8    above-entitled action at the time therein specified;

 9         That said deposition was taken before me at said

10    time, and was taken down in shorthand by me, a Certified

11    Shorthand Reporter of the State of California, and was

12    thereafter transcribed into typewriting, and that the

13    foregoing transcript constitutes a full, true and correct

14    report of said deposition and of the proceedings that

15    took place;

16         That before completion of the proceedings,

17    review of the transcript was requested.

18         IN WITNESS WHEREOF, I have hereunder subscribed

19    my hand this 3rd day of February, 2021.

20

21

          JANICE H. DISPO, CSR NO. 13299

22        State of California

23

24

25
```

Page 68

# EXHIBIT H

```
1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                 San Francisco Division
4
5    JOHN BAUER, an individual and
6    as Successor in Interest of
7    Jacob Bauer, deceased; ROSE
     BAUER, an individual and as
8    Successor in Interest of Jacob
9    Bauer, deceased,
10                   Plaintiffs,
         vs.                      No. 3:19-cv-04593-LB
11   CITY OF PLEASANTON; BRADLEE
12   MIDDLETON; JONATHAN CHIN;
13   RICHARD TROVAO; STEVEN BENNETT;
14   ALEX KOUMISS; JASON KNIGHT;
15   MARTY BILLDT; DAVID SPILLER;
16   and DOES 1 to 50, inclusive,
17                   Defendants.
     _____/
18              DEPOSITION OF RICHARD TROVAO
19                 Oakland, California
20              Thursday, October 8, 2020
21   Reported by:
22   Natalie Y. Botelho, CSR No. 9897
23   Job No. 4262017
     Confidential portions:
24   (Page 22, Line 13 - Page 24, Line 20)
25   (Pages 100, Line 18 - Page 103, Line 4)

                                          Page 1
```

```
1    A.        Yes.                                        13:48:24

2    Q.        Why did you decide to use a taser on Jacob  13:48:25

3    Bauer?                                                13:48:28

4    A.        I was trying to use it to gain compliance,  13:48:29

5    to release -- so he can release his arm that we were  13:48:32

6    trying to remove from under him.                      13:48:35

7    Q.        Are you aware that it might be against a     13:48:37

8    policy and certainly might not be safe for someone    13:48:41

9    if they're tased by two different people?             13:48:43

10        MR. BLECHMAN:  Incomplete.                        13:48:49

11        MR. GWILLIAM:  Q.  Let me rephrase that.          13:48:51

12   At the time you tased him, did you know whether        13:48:53

13   anybody had tased him before then?                     13:48:55

14   A.        At the time I tased him, no, I did not       13:48:59

15   know.  I realized it the second time I tased him,      13:49:03

16   when I saw the probes in Mr. Bauer.                    13:49:06

17   Q.        And you -- did you understand that           13:49:11

18   Middleton had tased him earlier?                       13:49:12

19   A.        At one point I did learn that, but I don't   13:49:17

20   know when.  I do know that he was tased after I        13:49:19

21   tried applying the second time, and I saw that there  13:49:23

22   were taser probes in Mr. -- I saw one.  Later on,      13:49:27

23   after reviewing the video, I saw there were two, but  13:49:31

24   at the time, I saw one, and I knew that he had been    13:49:34

25   tased and it was not successful.                       13:49:36
```

Page 53

| | | |
|---|---|---|
| 1 | Q.        Did you tase him again after you saw the | 13:49:39 |
| 2 | taser prongs in him? | 13:49:41 |
| 3 | A.        No. | 13:49:43 |
| 4 | Q.        Did you do what is referred to sometimes | 13:49:45 |
| 5 | as a drive stun when you tased him? | 13:49:48 |
| 6 | A.        Yes. | 13:49:52 |
| 7 | Q.        You've never done that before? | 13:49:52 |
| 8 |          MR. BLECHMAN:  Again, in the field, is the | 13:49:54 |
| 9 | question? | 13:49:56 |
| 10 |          MR. GWILLIAM:  Yeah. | 13:49:57 |
| 11 |          MR. BLECHMAN:  Thank you. | 13:49:57 |
| 12 |          THE WITNESS:  In the field, no, I don't | 13:49:58 |
| 13 | recall, no. | 13:49:58 |
| 14 |          MR. GWILLIAM:  Q.  Have you ever done it | 13:50:00 |
| 15 | in training? | 13:50:00 |
| 16 | A.        Yes. | 13:50:01 |
| 17 | Q.        Tell me what you've done in training with | 13:50:01 |
| 18 | regard to a drive stun. | 13:50:04 |
| 19 | A.        Well, oftentime we -- when we -- like I | 13:50:05 |
| 20 | mentioned earlier, we practice shooting at a | 13:50:10 |
| 21 | cardboard cutout target.  And you shoot the taser at | 13:50:13 |
| 22 | the cutout, and then you simulate that it did not | 13:50:16 |
| 23 | work.  Obviously it's cardboard, so, you know -- and | 13:50:20 |
| 24 | then you go up to complete the circuit with taser. | 13:50:24 |
| 25 | Because once you launch the taser probes, you can | 13:50:29 |

Page 54

1    still use the ends to complete a circuit, to finish          13:50:33

2    the tasing.                                                    13:50:37

3            We've also try -- rehearse -- or                      13:50:38

4    "rehearse" is probably not the right word -- trained          13:50:41

5    to remove the cartridge and use a drive stun along            13:50:45

6    the cardboard cutout, or whatever it is.                      13:50:50

7    Q.      So in all of your work with regard to the             13:50:55

8    so-called drive stun would have been on a cardboard           13:50:57

9    cutout?                                                        13:51:00

10   A.      Cardboard cutout.  Not human, but                     13:51:01

11   cardboard cutout.  I don't --                                 13:51:04

12   Q.      So what did you do?  Just put the taser                13:51:06

13   right up on the thing like this and tase the                  13:51:08

14   cardboard that way?                                           13:51:11

15   A.      Yes.                                                   13:51:12

16   Q.      Is that what you did?                                 13:51:13

17   A.      Yes.                                                   13:51:13

18   Q.      How many times do you think you've done               13:51:17

19   that before August 1st, '18?                                  13:51:19

20   A.      It would depend on how often we train.  I             13:51:25

21   don't recall if it's once a year or once every two            13:51:26

22   years, but I've been with the department since 2005,          13:51:30

23   and I was issued a taser soon after being hired, so           13:51:36

24   I would -- if we did it yearly, I would probably say          13:51:43

25   close to 13 times, if we did it yearly.                       13:51:46

Page 55

| | | |
|---|---|---|
| 1 | (Whereupon the video marked as Exhibit 16 | 14:10:53 |
| 2 | was played.) | 14:10:53 |
| 3 | MR. GWILLIAM:  Stop that right there. | 14:11:18 |
| 4 | Q.    Is this your foot on him right there? | 14:11:19 |
| 5 | A.    Yes. | 14:11:21 |
| 6 | Q.    Did you feel it was appropriate to put | 14:11:22 |
| 7 | your foot on him like that at that point? | 14:11:23 |
| 8 | A.    Yes. | 14:11:26 |
| 9 | Q.    Why did you feel it was important?  Were | 14:11:26 |
| 10 | you trying to stomp him? | 14:11:28 |
| 11 | MR. BLECHMAN:  Hold on.  Vague and | 14:11:29 |
| 12 | ambiguous as to "stomp."  Well, I think there was | 14:11:30 |
| 13 | two questions in there.  So it's compound, vague and | 14:11:33 |
| 14 | ambiguous as to "stomp," but go ahead. | 14:11:35 |
| 15 | THE WITNESS:  So I wasn't stomping.  I was | 14:11:38 |
| 16 | trying to use his leverage to shove him back over, | 14:11:40 |
| 17 | because he's trying to roll over towards us onto his | 14:11:43 |
| 18 | back at this point. | 14:11:44 |
| 19 | MR. GWILLIAM:  Q.  Do you feel it was | 14:11:45 |
| 20 | appropriate for you to put your foot on him to do | 14:11:47 |
| 21 | that? | 14:11:49 |
| 22 | A.    Yes, because it's a tight quarters, and to | 14:11:49 |
| 23 | go back down to get back in between them at that | 14:11:50 |
| 24 | point where I was standing, yes. | 14:11:53 |
| 25 | Q.    And did you feel that you stomped on him | 14:11:55 |

Page 64

1    and -- with your foot at that time?                    14:11:59

2            MR. BLECHMAN:  Misstates the witness's          14:12:02

3    testimony, asked and answered.  Go ahead and tell      14:12:03

4    him again.                                             14:12:05

5            THE WITNESS:  I was shoving him with my         14:12:06

6    foot.  It wasn't a stomp.  It was shoving him with     14:12:07

7    my foot, trying to shove him back over to the          14:12:11

8    position he was at earlier, because he's trying to     14:12:14

9    roll back over towards us.                             14:12:17

10           MR. GWILLIAM:  Q.  So the purpose of you        14:12:18

11   standing up and putting your foot on him was to try    14:12:19

12   and roll him over?  Is that what you're saying?        14:12:21

13   A.       To keep him from getting back up towards       14:12:24

14   us, yes.                                               14:12:26

15   Q.       Is this something that you have done in        14:12:29

16   the past?  You've put your feet on subjects to         14:12:31

17   control them?  Do you recall doing that in your        14:12:35

18   history of your work before?                           14:12:41

19   A.       I don't recall, no.                           14:12:42

20   Q.       All right.  Well, let's see what else          14:12:46

21   we've got.                                             14:12:47

22           Okay.  Yeah, the time is at 2:05, just for      14:12:48

23   the record.                                            14:12:51

24           (Whereupon the video marked as Exhibit 16       14:12:53

25           was played.)                                    14:12:53

Page 65

```
 1    A.        Yes.  Well --                          14:17:05

 2    Q.        When did you -- sorry.                 14:17:06

 3    A.        I don't know if it was this time I thought  14:17:07

 4    it wasn't working or the first time.  However, what  14:17:09

 5    I concluded here was that I attempted to tase him  14:17:12

 6    twice, and then I could see at that point that  14:17:17

 7    someone had already tased him because I saw the  14:17:20

 8    probes.  The taser wasn't -- it wasn't helping us  14:17:22

 9    trying to handcuff him.  That's why I said there was  14:17:26

10    no effect.  It's not --                           14:17:29

11    Q.        So he wasn't reacting to the taser?    14:17:30

12    A.        I don't believe so, because we're still  14:17:33

13    struggling with him and...                        14:17:35

14    Q.        Okay.  And the purpose, as far as you're  14:17:37

15    concerned, of the taser was to have pain compliance  14:17:42

16    so that he stops struggling?  Is that a reason you  14:17:46

17    did it?                                           14:17:49

18    A.        It's a type of pain compliance.  It's  14:17:50

19    considered less -- less lethal.  So yes, it's a type  14:17:52

20    of pain compliance, where we hoped that he would  14:17:55

21    comply with our orders so we could get him  14:17:59

22    handcuffed.                                       14:18:01

23    Q.        Okay.                                   14:18:02

24    A.        And he's act -- yes.                    14:18:02

25              MR. GWILLIAM:  2:20.  We'll move forward a  14:18:08
```

Page 70

```
 1   little.                                        14:18:11

 2              (Whereupon the video marked as Exhibit 19    14:18:12

 3              was played.)                        14:18:12

 4              MR. GWILLIAM:  Stop.                14:18:24

 5   Q.         So did you tase him again, then, at this    14:18:24

 6   point, just there at 2:35?                     14:18:27

 7   A.         I'm sorry.  For me?  No.            14:18:30

 8   Q.         Did you tase him again?             14:18:32

 9   A.         No.                                 14:18:34

10              MR. GWILLIAM:  Just take it back just a    14:18:34

11   little bit.  So take it from there.  Just move it    14:18:35

12   forward, 2:30.                                 14:18:50

13              (Whereupon the video marked as Exhibit 19    14:18:51

14              was played.)                        14:18:51

15              MR. GWILLIAM:  Q.  Okay.  We run that up    14:19:41

16   until I think it's about three minutes and 12    14:19:43

17   seconds or something like that.  Is that video    14:19:45

18   consistent with your recollection of what happened,    14:19:47

19   as far as you can see from the video?          14:19:49

20   A.         Yes.                                14:19:52

21              MR. GWILLIAM:  Okay.  We've got another    14:19:53

22   video.  Let's -- the next one has not been marked    14:19:55

23   yet, so I guess it will be 21.                 14:19:57

24              (Whereupon the video marked as Exhibit 21    14:20:14

25              was played.)                        14:20:14
```

Page 71

```
 1              MR. GWILLIAM:  Stop right there.          14:20:15

 2    Q.        Now, that was you using your baton on him,  14:20:16

 3    right?                                              14:20:18

 4    A.        Yes.                                      14:20:19

 5    Q.        Why did you pull out your baton and strike  14:20:19

 6    him like that?  And incidentally, we're at point 08  14:20:21

 7    of this video, Exhibit 21.                          14:20:26

 8    A.        So we were trying to remove his left arm   14:20:29

 9    from underneath Mr. Bauer.  And I tried initially to  14:20:31

10    try to pull his arm.  That didn't work, so I tried   14:20:35

11    the distraction blows with -- by jabbing, by using   14:20:39

12    my baton in the closed position, hoping that that    14:20:42

13    would release his grip, or whatever he was doing to  14:20:46

14    hold his arm underneath him.  And as you could see,  14:20:49

15    it didn't have any effect either.                   14:20:52

16    Q.        Where exactly on your body (sic) did you   14:20:54

17    hit him?  In the head?                              14:20:56

18    A.        No.  It was on the side.  Right here,     14:20:58

19    somewhere on the side (indicating).                 14:20:59

20              MR. BLECHMAN:  When you describe for the   14:21:02

21    video, you got to describe for the record.          14:21:04

22              THE WITNESS:  Oh, I'm sorry.  Left side    14:21:08

23    area, under -- under his arm.                       14:21:09

24              MR. GWILLIAM:  Q.  And you thought by      14:21:12

25    hitting --                                          14:21:13
```

Page 72

```
 1   A.        Might have been under his arm.           14:21:13

 2   Q.        What did you think you would accomplish by   14:21:15

 3   hitting him with your baton?                       14:21:17

 4   A.          I would hope he would feel enough pain   14:21:19

 5   there that he would release his grip.             14:21:22

 6   Q.         What was he holding on to that you mean   14:21:24

 7   "release his grip"?                               14:21:26

 8   A.          Well, he had his -- I say "grip."  That   14:21:27

 9   may be the wrong term.  Release his left arm to   14:21:29

10   where we could pull it out and handcuff him.      14:21:34

11   Q.          So the only purpose of that was to see if   14:21:39

12   you could release his arm so you could pull it out   14:21:42

13   from under his body and handcuff him, correct?    14:21:44

14   A.        Yes.                                      14:21:46

15   Q.        But you had plenty of manpower, people,   14:21:51

16   seems to me, to pull it out.  Would you agree with   14:21:53

17   that?                                             14:21:55

18         MR. BLECHMAN:  Hold on.  Argumentative,      14:21:56

19   calls for speculation, calls for expert testimony.   14:21:56

20   But go ahead and answer.                          14:22:00

21         THE WITNESS:  My honest answer is I wish      14:22:02

22   there was, but he was -- it wasn't.  Seemed like the   14:22:03

23   officers were already struggling prior to my arrival   14:22:09

24   to try to do that.  So I was there to assist them in   14:22:13

25   any way.                                          14:22:15
```

Page 73

| | | |
|---|---|---|
| 1 | MR. GWILLIAM:  All right.  Let's see -- | 14:22:17 |
| 2 | let's go on with the rest of this. | 14:22:18 |
| 3 | (Whereupon the video marked as Exhibit 21 | 14:22:21 |
| 4 | was played.) | 14:22:21 |
| 5 | MR. GWILLIAM:  Hold on a sec.  Wait a | 14:22:27 |
| 6 | minute.  Let's move that back just a little bit. | 14:22:28 |
| 7 | Hold on.  Stop it right there.  Let's stop it. | 14:22:38 |
| 8 | Q.      Now, is this your -- is this your taser | 14:22:41 |
| 9 | there on the hand we see here at -- we're at 13 | 14:22:43 |
| 10 | seconds.  Is that you? | 14:22:48 |
| 11 | A.      To your left, yes. | 14:22:49 |
| 12 | Q.      Now, is somebody else tasing him with | 14:22:51 |
| 13 | their hand over here next to yours? | 14:22:54 |
| 14 | MR. BLECHMAN:  Calls for speculation. | 14:22:56 |
| 15 | MR. GWILLIAM:  Q.  Seemed like it was two | 14:22:57 |
| 16 | people tasing him.  Do you see that? | 14:22:59 |
| 17 | MR. BLECHMAN:  Calls for speculation, | 14:23:01 |
| 18 | lacks foundation as to what the other person's taser | 14:23:01 |
| 19 | is doing.  But you can respond. | 14:23:06 |
| 20 | THE WITNESS:  He has his taser in his | 14:23:08 |
| 21 | hand.  However, I notified or I told him, "I have | 14:23:09 |
| 22 | it.  I got it.  I'm going to tase him," so he | 14:23:12 |
| 23 | doesn't tase him, from my understanding. | 14:23:14 |
| 24 | MR. GWILLIAM:  Q.  It's possible he tased | 14:23:17 |
| 25 | him.  It sounded to me like they both tased him. | 14:23:17 |

Page 74

```
1              CERTIFICATE OF REPORTER

2

3              I, Natalie Y. Botelho, a Certified

4    Shorthand Reporter, hereby certify that the witness

5    in the foregoing deposition was by me duly sworn to

6    tell the truth, the whole truth, and nothing but the

7    truth in the within-entitled.

8              The said deposition was taken down in

9    shorthand by me, a disinterested person, at the time

10   and place therein stated, and that the testimony of

11   said witness was thereafter reduced to typewriting,

12   by computer, under my direction and supervision;

13             That before completion of the deposition,

14   review of the transcript [ ] was|[X] was not

15   requested.  If requested, any changes made by the

16   deponent (and provided to the reporter) during the

17   period allowed are appended hereto.

18             I further certify that I am not of counsel

19   or attorney for either or any of the parties to the

20   said deposition, nor in any way interested in the

21   event of this cause, and that I am not related to

22   any of the parties thereto.

23             DATED: October 19, 2020

24

25             Natalie Y. Botelho, CSR No. 9897
```

                                        Page  123

# EXHIBIT I

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4                       --oOo--
 5   JOHN BAUER, an individual
     and as Successor in Interest
 6   of Jacob Bauer, deceased;
     ROSE BAUER, an individual
 7   and as Successor in Interest
     of Jacob Bauer, deceased;
 8
                     Plaintiffs,
 9
     vs.                            Case No.
10                                  3:19-cv-04593-LB
     CITY OF PLEASANTON; BRADLEE
11   MIDDLETON; JONATHAN CHIN;
     RICHARD TROVAO; STEVEN
12   BENNETT; ALEX KOUMISS; JASON
     KNIGHT; MARTY BILLDT; DAVID
13   SPILLER; and DOES 1 to 50,
     inclusive;
14
                     Defendants.
15   _____/
16
17
18       CONTAINS CONFIDENTIAL MATERIAL WHERE NOTED
19
20    VIDEO-RECORDED DEPOSITION OF ERIC (MARTY) BILLDT
21             THURSDAY, SEPTEMBER 3, 2020
22
23   Reported by:
24   Anrae Wimberley, CSR No. 7778
25   Job No.  4227616

                                          Page 1
```

1          You agree with that?                          11:36:02

2      A.   I agree with that in the policy, yes.

3      Q.   And the next sentence says, "Calls

4  involving these persons should be considered medical

5  emergencies."                                         11:36:15

6          Do you agree with that?

7      A.   I agree with that.

8      Q.   Do you agree that by the time you had

9  gotten on the scene and assessed it, that Jacob

10 Bauer was suffering from a medical emergency          11:36:25

11 pursuant to this policy?

12     MR. BLECHMAN:  Calls for expert testimony, it

13 lacks foundation, calls for speculation of this

14 witness.

15          Go ahead.                                    11:36:37

16     THE WITNESS:  I don't know what he was

17 suffering from.

18 BY MR. GWILLIAM:

19     Q.   Was it your job, as far as you were

20 concerned as the supervising officer at the scene,    11:36:42

21 to determine whether or not there was a mental

22 emergency pursuant to this policy?

23     A.   I know that it's my responsibility to get

24 medical emergency care there quickly, which

25 occurred, and it is the responsibility of fire and    11:37:01

                                                         Page 70

1    paramedics, who have a higher level of care, to make          11:37:09

2    that determination.

3         Q.   Had you had any experience with so-called

4    excited delirium in your peace officer experience

5    before August 1st, '18?                                        11:37:22

6         A.   Only through training.

7         Q.   Okay.  Did you consider at any time while

8    you were at the scene, before the paramedics arrived

9    on the scene, that Jacob Bauer might be suffering

10   from excited delirium?                                         11:37:37

11        MR. BLECHMAN:  Calls for expert testimony,

12   lacks foundation, and calls for speculation.

13             Go ahead.

14        THE WITNESS:  That thought did not cross my

15   mind at that time.                                             11:37:50

16   BY MR. GWILLIAM:

17        Q.   Has it since crossed your mind since you

18   look back on the situation?

19        MR. BLECHMAN:  Incomplete hypothetical, calls

20   for expert testimony, and lacks foundation.                    11:37:59

21             Go ahead.

22        THE WITNESS:  It's possible.

23   BY MR. GWILLIAM:

24        Q.   It's probable, wouldn't you agree?

25        MR. BLECHMAN:  It's argumentative, asked and               11:38:07

Page 71

```
 1    BY MR. GWILLIAM:                                    11:39:28

 2        Q.   All right.  Did you feel like you had full

 3    control of what was going on at the scene up until

 4    the time Jacob Bauer was placed in the ambulance?

 5        MR. BLECHMAN:  Vague and ambiguous as to "full   11:39:38

 6    control."

 7             But go ahead.

 8        THE WITNESS:  I don't know about full control,

 9    but I know I had support of two senior sergeants on

10    scene to assist me if needed.                        11:39:47

11    BY MR. GWILLIAM:

12        Q.   I'm going to get into the video in a

13    minute, but I want to ask another general question.

14    At any time up until the time the paramedics arrived

15    at the scene, did you have any specific concern       11:40:02

16    about the health and welfare of Jacob Bauer?

17        A.   Yes.

18        Q.   I didn't see anything in your report or

19    your statement about concerns about that.  You

20    talked about concerns about safety of your officers,  11:40:23

21    but I didn't see that.  Am I correct that you didn't

22    mention that in your statement?

23        MR. BLECHMAN:  Move to strike the statement as

24    argumentative, argumentative question.  And lacks

25    foundation that those questions were asked.           11:40:37
```

Page 73

```
 1              But go ahead.                              11:40:39

 2         THE WITNESS:  Without looking specifically at

 3    my report, I don't know if that was in there.

 4    BY MR. GWILLIAM:

 5         Q.   When you were at the scene, tell me        11:40:48

 6    exactly what considerations or thoughts you had

 7    about the safety and health considerations of Jacob

 8    Bauer before the paramedics arrived.

 9         A.   I couldn't give you specifics.  I know as

10    a supervisor, we want to render medical aid as soon  11:41:11

11    as possible.  Fire was summoned, they were staged to

12    come in as soon as it was safe to do so.  And once

13    it was deemed safe for them to come in, we had them

14    come to Mr. Bauer.

15         Q.   Did you make the call for paramedics to    11:41:34

16    come to the scene?

17         A.   I believe Sergeant Knight requested fire.

18         Q.   And exactly -- please give me your exact

19    best estimate as to how long you were at the scene

20    before a call was made for the paramedics.          11:41:48

21         A.   So the fire and paramedics will respond at

22    the same time, so just for clarification.

23         Q.   I meant the call.

24         A.   Oh, the call?

25              I would have to look at the timeline.      11:42:03
```

                                                    Page 74

```
 1    contact with Jacob Bauer; is that right?              11:47:04

 2        MR. BLECHMAN:  Vague and ambiguous as to "in

 3    contact."

 4           But go ahead.

 5        THE WITNESS:  Yes.                                 11:47:10

 6    BY MR. GWILLIAM:

 7        Q.   Okay.  What did you -- what was your first

 8    assessment there in terms of what should be your

 9    role here as the supervisor when you see these

10    people working on him?                                11:47:21

11        A.   Observe what's going on, make sure the --

12    eventually figure out what caused this struggle, but

13    make sure that the -- in this case, I didn't know it

14    was Mr. Bauer, but the subject being detained is

15    safe and that the officers are safe.                  11:47:44

16        Q.   So your first consideration was whether

17    Jacob Bauer should be safe?

18        A.   Well, the first consideration is the

19    safety of other -- of everyone involved, and

20    obviously, they're in a struggle to detain this      11:48:00

21    person and formulating the opinion that -- you know,

22    observing for the use of force that's occurring.

23        Q.   What was your impression when you first

24    came on and you see five officers trying to detain

25    this guy, in terms of what he had done, if anything,  11:48:23
```

Page 78

```
 1    to cause them to detain him?                        11:48:26

 2         MR. BLECHMAN:  Calls for speculation and lacks

 3    foundation in this witness.

 4             But go ahead.

 5    BY MR. GWILLIAM:                                     11:48:34

 6         Q.   I just want what your state of mind was.

 7         A.   My state of mind is this is a subject

 8    who's resisting arrest, so I have a -- there's a --

 9    I have at least a 148 PC at this point.

10         Q.   So you think he'd been arrested already?   11:48:50

11         A.   I see --

12         MR. BLECHMAN:  Hold on a second.

13             Calls for a legal conclusion about

14    "arrested already," lacks foundation, calls for

15    speculation.                                         11:49:01

16             But go ahead.

17         MR. GWILLIAM:  I think a police officer can

18    understand "arrest."

19    BY MR. GWILLIAM:

20         Q.   But you thought he'd been arrested; is      11:49:06

21    that right?

22         MR. BLECHMAN:  He wasn't on the scene, Counsel,

23    so how --

24    BY MR. GWILLIAM:

25         Q.   Was it your impression that he had been     11:49:11
```

Page 79

```
 1    try to help them detain him in some way?          11:51:11

 2        A.   Yeah.  At one point, when they're

 3    struggling with his hand, I did.

 4        Q.   Is this a little later?  At this point,

 5    have you gotten involved or are you just trying to  11:51:21

 6    look and see what's going on?

 7        A.   I'm still observing till -- yeah, just

 8    kind of taking in what's going on.

 9        MR. GWILLIAM:  And for the record, we're at

10    1:11, one minute and 11 seconds into the video.     11:51:31

11             All right.  Let's go ahead.

12             (Video played.)

13        MR. GWILLIAM:  Stop there.

14    BY MR. GWILLIAM:

15        Q.   Was it your impression they were trying to  11:51:51

16    handcuff him at this stage?

17        A.   Yes.

18        Q.   Let's go ahead.

19             What I'd like you to do, if you would,

20    Sergeant Billdt, is tell me --                      11:51:59

21        MR. GWILLIAM:  Just stop for a minute.

22    BY MR. GWILLIAM:

23        Q.   Just tell me when you get involved,

24    because I wasn't exactly sure from the video.  Just

25    tell us to stop when you reached in to try to help.  11:52:10
```

Page 82

```
 1          MR. GWILLIAM:  Go ahead.                    11:52:13

 2              (Video played.)

 3       THE WITNESS:  I guess you can say I got

 4    involved by making a suggestion to try to

 5    wedge . . .                                        11:52:23

 6          MR. GWILLIAM:  Okay, stop.

 7    BY MR. GWILLIAM:

 8       Q.   You were making a suggestion?

 9       A.   Yeah, to get -- put the baton in between

10    his arm to wedge it out.                           11:52:28

11       Q.   Why did you think that would be necessary?

12       A.   Because they were struggling to get his

13    arm out and to use it as leverage.

14       Q.   Did you ever physically get involved and

15    try to --                                          11:52:43

16       A.   Yeah --

17          MR. BLECHMAN:  Hold on, let him finish his

18    question so it's clear.

19              Sorry.

20    BY MR. GWILLIAM:                                   11:52:49

21       Q.   Did you ever physically get involved, in

22    terms of trying to help with some hands-on with

23    regard to his detention there?

24       A.   Yes.

25       Q.   All right.  Would you tell us when that    11:52:57

                                                 Page 83
```

```
 1          Q.   Is this where you --                    11:55:16

 2          A.   Yeah.

 3          Q.   Tell me what you're doing here, because I

 4     really couldn't see.

 5          A.   I just --                               11:55:21

 6          Q.   Wait just a minute.

 7               We're at 2:14 in the video.

 8          A.   I believe I just helped transition his arm

 9     up, push his arm up, and then once they grabbed hold

10     of it, I let go.                                  11:55:31

11          Q.   You were only involved in it for a very

12     short time?

13          A.   Very short time.

14          Q.   If I read your statement correctly, did

15     you feel that maybe it wasn't your job, as the       11:55:39

16     supervisor, to be hands-on and that you needed to be

17     more on an observation role and that's why you kind

18     of stepped back and decided not to be involved

19     directly with trying to detain him?  Do I understand

20     that correctly?                                   11:55:53

21          A.   That's correct.  That's why.

22          Q.   So at this stage, you said, wait a minute,

23     I need to pull back because my role as a supervisor

24     is to observe what's going on and not try to be

25     directly involved in the hands-on attempt to detain   11:56:03
```

Page 86

1    him; correct?                                          11:56:10

2        A.    Yes.

3        MR. GWILLIAM:  Okay.  Let's go on for a while

4    then.

5              (Video played.)                              11:56:17

6        MR. GWILLIAM:  Stop here.

7    BY MR. GWILLIAM:

8        Q.    I was curious, you're walking away from

9    the scene here.  Where are you going?

10       A.    I'm going to get the leg restraint, the     11:56:50

11   wrap device.

12       Q.    The wrap.  So whose -- was it your

13   decision to put a wrap on him at that time?

14       A.    No.  It was -- I agreed with the decision,

15   but I went to go retrieve it for the officers.         11:57:02

16       Q.    Whose idea was it to put the wrap on him?

17       A.    Officer Granados.

18       Q.    And how did that come about?  Did he just

19   say let's go get a wrap and everybody agrees or did

20   he confer with you about it or Knight or what?         11:57:19

21       A.    It's typical for us, with a subject that

22   is resisting, violently resisting, to place them

23   into a wrap for their safety and officer safety.

24       Q.    At any time, did you have any concerns

25   about the use of a wrap on Jacob Bauer, as you         11:57:38

Page 87

```
 1    understood his situation at that time?              11:57:42

 2         A.   At that time?

 3         Q.   Yeah.

 4         A.   No.

 5         Q.   Did you have any concerns that the wrap    11:57:48

 6    might be considered a danger to his health?

 7         A.   No.

 8         Q.   So you went -- you're going to get the

 9    wrap here.  Is that what you're doing?

10         A.   That's correct.                            11:58:02

11         MR. GWILLIAM:  Okay, let's move forward.

12              (Video played.)

13         MR. GWILLIAM:  Let's stop it here at 3:08.

14    There you go.  This is 3:07.

15    BY MR. GWILLIAM:                                     11:58:30

16         Q.   Now, I want to ask you at this point, did

17    you, at this point, have any specific concerns about

18    the health of Jacob Bauer or his safety?

19         A.   I can't recall.

20         Q.   Were you concerned that people might be    11:58:42

21    kneeling on him when he was on his stomach?

22         A.   At that time?  The thought didn't cross my

23    mind at that time.

24         Q.   Did the thought ever cross your mind that

25    he might have difficulty breathing with all these    11:59:00
```

Page 88

```
 1              Go ahead.                              12:14:17

 2         THE WITNESS:  Yeah, I don't know.

 3         MR. GWILLIAM:  Okay.  Let's move on.

 4              (Video played.)

 5         MR. GWILLIAM:  Let's just stop here.        12:14:56

 6    BY MR. GWILLIAM:

 7         Q.   I count at least six or seven officers

 8    that seem to be working on him.  Would you say that,

 9    that there were at least six or seven officers that

10    appeared to be hands-on on Jacob Bauer to try and    12:15:06

11    control him?

12              Would you agree with that?

13         MR. BLECHMAN:  Calls for speculation, lacks

14    foundation.

15              Go ahead.                              12:15:14

16    BY MR. GWILLIAM:

17         Q.   You were there.

18         A.   Six to seven officers?

19         Q.   Six or seven officers.

20         A.   Working on him?                        12:15:20

21         Q.   Yeah.

22         A.   I'd say six to seven officers assisting.

23         Q.   Did you have any concern that there might

24    be too many police officers who were trying to

25    detain him?                                      12:15:32
```

Page 104

```
 1      A.   No.                                    12:15:36

 2      Q.   I want to ask you this question,

 3   Sergeant Billdt.  At any time -- we're going to

 4   continue to go through this video, but at any time,

 5   did you feel that you should try to deescalate this  12:15:45

 6   situation?

 7      MR. BLECHMAN:  Vague as to time, vague as to

 8   "deescalate this situation."

 9           Go ahead.

10      THE WITNESS:  Deescalate.  At this time, again,   12:15:57

11   the goal was to safely render the scene safe, and

12   that's what they were doing.

13   BY MR. GWILLIAM:

14      Q.   Is the answer to my question no?

15      A.   No.                                    12:16:12

16      Q.   You never considered deescalation at any

17   time?

18      A.   I don't recall if that came across my

19   mind.

20      Q.   Did anybody at the scene ever say anything  12:16:19

21   about, hey, let's step back and assess this

22   situation and deescalate?

23      MR. BLECHMAN:  Vague as to time.

24   BY MR. GWILLIAM:

25      Q.   Let me rephrase that.                  12:16:28
```

Page 105

| | | |
|---|---|---|
| 1 | Did anybody at any time say, hey, let's | 12:16:28 |
| 2 | step back and try and assess this situation? | |
| 3 | MR. BLECHMAN:  Vague as to time, calls for | |
| 4 | speculation and lacks foundation as to other people. | |
| 5 | Go ahead. | 12:16:34 |
| 6 | THE WITNESS:  I don't recall that conversation | |
| 7 | occurring. | |
| 8 | BY MR. GWILLIAM: | |
| 9 | Q.   Would you describe the scene we were | |
| 10 | watching as chaotic? | 12:16:40 |
| 11 | MR. BLECHMAN:  Argumentative. | |
| 12 | But go ahead. | |
| 13 | THE WITNESS:  Looks chaotic. | |
| 14 | BY MR. GWILLIAM: | |
| 15 | Q.   Did that concern you, that you were | 12:16:47 |
| 16 | observing a situation that was chaotic? | |
| 17 | A.   Yes, it was a concern. | |
| 18 | Q.   What concerns did you have about that? | |
| 19 | A.   Well, obviously, I think I've stated is | |
| 20 | safely taking him into custody, rendering medical | 12:17:11 |
| 21 | aid, making sure officers are okay, making sure -- I | |
| 22 | mean . . . | |
| 23 | Q.   Finished with your answer? | |
| 24 | A.   Yes. | |
| 25 | Q.   What, if anything, did you do to see if | 12:17:27 |

Page 106

```
 1    you could reduce the chaos at the scene there?          12:17:30

 2         MR. BLECHMAN:  Vague as to time.

 3              Go ahead.

 4         THE WITNESS:  At this point, I didn't -- at

 5    this point, that thought hadn't crossed my mind,       12:17:43

 6    so . . .

 7    BY MR. GWILLIAM:

 8         Q.   We're going to go through the whole video,

 9    but at any point, I'm looking at the whole time you

10    were there, it was pretty chaotic right up until the   12:17:51

11    time they got the wrap on him, wouldn't you agree?

12         MR. BLECHMAN:  Vague and ambiguous as to

13    chaotic.

14              Go ahead.

15         THE WITNESS:  It was very fluid, yes.            12:18:01

16    BY MR. GWILLIAM:

17         Q.   Does "fluid" mean the same as chaotic?

18         A.   Well, I mean, there are a lot of moving

19    parts.  It looks chaotic, so yes.

20         Q.   All right.  My question, again is, what,    12:18:10

21    if anything, did you consider to try and reduce that

22    chaos up until the time that the paramedics arrived?

23         A.   I don't recall what I did.

24         MR. GWILLIAM:  Let's move it along.

25              (Video played.)                             12:18:25
```

Page 107

```
 1    and make sure that they did not use excessive force.        01:46:20

 2            Would you agree with me?

 3       A.   I agree.

 4       Q.   Okay.  And if, in fact, Officer Trovao hit

 5    him in the head with a baton, that would be                 01:46:29

 6    excessive force, would it not?

 7       A.   It could be, yes.

 8       MR. BLECHMAN:  Hold on.

 9            Calls for expert testimony, incomplete

10    hypothetical, lacks foundation.                             01:46:38

11            Go ahead.

12       THE WITNESS:  Yes, it could be.

13    BY MR. GWILLIAM:

14       Q.   Okay.  Do you think that you did a good

15    job in overseeing these officers at the scene here,        01:46:47

16    in retrospect?

17       A.   In retrospect, I think I did a good job

18    for a three-week supervisor.  Having the luxury of

19    having two senior officers, yes.

20       Q.   Would you have done anything different,           01:47:05

21    now that you've kind of had a chance to think back

22    on it and have a little more experience?

23       MR. BLECHMAN:  Calls for speculation.

24    BY MR. GWILLIAM:

25       Q.   In terms of overseeing these officers?           01:47:14
```

Page 138

1    MR. BLECHMAN:  Calls for speculation,          01:47:16

2    incomplete hypothetical, and argumentative.

3         Go ahead.

4    THE WITNESS:  I think there's always an

5    opportunity to be better.  I think the result of --    01:47:22

6    for me, personally, I wish I would have been the one

7    that requested medical -- been the one -- you know,

8    I brought them in, but -- so I know -- I can hear it

9    being done, so . . .

10        But overall, I think the scene was handled     01:47:42

11   as good as it can be, due to the circumstances that

12   we had and the information we had.  But again, we

13   always try to strive to be better when we manage

14   things.

15        I don't have a specific of what I would do     01:48:04

16   that's different.  I know that I had a lot of senior

17   sergeants making suggestions, and having the

18   experience and having two years under my belt,

19   obviously I would be handling those myself.

20   BY MR. GWILLIAM:                                   01:48:24

21       Q.   Okay.  In your long answer, one of the

22   things you said is that you wished that you had

23   requested the medical -- been the one to request the

24   medical.

25        Are you saying that you wish you had          01:48:41

                                        Page 139

```
 1    requested medical sooner under these circumstances?        01:48:43

 2         MR. BLECHMAN:  Misstates the witness'

 3    testimony.

 4            Go ahead.

 5         THE WITNESS:  No, I'm not saying that.  What          01:48:52

 6    I'm saying is, as things are unfolding that's one of

 7    the things that -- no, I wish -- not sooner, not --

 8    just being in more . . . I don't have a straight

 9    answer for you, I'm sorry.

10    BY MR. GWILLIAM:                                           01:49:18

11         Q.   I'm just not clear maybe, as to what you

12    meant by your answer, you said, I wish I had

13    requested the medical.  I didn't understand what you

14    meant by that.

15         A.   You asked me for examples of if I would         01:49:27

16    have done something different, and I said one of the

17    things I wish I would have done was been the one to

18    request medical at the time Sergeant Knight did.

19         Q.   Was Knight the one that called for the

20    medical?                                                   01:49:49

21         A.   I believe so, yes.

22         Q.   Did he confer with you about that before

23    he did it?

24         A.   No.

25         Q.   You were okay with him doing that?              01:49:59
```

Page 140

1       A.   **Absolutely.**                                      01:50:01

2       Q.   In some of the testimony, and I think

3   maybe some of the videos, I heard some of the

4   officers refer to this situation as a fight.

5            Is that the way you would describe what        01:50:22

6   was going on here, is that this was a fight?

7       MR. BLECHMAN:  Vague and ambiguous as to the

8   officers you're referencing.

9            But go ahead.

10      THE WITNESS:  I would describe it as a struggle    01:50:36

11  by the time I got on.  I don't know what -- again, I

12  don't know what happened beforehand that led them to

13  go to the ground, but they felt that they were in a

14  fight.

15           So I don't know if they meant a fight for     01:50:52

16  their life, a fight to get him into custody.  Fight

17  is very -- I don't know your definition of "fight"

18  or what the officers' definition of "fight" was.

19  BY MR. GWILLIAM:

20      Q.   How about you, would you refer to what was    01:51:03

21  going on from what you knew about it as a fight?

22      A.   It was a fight to get him into custody.

23      Q.   Did you think that Jacob Bauer did

24  anything to initiate a fight?

25      MR. BLECHMAN:  Lacks foundation and calls for      01:51:19

                                                       Page 141

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12         Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript ( ) was (X) was not requested.

16         I further certify that I am neither

17    financially interested in the action nor a relative

18    or employee of any attorney of any party to this

19    action.

20         IN WITNESS WHEREOF, I have this date

21    subscribed my name.

22    Dated:  September 22, 2020

23

24

25         ANRAE WIMBERLEY, CSR No. 7778

                                        Page 188

# EXHIBIT J

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 San Francisco Division

4

5    JOHN BAUER, an individual and

6    as Successor in Interest of

7    Jacob Bauer, deceased; ROSE

8    BAUER, an individual and as

9    Successor in Interest of Jacob

10   Bauer, deceased,

11                   Plaintiffs,

12      vs.                    No. 3:19-cv-04593-LB

13   CITY OF PLEASANTON; BRADLEE

14   MIDDLETON; JONATHAN CHIN;

15   RICHARD TROVAO; STEVEN BENNETT;

16   ALEX KOUMISS; JASON KNIGHT;

17   MARTY BILLDT; DAVID SPILLER;

18   and DOES 1 to 50, inclusive,

19                   Defendants.
     _____/

20            DEPOSITION OF JASON KNIGHT

21               Oakland, California

22             Thursday, October 8, 2020

     Reported by:

23   Natalie Y. Botelho

24   CSR No. 9897

25   Job No. 4262017

                                          Page  1

| | | |
|---|---|---|
| 1 | A.        Less than five.  Maybe less than three. | 10:07:17 |
| 2 | Q.        Okay.  And when you arrived at the scene, | 10:07:19 |
| 3 | who was there? | 10:07:22 |
| 4 | A.        Middleton, Chin. | 10:07:28 |
| 5 | Q.        Trovao? | 10:07:34 |
| 6 | A.        I'd have to watch the video again.  I | 10:07:36 |
| 7 | don't remember that. | 10:07:38 |
| 8 | Q.        Okay.  Was Marty Billdt there at the time | 10:07:39 |
| 9 | you arrived? | 10:07:42 |
| 10 | A.        We got there about the same time. | 10:07:43 |
| 11 | Q.        All right. | 10:07:45 |
| 12 | A.        Sorry. | 10:07:45 |
| 13 | MR. BLECHMAN:  It's okay.  Just let him | 10:07:45 |
| 14 | finish his question before you answer, and he'll do | 10:07:47 |
| 15 | the same -- | 10:07:50 |
| 16 | THE WITNESS:  My bad. | 10:07:51 |
| 17 | MR. BLECHMAN:  -- for you.  That's okay. | 10:07:53 |
| 18 | We're going a little fast, so... | 10:07:53 |
| 19 | MR. GWILLIAM:  If we're speaking too fast, | 10:07:55 |
| 20 | let us know. | 10:07:55 |
| 21 | (Discussion off the record.) | 10:08:19 |
| 22 | MR. GWILLIAM:  Q.  How would you describe | 10:08:26 |
| 23 | your role at the scene?  When I read your statement, | 10:08:27 |
| 24 | I thought at one time you said you were sort of a | 10:08:32 |
| 25 | supervisor or co-supervisor.  Can you describe for | 10:08:34 |

Page 29

| | | |
|---|---|---|
| 1 | me in your own words what you felt your role was | 10:08:36 |
| 2 | there at the scene from the time you arrived until | 10:08:40 |
| 3 | the time they put Mr. Bauer in the ambulance? | 10:08:42 |
| 4 | A.        Well, I'm obviously supervisor on scene. | 10:08:48 |
| 5 | However, on that situation, I believed that we were | 10:08:50 |
| 6 | going to have a use-of-force issue.  I mean, we | 10:08:55 |
| 7 | were.  And that it would have been a good | 10:08:57 |
| 8 | opportunity for Sergeant Billdt to do the | 10:08:59 |
| 9 | administrative review. | 10:09:02 |
| 10 | Q.        Well, who would be the commander?  Who | 10:09:07 |
| 11 | would be the person in charge, as far as you're | 10:09:10 |
| 12 | concerned, if there was one person in charge of the | 10:09:12 |
| 13 | scene, from the time you arrived until the time he | 10:09:15 |
| 14 | died or he coded? | 10:09:19 |
| 15 | A.        I mean, we're all supervisors on scene, | 10:09:22 |
| 16 | myself, Sara Sua, and Billdt.  We were the ones that | 10:09:24 |
| 17 | are going to continue to communicate with each | 10:09:28 |
| 18 | other, and we're all the same rank, and we're going | 10:09:30 |
| 19 | to communicate with each other to make decisions. | 10:09:34 |
| 20 | That -- during the fluid situation. | 10:09:38 |
| 21 | Q.        Did you perceive that Marty Billdt was the | 10:09:41 |
| 22 | primary commander at the scene there? | 10:09:43 |
| 23 | MR. BLECHMAN:  Vague and ambiguous as to | 10:09:48 |
| 24 | "commander," but go ahead. | 10:09:49 |
| 25 | THE WITNESS:  Like I said, I think that | 10:09:52 |

Page 30

| | | |
|---|---|---|
| 1 | all three of us were on scene as supervisors that | 10:09:54 |
| 2 | are able to make decisions and communicate together. | 10:09:57 |
| 3 | I mean, ultimately, we have a chain of command. | 10:10:00 |
| 4 | That is, we did not have a lieutenant on scene.  We | 10:10:02 |
| 5 | had three sergeants and several officers, and we are | 10:10:05 |
| 6 | the three that are going to be making decisions and | 10:10:08 |
| 7 | that are going to be responsible for getting medical | 10:10:11 |
| 8 | and those type of things, so... | 10:10:15 |
| 9 | MR. GWILLIAM:  Q.  So if I understand your | 10:10:17 |
| 10 | testimony, as far as you were concerned, all three | 10:10:19 |
| 11 | of the sergeants who were there were equally in | 10:10:21 |
| 12 | command?  There wasn't any chain of command between | 10:10:24 |
| 13 | the three of you?  Is that your understanding? | 10:10:26 |
| 14 | MR. BLECHMAN:  I think that misstates the | 10:10:29 |
| 15 | witness's testimony, but go ahead. | 10:10:30 |
| 16 | THE WITNESS:  Yeah, like I said, I don't | 10:10:32 |
| 17 | think that we -- we're all the same rank, so... | 10:10:34 |
| 18 | MR. GWILLIAM:  Q.  Okay.  But if you come | 10:10:41 |
| 19 | on a scene like this, where obviously there's some | 10:10:43 |
| 20 | use-of-force issues there, as far as you're | 10:10:47 |
| 21 | concerned, would there be -- there wouldn't be one | 10:10:50 |
| 22 | person that would necessarily be in charge?  If | 10:10:52 |
| 23 | you've got three sergeants, as you did here, the | 10:10:54 |
| 24 | three of you would be equally in charge?  Is that | 10:10:56 |
| 25 | your understanding of what was going on on | 10:10:58 |

Page 31

```
 1    August 1st?                                    10:11:01

 2    A.         What I'm saying is that you have three   10:11:03

 3    sergeants on scene, but my understanding was   10:11:04

 4    Sergeant Billdt was going to be handling the   10:11:08

 5    use-of-force issue, and my job at the time was to   10:11:10

 6    assist him with what type of resources he was going   10:11:13

 7    to need in order to complete that administrative   10:11:16

 8    review.                                        10:11:19

 9    Q.        Well, is the administrative review    10:11:22

10    something that would happen afterwards?        10:11:24

11    A.         Correct.                            10:11:26

12    Q.        Okay.  But at the scene, did you think   10:11:27

13    that Billdt had any different issue in terms of   10:11:29

14    chain of command from you?  He wasn't in charge of   10:11:34

15    you or giving you any directions?              10:11:38

16    A.         No.  We're going to work together as a   10:11:40

17    team.                                          10:11:42

18    Q.        Okay.  When you arrived, what did you --   10:11:42

19    what, if anything, did you do to assess the   10:11:47

20    situation in terms of what was going on?       10:11:51

21    A.         I arrived and saw a struggle on the   10:11:53

22    ground, and my main concern was the safety of the   10:11:56

23    subject, as well as the safety of the officers.   10:11:59

24    Until that subject's -- I did not know the type of   10:12:01

25    call it was.  So I didn't know what they were   10:12:05
```

Page 32

| | | |
|---|---|---|
| 1 | ahead.  You can respond.  It's also incomplete | 10:23:45 |
| 2 | hypothetical. | 10:23:49 |
| 3 |       THE WITNESS:  Please ask the question | 10:23:52 |
| 4 | again. | 10:23:53 |
| 5 |       MR. GWILLIAM:  Q.  Yeah, you said, "We're | 10:23:53 |
| 6 | going to get to that point later."  I want to know | 10:23:54 |
| 7 | when -- did you intend to get to that point after he | 10:23:56 |
| 8 | was taken to the hospital?  Is that when you -- | 10:23:59 |
| 9 | A.      So the first -- I'm sorry.  Are you done? | 10:24:02 |
| 10 | Q.      Please go ahead. | 10:24:03 |
| 11 | A.      So the first step, again, is to get him | 10:24:04 |
| 12 | into custody as quickly and safely as possible.  The | 10:24:06 |
| 13 | second step is to get medical attention there, which | 10:24:09 |
| 14 | was there monitoring him at the time.  And then the | 10:24:11 |
| 15 | third step would be whether or not we're going to | 10:24:13 |
| 16 | have a criminal act, which is going to be based on | 10:24:15 |
| 17 | investigating the vandalism, investigating the 148, | 10:24:18 |
| 18 | which is -- you know, the 148 issue.  And then after | 10:24:23 |
| 19 | that, while this is all going on and we're | 10:24:26 |
| 20 | investigating, we're also going to deal with this -- | 10:24:30 |
| 21 | doing a psychiatric evaluation. | 10:24:31 |
| 22 | Q.      So when did you think that you needed to | 10:24:35 |
| 23 | do that so-called psychiatric evaluation? | 10:24:37 |
| 24 | A.      Psychiatric evaluation is going to be done | 10:24:43 |
| 25 | once the scene is secure. | 10:24:46 |

Page 45

| | | |
|---|---|---|
| 1 | Q.        At any time up until the time he was put | 10:24:55 |
| 2 | in the ambulance, did you feel, as a supervisor at | 10:24:59 |
| 3 | the scene, that you needed to do anything to | 10:25:03 |
| 4 | deescalate the acts of the officers that were | 10:25:05 |
| 5 | working -- that were trying to restrain him? | 10:25:11 |
| 6 |         MR. BLECHMAN:  Vague and ambiguous as to | 10:25:15 |
| 7 | "deescalate."  Vague as to time.  Go ahead. | 10:25:15 |
| 8 |         THE WITNESS:  No, sir. | 10:25:24 |
| 9 |         MR. GWILLIAM:  Q.  Why not? | 10:25:26 |
| 10 | A.        Because they have a right to, you know, | 10:25:28 |
| 11 | prevent escape.  They have a right to effect an | 10:25:30 |
| 12 | arrest and to overcome his resistance, and that's | 10:25:34 |
| 13 | what they were doing. | 10:25:36 |
| 14 | Q.        All right.  Well, up until the time that | 10:25:37 |
| 15 | he was placed into the ambulance, did you observe | 10:25:40 |
| 16 | anything that concerned you about the use of force | 10:25:43 |
| 17 | on Jacob Bauer? | 10:25:46 |
| 18 | A.        No, sir. | 10:25:47 |
| 19 | Q.        Okay.  The first exhibit that I want to | 10:25:58 |
| 20 | just go over with you for a minute is the -- this is | 10:26:00 |
| 21 | an Exhibit 8 that we've used before.  You said | 10:26:04 |
| 22 | you've looked at it.  I'm going to -- this is -- for | 10:26:07 |
| 23 | the record, this is Exhibit 8 we've used in another | 10:26:09 |
| 24 | deposition. | 10:26:11 |
| 25 |         It doesn't need to be remarked.  We're | 10:26:26 |

Page 46

| | | |
|---|---|---|
| 1 | (Whereupon the video marked as Exhibit 18 | 10:55:16 |
| 2 | was played.) | 10:55:16 |
| 3 | MR. GWILLIAM:   Stop it here. | 10:55:17 |
| 4 | Q.      So what are you doing -- what's going on | 10:55:18 |
| 5 | here, Sergeant Knight? | 10:55:19 |
| 6 | A.      I'm grabbing his hand. | 10:55:21 |
| 7 | Q.      What exactly were you trying to do at this | 10:55:32 |
| 8 | point, Sergeant Knight? | 10:55:35 |
| 9 | A.      Put him in a rear wrist lock. | 10:55:37 |
| 10 | Q.      A what? | 10:55:40 |
| 11 | A.      Rear wrist lock. | 10:55:42 |
| 12 | Q.      And what was the purpose of doing a rear | 10:55:43 |
| 13 | wrist lock? | 10:55:45 |
| 14 | A.      To be able to get his hand to be able to | 10:55:47 |
| 15 | hold it so we can take him into custody. | 10:55:48 |
| 16 | Q.      Okay.  And this is your arm here in the | 10:55:50 |
| 17 | foreground? | 10:55:53 |
| 18 | A.      I believe so. | 10:55:54 |
| 19 | MR. GWILLIAM:  Okay.  Let's move it | 10:55:54 |
| 20 | forward a little bit. | 10:55:56 |
| 21 | (Whereupon the video marked as Exhibit 18 | 10:55:57 |
| 22 | was played.) | 10:55:57 |
| 23 | MR. GWILLIAM:  Stop it.  Stop. | 10:56:04 |
| 24 | Q.      To your knowledge, had there been any | 10:56:05 |
| 25 | tasers used on him at this point?  Did you know | 10:56:07 |

Page 60

| | | |
|---|---|---|
| 1 | anytime there's a possible use of force on the | 11:38:16 |
| 2 | suspect? | 11:38:19 |
| 3 | A.      Yes, sir. | 11:38:19 |
| 4 | Q.      When I was questioning Sergeant Billdt a | 11:38:25 |
| 5 | month or so ago, and you were present here, I asked | 11:38:28 |
| 6 | him if he would describe the scene, as he saw it, as | 11:38:31 |
| 7 | chaotic, and he agreed.  Do you also agree that the | 11:38:37 |
| 8 | scene was chaotic, as far as you were concerned when | 11:38:40 |
| 9 | you were there? | 11:38:42 |
| 10 | MR. BLECHMAN:  May misstate Sergeant | 11:38:42 |
| 11 | Billdt's testimony.  Vague and ambiguous as to the | 11:38:44 |
| 12 | term "chaotic."  But go ahead and respond. | 11:38:46 |
| 13 | THE WITNESS:  I don't think that's a word | 11:38:50 |
| 14 | I would use. | 11:38:51 |
| 15 | MR. GWILLIAM:  Q.  What word would you | 11:38:52 |
| 16 | use? | 11:38:53 |
| 17 | A.      Fluid. | 11:38:55 |
| 18 | Q.      How would you describe your understanding | 11:38:59 |
| 19 | of the word "fluid" as it relates to what was going | 11:39:01 |
| 20 | on with Jacob Bauer? | 11:39:05 |
| 21 | A.      There was a lot of moving parts.  There | 11:39:07 |
| 22 | was a lot of things to take into consideration. | 11:39:09 |
| 23 | Q.      Anything that would particularly concern | 11:39:14 |
| 24 | you as a supervisor at the scene? | 11:39:15 |
| 25 | A.      No, sir. | 11:39:18 |

Page 98

```
 1                 CERTIFICATE OF REPORTER

 2

 3          I, Natalie Y. Botelho, a Certified

 4   Shorthand Reporter, hereby certify that the witness

 5   in the foregoing deposition was by me duly sworn to

 6   tell the truth, the whole truth, and nothing but the

 7   truth in the within-entitled.

 8          The said deposition was taken down in

 9   shorthand by me, a disinterested person, at the time

10   and place therein stated, and that the testimony of

11   said witness was thereafter reduced to typewriting,

12   by computer, under my direction and supervision;

13          That before completion of the deposition,

14   review of the transcript [ ] was|[X] was not

15   requested.  If requested, any changes made by the

16   deponent (and provided to the reporter) during the

17   period allowed are appended hereto.

18          I further certify that I am not of counsel

19   or attorney for either or any of the parties to the

20   said deposition, nor in any way interested in the

21   event of this cause, and that I am not related to

22   any of the parties thereto.

23          DATED: October 22, 2020

24          _____

25          Natalie Y. Botelho, CSR No. 9897

                                           Page 103
```

# EXHIBIT K

1                UNITED STATES DISTRICT COURT
2               NORTHERN DISTRICT OF CALIFORNIA
3                         ---oOo---
4     JOHN BAUER, an individual
      and as Successor-in-Interest of
5     Jacob Bauer, deceased; ROSE BAUER,
      an individual and as
6     Successor-in-Interest of
      Jacob Bauer, deceased;
7
          Plaintiffs,
8
      vs.                              No. C19-04593LB
9
      CITY OF PLEASANTON; PLEASANTON
10    POLICE DEPARTMENT; DAVE SPILLER;
      and DOES 1 to 90, inclusive;
11
          Defendants.
12
      _____/
13
14
15
16           DEPOSITION OF CAPTAIN JAMES SMITH
17          via Remote Counsel virtual meeting
18             Friday, January 22, 2021
19
20
21
22
23
      Job no. 4401083-2
24    Taken before Catherine M. Meyer, RPR, CSR
                  CSR No. 11596
25    Pages 1 - 80

                                          Page 1

1      Q.  All right.  So was -- Jorge Diaz, was he the

2   one wearing the fire department T-shirt out there?

3      A.  I'm sorry.  I don't understand.

4      Q.  Well, we have body-worn camera video of a

5   couple of you guys out there.  I'm trying to figure out

6   who was who.

7      A.  Oh, I haven't seen it.  I'm sorry.

8      Q.  That's okay.  There's somebody I think who was

9   driving wearing a hat.  Was that you?

10      A.  Depends on if you're -- so this being so

11   dynamic, when Patrick -- so Patrick is our normal

12   driver.  He's our engineer.  He drove to the call.  But

13   because Patrick and Jorge went to the hospital, I had to

14   drive to the hospital.  So --

15      Q.  Okay.

16      A.  Yeah, so sorry about that.  I don't know which

17   time or --

18      Q.  That's okay.  I appreciate you clarifying that.

19          Okay.  So when we go back up -- so in general

20   when you got to the scene, Mr. Bauer was still

21   breathing, he was alive, he was respirating; is that

22   true?

23          MS. MILLER:  Captain Smith, did you respond?  I

24   couldn't hear you orally.

25          THE WITNESS:  Yes.

                                                    Page 17

```
 1              MS. MILLER:  Okay.

 2    BY MR. BLECHMAN:

 3         Q.  Your answer to my question was yes, right?

 4         A.  Yes, I said yes.

 5         Q.  Okay.

 6         A.  You said was he breathing.  Yes.

 7         Q.  Yeah.  And in Jorge's report here he says "On

 8    primary findings patient noted yelling and moving

 9    about."  You would agree with that as well?

10         A.  Yes, he was yelling and he was moving about,

11    yes.

12         Q.  And it said "No obvious signs of life

13    threatening injuries noted on visual assessment."  Was

14    that -- was that your observation as well?

15         A.  Yes, there was no what we would consider

16    obvious signs.  Like bleeding, for example, wasn't

17    noticed, anything like that, you know.

18         Q.  And -- right.  And Mr. Bauer never stated any

19    specific pain complaint like my leg, my leg or anything

20    like that, right?

21         A.  Not to my recollection, no.

22         Q.  Okay.  So at some point just to -- more

23    generally, chronologically, you guys arrive at the

24    scene.  Jorge and perhaps Mr. Thomson as well do some

25    visual assessments of Mr. Bauer as the police are still
```

Page 18

1    trying to deal with Mr. Bauer.  Is that kind of how

2    things started when you guys got there?

3         A.  Yeah, so -- so to kind of chronologically put

4    this, prior to arriving there in the area, we were asked

5    by PD to stage.  So we actually were on scene, but we

6    didn't get a chance to actually be on scene.  Typically

7    when we go to an incident that involves PD, and it could

8    be anything to do with like a safety issue, PD -- the

9    police department will ask the paramedics and the fire

10   department, I know kind of we're both, to stage out so

11   we don't get involved in the altercation.  Then they'll

12   call -- when they feel that they have a handle on it,

13   they will call us in so we can do our job.  So when

14   we -- go ahead.

15        Q.  That's okay.  Yeah, so you guys were staged

16   pretty close to where you ended up going?

17        A.  Yeah, I'd say reasonably.  We were -- we were

18   west of the incident kind of like a northwest area but

19   east of the -- the senior center.  I don't know if you

20   know the area that well.  It's Sunol.  It's on Sunol

21   Boulevard and Mission.  We were like right in that

22   intersection area.

23        Q.  So when you were called in from being staged,

24   how long do you think it took you to drive the rig over

25   and park basically?

1        A.  Ten seconds literally.  Once we get the call,

2    we were literally across the street.

3        Q.  So pretty quickly after the -- somebody called

4    you and said the scene is secure --

5        A.  Yes.

6        Q.  -- the fire can come in, you guys were there

7    parking, getting out?

8        A.  Yeah.

9        Q.  Okay.  How long were you staged; do you

10   remember?

11       A.  I do not know that.  Not for sure.  It would be

12   a guesstimate.  And time is one of those things, unless

13   it's totally stamped, most of us are wrong.

14       Q.  Yeah, no problem.

15           Okay.  So based on your memory, and we'll start

16   there and we can get into some of the reports I guess,

17   that might be the easiest way for you, too.  Once you

18   get to the scene, tell me what you recall being told

19   or -- well, let's back up.

20           Before you got to the scene, what was your

21   understanding as to what was going on at the scene, if

22   any, through dispatch or other information?

23       A.  It was just what we call a PD assist for a

24   medical call is what we kind of get that toned out for.

25   It's a medical call, PD assist.  And outside of that

Page 20

1    we -- it's very -- usually the police department doesn't

2    send us exactly what's going on because they're usually

3    in a -- you know, a dynamic situation.  They'll just say

4    they need fire and ambulance or EMS to respond.  While

5    we were staged, we obviously could see that it was a

6    rather large incident because of so many police cars and

7    we can see multiple police officers in the area.  We

8    could not actually see the -- the patient and the police

9    officers that were on the ground from where we were at

10   due to the -- the cars all being around, but we could

11   tell that the situation was a -- was a pretty big

12   incident just from -- just from that area, from the

13   staging area.

14        Q.  Okay.  And I'm assuming with your long career,

15   have you pretty much worked -- well, you've worked in

16   this area.  You've worked with Pleasanton Police

17   Department before I'm assuming, correct?

18        A.  Yeah, we run with multiple officers on calls.

19   I mean, it's -- our jobs kind of intertwine quite a bit.

20        Q.  And is it your understanding that when police

21   officers deploy a taser, a lot of times they have to get

22   the subject medically cleared before they can, you know,

23   take them to jail or that type of thing; is that your

24   general understanding?

25        A.  Yeah, we'll transport -- not us, the fire

Page 21

1    department.  But we'll go on the call obviously, and

2    then the medic unit, the transport unit will transport

3    them to the hospital for their clearance.

4         Q.  Okay.  So you get to the scene.  What do you

5    recall happening next once you got there?

6         A.  We arrived on scene.  I was met by an officer

7    to kind of -- as the captain officer.  Officers usually

8    will come up.  I can't remember if it was a sergeant or

9    if it was just a regular officer.  And they'll give us

10   like -- kind of like what's going on.  This is what we

11   have.  They brief us on that they were called out.

12   Because we always ask for what's the history behind it

13   because we want to know that kind of the depth of it,

14   right?  We don't want to just look at and try to -- try

15   to make an assessment out of -- out of no history.  So

16   we try to gather as much facts and history that we can.

17        But we were told that they were called out to

18   a -- like almost like a public disturbance within --

19   within Raley's.  I believe it's Raley's.  And they met

20   this gentleman in the parking lot.  Altercation.  He had

21   been tased multiple times, and now they had subdued him

22   putting him into what we -- I don't know the exact term

23   of it.  I think I put on my report the wrap because it's

24   like a -- it's like a burrito wrap.  And they had put a

25   spit mask over him.  And so that was the history that

Page 22

1    they gave us.

2            As an officer when I get on -- on scene, I kind

3    of take a brief overview of -- of like scene safety.

4    And my first impression is that they had a gentleman on

5    the ground that was extremely agitated.  He was -- he

6    was, you know, screaming at the top of his lungs, not in

7    any -- not in any words.  Like I didn't understand any

8    words that he was saying.  He was just in -- you know,

9    he was -- he was pissed I guess is the word -- you know,

10   I don't usually write that on a report, but he was -- he

11   was obviously upset at the situation at hand.

12       Q.  Okay.  So like you said, when you got to the

13   scene and when you get to scenes, you know, as the

14   captain of your rig you're responsible for your own

15   safety and your crew's safety, right?

16       A.  Yes, sir.

17       Q.  And so even though sometimes police call you

18   into the scene after being staged or whatnot, you want

19   to make sure it's safe enough for your -- you and your

20   employees to get close to somebody who may need some

21   treatment, right?

22       A.  Yes, sir.

23       Q.  And when you got on the scene and you're

24   hearing the screaming by this individual we know is

25   Mr. Bauer now and you described him as extremely

1   agitated, did this give you any concern about getting

2   too close to him until perhaps he calmed down or

3   anything like that?

4        A.   Yeah.   And I believe I -- I turned to the crew.

5   They -- they were gathering their stuff as they should,

6   medical equipment.   And I just told them no, let's stay

7   back for right now.   And one of the reasons was is that

8   I wasn't sure that he was all the way subdued in the

9   wrap and it still looked like they were struggling with

10  him.   They had a couple officers on his leg and I

11  believe there was an officer holding his shoulder and he

12  was -- he wasn't cooperating with them.   Typically

13  people that are in custody, even when we show up -- you

14  know, I kind of giggle about it, but they're kind of

15  relieved to see us.   You know, we're there to talk to

16  them a little bit, get a blood pressure, kind of see

17  what's going on, have some normalcy on the -- on the

18  assessment side.   But this gentleman here wasn't

19  having -- wasn't having any of it.   No one -- he wasn't

20  going to allow anybody else to get close to him.   So I

21  had my guys back up and we just -- we went back to

22  basically to a staged mode and we just visualized.

23       Q.   Yeah, yeah, because I think I've seen some

24  video you guys get there, and then a couple of you I

25  think including Jorge Diaz, you guys are kind of

Veritext Legal Solutions
866 299-5127

1    circling a little bit of the officers to kind of get a

2    sense of what's going on and where things are to do a

3    visual assessment; is that pretty accurate?

4         A.  Yeah, and 100 percent accurate.  And you'll see

5    Diaz is also a captain.  So his sense is kind of the

6    same sense that I -- that I have.  And so we kind of go

7    into that, you know, that mode first.  So -- but we were

8    on the same page.  We -- we were both definitely on the

9    same page regarding what was happening.

10        Q.  And I'm assuming hypothetically if you guys get

11   there and you see that the arrestee in this case appears

12   to be having an immediate medical issue, guys would have

13   jumped into action and tried to do -- do advanced life

14   saving efforts I'm assuming, correct?

15        A.  Yeah, I think that --

16            MS. WALKER:  Leading.

17            MS. MILLER:  It's an incomplete hypothetical as

18   well.  But you can answer if you can.

19            THE WITNESS:  Okay.  Typically, yeah, we -- if

20   we have a medical problem that doesn't -- that doesn't

21   pose a safety issue for our team, we would do our job.

22   BY MR. BLECHMAN:

23        Q.  So when in this call do you think was, you

24   know, safe enough for you and/or Mr. Thomson and

25   Mr. Diaz to really get closer to Mr. Bauer?

                                                    Page 25

```
 1    you remember?
 2         A.  This -- let's see.  So this was -- this was the
 3    next morning before I got off.  If I -- if I was -- I'm
 4    sorry.  I don't know if I actually worked the next day,
 5    but it was the morning before I got -- got off for the
 6    next -- next period.
 7         Q.  Okay.  So when you get on scene, Mr. Bauer was
 8    in the wrap and he also had a spit mask on at that time;
 9    is that correct?
10         A.  Yes, sir.
11         Q.  And this is what your -- you put this in your
12    report here and this narrative of page 3 of 4 on
13    Exhibit 33 we see that, right?
14         A.  Yes.
15         Q.  And some of these questions may be a little
16    obvious, but I -- you know, I need to ask them.  So was
17    there any doubt in your mind that Mr. Bauer was alive at
18    the time you guys arrive on the scene?
19         A.  There was no doubt that he was alive.
20         Q.  He was yelling, he was screaming, he appeared
21    agitated, correct?
22         A.  Yes.
23             MS. WALKER:  Objection.  Leading.
24    BY MR. BLECHMAN:
25         Q.  All right.  Okay.  So you say in here that
```

Page 32

1    step back.

2            I don't believe I helped put him on the gurney.

3    Normally I would stand back, watch the process happen to

4    make sure there wasn't -- there wasn't anything else

5    that was being missed or going on.  It's just -- it's

6    just a habit that we have with the gurney.  A captain

7    keeps his eyes -- generally keeps his eyes up, then head

8    down actually doing the work.  So he visualizes

9    everything that goes on.  So that's my recollection.

10           Q.   I appreciate that.

11           Did you make any observations about whether or

12   not when Mr. Bauer was being put on the gurney and put

13   in the soft restraints whether it appeared that he

14   needed any immediate medical attention?

15           A.   So from what I could see, not to my knowledge.

16   They were still putting him in restraints.  He had a

17   spit mask on.  He had at that time relaxed I guess is

18   the easier way because I believe that the Versed had

19   kicked in.  And so he became -- he wasn't agitated I

20   guess is the word.  He wasn't flopping around screaming.

21           Q.   Now, hypothetically if your associates Mr. Diaz

22   or Mr. Thomson are assisting and they see that

23   Mr. Bauer, at that point in time, looks to not be

24   breathing, looks to be turning blue or something like

25   that, you would assume they would have mentioned that

Page 38

1    and/or intervened at that point, correct?

2         A.  Yes.  The way I remember it is that would have

3    put four -- four paramedics that I know of in the area

4    that would have made -- I mean, between the four of us,

5    we could have -- if there was something wrong, I believe

6    we would have noticed it.

7         Q.  Yeah.  So -- and that was my next question.  At

8    this point in time when Mr. Bauer was being placed on

9    the gurney and put in the soft restraints, I know there

10   was some police officers that were assisting in the

11   process as well, but four other medical people were

12   basically assisting and around Mr. Bauer, correct?

13        A.  Yes.  It could have been five.  I don't know if

14   both -- both people on the ambulance were -- were there.

15   But I know there was one and there was three of us, so

16   that makes four right there.

17        Q.  Okay.  So at least one of the paramedics you're

18   saying to your recollection and then the three of you

19   were standing around and/or assisting, right?

20        A.  Yes, sir.

21        Q.  Okay.  So I think what you're saying is if

22   there was something dramatic happening with Mr. Bauer's

23   medical condition, at that point in time you would have

24   noticed and/or some of the other medical staff in close

25   proximity would have noticed, right?

```
 1              MS. WALKER:  Objection.
 2              THE WITNESS:  Yes, sir.
 3              MS. WALKER:  Leading.
 4   BY MR. BLECHMAN:
 5        Q.  Just so it's clear for the record, say that
 6   answer again.
 7              MS. MILLER:  Captain -- Captain Smith, I'm
 8   sorry.  Can you repeat your answer please for the
 9   record?
10              THE WITNESS:  It was yes.
11   BY MR. BLECHMAN:
12        Q.  And just so it's clear, you didn't see anything
13   yourself that caused you any concern during that period
14   of time in terms of Mr. Bauer's medical condition,
15   correct?
16        A.  Just confirming, this is before he got in the
17   ambulance?
18        Q.  Right.
19        A.  Still putting him on the gurney, right?
20        Q.  Correct.
21        A.  I did not see anything.
22        Q.  That caused you any significant concern about
23   Mr. Bauer's medical condition at the time staff medical
24   or officers were putting him onto the gurney, correct?
25        A.  Correct, I did not see anything.
```

Page 40

1    Q.  And then I know there was a period of time when
2    they were trying to take some of his handcuffs and put
3    him into soft restraints to attach him to the gurney.
4    The same question.  During that time did you see
5    anything that indicated to you he needed any immediate
6    medical intervention?

7    A.  I did not see anything.

8    Q.  And is that a normal process on occasion that
9    somebody needs to be taken out of handcuffs and put into
10   soft restraints?

11   A.  Yeah, that happens pretty often anytime someone
12   is in I would say handcuffs.  But yeah, anytime
13   someone -- we don't like to transport anybody with their
14   hands behind their back.  If we have a medical emergency
15   it puts us in a really bad bind.  A lot of our stuff, we
16   need the IV access.  If we ever had to do unfortunate a
17   CPR or something like that, having the hands behind the
18   back causes a lot of issues, even just getting vital
19   signs, blood pressures, pulses, stuff like that.

20   Q.  Okay.

21   A.  So it is -- it is typical that we would change
22   him to restraints.

23   Q.  And the restraints are used with somebody who
24   may be combative or had been combative, correct?

25   A.  Anytime the ambulance crew feels that they may

Page 41

1    be -- that they thought was going to be in jeopardy or

2    possibly be in jeopardy.  I mean, for instance, in this

3    case it was a -- one -- one paramedic typically would be

4    in the back with the patient.  And if he or she felt

5    uncomfortable, either PD would have to ride in along

6    while they were handcuffed into the thing or they just

7    put them in restraints, the soft restraints.

8         Q.  Okay.  So at some point the restraints, he's

9    put in the soft restraints, the gurney I believe is kind

10   of raised up, and then it's pushed over or moved over

11   towards the ambulance.  Is that generally what happened

12   here?

13        A.  Yeah.  Yes, sir.

14        Q.  And you were in close proximity at that time

15   observing as well?

16        A.  Yeah, the gurney went past me and I was just

17   behind the feet.

18        Q.  Okay.  And so --

19        A.  Toward the back -- toward the back of the

20   ambulance.

21        Q.  Okay.  And you're watching it move towards the

22   ambulance which I think it was some distance away.  Are

23   you watching during that time period?

24        A.  Yes.

25        Q.  And did you notice any significant need for

Page 42

1    immediate medical attention to Mr. Bauer at that time

2    while he was being moved over toward the ambulance?

3         A.  No, not at that time.

4         Q.  And he had a spit mask on we know when you got

5    to the scene and during this time we've been talking

6    about.  But the spit mask you could still see his eyes,

7    you know, the upper portion of his face and that type of

8    thing, correct?

9         A.  Yes and no.  Yes, we could see like eyes-ish,

10   but skin tone and all that, no.  And the reason is is

11   that because he would spit so much into the mask and

12   there was -- it made like a sheen over it like so as the

13   sun hit it, it almost played like a reflective to it,

14   right?  I couldn't -- you couldn't actually see his

15   facial features and all that through the mask.  And

16   that -- and that was a lot of it had to do with the sun

17   and its angle.  It was almost like reflected is how I --

18   is what I remember about it.

19        Q.  And you guys, you yourself, I mean, you've had

20   other calls where you guys have had to deal with

21   patients who have spit masks on I'm assuming, right?

22        A.  Yes, sir.

23        Q.  And does this spit mask seem any like unique in

24   any shape or form or did it look like a pretty typical

25   spit mask you've seen in the field before?

1          A.  It looked normal.

2          Q.  And you guys are still able to manipulate a

3    subject's eyes or open their eyes if their eyes are

4    closed to take a look at their pupils in their eyes if

5    need be, right?

6          A.  Not typically through a spit mask.  I mean, we

7    could -- if you understand like if you were to take like

8    a sheet over your eyes and you try to open someone's

9    eyes, it's -- it's pretty difficult.

10         Q.  Okay.  Well, I -- in some body-cam video I do

11   see when the paramedics are doing that and I think --

12   I'm not sure if any of the fire personnel, some of your

13   partners did any of that.  But that's why I wanted to

14   ask those questions.  So you can -- the spit mask

15   doesn't affect the ability to take a carotid pulse; does

16   it?

17         A.  No, it does not.

18         Q.  And are you still able to also see if someone

19   is breathing when they're in a spit mask, you can

20   normally and generally you can see some movement of the

21   mask around the mouth to indicate there could be some

22   breathing occurring?

23         A.  You could.  But the -- the real way to do it

24   would be to look at their chest rise and fall.

25         Q.  Okay.

1        A.  And listen.  You can hear.

2        Q.  Gotcha.  Okay.  So at some point he's placed in

3    the ambulance.  And I believe you're indicating here in

4    your report that when you were -- you were one of the

5    ones who noticed that his face was turning bluish?

6        A.  Yes.  So as they -- as they cleared the door on

7    the ambulance as they pushed him in, I was at the back

8    of the door.  And as soon as like the shadow, the shade

9    came in, right, and took the sheen out of the mask, I

10   looked up and something, you know, call it intuition,

11   but something didn't look right.  So I kind of took a

12   bigger -- a bigger like -- you know, took a bigger

13   picture of it and looked at it or looked at him.  And

14   then I asked I want to say it was Engineer Thomson hey,

15   is he breathing?  And I believe that's -- I asked him.

16   I said does he appear bluish?  Is he breathing to you?

17   And he checked for a pulse and he said he couldn't get a

18   pulse and he said he doesn't believe he's breathing.  I

19   turned -- yeah, and so that's what happened right there.

20   That's what -- that's how I noticed when they crested

21   the -- it went from sunny to shade.  I say shade.  The

22   lights were on still, but it got us out of the sun.

23       Q.  Okay.  But to be fair, so that was the first

24   time you noticed any significant discoloration of

25   Mr. Bauer's face that caused you any concern, correct?

Veritext Legal Solutions
866 299-5127

1          A.   Yes, sir.

2          Q.   And if someone's face is bluish, there's a

3     medical term for that.  Is it -- I just had it and it

4     went out of my -- is it cyanotic?

5          A.   Cyanotic, yeah, that could be used.

6          Q.   Okay.  Was there other terms?

7          A.   No, I mean, that's -- that's it.  I mean, I

8     think I even wrote bluish in my -- in my -- in my

9     sentence.  I might have -- I'd have to look at it.  But

10    I put bluish on there.

11         Q.   Yeah.

12         A.   But yeah, it's cyanosis.

13         Q.   Okay.  And cyanosis to a medical professional

14    like yourself could be signs of what?

15         A.   Lack of oxygen, lack of circulation.

16         Q.   For example, somebody's cardiorespiratory

17    system is in failure at that point and they're not

18    breathing and so they're not getting oxygen circulated?

19         A.   Yeah, it could be, sure.

20         Q.   Or somebody's heart stops beating and so

21    they're not circulating blood, and that's when they

22    start to turn blue?

23         A.   Yes, they could do that, yeah.

24         Q.   I guess -- so more generally based upon your

25    experience just briefly, what are some other causes of

Page 46

1      somebody turning bluish or cyanotic in your experience?

2          A.  Typically it comes down to respira -- the

3      respiratory cardio system.  It could be -- it could be

4      amplified by, for instance, if an opioid overdose,

5      right?  Typically a heroin overdose is someone that will

6      demonstrate that, too, before we give them Narcan,

7      right, and then they pink right up because their

8      respiratory and their heart rate has slowed so much that

9      they could be breathing two times a minute which we

10     normally breathe somewhere around ten to 12 for you and

11     I.  So that could cause it.  So it could be drug

12     induced.  It could be -- they could have a medical -- a

13     medical problem that we don't know.  Diabetics, for

14     instance, have really bad cyanosis in the limbs as they

15     get older, and that's hence the reason why they lose

16     their limbs.  It's one of -- it could be.

17         Q.  Okay.  So you gave the example of like the

18     heroin overdose.  We know that there was methamphetamine

19     found in his system at autopsy.  Could methamphetamine

20     overdose cause the same kind of symptoms to your

21     knowledge and experience?

22         A.  If -- yeah, I guess -- yeah, any overdose could

23     cause -- it doesn't have to be just necessarily

24     methamphetamine.  It could be anything.  Any overdose

25     could cause that -- that lack of oxygen -- oxygen

Page 47

1    toward -- toward the skin, lack of circulation to

2    profuse the skin because the body will shunt.  And I'm

3    going to get into all this medical stuff.  But the body

4    shunts it to its organs rather than to the -- to the

5    skin, hence the reason why you become cyanotic.

6         Q.  Okay.  Got you.  And then I take it that's the

7    first time any of the medical people on the scene,

8    anybody putting him on the gurney and attaching the soft

9    restraints, et cetera, et cetera, it's the first time

10   anybody noticed any discoloration in his face, right?

11        A.  Yeah, from what -- from everybody that -- at

12   least on my crew, the people that I talked to, which was

13   Diaz and Thomson, I was the first one to notice that

14   once we put him in the back.

15        Q.  Okay.  So once -- your report says that once

16   you guys basically realized that he did not have a

17   heartbeat at that point or wasn't breathing, that's when

18   you wanted the police to kind of undo the wrap device,

19   correct?

20        A.  Yes, sir.  And a lot of the -- the reason is

21   because in order for us to do CPR fully, you know,

22   correctly and to its best of its ability, we have a

23   machine that we attach to him called the Lucas.  And it

24   does compressions from the back and the front and

25   squeezes the patient's torso.  And so in order to get

Page 48

1    that in the proper place, we needed to have ability to

2    get to -- to this patient, be able to move him.

3         Q.   And was the wrap then quickly removed to access

4    the patient's torso?

5         A.   Yeah.   When I turned around and told I want to

6    say it was the sergeant.   And the reason I say that is

7    because in my head, even then as I see the three stripes

8    on the uniform, you know, looking back at this and I say

9    sergeant.   That's just what I remember what I see.   And

10   they -- they jumped in right away.   Everybody kind of

11   (snaps fingers) went to work I guess is the way --

12        Q.   So in other words, there was --

13        A.   -- the way to describe it.

14        Q.   Sorry.   So in other words, there wasn't any

15   delay, significant delay in your mind between when you

16   said hey, we need to undo the top of the wrap here to

17   when it was undone, correct?

18        A.   Correct.

19        Q.   Then you guys start life-saving efforts at that

20   point, right?

21        A.   Yes.

22        Q.   Including attaching the Lucas device, the CPR

23   device, right?

24        A.   Yes.

25        Q.   And so I know you did not go in the ambulance,

Page 49

```
 1                     REPORTER'S CERTIFICATE

 2

 3

 4          I, CATHERINE M. MEYER, a Shorthand Reporter,

 5     State of California, do hereby certify:

 6          That CAPTAIN JAMES SMITH, in the foregoing

 7     deposition named, was present via Remote Counsel virtual

 8     meeting and by me sworn as a witness in the

 9     above-entitled action at the time and place therein

10     specified;

11          That said deposition was taken before me at said

12     time and place, and was taken down in shorthand by me, a

13     Certified Shorthand Reporter of the State of California,

14     and was thereafter transcribed into typewriting, and

15     that the foregoing transcript constitutes a full, true

16     and correct report of said deposition and of the

17     proceedings that took place;

18           That before completion of the proceedings,

19     review of the transcript [ ] was [ X ] was not

20     requested.

21           IN WITNESS WHEREOF, I have hereunder subscribed

22     my hand this 12th day of February 2021.

23

24

            CATHERINE M. MEYER, CSR NO. 11596

25           State of California
```

Page 80

# EXHIBIT L

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                    ---oOo---

4    JOHN BAUER, et al.,

5          Plaintiffs,

6    vs.                        No. C19-04593 LB

7    CITY OF PLEASANTON, et

     al,

8

          Defendants.

9    _____/

10

11

12      VIRTUAL ZOOM DEPOSITION OF CAPTAIN JORGE DIAZ

13                February 2, 2021

14

15

16

17

18

19

20

21

22    Job No: 4429617-1

23    Taken before EARLY K. LANGLEY RMR, RSA, B.A.

24    CSR No. 3537

25    Pages:  1 - 100

                                    Page  1

1    threatening issues?

2        A.   That is correct.

3        Q.   And I believe you said you did not notice any

4    life-threatening issues; is that correct?

5        A.   No, I did not.

6        Q.   We did talk to Captain Smith at a deposition a

7    couple weeks ago.  One of the things he said was that

8    when you guys got to the scene, he told his crew, he

9    says, which would have been you and Mr. Thomson, to

10   stay back for a period of time because, I guess,

11   Mr. Bauer was still agitated.

12            Do you remember him telling you guys that?

13       A.   That sounds accurate.

14       Q.   When you got to the scene, did you make those

15   observations, that Mr. Bauer appeared to still be

16   agitated, was screaming, yelling, those type of things?

17       A.   Yes.

18       Q.   I'm assuming in your long career, Captain Diaz,

19   you've been to scenes where individuals have been

20   arrested, have been handcuffed, or put in sort of a

21   wrap device like this and were still agitated and

22   combative and that type of thing.  Is that accurate?

23       A.   That is accurate.

24       Q.   When you arrived at the scene, Mr. Bauer was in

25   a restraint device called -- I think it's called a

1    wrap.  It's sort of well-known in the community.  Are

2    you aware that term generally?

3         A.  Generally.  I don't know if that's the accurate

4    term for it, but I've heard it referred to as a wrap in

5    the past.

6         Q.  Okay.  You have seen that in the field before

7    in your long career?

8         A.  Yes, sir.

9         Q.  How many times do you think you've been to a

10   scene where an individual was either being put into

11   some sort of lower-body sort of restraint device or had

12   already been placed in such a device?

13        A.  I can't give you a definitive answer.  I know

14   I've seen it in the past.  I don't know how many times.

15   But it's -- it's not too uncommon.

16        Q.  Okay.  So let me back up a little bit in our

17   sequence here.

18             My understanding is you guys were called to the

19   scene to assist with potential medical issues and you

20   were staged for a period of time.  Is that accurate?

21        A.  That's correct.

22        Q.  And my understanding from Captain Smith's

23   testimony, you guys were staged pretty close by to

24   where you ended up coming in contact with Mr. Bauer.

25   Is that right?

1          A.   I don't truly understand what you would -- so

2     for us to stage -- let me just clarify this.

3               For us to stage, when PD requests us to stage,

4     we arrive in the generalized area, and we stage up a

5     distance away so we are not part of the scene.  When

6     we're cleared into the scene, then the rig will move

7     from our staged location over to actually at the scene.

8               So I don't truly know exactly what -- where it

9     is you're referring to.  We were cleared into the

10    scene.  The rig was relocated to where Pleasanton PD

11    and Mr. Bauer were.

12              We then dismounted the rig, pulled off our EMS

13    equipment and set it on the sidewalk, and that's when

14    we were told by PD to just hold off.  I believe

15    Captain -- they told Captain Smith, who told us to hold

16    off.

17         Q.   Okay.  Yeah.  I mean, Captain Smith basically

18    said wherever you guys were staging was close enough

19    that he believed it took about ten seconds once you

20    guys were called in to drive over to the location, like

21    you said, stop the rig, get out, and grab your

22    equipment.

23              Does that sound right?

24         A.   I'd say that's fair, yeah.

25         Q.   Okay.  So, clearly, you guys were close by

Veritext Legal Solutions
866 299-5127

1    while you were staging; right?

2          A.   Yeah, we were maybe 100, 150 yards away.

3          Q.   Do you remember what, if any, information you

4    got about what occurred before you arrived from anybody

5    once you arrived at the scene?

6          A.   I do not recall.

7          Q.   Were you made aware about any force that was

8    used on Mr. Bauer prior to your guys' arrival?  While

9    you were at the scene, what I mean.

10         A.   No, I was not.

11         Q.   Okay.  What, if anything, were you told by

12   any -- well, do you remember any conversations you had

13   with your captain at the time, Captain Smith, once you

14   arrived at the scene?

15              MS. MILLER:  Objection.  Overbroad.

16              About what in particular, Mr. Blechman?

17   BY MR. BLECHMAN:

18         Q.   Once you first arrived at the scene,

19   presumably -- if Captain Smith talked to any police

20   officers, did you get any information through your

21   captain about what you guys were going to be doing at

22   that time?  This is when you first arrived.

23         A.   I believe I answered that question earlier.  He

24   just told us to just hang back.

25         Q.   All right.  When you -- was it your impression

Page 25

1    Mr. Bauer was still alive when you arrived at the

2    scene?

3         A.   Yes, sir.  He was -- he was still yelling when

4    we got on scene.

5         Q.   And you did, it sounded like, some sort of

6    visual assessment with your 360 walk-around just to get

7    a sense of what was going on with Mr. Bauer; is that

8    right?

9         A.   That's correct.

10        Q.   At some point -- at some point, he was given a

11   sedative.  Were you generally aware that that occurred?

12        A.   Yes, I was.

13        Q.   Did you have any concerns about the fact that

14   the paramedics gave Mr. Bauer a sedative?

15        A.   No.

16        Q.   So I take it you were -- until the paramedics

17   got there, you and some of your other personnel, like

18   Mr. Thomson, were standing by.

19             And, presumably, hypothetically, if Mr. Bauer

20   started having major medical problems at that point or

21   indicated he was coding while he was sitting on the

22   ground, you guys would have been able to, presumably,

23   jump in to assist with life-saving efforts, right?

24             MS. MILLER:  Objection.  Incomplete

25   hypothetical.  Vague and ambiguous.  Lacks foundation.

```
 1              If you understand the question, Captain Diaz,
 2    you can respond, but if you don't, please let
 3    Mr. Blechman know.
 4              THE WITNESS:  No, Mr. Blechman, I don't fully
 5    understand your question.
 6    BY MR. BLECHMAN:
 7         Q.   What was your purpose of standing in proximity
 8    to the officers and Mr. Bauer before the ambulance
 9    personnel get to the scene?
10         A.   Stand by.
11         Q.   What do you mean by that?
12         A.   So I mentioned once before that when we showed
13    up, we were told by Captain Smith to just stand by.
14    The plan was to wait for the gurney to show up and then
15    move the patient from the gurney -- or from the ground
16    over to the gurney.
17              But because we were EMS standby, just to get a
18    better idea as to what was going on, I did a 360, never
19    once made contact with Mr. Bauer.  I stood, roughly,
20    about 6 to 8 feet away from him as I did a 360, only
21    looking for any life-threatening injuries.
22              Had I noticed any life-threatening injuries, I
23    would have overruled what Pleasanton PD had requested
24    and initiated patient care.  At that point, I didn't
25    recognize anything that seemed to me would be of
```

Page  27

1    concern to where I needed to intervene.

2        Q.  And so what type of things were you looking for

3    when you were doing your 360 observation?

4        A.  So you look to see if they are breathing.

5    Obviously, if he is yelling, you know, he's -- he's

6    breathing.  People talking, that is a pretty good

7    indicator that they're breathing.

8            You are looking for any bleeding, arterial

9    bleeds or anything like that that looks uncontrolled

10   that needs to be addressed, amputations, or any other

11   injuries.

12           I didn't see any.

13       Q.  And did you have an understanding as to why

14   either the captain or the police department wanted you

15   guys to stand back for a period of time, from your

16   experience?

17       A.  From my experience -- and I'm only speaking

18   from my experience -- I don't -- I don't know that I --

19   I wasn't privy to the conversation my fire captain had

20   with the officers.

21           But I would just say that they -- they were

22   holding the patient down, and they wanted to keep him

23   in place until we got the gurney in place and put him

24   in restraints so then we can go and render patient

25   care, or someone can render patient care.

                                            Page  28

```
1         Q.  In general --

2         A.  But that's pure speculation on my behalf.

3         Q.  Okay.  But in general, based upon your

4    experience, individuals who are in custody and who are

5    combative can still be a safety threat to first

6    responders like yourself; is that correct?

7         A.  That's very accurate.

8         Q.  Okay.  And did you get at a sense when you were

9    at the scene that prior to arriving, there was a pretty

10   significant struggle with this gentleman with police?

11            MS. MILLER:  Objection.  Vague and ambiguous

12   and calls for speculation.

13            If you know, you can answer, Captain Diaz.

14            THE WITNESS:  I'd rather not answer that

15   question because I don't know the answer.

16   BY MR. BLECHMAN:

17        Q.  Okay.  Did Mr. Bauer, when you arrived, appear

18   to still be agitated?

19        A.  Yes.  He was cussing and yelling.

20        Q.  And when you get to a scene and you see an

21   individual under arrest like Mr. Bauer, who's in a

22   wrap, based upon your experience, does that tell you

23   that this person may have been combative with the

24   police?

25        A.  That's a pretty good indicator.  Yes, that's
```

1  true, sir.  That's true.

2  Q.  Okay.  So was there any concern in your mind

3  when you arrived, see Mr. Bauer in the wrap, hear him

4  cursing, hear him yelling, that you didn't necessarily

5  want to get too close to him until he calmed down?  Was

6  that something that you thought about?

7  A.  It's something I considered, yes.

8  Q.  So hypothetically, Captain Diaz, if you're

9  doing your 360 assessment and you do see something that

10  indicates there is a life-threatening issue with

11  Mr. Bauer, what at that point would you have done?

12  A.  If I recognized something that needed to be

13  addressed immediately, I would have made it known to

14  the police officers and did what -- whatever

15  intervention I had to do.

16  Q.  Okay.  And you didn't see any excessive

17  bleeding that caused you any concern with regard to

18  Mr. Bauer in your 360 observations; correct?

19  A.  No, sir, I did not.

20  Q.  And so chronologically here, I know that -- and

21  we have a bunch of video and whatnot from various body

22  cameras of officers, but at some point, the paramedics

23  show up, and then they bring their gurney over towards

24  the area where Mr. Bauer is located.

25        Is that your recollection?

Page 30

1        A.   Yes, sir.

2        Q.   And at some point -- at that point, Mr. Bauer

3    is still on the ground, sitting up in an upright

4    position in the wrap; is that correct?

5        A.   That's correct.

6        Q.   And he had a spit mask on at the time you

7    arrived; is that right?

8        A.   That's correct.

9        Q.   And you were still able to make observations of

10   his face and the fact that he was still breathing even

11   though he had the spit mask on; is that correct?

12            MS. MILLER:   Objection.   Compound.

13            But you can answer.

14            THE WITNESS:   That is correct.

15   BY MR. BLECHMAN:

16       Q.   Did you say, "That is correct"?

17       A.   That is correct.   Yeah, I mentioned earlier he

18   was yelling, which is, once again, a pretty good

19   indicator he's able to breathe.

20       Q.   Okay.   And so once the paramedics arrive, is it

21   true Mr. Bauer was given the sedative while he was

22   still on the ground in the wrap?   Is that correct?

23       A.   I believe so, yes.

24       Q.   And that was done by the paramedic personnel;

25   right?

1        A.   Ambulance personnel, yes.

2        Q.   Yeah, the ambulance personnel.

3             And at some point, then, officers prepared to

4    pull and get Mr. Bauer onto the gurney; is that right?

5        A.   Yes, sir.

6        Q.   Before -- okay.  Before he's put on the gurney,

7    was Mr. Thomson also doing, you know, some general

8    walk-around-type observations as well, to your

9    understanding?

10       A.   I believe so, yes.

11       Q.   And at any time -- okay.  Strike that.

12            So Mr. Bauer is lifted up and put onto the

13   gurney.  Do you recall that occurring?

14       A.   Yes.

15       Q.   And then par- -- do you recall that the

16   paramedics wanted Mr. Bauer put in the soft restraints

17   so those restraints could be attached to the gurney and

18   he was not in handcuffs while being placed in the

19   ambulance?  Do you recall that?

20       A.   I don't recall who made that decision, but that

21   decision is typically made by -- by police personnel.

22       Q.   Okay.  Do you remember that --

23            Go ahead.

24       A.   No.  Please.

25       Q.   Do you remember that occurring with regard to

Page 32

1    Mr. Bauer in relation to this incident?

2         A.  Like I said, I don't -- I don't know who made

3    the decision to put him in soft restraints.

4              It is not at all unlikely when a suspect is in

5    custody and has been -- has prior restraints on -- it

6    is not at all unlikely for them to be removed from

7    handcuffs and placed into soft restraints.

8         Q.  And you've seen that in your experience?

9         A.  Multiple times.

10        Q.  And what's -- generally, to a layperson such as

11   myself, what is the purpose of putting somebody, say,

12   from handcuffs into soft restraints before, you know,

13   being placed in the ambulance?

14        A.  Paramedic safety.

15        Q.  And then -- so the soft restraints essentially

16   take the place of the handcuff restraints?

17        A.  In a sense, yes.

18        Q.  Okay.  And did you watch the process of

19   officers lifting Mr. Bauer onto the gurney and then the

20   process of Mr. Bauer being placed in the soft

21   restraints?

22        A.  That is correct.

23        Q.  During that period of time, did you notice any

24   life-threatening issues with regard to Mr. Bauer?

25        A.  No, I did not.

1        Q.   When was -- let's just go forward a little bit.

2   But when was the first time you ever noticed any

3   life-threatening-type issues with regard to Mr. Bauer

4   or the fact that there was a medical issue with

5   Mr. Bauer?

6        A.   I noticed there was a medical issue with

7   Mr. Bauer when we were starting to put our gear back on

8   the rig and somebody caught my attention.  I'm not sure

9   if it was Captain Smith or -- somebody caught my

10  attention.

11           As I looked to my left, I noticed Mr. Bauer

12  going limp in the back of the -- in the back of the

13  ambulance, so I walked over to go -- to go assist, see

14  if they needed help with him.

15       Q.   So just so I'm clear, Mr. Bauer's position at

16  that point in time was on the gurney inside the back of

17  the ambulance; correct?

18       A.   Yes, sir.

19       Q.   And you, at that point in time, were putting

20  some of your gear away back into the fire engine?

21       A.   In the fire engine, yes, sir.

22       Q.   Someone got your attention about a medical

23  issue; you went back to the ambulance and assisted with

24  the medical issue?

25       A.   Yeah.  That sounds -- that sounds accurate.

```
 1          Q.   Okay.  So prior to the time when you first were
 2   made aware of a medical issue with Mr. Bauer when he
 3   was in the back of the ambulance, had you ever noticed
 4   any medical issue with Mr. Bauer that you believe
 5   required medical attention?
 6          A.   No, I did not.
 7          Q.   What observations did you make once you went
 8   towards the ambulance, then, if any observations, with
 9   regard to what was going on with Mr. Bauer at that
10   time?
11          A.   The only observation I made was -- the only
12   observation I noticed was when, I mentioned earlier, he
13   had seemed like he had gone limp.  I seen him going
14   limp, and that was the only observation I noticed.
15               Does that answer your question, Mr. Blechman?
16          Q.   Yeah, I think so.
17          A.   Okay.
18          Q.   When you then got back to the ambulance, do you
19   remember whether or not the spit mask of Mr. Bauer was
20   still on, or was it off at that point in time?
21          A.   It was still on.
22          Q.   And was -- did somebody take the spit mask off
23   in the ambulance?
24          A.   Somebody took it off.  I don't recall who it
25   was.
```

```
 1          Q.   So when you say Mr. Bauer was limp when you
 2    first observed him in the ambulance, had you seen him
 3    in that condition, you believe, before you saw him in
 4    that condition in the back of the ambulance?
 5              MS. MILLER:  Objection.  Vague and ambiguous
 6    and asked and answered.
 7              You can answer, if you can, Captain Diaz.
 8              THE WITNESS:  I'll answer Mr. Blechman to the
 9    best of my ability.
10              You mentioned earlier if I witnessed
11    Mr. Blechman going from the ground over to the gurney
12    and --
13    BY MR. BLECHMAN:
14          Q.  Mr. Bauer.  You said "Mr. Blechman," but yeah,
15    Mr. Bauer.
16          A.  Okay.  Yes.
17              Mr. Bauer, nonetheless, had -- he was placed in
18    soft restraints.  I was assisting to place him in soft
19    restraints.  In other words, I was holding his arm down
20    while they put the restraints on him, and he was
21    actively fighting us and resisting.  I was, I think, in
22    control of his left arm, and he was pulling and
23    kicking, trying to get free.
24              So that was my last interaction with Mr. Bauer
25    prior to ensuing CPR.
```

1      Q.   And so that would have been before you started

2  the process of putting the equipment back in the

3  engine; correct?

4      A.   This is correct, yes, sir.

5      Q.   And Mr. Thomson was also assisting, I believe,

6  in putting the soft restraints on Mr. Bauer at the

7  gurney position?

8      A.   I do not recall.

9      Q.   Okay.   That's fine.

10          So tell me a little bit about that part.   When

11  you were assisting in placing the soft restraints, you

12  said that you could feel that Mr. Bauer was actively

13  trying to pull away or trying to prevent you guys from

14  putting the soft restraints on him?

15      A.   This is correct.

16      Q.   And you also mentioned that he was kicking

17  while you guys were trying to put him in the soft

18  restraints?

19      A.   Yes.   He was moving his -- he was moving his

20  legs -- he was moving his legs aggressively.

21      Q.   Did you make any other observations of

22  Mr. Bauer at that point in time, when you were

23  assisting in placing him in the soft restraints, that

24  he was voluntarily moving his body in any way, shape,

25  or form?

```
 1            But I said that would have to be definitive,
 2    and the fact that he is still -- he is still cussing
 3    and -- and -- and cursing at people and being
 4    aggressive, I knew his airway was still patent.  So
 5    that overruled.
 6        Q.  Did you at any time have any indication that
 7    his heart had stopped prior to when Mr. Bauer was in
 8    the back of the ambulance?
 9        A.  No.
10        Q.  Did you, yourself, have any indication that he
11    had no pulse or pulse-related issues prior to Mr. Bauer
12    being in the back of the ambulance?
13        A.  So I don't know if I understand the question,
14    but I will tell you this:  Mr. Bauer was placed in the
15    back of the ambulance on -- on a gurney.  After I was
16    done assisting putting him on the gurney, I essentially
17    walked away from Mr. Bauer to go start putting my gear
18    back on the rig, turning my back to Mr. Bauer.
19            Had I at any point thought that Mr. Bauer was
20    having a true medical emergency or a life-threatening
21    emergency, I would have never abandoned Mr. Bauer.  I
22    would have continued assisting in any way possible.
23            But by virtue of me walking away from him,
24    where -- I think would be a pretty clear indicator that
25    I had no concerns for his health or -- or well-being.
```

Page  43

1    There was nothing there to make me concerned for his

2    well-being.

3         Q.   In other words -- see if I understand your

4    testimony -- you assisted in the process to get him

5    attached to the gurney, and you made your assessments,

6    visual assessment and whatnot.

7              At that point in time, if you had noticed

8    anything significant, you would not have then walked

9    away to try to put your equipment away; you would have

10   stayed close to Mr. Bauer as he's being placed in the

11   ambulance, et cetera.

12             Is that accurate?

13        A.   That sounds -- that sounds accurate.  Most

14   likely, that's exactly what I would most likely be

15   doing.

16        Q.   Okay.  Let's go through your report briefly

17   here and see if there's any other additional

18   information you can glean from that.

19             So I understand you don't have a copy of it in

20   front of you.  This was marked as Exhibit 32 to

21   Mr. Smith's deposition.  I'm not going to probably

22   attach it to yours, unless anybody wants me to.

23             MR. BLECHMAN:  Any counsel want me to

24   specifically attach this exhibit to this deposition?

25             MR. GWILLIAM:  While we're dealing with the

1

2                    REPORTER'S CERTIFICATE

3

4          I, EARLY LANGLEY, a Certified Shorthand

5      Reporter, State of California, do hereby certify:

6          That JORGE DIAZ, in the foregoing deposition

7    named, was remotely present via Zoom and Zoom audio,

8    and by me sworn as a witness in the above-entitled

9    action at the time and place therein specified;

10         That said deposition was taken before me via

11   Zoom and Zoom audio at said time and place, and was

12   taken down in shorthand by me, a Certified Shorthand

13   Reporter of the State of California, and was thereafter

14   transcribed into typewriting, and that the foregoing

15   transcript constitutes a full, true and correct report

16   of said deposition and of the proceedings that took

17   place; that before completion of the proceedings,

18   review of the transcript was not requested.

19   IN WITNESS WHEREOF, I have hereunder subscribed my hand

20   on February 5, 2021.

21

22

23

24         EARLY LANGLEY, CSR NO. 3537

25         State of California .

Page 100

# EXHIBIT M

1      UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3                ---OOO---

4  JOHN BAUER, et al.,

5        Plaintiffs,

6  vs.                    No. C19-04593 LB

7  CITY OF PLEASANTON, et

   al,

8

        Defendants.

9  _____/

10

11

12      VIRTUAL ZOOM DEPOSITION OF PATRICK THOMSON

13              February 2, 2021

14

15

16

17

18

19

20

21

22  Job No: 4429617-2

23  Taken before EARLY K. LANGLEY RMR, RSA, B.A.

24  CSR No. 3537

25  Pages:  1 - 87

                              Page 1

1    just a generic medical emergency.  And then while we're

2    driving en route, dispatch will usually give us updated

3    information.

4         Q.  Okay.  Do you remember what information, if

5    any, you had before you guys actually drove into the

6    scene after being called into the scene?

7         A.  I don't recall specifically, other than we were

8    told to stage.

9         Q.  Okay.  And I understand from some other prior

10   testimony that when you guys did stage, you were very

11   close to the actual scene where you eventually came

12   into.  Is that correct?

13        A.  That's correct.

14        Q.  I think Captain Smith testified that from the

15   time you guys were called into the scene to the time

16   you arrived into the scene was only 10 seconds because

17   you guys were close by.

18             Does that comport with your recollection?

19        A.  Yes.

20        Q.  Okay.  So once you were called into the scene,

21   what do you recall seeing when you first arrived?

22        A.  The first thing I recall is when we were

23   staged.  Because of where we were at, we -- we could

24   see a lot of police cars and police motorcycles.  We

25   could see the police officers, but we couldn't actually

                                                   Page 15

1    see any -- we couldn't see the patient or what was

2    going on.

3           Once we were cleared into the scene and we

4    walked up, that's when we were able to see the patient

5    in PD custody or something of that matter.

6       Q.   Okay.  And do you recall that when you arrived

7    at the scene, Mr. Bauer, the patient or the arrestee,

8    was in custody?  You saw that; right?

9       A.   Yeah.  So we were cleared to come in on scene.

10   However, we still didn't actually go right up and make

11   patient contact because PD were still having difficulty

12   getting him completely restrained or stabilized or in

13   a -- in a safe -- restraints for us to be able to

14   actually make patient contact.

15      Q.   And, obviously, safety of yourself and some of

16   your fellow fire department personnel is very important

17   when you're coming into a scene involving an individual

18   who's under arrest; correct?

19      A.   Correct.  That's -- that's typically our number

20   one priority, scene safety, and we do not go in or make

21   patient care until we know that it is -- the scene is

22   safe.

23      Q.   Because, based upon your training and

24   experience, an individual who's handcuffed, an

25   individual in -- even in sort of a restraint could

Page 16

1    still cause you or some of your fellow fire department

2    personnel injuries if they're combative and you're in

3    close proximity; correct?

4         A.   Yes.

5         Q.   I believe Captain Smith testified that he told

6    his crew, meaning you and Captain Diaz, to stay back

7    for a period of time when you guys got to the scene

8    until things calmed down.

9              Does that comport with your memory?

10        A.   Yeah.  So we were staged on the street.  When

11   we were cleared to come in, I moved the fire engine

12   closer.  Basically by turning onto Mission.  We got

13   out, and we walked up so we could see, but we were

14   still probably, you know, 50 to 75 feet away from the

15   actual -- where the patient was at.

16        Q.   Okay.  And then there was a period of time when

17   you guys then got closer to Mr. Bauer; is that correct?

18        A.   Yeah.  At one point, we were, I guess -- I

19   can't remember clearly, but it was when he was fully

20   restrained.

21        Q.   Did you recall -- do you recall any specific

22   observations of Mr. Bauer once you got to the scene and

23   were able to see him there and what you recall about

24   that?

25        A.   Yes.  To the best of my memory, I remember him

                                                    Page  17

1    on the ground, on the grass.  He was handcuffed.

2    However, he was still screaming, yelling, and trying to

3    get up, and there was one officer that was keeping him

4    on the ground.  So he was, like, in a sitting position,

5    so the officer was basically standing next to him and

6    kind of keeping him from getting up.

7         Q.   Okay.  So just based upon those observations,

8    did you form a belief that Mr. Bauer was still alive?

9         A.   Oh, yes, absolutely.

10        Q.   Still breathing?

11        A.   Yes.

12        Q.   And what happened next in terms of any of your

13   observations or involvement?

14        A.   So in that time, the ambulance arrived on

15   scene, and we were still waiting for the patient to be

16   restrained enough for PD to then call us in to actually

17   make patient contact.

18             I remember that they pulled out what's called

19   the wrap because he was still very agitated and

20   resisting, not following the police officers' orders.

21             So then the -- and I cannot remember how many

22   police officers it took, but it took several to get him

23   into the wrap, which is typical.  It's a device that

24   keeps them -- essentially secures their feet as well as

25   their hands.  So it makes it so they can't get up and

                                        Page 18

1    run or kick or -- you know, reduces the ability to

2    cause harm.

3         Q.  Have you been at scenes before in your training

4    and experience for a long time as a paramedic and fire

5    personnel where officers have used that wrap or that

6    lower-body restraint device?

7         A.  Yes.  Even when I worked on an ambulance in

8    other cities and jurisdictions, yes.

9         Q.  Okay.  And with regard to Mr. Bauer -- so do

10   you believe that when you arrived on the screen and

11   started to first make observations that Mr. Bauer was

12   not yet in the wrap?

13        A.  Yes.  When we first got on scene, he was not

14   yet in the wrap.

15        Q.  Okay.  And -- but you saw the application of

16   the wrap; in other words, the wrap being placed on

17   Mr. Bauer?

18        A.  Yes.

19        Q.  As an experienced paramedic working for

20   numerous agencies over the years, does it mean anything

21   to you when you see somebody either in a wrap or being

22   placed in a wrap by law enforcement?

23        A.  Yes.

24             MS. MILLER:  That's vague and ambiguous.

25             You can answer, Engineer Thomson.

Page 19

```
 1              THE WITNESS:  Okay.
 2              Typically, patients that still pose a potential
 3   threat for harm; typically, when they are not following
 4   commands and they're still very agitated or aggressive.
 5   BY MR. BLECHMAN:
 6        Q.  Did you form any impressions about whether or
 7   not you believed Mr. Bauer, when you first arrived on
 8   scene, was agitated?
 9        A.  Yes.
10        Q.  What do you recall about that?
11        A.  He was screaming very loudly.  I just remember
12   feeling that he was -- he was very agitated and that he
13   just wasn't complying with the police department, with
14   the police officers.
15        Q.  Did he still appear to be moving around and
16   sort of resistive while he was in the wrap restraint?
17        A.  He was prior to the wrap restraint.  Once he
18   was in the wrap restraint, my memory isn't as -- as
19   clear as the time frame --
20        Q.  Okay.
21        A.  -- because that's when the ambulance showed up,
22   we worked with the ambulance, and we approached.  So
23   there was a lot going on.
24              Prior to the wrap, I was just standing back
25   watching, so everything is still pretty sharp in my
```

Page 20

```
 1    your statement that Bauer was in restraints; you
 2    examined his pupils and noticed that they were dilated.
 3            Do you remember telling the investigator that?
 4            MR. GWILLIAM:  Counsel, I object.
 5            Can you, once again, refer to the document and
 6    the page number, just for the record?
 7            MR. BLECHMAN:  Sure.  That's PPD158.
 8            MR. GWILLIAM:  Okay.
 9    BY MR. BLECHMAN:
10        Q.  You can respond, Mr. Thomson.
11        A.  If it's in the report, then I -- I feel
12    confident that that's what I said.
13        Q.  Well, let me just read -- he's summarizing your
14    statement, but this detective says that you examined
15    his pupils, noticed they were dilated, and you said
16    that dilated pupils were symptoms of being on a
17    stimulant.
18            Do you remember making any observations about
19    those issues at the scene?
20        A.  Sure.  So part of our training -- when we
21    assess patients, especially patients that aren't
22    cooperative or can't tell us or answer our questions,
23    for any number of reasons, one of the things we do is
24    we check pupils.  And it's -- can be an indicator of
25    either, like, a substance or some -- something that's
```

Page 24

1   causing -- it's not normal for pupils to be that

2   dilated.  It doesn't tell us what it is, but typically,

3   stimulants will dilate pupils.

4        Q.  And do you recall examining his pupils and

5   finding that they were dilated?

6        A.  Yes.

7        Q.  When in the sequence do you remember doing

8   that; do you recall?

9        A.  I -- I do not.

10       Q.  Did that viewing of his pupils and finding

11  they're dilated, coupled with your other observations

12  of Mr. Bauer being agitated, screaming loudly,

13  yelling -- did that give you any indication

14  preliminarily about whether or not you think there may

15  be substances on board?

16            MS. MILLER:  Objection to the extent it calls

17  for speculation.

18  BY MR. BLECHMAN:

19       Q.  Or a substance on board.

20            MS. MILLER:  You can answer, if you aren't

21  guessing, Engineer Thomson.

22            THE WITNESS:  Well, it's not -- it's not

23  guessing.  It's -- it's part of an assessment that --

24  when we do, it's just -- we make a note of it, that

25  there is potential for that.  It doesn't change our

Page 25

1    me back -- let me go forward, and then let me back up.

2              When was the first time you noticed any need --

3    that Mr. Bauer needed immediate medical care?  Was that

4    when he was in the back of the ambulance?

5         A.   That was when it became clear that he needed

6    immediate medical care, was right around the time we

7    were loading him into the ambulance.

8         Q.   Okay.  And we'll get to that as part of the

9    chronology, but I wanted to set that as a marker.

10             Prior to loading him into the ambulance and

11   noticing whatever you noticed collectively to determine

12   he may need immediate medical care, did it ever appear

13   to you previous to that that Mr. Bauer needed any

14   immediate medical care?

15        A.   Prior to that, there was nothing substantial or

16   jumping out to trigger us to think that he needed

17   immediate medical care right away.

18        Q.   Prior to that point in time, you had observed

19   Mr. Bauer breathing; correct?

20        A.   Correct.

21        Q.   And there was some indication prior to that

22   point in time that he had a pulse; correct?

23        A.   Correct.

24        Q.   And you did not see any excessive or concerning

25   bleeding pertaining Mr. Bauer prior to that point;

Page 27

1    correct?

2         A.  Correct.

3         Q.  And prior to that point, you did not see

4    anything that indicated any sort of life-threatening

5    injury or issue; is that correct?

6         A.  Correct.

7         Q.  And you, yourself, checked Mr. Bauer for a

8    pulse at one point; right?

9         A.  I believe so, yes.

10        Q.  And he had a pulse when you checked it?

11        A.  The first time when I -- yeah, when I -- so

12   through training and just being a paramedic, whenever

13   you make patient contact, even when a patient is

14   talking to you, one of the first things you do is check

15   a pulse.

16        You know, you're checking for the rate, how --

17   you know, the rapid, the strength, if there's any

18   abnormalities, is it slow, is it weak, you know.  That

19   also can tell you something about their, you know,

20   medical need.

21        You know, again, very minimal, but it's a part

22   of the assessment tool.  So just even out of muscle

23   memory, it's something that I do whenever I make

24   patient contact.

25        Q.  Okay.  And just getting back to your report --

Page 28

1      Q.  And a person is placed in those kind of

2    four-point soft restraints if they're combative or

3    there's a risk to some of the first responders; right?

4      A.  Correct.

5      Q.  And you, yourself, were concerned that during

6    the process of removing the handcuffs of Mr. Bauer and

7    putting him in the safe -- the soft restraints, that he

8    could have sort of started to struggle again, been

9    combative, and potentially been a risk to you or other

10   close people to Mr. Bauer; right?

11     A.  Correct, because of his size -- I mean, he

12   was a -- he was a big man -- size and the fact that --

13   just how he was initially acting on scene, with his

14   pupils being dilated and him not really cooperating

15   with us.

16          Just, again, my experience tells me that the

17   patient can go from very calm, sedated to very violent

18   very quickly, you know.  Not always, but you always --

19   you always plan for the potential.  So you treat

20   every -- very cautiously.

21     Q.  Okay.  And Captain Diaz testified that when you

22   all were putting him in the soft restraints, he noticed

23   that there was still some resistance in his arms and he

24   was still sort of doing some resistance or movement

25   with his arms during that period of time.

Page 39

1          Do you also remember that?

2     A.   Yes.  Again, that's my concern.  My focus was

3     maintaining control of his arm and wrist and not

4     watching his breathing or, you know, his airway.

5          Again, the Versed was given.  Sometimes it

6     takes a little while for it to fully take effect.  And

7     I know we were doing the transfer, and I was just

8     focused on maintaining that arm control.

9     Q.   So you remember you were trying to at least

10    maintain arm control of at least one of his arms; is

11    that right?

12    A.   I believe so.

13    Q.   And during that time when you were maintaining

14    that control of the arm, you did feel some movement and

15    resistance by Mr. Bauer?

16    A.   Correct.

17    Q.   That was an indication to you that Mr. Bauer

18    was still alive during that period of time?

19    A.   Correct.

20    Q.   And could you tell that he was still breathing

21    during that period of time of the transfer of him into

22    the soft restraints?

23    A.   Again, I -- I could not, because I was focused

24    on the arm, but my assumption would be that he was

25    still breathing if he was still -- if he still was, you

Page 40

1    know, giving a little resistance to what we were doing.

2        Q.   Okay.  And during this process of getting him

3    in the soft restraints, did you notice anything that

4    indicated to you that Mr. Bauer needed immediate

5    medical attention?

6        A.   Not right away.  Again, because we -- the

7    Versed had been administered, which is a central

8    nervous system sedative, when he started becoming more

9    laxed, in my mind, he was given Versed, so this is --

10   this is not un- -- abnormal.

11       Q.   Right.  And so for somebody who hasn't seen

12   many people, you know, administered a sedative and how

13   they react -- so are you saying that from what you saw,

14   Mr. Bauer's behavior post-sedative appeared to be

15   within the realm of normal from somebody getting a

16   sedative, essentially?

17       A.   Correct.  Like I said, the time frame for a

18   sedative to take effect, IV, could be, you know,

19   anywhere between one to -- one to five minutes, you

20   know, depending on the person.  And I was -- in my

21   mind, it was -- the sedative was taking effect.

22       Q.   Okay.  And so -- and, then, are you present

23   during the time when he's basically strapped to the

24   gurney and that process was completed and then he's

25   walked over -- or rolled over to the ambulance?  Are

Page 41

1    you present for that?

2         A.   Yes.

3         Q.   And did you -- while being, you know, rolled

4    over towards the ambulance, did you notice any

5    indication of Mr. Bauer that indicated he needed

6    immediate medical attention?

7         A.   I don't recall.

8              But my memory -- I do remember Captain Smith,

9    as he was being loaded into the -- the ambulance,

10   because Captain Smith was further back --

11             And, again, my focus was on the gurney, you

12   know, making sure that the gurney was clicked in

13   properly, you know.

14             Again, he was -- he was a bigger -- bigger

15   patient, a lot of weight.  So, you know, when you're

16   moving a patient on a gurney, a concern could be

17   that balance, that the gurney can fall over.  So I

18   wasn't really paying attention to him as much as the

19   gurney.

20             Again, the primary paramedic -- the primary

21   care was being handled by the ambulance paramedic, so

22   my concern -- usually what happens is, at that point,

23   as a firefighter assisting and making sure that the

24   gurney is loaded correctly, that no accidents occur.

25        Q.   Okay.  That makes sense.

                                           Page 42

1          And once the ambulance personnel are on the

2     scene, it's your understanding that they have taken

3     over primary care for the medical assessments and

4     treatment of Mr. Bauer; correct?

5          A.   Correct, because they're the transporting

6     paramedics.

7               What typically happens is, when we arrive on

8     scene first, we make patient contact; we assume care.

9     Once they arrive on scene, we give them a report,

10    transfer care to them.

11              However, because we were staged and we were

12    held back and we all kind of made patient -- access to

13    the patient at the same time, it was -- I don't want to

14    say assumed, but it was indicated that they would just

15    take patient care.  That way, there was no need for a

16    transfer of care in a very short time.  It just doesn't

17    make sense.

18         Q.   And so you -- during the time when Mr. Bauer's,

19    you know, in the wrap on the ground, being put into

20    the -- onto the gurney and the soft restraints, the

21    paramedics are right there in close proximity during

22    that time; right?

23         A.   I believe so.

24         Q.   Okay.  And --

25         A.   Again, there was a lot of activity going on, a

Veritext Legal Solutions
866 299-5127

1    lot of people coming and going, doing things.

2         Q.   Understood.

3              But you did have a recollection of seeing the

4    paramedics in close proximity of Mr. Bauer and presumed

5    for them to be monitoring Mr. Bauer's condition; right?

6         A.   Yes.

7         Q.   And that would be the same when he's on the

8    gurney and being wheeled to the ambulance; right?

9         A.   I believe so.

10         Q.   And I'm assuming -- tell me if I am correct or

11    if I am wrong, but I'm assuming that none of the

12    ambulance personnel ever mentioned any specific medical

13    issue or immediate medical need of Mr. Bauer until such

14    time as Mr. Bauer was in the ambulance.  Is that right?

15         A.   To the best of my recollection, yes.

16         Q.   Okay.  So I understand that once he was in the

17    ambulance, the spit mask was taken off, and then you

18    noticed some obvious discoloration to his face.  Is

19    that correct?

20         A.   I believe so, yeah.

21         Q.   What do you remember about that?

22         A.   I remember once we got loaded up, once the

23    gurney was loaded into the ambulance, something just

24    didn't feel right.  Something didn't seem right.

25              And I remember Captain Smith saying something;

Page 44

1    like, asking me if he was -- you know, "Is he

2    breathing," you know, something.

3            And I remember looking closely and

4    taking the -- like, I don't remember who took the spit

5    plastic off.  I believe it may have been the ambulance

6    paramedic, but, again, I -- that part is fuzzy.

7            But once the spit mask was taken off, I think

8    we all realized that he wasn't breathing because he was

9    looking cyanotic.

10   Q.  And this would have been the first time you,

11   yourself, had ever noticed that Mr. Bauer was not

12   breathing; correct?

13   A.  Correct.

14   Q.  Did you do anything then, at that point in

15   time, to assist in any medical attention?

16   A.  Yes.  I -- I believe I told Captain Smith to

17   get police officers to remove the wrap so we can render

18   treatment.  I believe the gurney -- because we --

19   because the wrap keeps him sitting up in an up

20   position, you can't really do CPR or breathe for them,

21   you know.  So we had to have them release the wrap.

22           And I -- I think I ran back and got the LUCAS

23   device, which is a CPR -- mechanical CPR machine that

24   we have on the fire engine, and Jorge Diaz and the

25   ambulance personnel were in the back of the ambulance

Page 45

1    still and initiating whatever care they could with the

2    wrap on and removing the wrap.

3            And I believe I helped remove some of the wrap

4    as well, but, again, it's fuzzy.

5        Q.   Okay.  And you assisted in some of the advanced

6    life support and hooking up the LUCAS device, and then

7    you went in the ambulance with Mr. Bauer and some other

8    personnel to the hospital; correct?

9        A.   Correct.  It was myself and Jorge Diaz, and I

10   believe there was at least one police officer, maybe

11   two, which is not unusual when you have had a

12   patient -- as Bauer was being combative early on and

13   being testy.

14       Q.   Right.

15           Once you guys started CPR on Mr. Bauer, did you

16   guys get any sort of pulse from him, any sort of heart

17   rate from him, or is there any requirement that in that

18   kind of situation, you're going to not transport

19   somebody unless there are signs of life?

20           MS. MILLER:  Objection.  Compound and calls for

21   speculation.

22           MR. BLECHMAN:  It was compound, meaning there

23   was a couple questions in there.  Let me break it up.

24   BY MR. BLECHMAN:

25       Q.   In that situation, if Mr. Bauer had shown no

                                                    Page 46

1    signs of life when you guys started CPR efforts in the

2    back of the ambulance, would he have been transported

3    to the hospital?

4        A.  Absolutely, because -- because we had just

5    started rendering ALS care and sometimes it can take up

6    to 40 minutes of care before you actually might see a

7    change.

8            But, typically, when it's a witnessed arrest,

9    which is kind of what this was -- meaning he was

10   talking -- not talking, but he was breathing, he was

11   combative early on, and then while we were there, at

12   some point, he went apneic and not breathing -- you do

13   everything you can because you know it was a very

14   recent medical issue.

15       Q.  Right.

16           Okay.  Was there any signs of life of Mr. Bauer

17   once he was in the ambulance and you guys started

18   working on him; do you recall?

19       A.  No.  To my -- to the best of my knowledge, we

20   never got any signs of life or any response to what we

21   were doing.

22       Q.  Okay.  In the statement you gave to the

23   investigator, it says that you said to the

24   investigator, based on your experience, you believed

25   Bauer was on some type of stimulant, which increased

1   his heart rate.

2          Does that comport with what you believe you

3   told the detective in your interview?

4          A.   I believe so.

5          Q.   And you believed that at the time of this

6   incident; correct?

7          A.   Yes.  When we were first on scene and when I

8   first checked the pulse, it seemed pounding and

9   potentially rapid.  I can't remember exactly, but it

10  corresponded with what I was seeing with the signs --

11  his skin signs and symptoms and how he was agitated.

12         There was nothing that seemed out of -- that

13  didn't seem odd.  Everything kind of seemed like he was

14  potentially under the influence of something --

15         Q.   Okay.

16         A.   -- and, more likely, a stimulant of some kind.

17         Q.   Okay.  The report goes on to say that you

18  suspected that the resistance with police may have

19  elevated Bauer's heart rate even more, causing his body

20  to go to distress.

21         Do you remember making those statements?

22         A.   If they're in the report, then I would -- I

23  would say yes.

24         With my knowledge, my experience, I would find

25  that would be very crucial assessments or -- or -- you

Page 48

1

2                    REPORTER'S CERTIFICATE

3

4            I, EARLY LANGLEY, a Certified Shorthand

5       Reporter, State of California, do hereby certify:

6            That PATRICK THOMSON, in the foregoing

7   deposition named, was remotely present via Zoom and

8   Zoom audio, and by me sworn as a witness in the

9   above-entitled action at the time and place therein

10  specified;

11           That said deposition was taken before me via

12  Zoom and Zoom audio at said time and place, and was

13  taken down in shorthand by me, a Certified Shorthand

14  Reporter of the State of California, and was thereafter

15  transcribed into typewriting, and that the foregoing

16  transcript constitutes a full, true and correct report

17  of said deposition and of the proceedings that took

18  place; that before completion of the proceedings,

19  review of the transcript was not requested.

20  IN WITNESS WHEREOF, I have hereunder subscribed my hand

21  on February 5, 2021.

22

23

24           EARLY LANGLEY, CSR NO. 3537

25           State of California .

                                            Page 87

# EXHIBIT N

1              UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF CALIFORNIA
3                 SAN FRANCISCO DIVISION
4                 _____
5
      JOHN BAUER, an individual  )
6     and as Successor in        )
      Interest of Jacob Bauer,   )
7     deceased; ROSE BAUER, an   )
      individual and as          )Case No.
8     Successor in Interest of   )3:19-cv-04593-LB
      Jacob Bauer, deceased,     )
9                                )
                     Plaintiffs, )
10                               )
             vs.                 )
11                               )
      CITY OF PLEASANTON,        )
12    BRADLEE MIDDLETON;         )
      JONATHAN CHIN; RICHARD     )
13    TROVAO; STEVEN BENNETT;    )
      ALEX KOUMISS; JASON        )
14    KNIGHT; MARTY BILLDT;      )
      DAVID SPILLER; and DOES 1  )
15    to 50, inclusive;          )
                                 )
16                   Defendants. )
                          ___    )
17
18                 REMOTE DEPOSITION
19                        OF
20             DR. MICHAEL JOSEPH FERENC
21             Tuesday, February 9, 2021
22                Modesto, California
23
24
25      Reported by:  B. Suzanne Hull, CSR No. 13495

                                        Page 1

1     Q    So I'm assuming, like in this case, sometimes

2     you get information from some law enforcement sources or

3     medical sources about circumstances surrounding a death,

4     and it is information that you review and take into

5     consideration for determining the cause of death of an

6     individual?

7     A    Yes, sir.

8     Q    And nowadays we have more video available --

9     whether it is surveillance video, cellphone video,

10    body-worn camera video.

11         Those are the types of things you would also

12    review; is that correct?

13    A    No, sir.  I would have reviewed those later,

14    not at the time of the autopsy.  There is a very limited

15    summary, which is in my report, of what I knew before

16    I saw the videos.  Those videos were not available then.

17    Q    Okay.  So in this case with Mr. Bauer,

18    obviously you performed the autopsy on Mr. Bauer;

19    correct?

20    A    Yes, sir.

21    Q    And we'll go through your report in a little

22    more detail.

23         But, generally, you did the autopsy on

24    Mr. Bauer prior to reviewing the body camera footage?

25    A    Yes, sir.

Page 13

1    Q    All right.  And -- and the cause of death you

2    listed for Mr. Bauer was acute methamphetamine toxicity;

3    is that correct?

4    A    Yes, sir.  With the other conditions associated

5    with it.

6    Q    Just can you tell me -- and we're going to get

7    to the other conditions.

8         But explain to me -- well, first of all, what

9    does that mean when you are indicating as a coroner the

10   cause of death?

11   A    It means that it is that proximate -- medically

12   proximate cause of the person's death that but for that

13   person, in your opinion, wouldn't have been dead that

14   day at that time, whether it is standing by itself or

15   whether it is associated with other factors that were

16   relevant to how it affected the person and caused their

17   death.

18   Q    How did you come to the conclusion here, in

19   a general sense, about the cause of death for Mr. Bauer

20   being acute methamphetamine toxicity?

21   A    Based upon the totality of what I saw both,

22   from a history, from what I saw at the autopsy, what

23   I saw under the microscope from histology, and from the

24   toxicology reports.

25   Q    Before you certified the death as -- the cause

Page 14

1    of death as the methamphetamine toxicity, you would have

2    seen the tox- -- the toxicology report; correct?

3         A    Yes, sir.

4         Q    And that is, I think, attached to the report;

5    is that right?

6         A    It is attached to yours.  I don't have a copy

7    of that, but I know the results, yes, sir.

8         Q    Okay.  And we can show you that.  I believe it

9    was done by Central Valley Toxicology.

10             Is that -- do you recall that?

11        A    Yes.  That is correct.  That is who did it.

12        Q    Okay.  And -- and you indicate the amount of

13   methamphetamine from that report in page two of your

14   report at the top; is that correct?

15        A    Yes, sir.

16        Q    Was there any significance to you in terms of

17   the -- first of all, the amphetamine level, indicating

18   whether or not it indicated this was a recent dose or

19   a dose taken over a longer period of time?

20        A    Well, no.  That -- if this person was

21   chronically using methamphetamine for a long period of

22   time, I'm not aware that I could interpret that through

23   just the amphetamine breakdown product -- because that

24   is what amphetamine is.  It breaks down.  The ratio

25   between the two -- methamphetamine and amphetamine -- is

                                              Page 15

1   what I have typically seen in a few other cases for

2   people that are actively acutely using.

3        Q    And was the ratio important to you in terms of

4   any of your findings here?

5        A    Well, it was consistent.  It fit the pattern

6   that you tend to see in a lot of people that are using

7   methamphetamine, how it breaks down, and what a typical

8   toxicological report says.

9        Q    Let's talk a second about the methamphetamine

10  level, 0.42.

11            Is that milligrams per liter?

12       A    Yes, it is.

13       Q    Okay.  And based upon your training and

14  experience over thirty-plus years of doing autopsies and

15  whatnot, how would you characterize that level of

16  methamphetamine?

17       A    It is not an enormous level.  It is not a tiny

18  trace amount.  It is a level that can have the effect of

19  killing someone.  I have seen it many times before.

20  I have seen -- on the other hand, I just signed out

21  a gunshot wound case -- I need to finish my paperwork.

22  A gunshot wound case yesterday that had, like, three

23  times that level, and he died from the gunshot wound,

24  not the methamphetamine.

25            It is a drug that is very unpredictable in how

Page 16

1    it behaves on individuals.  That little snapshot in time

2    doesn't tell me -- maybe a toxicologist would be

3    different, but it doesn't tell me how long that person

4    has been using.  Had they been high for a day?  Maybe

5    just an hour and a half?  I have no idea.

6        Q    Okay.  But you have -- you have seen lower

7    levels and -- I'm assuming, and have found

8    methamphetamine death with a level lower than that in

9    your career; correct?

10       A    Yes.

11            But I -- again, when they start getting much

12   lower than this, and even like this level, that is where

13   I tend to do other ancillary studies to make sure I am

14   not missing another factor.  As an example, another one

15   recently had a lower level, but then I found that this

16   person had scarring on their heart; so they were a setup

17   for the effects of methamphetamine; so I did some more

18   studies because of the level.  When it was getting

19   lower, it bothered me.  I want to see if there is

20   something else as a cofactor that is making them more

21   susceptible.

22       Q    And in your -- is there a range in your mind,

23   Doctor, where you would deem methamphetamine to be

24   potentially toxic or lethal?

25       A    Well, this is in the range that I expect has

                                          Page 17

1    the potential to be toxic or lethal.  I am more

2    comfortable with levels that are much higher than this

3    if they are factors by themselves, completely

4    independent, nothing else is there.

5         Q    Did postmortem redistribution factor into your

6    analysis at all in terms of the cause of death?

7         A    That could be something that could be relevant.

8    In this particular case, I didn't see any reason for

9    a dilutional effect because he is not transfused.  And

10   that is why the sample, you'll notice, on the toxicology

11   is femoral blood because I am trying to get a sample

12   that is more reliable for postmortem toxicology.

13        Q    And in your experience, the femoral blood would

14   be one of the most reliable sources -- blood sources?

15        A    It is pretty much the most reliable blood

16   source.  When you go to central blood or some other

17   locations -- I don't remember what the -- what the ratio

18   is, but there is often postmortem redistribution of

19   a lot of different drugs.  I forget what it is for

20   methamphetamine, but I try not to worry about it because

21   I take femoral blood; so instead I take femoral blood to

22   avoid the issue.

23        Q    And you did not find any other substances or,

24   I guess, toxicologically no other substances were found

25   in his system, no other drugs or alcohol; is that

Veritext Legal Solutions
866 299-5127

1    correct?

2         A     That is correct, sir.

3         Q     Now, your other conditions that you list here

4    are probable mechanical asphyxia while being placed in

5    restraint device by police; is that correct?

6         A     Yes, sir.

7         Q     Cardiac hypertrophy; correct?

8         A     Yes, sir.

9         Q     And morbid obesity?

10        A     Yes, sir.

11        Q     How are other conditions different than the

12   cause of death?

13        A     Well, other significant conditions are

14   cofactors and either make it possible for that -- let's

15   say -- we'll just stick with drugs; so just drugs in

16   general.  Drugs that cause the death or either

17   additively make it worse or synergistically make it

18   worse.  That is precipitating the death because,

19   unfortunately, I suspect there are methamphetamine

20   abusers walking around with a high blood level right now

21   and they are not dead.

22             Okay?

23             The drug is a very unpredictable one, but even

24   so, they are there.  There are factors that make the

25   person who is vulnerable because of whatever the primary

                                            Page 19

1    cause is, in fact, vulnerable.  It is sort of implicit

2    in -- and they are not -- most doctors would not list

3    this on things, but, for example, somebody could list

4    a cofactor on somebody that falls off a roof, and he

5    breaks a rib, and they say he has heart disease or

6    something like that.  By putting that and other

7    significant conditions, they say, yeah.  Those rib

8    fractures were significant and, yeah.  A person could

9    die from it, but this guy probably died from it right

10   now because he was so weak as a victim because of his

11   bad heart disease.

12          Do you see what I'm saying?

13          Think of the -- think of the analogy of the --

14   and I don't want to waste your time; so I'll make this

15   as brief as I can.  The twenty-year-old Marine out of

16   boot camp and his ninety-year-old grandfather both fall

17   off a roof, and they both break the same ribs.  The

18   Marine recovers from it, and the ninety-year-old grandpa

19   dies of his heart disease and his bad lungs and

20   everything else.  Those are the cofactors that made him

21   a particular victim.  They both received the same

22   injury, which may or may not kill in and of itself, but

23   nobody is surprised that Grandpa died.  It is horrible,

24   but nobody is surprised.

25      Q    So -- and then so what did you mean by the term

Page 20

1      Q    Okay.  I want to go sort of macro for a few

2   minutes here.

3           And you did not find any injuries to the head

4   of Mr. Bauer that related to his cause of death, did

5   you?

6      A    No.  There were just some minor external

7   injuries.

8      Q    And that would be true of, really, all of the

9   external findings.

10          They were all minor and did not relate to his

11   cause of death; correct?

12     A    No, not directly.  They did not.

13     Q    It does sound a little better; so that's good.

14          And he did not suffer any neck injuries that

15   related to the cause of death; correct?

16     A    No, sir.

17     Q    And there were no internal head or neck

18   injuries that you noted of significance in your report;

19   correct?

20     A    That is correct.

21     Q    You did not find any injuries to any of his

22   thoracoabdominal organs; correct?

23     A    No, sir.

24     Q    Is what I said correct, Doctor?

25     A    That is correct.

Page 37

1      Q     Okay.  And how was that finding significant?
2   What does that mean?
3      A     It means there were no blunt injuries or other
4   kind of injuries to his deep organs; in other words,
5   there weren't any tears or bruises to his deep organs.
6      Q     I know you found contusions on his torso.
7            And contusions are a fancy word for a bruise;
8   is that correct?
9      A     Yes, sir.
10     Q     And abrasions are a fancy word for scrapes;
11  right?
12     A     Yes, sir.
13     Q     Okay.  The contusions you found in terms of
14  the -- Mr. Bauer's body, did any of them cause his --
15  his death?
16     A     No.
17     Q     Were any of them significant enough that
18  indicated any significant force in that area?
19     A     No.
20           You are talking about the torso?  No, sir.
21     Q     Was there any indications on the torso of any
22  significant force that you believe could have been
23  attributed to any significant weight placed on Mr. Bauer
24  when he was in the prone position during the arrest or
25  shortly after the arrest?

                                              Page 38

1     A     No, sir.

2           There -- there were none.  And I even -- as is

3     evident in some of the pictures, you can see I checked

4     the -- the soft tissue of his back to make sure there

5     wasn't anything like that, no, sir.

6     Q     So in other words, there was no significant

7     internal findings of Mr. Bauer's back to indicate any

8     significant force or weight to his back; is that

9     correct?

10    A     That is an overstatement.  The -- there was no

11    focally condensed force somewhere in his back to produce

12    a blow like you would expect from a knee or a kick or

13    something like that.  But force that is diffusely

14    applied across the back doesn't necessarily have to

15    leave anything.  But no.  I didn't see any impacts.

16    Maybe that is a better word to use.  I didn't see any

17    impacts.

18    Q     And then I know you talked about mechanical

19    asphyxiation with regard to the restraint device, but --

20    as a contributing factor, but -- or I guess as another

21    significant factor.

22          But you did not -- when you reviewed the videos

23    and per your autopsy results, you did not find any

24    suspected asphyxiation when Mr. Bauer was in the prone

25    position; is that correct?

Page 39

1      A      When in the prone position?

2      Q      During his arrest and before he was, you know,

3   sat up and started to be placed in the wrap.

4          MR. GWILLIAM:   I'm going to object.   The

5   question is vague and uncertain both as to time and

6   exactly what we're doing with it; so to me, this

7   question is vague.

8   BY MR. BLECHMAN:

9      Q      You can respond.

10     A      Thank you.

11         No.   I didn't see anything that at that time

12  suggested to me asphyxia.

13     Q      So just so we are clear, when you reviewed the

14  video, I'm assuming one of the things you are looking

15  for is Mr. Bauer's condition when he is attempted to be

16  handcuffed in the prone position on his stomach and

17  shortly thereafter; correct?

18     A      That is the greater part of my focus.   But

19  I watched all of those videos four times -- all of them

20  four times from beginning to end to see what was

21  happening and roughly when.

22     Q      And just so it is clear for the time sequence

23  here, when -- when do you believe -- from your review of

24  all the evidence you reviewed, when do you believe

25  Mr. Bauer started to asphyxiate mechanically?

Page 40

1     A     We would have to go through the tapes again,

2     but from my recollection of it, it was a gradual

3     process.  While he was being placed into the wrap and

4     while they were attempting to adjust it and had him in

5     that jackknife position, he is gradually going into less

6     breathing, less voluntary actions, less evidence that he

7     is responsive, finally culminating in him becoming

8     unresponsive.

9          Part of the problem with judging that from the

10    videos, at least in my opinion, is that, of course, the

11    videos are being jostled because people move.  They are

12    jerking and everything; so I am trying to not take --

13    not mistake movements of him being jostled on the wrap

14    while he is on the gurney or by the person holding the

15    camera -- with the camera on their chest and mistaking

16    that for movements of him.  I am trying to look for

17    things that are just purposely for him; so I can't see

18    exact, but it is just a gradual process as the last few

19    minutes before he gets into the hands of the paramedics.

20    Q     And I think, if I understand your testimony,

21    you are talking about when he was basically rolled over

22    and put into sort of the sitting position -- you call it

23    the jackknife; sort of the L position -- and -- and then

24    things are being strapped down over his chest; correct?

25    A     Yes.

Page 41

1   consistent with any drive stun applications?

2       A    I couldn't find any distinct markings that

3   I could be certain were drive stun.  He just had a lot

4   of minor abrasions and contusions.

5       Q    Okay.  But -- so just to be clear, you did not

6   find any specific markings that you -- indicate to you

7   a location where Mr. Bauer was specifically drive

8   stunned; correct?

9       A    That's correct.  I couldn't prove any.

10      Q    And I take it that you did not find that any of

11  the drive stun applications by any officers led to

12  Mr. Bauer's death; correct?

13      A    No.  They did not.

14           MR. GWILLIAM:  Just a minute.

15           I'll object.  By led to, does that mean factor

16  in or that it was a direct cause?  Your question is

17  unclear.

18           THE WITNESS:  I did not find any evidence -- or

19  I couldn't see anything that proved that a drive stun

20  either caused the death or contributed to his death.

21  BY MR. BLECHMAN:

22      Q    Did you see any evidence that the Taser

23  deployed in the probe -- with the probes contributed to

24  Mr. Bauer's death?

25      A    I asked -- already answered that.  I didn't see

Page 53

1    any reason that it either caused his death or

2    contributed to his death.  It was incidental to his

3    death.

4         Q    Okay.  So that when you say incidental, that is

5    what you mean by that; correct?

6         A    Yes, sir.

7         Q    Incidental means that it is not a cause or

8    contributing factor to anybody's death in your -- to use

9    your terms; correct?

10        A    Yes, sir.

11             As an example, a gunshot wound to the chest

12   kills you; that you have emphysema is incidental to the

13   fact that you died.  You were going to die anyways.

14        Q    You -- on page -- moving back a little bit to

15   page one of your report -- and if you need to take

16   a break, Doctor -- or if anybody needs to take a break,

17   let me know, court reporter or counsel; so just let me

18   know if anybody wants to take a break.

19             MR. GWILLIAM:  Thank you.

20             MR. BLECHMAN:  Hearing none for the moment.

21   BY MR. BLECHMAN:

22        Q    On page one of your report you list, number

23   four, foam in bronchi.

24             What is that -- why is that a significant

25   finding?

Page 54

1    BY MR. BLECHMAN:

2        Q     This is PPD231.

3              Can you see that, Doctor?

4        A     I can see the upper half of the page.  Mine

5    cuts off where it says specimen, femoral blood.  Now you

6    have -- now you are starting to scroll it.

7        Q     Yeah.  Let me scroll.

8              So does this appear to be Mr. Bauer's

9    toxicology report that you relied upon for determining

10   his cause of death?

11       A     Yes, sir.

12             And, also, it has the vitreous humor results.

13       Q     Okay.  And was there any significant finding in

14   terms of the vitreous panel?

15       A     Not to my opinion.  I did it to make sure if he

16   was dehydrated or hyper- -- hyponatremic or something

17   else that might make him more prone to arrhythmias or to

18   seizures or to the effects of the drugs.

19       Q     And none of those findings led to that

20   conclusion?

21       A     Yeah.  They are not normal, if you look these

22   up in a medical textbook, but they are normal for a --

23   for a dead person.  They are in the range of acceptable.

24       Q     He was -- Mr. Bauer was reported before he was

25   contacted by the police to be in the Raley's store

Page 93

```
 1    sipping different liquids of bottles he was taking and
 2    then putting them back.
 3              Did you get any of that information as part of
 4    your investigation?
 5        A    Yes, I did.  And, in fact, I made comments.
 6    I don't know if I commented in my report, but
 7    I definitely saw when we were looking at my badly typed
 8    notes there my issue about that.
 9        Q    Do you disagree in terms of the -- it says
10    blood methamphetamine ranges, there is an effective
11    level listed, and then there is a potentially toxic
12    range that they indicate.
13              Did you have any significant disagreement in
14    terms of the range under potential -- potentially toxic?
15        A    I, frankly, don't pay too much attention.
16    Those come out of the Baselt's textbook of Disposition
17    of toxic chemicals and drugs in man.  They literally
18    cookie cut it and put it in there.  Usually that is
19    where it comes from.  And those kind of drugs,
20    methamphetamine, are so unpredictable.  But as a general
21    concept, I don't have a problem with that rule, but
22    I don't consider it authoritative or anything like that.
23        Q    There has been a lot of questioning by
24    plaintiffs' counsel of officers in this case about
25    excited delirium.
```

Page 94

```
 1            I am assume -- assume you have heard that term
 2     in your training and experience?
 3        A    Yes, sir.
 4        Q    I know you didn't mention it in your report
 5     anywhere; is that correct?
 6        A    That is correct.
 7        Q    Have you ever found an individual's cause of
 8     death to be excited delirium?
 9        A    I tend not to use the term excited delirium
10     because it is a descriptive thing of what the underlying
11     cause is.  There is actually forms of excited delirium
12     that are without any drugs in them, but they are -- they
13     are extremely rare.  I have never seen one of those.
14     But most of the cases I see, it is a behavioral issue
15     caused by the drugs, caused by the other things,
16     associated with the hyperthermia associated with the
17     effects of the drugs on the brain and the heart; so
18     I tend not to mention -- to pull it out.  Could you have
19     described him as behaving, at least initially, in an
20     excited delirium fashion?  Possibly once he gets
21     agitated.  But, for example, he was rather calm at the
22     beginning.
23        Q    You saw, and I'm sure you noted to some extent,
24     that once the struggle began between the initial
25     officers and Mr. Bauer, it took an extended period of
```

Page 95

1  time to get him in handcuffs and then an extended period
2  of time to get him into the wrap device; correct?
3      A    Yes.
4          And they had to double up the handcuffs because
5  of his -- his weight.
6      Q    And even when he was in the wrap, he was still
7  expending a lot of energy moving, yelling, grunting,
8  those type of things; correct?
9      A    Initially, yes, sir.
10     Q    So until he stopped talking essentially --
11  I mean, you would agree that based upon his size, based
12  upon the drugs in his system and some of the other
13  findings, that he expended a lot of energy in his
14  agitation and resistance and movement that day from the
15  video evidence you saw; right?
16     A    That is what it appeared to be, yes, sir.
17     Q    And that would have an impact on -- would that
18  have a negative impact on Mr. Bauer's ability to calm
19  himself down and, you know, regain normal breathing,
20  that type of thing?
21     A    Yes, sir.
22          It would have increased his temperature.  It
23  would have increased his metabolism.  It would have
24  increased his heart rate, increased his breathing rate
25  to try to compensate for that, yes, sir.

Page 96

1   STATE OF CALIFORNIA        )

                               ) ss.

2   COUNTY OF KERN             )

3

4

5        I, B. Suzanne Hull, a Certified Shorthand

6   Reporter in the State of California, holding

7   Certificate Number 13495, do hereby certify that

8   DR. MICHAEL JOSEPH FERENC, the witness named in the

9   foregoing deposition, was by me duly sworn; that said

10  deposition, was taken Tuesday, February 9, 2021, at the

11  time and place set forth on the first page hereof.

12       That upon the taking of the deposition, the

13  words of the witness were written down by me in

14  stenotypy and thereafter transcribed by computer under

15  my supervision; that the foregoing is a true and correct

16  transcript of the testimony given by the witness.

17       Pursuant to Federal Rule 30(e), transcript

18  review was requested.

19       I further certify that I am neither counsel for

20  nor in any way related to any party to said action, nor

21  in any way interested in the result or outcome thereof.

22       Dated this 11th day of February, 2021, at

23  Bakersfield, California.

24

25

         B. Suzanne Hull, CSR No. 13495

                                              Page 109

# EXHIBIT N-1

# Alameda County Sheriff's Office

### Coroner's Bureau
2901 Peralta Oaks Court, 2nd Floor, Oakland, CA 94605-5319

## Gregory J. Ahern, Sheriff

### Director of Emergency Services
### Coroner - Marshal

## M E M O R A N D U M

DATE:      August 2, 2018

FROM:      Michael Joseph Ferenc, M.D.

TO:   .     Case File 2018-02388

SUBJECT:   AUTOPSY PROTOCOL

An autopsy was performed on the body of Jacob John Bauer at the
Coroner's Bureau, 2901 Peralta Oaks Court, Oakland, California,
on August 2, 2018, at about 9:15 a.m.

### FINDINGS

1)   INJURIES
    A. HEAD AND NECK
       1.   EXTERNAL ABRASIONS TO HEAD
       2.   CONJUNCTIVAL PETECHIAE
       3.   NO INTERNAL HEAD OR NECK INJURIES
    B. TORSO
       1.   MINOR EXTERNAL INJURIES
       2.   CONTUSIONS TO ANTERIOR FATTY TISSUES
       3.   CONTUSIONS TO FAT AND MUSCLE OF BACK
       4.   TASER-TYPE BARBS EMBEDDED IN LEFT ABDOMEN
       5.   NO INJURIES TO THORACO-ABDOMINAL ORGANS
    C. LIMBS
       1.   ABRASIONS AND CONTUSIONS TO WRISTS
       2.   OTHER ABRASIONS AND CONTUSIONS TO ARMS.

2)   OBESITY (BMI 40.5).

3)   CARDIAC HYPERTROPHY AND DILATATION.

4)   FOAM IN BRONCHI.

5)   PULMONARY CONGESTION, SLIGHT.

6)   ENLARGED LIVER AND SPLEEN.

7)   TOXICOLOGY (CVT-18-10193)

Sheriff-Coroner
Alameda County                              Body of JACOB JOHN BAUER

     A. TOXICOLOGY ON FEMORAL BLOOD
       1.  METHAMPHETAMINE 0.42 MG/L
       2.  AMPHETAMINE 0.04 MG/L
       3.  NO OTHER SUBSTANCES OR ALCOHOL DETECTED*.
     B. VITREOUS HUMOR CHEMISTRY PANEL IS NON-CONTRIBUTORY.

8)  HISTOLOGY
     A. PULMONARY CONGESTION
     B. FOCAL SLIGHT INTRA-ALVEOLAR HEMORRHAGE
     C. SLIGHT HEPATIC STEATOSIS
     D. HEPATIC FIBROSIS.


CAUSE OF DEATH:   ACUTE METHAMPHETAMINE TOXICITY.
                Other conditions:  PROBABLE MECHANICAL ASPHYXIA
                               WHILE BEING PLACED IN
                               RESTRAINT DEVICE BY POLICE;
                               CARDIAC HYPERTROPHY; MORBID
                               OBESITY.


 **Note:** Mr. Bauer was given 4 mg of Midazolam as an intramuscular (IM) injection in his right upper arm.  IM absorption is slower than intravenous injection; however, with an intact circulatory system I would have expected at least a trace amount of the drug to be found in his postmortem blood (I had our toxicologist recheck their data, and they confirm no Midazolam was found.)  Its absence suggests to me that his circulatory system already had collapsed or was the process of collapsing when the dose was administered.

cc:  District Attorney
     Investigation's Bureau

Sheriff-Coroner
Alameda County

Body of JACOB JOHN BAUER

1 <u>CIRCUMSTANCES OF DEATH</u>

2 *Initial information:* This 38-year-old gentleman became

3 agitated and combative at a grocery store.   Police attempted to

4 gain control of him.  A Taser being was used 2 or 3 times

5 (including drive stun applications).   Eventually he was

6 handcuffed and placed in "The Wrap" restraining device.

7 Paramedics (Paramedics Plus M21399918084774) gave him 4 mg

8 of Midazolam intramuscularly into his arm.  Paramedics were not

9 given access to Mr. Bauer until about 8 minutes later.  He was

10 soon thereafter identified as pulseless, and apneic.

11 Cardiopulmonary resuscitation was started.   He was initially

12 ventilated following basic life support procedures, but in

13 transit endotracheal intubation (about 17 minutes after

14 administration of Midazolam) was done.  He arrived at hospital

15 (Stanford Hospital & Clinics 74780875) about 11 minutes later.

16 From his initial cardiopulmonary arrest, there was never any

17 return of spontaneous cardiac circulation.  No body temperature

18 was found in the records.  He expired in the emergency

19 department. In the hospital record it is noted that the "airway

20 [was] examined with McGrath videolaryngoscope and EMS placed ET

21 tube appears to be in esophagus …." A new endotracheal tube was

22 placed with direct visualization of the vocal cords.

PPD000198

Sheriff-Coroner
Alameda County

Body of JACOB JOHN BAUER

23    *The following are observations made from audiovisual*

24    *recordings obtained after the autopsy*: I reviewed 8 audiovisual

25    recordings (all MP4's) provided by Pleasanton Police (PPD Case

26    18-30256) of the encounter with Mr. Bauer. One was a recording

27    by a citizen across the street from the encounter (20180801-

28    145730 [length 10:03]) and 7 were from police body cams (Bennett

29    BWC [length 31:54], Chin BWC [length 38:10], Knight BWC [length

30    42:12], Lengel BWC [length 2:19:33], Middleton BWC 1st Officer

31    on scene [length 38:58], Sarasua BWC [length 1:17:49], and

32    Trovao BWC [length 3:23]).

33    Mr. Bauer was standing on a sidewalk when two officers

34    approached him on foot. He initially appeared calm and denied

35    any drug or alcohol use. When officers attempted to detain him,

36    he rapidly became agitated and combative. The initial officers

37    attempted to control him with force including Taser deployment

38    (at least 1 set of Taser barbs and several drive stuns). More

39    officers arrived, he was handcuffed posterior with two set of

40    handcuffs (length to length or in series), and officers began to

41    apply "The Wrap" restraint device including a spit mask

42    (covering his mouth and lower nose). During part of this time

43    Mr. Bauer was loudly yelling statements such as "...trying to

44    kill me and rape me, Mr. Trump.... You are suffocating me...."

Sheriff-Coroner
Alameda County                          Body of JACOB JOHN BAUER

45    The application of the restraint device until he was in

46  a "jack-knifed" or about 90 degree sitting position took about

47  14 minutes.   During that time, officers were physically

48  restraining him including pushing from his back to hold him in

49  the sitting position.   By the latter part and/or end of those

50  about 14 minutes his face appeared purple and his discernible

51  voluntary motions and/or respiratory efforts appeared markedly

52  diminished and/or absent.   It was about another 3 minutes when

53  paramedics were injecting his right bicep with 4 mg of

54  Midazolam.   It was approximately 8 minutes more before Mr. Bauer

55  was on the gurney and Paramedics were given full access to him.

56                      PRELIMINARY EXAMINATION

57    The unembalmed body of an obese middle-aged man is on a

58  mortuary table, is partially dressed, and has a properly labeled

59  identification tag. Paper bags are on his hands.   Two Taser-type

60  barbs are embedded on the left side of the abdomen. The lower

61  part of "The Wrap" restraint device is in place on his legs.

62  The upper harness part of "The Wrap" is loose behind his torso.

63  The spit hood component of "The Wrap" is not seen.   A grey

64  disposable blanket and plastic sheets are underneath him.   No

65  handcuffs are present.

Sheriff-Coroner
Alameda County                    Body of JACOB JOHN BAUER

66   Minor external injuries are described in the subsequent

67   section.  Fingernail clippings and gunpowder residue samples are

68   taken from his hands.

69   His clothing consistent of blue jeans pulled slightly down

70   on his hips, black underwear, white socks, and a cut-away green

71   tee shirt.  The side pockets of the jeans have been flagged. No

72   personal items are in the other pockets. A grey and black metal

73   bracelet is on the right wrist.

74                         RECENT INJURIES

75   There are external injuries to the head, torso, and upper

76   limbs.  There also are conjunctival petechiae.  No significant

77   injuries to internal organs are found.

78   There is an ill-defined, red-brown to tan, 1-1/2 inch

79   abrasion on the right cheek. A faint 1/4 inch, red-tan abrasion

80   is on the right forehead. A 7/8 x 1/2 inch, red-brown abrasion

81   is above the lateral left eyebrow.  On the left cheek is a faint

82   3/8 inch, red-blue contusion.

83   A small number of red-blue petechiae are on the

84   conjunctivae of the lower eyelids.

85   Several, 1/4 to 3/4 inch, faint, red-brown abrasions are on

86   the right lower quadrant of the abdomen.  On the left side of

87   the mid to lower abdomen are two, firmly embedded, Taser-type

Sheriff-Coroner
Alameda County                          Body of JACOB JOHN BAUER

88   barbs in the skin and focally hemorrhagic subcutaneous tissue.

89   About 1/4 inch areas of red-brown abrasion are on the skin

90   directly surrounding the barbs. The barbs are about 1-1/2 inches

91   apart. The wires to the Taser-type barbs are absent. (The

92   initial history indicates a Taser-type device may have been used

93   two or three times.  No other barbs or skin wounds consistent

94   with barb sites are identified.) There are no other significant

95   external injuries on the front or back of the torso.

96       The subcutaneous fat layer of the anterior abdomen shows

97   1/2 to 1 inch foci of dark blue hemorrhage consistent with small

98   contusions.  The deep fat and muscle of the back show 1/2 to 2

99   inch foci of red-blue hemorrhage on the right shoulder blade

100  area and bilaterally on the lateral mid back.

101      A 4 x 3 inch patch of red-tan abrasions and red contusions

102  are on the right elbow area.

103      On the right wrist are abrasions and contusions some of

104  which are consistent with handcuff marks:  A faint about 1/4 to

105  3/8 inch-wide band of red-blue contusions extends roughly

106  transversely across the back of the wrist area.  Near the ulnar

107  margin the contusions are replaced by to parallel thin bands of

108  red-brown abrasions. More distally on the back of the wrist is a

109  second similar band of red-blue abrasions and faint red-tan

PPD000202

Sheriff-Coroner
Alameda County                          Body of JACOB JOHN BAUER

110   abrasions.   Along the ulnar area of the wrist joint is a 3/4 x

111   3/4 inch area of dark blue hemorrhage and red-brown abrasion. On

112   the radial side of the right wrist is an ill-defined, faint,

113   1/12 inch, red contusions. Only faint bands of pallor are on the

114   anterior right wrist area.

115   On the back of the right hand are rare about 1/8 inch red-

116   tan abrasions.   An ill-defined about 1-1/2 inch contusions

117   involves the knuckles of the ring finger and little finger.   An

118   about 1/8 inch, red-brown abrasion is on the skin between these

119   two fingers.

120   On the left upper arm and left forearm are rare small 1/2

121   to 1-1/2 inch patches of red-tan to red-brown abrasions.

122   On the back of the left wrist are bands of red contusion

123   and red-tan abrasion that are fainter than those seen on the

124   right.   On the back of the left hand are rare 1/8 inch red-tan

125   abrasions.

126   The injuries and findings described above are not repeated.

127   <u>EXTERNAL EXAMINATION</u>

128   The body of a well-developed, markedly obese (BMI 40.5),

129   middle-aged, white man is reported to be 38 years, 69 inches,

130   and 274 pounds.   Rigor mortis is moderate.   Livor mortis is

131   moderate, posterior, and fixed.

PPD000203

Sheriff-Coroner
Alameda County                    Body of JACOB JOHN BAUER

132    The head shows no significant scars. The face is
133    congested. The hair is brown with slight grey, straight, and
134    about 2 inches. The hair on the top of the head is died pink-
135    red and blue. A trimmed moustache and a trimmed chin beard are
136    surrounded by beard stubble. The eyelids, sclerae, and
137    conjunctivae are congested. The eyes are blue-green. The nose
138    and the mouth show no lesions. An airway tube and an oral
139    gastric tube are seen. A nasal cannula and tubing are over the
140    upper head. The teeth are in fair to good condition. The ears
141    are intact.

142    The neck shows no significant trauma or scars. The chest
143    shows no significant trauma or scars. Tan discoloration over
144    the sternum is consistent with cardiopulmonary resuscitation.
145    The breasts are of a man. The abdomen shows a 4 inch scar in
146    the right lower quadrant. A 1/2 inch, healing, brown,
147    superficial ulcer is on the right lower quadrant under a skin
148    flap of the panniculus. ECG and cardioversion pads are on the
149    torso. The genitalia are of a circumcised man.

150    The arms and forearms are roughly symmetrical. Stretch
151    marks are on the upper arms and shoulders. ECG pads are on the
152    arms. A bandage covers a puncture mark with surrounding purpura
153    in the left antecubital fossa. Vascular lines are in the right

Sheriff-Coroner
Alameda County                        Body of JACOB JOHN BAUER

**154** forearm and back of the left hand. The legs and feet show no

**155** significant trauma or scars.

**156**     The back shows no significant scars. The anus is

**157** unremarkable.

**158**                   <u>INTERNAL EXAMINATION</u>

**159**     BODY WALLS AND CAVITIES: The subumbilical fat pad is about

**160** 3-1/2 inches. The subcutaneous and breast tissues show no

**161** findings except for trauma. The pleural cavities are smooth and

**162** glistening, have no significant adhesions, and contain minimal

**163** serous liquid. The pericardial sac is intact. The mediastinum

**164** is unremarkable. The diaphragm is intact. The peritoneal

**165** cavity shows no significant adhesions and contains minimal

**166** serous liquid. The retroperitoneal fat layer is moderately

**167** increased. The major organs are normally positioned.

**168**     CARDIOVASCULAR SYSTEM: The epicardium is smooth and

**169** glistening. The coronary arteries follow a right predominant

**170** distribution and show minimal atherosclerosis. A separate conus

**171** artery ostium arises from the right coronary cusp. The heart is

**172** 440 grams. The myocardium is red-tan, normal texture, and

**173** uniform. The right ventricular free wall does not show any

**174** significant increased fatty tissue or increased fibrous tissue.

**175** The left ventricle varies from 1.1 in the free wall to 1.3 cm in

PPD000205

Sheriff-Coroner
Alameda County                    Body of JACOB JOHN BAUER

176  the septum.   The right ventricle is about 0.3 cm.   The chambers
177  are slightly to moderately dilated.   The endocardium, chordae,
178  and papillary muscles are intact.   The coronary sinus ostium has
179  a full translucent valve.   The foramen ovale is closed.   The
180  atrioventricular and semilunar valves are normally formed, show
181  no lesions or vegetations, and are appropriate for age.   The
182  aorta shows no atherosclerosis.   The venae cavae and great
183  vessels show no thrombi or emboli.

184      PULMONARY SYSTEM:   The right and left lungs are 440 and 650
185  grams.   The lungs are red, poorly aerated, soft, and uniform
186  with smooth glistening surfaces.   The bronchi show no
187  significant lesions.   The mucosa is tan and coated by a moderate
188  amount of white foam.   The vessels show no significant thrombi
189  or emboli.

190      HEPATOBILIARY SYSTEM:   The liver is normal texture, uniform
191  with a smooth glistening capsule, red tan, and 2420 grams.   The
192  biliary tract is intact, and the gallbladder contains a small
193  amount of green bile and multiple, 0.5 to 1.5 cm, multifaceted,
194  smooth, yellow, centrally green-crystalline calculi.   The
195  pancreas is lobulated, normal texture, without focal lesions,
196  and tan.

Sheriff–Coroner
Alameda County                           Body of JACOB JOHN BAUER

197      HEMATOPOIETIC SYSTEM:   The spleen is soft, uniform with a

198   smooth capsule, dark red, and 420 grams.   The thymus gland is

199   unremarkable for age.   The lymph nodes are not significantly

200   enlarged and show no lesions.   The bone marrow of the ribs and

201   calvarium is unremarkable for age.

202      GASTROINTESTINAL SYSTEM:   The oropharynx, esophagus, and

203   stomach show no lesions.   The stomach contains about 25 mL of

204   grey, thin liquid. The duodenum, jejunum, ileum, and large bowel

205   show no mucosal, mural, or serosal lesions. No foreign material

206   is seen in the bowel contents.   The mesentery is intact.   The

207   appendix is not identified.

208      GENITOURINARY SYSTEM:   The adrenal glands are unremarkable.

209   The renal capsule strips with marked difficulty.   The right and

210   left kidneys are 160 and 200 grams.   The cortices are smooth,

211   red tan, normal thickness, and uniform except for a 3 cm smooth

212   walled clear liquid filled cyst on the left.   The calyces and

213   collecting systems are not dilated and show no lesions.   The

214   pyramids and papillae are intact.   The ureters are patent to the

215   bladder that contains over 100 mL of clear yellow urine.   The

216   bladder mucosa and wall are unremarkable.   The prostate gland is

217   unremarkable for age. The testes are unremarkable for age.

Sheriff-Coroner
Alameda County                              Body of JACOB JOHN BAUER

218    MUSCULOSKELETAL   SYSTEM:    The   muscles   show   no   diffuse

219    lesions. The skeleton is well developed and appropriate for age.

220    Occasional anterior-medial, upper rib fractures associated with

221    slight    hemorrhage    are    consistent    with    cardiopulmonary

222    resuscitation.

223    HEAD  AND  NERVOUS  SYSTEM:   The  scalp  shows  no  significant

224    hemorrhage.   The  skull  shows  no  fractures.   The  dura  mater  and

225    leptomeninges  show  no  significant  hemorrhages  or  lesions.   The

226    floor  of  the  skull  and  dural  sinuses  are  intact.   The  circle  of

227    Willis  shows  no  aneurysms  and  no  significant  atherosclerosis.

228    The  brain  is  1600  grams.  The  cerebral  hemispheres,  cerebellum,

229    and  brain  stem  show  no  significant  focal  or  diffuse  lesions.

230    The  grey  and  white  matter,  deep  nuclei,  cerebellar  folia,  and

231    brain  stem  show  no  significant  diffuse  or  focal  lesions.   The

232    pituitary gland is intact.

233    ANTERIOR  NECK  STRUCTURES:   The  anterior  neck  muscles  show

234    no  hemorrhage.   The  thyroid  gland  is  symmetrical,  not  enlarged,

235    normal  texture,  and  red  brown.   The  parathyroid  glands  are  not

236    identified.  The  laryngeal  cartilages,  cricoid  cartilage,  and

237    hyoid  bone  are  intact.   The  tracheal,  laryngeal  and  epiglottic

238    mucosa  shows  no  lesions.   The  mucosa  is  tan.   The  tongue  is

239    unremarkable.   The  posterior  pharynx  is  not  obstructed.   The

Sheriff-Coroner
Alameda County                              Body of JACOB JOHN BAUER

240    prevertebral fascia is intact.    The cervical vertebrae are

241    intact.

242

243         SPECIMENS RETAINED: femoral vein blood, heart blood, urine,

244    vitreous humor, gastric contents, and liver.  A full toxicology

245    screen is requested as well as vitreous humor electrolytes.

246         Representative tissue sections are retained in formalin.

247    Selected sections are submitted for processing.

248         OTHER STUDIES:  None.

249         Any items of evidence collected are retained for police

250    (Please see separate evidence inventory.).

251
252                                        9/13/18
253              Michael Joseph Ferenc, M.D.



Alameda County Coroner's Bureau
Gregory J. Ahern, Sheriff/Coroner
2901 Peralta Oaks Court, Oakland, CA 94605
(510) 382-3000

# Coroner Investigator's Report

| CALL INFO | NAME OF DECEASED (LAST, FIRST MIDDLE)<br>BAUER, Jacob John | | TENTATIVE I   UNIDENTIFIED | | CASE NUMBER<br>2018-02388 |
|---|---|---|---|---|---|
| | REPORTED BY<br>Eva Garcia | REPORTED BY PHONE | REPORTING AGENCY<br>Stanford Health Care - ValleyCare | | REFERENCE NUMBER<br>18-30256 |
| | INVESTIGATOR<br>CHARLES FRAZIER, | CALL DATE AND TIME<br>8/1/2018 1624 | CASE TYPE<br>Removal Case | | |

| DECEDENT | DATE AND TIME OF DEATH<br>8/1/2018 1615 | | DATE OF BIRTH<br>6/27/1980 | AGE<br>38 Years | GENDER<br>Male | RACE<br>Caucasian/White | MARITAL STATUS<br>Never Married | VET<br>No |
|---|---|---|---|---|---|---|---|---|
| | HGT | WGT | EYE COLOR<br>Hazel | HAIR COLOR<br>Brown | OCCUPATION<br>Information Technology | | EMPLOYER | |
| | Preliminary Summary | Undetermined death of a 38 year old male, identified as Jacob John Bauer, reported by Stanford Health Care - ValleyCare Hospital in Pleasanton. Bauer was involved in an altercation with officers from the PPD when they attempted to contact him regarding a vandalism call at a nearby Raleys grocery store. When Bauer became combative and non-compliant with the officers, he was tased two or three times and placed into "The Wrap" restraint device. Paramedics Plus responded during the altercation and administered 4 mg of Versed in an attempt to calm Bauer. When Bauer was moved onto a gurney for transport, paramedics noticed he was unresponsive. CPR was started with the mechanical Lucas device and Bauer was transported to ValleyCare where his death was pronounced. Bauer had abrasions on his face and head, and taser barbs were lodged in the left side of his torso.  PPD officers believed Bauer may have been under the influence of methamphetamine. NOK notified. | | | | | | |

| DEATH | LOCATION OF DEATH<br>Stanford Health Care - ValleyCare | | | LOC TYPE<br>HOSP |
|---|---|---|---|---|
| | ADDRESS (STREET, CITY, STATE, ZIP)<br>5555 W. Las Positas Boulevard, Pleasanton, CA, 94588 | | COUNTY<br>Alameda | |
| | Manner     Accident | Death Certificate Signed By     RAFAEL PLASENCIA, DEPUTY CORONER | | |
| | Cause A   ACUTE METHAMPHETAMINE TOXICITY | | Interval | Hours |
| | Cause B | | Interval | |
| | Cause C | | Interval | |
| | Cause D | | Interval | |
| | Other Significant Conditions | PROBABLE MECHANICAL ASPHYXIA WHILE BEING PLACED IN RESTRAINT DEVICE BY POLICE; CARDIAC HYPERTROPHY; MORBID OBESITY | | |

| NOTIFIC. | LEGAL NEXT OF KIN<br>Bauer, John | RELATIONSHIP<br>Father | TELEPHONE NO.<br>(925) 451-0675 |
|---|---|---|---|
| | NOTIFIED BY<br>Charles Frazier | METHOD<br>In Person | DATE AND TIME |
| | IDENTIFICATION METHOD<br>Personal Identification | DATE AND TIME<br>8/1/2018 1615 | |

| INCIDENT | LOCATION OF INCIDENT<br>Public Street | | AT WORK<br>No | |
|---|---|---|---|---|
| | ADDRESS (STREET, CITY, STATE, ZIP)<br>Across from 44 Mission Drive, Pleasanton, CA, 94566 | | COUNTY<br>Alameda | DATE AND TIME OF INCIDENT<br>8/1/2018 1450 |
| | INVESTIGATING AGENCY<br>Pleasanton Police Department | INV AGENCY PHONE NUMBER | | OFFICER<br>A. Pittl & J. Hunter |

| DISP | FUNERAL HOME<br>CHAPEL OF THE CHIMES - OAKLAND | | BODY RELEASE TO FUNERAL HOME IN<br>9/7/2018 1409 | |
|---|---|---|---|---|
| | Full Autopsy    Partial Autopsy    Inspection    Record Review    Inspection w/Specimen<br>Yes | | | EXAM BY<br>MICHAEL FERENC |



Alameda County Coroner's Bureau
Gregory J. Ahern, Sheriff/Coroner
2901 Peralta Oaks Court, Oakland, CA 94605
(510) 382-3000

# Coroner Investigator's Narrative

Case Number **2018-02388**

Name    **BAUER, Jacob John**

**First Call Information:**

On Wednesday, August 1, 2018, about 1624 hours, Registered Nurse Eva Garcia of the Stanford Health Care – ValleyCare Hospital reported the death of 38 year old Jacob John Bauer. According to Garcia, Bauer had been involved in an altercation with officers from the Pleasanton Police Department and was subsequently tased two or three times. While officers continued in their attempts to restrain and immobilize Bauer, he became unresponsive. CPR was started and he was transported to the hospital where his death was pronounced at 1615 hours.

On Wednesday, August 1, 2018, about 1751 hours, I (Frazier) spoke to Pleasanton Police Department Sergeant A. Fountain. According to Sergeant Fountain, on Wednesday, August 1, 2018, about 1444 hours, Bauer had been involved in an argument inside the Raleys grocery store. Bauer became combative and was reported to have been taking property and vandalizing items inside the store. About 1447 hours, 911 was called and Raleys grocery store employees escorted Bauer out of the store. Bauer began to walking towards Mission Drive.

About 1450 hours, officers from the Pleasanton Police Department arrived and made contact with Bauer. Bauer became combative with the officers and was tased several times before officers were able to apply handcuffs behind Bauer's back. Bauer continued to resist the officers' attempts to affect an arrest, and officers used "The Wrap" full body restraint device in an attempt to immobilize Bauer. Bauer continued to resist the officers and it took approximately 15 minutes to apply the restraint device. Paramedics Plus arrived on scene and the paramedics administered 4mg of the sedative Versed in an attempt to calm Bauer.

Once the restraint device was in place and Bauer was placed onto a gurney, paramedics noticed he was unresponsive. Paramedics performed CPR with the mechanical Lucas device and transported Bauer to the emergency room at the Stanford Health Care – ValleyCare Hospital in Pleasanton. While in the emergency room, life saving efforts continued without success and Doctor Brian Kaminski pronounced Bauer's death. (CEF1691)

**Related Medical Information:**

Bauer had abrasions to his face and head, and taser barbs were lodged in the left side of his torso.

According to Sergeant Fountain, Bauer had possibly been under the influence of methamphetamine. (CEF1691)

PPD000211



Alameda County Coroner's Bureau
Gregory J. Ahern, Sheriff/Coroner
2901 Peralta Oaks Court, Oakland, CA 94605
(510) 382-3000

**Death Scene:**

On Wednesday, August 1, 2018, about 1447 hours, officers from the Pleasanton Police Department attempted to arrest Bauer on the public sidewalk across from 44 Mission Drive in Pleasanton. Bauer became combative and was subsequently tased several times, placed in "The Wrap" full body restraint device, and administered the sedative Versed. (CEF1691)

On Wednesday, August 1, 2018, about 1615 hours, Bauer's death was pronounced in the emergency room at the Stanford Health Care – ValleyCare Hospital, located at 5555 W. Las Positas Boulevard in Pleasanton. (CEF1691)

**Body Identification:**

I (Frazier) entered Bauer's information into the Department of Justice Cal-Photo database and located a Department of Motor Vehicles (DMV) record with an image of Jacob John Bauer. I compared the decedent to the DMV photograph and general descriptors and they matched. (CEF1691)

On Friday, August 3, 2018, about 1020 hours, I (Cardoza) received a faxed Fingerprint Comparison Memorandum from the Central Identification Bureau (CIB). The memorandum documented the positive comparison of the fingerprints associated with Coroner's Case 2018-02388 and those associated with California Department of Justice (CII) #33970440. Both sets of fingerprints were positively identified to have been made by the same subject, Bauer, John Jacob with a Date of Birth (DOB) of 06/27/1980. I placed the faxed memorandum in the case file. (MJC5779)

**Last Known To Be Alive:**

On Wednesday, August 1, 2018, Doctor Brian Kaminski pronounced Bauer's death in the emergency room at the Stanford Health Care – ValleyCare Hospital in Pleasanton. (CEF1691)

**Next Of Kin Investigation:**

On August 1, 2018, Bauer's father, John Bauer, was notified by Pleasanton Police Department Detectives of his son's death.

I (Frazier) spoke with John and explained the Coroner's involvement. I told John he was the legal next of kin and would be in charge of authorizing funeral arrangements. (CEF1691)

**Other Agency Report:**

Bauer's death occurred within the jurisdiction of the Pleasanton Police Department. Detective A. Pittl responded to the scene and wrote report #18-30256 documenting the incident. A copy of the police report was reviewed and placed in the case file. The report was consistent with the details provided to me during the course of my investigation. (CEF1691)



Alameda County Coroner's Bureau
Gregory J. Ahern, Sheriff/Coroner
2901 Peralta Oaks Court, Oakland, CA 94605
(510) 382-3000

---

**Property And Evidence:**

Bauer's body and all the property on his person were collected and processed into the Coroner's Bureau. I issued Coroner's receipt #39526. (CEF1691)

On Friday, August 3, 2018, all of the property recovered during autopsy was released into the care of Pleasanton Police Detective Jason Hunter #270. (CEF1691)

**Coroner Fees:**

The Coroner's Bureau fees were for body removal ($333.00), body preparation ($67.00), filing of the death certificate ($140.00), and body storage ($2,739.00), for a total of $3,279.00. All Coroner's fees were outstanding. An Unpaid Fees form was completed and submitted to accounting for billing purposes. (CEF1691)

**Case Narrative:**

On Wednesday, August 1, 2018, about 1922 hours, Deputy M. Hartman #1938 and I (Frazier) arrived in the area across from 44 Mission Drive in Pleasanton for a scene investigation and to take photographs. We met with officers from the Pleasanton and Livermore Police Departments, who had the scene secured with a perimeter. The Alameda County Sheriff's Office Crime Lab was on scene and Sheriff's Technicians were conducting a Leica Scan of the scene. I saw several items of debris and the bag that had been used to store "The Wrap" restraining device lying on the sidewalk and in the street. I took digital photographs of the scene.

On Wednesday, August 1, 2018, about 1940 hours, Bauer's father, John Bauer, arrived on scene and was very angry and emotional, accusing the Pleasanton Police Department of killing his son. I spoke with John and explained the Coroner's involvement. John told me he was going to call his family attorney and he did not want to talk to law enforcement. I gave John my business card and the phone number to the Coroner's Bureau.

On Wednesday, August 1, 2018, about 1955 hours, Deputy Hartman and I (Frazier) arrived at the Stanford Health Care – ValleyCare Hospital emergency room to conduct a limited external examination, take photographs and to remove Bauer from the hospital. We met with medical staff and I obtained Bauer's medical records.

Medical Staff directed us to Exam Room #11 where Bauer was lying on a hospital gurney covered with a sheet. I removed the sheet and conducted a limited external examination. I saw medical therapy present consisting of intravenous tubing, cardiac monitoring and defibrillator pads, and tubing protruding from Bauer's mouth. I saw two taser probes lodged into the left side of Bauer's torso. Bauer's shirt was cut away and lying underneath him, exposing his chest. Bauer was clothed from the waist down and his legs were still restrained within "The Wrap." I saw abrasions above Bauer's left eyebrow, on the bridge of his nose, and on his right cheek. I saw scratches on his right hand and wrist. Livor mortis was present on Bauer's back, arms, and buttocks. Deputy Hartman took digital photographs of Bauer to document his condition. We moved Bauer to a gurney and into the Coroner's van for transportation back to the Corner's Bureau.

PPD000213



Alameda County Coroner's Bureau
Gregory J. Ahern, Sheriff/Coroner
2901 Peralta Oaks Court, Oakland, CA 94605
(510) 382-3000

Before leaving the hospital, I met with the Paramedics Plus crew that responded to the scene and provided care to Bauer. They said Bauer was administered 4 ml of the sedative Versed when they arrived on scene.

On August 1, 2018, about 2157 hours, we returned to the Coroner's Bureau and processed Bauer's body into the morgue. We took intake photographs at this time. The scene, hospital and intake photographs were transferred to a compact disk and placed in the case file. (CEF1691)

On Thursday, August 2, 2018, Coroner's Chief Forensic Pathologist Doctor M. Ferenc performed an autopsy on Bauer to determine his cause of death. During the autopsy, Doctor Ferenc noted injuries to Bauer's head/neck, torso, and limbs; obesity (BMI 40.5); cardiac hypertrophy and dilation; foam in bronchi; slight pulmonary congestion; and an enlarged liver and spleen. During the histological examination, Doctor Ferenc noted pulmonary congestion; focal slight intra-alveolar hemorrhage; and hepatic fibrosis. A sample of Bauer's femoral blood and vitreous humor were collected and sent to Central Valley Toxicology, Inc. Doctor Ferenc deferred the cause of death pending toxicology results. (CEF1691)

On Friday, August 03, 2018, about 1141 hours, I received an email from Kelly Stephan of the Cardoza Law Offices indicating that John and Rose Bauer had retained their services. I emailed a response to Stephan explaining the Coroner's involvement and I asked her to have John and Rose Bauer make funeral arrangements. (CEF1691)

On Friday, August 17, 2018, the toxicology results provided by Central Valley Toxicology (CVT), Inc. were complete. CVT detected the following drugs in Bauer's femoral blood sample: Methamphetamine 0.42 mg/L, and Amphetamine 0.04 mg/L. No other common acidic, neutral or basic drugs were detected. No ethyl alcohol was detected. (CEF1691)

On Monday, August 27, 2018, I sent another email to Kelly Stephan of the Cardoza Law Offices. I reminded her that Bauer's body was still in our morgue and requested she contact the family with regard to making funeral arrangements. Stephan responded and said John and Rose Bauer were still working on making arrangements. (CEF1691)

On Wednesday, August 29, 2018, about 1813 hours, I called Bauer's father, John Bauer. He did not answer and I left a message. I told him that his son's body was ready for release and I asked him to select a funeral home. (CEF1691)

On Wednesday, August 29, 2018, about 2045 hours, Detective Pittl of the Pleasanton Police Department informed me that a copy of the body worn camera footage from the incident had been given to Commander Staysa of the Alameda County Sheriff's Office. Commander Staysa delivered the video footage to Doctor Ferenc for review. (CEF1691)

On Friday, August 31, 2018, Coroner's Chief Forensic Pathologist Doctor M. Ferenc determined Bauer's cause of death was acute methamphetamine toxicity. Doctor Ferenc also determined that other significant conditions contributing to his death, but not resulting in the underlying cause were probable mechanical asphyxia while being placed in restraint device by police, cardiac hypertrophy, and morbid obesity. (CEF1691)

On Friday, September 7, 2018, about 1405 hours, Bauer's body was released into the care of Chapel of



Alameda County Coroner's Bureau
Gregory J. Ahern, Sheriff/Coroner
2901 Peralta Oaks Court, Oakland, CA 94605
(510) 382-3000

the Chimes-Oakland for final disposition.  (CEF1691)

**Findings:**
On Wednesday, October 24, 2018, I (Frazier) reviewed this case for the purpose of case closure. An autopsy was performed on Bauer to determine his cause of death.  Doctor Ferenc determined Bauer's cause of death was acute methamphetamine toxicity.  Doctor Ferenc also determined that other significant conditions contributing to his death, but not resulting in the underlying cause were probable mechanical asphyxia while being placed in restraint device by police, cardiac hypertrophy, and morbid obesity.  Upon reviewing the Autopsy Protocol, the information gathered at the scene of the incident and the scene of his death, and the Pleasanton Police Department report, I found the manner of Bauer's death to be an accident.  (CEF1691)

**Supervisory Review:**

On January 29, 2019, I (Sergeant A. Collins) reviewed this case for closure.  I agreed with the findings and considered this case closed. (AMC1696)

Outstanding Coroner fees will remain due and payable following the closure of this case. (AMC8216)

Alameda County Sheriff's Office
Coroner's Bureau
2901 Peralta Oaks Court, 2nd Floor, Oakland, CA 94605-5319

Gregory J. Ahern, Sheriff
Director of Emergency Services
Coroner - Marshal

M E M O R A N D U M

DATE:       August 2, 2018

FROM:       Michael Joseph Ferenc, M.D.

TO:    .    Case File 2018-02388

SUBJECT:    <u>AUTOPSY PROTOCOL</u>

An autopsy was performed on the body of Jacob John Bauer at the
Coroner's Bureau, 2901 Peralta Oaks Court, Oakland, California,
on August 2, 2018, at about 9:15 a.m.

<u>FINDINGS</u>

1)  INJURIES
    A. HEAD AND NECK
        1.   EXTERNAL ABRASIONS TO HEAD
        2.   CONJUNCTIVAL PETECHIAE
        3.   NO INTERNAL HEAD OR NECK INJURIES
    B. TORSO
        1.   MINOR EXTERNAL INJURIES
        2.   CONTUSIONS TO ANTERIOR FATTY TISSUES
        3.   CONTUSIONS TO FAT AND MUSCLE OF BACK
        4.   TASER-TYPE BARBS EMBEDDED IN LEFT ABDOMEN
        5.   NO INJURIES TO THORACO-ABDOMINAL ORGANS
    C. LIMBS
        1.   ABRASIONS AND CONTUSIONS TO WRISTS
        2.   OTHER ABRASIONS AND CONTUSIONS TO ARMS.

2)  OBESITY (BMI 40.5).

3)  CARDIAC HYPERTROPHY AND DILATATION.

4)  FOAM IN BRONCHI.

5)  PULMONARY CONGESTION, SLIGHT.

6)  ENLARGED LIVER AND SPLEEN.

7)  TOXICOLOGY (CVT-18-10193)

PPD000216

Sheriff-Coroner
Alameda County                              Body of JACOB JOHN BAUER

---

    A.  TOXICOLOGY ON FEMORAL BLOOD
       1.   METHAMPHETAMINE 0.42 MG/L
       2.   AMPHETAMINE 0.04 MG/L
       3.   NO OTHER SUBSTANCES OR ALCOHOL DETECTED*.
    B.  VITREOUS HUMOR CHEMISTRY PANEL IS NON-CONTRIBUTORY.

  8)  HISTOLOGY
    A.  PULMONARY CONGESTION
    B.  FOCAL SLIGHT INTRA-ALVEOLAR HEMORRHAGE
    C.  SLIGHT HEPATIC STEATOSIS
    D.  HEPATIC FIBROSIS.

CAUSE OF DEATH:   ACUTE METHAMPHETAMINE TOXICITY.
               Other conditions:  PROBABLE MECHANICAL ASPHYXIA
                                WHILE BEING PLACED IN
                                RESTRAINT DEVICE BY POLICE;
                                CARDIAC HYPERTROPHY; MORBID
                                OBESITY.

**\*Note:** Mr. Bauer was given 4 mg of Midazolam as an intramuscular (IM) injection in his right upper arm.  IM absorption is slower than intravenous injection; however, with an intact circulatory system I would have expected at least a trace amount of the drug to be found in his postmortem blood (I had our toxicologist recheck their data, and they confirm no Midazolam was found.)  Its absence suggests to me that his circulatory system already had collapsed or was the process of collapsing when the dose was administered.

cc:  District Attorney
     Investigation's Bureau

Sheriff-Coroner
Alameda County                          Body of JACOB JOHN BAUER

---

1                    CIRCUMSTANCES OF DEATH

2       *Initial information:* This 38-year-old gentleman became

3    agitated and combative at a grocery store. Police attempted to

4    gain control of him. A Taser being was used 2 or 3 times

5    (including drive stun applications). Eventually he was

6    handcuffed and placed in "The Wrap" restraining device.

7       Paramedics (Paramedics Plus M21399918084774) gave him 4 mg

8    of Midazolam intramuscularly into his arm. Paramedics were not

9    given access to Mr. Bauer until about 8 minutes later. He was

10   soon thereafter identified as pulseless, and apneic.

11   Cardiopulmonary resuscitation was started. He was initially

12   ventilated following basic life support procedures, but in

13   transit endotracheal intubation (about 17 minutes after

14   administration of Midazolam) was done. He arrived at hospital

15   (Stanford Hospital & Clinics 74780875) about 11 minutes later.

16   From his initial cardiopulmonary arrest, there was never any

17   return of spontaneous cardiac circulation. No body temperature

18   was found in the records. He expired in the emergency

19   department. In the hospital record it is noted that the "airway

20   [was] examined with McGrath videolaryngoscope and EMS placed ET

21   tube appears to be in esophagus …." A new endotracheal tube was

22   placed with direct visualization of the vocal cords.

Sheriff-Coroner
Alameda County                          Body of JACOB JOHN BAUER

---

23       _The following are observations made from audiovisual_

24   _recordings obtained after the autopsy_: I reviewed 8 audiovisual

25   recordings (all MP4's) provided by Pleasanton Police (PPD Case

26   18-30256) of the encounter with Mr. Bauer. One was a recording

27   by a citizen across the street from the encounter (20180801-

28   145730 [length 10:03]) and 7 were from police body cams (Bennett

29   BWC [length 31:54], Chin BWC [length 38:10], Knight BWC [length

30   42:12], Lengel BWC [length 2:19:33], Middleton BWC 1st Officer

31   on scene [length 38:58], Sarasua BWC [length 1:17:49], and

32   Trovao BWC [length 3:23]).

33       Mr. Bauer was standing on a sidewalk when two officers

34   approached him on foot.  He initially appeared calm and denied

35   any drug or alcohol use.  When officers attempted to detain him,

36   he rapidly became agitated and combative.  The initial officers

37   attempted to control him with force including Taser deployment

38   (at least 1 set of Taser barbs and several drive stuns). More

39   officers arrived, he was handcuffed posterior with two set of

40   handcuffs (length to length or in series), and officers began to

41   apply "The Wrap" restraint device including a spit mask

42   (covering his mouth and lower nose).   During part of this time

43   Mr. Bauer was loudly yelling statements such as "...trying to

44   kill me and rape me, Mr. Trump.... You are suffocating me...."

Sheriff-Coroner
Alameda County                              Body of JACOB JOHN BAUER

---

45      The application of the restraint device until he was in

46   a "jack-knifed" or about 90 degree sitting position took about

47   14 minutes.    During that time, officers were physically

48   restraining him including pushing from his back to hold him in

49   the sitting position.   By the latter part and/or end of those

50   about 14 minutes his face appeared purple and his discernible

51   voluntary motions and/or respiratory efforts appeared markedly

52   diminished and/or absent.   It was about another 3 minutes when

53   paramedics were injecting his right bicep with 4 mg of

54   Midazolam.   It was approximately 8 minutes more before Mr. Bauer

55   was on the gurney and Paramedics were given full access to him.

56                          PRELIMINARY EXAMINATION

57      The unembalmed body of an obese middle-aged man is on a

58   mortuary table, is partially dressed, and has a properly labeled

59   identification tag. Paper bags are on his hands.   Two Taser-type

60   barbs are embedded on the left side of the abdomen. The lower

61   part of "The Wrap" restraint device is in place on his legs.

62   The upper harness part of "The Wrap" is loose behind his torso.

63   The spit hood component of "The Wrap" is not seen.   A grey

64   disposable blanket and plastic sheets are underneath him.   No

65   handcuffs are present.

Sheriff-Coroner
Alameda County                          Body of JACOB JOHN BAUER

---

66      Minor  external  injuries  are  described  in  the  subsequent

67   section.   Fingernail clippings and gunpowder residue samples are

68   taken from his hands.

69      His clothing consistent of blue jeans pulled slightly down

70   on his hips, black underwear, white socks, and a cut-away green

71   tee shirt.   The side pockets of the jeans have been flagged.  No

72   personal items are in the other pockets.  A grey and black metal

73   bracelet is on the right wrist.

74                           RECENT INJURIES

75      There are external injuries to the head, torso, and upper

76   limbs.   There also are conjunctival petechiae.   No significant

77   injuries to internal organs are found.

78      There  is  an  ill-defined,  red-brown  to  tan,  1-1/2  inch

79   abrasion on the right cheek. A faint 1/4 inch, red-tan abrasion

80   is on the right forehead. A 7/8 x 1/2 inch, red-brown abrasion

81   is above the lateral left eyebrow.  On the left cheek is a faint

82   3/8 inch, red-blue contusion.

83      A  small  number  of  red-blue  petechiae  are  on  the

84   conjunctivae of the lower eyelids.

85      Several, 1/4 to 3/4 inch, faint, red-brown abrasions are on

86   the right lower quadrant of the abdomen.  On the left side of

87   the mid to lower abdomen are two, firmly embedded, Taser-type

PPD000221

Sheriff-Coroner
Alameda County                          Body of JACOB JOHN BAUER

---

88    barbs in the skin and focally hemorrhagic subcutaneous tissue.

89    About 1/4 inch areas of red-brown abrasion are on the skin

90    directly surrounding the barbs. The barbs are about 1-1/2 inches

91    apart. The wires to the Taser-type barbs are absent. (The

92    initial history indicates a Taser-type device may have been used

93    two or three times. No other barbs or skin wounds consistent

94    with barb sites are identified.) There are no other significant

95    external injuries on the front or back of the torso.

96        The subcutaneous fat layer of the anterior abdomen shows

97    1/2 to 1 inch foci of dark blue hemorrhage consistent with small

98    contusions. The deep fat and muscle of the back show 1/2 to 2

99    inch foci of red-blue hemorrhage on the right shoulder blade

100   area and bilaterally on the lateral mid back.

101       A 4 x 3 inch patch of red-tan abrasions and red contusions

102   are on the right elbow area.

103       On the right wrist are abrasions and contusions some of

104   which are consistent with handcuff marks: A faint about 1/4 to

105   3/8 inch-wide band of red-blue contusions extends roughly

106   transversely across the back of the wrist area. Near the ulnar

107   margin the contusions are replaced by to parallel thin bands of

108   red-brown abrasions. More distally on the back of the wrist is a

109   second similar band of red-blue abrasions and faint red-tan

Sheriff-Coroner
Alameda County                          Body of JACOB JOHN BAUER

---

110   abrasions.   Along the ulnar area of the wrist joint is a 3/4 x

111   3/4 inch area of dark blue hemorrhage and red-brown abrasion. On

112   the radial side of the right wrist is an ill-defined, faint,

113   1/12 inch, red contusions. Only faint bands of pallor are on the

114   anterior right wrist area.

115        On the back of the right hand are rare about 1/8 inch red-

116   tan abrasions.    An ill-defined about 1-1/2 inch contusions

117   involves the knuckles of the ring finger and little finger.   An

118   about 1/8 inch, red-brown abrasion is on the skin between these

119   two fingers.

120        On the left upper arm and left forearm are rare small 1/2

121   to 1-1/2 inch patches of red-tan to red-brown abrasions.

122        On the back of the left wrist are bands of red contusion

123   and red-tan abrasion that are fainter than those seen on the

124   right.   On the back of the left hand are rare 1/8 inch red-tan

125   abrasions.

126        The injuries and findings described above are not repeated.

127                        EXTERNAL EXAMINATION

128        The body of a well-developed, markedly obese (BMI 40.5),

129   middle-aged, white man is reported to be 38 years, 69 inches,

130   and 274 pounds.   Rigor mortis is moderate.   Livor mortis is

131   moderate, posterior, and fixed.

132    The head shows no significant scars. The face is

133    congested. The hair is brown with slight grey, straight, and

134    about 2 inches. The hair on the top of the head is died pink-

135    red and blue. A trimmed moustache and a trimmed chin beard are

136    surrounded by beard stubble. The eyelids, sclerae, and

137    conjunctivae are congested. The eyes are blue-green. The nose

138    and the mouth show no lesions. An airway tube and an oral

139    gastric tube are seen. A nasal cannula and tubing are over the

140    upper head. The teeth are in fair to good condition. The ears

141    are intact.

142    The neck shows no significant trauma or scars. The chest

143    shows no significant trauma or scars. Tan discoloration over

144    the sternum is consistent with cardiopulmonary resuscitation.

145    The breasts are of a man. The abdomen shows a 4 inch scar in

146    the right lower quadrant. A 1/2 inch, healing, brown,

147    superficial ulcer is on the right lower quadrant under a skin

148    flap of the panniculus. ECG and cardioversion pads are on the

149    torso. The genitalia are of a circumcised man.

150    The arms and forearms are roughly symmetrical. Stretch

151    marks are on the upper arms and shoulders. ECG pads are on the

152    arms. A bandage covers a puncture mark with surrounding purpura

153    in the left antecubital fossa. Vascular lines are in the right

Sheriff-Coroner
Alameda County                                    Body of JACOB JOHN BAUER

---

154  forearm and back of the left hand. The legs and feet show no

155  significant trauma or scars.

156      The back shows no significant scars. The anus is

157  unremarkable.

158                          <u>INTERNAL EXAMINATION</u>

159      BODY WALLS AND CAVITIES: The subumbilical fat pad is about

160  3-1/2 inches. The subcutaneous and breast tissues show no

161  findings except for trauma. The pleural cavities are smooth and

162  glistening, have no significant adhesions, and contain minimal

163  serous liquid. The pericardial sac is intact. The mediastinum

164  is unremarkable. The diaphragm is intact. The peritoneal

165  cavity shows no significant adhesions and contains minimal

166  serous liquid. The retroperitoneal fat layer is moderately

167  increased. The major organs are normally positioned.

168      CARDIOVASCULAR SYSTEM: The epicardium is smooth and

169  glistening. The coronary arteries follow a right predominant

170  distribution and show minimal atherosclerosis. A separate conus

171  artery ostium arises from the right coronary cusp. The heart is

172  440 grams. The myocardium is red-tan, normal texture, and

173  uniform. The right ventricular free wall does not show any

174  significant increased fatty tissue or increased fibrous tissue.

175  The left ventricle varies from 1.1 in the free wall to 1.3 cm in

176   the septum.   The right ventricle is about 0.3 cm.   The chambers

177   are slightly to moderately dilated.   The endocardium, chordae,

178   and papillary muscles are intact.   The coronary sinus ostium has

179   a full translucent valve.   The foramen ovale is closed.   The

180   atrioventricular and semilunar valves are normally formed, show

181   no lesions or vegetations, and are appropriate for age.   The

182   aorta shows no atherosclerosis.   The venae cavae and great

183   vessels show no thrombi or emboli.

184        PULMONARY SYSTEM:   The right and left lungs are 440 and 650

185   grams.   The lungs are red, poorly aerated, soft, and uniform

186   with smooth glistening surfaces.   The bronchi show no

187   significant lesions.   The mucosa is tan and coated by a moderate

188   amount of white foam.   The vessels show no significant thrombi

189   or emboli.

190        HEPATOBILIARY SYSTEM:   The liver is normal texture, uniform

191   with a smooth glistening capsule, red tan, and 2420 grams.   The

192   biliary tract is intact, and the gallbladder contains a small

193   amount of green bile and multiple, 0.5 to 1.5 cm, multifaceted,

194   smooth, yellow, centrally green-crystalline calculi.   The

195   pancreas is lobulated, normal texture, without focal lesions,

196   and tan.

Sheriff-Coroner
Alameda County

Body of JACOB JOHN BAUER

197    HEMATOPOIETIC SYSTEM:   The spleen is soft, uniform with a
198  smooth capsule, dark red, and 420 grams.   The thymus gland is
199  unremarkable for age.   The lymph nodes are not significantly
200  enlarged and show no lesions.   The bone marrow of the ribs and
201  calvarium is unremarkable for age.

202    GASTROINTESTINAL SYSTEM:   The oropharynx, esophagus, and
203  stomach show no lesions.   The stomach contains about 25 mL of
204  grey, thin liquid. The duodenum, jejunum, ileum, and large bowel
205  show no mucosal, mural, or serosal lesions. No foreign material
206  is seen in the bowel contents.   The mesentery is intact.   The
207  appendix is not identified.

208    GENITOURINARY SYSTEM:   The adrenal glands are unremarkable.
209  The renal capsule strips with marked difficulty.   The right and
210  left kidneys are 160 and 200 grams.   The cortices are smooth,
211  red tan, normal thickness, and uniform except for a 3 cm smooth
212  walled clear liquid filled cyst on the left.   The calyces and
213  collecting systems are not dilated and show no lesions.   The
214  pyramids and papillae are intact.   The ureters are patent to the
215  bladder that contains over 100 mL of clear yellow urine.   The
216  bladder mucosa and wall are unremarkable.   The prostate gland is
217  unremarkable for age. The testes are unremarkable for age.

Sheriff-Coroner
Alameda County                    Body of JACOB JOHN BAUER

218    MUSCULOSKELETAL   SYSTEM:    The  muscles   show   no   diffuse

219    lesions. The skeleton is well developed and appropriate for age.

220    Occasional anterior-medial, upper rib fractures associated with

221    slight   hemorrhage   are   consistent   with   cardiopulmonary

222    resuscitation.

223    HEAD AND NERVOUS SYSTEM:   The scalp shows no significant

224    hemorrhage.   The skull shows no fractures.   The dura mater and

225    leptomeninges show no significant hemorrhages or lesions.   The

226    floor of the skull and dural sinuses are intact.   The circle of

227    Willis shows no aneurysms and no significant atherosclerosis.

228    The brain is 1600 grams. The cerebral hemispheres, cerebellum,

229    and brain stem show no significant focal or diffuse lesions.

230    The grey and white matter, deep nuclei, cerebellar folia, and

231    brain stem show no significant diffuse or focal lesions.   The

232    pituitary gland is intact.

233    ANTERIOR NECK STRUCTURES:   The anterior neck muscles show

234    no hemorrhage.   The thyroid gland is symmetrical, not enlarged,

235    normal texture, and red brown.   The parathyroid glands are not

236    identified. The laryngeal cartilages, cricoid cartilage, and

237    hyoid bone are intact.   The tracheal, laryngeal and epiglottic

238    mucosa shows no lesions.   The mucosa is tan. The tongue is

239    unremarkable.   The posterior pharynx is not obstructed.   The

Sheriff-Coroner
Alameda County                              Body of JACOB JOHN BAUER

---

240    prevertebral  fascia  is  intact.    The  cervical  vertebrae  are

241    intact.

242

243        SPECIMENS RETAINED: femoral vein blood, heart blood, urine,

244    vitreous humor, gastric contents, and liver.   A full toxicology

245    screen is requested as well as vitreous humor electrolytes.

246        Representative  tissue  sections  are  retained  in  formalin.

247    Selected sections are submitted for processing.

248        OTHER STUDIES:  None.

249        Any items of evidence collected are retained for police

250    (Please see separate evidence inventory.).

251
252                                    9/13/18
253                        Michael Joseph Ferenc, M.D.

PPD000229

Alameda County Sheriff's Office

Coroner's Bureau
2901 Peralta Oaks Court, 2nd Floor, Oakland, CA 94605-5319



Gregory J. Ahern, Sheriff

Director of Emergency Services
Coroner - Marshal

| CASE NUMBER:  2018-02388 | CASE NAME:  JACOB JOHN BAUER |
|---|---|
| PATHOLOGIST:  Michael Joseph Ferenc | HISTOLOGICAL EXAMINATION |

**BRAIN:** Sections of hippocampi with attached leptomeninges, basal ganglia, pons, and random cortex show no neoplasia, inflammatory infiltrates, degenerative diseases, or trauma.

**HEART:** Sections (10) of left and right ventricle, interventricular septum, and region of the cardiac conduction system including left atrium and AV node show intact myocytes and no significant inflammatory infiltrates. Endocardial and epicardial surfaces and vessels are unremarkable.

**LUNGS:** Sections show intact congested parenchyma and no acute significant inflammatory infiltrates. Bronchial elements are unremarkable. No significant polarizable foreign material is seen.

**LIVER:** Section shows hepatocytes with primarily centrilobular located slight macrovesicular and microvesicular vacuolization. The sinusoids are congested. The portal areas are intact; although, increased fibrous tissue extends from the edges of the portal triads.

**KIDNEY:** Section shows intact glomeruli, autolyzed nut otherwise urn1 tubules, interstitium with patchy congestion, and unremarkable vessels. No significant polarizable foreign material is seen.

**ADRENAL GLAND:** Section shows unremarkable cortex and medulla.

**THYROID GLAND:** Section shows variable-sized, pink colloid-filled follicles lined by flattened to cuboidal epithelium.

**SPLEEN:** Section shows autolyzed but otherwise intact red and white pulp, vessels, and capsule.

**PANCREAS:** Section shows unremarkable islets and acini, vessels, and ducts.

**SKIN:** Sections of skin and subcutaneous tissue from the Taser-type barb site, right wrist, and back show foci of acute hemorrhage.

9|13|18
Date                        Signature                     M.D.

PPD000230

# EXHIBIT N-2



## CENTRAL VALLEY TOXICOLOGY, INC.

| | |
|---|---|
| **Case Name:** | **TOXICOLOGY NUMBER:** CVT-18-10193 |

Bauer,                    Jacob            J.

28 ml femoral blood & 3 ml vitreous humor labeled "Bauer, Jacob; 2018-02388;

**Specimen Description:**        08/02/2018; 0900 hrs; MJF; BM"

**Delivered by**  Tricor          **Date**  03-Aug-18      **Received by**  Bill Posey      **Date**  03-Aug-18

**Request:**  Complete Drug Screen                    **Agency Case #**  2018-02388

**Requesting Agency**                    **Report To**
Alameda Co. Coroner's Office              Alameda Co. Coroner's Office
Attn: Acct's Payable                      Attn: Dr. Ferenc
2901 Peralta Oaks Ct., 2nd Floor          2901 Peralta Oaks Ct., 2nd Floor
Oakland  CA 94605                         Oakland  CA 94605

## RESULTS

Specimen: Femoral Blood and Vitreous Humor Samples

Complete Drug Screen: Methamphetamine detected.
                No other common acidic, neutral or basic drugs detected.
                No Ethyl Alcohol detected.

d-Methamphetamine = 0.42 mg/L            Vitreous Panel: Glucose   =   23   mg/dL
d-Amphetamine      = 0.04 mg/L                            Sodium    = 146   mmol/L
                                                          Potassium >   9.0 mmol/L
                                                          Chloride  = 125   mmol/L

Blood Methamphetamine Ranges              Blood Amphetamine Ranges
Effective Level:     (0.01 - 0.05 mg/L)   Effective Level:     (0.02 - 0.15 mg/L)
Potentially Toxic:   (0.2 - 5 mg/L)       Potentially Toxic:   (0.2  mg/L)

**B.L. POSEY**
**S.N. KIMBLE**
*Directors*

1580 Tollhouse Road
Clovis, California 93611
Phone (559) 323-9940
Fax (559) 323-7502

B. L. Posey                    August 10, 2018

PPD000231

# EXHIBIT O

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                      ---oOo---
 4   JOHN BAUER, an
     individual and as
 5   Successor in Interest of
     Jacob Bauer, deceased;      No. 3:19-cv-04593-LB
 6   ROSE BAUER, an
     individual and as
 7   Successor in Interest of
     Jacob Bauer, deceased,
 8
        Plaintiffs,
 9   vs.
10   CITY OF PLEASANTON;
     BRADLEE MIDDLETON;
11   JONATHAN CHIN; RICHARD
     TROVAO; STEVEN BENNETT;
12   ALEX KOUMISS; JASON
     KNIGHT; MARTY BILLDT;
13   DAVID SPILLER, and DOES
     1 to 50, inclusive,
14
        Defendants.
15   _____/
16
17      REMOTE VIDEOTAPED DEPOSITION OF SERGEANT ERIC GORA
18              CONFIDENTIAL TRANSCRIPT
19
20        Taken before ERIN F. ROBINSON, RPR, CRR
21                 CSR NO. 12199
22               January 26, 2021
23
24
25

                                      Page  1
```

1      Q.   Okay.   And what did you see as your role

2    as the sergeant in charge of the administrative

3    investigation in this case?   In other words, what

4    was your responsibilities in conducting your

5    investigation?                                    10:30

6        A.   My responsibility was to take the

7    incident, the entire incident, and in relation to

8    our department policy, to see if the department

9    policy was adhered to.   If it was not adhered to,

10   identify any maybe training issues for areas where  10:31

11   something occurred that wasn't covered in policy.

12       Q.   Okay.   And if officers violated internal

13   policies, even if they were not found to have

14   acted criminally, were you investigating whether

15   they should be disciplined?                        10:31

16       A.   The determination of discipline isn't

17   mine.   I would be the investigator and documenting

18   any policy violations or a policy wasn't adhered

19   to.

20            And then I perform any investigation       10:31

21   through Lieutenant Tamm and at the management

22   level, either Captain Craig Eicher or at the time

23   Chief Dave Spiller would make the determination on

24   discipline.   I just complete the investigation.

25       Q.   Okay.   So you would notify Captain Eicher  10:32

Page 14

Aiken Welch, A Veritext Company
510-451-1580

1    and Chief Spiller if there were policy violations,

2    but you would not make a recommendation as to

3    whether discipline should result from the policy

4    violations.

5           Would that be a correct statement?        10:32

6           MR. BLECHMAN:  Assumes facts not in

7    evidence.  Misstates the witness' testimony.

8    Lacks foundation and calls for speculation.  Go

9    ahead.

10          THE WITNESS:  I'm sorry, could you repeat  10:32

11   the question.

12   BY MS. WALKER:

13      Q.  Sure.  And I'm just trying to determine

14   what your role was.

15          And so my question was, was your role      10:32

16   essentially to investigate whether there were

17   policy recommendations, and then inform the

18   captain and the chief of that?

19      A.  Sorry, Noah.

20          MR. BLECHMAN:  You said policy             10:32

21   recommendations, I think, Jayme.  Did you mean

22   violations?

23   BY MS. WALKER:

24      Q.  I'll rephrase it.  Sergeant Gora, your

25   role in conducting the administrative             10:33

                                              Page 15

1   investigation was to determine whether there were

2   policy violations and then inform Captain Eicher

3   and Chief Spiller of those violations; is that

4   true?

5        A.   My role is to look at the policy to see if   10:33

6   the policy was adhered to or not adhered to.   I

7   documented that in my administrative investigation

8   and forwarded that up the chain through Lieutenant

9   Tamm.

10       Q.   Okay.  And did you make, if you were to      10:33

11  find any policy violations, did you make

12  recommendations as to what should be done with

13  regard to those policy violations?

14       A.   No, ma'am.

15       Q.   Okay.  So that was outside your role as      10:33

16  the administrative investigator to make

17  recommendations as to what should be done as to

18  the policy violations?

19       A.   Correct.

20       Q.   And whose role would that be, if you know? 10:34

21       A.   I believe it would be the determination by

22  the chief of police or his designee.

23       Q.   And when you say his designee, what do you

24  mean?

25       A.   So he would designate his captain possibly 10:34

Page 16

1    to determine discipline, but that's far outside

2    the scope of my job knowledge.  I just submit my

3    investigation.

4        Q.  Okay.  And can you give me an overview as

5    to what you did to conduct this administrative     10:34

6    investigation into the death of Jacob Bauer?

7            MR. BLECHMAN:  Real quickly, we talked

8    about this off the record?  Maybe now is a good

9    time.  The administrative investigation was

10   produced in this case confidentially pursuant to   10:34

11   the stipulated protective order.

12           I'm allowing the witness to answer all

13   these questions not under a confidential veil for

14   the most part today as to these issues other than

15   to the extent there's any policy violations and    10:35

16   discussions about what officer or officers are

17   involved in that.

18           However, I'm not waiving our

19   confidentiality designation with regard to the

20   entirety of the administrative investigation.      10:35

21   Does that comport with your understanding, Jayme,

22   as to these issues?

23           MS. WALKER:  Yes.

24           MR. BLECHMAN:  Okay, thanks.  So the

25   question, if you remember, Sergeant Gora, had to   10:35

                                              Page 17

CONFIDENTIAL

1    do with just overview of what you did for your

2    administrative investigation, I believe.

3              THE WITNESS:   I was assigned the

4    investigations by our -- the investigations unit

5    captain, it was Captain Cox at the time.  I was on      10:35

6    patrol the day -- sorry, I was on duty the day

7    this happened.  I heard it on the radio, so I had

8    gone down to talk to him.

9              And he let me know that I'd be conducting

10   the administrative investigation at the direction      10:36

11   of the chief of police and I would report directly

12   to Lieutenant Tamm.

13             And from that point on, overview is I

14   completed kind of a mirrored investigation with

15   our investigations unit, as they were conducting      10:36

16   the criminal investigation, I was at the same time

17   conducting the administrative investigation.

18             And then as it progressed, you know, my

19   focus is different than the criminal

20   investigation, and so I would report any questions    10:36

21   I had or avenues of investigation directly with

22   Lieutenant Tamm.

23   BY MS. WALKER:

24        Q.   Okay.  When you say your investigation

25   mirrored the criminal investigation, does that        10:36

Page 18

CONFIDENTIAL

1   mean that you concurrently investigated it, so if

2   there was an interview being conducted, you were

3   present for that interview in the criminal

4   investigation, or did you conduct your own

5   separate interviews?                              10:37

6        A.   Well, yeah, the answer is yes to both.

7   When the initial interviews with the officers were

8   being done by investigators from the district

9   attorney's office, our internal investigators, I

10  was viewing those investigations via remote camera  10:37

11  in our interview room.

12          If I had questions before they would

13  conclude their interview, I would write them down

14  for the detective that was interviewing the

15  officer, and that detective would ask for me.      10:37

16          There were times I interviewed officers

17  separately from the criminal investigation, and

18  the main issue that we have at our department is

19  our interview room is tiny.  It doesn't really

20  facilitate the ability to interview with, you      10:38

21  know, four, five, six different investigators in

22  the room.

23          But it does allow us to record, so I was

24  up in my office and sat through each one of the

25  interviews.                                        10:38

```
 1            MR. BLECHMAN:  I think it's an incomplete
 2   hypothetical.  Calls for expert testimony.
 3   Exceeds the scope of this witness' -- you know,
 4   personal knowledge here today, but you can
 5   respond.                                     11:30
 6            THE WITNESS:  I think it's discouraged by
 7   policy, but it depends on the situation, the
 8   totality of the circumstances that the officers
 9   are dealing with, and when determining if it's a
10   violation of policy.                         11:30
11   BY MS. WALKER:
12      Q.  Would 21 seconds of charge be multiple
13   deployments that are discouraged under the
14   Pleasanton Police Department policy?
15            MR. BLECHMAN:  Vague and ambiguous.  11:31
16   Incomplete hypothetical.  But go ahead.
17            THE WITNESS:  No, part of my investigation
18   was to look at the amount of Taser deployments on
19   officers, and it's not on the 21 seconds, but it's
20   multiple officers deploying.                 11:31
21            And based on the active resistance by
22   Mr. Bauer and the ineffectiveness of each of the
23   Taser deployments, and throughout this context,
24   the evaluation of the Taser deployments and the
25   multiple Taser deployments were not a violation of 11:31
```

Page 49

CONFIDENTIAL

1    policy.

2    BY MS. WALKER:

3        Q.   So you didn't -- your investigation made

4    the determination that the 31 seconds of

5    continuous Taser deployments, despite the fact          11:31

6    that officers had said they were ineffective, was

7    not a violation of the Pleasanton Police

8    Department policy?

9            MR. BLECHMAN:  I think that -- hold on one

10   second.  Objection.  I think it misstates the          11:31

11   record.  It's argumentative as phrased, vague and

12   ambiguous as to the term "continuous," but you can

13   respond.

14           THE WITNESS:  Yes, just to be -- it wasn't

15   31 seconds.  I think we're talking about 21            11:32

16   seconds, and it wasn't continuous Tasering.  There

17   was breaks in amongst the tasing segments.  And

18   there was multiple officers that deployed Tasers.

19           So the determination based on the Taser

20   deployment by Officer Middleton was found to be in     11:32

21   compliance with departmental policy.

22   BY MS. WALKER:

23       Q.   Okay.  So for Officer Middleton, they were

24   21 seconds and Officer Travao also deployed his

25   Taser two deployments for a total of ten seconds.      11:32

                                            Page 50

```
 1   avoiding violent situations, for the safety of

 2   everyone?

 3          MR. BLECHMAN:  Incomplete hypothetical as

 4   phrased.  Go ahead.

 5          THE WITNESS:  The purpose of using         12:18

 6   deescalation techniques is to attempt to

 7   deescalate the situation, yes, for the safety of

 8   all people involved.

 9   BY MS. WALKER:

10      Q.  Right.  And it's safer for all people      12:18

11   involved to avoid a violent encounter, true?

12      A.  Yes.

13          MS. WALKER:  Let's, why don't we take a

14   lunch break at this time and come back at 1:00

15   o'clock, and I'm still on track to finish probably  12:19

16   before 3:00.  Okay?

17          MR. BLECHMAN:  That's fine with me, yeah.

18          THE VIDEOGRAPHER:  Very good, going off

19   the record, the time now is 12:19.

20          (Lunch recess was taken.)                  12:20

21          THE VIDEOGRAPHER:  Video is rolling.  Back

22   on the record, the time now is 1:04.

23   BY MS. WALKER:

24      Q.  Okay, welcome back, Sergeant Gora.  I want

25   to turn back to your administrative investigation   13:05
```

Page 83

1    report, and I want to have you turn to the Bates

2    stamp page 1196, and that sort of hits us right in

3    the middle of PPD policy 309.5.4 regarding

4    multiple applications of the conducted energy

5    device.                                13:05

6             And just so the record is clear, when we

7    say CER or conducted energy device, we're talking

8    about the Taser, right?

9       A.   Correct.

10       Q.   Okay.  So turning to page 1196, there's   13:05

11    bullet points ABC, and then there's a sentence

12    that says, officer should generally not

13    intentionally apply more than one CED at a time

14    against a single subject.

15             But you did not find in your         13:05

16    administrative investigation that either Officer

17    Middleton or Officer Travao violated this policy;

18    is that correct?

19       A.   Correct.

20       Q.   But you do recall in the body camera   13:06

21    seeing the two of them apply their Tasers to Jacob

22    Bauer at the same time?

23             MR. BLECHMAN:  Hold on, calls for

24    speculation, lacks foundation, vague as to same

25    time.  Go ahead.                   13:06

Aiken Welch, A Veritext Company
510-451-1580

```
 1    BY MS. WALKER:
 2         Q.  Meaning like the video stops and starts?
 3         A.  Yeah, it was like the video was choppy, so
 4    I could see Middleton with the Taser in his right
 5    hand.  I never -- I couldn't see the other         13:09
 6    officer, I'm sorry.
 7         Q.  Okay.  Let's try it again.  Do you see
 8    right here where there's the two?  Did you see
 9    there where there was the two Tasers at the same
10    time?                                              13:09
11         A.  I did.
12         Q.  Do you recall seeing that before when you
13    conducted your administrative review?
14         A.  I don't recall seeing that specifically.
15         Q.  Okay, seeing that now, do you think that   13:10
16    that violated the Pleasanton Police Department
17    309.5. -- I think it's 4, yeah, that officers
18    should generally not intentionally apply more than
19    one CED at a time against a single subject?
20              MR. BLECHMAN:  Objection, lacks           13:10
21    foundation, calls for speculation, incomplete
22    hypothetical.  You can respond.
23              THE WITNESS:  No, the -- in that policy
24    it's not a shall.  So it's not restricting, it's a
25    should generally not, so we would look at the      13:10
```

Page 87

CONFIDENTIAL

```
 1   totality of the circumstances that -- in the mind
 2   set of the officers in determining that.  I don't
 3   recall specifically asking the officers about that
 4   tasing, and I don't remember like noting that in
 5   my investigation.                                  13:10
 6   BY MS. WALKER:
 7        Q.  So you did not investigate whether that
 8   was a violation of PPD policy?
 9        A.  I investigated -- I don't recall seeing
10   that portion during my investigation, and I don't  13:11
11   know if I noted that in my investigation.
12        Q.  Okay.  And seeing it now, you still don't
13   believe that a violation of the Pleasanton Police
14   Department policies occurred; is that true?
15        A.  No, not based on the totality of the      13:11
16   circumstances and the active resisting of
17   Mr. Bauer, I don't believe that would be a
18   violation of this policy.
19        Q.  Did you find that there were any -- there
20   was anything that any of the supervisors on scene  13:11
21   could have done to reduce the chaos of the scene
22   or ensure -- well, let's take it one at a time.
23             In your administrative investigation, did
24   you find there were anything the supervisors could
25   have done differently to decrease the chaotic      13:12
```

Page 88

1    nature of the scene?

2         MR. BLECHMAN:  Argumentative.  You can

3    respond.

4         THE WITNESS:  I have a question about that

5    question.  However, I don't know that -- I don't    13:12

6    know if there was a better way for people to

7    respond.  I evaluate the response of each

8    individual and apply it to policy.

9    BY MS. WALKER:

10        Q.  Okay.  So you don't -- when you're         13:12

11   conducting this -- that's helpful, thank you.

12            When you're conducting your administrative

13   investigation, you take the response as it is and

14   then determine whether it violates policy, you

15   don't make any determination as to what could have  13:12

16   been done differently to have a different outcome

17   perhaps that may be saving Mr. Bauer's life or

18   reducing the chaotic nature of the scene or

19   anything like that?

20            MR. BLECHMAN:  Argumentative.  Incomplete  13:13

21   hypothetical.  You can respond.

22            THE WITNESS:  If -- so my -- part of this

23   investigation regarding policy 300 talks about a

24   lot of the objective reasonable standards that

25   officers use, and part of that is to make sure      13:13

Page 89

CONFIDENTIAL

1    we're complying with policy, and looking at the

2    response of everybody.

3           But what I don't have the luxury of doing

4    is picking every other possibility in the -- like

5    that that person could do or could see.  I have to    13:13

6    take the information that the officers had at the

7    time.

8           We have to take like the objective

9    reasonableness, the factors that are provided at

10   that time when determining the officer standard or    13:14

11   the reasonableness of their decision making or the

12   level of force, and this comes back to Graham v.

13   Connor and some of the really detailed factors in

14   our policy 300.

15          So sorry, long-winded answer.  However, I     13:14

16   don't hypothetically look at every scenario and

17   see what might have changed because every factor

18   that I would change would lead to like an infinite

19   amount of end results.

20   BY MS. WALKER:                                        13:14

21       Q.  Okay.  I'm not expecting -- certainly

22   nobody is expecting you to look at every factor to

23   come to an infinite amount of results.

24          But I guess my question is, are all -- all

25   you're doing in this administrative investigation    13:14

Page 90

CONFIDENTIAL

```
 1    is simply to determine whether policies were
 2    violated; is that right?
 3          A.   It is, yeah, the primary function is to
 4    look at our policy and to find out if they appear
 5    to or not, correct.                            13:15
 6          Q.   Okay, so you don't see it as a function of
 7    your administrative investigation to determine
 8    whether additional training is warranted, to have
 9    better outcomes between, say, police interactions
10    with the mentally ill, that's not -- you don't see  13:15
11    that as part of your scope?
12               MR. BLECHMAN:  Misstates the witness'
13    prior testimony.  But go ahead.
14               THE WITNESS:  No, part of it is to
15    identify areas where policy may be lacking, and     13:15
16    part of it is to determine any training issues for
17    example several officers didn't spark test their
18    Taser, I pointed that out.
19               And but I don't make the recommendations
20    of what that looks like.  It's just pointing it     13:15
21    out in the investigation.
22    BY MS. WALKER:
23          Q.   Okay.  So would you see it as part of your
24    scope in this administrative investigation to make
25    recommendations as to how officers could more       13:16
```

Page 91

1    safely interact with someone who was mentally ill?

2           MR. BLECHMAN:   It's an argumentative and

3    incomplete hypothetical as phrased.   Go ahead.

4           THE WITNESS:   I think it depends.   In this

5    circumstance, I didn't think there was anything        13:16

6    that the sergeants should have done differently or

7    better.

8    BY MS. WALKER:

9        Q.  Um, I want you to direct your attention to

10   Bates stamp page 1198, that's under Pleasanton        13:16

11   Police Department policy 309.9 training, and I

12   think this is training related to Tasers; is that

13   correct?

14       A.  Yes.

15       Q.  If you go, the training officer should       13:17

16   ensure that all training includes and down at the

17   bottom of that list is deescalation techniques and

18   also restraint techniques that do not impair

19   respiration, following the application of the CED

20   or Taser.                                             13:17

21           Did you make any findings that it was

22   inappropriate for the officers to apply the Taser

23   to Jacob Bauer and then use multiple devices,

24   restraint devices that impacted his ability to

25   breathe?                                              13:17

                                              Page 92

```
 1              MR. BLECHMAN:  Hold on.  It assumes facts
 2     not in evidence, argumentative as phrased.  It's
 3     an incomplete hypothetical.  Lacks foundation and
 4     calls for speculation.  Go ahead.
 5              THE WITNESS:  I'm sorry, I forgot the      13:18
 6     question, could you repeat it.
 7     BY MS. WALKER:
 8         Q.  That's okay, I did, too, Erin, can you
 9     read it back.  It's a long question, too, I think,
10     sorry.                                             13:18
11              (Record read by Court Reporter.)
12              MR. BLECHMAN:  Same objections.
13              THE WITNESS:  I did not.
14     BY MS. WALKER:
15         Q.  Did you think it was a violation of policy 13:19
16     for the officers to use both the Wrap restraint
17     and the spit hood after Jacob Bauer had been tased
18     multiple times?
19         A.  No, ma'am.
20         Q.  I want you to turn to what's Bates stamped 13:20
21     PPD1205, and it's Pleasanton Police Department
22     policy 306.3, use of restraints?
23         A.  Did you say 306.5?
24         Q.  306.3.
25         A.  Sorry, okay, I got it.                     13:20
```

                                                    Page 93

1        Q.   Yeah.  Actually, no, let's go on, I think

2   you've already answered that question, so let's go

3   on to 306.5 which is application of spit hood and

4   masks.

5            About the fourth paragraph down, it says    13:20

6   split hood should not be used in situations where

7   the restrained person is bleeding profusely or if

8   there are indications that the person has a

9   medical condition such as difficulty breathing or

10  vomiting.                                            13:20

11           Did you find that once Jacob Bauer was

12  placed in a spit hood, did you find there was any

13  violation of this policy once he had difficulty

14  breathing?

15           MR. BLECHMAN:  Hold on.  Assumes facts      13:21

16  that he had difficulty breathing, it's

17  argumentative as phrased, incomplete hypothetical.

18  You can respond.

19           THE WITNESS:  No, ma'am, the spit hood

20  application was put on while he was -- I believe     13:21

21  still being put into the Wrap and then taking

22  off -- and taken off when they determined that he

23  was not breathing.

24  BY MS. WALKER:

25       Q.   Okay.  While he was in the Wrap, fully     13:21

                                           Page 94

1   restrained in the Wrap and had the spit hood on he

2   told Sergeant Sarasua and Officer Granados that he

3   couldn't breathe.

4           Do you recall that?

5       A.  I do.                                    13:21

6       Q.  At that point did you think that the spit

7   hood or the Wrap restraint should be removed?

8           MR. BLECHMAN:  Calls for speculation.

9   Lacks foundation.  Exceeds the scope of this

10  witness' personal knowledge here.  It's an          13:22

11  incomplete hypothetical.  You can respond.

12  BY MS. WALKER:

13      Q.  Well, I'm asking as part of this

14  administrative investigation, did you evaluate

15  that and believe that that is what should have      13:22

16  been done once he articulated that he could not

17  breathe?

18          MR. BLECHMAN:  Well, it suffers from the

19  same problems as I previously stated the objection

20  the way it's phrased.  You can respond.             13:22

21          THE WITNESS:  It was part of this

22  investigation, and I concluded that the officers

23  put the spit shield on based on their statements

24  because they had seen the blood and worried about

25  Mr. Bauer spitting on them, the application of the  13:22

                                            Page 95

1   Wrap was within policy and that was adhered to.

2        I think that's the end of my answer.

3   BY MS. WALKER:

4        Q.   Okay.   So you didn't find any violations

5   of the policy by use of the spit hood or a wrap       13:23

6   restraint once Mr. Bauer articulated that he could

7   not breathe; is that correct?

8        A.   Yeah, we had to weigh all the factors, and

9   that's why the policy talks about shouldn't, and

10  there's a lot of split-second decisions being         13:23

11  made, and this was a very chaotic and volatile

12  situation, so for that, this policy was adhered

13  to, there was no violation.

14       Q.   At the time you completed this

15  administrative investigation, Pleasanton Police       13:23

16  Department did not have a policy on crisis

17  intervention and citizens; is that true?

18       A.   I have policy 419.

19       Q.   Yeah, that policy was not in place at the

20  time you did this administrative investigation,       13:24

21  was it?

22       A.   This policy was in place January 29th,

23  2018, I believe it was, ma'am.

24       Q.   2018?

25       A.   Correct.                                     13:24

Page 96

```
 1    are better trained than us as kind of first

 2    responders.

 3    BY MS. WALKER:

 4         Q.  Did you review the Paramedics Plus report

 5    as part of your administrative investigation?      13:31

 6         A.  I don't recall ever receiving any report

 7    from Paramedics Plus.

 8         Q.  Did you -- were you a part of the

 9    interview of Paramedics Plus paramedic Racheal

10    Kitchens?                                           13:31

11         A.  I was not.

12         Q.  Once -- even after the paramedics and the

13    fire department officials arrived, did you

14    evaluate whether the -- well, first off, did you

15    believe that the officers, the police officers    13:32

16    present had a duty even after the paramedic

17    arrival to continue to medically assess and

18    monitor Jacob Bauer?

19              MR. BLECHMAN:  Incomplete hypothetical.

20    Calls for expert testimony.  Vague and ambiguous   13:32

21    as to medically assess.  You can respond.

22              THE WITNESS:  I'm sorry, I lost

23    your question.  Can you repeat it.

24              MS. WALKER:  Yeah.  Are we in agreement,

25    Noah, that Sergeant Gora is not going to be giving  13:32
```

Page 101

CONFIDENTIAL

1    any expert testimony whether on Pleasanton Police

2    Department policies, whether those policies were

3    violated, what the officers' duties were under

4    those policies?

5            Because you've made several objections        13:32

6    that he's not an expert, so I just want to make

7    sure we're on the same page that he's not going to

8    be giving any expert testimony on that.

9            MR. BLECHMAN:  Yeah, he's not an expert

10   designated in this case.  So he's not going to be   13:32

11   giving expert opinion.

12   BY MS. WALKER:

13       Q.  Okay, good.  All right.

14           So then the question was, as part of your

15   evaluation in this administrative investigation,    13:33

16   Sergeant Gora, did you believe any of the officers

17   violated their duty to continuously medically

18   assess Jacob Bauer even after the paramedics

19   arrived?

20       A.  No, I don't believe that there is a          13:33

21   violation of policy regarding that.

22       Q.  I didn't see any reference in your

23   administrative investigation to Pleasanton Police

24   Department policy 300.6, medical considerations.

25           Are you familiar with that policy, part of 13:33

Aiken Welch, A Veritext Company
510-451-1580

CONFIDENTIAL

```
 1    the policy.
 2            But the question is, what are the duties
 3    of the Pleasanton police officers on scene when a
 4    person is exhibiting these characteristics that
 5    we've read in this policy that are sometimes        13:39
 6    called excited delirium or persons who require
 7    protracted physical encounter with multiple
 8    officers and are at an increased risk of sudden
 9    death?
10            Is it your testimony that the only duties   13:39
11    of the officers are to request medical assistance
12    and have them stage away as appropriate?
13        A.  Yeah, there's also -- there is that, and
14    to assessor should be continually monitoring,
15    that's part of that policy also.                    13:40
16            And typically, we don't always have the
17    luxury of having the fire department get there so
18    fast like we had in this Bauer incident.
19            Typically once the -- once they're being
20    medically assessed by paramedics the officers       13:40
21    will -- we stand out to allow people with a higher
22    level of training to assess the medical portion
23    of -- the medical aspects of the encounter.
24        Q.  Okay.  Did you think that Jacob Bauer was
25    experiencing excited delirium or at least           13:40
```

Page 107

```
 1    policy, but we didn't get this one.

 2           MR. BLECHMAN:  Right, I'd have to look

 3    back at the requests and see.  I know we did not

 4    produce it because it's not been -- I haven't seen

 5    it in this case per se.  I don't know that it was      13:51

 6    specifically requested.  So yeah, I mean, I could

 7    take a look at that.

 8    BY MS. WALKER:

 9        Q.  All right.  And I'm sure that you've

10    already answered this, but I just want to make         13:52

11    sure it's clear.

12           As part of this administrative evaluation,

13    you would not -- you did not evaluate whether

14    crisis intervention techniques could have been

15    employed, you know, once Jacob Bauer began to          13:52

16    resist, and it was clear that there was going to

17    be a protracted struggle, you didn't evaluate that

18    at all whether, you know, officers could have

19    stepped back and tried to deescalate the situation

20    rather than continuing to escalate it?                 13:52

21           Would that be a true statement?

22           MR. BLECHMAN:  That is extremely

23    argumentative.  It's an incomplete hypothetical.

24    It assumes facts not in evidence.  Calls for

25    speculation and lacks foundation.  But go ahead.       13:53
```

Page 115

 1          THE WITNESS:  I did in my evaluation talk

 2   about deescalation techniques that were employed

 3   by Officer Middleton initially in this

 4   investigation.  I didn't highlight specifically

 5   policy 419, and I did not recall reviewing it as      13:53

 6   specifically as I did policy 300.

 7          However, I did note the deescalation

 8   techniques that were employed by Officer

 9   Middleton.  I don't know, I can't find it.

10   BY MS. WALKER:                                         13:53

11      Q.  But you didn't evaluate whether, once the

12   situation -- once Officer Middleton went hands on

13   on Jacob Bauer, as he stated, you didn't evaluate

14   whether crisis intervention techniques could have

15   been employed at that stage to reduce the            13:54

16   incidence of the violent encounter?

17          You didn't make an evaluation like that as

18   to decision points when officers could have

19   engaged those techniques to avoid the sudden death

20   that occurred?                                        13:54

21          MR. BLECHMAN:  Same objections as

22   previously stated.  Asked and answered.  But go

23   ahead.

24          THE WITNESS:  I did note that the

25   deescalation techniques that Officer Middleton       13:54

                                              Page  116

CONFIDENTIAL

```
1    used, and he continued to use these as he tried to

2    detain Mr. Bauer.

3              And the policy 419 is very clear in the

4    training that the deescalation techniques and

5    crisis intervention aren't to supplement basic         13:54

6    officer safety tactics, and doesn't eliminate

7    someone's requirement to be arrested or if someone

8    is an imminent threat or violent against police

9    officers.

10             The policy is -- there's language in there   13:55

11   that's explaining that intervention techniques

12   aren't always 100 percent effective, and you don't

13   know if the subject is experiencing a crisis based

14   on a mental health issue or substance abuse or

15   alcohol or some other sort of crisis where you're     13:55

16   trying to provide a concerned response in an

17   imminent threat situation, in a split-second

18   decision.

19             But officers did employ those deescalation

20   techniques.                                            13:55

21   BY MS. WALKER:

22        Q.  Is it your testimony that if you would --

23   if you were in charge of a crisis intervention

24   response, and you weren't sure if the person --

25   well, let's take the John Deming Jr., situation.      13:55
```

Page 117

1              REPORTER'S CERTIFICATE

2

3        I, ERIN F. ROBINSON, a Shorthand Reporter, State

4   of California, do hereby certify:

5        That SERGEANT ERIC GORA, in the foregoing

6   deposition named, was present and by me sworn as a

7   witness in the above-entitled action at the time and

8   place therein specified;

9        That said deposition was taken before me at said

10  time and place, and was taken down in shorthand by me,

11  a Certified Shorthand Reporter of the State of

12  California, and was thereafter transcribed into

13  typewriting, and that the foregoing transcript

14  constitutes a full, true and correct report of said

15  deposition and of the proceedings that took place;

16       IN WITNESS WHEREOF, I have hereunder subscribed my

17  hand this 29th day of January 2021.

18

19

20

21
              *Erin F. Robinson*
22

              ERIN F. ROBINSON, CSR NO. 12199

23            State of California

24

25

                                        Page 135

# EXHIBIT P

```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4
 5    John Bauer, an individual and  )NO 3:19-cv-04593-LB
      as Successor in Interest of    )
 6    Jacob Bauer, deceased; ROSE     )
      BAUER, an individual and as     )
 7    Successor in Interest of Jacob )
      Bauer, deceased,                )
 8                                     )
                      Plaintiffs      )
 9                                     )
           v.                          )
10                                     )
      CITY OF PLEASANTON, et al.,     )
11                                     )
                      Defendants.     )
12    _____)
13
14
15
16       REMOTE VIDEOTAPED DEPOSITION OF DAVID SPILLER
17                 Livermore, California
18              Friday, January 29, 2021
19
20
21    Reported by:
      Heidi Hummel-Grant
22    CSR No. 12556
23    Pages 1 - 89
24
25
```

                                                    Page 1

```
 1              Prior to your service on the Deadly Force      01:17
 2    Review Panel for the CDCR, what position -- or what
 3    employment did you hold before that?
 4         A   I was the chief of police for the City
 5    of Pleasanton.                                           01:17
 6         Q   And I understand you've retired from
 7    that position?
 8         A   I retired from Pleasanton in November of
 9    2019.
10         Q   Was that a planned retirement?                  01:17
11         A   Yes, it was a planned retirement, and it
12    was a service retirement.
13         Q   What does that mean, for it to be a
14    service retirement?
15         A   It was -- I have done my time, and it           01:17
16    was time to retire.  I -- I retired in good
17    standing.  I pretty much negotiated the departure
18    and the timing with the City manager, who was my
19    boss at the time.  So yes, it was planned.
20         Q   Are you in contention to be the chief of        01:18
21    police for Menlo Park, or is that a -- a temporary
22    contract position?
23         A   It's a temporary contract position.  I
24    am not in contention to be the police chief there.
25         Q   Okay.                                           01:18
```

Page 14

```
 1    disengagement absent an imminent threat to the        02:23
 2    public and if circumstances dictate.  This may
 3    include removing or reducing law enforcement
 4    resources or engaging in passive monitoring.
 5          Is that something that you would expect         02:23
 6    supervisors to consider when they are responding to
 7    a scene with a potential person in crisis?
 8          MR. BLECHMAN:  Incomplete hypothetical.
 9          Go ahead.
10          THE WITNESS:  My response to that is it's        02:23
11     entirely circumstantial.  It totally depends on
12     what the officers are dealing with.
13          MS. WALKER:
14          Q   And -- and of course, that -- when it
15    says consider strategic disengagement, it's          02:24
16    something that you would expect the supervisor to
17    consider based on the totality of the circumstances?
18          A   Yes.
19          Q   And you would have expected that
20    irrespective of whether this policy was in place at  02:24
21    the time that you were chief of police?
22          A   I would want the supervisors to consider
23    all options and all -- all potential alternatives.
24          Q   Okay.
25              And when you were the -- the chief of police 02:24
```

Page 53

1   at the Pleasanton Police Department, was there a          02:24

2   process in place to identify whether after a

3   critical incident, including like an

4   officer-involved death, is there a process to

5   identify whether there's remedial training needed     02:25

6   for the officers involved in that incident?

7           A   The process would be based on the

8   administrative review.

9           Q   Okay.

10          So you would rely on the administrative          02:25

11  review to inform you whether they believed that

12  remedial training might be necessary for any of the

13  officers involved in the incident that it -- that

14  resulted in the death of a person?

15          A   The administrative review would inform     02:25

16  me, the senior command staff, the force options

17  group, of any potential areas of -- of training

18  opportunity, whether it's a training deficiency or

19  simply a training opportunity, because, you know,

20  circumstances in law enforcement continue to grow     02:25

21  more and more complex.  So the administrative review

22  is the mechanism for the chief and senior staff to

23  review any potential training opportunities.

24          Q   When I took Sergeant Gora's deposition

25  earlier this week, he indicated that he viewed it as    02:26

                                              Page 54

1    his role to -- to determine whether there was a          02:26

2    policy violation or not, and it wasn't necessarily

3    his role to determine whether officers, considering

4    the totality of the circumstances, could have chosen

5    other courses of action.                                 02:26

6            Is there -- was there -- what was the

7    mechanism by which you and the senior command staff

8    would determine in an incident, not necessarily

9    whether policy was violated, but whether there was a

10   course of action that may be remediated by              02:26

11   additional training that could have possibly

12   prevented the death?

13           A   There are circumstances even if an

14   incident is handled within policy that there may be

15   some training concern.  And an example might be a       02:27

16   young officer effecting an arrest by themselves that

17   didn't go smoothly and required a control hold or

18   something to get the person into compliance, where a

19   more experienced officer would wait for backup and

20   maybe that could be prevented.  So as an example,       02:27

21   you know, that control hold would be well within

22   policy to effect the arrest and -- and to place the

23   detainee or the arrestee in handcuffs.  But there's

24   a training opportunity there that contact and cover

25   is a good law enforcement practice and that control     02:27

Page 55

1    hold or a further escalation may have been prevented    02:27

2    if he waited for a -- a cover officer.  That's an

3    example of something that is well within policy but

4    there might be a training opportunity.

5            Does that answer the question?    02:28

6            Q   Well, it gives a really good example of

7    exactly what I was asking about.  But my question

8    more went towards I understood from Sergeant Gora

9    that it wasn't his role to determine that when he

10   was conducting the administrative review, and he was    02:28

11   simply deciding was it a violation of policy or not.

12           And so my question to you is as the chief

13   and the person who's a part of the team of command

14   staff reviewing the incident, what's the mechanism

15   in place to identify things in that situation where    02:28

16   there's no violation of policy but some remedial

17   training may be effective in having a better

18   outcome?

19           A   It's the same mechanism.  So

20   Sergeant Gora's task is to determine whether the    02:28

21   actions were within policy.  As the subsequent

22   readers, the division commanders, the training, the

23   force options trainers, police chief, read that,

24   there is a concurrence whether it is within policy,

25   and then it -- it goes up the chain.  But as readers    02:28

                                        Page 56

1    review that, particularly the force options training        02:28
2    group, they are able to glean or develop, including
3    the potential review of body-worn video or
4    surveillance video, if tactics can be improved or if
5    there's a training opportunity.                             02:29
6            Q    Okay.
7            A    So it's the same mechanism.
8            Q    And so once -- once an administrative
9    investigation is complete as a result -- as a result
10   of and the incident, what -- what happens after            02:29
11   Sargeant Gora completes his investigation?
12           A    The supervisor assigned to
13   administrative investigation will submit it to the
14   effective manager, the manager reviews and concurs,
15   and then it goes through the -- the division               02:29
16   commander to the police chief.
17           Q    So there's -- the supervisors in charge
18   of the actual administrative investigation, that
19   would be the supervisor of support services?  Or --
20           A    It depends -- it depends.  It depends          02:29
21   who the chief or who the division commander assigned
22   to do that investigation.
23           So it -- in a case like this it would be the
24   professional standards supervisor would be assigned
25   to do that administrative review.  In cases like           02:30

Page 57

```
 1    this it would not be unusual for a middle manager to    02:30
 2    work with that supervisor and to do the
 3    investigation as a team.
 4            Q    Okay.
 5            And so this -- in this case, in the Bauer --    02:30
 6    I know didn't -- weren't there for the final
 7    conclusion.  But you were the chief of police at
 8    least for the assignment of administrative
 9    investigating; is that true?
10            A    That's correct, yes.                       02:30
11            Q    And the supervisor of professional
12    standards would have been Sergeant Gora?
13            A    Yes.
14            Q    And then the manager that he reports to
15    would have been Lieutenant Tamm?                        02:30
16            A    No.  I -- so I -- as it relates to this
17    investigation he would have reported to the patrol
18    division commander.
19            Q    Okay.
20            Do you recall who that was at the time that     02:31
21    Sergeant Gora was assigned the administrative review
22    of the Jacob Bauer incident?
23            A    The protocol division commander at the
24    time was Captain Craig Eicher.
25            Q    Okay.                                       02:31
```

Page 58

```
 1              And so that would have been the manager that    02:31
 2     Sergeant Gora submits his review to.  And if the
 3     manager concurs, then it goes to who?
 4          A    So in this case it -- Sergeant Gora
 5     reported to Captain Eicher.  Captain Eicher would    02:31
 6     concur, and then send it to the police -- the chief
 7     of police.  There's nobody between Captain Eicher
 8     and the chief.  Captain Eicher is the direct report
 9     to the office of the chief.
10          Q    Okay.                                         02:31
11              So it would be -- in this case -- I know you
12     weren't the chief of police at the time the
13     administrative review was completed -- but the
14     people who would review the administrative
15     investigation for potential remedial training       02:31
16     opportunities would be Captain Eicher as the -- and
17     whoever is the chief of police at the time?
18          A    Yes, and potentially the force options
19     group.
20          Q    Who was a part of the force options        02:32
21     trainings group at the time that you retired from
22     Pleasanton Police Department?
23          A    I don't -- I don't remember.  I -- I
24     believe Officer Pittle, Sergeant Pittle at the time
25     I retired was on the force options training group.   02:32
```

Page 59

```
 1    Surgery Aaron Fountain was on the force options        02:32
 2    training group.  The personnel and training officer
 3    by function, I believe, was on the force options
 4    group.  And there were several others.
 5             Q   Okay.                                     02:32
 6             About how many people were -- are on the
 7    force options training group?
 8             A   I am not sure.  Approximately six.  I'm
 9    guessing.
10             Q   Okay.                                     02:32
11             How do you select the individuals -- or
12    how -- how are the individuals that are going to
13    conduct administrative reviews of incidents
14    selected?
15             A   It depends on the circumstances.          02:32
16             Q   Okay.
17             If it's an -- if it's an officer-involved
18    in-custody death, how would that person be selected.
19             A   As the sitting chief at the time I would
20    have assigned it to the professional standards        02:33
21    sergeant.
22             Q   And how -- how does the professional
23    standards sergeant get that assignment?  Is that
24    just a rotation, or is it something they have to
25    have some specialized training for?  How does that    02:33
```

Page 60

```
1    work at the Pleasanton Police Department?              02:33
2           A   So both.  The chief determines roles and
3    assignments.  At the officer level, officers will
4    compete and ask and interview for assignments like
5    that.  But at the supervisor level it's the chief's   02:33
6    discretion, and the chief moves people based on the
7    development of their career and what's -- what is in
8    the best interest of the organization.
9           Q   Did -- as the chief of police of the
10   Pleasanton Police Department was there any sort of    02:33
11   specialized training that you required for the
12   professional standards supervisor?
13          A   Lots, yes.
14          Q   Can you give me an overview?
15          A   Yeah.  So, you know, the professional      02:34
16   standards sergeant is responsible for compliance
17   issues, audit issues, significant internal affairs
18   or citizen's complaint issues.  So some of the
19   trainings will include response to critical incident
20   trading, it will include internal affairs            02:34
21   investigations training, it will include -- you
22   know, sometimes it includes -- it includes a higher
23   level of jail or in custody, like temporary holding
24   facility training because with the temporary holding
25   facility, that is the supervisor that's responsible   02:34
```

Page 61

 1   for working with the State on audits and compliance.   02:34

 2   So there's a myriad of training opportunities for

 3   that individual.

 4          Q    Okay.   Thank you.

 5          I want to talk to you about the John Deming,   02:34

 6   Jr. situation.

 7          I understand you were the chief of police

 8   when that officer-involved shooting occurred.

 9          A    I was.

10          Q    Okay.                                       02:35

11          Did you yourself watch any of the body cam

12   video from that incident?

13          A    I did, yes.

14          Q    Okay.

15          And did you -- you reviewed the                  02:35

16   administrative investigation of that incident?

17          A    I did, yes.

18          Q    If you -- if Policy 419, or any policy

19   related to crisis intervention incidents, had been

20   in place at the time of that administrative           02:35

21   review -- review, would you have expected that

22   policy to be evaluated as part of the administrative

23   investigation and whether there were violations of

24   that policy?

25          MR. BLECHMAN:   Calls for speculation.   Hold   02:35

                                                   Page 62

```
 1            THE WITNESS:  I don't believe so, no.        02:49
 2            MS. WALKER:
 3            Q    You don't believe there were any
 4     remedial training?
 5            A    That's correct.                         02:49
 6            Q    Was anybody disciplined as a result of
 7     the John Deming, Jr. situation?
 8            A    No.
 9            MS. WALKER:  I -- I do want to mark that
10      video as Exhibit 41.  So we'll upload that to the  02:49
11       Exhibit Share.
12            (Exhibit 41 was marked for identification, a
13     copy of which is attached hereto.)
14            MS. WALKER:
15            Q    I'm going to move on to the Jacob Bauer
16     situation on August 1st, 2018.
17            And we've already established that you were
18     the chief of police on August 1st, 2018.  I
19     understand you had retired by the time the
20     administrative investigation was completed, which   02:50
21     was sometime in early 2020.
22            And is it typical, in your experience,
23     Sergeant Spiller [sic], that an administrative
24     investigation of an officer-involved death or an
25     in-custody death would take well over a year to     02:50
```

Page 73

```
 1   complete?                                              02:50

 2          A    So I believe that was unusual.  It was

 3   typically much quicker than that.

 4          Q    What were the reasons that the Bauer

 5   case took so long?                                     02:50

 6          A    The district attorney conducted a

 7   parallel investigation of the -- of the incident.

 8   And it was lengthy.  I don't why it was so delayed.

 9          Q    Is there some restriction on completing

10   your administrative investigation prior to the        02:51

11   criminal -- a completion of the criminal

12   investigation?

13          A    No restriction, no.

14          Q    So you could have ordered the

15   administrative investigation completed at a normal     02:51

16   pace irrespective of the district attorney's

17   investigation; true?

18          MR. BLECHMAN:  Argumentative.  It's an

19    incomplete hypothetical.

20          But go ahead.                                   02:51

21          THE WITNESS:  I think it's a best -- I

22    believe it's a best practice to ensure that the

23    district attorney's office has done a comprehensive

24    review and that there's no criminal finding and

25    that there are no -- that it coincides with or that   02:51
```

                                                    Page 74

```
1      it doesn't create issues from an administrative        02:51
2       investigation.
3             The administrative investigation determines
4       whether it was with -- within policy or not, and it
5       could create some substantive problems if the DA was   02:52
6       going to file charges or needed further
7       investigation.
8             MS. WALKER:   Okay.
9        Q    Did you have any role at all in
10     reviewing the incident of -- of Jacob Bauer's death?    02:52
11       A    I had a very limited role in reviewing
12      the incident.
13       Q    As chief of police when that death
14      occurred, did you watch any of the body-worn camera?
15       A    My role as reviewing the incident and       02:52
16      watching any videos was with counsel in -- in the
17      wake of the critical incident.  City attorney,
18      excuse me.  It was with the City attorney.
19       Q    So you didn't undertake any review of
20      that incident simply as the chief of police to        02:53
21      determine whether you believed there was a need for
22      remedial training or officers being put on
23      administrative leave or anything like that?
24       A    That's not my role.  I did not -- I
25      assigned the investigation to be reviewed.  My role    02:53
```

Page 75

1    would be to objectively review the investigation.        02:53
2    And others who read it would make those
3    determinations in terms of training opportunities
4    that either were remedial or for an advanced officer
5    training opportunity.                                     02:53
6         Q    I thought when we talked earlier about
7    administrative reviews -- or the administrative
8    investigations, that you said it would be the
9    command staff and possibly the use of force training
10   team and yourself who would make recommendations for    02:53
11   officer discipline and -- or remedial training.
12        A    That's true, yes.
13        Q    So I guess I'm confused on what you just
14   testified that it would not be your role.
15        A    It would be my role in the               02:54
16   administrate -- forgive me if I misunderstood.
17        It would be my role to review once an
18   administrative investigation was completed.  It
19   was --
20        Q    I --                                      02:54
21        A    -- not my job or my role to investigate
22   it myself --
23        Q    I --
24        A    -- which would have -- which would have
25   created an objectivity issue when the administrative   02:54

                                              Page 76

```
 1    investigation was completed.                          02:54
 2         Q    And did you only review the body cam
 3    with the City attorney in the wake of the lawsuit
 4    being filed, or was that before?
 5         A    It was before.                               02:54
 6         Q    Okay.
 7         And is it your testimony that you weren't
 8    doing that for purposes of determining whether there
 9    needed to be officer discipline or training in the
10    immediate wake of it -- of the incident prior to the  02:54
11    administrative review being completed?
12         A    This incident centered on a tragic loss
13    of life and it exposed the organization to potential
14    liability.  And that's the reason why I briefed the
15    City attorney and reviewed the case with the City     02:55
16    attorney.
17         Q    Okay.
18         And did you make any determination,
19    irrespective of what any advice of counsel was, did
20    you make any determination based on your review of    02:55
21    the evidence and body cameras in that case whether
22    there was a need for any officer training or
23    discipline?
24         MR. BLECHMAN:  I think it's been asked and
25     answered.                                            02:55
```

Page 77

```
 1              You can answer that again.               02:55
 2          THE WITNESS:  I did not make a determination
 3       that there was a deficiency or that there was a --
 4       a policy violation.
 5          MS. WALKER:  Okay.                           02:55
 6          Q   And I just want to -- I don't mean to
 7       ask again or -- I just want to make sure I'm clear.
 8          Is that because you were withholding that
 9       judgment for the completion of the administrative
10       investigation, or did you actually make a         02:55
11       determination that no training or discipline was
12       warranted?
13          A   Based on the information that I had at
14       the point when I was reviewing the video or any
15       detail with the City attorney I did not have the  02:56
16       opinion that there was any training deficiency or
17       potential policy violations.  But I should be clear
18       that I was not conducting the investigation and did
19       not have the entirety of the evidence at my
20       disposal.                                         02:56
21          Q   Have you had any involvement in review
22       of this incident since the time that the
23       administrative investigation was completed?
24          A   None.
25          Q   Have you had any communications with --   02:56
```

                                              Page 78

```
1        Certification of Court Reporter Federal Jurat

2

3             I, the undersigned, a Certified Shorthand

4    Reporter of the State of California do hereby

5    certify:

6             That the foregoing proceedings were taken

7    before me remotely at the time herein set forth;

8    that any witnesses in the foregoing proceedings,

9    prior to testifying, were placed under oath; that a

10   verbatim record of the proceedings was made by me

11   using machine shorthand, which was thereafter

12   transcribed under my direction; further, that the

13   foregoing is an accurate transcription thereof.

14            That before completion of the deposition a

15   review of the transcript was not requested.

16            I further certify that I am neither

17   financially interested in the action nor a relative

18   or employee of any of the parties.

19            IN WITNESS WHEREOF, I hereby subscribe my

20   name this 16th day of February 2021.

21

22

23

          Heidi Hummel-Grant

24        Certified Shorthand Reporter No. 12556

25
```

Page 91

# EXHIBIT Q

## Pleasanton Police Department
### Pleasanton PD Policy Manual

# Use of Force

## 300.1   PURPOSE AND SCOPE

This policy provides guidelines on the reasonable use of force. While there is no way to specify the exact amount or type of reasonable force to be applied in any situation, every member of this department is expected to use these guidelines to make such decisions in a professional, impartial and reasonable manner.

### 300.1.1   DEFINITIONS

Definitions related to this policy include:

**Deadly force** - Force reasonably anticipated and intended to create a substantial likelihood of causing death or very serious injury.

**Force** - The application of physical techniques or tactics, chemical agents or weapons to another person. It is not a use of force when a person allows him/herself to be searched, escorted, handcuffed or restrained.

## 300.2   POLICY

The use of force by law enforcement personnel is a matter of critical concern, both to the public and to the law enforcement community. Officers are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties.

Officers must have an understanding of, and true appreciation for, their authority and limitations. This is especially true with respect to overcoming resistance while engaged in the performance of law enforcement duties.

The Department recognizes and respects the value of all human life and dignity without prejudice to anyone. Vesting officers with the authority to use reasonable force and to protect the public welfare requires monitoring, evaluation and a careful balancing of all interests.

### 300.2.1   DUTY TO INTERCEDE

Any officer present and observing another officer using force that is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intercede to prevent the use of unreasonable force. An officer who observes another employee use force that exceeds the degree of force permitted by law should promptly report these observations to a supervisor.

## 300.3   USE OF FORCE

Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.

The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

# Pleasanton Police Department

Pleasanton PD Policy Manual

## *Use of Force*

appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.

Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.

It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.

While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.

### 300.3.1   USE OF FORCE TO EFFECT AN ARREST

Any peace officer may use reasonable force to effect an arrest, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape or to overcome resistance (Penal Code § 835a).

### 300.3.2   FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE

When determining whether to apply force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit. These factors include, but are not limited to:

(a)   Immediacy and severity of the threat to officers or others.

(b)   The conduct of the individual being confronted, as reasonably perceived by the officer at the time.

(c)   Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects).

(d)   The effects of drugs or alcohol.

(e)   Subject's mental state or capacity.

(f)   Proximity of weapons or dangerous improvised devices.

(g)   The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

(h)   The availability of other options and their possible effectiveness.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000441

# Pleasanton Police Department

Pleasanton PD Policy Manual

## *Use of Force*

    (i)    Seriousness of the suspected offense or reason for contact with the individual.

    (j)    Training and experience of the officer.

    (k)    Potential for injury to officers, suspects and others.

    (l)    Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the officer.

    (m)    The risk and reasonably foreseeable consequences of escape.

    (n)    The apparent need for immediate control of the subject or a prompt resolution of the situation.

    (o)    Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.

    (p)    Prior contacts with the subject or awareness of any propensity for violence.

    (q)    Any other exigent circumstances.

## 300.3.3  PAIN COMPLIANCE TECHNIQUES

Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:

    (a)    The degree to which the application of the technique may be controlled given the level of resistance.

    (b)    Whether the person can comply with the direction or orders of the officer.

    (c)    Whether the person has been given sufficient opportunity to comply.

The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.

## 300.3.4  CAROTID CONTROL HOLD

The proper application of the carotid control hold may be effective in restraining a violent or combative individual. However, due to the potential for injury, the use of the carotid control hold is subject to the following:

    (a)    The officer shall have successfully completed department-approved training in the use and application of the carotid control hold.

    (b)    The carotid control hold may only be used when circumstances perceived by the officer at the time indicate that such application reasonably appears necessary to control a person in any of the following circumstances:

        1.    The subject is violent or physically resisting.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000442

# Pleasanton Police Department

Pleasanton PD Policy Manual

*Use of Force*

---

2. The subject, by words or actions, has demonstrated an intention to be violent and reasonably appears to have the potential to harm officers, him/herself or others.

(c) The application of a carotid control hold on the following individuals should generally be avoided unless the totality of the circumstances indicates that other available options reasonably appear ineffective, or would present a greater danger to the officer, the subject or others, and the officer reasonably believes that the need to control the individual outweighs the risk of applying a carotid control hold:

1. Females who are known to be pregnant

2. Elderly individuals

3. Obvious juveniles

4. Individuals who appear to have Down syndrome or who appear to have obvious neck deformities or malformations, or visible neck injuries

(d) Any individual who has had the carotid control hold applied, regardless of whether he/she was rendered unconscious, shall be promptly examined by paramedics or other qualified medical personnel and should be monitored until examined by paramedics or other appropriate medical personnel.

(e) The officer shall inform any person receiving custody, or any person placed in a position of providing care, that the individual has been subjected to the carotid control hold and whether the subject lost consciousness as a result.

(f) Any officer attempting or applying the carotid control hold shall promptly notify a supervisor of the use or attempted use of such hold.

(g) The use or attempted use of the carotid control hold shall be thoroughly documented by the officer in any related reports.

## 300.3.5   USE OF FORCE TO SEIZE EVIDENCE

In general, officers may use reasonable force to lawfully seize evidence and to prevent the destruction of evidence. However, officers are discouraged from using force solely to prevent a person from swallowing evidence or contraband. In the instance when force is used, officers should not intentionally use any technique that restricts blood flow to the head, restricts respiration or which creates a reasonable likelihood that blood flow to the head or respiration would be restricted. Officers are encouraged to use techniques and methods taught by the Pleasanton Police Department for this specific purpose.

## 300.4   DEADLY FORCE APPLICATIONS

Use of deadly force is justified in the following circumstances:

(a) An officer may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily injury.

---

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000443

Pleasanton Police Department

Pleasanton PD Policy Manual

*Use of Force*

(b)   An officer may use deadly force to stop a fleeing subject when the officer has probable cause to believe that the person has committed, or intends to commit, a felony involving the infliction or threatened infliction of serious bodily injury or death, and the officer reasonably believes that there is an imminent risk of serious bodily injury or death to any other person if the subject is not immediately apprehended. Under such circumstances, a verbal warning should precede the use of deadly force, where feasible.

Imminent does not mean immediate or instantaneous. An imminent danger may exist even if the suspect is not at that very moment pointing a weapon at someone. For example, an imminent danger may exist if an officer reasonably believes any of the following:

1.   The person has a weapon or is attempting to access one and it is reasonable to believe the person intends to use it against the officer or another.

2.   The person is capable of causing serious bodily injury or death without a weapon and it is reasonable to believe the person intends to do so.

### 300.4.1   SHOOTING AT OR FROM MOVING VEHICLES

Shots fired at or from a moving vehicle are rarely effective. Officers should move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants. An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others.

Officers should not shoot at any part of a vehicle in an attempt to disable the vehicle.

### 300.5   REPORTING THE USE OF FORCE

Any use of force by a member of this department shall be documented promptly, completely and accurately in an appropriate report, depending on the nature of the incident. The officer should articulate the factors perceived and why he/she believed the use of force was reasonable under the circumstances. To collect data for purposes of training, resource allocation, analysis and related purposes, the Department may require the completion of additional report forms, as specified in department policy, procedure or law.

### 300.5.1   NOTIFICATION TO SUPERVISORS

Supervisory notification shall be made as soon as practicable following the application of force in any of the following circumstances:

(a)   The application caused a visible injury.

(b)   The application would lead a reasonable officer to conclude that the individual may have experienced more than momentary discomfort.

(c)   The individual subjected to the force complained of injury or continuing pain.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000444

# Pleasanton Police Department

Pleasanton PD Policy Manual

*Use of Force*

    (d)    The individual indicates intent to pursue litigation.

    (e)    Any application of a CED or control device.

    (f)    Any application of a restraint device other than handcuffs, shackles or belly chains.

    (g)    The individual subjected to the force was rendered unconscious.

    (h)    An individual was struck or kicked.

    (i)    An individual alleges any of the above has occurred.

## 300.5.2   REPORTING TO CALIFORNIA DEPARTMENT OF JUSTICE

Statistical data regarding all officer-involved shootings and incidents involving use of force resulting in serious bodily injury is to be reported to the California Department of Justice as required by Government Code § 12525.2. See the Records policy.

## 300.6   MEDICAL CONSIDERATION

Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.

Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.

The on-scene supervisor or, if the on-scene supervisor is not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).

Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000445

Pleasanton Police Department

Pleasanton PD Policy Manual

*Use of Force*

## 300.7   SUPERVISOR RESPONSIBILITY

When a supervisor is able to respond to an incident in which there has been a reported application of force, the supervisor is expected to:

(a) Obtain the basic facts from the involved officers. Absent an allegation of misconduct or excessive force, this will be considered a routine contact in the normal course of duties.

(b) Ensure that any injured parties are examined and treated.

(c) When possible, separately obtain a recorded interview with the subject upon whom force was applied. If this interview is conducted without the person having voluntarily waived his/her *Miranda* rights, the following shall apply:

    1. The content of the interview should not be summarized or included in any related criminal charges.

    2. The fact that a recorded interview was conducted should be documented in a property or other report.

    3. The recording of the interview should be distinctly marked for retention until all potential for civil litigation has expired.

(d) Once any initial medical assessment has been completed or first aid has been rendered, ensure that photographs have been taken of any areas involving visible injury or complaint of pain, as well as overall photographs of uninjured areas. These photographs should be retained until all potential for civil litigation has expired.

(e) Identify any witnesses not already included in related reports.

(f) Review and approve all related reports.

(g) Determine if there is any indication that the subject may pursue civil litigation.

    1. If there is an indication of potential civil litigation, the supervisor should complete and route a notification of a potential claim through the appropriate channels.

(h) Evaluate the circumstances surrounding the incident and initiate an administrative investigation if there is a question of policy non-compliance or if for any reason further investigation may be appropriate.

In the event that a supervisor is unable to respond to the scene of an incident involving the reported application of force, the supervisor is still expected to complete as many of the above items as circumstances permit.

### 300.7.1   WATCH COMMANDER RESPONSIBILITY

The Watch Commander shall review each use of force by any personnel within his/her command to ensure compliance with this policy and to address any training issues.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000446

# Pleasanton Police Department

Pleasanton PD Policy Manual

*Use of Force*

## 300.8   USE OF FORCE ANALYSIS

At least annually, the Professional Standards Sergeant  should prepare an analysis report on use of force incidents. The report should be submitted to the Chief of Police. The report should not contain the names of officers, suspects or case numbers, and should include:

(a)   The identification of any trends in the use of force by members.

(b)   Training needs recommendations.

(c)   Equipment needs recommendations.

(d)   Policy revision recommendations.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000447

Pleasanton Police Department

Pleasanton PD Policy Manual

# Handcuffing and Restraints

## 306.1  PURPOSE AND SCOPE

This policy provides guidelines for the use of handcuffs and other restraints during detentions and arrests.

## 306.2  POLICY

The Pleasanton Police Department authorizes the use of restraint devices in accordance with this policy, the Use of Force Policy and department training. Restraint devices shall not be used to punish, to display authority or as a show of force.

## 306.3  USE OF RESTRAINTS

Only members who have successfully completed Pleasanton Police Department-approved training on the use of restraint devices described in this policy are authorized to use these devices.

When deciding whether to use any restraint, officers should carefully balance officer safety concerns with factors that include, but are not limited to:

- The circumstances or crime leading to the arrest.

- The demeanor and behavior of the arrested person.

- The age and health of the person.

- Whether the person is known to be pregnant.

- Whether the person has a hearing or speaking disability. In such cases, consideration should be given, safety permitting, to handcuffing to the front in order to allow the person to sign or write notes.

- Whether the person has any other apparent disability.

### 306.3.1  RESTRAINT OF DETAINEES

Situations may arise where it may be reasonable to restrain an individual who may, after brief investigation, be released without arrest. Unless arrested, the use of restraints on detainees should continue only for as long as is reasonably necessary to assure the safety of officers and others. When deciding whether to remove restraints from a detainee, officers should continuously weigh the safety interests at hand against the continuing intrusion upon the detainee.

### 306.3.2  RESTRAINT OF PREGNANT PERSONS

Persons who are known to be pregnant should be restrained in the least restrictive manner that is effective for officer safety and in no event shall these persons be restrained by the use of leg irons, waist chains or handcuffs behind the body.

No person who is in labor, delivery or recovery after delivery shall be handcuffed or restrained except in extraordinary circumstances and only when a supervisor makes an individualized

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000448

Pleasanton Police Department

Pleasanton PD Policy Manual

*Handcuffing and Restraints*

determination that such restraints are necessary for the safety of the arrestee, officers or others (Penal Code § 3407; Penal Code § 6030).

### 306.3.3   RESTRAINT OF JUVENILES
A juvenile under 14 years of age should not be restrained unless he/she is suspected of a dangerous felony or when the officer has a reasonable suspicion that the juvenile may resist, attempt escape, injure him/herself, injure the officer or damage property.

### 306.3.4   NOTIFICATIONS
Whenever an officer transports a person with the use of restraints other than handcuffs, the officer shall inform the jail staff upon arrival at the jail that restraints were used. This notification should include information regarding any other circumstances the officer reasonably believes would be potential safety concerns or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration) that may have occurred prior to, or during transportation to the jail.

## 306.4   APPLICATION OF HANDCUFFS OR PLASTIC CUFFS
Handcuffs, including temporary nylon or plastic cuffs, may be used only to restrain a person's hands to ensure officer safety.

Although recommended for most arrest situations, handcuffing is discretionary and not an absolute requirement of the Department. Officers should consider handcuffing any person they reasonably believe warrants that degree of restraint. However, officers should not conclude that in order to avoid risk every person should be handcuffed, regardless of the circumstances.

In most situations handcuffs should be applied with the hands behind the person's back. When feasible, handcuffs should be double-locked to prevent tightening, which may cause undue discomfort or injury to the hands or wrists.

In situations where one pair of handcuffs does not appear sufficient to restrain the individual or may cause unreasonable discomfort due to the person's size, officers should consider alternatives, such as using an additional set of handcuffs or multiple plastic cuffs.

Handcuffs should be removed as soon as it is reasonable or after the person has been searched and is safely confined within a detention facility.

## 306.5   APPLICATION OF SPIT HOODS/MASKS/SOCKS
Spit hoods/masks/socks are temporary protective devices designed to prevent the wearer from biting and/or transferring or transmitting fluids (saliva and mucous) to others.

Spit hoods may be placed upon persons in custody when the officer reasonably believes the person will bite or spit, either on a person or in an inappropriate place. They are generally used during application of a physical restraint, while the person is restrained, or during or after transport.

Officers utilizing spit hoods should ensure that the spit hood is fastened properly to allow for adequate ventilation and that the restrained person can breathe normally. Officers should provide assistance during the movement of restrained individuals due to the potential for impaired or

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000449

Pleasanton Police Department

Pleasanton PD Policy Manual

*Handcuffing and Restraints*

distorted vision on the part of the individual. Officers should avoid comingling individuals wearing spit hoods with other detainees.

Spit hoods should not be used in situations where the restrained person is bleeding profusely from the area around the mouth or nose, or if there are indications that the person has a medical condition, such as difficulty breathing or vomiting. In such cases, prompt medical care should be obtained. If the person vomits while wearing a spit hood, the spit hood should be promptly removed and discarded. Persons who have been sprayed with oleoresin capsicum (OC) spray should be thoroughly decontaminated including hair, head and clothing prior to application of a spit hood.

Those who have been placed in a spit hood should be continually monitored and shall not be left unattended until the spit hood is removed. Spit hoods shall be discarded after each use.

## 306.6   APPLICATION OF AUXILIARY RESTRAINT DEVICES

Auxiliary restraint devices include transport belts, waist or belly chains, transportation chains, leg irons and other similar devices. Auxiliary restraint devices are intended for use during long-term restraint or transportation. They provide additional security and safety without impeding breathing, while permitting adequate movement, comfort and mobility.

Only department-authorized devices may be used. Any person in auxiliary restraints should be monitored as reasonably appears necessary.

## 306.7   APPLICATION OF LEG RESTRAINT DEVICES

Leg restraints may be used to restrain the legs of a violent or potentially violent person when it is reasonable to do so during the course of detention, arrest or transportation. Only restraint devices approved by the Department shall be used.

In determining whether to use the leg restraint, officers should consider:

(a)   Whether the officer or others could be exposed to injury due to the assaultive or resistant behavior of a suspect.

(b)   Whether it is reasonably necessary to protect the suspect from his/her own actions (e.g., hitting his/her head against the interior of the patrol unit, running away from the arresting officer while handcuffed, kicking at objects or officers).

(c)   Whether it is reasonably necessary to avoid damage to property (e.g., kicking at windows of the patrol unit).

### 306.7.1   GUIDELINES FOR USE OF LEG RESTRAINTS

When applying leg restraints the following guidelines should be followed:

(a)   If practicable, officers should notify a supervisor of the intent to apply the leg restraint device. In all cases, a supervisor shall be notified as soon as practicable after the application of the leg restraint device.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000450

# Pleasanton Police Department

Pleasanton PD Policy Manual

## Handcuffing and Restraints

(b) Once applied, absent a medical or other emergency, restraints should remain in place until the officer arrives at the jail or other facility or the person no longer reasonably appears to pose a threat.

(c) Once secured, the person should be placed in a seated or upright position, secured with a seat belt, and shall not be placed on his/her stomach for an extended period, as this could reduce the person's ability to breathe.

(d) The restrained person should be continually monitored by an officer while in the leg restraint. The officer should ensure that the person does not roll onto and remain on his/her stomach.

(e) The officer should look for signs of labored breathing and take appropriate steps to relieve and minimize any obvious factors contributing to this condition.

(f) When transported by ambulance/paramedic unit, the restrained person should be accompanied by an officer when requested by medical personnel. The transporting officer should describe to medical personnel any unusual behaviors or other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).

## 306.8  REQUIRED DOCUMENTATION

If an individual is restrained and released without an arrest, the officer shall document the details of the detention and the need for handcuffs or other restraints in a CAD note or written report.

If an individual is arrested, the use of restraints other than handcuffs shall be documented in the related report. The officer should include, as appropriate:

(a) The amount of time the suspect was restrained.

(b) How the suspect was transported and the position of the suspect.

(c) Observations of the suspect's behavior and any signs of physiological problems.

(d) Any known or suspected drug use or other medical problems.

(e) The type of restraint device used.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000451

**Pleasanton Police Department**

Pleasanton PD Policy Manual

# Control Devices and Techniques

## 308.1  PURPOSE AND SCOPE

This policy provides guidelines for the use and maintenance of control devices that are described in this policy.

## 308.2  POLICY

In order to control subjects who are violent or who demonstrate the intent to be violent, the Pleasanton Police Department authorizes officers to use control devices in accordance with the guidelines in this policy and the Use of Force Policy.

## 308.3  ISSUING, CARRYING AND USING CONTROL DEVICES

Control devices described in this policy may be carried and used by members of this department only if the device has been issued by the Department or approved by the Chief of Police or the authorized designee.

Only officers who have successfully completed department-approved training in the use of any control device are authorized to carry and use the device.

Control devices may be used when a decision has been made to control, restrain or arrest a subject who is violent or who demonstrates the intent to be violent, and the use of the device appears reasonable under the circumstances. When reasonable, a verbal warning and opportunity to comply should precede the use of these devices.

When using control devices, officers should carefully consider potential impact areas in order to minimize injuries and unintentional targets.

## 308.4  RESPONSIBILITIES

### 308.4.1  WATCH COMMANDER RESPONSIBILITIES

The Watch Commander may authorize the use of a control device by selected personnel or members of specialized units who have successfully completed the required training.

### 308.4.2  RANGEMASTER RESPONSIBILITIES

The Training Manager shall control the inventory and issuance of designated control devices and shall ensure that all damaged, inoperative, outdated or expended control devices or munitions are properly disposed of, repaired or replaced.

Every control device will be periodically inspected by the Rangemaster or a designated instructor for a particular control device. The inspection shall be documented.

### 308.4.3  USER RESPONSIBILITIES

All normal maintenance, charging or cleaning shall remain the responsibility of personnel using the various devices.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000452

Pleasanton Police Department

Pleasanton PD Policy Manual

## Control Devices and Techniques

Any damaged, inoperative, outdated or expended control devices or munitions, along with documentation explaining the cause of the damage, shall be returned to the Training Manager for disposition. Damage to City property forms shall also be prepared and forwarded through the chain of command, when appropriate, explaining the cause of damage.

### 308.5   BATON GUIDELINES

The need to immediately control a suspect must be weighed against the risk of causing serious injury. The head, neck, throat, spine, heart, kidneys and groin should not be intentionally targeted except when the officer reasonably believes the suspect poses an imminent threat of serious bodily injury or death to the officer or others.

When carrying a baton, uniformed personnel shall carry the baton in its authorized holder on the equipment belt. Plainclothes and non-field personnel may carry the baton as authorized and in accordance with the needs of their assignment or at the direction of their supervisor.

### 308.6   TEAR GAS GUIDELINES

Tear gas may be used for crowd control, crowd dispersal or against barricaded suspects based on the circumstances. Only the Watch Commander, Incident Commander or Crisis Response Unit Commander may authorize the delivery and use of tear gas, and only after evaluating all conditions known at the time and determining that such force reasonably appears justified and necessary.

When practicable, fire personnel should be alerted or summoned to the scene prior to the deployment of tear gas to control any fires and to assist in providing medical aid or gas evacuation if needed.

### 308.7   OLEORESIN CAPSICUM (OC) GUIDELINES

As with other control devices, oleoresin capsicum (OC) spray and pepper projectiles may be considered for use to bring under control an individual or groups of individuals who are engaging in, or are about to engage in violent behavior. Pepper projectiles and OC spray should not, however, be used against individuals or groups who merely fail to disperse or do not reasonably appear to present a risk to the safety of officers or the public.

### 308.7.1   OC SPRAY

Uniformed personnel carrying OC spray shall carry the device in its holster on the equipment belt. Plainclothes and non-field personnel may carry OC spray as authorized, in accordance with the needs of their assignment or at the direction of their supervisor.

### 308.7.2   PEPPER PROJECTILE SYSTEMS

Pepper projectiles are plastic spheres that are filled with a derivative of OC powder. Because the compressed gas launcher delivers the projectiles with enough force to burst the projectiles on impact and release the OC powder, the potential exists for the projectiles to inflict injury if they strike the head, neck, spine or groin. Therefore, personnel deploying a pepper projectile system should not intentionally target those areas, except when the officer reasonably believes the suspect poses an imminent threat of serious bodily injury or death to the officer or others.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000453

Pleasanton Police Department

Pleasanton PD Policy Manual

## Control Devices and Techniques

The use of a pepper projectile system is subject to the following requirements:

(a) Pepper projectile systems may only be deployed by an officer or supervisor trained in the use of the system. Officers encountering a situation that warrants the use of a pepper projectile system shall notify a supervisor as soon as practicable. If a pepper projectile system is deployed, the supervisor shall ensure that all notifications and reports are completed as required by the Use of Force Policy.

(b) Each deployment of a pepper projectile system shall be documented. This includes situations where the launcher was directed toward the suspect, whether or not the launcher was used. Accidental discharges shall be promptly reported to a supervisor and documented on the appropriate report form. Only non-incident deployments, such as training and product demonstrations, are exempt from the reporting requirement.

### 308.7.3   TREATMENT FOR OC SPRAY EXPOSURE
Persons who have been sprayed with or otherwise affected by the use of OC should be promptly provided with clean water to cleanse the affected areas. Those persons who complain of further severe effects shall be examined by appropriate medical personnel.

### 308.8   POST-APPLICATION NOTICE
Whenever tear gas or OC has been introduced into a residence, building interior, vehicle or other enclosed area, officers should provide the owners or available occupants with notice of the possible presence of residue that could result in irritation or injury if the area is not properly cleaned. Such notice should include advisement that clean up will be at the owner's expense. Information regarding the method of notice and the individuals notified should be included in related reports.

### 308.8.1   DEPLOYMENT CONSIDERATIONS
Before discharging projectiles, the officer should consider such factors as:

(a) Distance and angle to target.

(b) Type of munitions employed.

(c) Type and thickness of subject's clothing.

(d) The subject's proximity to others.

(e) The location of the subject.

(f) Whether the subject's actions dictate the need for an immediate response and the use of control devices appears appropriate.

(g) Training and skill of Officer(s) intending to deploy projectiles.

A verbal warning of the intended use of the device should precede its application, unless it would otherwise endanger the safety of officers or when it is not practicable due to the circumstances.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000454

Pleasanton Police Department

Pleasanton PD Policy Manual

## Control Devices and Techniques

The purpose of the warning is to give the individual a reasonable opportunity to voluntarily comply and to warn other officers and individuals that the device is being deployed.

Officers should keep in mind the manufacturer's recommendations and their training regarding deployment distances and target areas. However, officers are not restricted solely to use according to manufacturer recommendations. Each situation must be evaluated on the totality of circumstances at the time of deployment.

The need to immediately incapacitate the subject must be weighed against the risk of causing serious injury or death. The head and neck should not be intentionally targeted, except when the officer reasonably believes the suspect poses an imminent threat of serious bodily injury or death to the officer or others.

### 308.8.2   SAFETY PROCEDURES
Shotguns designated for the use of kinetic energy projectiles will be specially marked as such by being painted yellow.

Officers carrying these shotguns will inspect the shotgun at the beginning of each shift to ensure that it is in proper working order and loaded only with approved projectiles.

### 308.9   KINETIC ENERGY PROJECTILE GUIDELINES
The Training Officer shall ensure that all personnel who are authorized to carry a control device have been properly trained and certified to carry the specific control device and are retrained or recertified as necessary.

(a) Proficiency training shall be monitored and documented by a certified, control-device weapons or tactics instructor.

(b) All training and proficiency for control devices will be documented in the officer's training file.

(c) Officers who fail to demonstrate proficiency with the control device or knowledge of this agency's Use of Force Policy will be provided remedial training. If an officer cannot demonstrate proficiency with a control device or knowledge of this agency's Use of Force Policy after remedial training, the officer will be restricted from carrying the control device and may be subject to discipline.

### 308.9.1   DEPLOYMENT AND USE
Only department-approved kinetic energy munitions shall be carried and deployed. Approved munitions may be used to compel an individual to cease his/her actions when such munitions present a reasonable option.

Officers are not required or compelled to use approved munitions in lieu of other reasonable tactics if the involved officer determines that deployment of these munitions cannot be done safely. The safety of hostages, innocent persons and officers takes priority over the safety of subjects engaged in criminal or suicidal behavior.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000455

# Pleasanton Police Department

Pleasanton PD Policy Manual

## Control Devices and Techniques

Circumstances appropriate for deployment include, but are not limited to, situations in which:

(a) The suspect is armed with a weapon and the tactical circumstances allow for the safe application of approved munitions.

(b) The suspect has made credible threats to harm him/herself or others.

(c) The suspect is engaged in riotous behavior or is throwing rocks, bottles or other dangerous projectiles at people and/or officers.

(d) There is probable cause to believe that the suspect has already committed a crime of violence and is refusing to comply with lawful orders.

### 308.9.2 DEPLOYMENT CONSIDERATIONS

Before discharging projectiles, the officer should consider such factors as:

(a) Distance and angle to target.

(b) Type of munitions employed.

(c) Type and thickness of subject's clothing.

(d) The subject's proximity to others.

(e) The location of the subject.

(f) Whether the subject's actions dictate the need for an immediate response and the use of control devices appears appropriate.

(g) Training and skill of the officer(s) intending to deploy the projectile(s).

A verbal warning of the intended use of the device should precede its application, unless it would otherwise endanger the safety of officers or when it is not practicable due to the circumstances. The purpose of the warning is to give the individual a reasonable opportunity to voluntarily comply and to warn other officers and individuals that the device is being deployed.

Officers should keep in mind the manufacturer's recommendations and their training regarding effective distances and target areas. However, officers are not restricted solely to use according to manufacturer recommendations. Each situation must be evaluated on the totality of circumstances at the time of deployment.

The need to immediately incapacitate the subject must be weighed against the risk of causing serious injury or death. The head and neck should not be intentionally targeted, except when the officer reasonably believes the suspect poses an imminent threat of serious bodily injury or death to the officer or others.

### 308.9.3 SAFETY PROCEDURES

Shotguns specifically designated for use with kinetic energy projectiles will be specially marked in a manner that makes them readily identifiable as such.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000456

Pleasanton Police Department

Pleasanton PD Policy Manual

## Control Devices and Techniques

Officers will inspect the shotgun and projectiles at the beginning of each shift to ensure that the shotgun is in proper working order and the projectiles are of the approved type and appear to be free from defects.

When it is not deployed, the shotgun will be unloaded and properly and securely stored in the vehicle. When deploying the kinetic energy projectile shotgun, the officer shall visually inspect the kinetic energy projectiles to ensure that conventional ammunition is not being loaded into the shotgun.

Absent compelling circumstances, officers who must transition from conventional ammunition to kinetic energy projectiles will employ the two-person rule for loading. The two-person rule is a safety measure in which a second officer watches the unloading and loading process to ensure that the weapon is completely emptied of conventional ammunition.

### 308.10   TRAINING FOR CONTROL DEVICES

The Training Officer shall ensure that all personnel who are authorized to carry a control device have been properly trained and certified to carry the specific control device and are retrained or recertified as necessary.

(a)   Proficiency training shall be monitored and documented by a certified, control-device weapons or tactics instructor.

(b)   All training and proficiency for control devices will be documented in the officer's training file.

(c)   Officers who fail to demonstrate proficiency with the control device or knowledge of this agency's Use of Force Policy will be provided remedial training. If an officer cannot demonstrate proficiency with a control device or knowledge of this agency's Use of Force Policy after remedial training, the officer will be restricted from carrying the control device and may be subject to discipline.

### 308.11   REPORTING USE OF CONTROL DEVICES AND TECHNIQUES

Any application of a control device or technique listed in this policy shall be documented in the related incident report and reported pursuant to the Use of Force Policy.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000457

**Pleasanton Police Department**

Pleasanton PD Policy Manual

# Conducted Energy Device

### 309.1  PURPOSE AND SCOPE
This policy provides guidelines for the issuance and use of CEDs.

### 309.2  POLICY
The Conducted Energy Device is intended to control a violent or potentially violent individual, while minimizing the risk of serious injury. The appropriate use of such a device should result in fewer serious injuries to officers and suspects.

### 309.3  ISSUANCE AND CARRYING CONDUCTED ENERGY DEVICES
Only members who have successfully completed department-approved training may be issued and carry the CED.

CEDs are issued for use during a member's current assignment. Those leaving a particular assignment may be required to return the device to the department's inventory.

Officers shall only use the CED and cartridges that have been issued by the Department. Uniformed officers who have been issued the CED shall wear the device in an approved holster on their person.

Officers shall only use the TASER and cartridges that have been issued by the Department. The TASER shall be carried as part of a uniformed officer's equipment in an approved holster. In situations where a holster is impractical officers must seek supervisory approval to carry the TASER in such a manner that it is readily accessible at all times.

Members carrying the CED should perform a spark test on the unit prior to every shift.

When carried while in uniform officers shall carry the CED in a weak-side holster on the side opposite the duty weapon.

  (a)  All CEDs shall be clearly and distinctly marked to differentiate them from the duty weapon and any other device.

  (b)  Whenever practicable, officers should carry two or more cartridges on their person when carrying the CED.

  (c)  Officers shall be responsible for ensuring that their issued CED is properly maintained and in good working order.

  (d)  Officers should not hold both a firearm and the CED at the same time.

### 309.4  VERBAL AND VISUAL WARNINGS
A verbal warning of the intended use of the CED should precede its application, unless it would otherwise endanger the safety of officers or when it is not practicable due to the circumstances. The purpose of the warning is to:

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000458

Pleasanton Police Department

Pleasanton PD Policy Manual

*Conducted Energy Device*

(a) Provide the individual with a reasonable opportunity to voluntarily comply.

(b) Provide other officers and individuals with a warning that the CED may be deployed.

If, after a verbal warning, an individual is unwilling to voluntarily comply with an officer's lawful orders and it appears both reasonable and feasible under the circumstances, the officer may, but is not required to, display the electrical arc (provided that a cartridge has not been loaded into the device), or the laser in a further attempt to gain compliance prior to the application of the CED. The aiming laser should never be intentionally directed into the eyes of another as it may permanently impair his/her vision.

The fact that a verbal or other warning was given or the reasons it was not given shall be documented by the officer deploying the CED in the related report.

## 309.5  USE OF THE CONDUCTED ENERGY DEVICE
The CED has limitations and restrictions requiring consideration before its use. The CED should only be used when its operator can safely approach the subject within the operational range of the device. Although the CED is generally effective in controlling most individuals, officers should be aware that the device may not achieve the intended results and be prepared with other options.

### 309.5.1  APPLICATION OF THE CONDUCTED ENERGY DEVICE
The CED may be used in any of the following circumstances, when the circumstances perceived by the officer at the time indicate that such application is reasonably necessary to control a person:

(a) The subject is violent or is physically resisting.

(b) The subject has demonstrated, by words or action, an intention to be violent or to physically resist, and reasonably appears to present the potential to harm officers, him/herself or others.

Mere flight from a pursuing officer, without other known circumstances or factors, is not good cause for the use of the CED to apprehend an individual.

### 309.5.2  SPECIAL DEPLOYMENT CONSIDERATIONS
The use of the CED on certain individuals should generally be avoided unless the totality of the circumstances indicates that other available options reasonably appear ineffective or would present a greater danger to the officer, the subject or others, and the officer reasonably believes that the need to control the individual outweighs the risk of using the device. This includes:

(a) Individuals who are known to be pregnant.

(b) Elderly individuals or obvious juveniles.

(c) Individuals with obviously low body mass.

(d) Individuals who are handcuffed or otherwise restrained.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000459

# Pleasanton Police Department

Pleasanton PD Policy Manual

## Conducted Energy Device

(e)     Individuals who have been recently sprayed with a flammable chemical agent or who are otherwise in close proximity to any known combustible vapor or flammable material, including alcohol-based oleoresin capsicum (OC) spray.

(f)     Individuals whose position or activity may result in collateral injury (e.g., falls from height, operating vehicles).

Because the application of the CED in the drive-stun mode (i.e., direct contact without probes) relies primarily on pain compliance, the use of the drive-stun mode generally should be limited to supplementing the probe-mode to complete the circuit, or as a distraction technique to gain separation between officers and the subject, thereby giving officers time and distance to consider other force options or actions.

The CED shall not be used to psychologically torment, elicit statements or to punish any individual.

### 309.5.3   TARGETING CONSIDERATIONS
Reasonable efforts should be made to target lower center mass and avoid the head, neck, chest and groin. If the dynamics of a situation or officer safety do not permit the officer to limit the application of the CED probes to a precise target area, officers should monitor the condition of the subject if one or more probes strikes the head, neck, chest or groin until the subject is examined by paramedics or other medical personnel.

### 309.5.4   MULTIPLE APPLICATIONS OF THE CONDUCTED ENERGY DEVICE
Officers should apply the CED for only one standard cycle and then evaluate the situation before applying any subsequent cycles. Multiple applications of the CED against a single individual are generally not recommended and should be avoided unless the officer reasonably believes that the need to control the individual outweighs the potentially increased risk posed by multiple applications.

If the first application of the CED appears to be ineffective in gaining control of an individual, the officer should consider certain factors before additional applications of the CED, including:

(a)     Whether the probes are making proper contact.

(b)     Whether the individual has the ability and has been given a reasonable opportunity to comply.

(c)     Whether verbal commands, other options or tactics may be more effective.

Officers should generally not intentionally apply more than one CED at a time against a single subject.

### 309.5.5   ACTIONS FOLLOWING DEPLOYMENTS
Officers shall notify a supervisor of all CED discharges. Confetti tags should be collected and the expended cartridge, along with both probes and wire, should be submitted into evidence.

---

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000460

# Pleasanton Police Department

Pleasanton PD Policy Manual

## Conducted Energy Device

The cartridge serial number should be noted and documented on the evidence paperwork. The evidence packaging should be marked "Biohazard" if the probes penetrated the subject's skin.

### 309.5.6   DANGEROUS ANIMALS

The CED may be deployed against an animal as part of a plan to deal with a potentially dangerous animal, such as a dog, if the animal reasonably appears to pose an imminent threat to human safety and alternative methods are not reasonably available or would likely be ineffective.

### 309.5.7   OFF-DUTY CONSIDERATIONS

Officers are not authorized to carry department CEDs while off-duty.

Officers shall ensure that CEDs are secured while in their homes, vehicles or any other area under their control, in a manner that will keep the device inaccessible to others.

### 309.6   DOCUMENTATION

Officers shall document all CED discharges in the related arrest/crime report and the CED report form. Notification shall also be made to a supervisor in compliance with the Use of Force Policy. Unintentional discharges, pointing the device at a person, laser activation and arcing the device will also be documented on the report form.

### 309.6.1   CONDUCTED ENERGY DEVICE USE FORM

Items that shall be included in the CED report form are:

(a)   The type and brand of CED and cartridge and cartridge serial number.

(b)   Date, time and location of the incident.

(c)   Whether any display, laser or arc deterred a subject and gained compliance.

(d)   The number of CED activations, the duration of each cycle, the duration between activations, and (as best as can be determined) the duration that the subject received applications.

(e)   The range at which the CED was used.

(f)   The type of mode used (probe or drive-stun).

(g)   Location of any probe impact.

(h)   Location of contact in drive-stun mode.

(i)   Description of where missed probes went.

(j)   Whether medical care was provided to the subject.

(k)   Whether the subject sustained any injuries.

(l)   Whether any officers sustained any injuries.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000461

# Pleasanton Police Department

Pleasanton PD Policy Manual

## Conducted Energy Device

The Training Officer should periodically analyze the report forms to identify trends, including deterrence and effectiveness. The Training Officer should also conduct audits of data downloads and reconcile CED report forms with recorded activations. CED information and statistics, with identifying information removed, should periodically be made available to the public.

### 309.6.2   REPORTS
The officer should include the following in the arrest/crime report:

(a)   Identification of all personnel firing CEDs

(b)   Identification of all witnesses

(c)   Medical care provided to the subject

(d)   Observations of the subject's physical and physiological actions

(e)   Any known or suspected drug use, intoxication or other medical problems

## 309.7   MEDICAL TREATMENT
Consistent with local medical personnel protocols and absent extenuating circumstances, only appropriate medical personnel should remove CED probes from a person's body. Used CED probes shall be treated as a sharps biohazard, similar to a used hypodermic needle, and handled appropriately. Universal precautions should be taken.

All persons who have been struck by CED probes or who have been subjected to the electric discharge of the device shall be medically assessed prior to booking. Additionally, any such individual who falls under any of the following categories should, as soon as practicable, be examined by paramedics or other qualified medical personnel:

(a)   The person is suspected of being under the influence of controlled substances and/or alcohol.

(b)   The person may be pregnant.

(c)   The person reasonably appears to be in need of medical attention.

(d)   The CED probes are lodged in a sensitive area (e.g., groin, female breast, head, face, neck).

(e)   The person requests medical treatment.

Any individual exhibiting signs of distress or who is exposed to multiple or prolonged applications (i.e., more than 15 seconds) shall be transported to a medical facility for examination or medically evaluated prior to booking. If any individual refuses medical attention, such a refusal should be witnessed by another officer and/or medical personnel and shall be fully documented in related reports. If an audio recording is made of the contact or an interview with the individual, any refusal should be included, if possible.

The transporting officer shall inform any person providing medical care or receiving custody that the individual has been subjected to the application of the CED.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000462

Pleasanton Police Department

Pleasanton PD Policy Manual

## Conducted Energy Device

### 309.8   SUPERVISOR RESPONSIBILITIES

When possible, supervisors should respond to calls when they reasonably believe there is a likelihood the CED may be used. A supervisor should respond to all incidents where the CED was activated.

A supervisor shall review each incident where a person has been exposed to an activation of the CED. The device's onboard memory should be downloaded through the data port by Personnel and Training or a supervisor and saved with the related arrest/crime report. Photographs of probe sites should be taken and witnesses interviewed.

### 309.9   TRAINING

Personnel who are authorized to carry the CED shall be permitted to do so only after successfully completing the initial department-approved training. Any personnel who have not carried the CED as a part of their assignment for a period of six months or more shall be recertified by a department-approved CED instructor prior to again carrying or using the device.

Proficiency training for personnel who have been issued CEDs should occur every year. A reassessment of an officer's knowledge and/or practical skill may be required at any time if deemed appropriate by the Training Officer. All training and proficiency for CEDs will be documented in the officer's training file.

Command staff, supervisors and investigators should receive CED training as appropriate for the investigations they conduct and review.

Officers who do not carry CEDs should receive training that is sufficient to familiarize them with the device and with working with officers who use the device.

The Training Officer is responsible for ensuring that all members who carry CEDs have received initial and annual proficiency training. Periodic audits should be used for verification.

Application of CEDs during training could result in injury to personnel and should not be mandatory for certification.

The Training Officer should ensure that all training includes:

(a)   A review of this policy.

(b)   A review of the Use of Force Policy.

(c)   Performing weak-hand draws or cross-draws to reduce the possibility of unintentionally drawing and firing a firearm.

(d)   Target area considerations, to include techniques or options to reduce the unintentional application of probes near the head, neck, chest and groin.

(e)   Handcuffing a subject during the application of the CED and transitioning to other force options.

(f)   De-escalation techniques.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000463

# Pleasanton Police Department

Pleasanton PD Policy Manual

## Conducted Energy Device

(g)    Restraint techniques that do not impair respiration following the application of the CED.

## 309.10  DATAPORT TRACKING

The Personnel and Training Unit will be responsible for dataport tracking of all assigned Tasers and shall be responsible for:

(a)    Performing random audit downloads of department issued TASERS. The audit will also consist of the functioning of the device as well as testing and checking for abuse of the TASER.

(b)    When informed of a TASER discharge.

1.    Download the discharge memory of the involved TASER for record keeping which will serve as a supplemental report.

2.    If there is a significant difference between the download data and the reported time the device was applied, the department designee shall advise the officer's watch commander of any discrepancies.

(c)    Maintaining a log of all TASER discharges on a yearly basis.

Copyright Lexipol, LLC 2018/01/29, All Rights Reserved.
Published with permission by Pleasanton Police Department

PPD000464

EXHIBIT R

Pleasanton Police Department

## Individual Training Activity

| Person: | **Bennett, Steven  #A60-T57** |
|---|---|

### Personal

| Agency: | Pleasanton Police Department |
|---|---|
| ID #: | A60-T57 |

### Employment

| Property | Value | From | Through |
|---|---|---|---|
| **Active Status:** | Active | 06/04/2007 | / / |
| **Duty Status:** | Full Duty | 06/04/2007 | / / |
| **Time Status:** | Full Time | 06/04/2007 | / / |
| **Rank:** | Police Officer | 06/04/2007 | / / |
| **Work Unit:** | Patrol Bureau | 06/04/2007 | / / |
| **Station:** | Headquarters Station | 06/04/2007 | / / |
| **Division:** | Operations | 06/04/2007 | / / |

### Scheduled Training In:   2020

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6784 | 02/06/2020 | First Aid Cpr AED Instructor | *** None *** | ✓ | P | | 08:00 |
| -  -6771 | 01/27/2020 | Building Searches/High Risk Stops/ARV | *** None *** | ✓ | P | | 04:00 |
| -  -6771 | 01/27/2020 | Pursuit Driving Update | *** None *** | ✓ | P | | 02:00 |
| -  -6771 | 01/27/2020 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |
| **Totals For Training Completed in: 2020** | | Completed 4 of 4 Modules | | | | | 16:00 |

### Scheduled Training In:   2019

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6752 | 12/31/2019 | AB 392 Use of Force Update | *** None *** | ✓ | P | | 02:00 |
| -  -6726 | 10/28/2019 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 08:00 |
| -  -6726 | 10/28/2019 | Gracie Survival Tactics | *** None *** | ✓ | P | | 02:00 |
| -  -6705 | 09/09/2019 | Crisis Intervention Training (CIT) Update | *** None *** | ✓ | P | | 10:00 |
| -  -6678 | 07/22/2019 | Reality Based De-escalation Training | *** None *** | ✓ | P | | 06:00 |
| -  -6679 | 07/22/2019 | Pursuit Driving Update | *** None *** | ✓ | P | | 02:00 |
| -  -6678 | 07/22/2019 | CIU Update & Incident Debrief | *** None *** | ✓ | P | | 04:00 |
| -  -6665 | 06/13/2019 | Less Lethal Training: Shotgun, Taser and FN303 | *** None *** | ✓ | P | | 04:00 |
| -  -6665 | 06/13/2019 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 06:00 |
| -  -6652 | 05/14/2019 | Less Lethal Training: Shotgun, Taser and FN303 | *** None *** | ✓ | P | | 04:00 |
| -  -6652 | 05/13/2019 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 06:00 |

Pleasanton Police Department

# Individual Training Activity

05/27/2020                                                                                          Page 35 of 462 pages

| Person: | | **Bennett, Steven  #A60-T57** | | | | | (Continued) |

| Scheduled Training In: | **2019** | | | | | | (Continued) |

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6598 | 04/26/2019 | Auto-Pedestrian Traffic Collision Investigation | CA-POST 1122-33631-18002 | ✓ | P | | 40:00 |
| -  -6625 | 04/11/2019 | Arrest and Control Training | *** None *** | ✓ | P | | 08:00 |
| -  -6625 | 04/11/2019 | Peer Support | *** None *** | ✓ | P | | 02:00 |
| -  -6597 | 03/29/2019 | Traffic Collision Investigation Advanced | CA-POST 1122-33610-18002 | ✓ | P | | 80:00 |
| -  -6623 | 03/08/2019 | FN 303 Operator | *** None *** | ✓ | P | | 02:00 |
| -  -6609 | 02/28/2019 | First Aid/CPR/BBP/ATD | CA-POST -   -18 | ✓ | P | | 06:00 |
| -  -6609 | 02/28/2019 | Temporary Holding Facility | CA-POST -   -18 | ✓ | P | | 04:00 |
| **Totals For Training Completed in: 2019** | | Completed 18 of 18 Modules | | | | | 196:00 |

| Scheduled Training In: | **2018** | | | | | | |

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6570 | 12/19/2018 | Pursuit Driving Update | CA-POST -   -18 | ✓ | P | | 02:00 |
| -  -6553 | 12/06/2018 | Range Training and Department Qualifications | CA-POST -   -18 | ✓ | P | | 10:00 |
| -  -6567 | 10/26/2018 | Motorcycle Training Instructor | CA-POST 1010-21540-18001 | ✓ | P | | 80:00 |
| -  -6476 | 09/27/2018 | Blue Courage | *** None *** | ✓ | P | | 10:00 |
| -  -6477 | 09/05/2018 | Defensive Tactics/Impact Weapons | *** None *** | ✓ | P | | 05:00 |
| -  -6415 | 08/30/2018 | Tactical Rifle for First Responders | CA-POST 1010-32175-18001 | ✓ | P | | 24:00 |
| -  -6455 | 08/13/2018 | Driver Training-Simulator | *** None *** | ✓ | P | | 04:00 |
| -  -6434 | 08/02/2018 | Active Threat | *** None *** | ✓ | P | | 10:00 |
| -  -6410 | 06/07/2018 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 10:00 |
| -  -6374 | 04/12/2018 | Crowd Control | *** None *** | ✓ | P | | 05:00 |
| -  -6374 | 04/12/2018 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |
| -  -6374 | 04/12/2018 | Terrorism Liaison Officer | *** None *** | ✓ | P | | 02:00 |
| -  -6346 | 02/23/2018 | First Aid/CPR/BBP/ATD | *** None *** | ✓ | P | | 05:00 |
| -  -6346 | 02/22/2018 | Temporary Holding Facility | *** None *** | ✓ | P | | 05:00 |
| -  -6328 | 01/22/2018 | First Aid/CPR/BBP/ATD | *** None *** | ✓ | P | | 06:00 |
| -  -6328 | 01/22/2018 | Temporary Holding Facility | *** None *** | ✓ | P | | 04:00 |
| **Totals For Training Completed in: 2018** | | Completed 16 of 16 Modules | | | | | 184:00 |

Pleasanton Police Department

# Individual Training Activity

| Person: | Bennett, Steven  #A60-T57 | | | | (Continued) |
|---|---|---|---|---|---|

| Scheduled Training In: | 2017 |
|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - -6305 | 12/14/2017 | Range Qualifications | *** None *** | ✓ | P | | 03:00 |
| - -6305 | 12/14/2017 | Taser, Less Lethal and WRAP | *** None *** | ✓ | P | | 03:00 |
| - -6305 | 12/14/2017 | Defensive Tactics/Impact Weapons | *** None *** | ✓ | P | | 04:00 |
| - -6273 | 10/19/2017 | Active Shooter Update | *** None *** | ✓ | P | | 05:00 |
| - -6273 | 10/19/2017 | CIT Update | *** None *** | ✓ | P | | 05:00 |
| - -6210 | 07/24/2017 | Human Trafficking | *** None *** | ✓ | P | | 03:00 |
| - -6210 | 07/24/2017 | Traffic Enforcement Advanced Officer Training | *** None *** | ✓ | P | | 02:00 |
| - -6210 | 07/24/2017 | CIU Advanced Officer Training | *** None *** | ✓ | P | | 05:00 |
| - -6204 | 06/26/2017 | Firearms Transition Qualification | *** None *** | ✓ | P | | 04:00 |
| - -6203 | 06/22/2017 | Monthly Departmental Training | *** None *** | ✓ | P | | 10:00 |
| - -6150 | 05/12/2017 | Dual Purpose Motorcycle | CA-POST 1010-32511-16002 | ✓ | P | | 80:00 |
| - -6165 | 04/27/2017 | Principled Policing | *** None *** | ✓ | P | | 10:00 |
| - -6146 | 03/30/2017 | Radar-Laser Operator (Lidar) | CA-POST 1010-23320-16001 | ✓ | P | | 08:00 |
| - -6154 | 03/24/2017 | Traffic Collision Investigation Intermediate | CA-POST 2970-33630-16002 | ✓ | P | | 40:00 |
| - -6143 | 03/01/2017 | Explorer Program Advisor | *** None *** | ✓ | P | | 08:00 |
| - -6129 | 02/23/2017 | First Aid/CPR Refresher | CA-POST 6000-21771-16002 | ✓ | P | | 06:00 |
| - -6129 | 02/23/2017 | Court and Temporary Holding Facility | CA-POST 6000-30780-16002 | ✓ | P | | 04:00 |
| - -6124 | 02/07/2017 | First Aid Instructor Transition | CA-POST 1179-21799-16011 | ✓ | P | | 08:00 |
| - -6103 | 01/13/2017 | Commercial Enforcement | CA-POST 1270-30800-16002 | ✓ | P | | 40:00 |

| Totals For Training Completed in: 2017 | Completed 19 of 19 Modules | 248:00 |
|---|---|---|

| Scheduled Training In: | 2016 |
|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - -6157 | 12/16/2016 | Preventing Workplace Harassment | *** None *** | ✓ | P | | 02:00 |
| - -6033 | 12/05/2016 | Evoc Basic Skills Update | CA-POST 1010-21155-16049 | ✓ | P | | 08:00 |
| - -6088 | 11/17/2016 | Monthly Departmental Training | *** None *** | ✓ | P | | 10:00 |
| - -6054 | 09/29/2016 | Crowd Control | *** None *** | ✓ | P | | 04:00 |
| - -6054 | 09/29/2016 | YCSU Presentation | *** None *** | ✓ | P | | 01:00 |

Pleasanton Police Department

# Individual Training Activity

05/27/2020

| Person: | | **Bennett, Steven  #A60-T57** | | | | | (Continued) |
|---|---|---|---|---|---|---|---|

| Scheduled Training In: | **2016** | | | | | | (Continued) |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6054 | 09/29/2016 | Monthly Departmental Training | *** None *** | ✓ | P | | 05:00 |
| -  -5988 | 06/30/2016 | POST Pursuit Driving Update | CA-POST 6000-29000-15001 | ✓ | P | | 02:00 |
| -  -5893 | 01/25/2016 | Trauma Training | *** None *** | ✓ | P | | 04:00 |
| -  -5893 | 01/25/2016 | First Aid/ BBP | CA-POST 6000-21771-15001 | ✓ | P | | 04:00 |
| -  -5893 | 01/25/2016 | PPD Animal Services | *** None *** | ✓ | P | | 02:00 |
| **Totals For Training Completed in: 2016** | | Completed 10 of 10 Modules | | | | | 42:00 |

| Scheduled Training In: | **2015** | | | | | | |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5868 | 12/03/2015 | Department Firearms Qualifications | *** None *** | ✓ | P | | 02:00 |
| -  -5868 | 12/03/2015 | Electronic Weapons Update (Taser) | CA-POST 6000-23093-15 | ✓ | P | | 04:00 |
| -  -5868 | 12/03/2015 | Arrest & Control PSP | CA-POST 6000-29503-15 | ✓ | P | | 04:00 |
| -  -6158 | 09/01/2015 | CLETS Access (Test) | *** None *** | ✓ | P | | 01:00 |
| -  -5838 | 09/01/2015 | Response to Criminal Mass Casualty Incidents | *** None *** | ✓ | P | | 10:00 |
| -  -5826 | 08/14/2015 | First Aid Cpr AED Instructor | *** None *** | ✓ | P | | 08:00 |
| -  -5813 | 08/13/2015 | Stinger Spike Strips | *** None *** | ✓ | P | | 03:00 |
| -  -5813 | 08/13/2015 | Peer Support | *** None *** | ✓ | P | | 02:00 |
| -  -5813 | 08/13/2015 | POST Pursuit Driving Update | *** None *** | ✓ | P | | 01:00 |
| -  -5813 | 08/13/2015 | Traffic Unit | *** None *** | ✓ | P | | 02:00 |
| -  -5813 | 08/13/2015 | Branding | *** None *** | ✓ | P | | 02:00 |
| -  -5784 | 06/18/2015 | Firearms (Psp) | CA-POST 6000-29501-14005 | ✓ | P | | 10:30 |
| -  -5794 | 06/17/2015 | Law Enforcement Tactical Lifesaver | *** None *** | ✓ | P | | 08:00 |
| -  -5773 | 05/07/2015 | Assertive Supervision | CA-POST 9750-12100-14020 | ✓ | P | | 24:00 |
| -  -5755 | 04/23/2015 | CIU Advanced Officer Training | *** None *** | ✓ | P | | 06:30 |
| -  -5755 | 04/23/2015 | Patrol Canine Training | *** None *** | ✓ | P | | 03:00 |
| -  -5696 | 02/26/2015 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |
| -  -5696 | 02/26/2015 | CPR/AED/BBP | CA-POST 6000-21771-14 | ✓ | P | | 04:00 |
| -  -5696 | 02/26/2015 | Jail Operations | CA-POST 6000-30780-14 | ✓ | P | | 04:00 |
| **Totals For Training Completed in: 2015** | | Completed 19 of 19 Modules | | | | | 101:00 |

Pleasanton Police Department

# Individual Training Activity

| Person: | **Bennett, Steven  #A60-T57** | | (Continued) |
|---|---|---|---|

| Scheduled Training In: | **2014** |
|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5636 | 10/23/2014 | Firearm (PSP) | CA-POST 6000-29501-14001 | ✓ | P | | 05:00 |
| -  -5644 | 10/23/2014 | Department Firearms Qualifications | *** None *** | ✓ | P | | 02:00 |
| -  -5644 | 10/23/2014 | Taser Update & Qual | *** None *** | ✓ | P | | 01:30 |
| -  -5644 | 10/23/2014 | Defensive Tactics | *** None *** | ✓ | P | | 01:30 |
| -  -5627 | 10/16/2014 | POST Driver Training Update - Simulator | *** None *** | ✓ | P | | 04:00 |
| -  -5598 | 08/29/2014 | Chasing Cell Phones | *** None *** | ✓ | P | | 06:00 |
| -  -5598 | 08/28/2014 | Slow Speed Driving | *** None *** | ✓ | P | | 04:00 |
| -  -5550 | 06/26/2014 | Active Shooter / Fire Rescue Task Force Training | *** None *** | ✓ | P | | 10:00 |
| -  -5534 | 05/26/2014 | FIrearms Qualifications (rifle/pistol/less lethal) | *** None *** | ✓ | P | | 10:00 |
| -  -5489 | 04/11/2014 | Interview and Interrogation | CA-POST 9590-31445-13012 | ✓ | P | | 40:00 |
| -  -5466 | 02/20/2014 | OIS Peer Support | *** None *** | ✓ | P | | 02:00 |
| -  -5466 | 02/20/2014 | OIS Investigations | *** None *** | ✓ | P | | 03:00 |
| -  -5466 | 02/20/2014 | Officer Involved Shootings | *** None *** | ✓ | P | | 04:30 |
| -  -5466 | 02/20/2014 | Mothers with a Purpose | *** None *** | ✓ | P | | 00:30 |

| Totals For Training Completed in: 2014 | Completed 14 of 14 Modules | | 94:00 |
|---|---|---|---|

| Scheduled Training In: | **2013** |
|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5392 | 09/26/2013 | Crisis Intervention Training (CIT) | CA-POST 2010-20801-13002 | ✓ | P | | 38:00 |
| -  -5359 | 06/28/2013 | Active Shooter Update | CA-POST -   -12 | ✓ | P | | 10:00 |
| -  -5359 | 06/27/2013 | Arrest and Control (Psp) | CA-POST 6000-29503-12004 | ✓ | P | | 04:00 |
| -  -5359 | 06/27/2013 | District Attorney Update | CA-POST -   -12 | ✓ | P | | 02:00 |
| -  -5359 | 06/27/2013 | Taser Update | CA-POST 6000-23093-12003 | ✓ | P | | 04:00 |
| -  -5359 | 06/26/2013 | First Aid CPR AED Update | CA-POST 6000-21771-12004 | ✓ | P | | 05:00 |
| -  -5359 | 06/26/2013 | Court & Temporary Holding Facility | CA-POST 6000-30780-12004 | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2013 | Completed 7 of 7 Modules | | 67:00 |
|---|---|---|---|

Pleasanton Police Department

# Individual Training Activity

| Person: | Bennett, Steven  #A60-T57 | | | | (Continued) |
|---|---|---|---|---|---|

**Scheduled Training In:  2012**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5118 | 06/15/2012 | Evoc Basic Skills Update | CA-POST 1010-21155-11063 | ✓ | P | | 08:00 |
| -  -5118 | 06/14/2012 | Firearms (Psp) | CA-POST 6000-29501-11002 | ✓ | P | | 04:00 |
| -  -5118 | 06/14/2012 | Calico Center Training | CA-POST -  -11 | ✓ | P | | 02:00 |
| -  -5118 | 06/14/2012 | Racial Profiling Update | CA-POST 6000-29000-11176 | ✓ | P | | 02:00 |
| -  -5118 | 06/13/2012 | First Aid CPR AED Update | CA-POST 6000-21771-11003 | ✓ | P | | 04:00 |
| -  -5118 | 06/13/2012 | Consolidated Records Information Management System | CA-POST -  -11 | ✓ | P | | 02:00 |
| -  -5118 | 06/13/2012 | Court & Temporary Holding Facility | CA-POST 6000-30780-11003 | ✓ | P | | 04:00 |
| -  -5107 | 03/07/2012 | Firearms Investigation | *** None *** | ✓ | P | | 09:00 |
| -  -5093 | 03/01/2012 | Traffic Collision Investigation Basic | CA-POST 5590-33590-11005 | ✓ | P | | 40:00 |
| **Totals For Training Completed in: 2012** | | Completed 9 of 9 Modules | | | | | **75:00** |

**Scheduled Training In:  2011**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -4986 | 07/05/2011 | Clets Less Than Full Access (Test) | *** None *** | ✓ | P | | 01:00 |
| -  -4936 | 06/16/2011 | Electronic Weapons Update (Taser) | CA-POST 6000-23093-10003 | ✓ | P | | 04:00 |
| -  -4936 | 06/16/2011 | Arrest and Control (Psp) | CA-POST 6000-29503-10003 | ✓ | P | | 04:00 |
| -  -4936 | 06/16/2011 | LPFD Incident Command | CA-POST -  -10 | ✓ | P | | 02:00 |
| -  -4936 | 06/15/2011 | Pursuit Driving Update | CA-POST 6000-29000-1000 | ✓ | P | | 02:00 |
| -  -4936 | 06/15/2011 | First Aid | CA-POST 6000-21771-10003 | ✓ | P | | 04:00 |
| -  -4936 | 06/15/2011 | Court & Temporary Holding Facility | CA-POST 6000-30780-10003 | ✓ | P | | 04:00 |
| **Totals For Training Completed in: 2011** | | Completed 7 of 7 Modules | | | | | **21:00** |
| **Totals For: Bennett, Steven  #A60-T57** | | Completed 123 of 123 Modules | | | | | **1,044:00** |

Pleasanton Police Department

# Individual Training Activity

05/27/2020                                                                       Page 40 of 462 pages

| Person: | **Billdt, Eric  #A75-L86** |
|---|---|

### Personal
| | |
|---|---|
| **Agency:** | Pleasanton Police Department |
| **ID #:** | A75-L86 |

### Employment
| Property | Value | From | Through |
|---|---|---|---|
| **Active Status:** | Active | 12/18/2006 | / / |
| **Duty Status:** | Full Duty | 12/18/2006 | / / |
| **Time Status:** | Full Time | 12/18/2006 | / / |
| **Rank:** | Police Sergeant | 07/07/2018 | / / |
| **Work Unit:** | Patrol Bureau | 07/07/2018 | / / |
| **Station:** | Headquarters Station | 12/18/2006 | / / |
| **Division:** | Operations | 07/07/2018 | / / |

| Scheduled Training In: | **2020** | | | | | | |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6772 | 02/27/2020 | Building Searches/High Risk Stops/ARV | *** None *** | ✓ | P | | 04:00 |
| -  -6772 | 02/27/2020 | Pursuit Driving Update | *** None *** | ✓ | P | | 02:00 |
| -  -6772 | 02/27/2020 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |
| **Totals For Training Completed in: 2020** | | **Completed 3 of 3 Modules** | | | | | **08:00** |

| Scheduled Training In: | **2019** | | | | | | |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6738 | 12/31/2019 | Pursuit Driving Update | *** None *** | ✓ | P | | 02:00 |
| -  -6752 | 12/31/2019 | AB 392 Use of Force Update | *** None *** | ✓ | P | | 02:00 |
| -  -6747 | 12/05/2019 | Writing Reports NIBRS Style | *** None *** | ✓ | P | | 06:00 |
| -  -6726 | 10/28/2019 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 08:00 |
| -  -6726 | 10/28/2019 | Gracie Survival Tactics | *** None *** | ✓ | P | | 02:00 |
| -  -6705 | 09/09/2019 | Crisis Intervention Training (CIT) Update | *** None *** | ✓ | P | | 10:00 |
| -  -6684 | 08/01/2019 | Reality Based De-escalation Training | *** None *** | ✓ | P | | 06:00 |
| -  -6685 | 08/01/2019 | Pursuit Driving Update | *** None *** | ✓ | P | | 02:00 |
| -  -6684 | 08/01/2019 | CIU Update & Incident Debrief | *** None *** | ✓ | P | | 04:00 |
| -  -6665 | 06/13/2019 | Less Lethal Training: Shotgun, Taser and FN303 | *** None *** | ✓ | P | | 04:00 |
| -  -6665 | 06/13/2019 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 06:00 |
| -  -6515 | 05/17/2019 | Supervisory Course | *** None *** | ✓ | P | | 80:00 |
| -  -6613 | 03/11/2019 | Arrest and Control Training | CA-POST  -  -18 | ✓ | P | | 08:00 |

Pleasanton Police Department

# Individual Training Activity

05/27/2020                                                                              Page 41 of 462 pages

| Person: | Billdt, Eric  #A75-L86 | (Continued) |
|---|---|---|

| Scheduled Training In: | 2019 | | | | | (Continued) |
|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6613 | 03/11/2019 | Peer Support | CA-POST | ✓ | P | | 02:00 |
| | | | -    -18 | | | | |
| -  -6592 | 01/29/2019 | First Aid/CPR/BBP/ATD | CA-POST | ✓ | P | | 06:00 |
| | | | -    -18 | | | | |
| -  -6592 | 01/28/2019 | Temporary Holding Facility | CA-POST | ✓ | P | | 04:00 |
| | | | -    -18 | | | | |

| Totals For Training Completed in: 2019 | Completed 16 of 16 Modules | | | | | | 152:00 |
|---|---|---|---|---|---|---|---|

| Scheduled Training In: | 2018 | | | | | |
|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6553 | 12/06/2018 | Range Training and Department Qualifications | CA-POST | ✓ | P | | 10:00 |
| | | | -    -18 | | | | |
| -  -6551 | 12/02/2018 | Pursuit Driving Update | CA-POST | ✓ | P | | 02:00 |
| | | | -    -18 | | | | |
| -  -6476 | 09/27/2018 | Blue Courage | *** None *** | ✓ | P | | 10:00 |
| -  -6463 | 09/26/2018 | Critical Incident Response for Supervisors | CA-POST | ✓ | P | | 24:00 |
| | | | 2540-10342-18002 | | | | |
| -  -6462 | 09/07/2018 | Internal Affairs Inv. | CA-POST | ✓ | P | | 24:00 |
| | | | 1010-32100-18001 | | | | |
| -  -6445 | 08/10/2018 | Driver Training-Simulator | *** None *** | ✓ | P | | 04:00 |
| -  -6434 | 08/02/2018 | Active Threat | *** None *** | ✓ | P | | 10:00 |
| -  -6410 | 06/07/2018 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 10:00 |
| -  -6393 | 05/23/2018 | School Violence and the Active Shooter | *** None *** | ✓ | P | | 04:00 |
| -  -6374 | 04/12/2018 | Crowd Control | *** None *** | ✓ | P | | 05:00 |
| -  -6374 | 04/12/2018 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |
| -  -6374 | 04/12/2018 | Terrorism Liaison Officer | *** None *** | ✓ | P | | 02:00 |
| -  -6335 | 02/08/2018 | Digital Safety (Train the Trainer) | *** None *** | ✓ | P | | 08:00 |
| -  -6333 | 02/06/2018 | Making the Transition to Leadership: "From Buddy to Boss" | *** None *** | ✓ | P | | 07:00 |
| -  -6328 | 01/22/2018 | First Aid/CPR/BBP/ATD | *** None *** | ✓ | P | | 06:00 |
| -  -6328 | 01/22/2018 | Temporary Holding Facility | *** None *** | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2018 | Completed 16 of 16 Modules | | | | | | 132:00 |
|---|---|---|---|---|---|---|---|

Pleasanton Police Department

# Individual Training Activity

| Person: | | **Billdt, Eric  #A75-L86** | | | | | (Continued) |
|---|---|---|---|---|---|---|---|

**Scheduled Training In:   2017**

| TMS # | | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|---|
| - | -6305 | 12/14/2017 | Range Qualifications | *** None *** | ✓ | P | | 03:00 |
| - | -6305 | 12/14/2017 | Taser, Less Lethal and WRAP | *** None *** | ✓ | P | | 03:00 |
| - | -6305 | 12/14/2017 | Defensive Tactics/Impact Weapons | *** None *** | ✓ | P | | 04:00 |
| - | -6262 | 09/18/2017 | Active Threat | *** None *** | ✓ | P | | 06:00 |
| - | -6262 | 09/18/2017 | CIT Update | *** None *** | ✓ | P | | 04:00 |
| - | -6212 | 08/02/2017 | School and Juvenile Legal Issues | *** None *** | ✓ | P | | 16:00 |
| - | -6206 | 06/30/2017 | Firearms Transition Qualification | *** None *** | ✓ | P | | 04:00 |
| - | -6203 | 06/22/2017 | Monthly Departmental Training | *** None *** | ✓ | P | | 10:00 |
| - | -6165 | 04/27/2017 | Principled Policing | *** None *** | ✓ | P | | 10:00 |
| - | -6162 | 03/31/2017 | Cyber Influence:  Kids, Cops & Schools | *** None *** | ✓ | P | | 24:00 |
| - | -6138 | 02/14/2017 | Search Warrants A-Z | *** None *** | ✓ | P | | 16:00 |
| - | -6128 | 01/23/2017 | First Aid/CPR Refresher | CA-POST 6000-21771-16001 | ✓ | P | | 06:00 |
| - | -6128 | 01/23/2017 | Court and Temporary Holding Facility | CA-POST 6000-30780-16001 | ✓ | P | | 04:00 |

| **Totals For Training Completed in: 2017** | **Completed 13 of 13 Modules** | **110:00** |
|---|---|---|

**Scheduled Training In:   2016**

| TMS # | | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|---|
| - | -6157 | 12/16/2016 | Preventing Workplace Harassment | *** None *** | ✓ | P | | 02:00 |
| - | -6088 | 11/17/2016 | Monthly Departmental Training | *** None *** | ✓ | P | | 10:00 |
| - | -6091 | 11/16/2016 | Crimes Against Children, Teens and Women | *** None *** | ✓ | P | | 08:00 |
| - | -6054 | 09/29/2016 | Crowd Control | *** None *** | ✓ | P | | 04:00 |
| - | -6054 | 09/29/2016 | YCSU Presentation | *** None *** | ✓ | P | | 01:00 |
| - | -6054 | 09/29/2016 | Monthly Departmental Training | *** None *** | ✓ | P | | 05:00 |
| - | -6033 | 07/28/2016 | Evoc Basic Skills Update | CA-POST 1010-21155-16010 | ✓ | P | | 08:00 |
| - | -6015 | 07/11/2016 | Active Shooter | *** None *** | ✓ | P | | 10:00 |
| - | -5988 | 06/30/2016 | POST Pursuit Driving Update | CA-POST 6000-29000-15001 | ✓ | P | | 02:00 |
| - | -5990 | 06/16/2016 | Firearms (Psp) | CA-POST 6000-29501-15002 | ✓ | P | | 10:00 |
| - | -5990 | 06/16/2016 | POST Pursuit Driving Update | CA-POST 6000-29000-15002 | ✓ | P | | 01:00 |
| - | -5950 | 04/21/2016 | Defensive Tactics / Ground Control | CA-POST 6000-30780-15004 | ✓ | P | | 05:00 |

Pleasanton Police Department

# Individual Training Activity

| Person: | **Billdt, Eric  #A75-L86** | (Continued) |
|---|---|---|

| Scheduled Training In:   **2016** | | (Continued) |
|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -   -5950 | 04/21/2016 | Court and Temporary Holding Facility | CA-POST 6000-30780-15002 | ✓ | P | | 04:00 |
| -   -5950 | 04/21/2016 | Below 100 | *** None *** | ✓ | P | | 01:00 |
| -   -5913 | 03/25/2016 | Campus Law Enforcement | CA-POST 4200-22294-15001 | ✓ | P | | 40:00 |
| -   -5894 | 02/25/2016 | Trauma Training | *** None *** | ✓ | P | | 04:00 |
| -   -5894 | 02/25/2016 | First Aid/BBP | CA-POST 6000-21771-15002 | ✓ | P | | 04:00 |
| -   -5894 | 02/25/2016 | PPD Animal Services | *** None *** | ✓ | P | | 02:00 |
| -   -5880 | 01/07/2016 | Crisis Intervention Training (CIT) | CA-POST 2010-20801-15004 | ✓ | P | | 38:00 |

| Totals For Training Completed in: 2016 | Completed 19 of 19 Modules | | | | | | 159:00 |
|---|---|---|---|---|---|---|---|

| Scheduled Training In:   **2015** | | | | | | | |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -   -5868 | 12/03/2015 | Department Firearms Qualifications | *** None *** | ✓ | P | | 02:00 |
| -   -5868 | 12/03/2015 | Electronic Weapons Update (Taser) | CA-POST 6000-23093-15 | ✓ | P | | 04:00 |
| -   -5868 | 12/03/2015 | Arrest & Control PSP | CA-POST 6000-29503-15 | ✓ | P | | 04:00 |
| -   -5839 | 10/09/2015 | Response to Criminal Mass Casualty Incidents | *** None *** | ✓ | P | | 10:00 |
| -   -6158 | 09/01/2015 | CLETS Access (Test) | *** None *** | ✓ | P | | 01:00 |
| -   -5812 | 07/13/2015 | Stinger Spike Strips | *** None *** | ✓ | P | | 03:00 |
| -   -5812 | 07/13/2015 | Peer Support | *** None *** | ✓ | P | | 02:00 |
| -   -5812 | 07/13/2015 | POST Pursuit Driving Update | *** None *** | ✓ | P | | 01:00 |
| -   -5812 | 07/13/2015 | Traffic Unit | *** None *** | ✓ | P | | 02:00 |
| -   -5812 | 07/13/2015 | Branding | *** None *** | ✓ | P | | 02:00 |
| -   -5720 | 06/19/2015 | School Resource Officer | *** None *** | ✓ | P | | 40:00 |
| -   -5783 | 05/18/2015 | Firearms (Psp) | CA-POST 6000-29501-14004 | ✓ | P | | 10:30 |
| -   -5755 | 04/23/2015 | CIU Advanced Officer Training | *** None *** | ✓ | P | | 06:30 |
| -   -5755 | 04/23/2015 | Patrol Canine Training | *** None *** | ✓ | P | | 03:00 |
| -   -5752 | 04/10/2015 | Emotional Survival, Pesonal & Professional | *** None *** | ✓ | P | | 07:00 |
| -   -5672 | 03/20/2015 | ICI Child Abuse Investigations | CA-POST 2540-32340-14002 | ✓ | P | | 40:00 |
| -   -5696 | 02/26/2015 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |

Pleasanton Police Department

# Individual Training Activity

05/27/2020                                                                    Page 44 of 462 pages

| Person: | **Billdt, Eric  #A75-L86** | (Continued) |
|---|---|---|

| Scheduled Training In:   **2015** | | (Continued) |
|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5696 | 02/26/2015 | CPR/AED/BBP | CA-POST 6000-21771-14 | ✓ | P | | 04:00 |
| -  -5696 | 02/26/2015 | Jail Operations | CA-POST 6000-30780-14 | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2015 | Completed 19 of 19 Modules | | 148:00 |
|---|---|---|---|

| Scheduled Training In:   **2014** | | |
|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5632 | 10/30/2014 | POST Driver Training Update - Simulator | *** None *** | ✓ | P | | 04:00 |
| -  -5636 | 10/23/2014 | Firearm (PSP) | CA-POST 6000-29501-14002 | ✓ | P | | 05:00 |
| -  -5644 | 10/23/2014 | Department Firearms Qualifications | *** None *** | ✓ | P | | 02:00 |
| -  -5644 | 10/23/2014 | Taser Update & Qual | *** None *** | ✓ | P | | 01:30 |
| -  -5644 | 10/23/2014 | Defensive Tactics | *** None *** | ✓ | P | | 01:30 |
| -  -5599 | 09/22/2014 | Chasing Cell Phones | *** None *** | ✓ | P | | 06:00 |
| -  -5599 | 09/22/2014 | Slow Speed Driving | *** None *** | ✓ | P | | 04:00 |
| -  -5566 | 08/07/2014 | New World Mobile Enterprise Training | *** None *** | ✓ | P | | 04:00 |
| -  -5550 | 06/26/2014 | Active Shooter / Fire Rescue Task Force Training | *** None *** | ✓ | P | | 10:00 |
| -  -5541 | 06/19/2014 | Illegal Street Racing / Modified Vehicle | CA-POST 1192-30252-13003 | ✓ | P | | 04:00 |
| -  -5533 | 05/08/2014 | FIrearms Qualifications (rifle/pistol/less lethal) | *** None *** | ✓ | P | | 10:00 |
| -  -5516 | 04/23/2014 | Below 100 | *** None *** | ✓ | P | | 08:00 |
| -  -5497 | 03/10/2014 | Pursuit Driving Update | *** None *** | ✓ | P | | 01:00 |
| -  -5497 | 03/10/2014 | Court & Temporary Holding Facility | CA-POST 6000-30780-13002 | ✓ | P | | 04:00 |
| -  -5497 | 03/10/2014 | Hide it, Lock it or Lose it | *** None *** | ✓ | P | | 01:00 |
| -  -5497 | 03/10/2014 | First Aid | CA-POST 6000-21771-13002 | ✓ | P | | 04:00 |
| -  -5466 | 02/20/2014 | OIS Peer Support | *** None *** | ✓ | P | | 02:00 |
| -  -5466 | 02/20/2014 | OIS Investigations | *** None *** | ✓ | P | | 03:00 |
| -  -5466 | 02/20/2014 | Officer Involved Shootings | *** None *** | ✓ | P | | 04:30 |
| -  -5466 | 02/20/2014 | Mothers with a Purpose | *** None *** | ✓ | P | | 00:30 |

| Totals For Training Completed in: 2014 | Completed 20 of 20 Modules | | 80:00 |
|---|---|---|---|

Pleasanton Police Department

# Individual Training Activity

| Person: | **Billdt, Eric  #A75-L86** | | | | (Continued) |

**Scheduled Training In:   2013**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5410 | 09/18/2013 | Preventing Workplace Harassment | *** None *** | ✓ | P | | 03:00 |
| -  -5359 | 06/28/2013 | Active Shooter Update | CA-POST -  -12 | ✓ | P | | 10:00 |
| -  -5359 | 06/27/2013 | Arrest and Control (Psp) | CA-POST 6000-29503-12004 | ✓ | P | | 04:00 |
| -  -5359 | 06/27/2013 | District Attorney Update | CA-POST -  -12 | ✓ | P | | 02:00 |
| -  -5359 | 06/27/2013 | Taser Update | CA-POST 6000-23093-12003 | ✓ | P | | 04:00 |
| -  -5359 | 06/26/2013 | First Aid CPR AED Update | CA-POST 6000-21771-12004 | ✓ | P | | 05:00 |
| -  -5359 | 06/26/2013 | Court & Temporary Holding Facility | CA-POST 6000-30780-12004 | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2013 | Completed 7 of 7 Modules | | 32:00 |

**Scheduled Training In:   2012**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5262 | 11/10/2012 | Leadership Track 2012 | *** None *** | ✓ | P | | 32:00 |
| -  -5175 | 10/11/2012 | Assertive Supervision | CA-POST 9750-12100-12005 | ✓ | P | | 24:00 |
| -  -5159 | 06/25/2012 | Motorcycle Safety and Enforcement | CA-POST 5860-32552-11010 | ✓ | P | | 08:00 |
| -  -5117 | 06/06/2012 | Firearms (Psp) | CA-POST 6000-29501-11001 | ✓ | P | | 04:00 |
| -  -5117 | 06/06/2012 | Calico Center Training | CA-POST -  -11 | ✓ | P | | 02:00 |
| -  -5117 | 06/06/2012 | Racial Profiling Update | CA-POST 6000-29000-11176 | ✓ | P | | 02:00 |
| -  -5117 | 06/05/2012 | First Aid CPR AED Update | CA-POST 6000-21771-11002 | ✓ | P | | 04:00 |
| -  -5117 | 06/05/2012 | Consolidated Records Information Management System | CA-POST -  -11 | ✓ | P | | 02:00 |
| -  -5117 | 06/05/2012 | Court & Temporary Holding Facility Training | CA-POST 6000-30780-11002 | ✓ | P | | 04:00 |
| -  -5129 | 05/29/2012 | Evoc Basic Skills Update | CA-POST 1010-21551-1058 | ✓ | P | | 08:00 |

| Totals For Training Completed in: 2012 | Completed 10 of 10 Modules | | 90:00 |

**Pleasanton Police Department**

## Individual Training Activity

05/27/2020                                                                              Page 46 of 462 pages

| Person: | **Billdt, Eric  #A75-L86** | (Continued) |
|---|---|---|

| Scheduled Training In: | **2011** | |
|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -4958 | 08/10/2011 | Hidden Assets in Passenger Vehicles | *** None *** | ✓ | P | | 24:00 |
| -  -4986 | 07/05/2011 | Clets Less Than Full Access (Test) | *** None *** | ✓ | P | | 01:00 |
| -  -4951 | 06/29/2011 | Traffic Collision Railroad Crossing | CA-POST 8390-33680-10012 | ✓ | P | | 04:00 |
| -  -4935 | 06/14/2011 | LPFD Incident Command | CA-POST -   -10 | ✓ | P | | 02:00 |
| -  -4935 | 06/13/2011 | Pursuit Driving Update | CA-POST 6000-29000-1000 | ✓ | P | | 02:00 |
| -  -4935 | 06/13/2011 | Electronic Weapons Update (Taser) | CA-POST 6000-23093-10001 | ✓ | P | | 04:00 |
| -  -4935 | 06/13/2011 | First Aid | CA-POST 6000-21771-10002 | ✓ | P | | 04:00 |
| -  -4935 | 06/13/2011 | Arrest and Control (Psp) | CA-POST 6000-29503-10001 | ✓ | P | | 04:00 |
| -  -4935 | 06/13/2011 | Court & Temporary Holding Facility | CA-POST 6000-35780-10002 | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2011 | Completed 9 of 9 Modules | 49:00 |
|---|---|---|
| **Totals For: Billdt, Eric  #A75-L86** | **Completed 132 of 132 Modules** | **960:00** |

Pleasanton Police Department

# Individual Training Activity

| Person: | Chin, Jonathan  #C07-N09 |
|---|---|

### Personal
**Agency:**   Pleasanton Police Department
**ID #:**   C07-N09

### Employment

| Property | Value | From | Through |
|---|---|---|---|
| **Active Status:** | Active | 01/19/2009 | / / |
| **Duty Status:** | Full Duty | 01/19/2009 | / / |
| **Time Status:** | Full Time | 01/19/2009 | / / |
| **Rank:** | Police Officer | 01/19/2009 | / / |
| **Work Unit:** | Detective Bureau | 07/07/2014 | / / |
| **Station:** | Headquarters Station | 01/19/2009 | / / |
| **Division:** | Inv/Support | 07/07/2014 | / / |

**Scheduled Training In:   2020**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6760 | 05/19/2020 | Leadership Development Program | *** None *** | ✓ | P | | 72:00 |
| -  -6772 | 02/27/2020 | Building Searches/High Risk Stops/ARV | *** None *** | ✓ | P | | 04:00 |
| -  -6772 | 02/27/2020 | Pursuit Driving Update | *** None *** | ✓ | P | | 02:00 |
| -  -6772 | 02/27/2020 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |

| Totals For Training Completed in: 2020 | Completed 4 of 4 Modules | | 80:00 |
|---|---|---|---|

**Scheduled Training In:   2019**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6752 | 12/31/2019 | AB 392 Use of Force Update | *** None *** | ✓ | P | | 02:00 |
| -  -6726 | 10/28/2019 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 08:00 |
| -  -6726 | 10/28/2019 | Gracie Survival Tactics | *** None *** | ✓ | P | | 02:00 |
| -  -6705 | 09/09/2019 | Crisis Intervention Training (CIT) Update | *** None *** | ✓ | P | | 10:00 |
| -  -6701 | 08/30/2019 | Gun Violence Restraining Orders | *** None *** | ✓ | P | | 03:00 |
| -  -6696 | 08/16/2019 | Gun Violence Restraining Orders | *** None *** | ✓ | P | | 08:00 |
| -  -6684 | 08/01/2019 | Reality Based De-escalation Training | *** None *** | ✓ | P | | 06:00 |
| -  -6685 | 08/01/2019 | Pursuit Driving Update | *** None *** | ✓ | P | | 02:00 |
| -  -6684 | 08/01/2019 | CIU Update & Incident Debrief | *** None *** | ✓ | P | | 04:00 |
| -  -6652 | 05/14/2019 | Less Lethal Training: Shotgun, Taser and FN303 | *** None *** | ✓ | P | | 04:00 |
| -  -6652 | 05/13/2019 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 06:00 |
| -  -6625 | 04/11/2019 | Arrest and Control Training | *** None *** | ✓ | P | | 08:00 |
| -  -6625 | 04/11/2019 | Peer Support | *** None *** | ✓ | P | | 02:00 |

Pleasanton Police Department

# Individual Training Activity

| Person: | **Chin, Jonathan  #C07-N09** | | | | | | (Continued) |

| Scheduled Training In:   **2019** | | | | | | | (Continued) |

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -   -6609 | 02/28/2019 | First Aid/CPR/BBP/ATD | CA-POST  -   -18 | ✓ | P | | 06:00 |
| -   -6609 | 02/28/2019 | Temporary Holding Facility | CA-POST  -   -18 | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2019 | Completed 15 of 15 Modules | | | | | | 75:00 |

| Scheduled Training In:   **2018** | | | | | | | |

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -   -6485 | 11/06/2018 | The Ultimate Training Officer | *** None *** | ✓ | P | | 16:00 |
| -   -6516 | 10/22/2018 | Range Training and Department Qualifications | CA-POST  -   -18 | ✓ | P | | 10:00 |
| -   -6475 | 08/27/2018 | Blue Courage | *** None *** | ✓ | P | | 10:00 |
| -   -6461 | 08/24/2018 | Bicycle Patrol | *** None *** | ✓ | P | | 24:00 |
| -   -6446 | 08/13/2018 | Driver Training-Simulator | *** None *** | ✓ | P | | 04:00 |
| -   -6434 | 08/02/2018 | Active Threat | *** None *** | ✓ | P | | 10:00 |
| -   -6399 | 05/07/2018 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 10:00 |
| -   -6374 | 04/12/2018 | Crowd Control | *** None *** | ✓ | P | | 05:00 |
| -   -6374 | 04/12/2018 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |
| -   -6374 | 04/12/2018 | Terrorism Liaison Officer | *** None *** | ✓ | P | | 02:00 |
| -   -6358 | 03/13/2018 | Crowd Control | *** None *** | ✓ | P | | 05:00 |
| -   -6358 | 03/12/2018 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |
| -   -6358 | 03/12/2018 | Terrorism Liaison Officer | *** None *** | ✓ | P | | 02:00 |
| -   -6302 | 02/09/2018 | Field Training Officer | CA-POST 5590-31725-17003 | ✓ | P | | 40:00 |
| -   -6328 | 01/22/2018 | First Aid/CPR/BBP/ATD | *** None *** | ✓ | P | | 06:00 |
| -   -6328 | 01/22/2018 | Temporary Holding Facility | *** None *** | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2018 | Completed 16 of 16 Modules | | | | | | 152:00 |

| Scheduled Training In:   **2017** | | | | | | | |

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -   -6297 | 11/13/2017 | Range Qualifications | *** None *** | ✓ | P | | 03:00 |
| -   -6297 | 11/13/2017 | Taser, Less Lethal and WRAP | *** None *** | ✓ | P | | 03:00 |
| -   -6297 | 11/13/2017 | Defensive Tactics/Impact Weapons | *** None *** | ✓ | P | | 04:00 |
| -   -6273 | 10/19/2017 | Active Shooter Update | *** None *** | ✓ | P | | 05:00 |
| -   -6273 | 10/19/2017 | CIT Update | *** None *** | ✓ | P | | 05:00 |
| -   -6262 | 09/18/2017 | Active Threat | *** None *** | ✓ | P | | 06:00 |

Pleasanton Police Department

## Individual Training Activity

05/27/2020                                                                                    Page 80 of 462 pages

| Person: | **Chin, Jonathan  #C07-N09** | | | | | (Continued) |

| Scheduled Training In: | **2017** | | | | (Continued) |

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - -6211 | 08/24/2017 | Human Trafficking | *** None *** | ✓ | P | | 03:00 |
| - -6211 | 08/24/2017 | Traffic Enforcement Advanced Officer Training | *** None *** | ✓ | P | | 02:00 |
| - -6211 | 08/24/2017 | CIU Advanced Officer Training | *** None *** | ✓ | P | | 05:00 |
| - -6202 | 05/15/2017 | Monthly Departmental Training | *** None *** | ✓ | P | | 10:00 |
| - -6165 | 04/27/2017 | Principled Policing | *** None *** | ✓ | P | | 10:00 |
| - -6138 | 02/14/2017 | Search Warrants A-Z | *** None *** | ✓ | P | | 16:00 |
| - -6133 | 01/31/2017 | Cell Phone Investigations | *** None *** | ✓ | P | | 16:00 |
| - -6128 | 01/23/2017 | First Aid/CPR Refresher | CA-POST 6000-21771-16001 | ✓ | P | | 06:00 |
| - -6128 | 01/23/2017 | Court and Temporary Holding Facility | CA-POST 6000-30780-16001 | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2017 | Completed 15 of 15 Modules | | | | | 98:00 |

| Scheduled Training In: | **2016** | | | | |

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - -6157 | 12/16/2016 | Preventing Workplace Harassment | *** None *** | ✓ | P | | 02:00 |
| - -6033 | 12/05/2016 | Evoc Basic Skills Update | CA-POST 1010-21155-16049 | | P | | 08:00 |
| - -6088 | 11/17/2016 | Monthly Departmental Training | *** None *** | ✓ | P | | 10:00 |
| - -6054 | 09/29/2016 | Crowd Control | *** None *** | ✓ | P | | 04:00 |
| - -6054 | 09/29/2016 | YCSU Presentation | *** None *** | ✓ | P | | 01:00 |
| - -6054 | 09/29/2016 | Monthly Departmental Training | *** None *** | ✓ | P | | 05:00 |
| - -6016 | 08/11/2016 | Active Shooter | *** None *** | ✓ | P | | 10:00 |
| - -5988 | 06/30/2016 | POST Pursuit Driving Update | CA-POST 6000-29000-15001 | ✓ | P | | 02:00 |
| - -5990 | 06/16/2016 | Firearms (Psp) | CA-POST 6000-29501-15002 | ✓ | P | | 10:00 |
| - -5990 | 06/16/2016 | POST Pursuit Driving Update | CA-POST 6000-29000-15002 | ✓ | P | | 01:00 |
| - -5995 | 06/03/2016 | Crime Scene & Forensic Photography | CA-POST 2540-31684-15002 | ✓ | P | | 24:00 |
| - -5987 | 05/20/2016 | ICI Sexual Assault Investigation | CA-POST 2540-33430-15004 | ✓ | P | | 40:00 |
| - -5950 | 04/21/2016 | Defensive Tactics / Ground Control | CA-POST 6000-30780-15004 | ✓ | P | | 05:00 |
| - -5950 | 04/21/2016 | Court and Temporary Holding Facility | CA-POST 6000-30780-15002 | ✓ | P | | 04:00 |

Pleasanton Police Department

# Individual Training Activity

| Person: | Chin, Jonathan #C07-N09 | | | | | | (Continued) |
|---|---|---|---|---|---|---|---|

| Scheduled Training In: | 2016 | | | | | | (Continued) |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - -5950 | 04/21/2016 | Below 100 | *** None *** | ✓ | P | | 01:00 |
| - -5915 | 02/12/2016 | ICI Child Abuse Investigations | CA-POST 2540-32340-15002 | ✓ | P | | 40:00 |
| - -5893 | 01/25/2016 | Trauma Training | *** None *** | ✓ | P | | 04:00 |
| - -5893 | 01/25/2016 | First Aid/ BBP | CA-POST 6000-21771-15001 | ✓ | P | | 04:00 |
| - -5893 | 01/25/2016 | PPD Animal Services | *** None *** | ✓ | P | | 02:00 |
| **Totals For Training Completed in: 2016** | | Completed 19 of 19 Modules | | | | | **177:00** |

| Scheduled Training In: | 2015 | | | | | | |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - -5868 | 12/03/2015 | Department Firearms Qualifications | *** None *** | ✓ | P | | 02:00 |
| - -5868 | 12/03/2015 | Electronic Weapons Update (Taser) | CA-POST 6000-23093-15 | ✓ | P | | 04:00 |
| - -5868 | 12/03/2015 | Arrest & Control PSP | CA-POST 6000-29503-15 | ✓ | P | | 04:00 |
| - -6158 | 09/01/2015 | CLETS Access (Test) | *** None *** | ✓ | P | | 01:00 |
| - -5838 | 09/01/2015 | Response to Criminal Mass Casualty Incidents | *** None *** | ✓ | P | | 10:00 |
| - -5813 | 08/13/2015 | Stinger Spike Strips | *** None *** | ✓ | P | | 03:00 |
| - -5813 | 08/13/2015 | Peer Support | *** None *** | ✓ | P | | 02:00 |
| - -5813 | 08/13/2015 | POST Pursuit Driving Update | *** None *** | ✓ | P | | 01:00 |
| - -5813 | 08/13/2015 | Traffic Unit | *** None *** | ✓ | P | | 02:00 |
| - -5813 | 08/13/2015 | Branding | *** None *** | ✓ | P | | 02:00 |
| - -5784 | 06/18/2015 | Firearms (Psp) | CA-POST 6000-29501-14005 | ✓ | P | | 10:30 |
| - -5794 | 06/17/2015 | Law Enforcement Tactical Lifesaver | *** None *** | ✓ | P | | 08:00 |
| - -5749 | 04/24/2015 | ICI Officer Involved Shooting and Force Investigations | CA-POST 2540-22450-14004 | ✓ | P | | 40:00 |
| - -5740 | 04/06/2015 | Law Enforcement Tactical Lifesaver | *** None *** | ✓ | P | | 08:00 |
| - -5762 | 04/02/2015 | Basic CMS | *** None *** | ✓ | P | | 02:00 |
| - -5754 | 03/23/2015 | CIU Advanced Officer Training | *** None *** | ✓ | P | | 06:30 |
| - -5754 | 03/23/2015 | Patrol Canine Training | *** None *** | ✓ | P | | 03:00 |
| - -5695 | 01/26/2015 | Human Trafficking | CA-POST | ✓ | P | | 02:00 |
| - -5695 | 01/26/2015 | CPR/AED/BBP | CA-POST 6000-21771-14 | ✓ | P | | 04:00 |
| - -5695 | 01/26/2015 | Jail Operations | CA-POST 6000-30780-14 | ✓ | P | | 04:00 |
| **Totals For Training Completed in: 2015** | | Completed 20 of 20 Modules | | | | | **119:00** |

Pleasanton Police Department

# Individual Training Activity

05/27/2020

| Person: | **Chin, Jonathan  #C07-N09** | (Continued) |
|---|---|---|

| Scheduled Training In: | **2014** |
|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5571 | 12/12/2014 | ICI Homicide Course | CA-POST 2540-31921-14003 | ✓ | P | | 80:00 |
| -  -5637 | 11/17/2014 | Firearm (PSP) | CA-POST 6000-29501-14004 | ✓ | P | | 05:00 |
| -  -5645 | 11/17/2014 | Department Firearms Qualifications | *** None *** | ✓ | P | | 02:00 |
| -  -5645 | 11/17/2014 | Taser Update & Qual | *** None *** | ✓ | P | | 01:30 |
| -  -5645 | 11/17/2014 | Defensive Tactics | *** None *** | ✓ | P | | 01:30 |
| -  -5632 | 10/30/2014 | POST Driver Training Update - Simulator | *** None *** | ✓ | P | | 04:00 |
| -  -5615 | 10/24/2014 | ICI Financial Crimes | CA-POST 2540-30610-14001 | ✓ | P | | 40:00 |
| -  -5612 | 10/10/2014 | Bicycle Patrol Instructor | CA-POST 2310-23830-14001 | ✓ | P | | 40:00 |
| -  -5599 | 09/22/2014 | Chasing Cell Phones | *** None *** | ✓ | P | | 06:00 |
| -  -5599 | 09/22/2014 | Slow Speed Driving | *** None *** | ✓ | P | | 04:00 |
| -  -5562 | 07/10/2014 | Digital Imaging and Video Recovery Team | *** None *** | ✓ | P | | 24:00 |
| -  -5550 | 06/26/2014 | Active Shooter / Fire Rescue Task Force Training | *** None *** | ✓ | P | | 10:00 |
| -  -5538 | 06/13/2014 | ICI Core Course | CA-POST 2540-26000-13004 | ✓ | P | | 80:00 |
| -  -5533 | 05/08/2014 | FIrearms Qualifications (rifle/pistol/less lethal) | *** None *** | ✓ | P | | 10:00 |
| -  -5498 | 04/10/2014 | Pursuit Driving Update | *** None *** | ✓ | P | | 01:00 |
| -  -5498 | 04/10/2014 | Court & Temporary Holding Facility | CA-POST 6000-30780-13002 | ✓ | P | | 04:00 |
| -  -5498 | 04/10/2014 | Hide it, Lock it or Lose it | *** None *** | ✓ | P | | 01:00 |
| -  -5498 | 04/10/2014 | First Aid | CA-POST 6000-21771-13002 | ✓ | P | | 04:00 |
| -  -5466 | 02/20/2014 | OIS Peer Support | *** None *** | ✓ | P | | 02:00 |
| -  -5466 | 02/20/2014 | OIS Investigations | *** None *** | ✓ | P | | 03:00 |
| -  -5466 | 02/20/2014 | Officer Involved Shootings | *** None *** | ✓ | P | | 04:30 |
| -  -5466 | 02/20/2014 | Mothers with a Purpose | *** None *** | ✓ | P | | 00:30 |
| -  -5469 | 02/04/2014 | Chasing Cell Phones | CA-POST 8790-20447-13001 | ✓ | P | | 08:00 |

| Totals For Training Completed in: 2014 | Completed 23 of 23 Modules | 336:00 |
|---|---|---|

Pleasanton Police Department

# Individual Training Activity

05/27/2020                                                                                    Page 83 of 462 pages

| Person: | **Chin, Jonathan  #C07-N09** | (Continued) |
|---|---|---|

| Scheduled Training In: | **2013** |
|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5418 | 10/31/2013 | Bicycle Patrol Instructor | CA-POST 2330-23830-13001 | ✓ | P | | 40:00 |
| -  -5392 | 09/26/2013 | Crisis Intervention Training (CIT) | CA-POST 2010-20801-13002 | ✓ | P | | 38:00 |
| -  -5357 | 06/25/2013 | Arrest and Control (Psp) | CA-POST 6000-29503-12003 | ✓ | P | | 04:00 |
| -  -5357 | 06/25/2013 | District Attorney Update | CA-POST | ✓ | P | | 02:00 |
| -  -5357 | 06/25/2013 | Taser Update | CA-POST 6000-23093-12002 | ✓ | P | | 04:00 |
| -  -5357 | 06/24/2013 | First Aid CPR AED Update | CA-POST 6000-21771-12003 | ✓ | P | | 05:00 |
| -  -5357 | 06/24/2013 | Court & Temporary Holding Facility | CA-POST 6000-30780-12003 | ✓ | P | | 04:00 |
| -  -5357 | 06/22/2013 | Active Shooter Update | CA-POST | ✓ | P | | 10:00 |
| **Totals For Training Completed in: 2013** | | Completed 8 of 8 Modules | | | | | 107:00 |

| Scheduled Training In: | **2012** |
|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5247 | 12/14/2012 | LIDAR Operator | CA-POST 2540-23320-12002 | ✓ | P | | 08:00 |
| -  -5247 | 12/13/2012 | Radar Operator | CA-POST 2540-23300-12002 | ✓ | P | | 24:00 |
| -  -5118 | 06/15/2012 | Evoc Basic Skills Update | CA-POST 1010-21155-11063 | ✓ | P | | 08:00 |
| -  -5118 | 06/14/2012 | Firearms (Psp) | CA-POST 6000-29501-11002 | ✓ | P | | 04:00 |
| -  -5118 | 06/14/2012 | Calico Center Training | CA-POST -  -11 | ✓ | P | | 02:00 |
| -  -5118 | 06/14/2012 | Racial Profiling Update | CA-POST 6000-29000-11176 | ✓ | P | | 02:00 |
| -  -5118 | 06/13/2012 | First Aid CPR AED Update | CA-POST 6000-21771-11003 | ✓ | P | | 04:00 |
| -  -5118 | 06/13/2012 | Consolidated Records Information Management System | CA-POST -  -11 | ✓ | P | | 02:00 |
| -  -5118 | 06/13/2012 | Court & Temporary Holding Facility | CA-POST 6000-30780-11003 | ✓ | P | | 04:00 |
| -  -5109 | 03/08/2012 | Prison Gangs/Street Gangs & Drugs | CA-POST 8790-23200-11001 | ✓ | P | | 08:00 |

Pleasanton Police Department

## Individual Training Activity

05/27/2020                                                                          Page 84 of 462 pages

| Person: | **Chin, Jonathan  #C07-N09** | | | | (Continued) |
|---|---|---|---|---|---|

| Scheduled Training In:   2012 | | | | | (Continued) |
|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5076 | 03/01/2012 | Traffic Collision Investigation Basic | CA-POST 5590-33590-11005 | ✓ | P | | 40:00 |
| -  -5097 | 02/23/2012 | Outlaw Motorcycle Gangs Intelligence Update | CA-POST 8790-23250-11005 | ✓ | P | | 08:00 |

| Totals For Training Completed in: 2012 | Completed 12 of 12 Modules | | | | 114:00 |
|---|---|---|---|---|---|

| Scheduled Training In:   2011 | | | | | |
|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -4986 | 07/05/2011 | Clets Less Than Full Access (Test) | *** None *** | ✓ | P | | 01:00 |
| -  -4937 | 06/21/2011 | Electronic Weapons Update (Taser) | CA-POST 6000-23093-10005 | ✓ | P | | 04:00 |
| -  -4937 | 06/21/2011 | Arrest and Control (Psp) | CA-POST 6000-29503-10005 | ✓ | P | | 04:00 |
| -  -4937 | 06/21/2011 | Court & Temporary Holding Facility | CA-POST 6000-30780-10004 | ✓ | P | | 04:00 |
| -  -4937 | 06/21/2011 | LPFD Incident Command | CA-POST -  -10 | ✓ | P | | 02:00 |
| -  -4937 | 06/20/2011 | Pursuit Driving Update | CA-POST 6000-29000-1000 | ✓ | P | | 02:00 |
| -  -4937 | 06/20/2011 | First Aid | CA-POST 6000-21771-10004 | ✓ | P | | 04:00 |
| -  -4899 | 05/20/2011 | Driving Under the Influence Seminar | CA-POST 1010-20290-10003 | ✓ | P | | 24:00 |
| -  -4893 | 05/04/2011 | Bicycle Patrol Update | CA-POST 6000-23820-10002 | ✓ | P | | 10:00 |

| Totals For Training Completed in: 2011 | Completed 9 of 9 Modules | | | | 55:00 |
|---|---|---|---|---|---|
| Totals For: Chin, Jonathan  #C07-N09 | Completed 141 of 141 Modules | | | | 1,313:00 |

PPD000996

Pleasanton Police Department

# Individual Training Activity

| Person: | Knight, Jason  #B87-P69 |
|---|---|

### Personal
| | |
|---|---|
| Agency: | Pleasanton Police Department |
| ID #: | B87-P69 |

### Employment
| Property | Value | From | Through |
|---|---|---|---|
| Active Status: | Active | 12/06/2004 | / / |
| Duty Status: | Full Duty | 12/06/2004 | / / |
| Time Status: | Full Time | 12/06/2004 | / / |
| Rank: | Police Sergeant | 03/15/2017 | / / |
| Work Unit: | Patrol Bureau | 03/15/2017 | / / |
| Station: | Headquarters Station | 12/06/2004 | / / |
| Division: | Operations | 03/15/2017 | / / |

### Scheduled Training In:   2020

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6795 | 03/24/2020 | Animal Care Conference | *** None *** | ✓ | P | | 32:00 |
| -  -6771 | 01/27/2020 | Building Searches/High Risk Stops/ARV | *** None *** | ✓ | P | | 04:00 |
| -  -6771 | 01/27/2020 | Pursuit Driving Update | *** None *** | ✓ | P | | 02:00 |
| -  -6771 | 01/27/2020 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |

| Totals For Training Completed in: 2020 | Completed 4 of 4 Modules | 40:00 |
|---|---|---|

### Scheduled Training In:   2019

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6738 | 12/31/2019 | Pursuit Driving Update | *** None *** | ✓ | P | | 02:00 |
| -  -6752 | 12/31/2019 | AB 392 Use of Force Update | *** None *** | ✓ | P | | 02:00 |
| -  -6726 | 10/28/2019 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 08:00 |
| -  -6726 | 10/28/2019 | Gracie Survival Tactics | *** None *** | ✓ | P | | 02:00 |
| -  -6618 | 10/03/2019 | InTime University | *** None *** | ✓ | P | | 32:00 |
| -  -6705 | 09/09/2019 | Crisis Intervention Training (CIT) Update | *** None *** | ✓ | P | | 10:00 |
| -  -6678 | 07/22/2019 | Reality Based De-escalation Training | *** None *** | ✓ | P | | 06:00 |
| -  -6679 | 07/22/2019 | Pursuit Driving Update | *** None *** | ✓ | P | | 02:00 |
| -  -6678 | 07/22/2019 | CIU Update & Incident Debrief | *** None *** | ✓ | P | | 04:00 |
| -  -6635 | 06/28/2019 | Echelon Front | *** None *** | ✓ | P | | 08:00 |
| -  -6652 | 05/14/2019 | Less Lethal Training: Shotgun, Taser and FN303 | *** None *** | ✓ | P | | 04:00 |
| -  -6652 | 05/13/2019 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 06:00 |
| -  -6625 | 04/11/2019 | Arrest and Control Training | *** None *** | ✓ | P | | 08:00 |

Pleasanton Police Department

# Individual Training Activity

| Person: | **Knight, Jason  #B87-P69** | | | (Continued) |
| --- | --- | --- | --- | --- |

| Scheduled Training In: | **2019** | | | (Continued) |
| --- | --- | --- | --- | --- |

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
| --- | --- | --- | --- | --- | --- | --- | --- |
| -  -6625 | 04/11/2019 | Peer Support | *** None *** | ✓ | P | | 02:00 |
| -  -6613 | 03/11/2019 | Arrest and Control Training | CA-POST -  -18 | ✓ | P | | 08:00 |
| -  -6613 | 03/11/2019 | Peer Support | CA-POST -  -18 | ✓ | P | | 02:00 |
| -  -6592 | 01/29/2019 | First Aid/CPR/BBP/ATD | CA-POST -  -18 | ✓ | P | | 06:00 |
| -  -6592 | 01/28/2019 | Temporary Holding Facility | CA-POST -  -18 | ✓ | P | | 04:00 |
| -  -6540 | 01/08/2019 | Emotional Survival for Law Enforcement | *** None *** | ✓ | P | | 08:00 |

| Totals For Training Completed in: 2019 | Completed 19 of 19 Modules | | 124:00 |
| --- | --- | --- | --- |

| Scheduled Training In: | **2018** |
| --- | --- |

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
| --- | --- | --- | --- | --- | --- | --- | --- |
| -  -6527 | 12/14/2018 | Current Heroin Threat | *** None *** | ✓ | P | | 07:00 |
| -  -6550 | 11/29/2018 | Pursuit Driving Update | CA-POST -  -18 | ✓ | P | | 02:00 |
| -  -6516 | 10/22/2018 | Range Training and Department Qualifications | CA-POST -  -18 | ✓ | P | | 10:00 |
| -  -6419 | 10/04/2018 | WSPCA Working Dog Conference | *** None *** | ✓ | P | | 32:00 |
| -  -6475 | 08/27/2018 | Blue Courage | *** None *** | ✓ | P | | 10:00 |
| -  -6433 | 07/16/2018 | Active Threat | *** None *** | ✓ | P | | 10:00 |
| -  -6432 | 07/13/2018 | Driver Training-Simulator | CA-POST 1010-20985-18007 | ✓ | P | | 04:00 |
| -  -6390 | 06/28/2018 | Use of Force Investigation | *** None *** | ✓ | P | | 08:00 |
| -  -6399 | 05/07/2018 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 10:00 |
| -  -6340 | 04/26/2018 | K9 Unit Supervisor | *** None *** | ✓ | P | | 24:00 |
| -  -6374 | 04/12/2018 | Crowd Control | *** None *** | ✓ | P | | 05:00 |
| -  -6374 | 04/12/2018 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |
| -  -6374 | 04/12/2018 | Terrorism Liaison Officer | *** None *** | ✓ | P | | 02:00 |
| -  -6350 | 03/14/2018 | The Bulletproof Mind - Lecture | *** None *** | ✓ | P | | 08:00 |
| -  -6346 | 02/23/2018 | First Aid/CPR/BBP/ATD | *** None *** | ✓ | P | | 05:00 |
| -  -6346 | 02/22/2018 | Temporary Holding Facility | *** None *** | ✓ | P | | 05:00 |
| -  -6334 | 02/13/2018 | The Fight After the Fight | *** None *** | ✓ | P | | 08:00 |
| -  -6234 | 02/02/2018 | Supervisory Course | CA-POST 1010-00400-17004 | ✓ | P | | 80:00 |

| Totals For Training Completed in: 2018 | Completed 18 of 18 Modules | | 232:00 |
| --- | --- | --- | --- |

Pleasanton Police Department

# Individual Training Activity

| Person: | **Knight, Jason  #B87-P69** | | | | (Continued) |

**Scheduled Training In:   2017**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6307 | 12/19/2017 | Leadership Training | *** None *** | ✓ | P | | 08:00 |
| -  -6305 | 12/14/2017 | Range Qualifications | *** None *** | ✓ | P | | 03:00 |
| -  -6305 | 12/14/2017 | Taser, Less Lethal and WRAP | *** None *** | ✓ | P | | 03:00 |
| -  -6305 | 12/14/2017 | Defensive Tactics/Impact Weapons | *** None *** | ✓ | P | | 04:00 |
| -  -6279 | 12/06/2017 | Internal Affairs Inv. | CA-POST 1010-32100-17002 | ✓ | P | | 24:00 |
| -  -6262 | 09/18/2017 | Active Threat | *** None *** | ✓ | P | | 06:00 |
| -  -6262 | 09/18/2017 | CIT Update | *** None *** | ✓ | P | | 04:00 |
| -  -6210 | 07/24/2017 | Human Trafficking | *** None *** | ✓ | P | | 03:00 |
| -  -6210 | 07/24/2017 | Traffic Enforcement Advanced Officer Training | *** None *** | ✓ | P | | 02:00 |
| -  -6210 | 07/24/2017 | CIU Advanced Officer Training | *** None *** | ✓ | P | | 05:00 |
| -  -6206 | 06/30/2017 | Firearms Transition Qualification | *** None *** | ✓ | P | | 04:00 |
| -  -6135 | 05/23/2017 | Leadership Development Program | *** None *** | ✓ | P | | 72:00 |
| -  -6202 | 05/15/2017 | Monthly Departmental Training | *** None *** | ✓ | P | | 10:00 |
| -  -6173 | 05/03/2017 | Critical Incident Response for Managers and Supervisors | CA-POST 2540-10342-16001 | ✓ | P | | 24:00 |
| -  -6164 | 03/20/2017 | Principled Policing | *** None *** | ✓ | P | | 10:00 |
| -  -6130 | 02/28/2017 | San Bernardino Terrorist Shooting Incident Debrief | *** None *** | ✓ | P | | 05:00 |
| -  -6128 | 01/23/2017 | First Aid/CPR Refresher | CA-POST 6000-21771-16001 | ✓ | P | | 06:00 |
| -  -6128 | 01/23/2017 | Court and Temporary Holding Facility | CA-POST 6000-30780-16001 | ✓ | P | | 04:00 |

| **Totals For Training Completed in: 2017** | Completed 18 of 18 Modules | | | | | | 197:00 |

**Scheduled Training In:   2016**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6157 | 12/16/2016 | Preventing Workplace Harassment | *** None *** | ✓ | P | | 02:00 |
| -  -6100 | 12/12/2016 | Legislative Update 2017 | CA-POST 9100-20010-16008 | ✓ | P | | 04:00 |
| -  -6096 | 11/07/2016 | Making the Transition to Leadership: "From Buddy to Boss" | *** None *** | ✓ | P | | 06:30 |
| -  -6087 | 10/24/2016 | Monthly Departmental Training | *** None *** | ✓ | P | | 10:00 |
| -  -6033 | 09/16/2016 | Evoc Basic Skills Update | CA-POST 1010-21155-16018 | ✓ | P | | 08:00 |
| -  -6049 | 08/29/2016 | YCSU Presentation | *** None *** | ✓ | P | | 01:00 |

Pleasanton Police Department

# Individual Training Activity

| Person: | **Knight, Jason  #B87-P69** | (Continued) |
|---|---|---|

| Scheduled Training In:   **2016** | | (Continued) |
|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6049 | 08/29/2016 | OIS Presentation | *** None *** | ✓ | P | | 05:00 |
| -  -5988 | 06/30/2016 | POST Pursuit Driving Update | CA-POST 6000-29000-15001 | ✓ | P | | 02:00 |
| -  -6010 | 06/29/2016 | Terrorism Liaison Officer Basic | *** None *** | ✓ | P | | 08:00 |
| -  -5990 | 06/16/2016 | Firearms (Psp) | CA-POST 6000-29501-15002 | ✓ | P | | 10:00 |
| -  -5990 | 06/16/2016 | POST Pursuit Driving Update | CA-POST 6000-29000-15002 | ✓ | P | | 01:00 |
| -  -5997 | 06/09/2016 | Training Manager | CA-POST 2980-41520-15003 | ✓ | P | | 24:00 |
| -  -5975 | 05/25/2016 | Law Enforcement Prevention & Deterrence of Terrorist Acts | *** None *** | ✓ | P | | 16:00 |
| -  -5989 | 05/16/2016 | Firearms (Psp) | CA-POST 6000-29501-15001 | ✓ | P | | 10:00 |
| -  -5989 | 05/16/2016 | POST Pursuit Driving Update | CA-POST 6000-29000-15001 | ✓ | P | | 01:00 |
| -  -5981 | 05/11/2016 | File That!  Best Practices for Document and Record Management | *** None *** | ✓ | P | | 03:00 |
| -  -5980 | 05/11/2016 | Legal Issues Regarding Hiring | *** None *** | ✓ | P | | 03:00 |
| -  -5927 | 04/21/2016 | Dorner (Tactical) Incident Debrief / Critical Legal Issues | CA-POST 2540-12514-15003 | ✓ | P | | 08:00 |
| -  -5949 | 03/21/2016 | Below 100 | *** None *** | ✓ | P | | 01:00 |
| -  -5949 | 03/21/2016 | Court and Temporary Holding Facility | CA-POST 6000-30780-15001 | ✓ | P | | 04:00 |
| -  -5949 | 03/21/2016 | Defensive Tactics / Ground Control | CA-POST 6000-29503-15003 | ✓ | P | | 05:00 |
| -  -5920 | 02/26/2016 | Advanced Threat Assessment | *** None *** | ✓ | P | | 16:00 |
| -  -5893 | 01/25/2016 | Trauma Training | *** None *** | ✓ | P | | 04:00 |
| -  -5893 | 01/25/2016 | First Aid/ BBP | CA-POST 6000-21771-15001 | ✓ | P | | 04:00 |
| -  -5893 | 01/25/2016 | PPD Animal Services | *** None *** | ✓ | P | | 02:00 |

| Totals For Training Completed in: 2016 | Completed 25 of 25 Modules | 158:30 |
|---|---|---|

| Scheduled Training In:   **2015** | |
|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5873 | 12/14/2015 | Legislative Update 2016 | CA-POST 9100-20010-15001 | ✓ | P | | 04:00 |

Pleasanton Police Department

# Individual Training Activity

05/27/2020

| Person: | **Knight, Jason  #B87-P69** | | (Continued) |

| Scheduled Training In:   **2015** | | | (Continued) |

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5867 | 11/02/2015 | Department Firearms Qualifications | CA-POST<br>-    -15 | ✓ | P | | 02:00 |
| -  -5867 | 11/02/2015 | Electronic Weapons Update (Taser) | CA-POST<br>6000-23093-15 | ✓ | P | | 04:00 |
| -  -5867 | 11/02/2015 | Arrest & Control PSP | CA-POST<br>6000-29503-15 | ✓ | P | | 04:00 |
| -  -5839 | 10/09/2015 | Response to Criminal Mass Casualty Incidents | *** None *** | ✓ | P | | 10:00 |
| -  -6158 | 09/01/2015 | CLETS Access (Test) | *** None *** | ✓ | P | | 01:00 |
| -  -5812 | 07/13/2015 | Stinger Spike Strips | *** None *** | ✓ | P | | 03:00 |
| -  -5812 | 07/13/2015 | Peer Support | *** None *** | ✓ | P | | 02:00 |
| -  -5812 | 07/13/2015 | POST Pursuit Driving Update | *** None *** | ✓ | P | | 01:00 |
| -  -5812 | 07/13/2015 | Traffic Unit | *** None *** | ✓ | P | | 02:00 |
| -  -5812 | 07/13/2015 | Branding | *** None *** | ✓ | P | | 02:00 |
| -  -5783 | 05/18/2015 | Firearms (Psp) | CA-POST<br>6000-29501-14004 | ✓ | P | | 10:30 |
| -  -5773 | 05/07/2015 | Assertive Supervision | CA-POST<br>9750-12100-14020 | ✓ | P | | 24:00 |
| -  -5763 | 04/15/2015 | Mobile ID Devices | *** None *** | ✓ | P | | 01:30 |
| -  -5754 | 03/23/2015 | CIU Advanced Officer Training | *** None *** | ✓ | P | | 06:30 |
| -  -5754 | 03/23/2015 | Patrol Canine Training | *** None *** | ✓ | P | | 03:00 |
| -  -5695 | 01/26/2015 | Human Trafficking | CA-POST | ✓ | P | | 02:00 |
| -  -5695 | 01/26/2015 | CPR/AED/BBP | CA-POST<br>6000-21771-14 | ✓ | P | | 04:00 |
| -  -5695 | 01/26/2015 | Jail Operations | CA-POST<br>6000-30780-14 | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2015 | Completed 19 of 19 Modules | | 90:30 |

| Scheduled Training In:   **2014** | | |

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5645 | 11/17/2014 | Department Firearms Qualifications | *** None *** | ✓ | P | | 02:00 |
| -  -5645 | 11/17/2014 | Taser Update & Qual | *** None *** | ✓ | P | | 01:30 |
| -  -5645 | 11/17/2014 | Defensive Tactics | *** None *** | ✓ | P | | 01:30 |
| -  -5637 | 11/17/2014 | Firearm (PSP) | CA-POST<br>6000-29501-14003 | ✓ | P | | 05:00 |
| -  -5629 | 10/17/2014 | POST Driver Training Update - Simulator | *** None *** | ✓ | P | | 04:00 |
| -  -5585 | 09/25/2014 | Crisis Intervention Training (CIT) | CA-POST<br>2010-20801-14001 | ✓ | P | | 38:00 |

Pleasanton Police Department

# Individual Training Activity

| Person: | Knight, Jason  #B87-P69 | | | (Continued) |
|---------|------------------------|--|--|-------------|

| Scheduled Training In: | 2014 | (Continued) |
|------------------------|------|-------------|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|-------|-------|---------|---------------|--------|-------|-------|-----------|
| -  -5599 | 09/22/2014 | Chasing Cell Phones | *** None *** | ✓ | P | | 06:00 |
| -  -5599 | 09/22/2014 | Slow Speed Driving | *** None *** | ✓ | P | | 04:00 |
| -  -5568 | 08/08/2014 | New World Mobile Enterprise Training | *** None *** | ✓ | P | | 04:00 |
| -  -5552 | 07/28/2014 | Active Shooter / Fire Rescue Task Force Training | *** None *** | ✓ | P | | 10:00 |
| -  -5534 | 05/26/2014 | FIrearms Qualifications (rifle/pistol/less lethal) | *** None *** | ✓ | P | | 10:00 |
| -  -5497 | 03/10/2014 | Pursuit Driving Update | *** None *** | ✓ | P | | 01:00 |
| -  -5497 | 03/10/2014 | Court & Temporary Holding Facility | CA-POST 6000-30780-13002 | ✓ | P | | 04:00 |
| -  -5497 | 03/10/2014 | Hide it, Lock it or Lose it | *** None *** | ✓ | P | | 01:00 |
| -  -5497 | 03/10/2014 | First Aid | CA-POST 6000-21771-13002 | ✓ | P | | 04:00 |
| -  -5464 | 01/27/2014 | OIS Peer Support | *** None *** | ✓ | P | | 02:00 |
| -  -5464 | 01/27/2014 | OIS Investigations | *** None *** | ✓ | P | | 03:00 |
| -  -5464 | 01/27/2014 | Officer Involved Shootings | *** None *** | ✓ | P | | 04:30 |
| -  -5464 | 01/27/2014 | Mothers with a Purpose | *** None *** | ✓ | P | | 00:30 |

| Totals For Training Completed in: 2014 | Completed 19 of 19 Modules | | 106:00 |
|----------------------------------------|----------------------------|--|--------|

| Scheduled Training In: | 2013 |
|------------------------|------|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|-------|-------|---------|---------------|--------|-------|-------|-----------|
| -  -5356 | 06/21/2013 | Active Shooter Update | CA-POST | ✓ | P | | 10:00 |
| -  -5356 | 06/20/2013 | Arrest and Control (Psp) | CA-POST 6000-29503-12002 | ✓ | P | | 04:00 |
| -  -5356 | 06/20/2013 | Taser Update | CA-POST 6000-23093-12001 | ✓ | P | | 04:00 |
| -  -5356 | 06/20/2013 | District Attorney Update | CA-POST | ✓ | P | | 02:00 |
| -  -5356 | 06/19/2013 | First Aid CPR AED Update | CA-POST 6000-21771-12002 | ✓ | P | | 05:00 |
| -  -5356 | 06/19/2013 | Court & Temporary Holding Facility | CA-POST 6000-30780-12002 | ✓ | P | | 04:00 |
| -  -5345 | 05/13/2013 | From 911 Call to Clearing the Call, How Below 100 Saves Lives | CA-POST 1042-28389-12001 | ✓ | P | | 04:00 |
| -  -5309 | 04/19/2013 | Field Training Officer | CA-POST 2970-31725-12002 | ✓ | P | | 40:00 |

| Totals For Training Completed in: 2013 | Completed 8 of 8 Modules | | 73:00 |
|----------------------------------------|--------------------------|--|-------|

Pleasanton Police Department

# Individual Training Activity

05/27/2020

| Person: | Knight, Jason  #B87-P69 | | | (Continued) | | | |
|---|---|---|---|---|---|---|---|

**Scheduled Training In:  2012**

| TMS # | | Ended | Subject | Certification | Compl. | Grade | Score Tng. Time |
|---|---|---|---|---|---|---|---|
| - | -5117 | 06/06/2012 | Firearms (Psp) | CA-POST 6000-29501-11001 | ✓ | P | 04:00 |
| - | -5117 | 06/06/2012 | Calico Center Training | CA-POST -   -11 | ✓ | P | 02:00 |
| - | -5117 | 06/06/2012 | Racial Profiling Update | CA-POST 6000-29000-11176 | ✓ | P | 02:00 |
| - | -5117 | 06/05/2012 | First Aid CPR AED Update | CA-POST 6000-21771-11002 | ✓ | P | 04:00 |
| - | -5117 | 06/05/2012 | Consolidated Records Information Management System | CA-POST -   -11 | ✓ | P | 02:00 |
| - | -5117 | 06/05/2012 | Court & Temporary Holding Facility Training | CA-POST 6000-30780-11002 | ✓ | P | 04:00 |
| - | -5117 | 06/04/2012 | Evoc Basic Skills Update | CA-POST 1010-21155-11060 | ✓ | P | 08:00 |
| - | -5135 | 04/27/2012 | Traffic Collision Investigation Basic | CA-POST 5590-33590-11006 | ✓ | P | 40:00 |
| - | -5101 | 02/23/2012 | Cogent Mugshot System Training | *** None *** | ✓ | P | 04:00 |
| **Totals For Training Completed in: 2012** | | | **Completed 9 of 9 Modules** | | | | **70:00** |

**Scheduled Training In:  2011**

| TMS # | | Ended | Subject | Certification | Compl. | Grade | Score Tng. Time |
|---|---|---|---|---|---|---|---|
| - | -4967 | 09/16/2011 | Interview and Interrogation | CA-POST 9590-31445-1100 | ✓ | P | 40:00 |
| - | -4950 | 09/08/2011 | Taser Update | CA-POST 6000-23093-11001 | ✓ | P | 04:00 |
| - | -4950 | 09/08/2011 | Arrest and Control (Psp) | CA-POST 6000-29503-11001 | ✓ | P | 04:00 |
| - | -4950 | 09/08/2011 | LPFD Incident Command | CA-POST -   -11 | ✓ | P | 02:00 |
| - | -4950 | 09/07/2011 | Pursuit Driving Update | CA-POST 6000-29000-11001 | ✓ | P | 02:00 |
| - | -4950 | 09/07/2011 | First Aid | CA-POST 6000-21771-11001 | ✓ | P | 04:00 |
| - | -4950 | 09/07/2011 | Court & Temporary Holding Facility | CA-POST 6000-35780-11001 | ✓ | P | 04:00 |
| - | -4962 | 07/13/2011 | Cantu Debrief | *** None *** | ✓ | P | 03:30 |
| - | -4986 | 07/05/2011 | Clets Less Than Full Access (Test) | *** None *** | ✓ | P | 01:00 |
| **Totals For Training Completed in: 2011** | | | **Completed 9 of 9 Modules** | | | | **64:30** |
| **Totals For: Knight, Jason  #B87-P69** | | | **Completed 148 of 148 Modules** | | | | **1,155:30** |

Pleasanton Police Department

# Individual Training Activity

| Person: | Koumiss, Alex  #B49-E31 |
|---|---|

### Personal
| Agency: | Pleasanton Police Department |
|---|---|
| ID #: | B49-E31 |

### Employment
| Property | Value | From | Through |
|---|---|---|---|
| Active Status: | Active | 09/08/1997 | / / |
| Duty Status: | Full Duty | 09/08/1997 | / / |
| Time Status: | Full Time | 09/08/1997 | / / |
| Rank: | Police Officer | 09/08/1997 | / / |
| Work Unit: | Patrol Bureau | 09/08/1997 | / / |
| Station: | Headquarters Station | 09/08/1997 | / / |
| Division: | Operations | 09/08/1997 | / / |

**Scheduled Training In:   2020**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6772 | 02/27/2020 | Building Searches/High Risk Stops/ARV | *** None *** | ✓ | P | | 04:00 |
| -  -6772 | 02/27/2020 | Pursuit Driving Update | *** None *** | ✓ | P | | 02:00 |
| -  -6772 | 02/27/2020 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |
| **Totals For Training Completed in: 2020** | | **Completed 3 of 3 Modules** | | | | | **08:00** |

**Scheduled Training In:   2019**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6752 | 12/31/2019 | AB 392 Use of Force Update | *** None *** | ✓ | P | | 02:00 |
| -  -6706 | 10/10/2019 | Crisis Intervention Training (CIT) Update | *** None *** | ✓ | P | | 10:00 |
| -  -6684 | 08/01/2019 | Reality Based De-escalation Training | *** None *** | ✓ | P | | 06:00 |
| -  -6685 | 08/01/2019 | Pursuit Driving Update | *** None *** | ✓ | P | | 02:00 |
| -  -6684 | 08/01/2019 | CIU Update & Incident Debrief | *** None *** | ✓ | P | | 04:00 |
| -  -6665 | 06/13/2019 | Less Lethal Training: Shotgun, Taser and FN303 | *** None *** | ✓ | P | | 04:00 |
| -  -6665 | 06/13/2019 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 06:00 |
| -  -6625 | 04/11/2019 | Arrest and Control Training | *** None *** | ✓ | P | | 08:00 |
| -  -6625 | 04/11/2019 | Peer Support | *** None *** | ✓ | P | | 02:00 |
| -  -6623 | 03/08/2019 | FN 303 Operator | *** None *** | ✓ | P | | 02:00 |
| -  -6609 | 02/28/2019 | First Aid/CPR/BBP/ATD | CA-POST -  -18 | ✓ | P | | 06:00 |
| -  -6609 | 02/28/2019 | Temporary Holding Facility | CA-POST -  -18 | ✓ | P | | 04:00 |
| -  -6755 | 01/08/2019 | Survival Mindset for Street Cops and 1st Responders | *** None *** | ✓ | P | | 08:00 |
| **Totals For Training Completed in: 2019** | | **Completed 13 of 13 Modules** | | | | | **64:00** |

Pleasanton Police Department

# Individual Training Activity

05/27/2020                                                                              Page 221 of 462 pages

| Person: | Koumiss, Alex  #B49-E31 | | | (Continued) |

## Scheduled Training In:   2018

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6571 | 12/20/2018 | Range Training and Department Qualifications | CA-POST<br>-    -18 | ✓ | P | | 04:00 |
| -  -6553 | 12/06/2018 | Range Training and Department Qualifications | CA-POST<br>-    -18 | ✓ | P | | 10:00 |
| -  -6551 | 12/02/2018 | Pursuit Driving Update | CA-POST<br>-    -18 | ✓ | P | | 02:00 |
| -  -6476 | 09/27/2018 | Blue Courage | *** None *** | ✓ | P | | 10:00 |
| -  -6444 | 08/10/2018 | Driver Training-Simulator | *** None *** | ✓ | P | | 04:00 |
| -  -6433 | 07/16/2018 | Active Threat | *** None *** | ✓ | P | | 10:00 |
| -  -6338 | 07/11/2018 | Field Training Officer Update | CA-POST<br>2540-31715-19001 | ✓ | P | | 24:00 |
| -  -6399 | 05/07/2018 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 10:00 |
| -  -6369 | 04/18/2018 | 2018 Legal Update | *** None *** | ✓ | P | | 08:00 |
| -  -6374 | 04/12/2018 | Crowd Control | *** None *** | ✓ | P | | 05:00 |
| -  -6374 | 04/12/2018 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |
| -  -6374 | 04/12/2018 | Terrorism Liaison Officer | *** None *** | ✓ | P | | 02:00 |
| -  -6371 | 04/05/2018 | Use It, Write It, Tell It (Use of Force Report Writing) | *** None *** | ✓ | P | | 08:00 |
| -  -6346 | 02/23/2018 | First Aid/CPR/BBP/ATD | *** None *** | ✓ | P | | 05:00 |
| -  -6346 | 02/22/2018 | Temporary Holding Facility | *** None *** | ✓ | P | | 05:00 |
| -  -6299 | 01/04/2018 | Emotional Survival for Law Enforcement | *** None *** | ✓ | P | | 08:00 |

| Totals For Training Completed in: 2018 | Completed 16 of 16 Modules | 117:00 |

## Scheduled Training In:   2017

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6305 | 12/14/2017 | Range Qualifications | *** None *** | ✓ | P | | 03:00 |
| -  -6305 | 12/14/2017 | Taser, Less Lethal and WRAP | *** None *** | ✓ | P | | 03:00 |
| -  -6305 | 12/14/2017 | Defensive Tactics/Impact Weapons | *** None *** | ✓ | P | | 04:00 |
| -  -6262 | 09/18/2017 | Active Threat | *** None *** | ✓ | P | | 06:00 |
| -  -6262 | 09/18/2017 | CIT Update | *** None *** | ✓ | P | | 04:00 |
| -  -6210 | 07/24/2017 | Human Trafficking | *** None *** | ✓ | P | | 03:00 |
| -  -6210 | 07/24/2017 | Traffic Enforcement Advanced Officer Training | *** None *** | ✓ | P | | 02:00 |
| -  -6210 | 07/24/2017 | CIU Advanced Officer Training | *** None *** | ✓ | P | | 05:00 |
| -  -6206 | 06/30/2017 | Firearms Transition Qualification | *** None *** | ✓ | P | | 04:00 |
| -  -6166 | 06/06/2017 | FTO Adult Learning Techniques | CA-POST<br>9100-31722-16003 | ✓ | P | | 16:00 |

Pleasanton Police Department

# Individual Training Activity

05/27/2020                                                                          Page 222 of 462 pages

| Person: | **Koumiss, Alex  #B49-E31** | (Continued) |
|---|---|---|

| Scheduled Training In:   **2017** | (Continued) |
|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6202 | 05/15/2017 | Monthly Departmental Training | *** None *** | ✓ | P | | 10:00 |
| -  -6165 | 04/27/2017 | Principled Policing | *** None *** | ✓ | P | | 10:00 |
| -  -6129 | 02/23/2017 | First Aid/CPR Refresher | CA-POST 6000-21771-16002 | ✓ | P | | 06:00 |
| -  -6129 | 02/23/2017 | Court and Temporary Holding Facility | CA-POST 6000-30780-16002 | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2017 | Completed 14 of 14 Modules | 80:00 |
|---|---|---|

| Scheduled Training In:   **2016** | |
|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6157 | 12/16/2016 | Preventing Workplace Harassment | *** None *** | ✓ | P | | 02:00 |
| -  -6033 | 10/28/2016 | Evoc Basic Skills Update | CA-POST 1010-21155-16033 | ✓ | P | | 08:00 |
| -  -6087 | 10/24/2016 | Monthly Departmental Training | *** None *** | ✓ | P | | 10:00 |
| -  -6050 | 09/15/2016 | Court & Temporary Holding Facility | CA-POST 6000-30780-16001 | ✓ | P | | 04:00 |
| -  -6049 | 08/30/2016 | Crowd Control | *** None *** | ✓ | P | | 05:00 |
| -  -6049 | 08/29/2016 | YCSU Presentation | *** None *** | ✓ | P | | 01:00 |
| -  -6049 | 08/29/2016 | OIS Presentation | *** None *** | ✓ | P | | 05:00 |
| -  -6015 | 07/11/2016 | Active Shooter | *** None *** | ✓ | P | | 10:00 |
| -  -5988 | 06/30/2016 | POST Pursuit Driving Update | CA-POST 6000-29000-15001 | ✓ | P | | 02:00 |
| -  -6001 | 06/22/2016 | Law Enforcement Tactical Lifesaver | *** None *** | ✓ | P | | 08:00 |
| -  -5989 | 05/16/2016 | Firearms (Psp) | CA-POST 6000-29501-15001 | ✓ | P | | 10:00 |
| -  -5989 | 05/16/2016 | POST Pursuit Driving Update | CA-POST 6000-29000-15001 | ✓ | P | | 01:00 |
| -  -5949 | 03/21/2016 | Below 100 | *** None *** | ✓ | P | | 01:00 |
| -  -5949 | 03/21/2016 | Court and Temporary Holding Facility | CA-POST 6000-30780-15001 | ✓ | P | | 04:00 |
| -  -5949 | 03/21/2016 | Defensive Tactics / Ground Control | CA-POST 6000-29503-15003 | ✓ | P | | 05:00 |
| -  -5894 | 02/25/2016 | Trauma Training | *** None *** | ✓ | P | | 04:00 |
| -  -5894 | 02/25/2016 | First Aid/BBP | CA-POST 6000-21771-15002 | ✓ | P | | 04:00 |
| -  -5894 | 02/25/2016 | PPD Animal Services | *** None *** | ✓ | P | | 02:00 |

| Totals For Training Completed in: 2016 | Completed 18 of 18 Modules | 86:00 |
|---|---|---|

Pleasanton Police Department

# Individual Training Activity

| Person: | Koumiss, Alex  #B49-E31 | (Continued) |
|---|---|---|

**Scheduled Training In:    2015**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5867 | 11/02/2015 | Department Firearms Qualifications | CA-POST -    -15 | ✓ | P | | 02:00 |
| -  -5867 | 11/02/2015 | Electronic Weapons Update (Taser) | CA-POST 6000-23093-15 | ✓ | P | | 04:00 |
| -  -5867 | 11/02/2015 | Arrest & Control PSP | CA-POST 6000-29503-15 | ✓ | P | | 04:00 |
| -  -5843 | 09/25/2015 | Field Training Officer | CA-POST 2540-31725-15001 | ✓ | P | | 40:00 |
| -  -6158 | 09/01/2015 | CLETS Access (Test) | *** None *** | ✓ | P | | 01:00 |
| -  -5838 | 09/01/2015 | Response to Criminal Mass Casualty Incidents | *** None *** | ✓ | P | | 10:00 |
| -  -5812 | 07/13/2015 | Stinger Spike Strips | *** None *** | ✓ | P | | 03:00 |
| -  -5812 | 07/13/2015 | Peer Support | *** None *** | ✓ | P | | 02:00 |
| -  -5812 | 07/13/2015 | POST Pursuit Driving Update | *** None *** | ✓ | P | | 01:00 |
| -  -5812 | 07/13/2015 | Traffic Unit | *** None *** | ✓ | P | | 02:00 |
| -  -5812 | 07/13/2015 | Branding | *** None *** | ✓ | P | | 02:00 |
| -  -5783 | 05/18/2015 | Firearms (Psp) | CA-POST 6000-29501-14004 | ✓ | P | | 10:30 |
| -  -5754 | 03/23/2015 | CIU Advanced Officer Training | *** None *** | ✓ | P | | 06:30 |
| -  -5754 | 03/23/2015 | Patrol Canine Training | *** None *** | ✓ | P | | 03:00 |
| -  -5695 | 01/26/2015 | Human Trafficking | CA-POST | ✓ | P | | 02:00 |
| -  -5695 | 01/26/2015 | CPR/AED/BBP | CA-POST 6000-21771-14 | ✓ | P | | 04:00 |
| -  -5695 | 01/26/2015 | Jail Operations | CA-POST 6000-30780-14 | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2015 | Completed 17 of 17 Modules | 101:00 |
|---|---|---|

**Scheduled Training In:    2014**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5636 | 10/23/2014 | Firearm (PSP) | CA-POST 6000-29501-14001 | ✓ | P | | 05:00 |
| -  -5644 | 10/23/2014 | Department Firearms Qualifications | *** None *** | ✓ | P | | 02:00 |
| -  -5644 | 10/23/2014 | Taser Update & Qual | *** None *** | ✓ | P | | 01:30 |
| -  -5644 | 10/23/2014 | Defensive Tactics | *** None *** | ✓ | P | | 01:30 |
| -  -5627 | 10/16/2014 | POST Driver Training Update - Simulator | *** None *** | ✓ | P | | 04:00 |
| -  -5599 | 09/22/2014 | Chasing Cell Phones | *** None *** | ✓ | P | | 06:00 |
| -  -5599 | 09/22/2014 | Slow Speed Driving | *** None *** | ✓ | P | | 04:00 |
| -  -5573 | 08/14/2014 | LIDAR Operator | CA-POST 1010-23320-14001 | ✓ | P | | 08:00 |

Pleasanton Police Department

# Individual Training Activity

05/27/2020

| Person: | | **Koumiss, Alex  #B49-E31** | | | | | (Continued) |
|---|---|---|---|---|---|---|---|

| Scheduled Training In: | **2014** | | | | | | (Continued) |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5573 | 08/13/2014 | Radar Operator | CA-POST 1010-23300-14001 | ✓ | P | | 24:00 |
| -  -5564 | 08/04/2014 | New World Mobile Enterprise Training | *** None *** | ✓ | P | | 04:00 |
| -  -5552 | 07/28/2014 | Active Shooter / Fire Rescue Task Force Training | *** None *** | ✓ | P | | 10:00 |
| -  -5540 | 06/19/2014 | Crisis Intervention Training (CIT) | CA-POST 2010-20801-13005 | ✓ | P | | 38:00 |
| -  -5534 | 05/26/2014 | FIrearms Qualifications (rifle/pistol/less lethal) | *** None *** | ✓ | P | | 10:00 |
| -  -5498 | 04/10/2014 | Pursuit Driving Update | *** None *** | ✓ | P | | 01:00 |
| -  -5498 | 04/10/2014 | Court & Temporary Holding Facility | CA-POST 6000-30780-13002 | ✓ | P | | 04:00 |
| -  -5498 | 04/10/2014 | Hide it, Lock it or Lose it | *** None *** | ✓ | P | | 01:00 |
| -  -5498 | 04/10/2014 | First Aid | CA-POST 6000-21771-13002 | ✓ | P | | 04:00 |
| -  -5466 | 02/20/2014 | OIS Peer Support | *** None *** | ✓ | P | | 02:00 |
| -  -5466 | 02/20/2014 | OIS Investigations | *** None *** | ✓ | P | | 03:00 |
| -  -5466 | 02/20/2014 | Officer Involved Shootings | *** None *** | ✓ | P | | 04:30 |
| -  -5466 | 02/20/2014 | Mothers with a Purpose | *** None *** | ✓ | P | | 00:30 |
| **Totals For Training Completed in: 2014** | | Completed 21 of 21 Modules | | | | | **138:00** |

| Scheduled Training In: | **2013** | | | | | | |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5357 | 06/25/2013 | Arrest and Control (Psp) | CA-POST 6000-29503-12003 | ✓ | P | | 04:00 |
| -  -5357 | 06/25/2013 | District Attorney Update | CA-POST | ✓ | P | | 02:00 |
| -  -5357 | 06/25/2013 | Taser Update | CA-POST 6000-23093-12002 | ✓ | P | | 04:00 |
| -  -5357 | 06/24/2013 | First Aid CPR AED Update | CA-POST 6000-21771-12003 | ✓ | P | | 05:00 |
| -  -5357 | 06/24/2013 | Court & Temporary Holding Facility | CA-POST 6000-30780-12003 | ✓ | P | | 04:00 |
| -  -5357 | 06/22/2013 | Active Shooter Update | CA-POST | ✓ | P | | 10:00 |
| **Totals For Training Completed in: 2013** | | Completed 6 of 6 Modules | | | | | **29:00** |

**Pleasanton Police Department**

## Individual Training Activity

05/27/2020

| Person: | **Koumiss, Alex  #B49-E31** | (Continued) |
|---|---|---|

| Scheduled Training In: | **2011** | | | | | | |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - -4986 | 07/05/2011 | Clets Less Than Full Access (Test) | *** None *** | ✔ | P | | 01:00 |
| - -4935 | 06/14/2011 | Electronic Weapons Update (Taser) | *** None *** | ✔ | P | | 04:00 |
| - -4935 | 06/14/2011 | LPFD Incident Command | CA-POST<br>- -10 | ✔ | P | | 02:00 |
| - -4935 | 06/13/2011 | Pursuit Driving Update | CA-POST<br>6000-29000-1000 | ✔ | P | | 02:00 |
| - -4935 | 06/13/2011 | First Aid | CA-POST<br>6000-21771-10002 | ✔ | P | | 04:00 |
| - -4935 | 06/13/2011 | Arrest and Control (Psp) | CA-POST<br>6000-29503-10001 | ✔ | P | | 04:00 |
| - -4935 | 06/13/2011 | Court & Temporary Holding Facility | CA-POST<br>6000-35780-10002 | ✔ | P | | 04:00 |

| Totals For Training Completed in: 2011 | Completed 7 of 7 Modules | 21:00 |
|---|---|---|
| Totals For: Koumiss, Alex  #B49-E31 | Completed 115 of 115 Modules | 644:00 |

Pleasanton Police Department

# Individual Training Activity

| Person: | **Middleton, Bradlee  #C35-C00** |
|---|---|

### Personal

**Agency:**    Pleasanton Police Department
**ID #:**    C35-C00

### Employment

| Property | Value | From | Through |
|---|---|---|---|
| **Active Status:** | Active | 08/12/2013 | / / |
| **Duty Status:** | Full Duty | 08/12/2013 | / / |
| **Time Status:** | Full Time | 08/12/2013 | / / |
| **Rank:** | Police Officer | 08/12/2013 | / / |
| **Work Unit:** | Patrol Bureau | 08/12/2013 | / / |
| **Station:** | Headquarters Station | 08/12/2013 | / / |
| **Division:** | Operations | 08/12/2013 | / / |

| Scheduled Training In: | **2020** | | | | | | |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6790 | 03/13/2020 | Dual Purpose Motorcycle | *** None *** | ✓ | P | | 80:00 |
| -  -6777 | 02/14/2020 | Traffic Collision Investigation Intermediate | *** None *** | ✓ | P | | 40:00 |
| -  -6771 | 01/27/2020 | Building Searches/High Risk Stops/ARV | *** None *** | ✓ | P | | 04:00 |
| -  -6771 | 01/27/2020 | Pursuit Driving Update | *** None *** | ✓ | P | | 02:00 |
| -  -6771 | 01/27/2020 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |

| Totals For Training Completed in: 2020 | Completed 5 of 5 Modules | | 128:00 |
|---|---|---|---|

| Scheduled Training In: | **2019** | | | | | | |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6752 | 12/31/2019 | AB 392 Use of Force Update | *** None *** | ✓ | P | | 02:00 |
| -  -6745 | 12/18/2019 | Advanced Roadside Impaired Driver Enforcement | *** None *** | ✓ | P | | 16:00 |
| -  -6746 | 11/21/2019 | Gracie Survival Tactics | *** None *** | ✓ | P | | 05:00 |
| -  -6746 | 11/21/2019 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 05:00 |
| -  -6706 | 10/10/2019 | Crisis Intervention Training (CIT) Update | *** None *** | ✓ | P | | 10:00 |
| -  -6690 | 08/20/2019 | Advanced Roadside Impaired Driver Enforcement | *** None *** | ✓ | P | | 16:00 |
| -  -6684 | 08/01/2019 | Reality Based De-escalation Training | *** None *** | ✓ | P | | 06:00 |
| -  -6685 | 08/01/2019 | Pursuit Driving Update | *** None *** | ✓ | P | | 02:00 |
| -  -6684 | 08/01/2019 | CIU Update & Incident Debrief | *** None *** | ✓ | P | | 04:00 |
| -  -6665 | 06/13/2019 | Less Lethal Training: Shotgun, Taser and FN303 | *** None *** | ✓ | P | | 04:00 |

Pleasanton Police Department

# Individual Training Activity

| Person: | **Middleton, Bradlee  #C35-C00** | | | | (Continued) |
|---|---|---|---|---|---|

| Scheduled Training In:   **2019** | | | | | (Continued) |
|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6665 | 06/13/2019 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 06:00 |
| -  -6542 | 04/12/2019 | Traffic Collision Investigation Basic | *** None *** | ✓ | P | | 40:00 |
| -  -6609 | 02/28/2019 | First Aid/CPR/BBP/ATD | CA-POST -  -18 | ✓ | P | | 06:00 |
| -  -6609 | 02/28/2019 | Temporary Holding Facility | CA-POST -  -18 | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2019 | Completed 14 of 14 Modules | | | | | | 126:00 |
|---|---|---|---|---|---|---|---|

| Scheduled Training In:   **2018** | | | | | |
|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6553 | 12/06/2018 | Range Training and Department Qualifications | CA-POST -  -18 | ✓ | P | | 10:00 |
| -  -6551 | 12/02/2018 | Pursuit Driving Update | CA-POST -  -18 | ✓ | P | | 02:00 |
| -  -6476 | 09/27/2018 | Blue Courage | *** None *** | ✓ | P | | 10:00 |
| -  -6445 | 08/10/2018 | Driver Training-Simulator | *** None *** | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2018 | Completed 4 of 4 Modules | | | | | | 26:00 |
|---|---|---|---|---|---|---|---|

| Scheduled Training In:   **2017** | | | | | |
|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6297 | 11/13/2017 | Range Qualifications | *** None *** | ✓ | P | | 03:00 |
| -  -6297 | 11/13/2017 | Taser, Less Lethal and WRAP | *** None *** | ✓ | P | | 03:00 |
| -  -6297 | 11/13/2017 | Defensive Tactics/Impact Weapons | *** None *** | ✓ | P | | 04:00 |
| -  -6262 | 09/18/2017 | Active Threat | *** None *** | ✓ | P | | 06:00 |
| -  -6262 | 09/18/2017 | CIT Update | *** None *** | ✓ | P | | 04:00 |
| -  -6210 | 07/24/2017 | Human Trafficking | *** None *** | ✓ | P | | 03:00 |
| -  -6210 | 07/24/2017 | Traffic Enforcement Advanced Officer Training | *** None *** | ✓ | P | | 02:00 |
| -  -6210 | 07/24/2017 | CIU Advanced Officer Training | *** None *** | ✓ | P | | 05:00 |
| -  -6202 | 05/15/2017 | Monthly Departmental Training | *** None *** | ✓ | P | | 10:00 |
| -  -6164 | 03/20/2017 | Principled Policing | *** None *** | ✓ | P | | 10:00 |
| -  -6128 | 01/23/2017 | First Aid/CPR Refresher | CA-POST 6000-21771-16001 | ✓ | P | | 06:00 |
| -  -6128 | 01/23/2017 | Court and Temporary Holding Facility | CA-POST 6000-30780-16001 | ✓ | P | | 04:00 |

Pleasanton Police Department

# Individual Training Activity

05/27/2020                                                                                    Page 286 of 462 pages

| Person: | **Middleton, Bradlee  #C35-C00** | (Continued) |
|---|---|---|

| Scheduled Training In:   **2017** | | (Continued) |
|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6121 | 01/20/2017 | Search Warrant - Patrol | CA-POST 2540-24261-16003 | ✓ | P | | 10:00 |

| Totals For Training Completed in: 2017 | Completed 13 of 13 Modules | | | | | | 70:00 |
|---|---|---|---|---|---|---|---|

| Scheduled Training In:   **2016** | | | | | | | |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6157 | 12/16/2016 | Preventing Workplace Harassment | *** None *** | ✓ | P | | 02:00 |
| -  -6033 | 12/12/2016 | Evoc Basic Skills Update | CA-POST 1010-21155-16052 | ✓ | P | | 08:00 |
| -  -6087 | 10/24/2016 | Monthly Departmental Training | *** None *** | ✓ | P | | 10:00 |
| -  -6033 | 09/16/2016 | Evoc Basic Skills Update | CA-POST 1010-21155-16018 | ✓ | P | | 08:00 |
| -  -6049 | 08/30/2016 | Crowd Control | *** None *** | ✓ | P | | 05:00 |
| -  -6049 | 08/29/2016 | YCSU Presentation | *** None *** | ✓ | P | | 01:00 |
| -  -6049 | 08/29/2016 | OIS Presentation | *** None *** | ✓ | P | | 05:00 |
| -  -6015 | 07/11/2016 | Active Shooter | *** None *** | ✓ | P | | 10:00 |
| -  -5988 | 06/30/2016 | POST Pursuit Driving Update | CA-POST 6000-29000-15001 | ✓ | P | | 02:00 |
| -  -5989 | 05/16/2016 | Firearms (Psp) | CA-POST 6000-29501-15001 | ✓ | P | | 10:00 |
| -  -5989 | 05/16/2016 | POST Pursuit Driving Update | CA-POST 6000-29000-15001 | ✓ | P | | 01:00 |
| -  -5950 | 04/21/2016 | Below 100 | *** None *** | ✓ | P | | 01:00 |
| -  -5950 | 04/21/2016 | Court and Temporary Holding Facility | CA-POST 6000-30780-15002 | ✓ | P | | 04:00 |
| -  -5950 | 04/21/2016 | Defensive Tactics / Ground Control | CA-POST 6000-30780-15004 | ✓ | P | | 05:00 |
| -  -5912 | 03/11/2016 | Drug Influence - 11550 | CA-POST 2310-22220-15005 | ✓ | P | | 24:00 |
| -  -5894 | 02/25/2016 | Trauma Training | *** None *** | ✓ | P | | 04:00 |
| -  -5894 | 02/25/2016 | First Aid/BBP | CA-POST 6000-21771-15002 | ✓ | P | | 04:00 |
| -  -5894 | 02/25/2016 | PPD Animal Services | *** None *** | ✓ | P | | 02:00 |
| -  -5896 | 02/11/2016 | Crisis Intervention Training (CIT) | CA-POST 2010-20801-15005 | ✓ | P | | 38:00 |

| Totals For Training Completed in: 2016 | Completed 19 of 19 Modules | | | | | | 144:00 |
|---|---|---|---|---|---|---|---|

Pleasanton Police Department

## Individual Training Activity

05/27/2020

| Person: | Middleton, Bradlee  #C35-C00 | | (Continued) |
|---|---|---|---|

**Scheduled Training In:   2015**

| TMS # | | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|:---:|:---:|---|---:|
| - | -5868 | 12/03/2015 | Department Firearms Qualifications | *** None *** | ✓ | P | | 02:00 |
| - | -5868 | 12/03/2015 | Electronic Weapons Update (Taser) | CA-POST 6000-23093-15 | ✓ | P | | 04:00 |
| - | -5868 | 12/03/2015 | Arrest & Control PSP | CA-POST 6000-29503-15 | ✓ | P | | 04:00 |
| - | -6158 | 09/01/2015 | CLETS Access (Test) | *** None *** | ✓ | P | | 01:00 |
| - | -5838 | 09/01/2015 | Response to Criminal Mass Casualty Incidents | *** None *** | ✓ | P | | 10:00 |
| - | -5813 | 08/13/2015 | Stinger Spike Strips | *** None *** | ✓ | P | | 03:00 |
| - | -5813 | 08/13/2015 | Peer Support | *** None *** | ✓ | P | | 02:00 |
| - | -5813 | 08/13/2015 | POST Pursuit Driving Update | *** None *** | ✓ | P | | 01:00 |
| - | -5813 | 08/13/2015 | Traffic Unit | *** None *** | ✓ | P | | 02:00 |
| - | -5813 | 08/13/2015 | Branding | *** None *** | ✓ | P | | 02:00 |
| - | -5784 | 06/18/2015 | Firearms (Psp) | CA-POST 6000-29501-14005 | ✓ | P | | 10:30 |
| - | -5702 | 05/14/2015 | LIDAR Operator | CA-POST 1010-23320-14003 | ✓ | P | | 08:00 |
| - | -5702 | 05/13/2015 | Radar Operator | CA-POST 1010-23300-14003 | ✓ | P | | 24:00 |
| - | -5755 | 04/23/2015 | CIU Advanced Officer Training | *** None *** | ✓ | P | | 06:30 |
| - | -5755 | 04/23/2015 | Patrol Canine Training | *** None *** | ✓ | P | | 03:00 |
| - | -5696 | 02/26/2015 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |
| - | -5696 | 02/26/2015 | CPR/AED/BBP | *** None *** | ✓ | P | | 04:00 |
| - | -5696 | 02/26/2015 | Jail Operations | *** None *** | ✓ | P | | 04:00 |
| **Totals For Training Completed in: 2015** | | | Completed 18 of 18 Modules | | | | | **93:00** |

**Scheduled Training In:   2014**

| TMS # | | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|:---:|:---:|---|---:|
| - | -5632 | 10/30/2014 | POST Driver Training Update - Simulator | *** None *** | ✓ | P | | 04:00 |
| - | -5636 | 10/23/2014 | Firearm (PSP) | CA-POST 6000-29501-14002 | ✓ | P | | 05:00 |
| - | -5644 | 10/23/2014 | Department Firearms Qualifications | *** None *** | ✓ | P | | 02:00 |
| - | -5644 | 10/23/2014 | Taser Update & Qual | *** None *** | ✓ | P | | 01:30 |
| - | -5644 | 10/23/2014 | Defensive Tactics | *** None *** | ✓ | P | | 01:30 |
| - | -5598 | 08/29/2014 | Chasing Cell Phones | *** None *** | ✓ | P | | 06:00 |
| - | -5598 | 08/28/2014 | Slow Speed Driving | *** None *** | ✓ | P | | 04:00 |
| - | -5574 | 08/22/2014 | DUI Detection-Field Sobriety | CA-POST 1010-20290-14001 | ✓ | P | | 24:00 |

Pleasanton Police Department

# Individual Training Activity

05/27/2020                                                                                                          Page 288 of 462 pages

| Person: | | **Middleton, Bradlee  #C35-C00** | | | | (Continued) |
|---|---|---|---|---|---|---|

| Scheduled Training In: | **2014** | | | | | (Continued) |
|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5550 | 06/26/2014 | Active Shooter / Fire Rescue Task Force Training | *** None *** | ✓ | P | | 10:00 |
| -  -5472 | 05/29/2014 | Forensic Breath Alcohol Analysis | CA-POST 1010-20322-13006 | ✓ | P | | 04:00 |
| -  -5522 | 05/21/2014 | Museum of Tolerance | CA-POST 4890-23272-13075 | ✓ | P | | 08:00 |
| -  -5533 | 05/08/2014 | FIrearms Qualifications (rifle/pistol/less lethal) | *** None *** | ✓ | P | | 10:00 |
| -  -5498 | 04/10/2014 | Pursuit Driving Update | *** None *** | ✓ | P | | 01:00 |
| -  -5498 | 04/10/2014 | Court & Temporary Holding Facility | CA-POST 6000-30780-13002 | ✓ | P | | 04:00 |
| -  -5498 | 04/10/2014 | Hide it, Lock it or Lose it | *** None *** | ✓ | P | | 01:00 |
| -  -5498 | 04/10/2014 | First Aid | CA-POST 6000-21771-13002 | ✓ | P | | 04:00 |
| -  -5466 | 02/20/2014 | OIS Peer Support | *** None *** | ✓ | P | | 02:00 |
| -  -5466 | 02/20/2014 | OIS Investigations | *** None *** | ✓ | P | | 03:00 |
| -  -5466 | 02/20/2014 | Officer Involved Shootings | *** None *** | ✓ | P | | 04:30 |
| -  -5466 | 02/20/2014 | Mothers with a Purpose | *** None *** | ✓ | P | | 00:30 |
| -  -5457 | 02/04/2014 | Basic Patrol Rifle | CA-POST 2530-32075-13001 | ✓ | P | | 16:00 |

| Totals For Training Completed in: 2014 | Completed 21 of 21 Modules | 116:00 |
|---|---|---|

| Scheduled Training In: | **2013** |
|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5371 | 08/17/2013 | Active Shooter Update | *** None *** | ✓ | P | | 10:00 |

| Totals For Training Completed in: 2013 | Completed 1 of 1 Modules | 10:00 |
|---|---|---|

| Totals For: Middleton, Bradlee  #C35-C00 | Completed 95 of 95 Modules | 713:00 |
|---|---|---|

Pleasanton Police Department

# Individual Training Activity

05/27/2020

| Person: | Spiller, David  #A69-S76 |
|---|---|

### Personal

| | |
|---|---|
| Agency: | Pleasanton Police Department |
| ID #: | A69-S76 |

### Employment

| Property | Value | From | Through |
|---|---|---|---|
| Active Status: | Inactive | 08/05/2002 | 11/14/2019 |
| Duty Status: | Full Duty | 08/05/2002 | 11/14/2019 |
| Time Status: | Full Time | 08/05/2002 | 11/14/2019 |
| Rank: | Chief Of Police | 05/09/2011 | 11/14/2019 |
| Work Unit: | Chief of Police | 05/09/2011 | 11/14/2019 |
| Station: | Headquarters Station | 08/05/2002 | 11/14/2019 |
| Division: | Chief of Police | 05/09/2011 | 11/14/2019 |

### Scheduled Training In:   2019

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6663 | 09/27/2019 | CPCA Board Meeting | *** None *** | ✓ | P | | 16:00 |
| -  -6667 | 08/22/2019 | ADVANCE Conference | *** None *** | ✓ | P | | 20:00 |
| -  -6664 | 06/03/2019 | California for All:  Emergency Management Preparedness Summit | *** None *** | ✓ | P | | 08:00 |
| -  -6622 | 05/15/2019 | CPCA Board Meeting | *** None *** | ✓ | P | | 16:00 |
| -  -6575 | 01/24/2019 | Executive Training Seminar | CA-POST 9180-11000-18010 | ✓ | P | | 24:00 |
| -  -6517 | 01/16/2019 | Law Enforcement Leadership Symposium | *** None *** | ✓ | P | | 16:00 |

| Totals For Training Completed in: 2019 | Completed 6 of 6 Modules | 100:00 |
|---|---|---|

### Scheduled Training In:   2018

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6577 | 12/31/2018 | Pursuit Driving Update | CA-POST -  -18 | ✓ | P | | 02:00 |
| -  -6496 | 12/07/2018 | CPCA Board Meeting | *** None *** | ✓ | P | | 12:00 |
| -  -6538 | 11/13/2018 | New Legislation Targets Law Enforcement | *** None *** | ✓ | P | | 08:00 |
| -  -6476 | 09/27/2018 | Blue Courage | *** None *** | ✓ | P | | 10:00 |
| -  -6404 | 09/20/2018 | Copswest | *** None *** | ✓ | P | | 32:00 |
| -  -6416 | 09/13/2018 | Fbinaa California Chapter Conference | *** None *** | ✓ | P | | 40:00 |
| -  -6341 | 05/16/2018 | CPCA Legislative Day | *** None *** | ✓ | P | | 08:00 |
| -  -6344 | 04/19/2018 | CALEEDS | *** None *** | ✓ | P | | 32:00 |
| -  -6312 | 03/22/2018 | CPCA Training Symposium | *** None *** | ✓ | P | | 40:00 |
| -  -6309 | 01/18/2018 | Executive Training Seminar | CA-POST 9180-11000-17006 | ✓ | P | | 32:00 |

Pleasanton Police Department

# Individual Training Activity

05/27/2020                                                                                      Page 2 of 4 pages

| Person: | **Spiller, David  #A69-S76** | | (Continued) |
|---|---|---|---|

| Scheduled Training In:   **2018** | | | (Continued) |
|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6310 | 01/18/2018 | CPCA Board Meeting | *** None *** | ✓ | P | | 08:00 |
| -  -6257 | 01/05/2018 | Law Enforcement Leadership Symposium | *** None *** | ✓ | P | | 16:00 |
| -  -6308 | 01/03/2018 | Police Officer Bill of Rights Workshop | *** None *** | ✓ | P | | 04:00 |
| **Totals For Training Completed in: 2018** | | Completed 13 of 13 Modules | | | | | **244:00** |

| Scheduled Training In:   **2017** | | | |
|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6253 | 11/01/2017 | Copswest | *** None *** | ✓ | P | | 24:00 |
| -  -6249 | 09/15/2017 | CPCA Board Meeting | *** None *** | ✓ | P | | 08:00 |
| -  -6205 | 06/28/2017 | Firearms Transition Qualification | *** None *** | ✓ | P | | 04:00 |
| -  -6183 | 06/09/2017 | CPCA Board Meeting | *** None *** | ✓ | P | | 16:00 |
| -  -6117 | 04/13/2017 | CPCA Training Symposium | CA-POST 1137-10860-16003 | ✓ | P | | 36:00 |
| -  -6164 | 03/20/2017 | Principled Policing | *** None *** | ✓ | P | | 10:00 |
| -  -6114 | 01/19/2017 | Executive Training Seminar | *** None *** | ✓ | P | | 24:00 |
| -  -6051 | 01/06/2017 | USF Law Enforcement Symposium | *** None *** | ✓ | P | | 16:00 |
| **Totals For Training Completed in: 2017** | | Completed 8 of 8 Modules | | | | | **138:00** |

| Scheduled Training In:   **2016** | | | |
|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6076 | 10/06/2016 | Copswest | *** None *** | ✓ | P | | 32:00 |
| -  -6040 | 08/30/2016 | IACP Critical Issues Forum | *** None *** | ✓ | P | | 04:00 |
| -  -6018 | 07/27/2016 | Priority of Life Webinar | *** None *** | ✓ | P | | 01:00 |
| -  -6012 | 06/24/2016 | Strategic Planning Workshop | *** None *** | ✓ | P | | 16:00 |
| -  -5994 | 06/07/2016 | 21st Century Policing Presentation | *** None *** | ✓ | P | | 04:00 |
| -  -5952 | 05/19/2016 | Executive Development Seminar | *** None *** | ✓ | P | | 32:00 |
| -  -5959 | 04/13/2016 | Police Chief Forum on Physical Fitness for Duty | *** None *** | ✓ | P | | 04:00 |
| -  -5906 | 03/17/2016 | CPCA Training Symposium | *** None *** | ✓ | P | | 36:00 |
| -  -5879 | 01/21/2016 | Executive Training Seminar | *** None *** | ✓ | P | | 24:00 |
| **Totals For Training Completed in: 2016** | | Completed 9 of 9 Modules | | | | | **153:00** |

| Scheduled Training In:   **2015** | | | |
|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5782 | 10/27/2015 | IACP 2015 Annual Conference | *** None *** | ✓ | P | | 32:00 |
| -  -5815 | 10/15/2015 | Copswest | *** None *** | ✓ | P | | 24:00 |

Pleasanton Police Department

# Individual Training Activity

05/27/2020

| Person: | **Spiller, David  #A69-S76** | (Continued) |
|---|---|---|

| Scheduled Training In:  **2015** | | (Continued) |
|---|---|---|

| | TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|---|
| - | -5840 | 09/16/2015 | CPCA Board Meeting | *** None *** | ✓ | P | | 08:00 |
| - | -6158 | 09/01/2015 | CLETS Access (Test) | *** None *** | ✓ | P | | 01:00 |
| - | -5692 | 04/30/2015 | CPCA Legislative Day | *** None *** | ✓ | P | | 10:00 |
| - | -5727 | 03/11/2015 | Law Enforcement Executive Summit | *** None *** | ✓ | P | | 08:00 |
| - | -5669 | 03/06/2015 | Public Sector Employment Law Conference | *** None *** | ✓ | P | | 16:00 |
| - | -5687 | 02/26/2015 | CPCA Training Symposium | *** None *** | ✓ | P | | 32:00 |
| - | -5686 | 01/23/2015 | Executive Training Seminar | *** None *** | ✓ | P | | 40:00 |
| - | -5684 | 01/13/2015 | Leading Change:  Law Enforcement Technology Symposium | *** None *** | ✓ | P | | 13:00 |

| Totals For Training Completed in: 2015 | Completed 10 of 10 Modules | 184:00 |
|---|---|---|

| Scheduled Training In:  **2014** | | |
|---|---|---|

| | TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|---|
| - | -5646 | 11/12/2014 | Police Organizational Culture Demystified | *** None *** | ✓ | P | | 04:30 |
| - | -5621 | 10/23/2014 | Preventing Workplace Harassment | *** None *** | ✓ | P | | 02:00 |
| - | -5608 | 10/22/2014 | Social Media | *** None *** | ✓ | P | | 03:00 |
| - | -5546 | 10/08/2014 | Copswest | *** None *** | ✓ | P | | 24:00 |
| - | -5619 | 10/08/2014 | You Lie, You Die". . . | *** None *** | ✓ | P | | 01:00 |
| - | -5582 | 09/04/2014 | Urban Shield Training Seminar | *** None *** | ✓ | P | | 08:00 |
| - | -5560 | 07/09/2014 | Top Mistakes Made in Law Enforcement Discipline | *** None *** | ✓ | P | | 01:00 |
| - | -5517 | 05/23/2014 | Peer Support - Police Chief Survival in the 21st Century | CA-POST 1137-11020-13002 | ✓ | P | | 16:00 |
| - | -5501 | 05/14/2014 | CPCA Legislative Day | *** None *** | ✓ | P | | 10:00 |
| - | -5434 | 02/27/2014 | CPCA Training Symposium | *** None *** | ✓ | P | | 32:00 |
| - | -5447 | 01/24/2014 | Executive Training Seminar | *** None *** | ✓ | P | | 20:00 |

| Totals For Training Completed in: 2014 | Completed 11 of 11 Modules | 121:30 |
|---|---|---|

| Scheduled Training In:  **2013** | |
|---|---|

| | TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|---|
| - | -5416 | 10/25/2013 | Urban Shield Training Seminar | *** None *** | ✓ | P | | 08:00 |
| - | -5358 | 06/28/2013 | Tools for Tolerance Advanced Leadership Development for Command Staff | CA-POST 4890-23295-12001 | ✓ | P | | 24:00 |
| - | -5338 | 04/24/2013 | Active Shooter Executive Law Enforcement Conference | *** None *** | ✓ | P | | 16:00 |

Pleasanton Police Department

# Individual Training Activity

05/27/2020                                                                                           Page 4 of 4 pages

| Person: | **Spiller, David  #A69-S76** | | (Continued) |
|---------|------------------------------|--|-------------|

| Scheduled Training In: | **2013** | | (Continued) |
|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - -5317 | 03/22/2013 | Public Sector Employment Law Conference | *** None *** | ✓ | P | | 16:00 |
| - -5290 | 02/28/2013 | CPCA Training Symposium | *** None *** | ✓ | P | | 32:00 |
| - -5258 | 01/25/2013 | Executive Training Seminar | CA-POST 9180-11000-12008 | ✓ | P | | 40:00 |
| **Totals For Training Completed in: 2013** | | Completed 6 of 6 Modules | | | | | **136:00** |

| Scheduled Training In: | **2012** | |
|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - -5266 | 12/06/2012 | Preventing Workplace Harassment | *** None *** | ✓ | P | | 03:00 |
| - -5166 | 07/18/2012 | Managing Emotions Under Pressure Workshop | *** None *** | ✓ | P | | 07:30 |
| - -5155 | 06/14/2012 | Nena Annual Conference | *** None *** | ✓ | P | | 40:00 |
| - -5108 | 03/28/2012 | Cpoa Legislative Day | *** None *** | ✓ | P | | 12:00 |
| - -5080 | 03/15/2012 | Cpca Conference | *** None *** | ✓ | P | | 40:00 |
| - -5085 | 02/10/2012 | Team Building Workshop | CA-POST 1183-50000-11001 | ✓ | P | | 24:00 |
| - -5030 | 01/20/2012 | Executive Training Seminar | CA-POST 9180-11000-11010 | ✓ | P | | 32:00 |
| **Totals For Training Completed in: 2012** | | Completed 7 of 7 Modules | | | | | **158:30** |

| Scheduled Training In: | **2011** | |
|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - -5033 | 12/02/2011 | S.L.I. Class 299 - Session 8 | *** None *** | ✓ | P | | 03:00 |
| - -5012 | 10/20/2011 | Criminal Intelligence for Executives | CA-POST 9260-11140-11001 | ✓ | P | | 16:00 |
| - -4986 | 07/05/2011 | Clets Less Than Full Access (Test) | *** None *** | ✓ | P | | 01:00 |
| **Totals For Training Completed in: 2011** | | Completed 3 of 3 Modules | | | | | **20:00** |
| **Totals For: Spiller, David  #A69-S76** | | Completed 73 of 73 Modules | | | | | **1,255:00** |

Pleasanton Police Department

# Individual Training Activity

| Person: | Trovao, Richard  #B94-V33 |
|---|---|

### Personal

| | |
|---|---|
| Agency: | Pleasanton Police Department |
| ID #: | B94-V33 |

### Employment

| Property | Value | From | Through |
|---|---|---|---|
| Active Status: | Active | 06/04/2005 | / / |
| Duty Status: | Full Duty | 06/04/2005 | / / |
| Time Status: | Full Time | 06/04/2005 | / / |
| Rank: | Police Officer | 06/04/2005 | / / |
| Work Unit: | Patrol Bureau | 06/04/2005 | / / |
| Station: | Headquarters Station | 06/04/2005 | / / |
| Division: | Operations | 06/04/2005 | / / |

| Scheduled Training In: | 2020 | | | | | | |
|---|---|---|---|---|---|---|---|

| | TMS # | Ended | Subject | Certification | Compl. | Grade | Score Tng. Time |
|---|---|---|---|---|---|---|---|
| - | -6813 | 03/16/2020 | First Aid/CPR/AED/BBP | *** None *** | ✓ | P | 08:00 |
| - | -6813 | 03/16/2020 | Court and Temporary Holding Facility | *** None *** | ✓ | P | 04:00 |
| - | -6785 | 02/06/2020 | First Aid Cpr AED Instructor Refresher | *** None *** | ✓ | P | 04:00 |
| - | -6771 | 01/27/2020 | Building Searches/High Risk Stops/ARV | *** None *** | ✓ | P | 04:00 |
| - | -6771 | 01/27/2020 | Pursuit Driving Update | *** None *** | ✓ | P | 02:00 |
| - | -6771 | 01/27/2020 | Human Trafficking | *** None *** | ✓ | P | 02:00 |
| - | -6753 | 01/07/2020 | Mindfulness & Resiliency for Public Safety | *** None *** | ✓ | P | 16:00 |

| Totals For Training Completed in: 2020 | Completed 7 of 7 Modules | 40:00 |
|---|---|---|

| Scheduled Training In: | 2019 | | | | | | |
|---|---|---|---|---|---|---|---|

| | TMS # | Ended | Subject | Certification | Compl. | Grade | Score Tng. Time |
|---|---|---|---|---|---|---|---|
| - | -6752 | 12/31/2019 | AB 392 Use of Force Update | *** None *** | ✓ | P | 02:00 |
| - | -6742 | 12/04/2019 | Law Enforcement Family  Resiliency Conference | *** None *** | ✓ | P | 08:00 |
| - | -6746 | 11/21/2019 | Gracie Survival Tactics | *** None *** | ✓ | P | 05:00 |
| - | -6746 | 11/21/2019 | Range Training and Department Qualifications | *** None *** | ✓ | P | 05:00 |
| - | -6706 | 10/10/2019 | Crisis Intervention Training (CIT) Update | *** None *** | ✓ | P | 10:00 |
| - | -6703 | 09/11/2019 | De-escalation:  The Science of Using Mindful Breathing | *** None *** | ✓ | P | 08:00 |
| - | -6684 | 08/01/2019 | Reality Based De-escalation Training | *** None *** | ✓ | P | 06:00 |
| - | -6685 | 08/01/2019 | Pursuit Driving Update | *** None *** | ✓ | P | 02:00 |

Pleasanton Police Department

# Individual Training Activity

05/27/2020

| Person: | **Trovao, Richard  #B94-V33** | | (Continued) |
|---|---|---|---|

| Scheduled Training In:   **2019** | | | | | | | (Continued) |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6684 | 08/01/2019 | CIU Update & Incident Debrief | *** None *** | ✓ | P | | 04:00 |
| -  -6665 | 06/13/2019 | Less Lethal Training: Shotgun, Taser and FN303 | *** None *** | ✓ | P | | 04:00 |
| -  -6665 | 06/13/2019 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 06:00 |
| -  -6613 | 03/11/2019 | Arrest and Control Training | CA-POST - -18 | ✓ | P | | 08:00 |
| -  -6613 | 03/11/2019 | Peer Support | CA-POST - -18 | ✓ | P | | 02:00 |
| -  -6592 | 01/29/2019 | First Aid/CPR/BBP/ATD | CA-POST - -18 | ✓ | P | | 06:00 |
| -  -6592 | 01/28/2019 | Temporary Holding Facility | CA-POST - -18 | ✓ | P | | 04:00 |
| **Totals For Training Completed in: 2019** | | Completed 15 of 15 Modules | | | | | **80:00** |

| Scheduled Training In:   **2018** | | | | | | | |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6547 | 11/28/2018 | Pursuit Driving Update | CA-POST - -18 | ✓ | P | | 02:00 |
| -  -6516 | 10/22/2018 | Range Training and Department Qualifications | CA-POST - -18 | ✓ | P | | 10:00 |
| -  -6400 | 10/19/2018 | Public Safety Peer Support Association Conference | *** None *** | ✓ | P | | 32:00 |
| -  -6475 | 08/27/2018 | Blue Courage | *** None *** | ✓ | P | | 10:00 |
| -  -6444 | 08/10/2018 | Driver Training-Simulator | *** None *** | ✓ | P | | 04:00 |
| -  -6433 | 07/16/2018 | Active Threat | *** None *** | ✓ | P | | 10:00 |
| -  -6399 | 05/07/2018 | Range Training and Department Qualifications | *** None *** | ✓ | P | | 10:00 |
| -  -6358 | 03/13/2018 | Crowd Control | *** None *** | ✓ | P | | 05:00 |
| -  -6358 | 03/12/2018 | Human Trafficking | *** None *** | ✓ | P | | 02:00 |
| -  -6358 | 03/12/2018 | Terrorism Liaison Officer | *** None *** | ✓ | P | | 02:00 |
| -  -6328 | 01/22/2018 | First Aid/CPR/BBP/ATD | *** None *** | ✓ | P | | 06:00 |
| -  -6328 | 01/22/2018 | Temporary Holding Facility | *** None *** | ✓ | P | | 04:00 |
| **Totals For Training Completed in: 2018** | | Completed 12 of 12 Modules | | | | | **97:00** |

| Scheduled Training In:   **2017** | | | | | | | |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -6278 | 11/30/2017 | Critical Incident Stress Management | *** None *** | ✓ | P | | 32:00 |

Pleasanton Police Department

# Individual Training Activity

| Person: | **Trovao, Richard  #B94-V33** | (Continued) |
|---|---|---|

| Scheduled Training In: | **2017** | (Continued) |
|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - -6297 | 11/13/2017 | Range Qualifications | *** None *** | ✓ | P | | 03:00 |
| - -6297 | 11/13/2017 | Taser, Less Lethal and WRAP | *** None *** | ✓ | P | | 03:00 |
| - -6297 | 11/13/2017 | Defensive Tactics/Impact Weapons | *** None *** | ✓ | P | | 04:00 |
| - -6262 | 09/18/2017 | Active Threat | *** None *** | ✓ | P | | 06:00 |
| - -6262 | 09/18/2017 | CIT Update | *** None *** | ✓ | P | | 04:00 |
| - -6210 | 07/24/2017 | Human Trafficking | *** None *** | ✓ | P | | 03:00 |
| - -6210 | 07/24/2017 | Traffic Enforcement Advanced Officer Training | *** None *** | ✓ | P | | 02:00 |
| - -6210 | 07/24/2017 | CIU Advanced Officer Training | *** None *** | ✓ | P | | 05:00 |
| - -6206 | 06/30/2017 | Firearms Transition Qualification | *** None *** | ✓ | P | | 04:00 |
| - -6202 | 05/15/2017 | Monthly Departmental Training | *** None *** | ✓ | P | | 10:00 |
| - -6164 | 03/20/2017 | Principled Policing | *** None *** | ✓ | P | | 10:00 |
| - -6143 | 03/01/2017 | Explorer Program Advisor | *** None *** | ✓ | P | | 08:00 |
| - -6124 | 02/07/2017 | First Aid Instructor Transition | CA-POST 1179-21799-16011 | ✓ | P | | 08:00 |
| - -6128 | 01/23/2017 | First Aid/CPR Refresher | CA-POST 6000-21771-16001 | ✓ | P | | 06:00 |
| - -6128 | 01/23/2017 | Court and Temporary Holding Facility | CA-POST 6000-30780-16001 | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2017 | Completed 16 of 16 Modules | 112:00 |
|---|---|---|

| Scheduled Training In: | **2016** | |
|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| - -6157 | 12/16/2016 | Preventing Workplace Harassment | *** None *** | ✓ | P | | 02:00 |
| - -6087 | 10/24/2016 | Monthly Departmental Training | *** None *** | ✓ | P | | 10:00 |
| - -6050 | 09/15/2016 | Court & Temporary Holding Facility | CA-POST 6000-30780-16001 | ✓ | P | | 04:00 |
| - -6049 | 08/30/2016 | Crowd Control | *** None *** | ✓ | P | | 05:00 |
| - -6049 | 08/29/2016 | YCSU Presentation | *** None *** | ✓ | P | | 01:00 |
| - -6049 | 08/29/2016 | OIS Presentation | *** None *** | ✓ | P | | 05:00 |
| - -6016 | 08/11/2016 | Active Shooter | *** None *** | ✓ | P | | 10:00 |
| - -6033 | 07/28/2016 | Evoc Basic Skills Update | CA-POST 1010-21155-16010 | ✓ | P | | 08:00 |
| - -5988 | 06/30/2016 | POST Pursuit Driving Update | CA-POST 6000-29000-15001 | ✓ | P | | 02:00 |
| - -5990 | 06/16/2016 | Firearms (Psp) | CA-POST 6000-29501-15002 | ✓ | P | | 10:00 |
| - -5990 | 06/16/2016 | POST Pursuit Driving Update | CA-POST 6000-29000-15002 | ✓ | P | | 01:00 |

Pleasanton Police Department

# Individual Training Activity

05/27/2020

| Person: | **Trovao, Richard  #B94-V33** | (Continued) |
|---|---|---|

| Scheduled Training In: | **2016** | (Continued) |
|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5949 | 03/21/2016 | Below 100 | *** None *** | ✓ | P | | 01:00 |
| -  -5949 | 03/21/2016 | Court and Temporary Holding Facility | CA-POST 6000-30780-15001 | ✓ | P | | 04:00 |
| -  -5949 | 03/21/2016 | Defensive Tactics / Ground Control | CA-POST 6000-29503-15003 | ✓ | P | | 05:00 |
| -  -5897 | 03/10/2016 | Crisis Intervention Training (CIT) | CA-POST 2010-20801-15006 | ✓ | P | | 38:00 |
| -  -5893 | 01/25/2016 | Trauma Training | *** None *** | ✓ | P | | 04:00 |
| -  -5893 | 01/25/2016 | First Aid/ BBP | CA-POST 6000-21771-15001 | ✓ | P | | 04:00 |
| -  -5893 | 01/25/2016 | PPD Animal Services | *** None *** | ✓ | P | | 02:00 |

| Totals For Training Completed in: 2016 | Completed 18 of 18 Modules | 116:00 |
|---|---|---|

| Scheduled Training In: | **2015** | |
|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -5868 | 12/03/2015 | Department Firearms Qualifications | *** None *** | ✓ | P | | 02:00 |
| -  -5868 | 12/03/2015 | Electronic Weapons Update (Taser) | CA-POST 6000-23093-15 | ✓ | P | | 04:00 |
| -  -5868 | 12/03/2015 | Arrest & Control PSP | CA-POST 6000-29503-15 | ✓ | P | | 04:00 |
| -  -6158 | 09/01/2015 | CLETS Access (Test) | *** None *** | ✓ | P | | 01:00 |
| -  -5838 | 09/01/2015 | Response to Criminal Mass Casualty Incidents | *** None *** | ✓ | P | | 10:00 |
| -  -5813 | 08/13/2015 | Stinger Spike Strips | *** None *** | ✓ | P | | 03:00 |
| -  -5813 | 08/13/2015 | Peer Support | *** None *** | ✓ | P | | 02:00 |
| -  -5813 | 08/13/2015 | POST Pursuit Driving Update | *** None *** | ✓ | P | | 01:00 |
| -  -5813 | 08/13/2015 | Traffic Unit | *** None *** | ✓ | P | | 02:00 |
| -  -5813 | 08/13/2015 | Branding | *** None *** | ✓ | P | | 02:00 |
| -  -5784 | 06/18/2015 | Firearms (Psp) | CA-POST 6000-29501-14005 | ✓ | P | | 10:30 |
| -  -5754 | 03/23/2015 | CIU Advanced Officer Training | *** None *** | ✓ | P | | 06:30 |
| -  -5754 | 03/23/2015 | Patrol Canine Training | *** None *** | ✓ | P | | 03:00 |
| -  -5695 | 01/26/2015 | Human Trafficking | CA-POST | ✓ | P | | 02:00 |
| -  -5695 | 01/26/2015 | CPR/AED/BBP | CA-POST 6000-21771-14 | ✓ | P | | 04:00 |
| -  -5695 | 01/26/2015 | Jail Operations | CA-POST 6000-30780-14 | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2015 | Completed 16 of 16 Modules | 61:00 |
|---|---|---|

Pleasanton Police Department

# Individual Training Activity

05/27/2020                                                                    Page 435 of 462 pages

| Person: | **Trovao, Richard  #B94-V33** | | (Continued) |
| --- | --- | --- | --- |

**Scheduled Training In:   2014**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
| --- | --- | --- | --- | --- | --- | --- | --- |
| -  -5645 | 11/17/2014 | Department Firearms Qualifications | *** None *** | ✓ | P | | 02:00 |
| -  -5645 | 11/17/2014 | Taser Update & Qual | *** None *** | ✓ | P | | 01:30 |
| -  -5645 | 11/17/2014 | Defensive Tactics | *** None *** | ✓ | P | | 01:30 |
| -  -5637 | 11/17/2014 | Firearm (PSP) | CA-POST 6000-29501-14003 | ✓ | P | | 05:00 |
| -  -5631 | 10/30/2014 | POST Driver Training Update - Simulator | *** None *** | ✓ | P | | 04:00 |
| -  -5599 | 09/22/2014 | Chasing Cell Phones | *** None *** | ✓ | P | | 06:00 |
| -  -5599 | 09/22/2014 | Slow Speed Driving | *** None *** | ✓ | P | | 04:00 |
| -  -5566 | 08/07/2014 | New World Mobile Enterprise Training | *** None *** | ✓ | P | | 04:00 |
| -  -5552 | 07/28/2014 | Active Shooter / Fire Rescue Task Force Training | *** None *** | ✓ | P | | 10:00 |
| -  -5534 | 05/26/2014 | FIrearms Qualifications (rifle/pistol/less lethal) | *** None *** | ✓ | P | | 10:00 |
| -  -5497 | 03/10/2014 | Pursuit Driving Update | *** None *** | ✓ | P | | 01:00 |
| -  -5497 | 03/10/2014 | Court & Temporary Holding Facility | CA-POST 6000-30780-13002 | ✓ | P | | 04:00 |
| -  -5497 | 03/10/2014 | Hide it, Lock it or Lose it | *** None *** | ✓ | P | | 01:00 |
| -  -5497 | 03/10/2014 | First Aid | CA-POST 6000-21771-13002 | ✓ | P | | 04:00 |
| -  -5464 | 01/27/2014 | OIS Peer Support | *** None *** | ✓ | P | | 02:00 |
| -  -5464 | 01/27/2014 | OIS Investigations | *** None *** | ✓ | P | | 03:00 |
| -  -5464 | 01/27/2014 | Officer Involved Shootings | *** None *** | ✓ | P | | 04:30 |
| -  -5464 | 01/27/2014 | Mothers with a Purpose | *** None *** | ✓ | P | | 00:30 |
| -  -5450 | 01/17/2014 | Emotional Survival for Law Enforcement | *** None *** | ✓ | P | | 08:00 |

| **Totals For Training Completed in: 2014** | Completed 19 of 19 Modules | | 76:00 |
| --- | --- | --- | --- |

**Scheduled Training In:   2013**

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
| --- | --- | --- | --- | --- | --- | --- | --- |
| -  -5371 | 08/17/2013 | Active Shooter Update | CA-POST -    -13 | ✓ | P | | 10:00 |
| -  -5371 | 08/16/2013 | Arrest and Control (Psp) | CA-POST 6000-29503-13001 | ✓ | P | | 04:00 |
| -  -5371 | 08/16/2013 | District Attorney Update | CA-POST -    -13 | ✓ | P | | 02:00 |
| -  -5371 | 08/16/2013 | Taser Update | CA-POST 6000-23093-13001 | ✓ | P | | 04:00 |

Pleasanton Police Department

# Individual Training Activity

05/27/2020

| Person: | Trovao, Richard  #B94-V33 | (Continued) |
| --- | --- | --- |

| Scheduled Training In:   **2013** | | | | | (Continued) |
| --- | --- | --- | --- | --- | --- |

| TMS # | | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| - | -5371 | 08/15/2013 | First Aid CPR AED Update | CA-POST 6000-21771-13001 | ✓ | P | | 05:00 |
| - | -5371 | 08/15/2013 | Court & Temporary Holding Facility | CA-POST 6000-30780-13001 | ✓ | P | | 04:00 |
| - | -5355 | 05/31/2013 | First Aid Cpr AED Instructor | *** None *** | ✓ | P | | 08:00 |
| **Totals For Training Completed in: 2013** | | | Completed 7 of 7 Modules | | | | | 37:00 |

| Scheduled Training In:   **2012** | | | | | |
| --- | --- | --- | --- | --- | --- |

| TMS # | | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| - | -5195 | 11/13/2012 | Evoc Basic Skills Update | CA-POST 1010-21155-12024 | ✓ | P | | 08:00 |
| - | -5242 | 11/02/2012 | Cyber Bullying Prevention | CA-POST 2750-30553-12001 | ✓ | P | | 08:00 |
| - | -5203 | 09/21/2012 | Law Enforcement Explorer Advisor Training | *** None *** | ✓ | P | | 12:00 |
| - | -5216 | 09/18/2012 | Firearms (Psp) | CA-POST 6000-29501-12001 | ✓ | P | | 06:00 |
| - | -5216 | 09/18/2012 | Calico Center Training | CA-POST | ✓ | P | | 02:00 |
| - | -5216 | 09/18/2012 | Racial Profiling Update | CA-POST 6000-29000-12176 | ✓ | P | | 02:00 |
| - | -5216 | 09/17/2012 | First Aid CPR AED Update | CA-POST 6000-21771-12001 | ✓ | P | | 04:00 |
| - | -5216 | 09/17/2012 | Consolidated Records Information Management System | CA-POST | ✓ | P | | 02:00 |
| - | -5216 | 09/17/2012 | Court & Temporary  Holding Facility Training | CA-POST 6000-30780-12001 | ✓ | P | | 04:00 |
| - | -5213 | 09/14/2012 | Confronting School Violence | *** None *** | ✓ | P | | 04:00 |
| - | -5104 | 02/27/2012 | Cogent Mugshot System Training | *** None *** | ✓ | P | | 04:00 |
| **Totals For Training Completed in: 2012** | | | Completed 11 of 11 Modules | | | | | 56:00 |

| Scheduled Training In:   **2011** | | | | | |
| --- | --- | --- | --- | --- | --- |

| TMS # | | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| - | -4954 | 08/18/2011 | DARE Training Seminar | *** None *** | ✓ | P | | 24:00 |
| - | -4986 | 07/05/2011 | Clets Less Than Full Access (Test) | *** None *** | ✓ | P | | 01:00 |
| - | -4935 | 06/14/2011 | Arrest and Control (Psp) | CA-POST 6000-29503-10002 | ✓ | P | | 04:00 |
| - | -4935 | 06/14/2011 | Electronic Weapons Update (Taser) | CA-POST 6000-23093-10002 | ✓ | P | | 04:00 |

**Pleasanton Police Department**

## Individual Training Activity

| Person: | Trovao, Richard  #B94-V33 | | | | | | (Continued) |
|---|---|---|---|---|---|---|---|

| Scheduled Training In:   2011 | | | | | | | (Continued) |
|---|---|---|---|---|---|---|---|

| TMS # | Ended | Subject | Certification | Compl. | Grade | Score | Tng. Time |
|---|---|---|---|---|---|---|---|
| -  -4935 | 06/14/2011 | LPFD Incident Command | CA-POST<br>-    -10 | ✓ | P | | 02:00 |
| -  -4935 | 06/13/2011 | Pursuit Driving Update | CA-POST<br>6000-29000-1000 | ✓ | P | | 02:00 |
| -  -4935 | 06/13/2011 | First Aid | CA-POST<br>6000-21771-10002 | ✓ | P | | 04:00 |
| -  -4935 | 06/13/2011 | Court & Temporary Holding Facility | CA-POST<br>6000-35780-10002 | ✓ | P | | 04:00 |

| Totals For Training Completed in: 2011 | Completed 8 of 8 Modules | 45:00 |
|---|---|---|
| Totals For: Trovao, Richard  #B94-V33 | Completed 129 of 129 Modules | 720:00 |