1  J. GARY GWILLIAM (SBN. 33430)
2  JAYME L. WALKER (SBN. 273159)
   GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
3  1999 Harrison St., Suite 1600,
   Oakland, CA 94612
4  Phone: (510) 832-5411
   Fax: (510) 832-1918
5  Email: ggwilliam@giccb.com
          jwalker@giccb.com
6
7  MICHAEL E. CARDOZA (SBN 52264)
   The Cardoza Law Offices
8  1407 Oakland Blvd. Ste 200
   Walnut Creek, CA 94596
9  Telephone: (925) 274-2900
   Facsimile: (925) 274-2910
10
11 Attorneys for Plaintiffs
   JOHN AND ROSE BAUER
12
13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15                  San Francisco Division

16 JOHN BAUER, an individual and as        Case No.: 3:19-cv-04593-LB
   Successor in Interest of Jacob Bauer,
17 deceased; ROSE BAUER, an individual and  [ASSIGNED FOR ALL PURPOSES TO THE
   as Successor in Interest of Jacob Bauer, HON. LAUREL BEELER]
18 deceased;
                                            [REDACTED]
19          Plaintiffs,                     PLAINTIFFS JOHN AND ROSE BAUER'S
                                            OPPOSITION TO DEFENDANTS' MOTION
20 vs.                                      FOR SUMMARY JUDGMENT/PARTIAL
                                            SUMMARY JUDGMENT
21 CITY OF PLEASANTON; BRADLEE
   MIDDLETON; JONATHAN CHIN;               Date: April 8, 2021
22 RICHARD TROVAO; STEVEN                  Time: 9:30 a.m.
   BENNETT; ALEX KOUMISS; JASON           Dept.: Courtroom B – 15th Floor (San Francisco)
23 KNIGHT; MARTY BILLDT; DAVID            Judge: Hon. Laurel Beeler
   SPILLER; and DOES 1 to 50, inclusive;
24                                         Date Removed: August 7, 2019
            Defendants.                    Complaint Filed: June 20, 2019
25                                         Trial Date: July 19, 2021
26
27
28

*(left margin, vertical text)* GWILLIAM IVARY CHIOSSO CAVALLI & BREWER / ATTORNEYS AT LAW / A Professional Corporation / 1999 Harrison St., Suite 1600, Oakland, CA 94612

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...........................................................................................................1

II.   STATEMENT OF FACTS .............................................................................................2

    A.    Plaintiffs Notified the Pleasanton Police Department Four Times
        That Jacob Was in a Mental Health Crisis, Including Three Days
        Before He Was Killed..........................................................................................2

    B.    Middleton and Chin Should Have Known That Jacob Was in a
        Mental Health Crisis. .........................................................................................3

    C.    Middleton and Chin Unlawfully Attempted to Handcuffed
        Jacob Bauer and Violently Escalated the Encounter. ..........................................4

    D.    Jacob Was Tased, Jabbed With a Baton, Hit with a Fist,
        Had Officers Weighing on his Head, Neck, and Back, and
        at Least Seven Officers on Top of Him, While Other
        Officers, including Supervisors Looked on .........................................................5

    E.    The Supervisory Officers Failed to Properly Supervise
        and/or Intervene in the Excessive Use of Force.................................................8

    F.    Jacob Was Placed in Numerous Restraints, Including a WRAP,
        Spit Hood, and Four Sets of Handcuffs. ..........................................................11

    G.    Defendants Denied Paramedics Access to Jacob...............................................12

    H.    Jacob's Death Was Caused by Officers' Use of Force, not
        Methamphetamine Intoxication. .......................................................................13

    I.    Pleasanton Police Department's Policies  Applicable to the Mentally
        Ill Are Plainly Deficient, as is Their Training of Officers...............................15

III.  LEGAL STANDARDS .................................................................................................17

    A.    Summary Judgment Standards...........................................................................17

    B.    Qualified Immunity Standards...........................................................................18

IV.   ARGUMENT.................................................................................................................19

    A.    Defendants Middleton and Chin Violated Jacob's Fourth
        Amendment Rights When They Unlawfully Seized him. ................................. 20

        a.    Defendants Middleton and Chin did not have reasonable
            suspicion to handcuff Jacob................................................................ 20

        b.    Defendants Middleton and Chin are not entitled to qualified
            immunity for the unlawful seizure .....................................................21

///

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

## **TABLE OF CONTENTS (cont.)**

**Page**

B.  Defendant Officers Violated the Fourth Amendment by Using
Unreasonable and Excessive Force Against Jacob. ............................... 22

    a.  Neither Defendants Middleton, Chin, nor Trovao are entitled
to qualified immunity for their unreasonable and excessive
force .................................................................................................24

C.  Plaintiffs' Claims for Supervisory Liability Against
Defendants Marty Billdt and Jason Knight Are Proper .........................24

D.  Defendant Officers Demonstrated a Purpose to Harm Jacob in
Violation of the Fourteenth Amendment's Mandate of Substantive
Due Process..........................................................................................25

E.  Defendant Officers did not Monitor Jacob's Physical Condition and
Failed to Provide him With Medical Care ............................................26

F.  Plaintiffs' *Monell* Claims Against Defendants City of Pleasanton
and Chief Spiller are Proper................................................................27

    a.  PPD's policies are deficient .....................................................28

    b.  PPD's training is deficient .......................................................28

    c.  Defendants City and Spiller ratified officers' actions ...............29

B.  Questions of Fact Preclude Summary Judgment of State Law
Claims .................................................................................................30

V.  CONCLUSION...............................................................................................30

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

Supreme Court of the United States

*Anderson v. Creighton*
 483 U.S. 635 (1987)..................................................................................18

*Beck v. State of Ohio*
 379 U.S. 89 (1964)....................................................................................20

*City of Canton, Ohio v. Harris*
 489 U.S. 378 (1989)..................................................................................28

*Cty. of Sacramento v. Lewis*
 523 U.S. 833 (1998)..............................................................................25, 26

*Graham v. Connor*
 490 U.S. 386, 397 (1989).........................................................................22

*Hope v. Pelzer*
 536 U.S. 730 (2002)..................................................................................18

*Kingsley v. Hendrickson*
 576 U.S. 389 (2015)..................................................................................27

*Kisela v. Hughes*
 138 S. Ct. 1148 (2018)..............................................................................18

*Monell v. Dep't of Soc. Servs.*
 436 U.S. 658 (1978)..................................................................................26

*Pearson v. Callahan*
 555 U.S. 233 (2009)..................................................................................18

*Pembaur v. City of Cincinnati*
 475 U.S. 469 (1986)..................................................................................28

*Saucier v. Katz*
 533 U.S. 194 (2001)..................................................................................18

*Terry v. Ohio*
 392 U.S. 1 (1968)......................................................................................20

*Tolan v. Cotton*
 572 U.S. 650 (2014)..................................................................................18

*///*

*///*

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

United States Circuit Courts of Appeal

*Arpin v. Santa Clara Valley Transp. Agency*
  261 F.3d 912 (9th Cir.2001) ........................................................... 21

*Blankenhorn v. City of Orange*
  485 F.3d 463 (9th Cir. 2007) .......................................................... 21

*Bryan v. MacPherson*
  630 F.3d 805 (9th Cir. 2010) ............................................. 22, 23, 24

*Castro v. Cty. of Los Angeles*
  833 F.3d 1060 (9th Cir. 2016) ........................................................ 27

*Chew v. Gates*
  27 F.3d 1432 (9th Cir. 1994) .......................................................... 28

*Christie v. Iopa*
  176 F.3d 1231, 1238 (9th Cir. 1999) ............................................. 29

*Cruz v. City of Anaheim*
  765 F.3d 1076 (9th Cir. 2014) ........................................................ 18

*Deorle v. Rutherford*
  272 F.3d 1272 (9th Cir. 2001) .................................................. 23, 24

*Edgerly v. City & Cty. of San Francisco*
  599 F.3d 946 (9th Cir. 2010) .......................................................... 21

*Estate of Owensby v. City of Cincinatti*
  413 F.3d 596 (6th Cir. 2005) .......................................................... 27

*Fontana v. Haskin*
  262 F.3d 871, 882 (9th Cir. 2001) ................................................. 26

*Glenn v. Washington Cnty.*
  673 F.3d 864 (9th Cir. 2011) .......................................................... 22

*Gordon v. Cty. of Orange*
  888 F.3d 1118 (9th Cir. 2018) ........................................................ 27

*Gravelet-Blondin v. Shelton*
  728 F.3d 1086 (9th Cir. 2013) .................................................. 19, 24

*Green v. City & Cty. of San Francisco*
  751 F.3d 1039 (9th Cir. 2014) ........................................................ 30

*Pike v. Hester*
  891 F.3d 1131 (9th Cir. 2018) ........................................................ 18

*Kennedy v. City of Ridgefield*
  439 F.3d 1055 (9th Cir. 2006) ........................................................ 18

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

**TABLE OF AUTHORITIES (cont.)**

Page(s)

*Lowry v. City of San Dieg*
    858 F.3d 1248 (9th Cir. 2017) ......................................................................... 22

*Maddox v. City of Los Angeles*
    792 F.2d 1408 (9th Cir. 1986) ......................................................................... 27

*Oviatt By & Through Waugh v. Pearce*
    954 F.2d 1470 (9th Cir. 1992) ......................................................................... 28

*Palmer v. Sanderson*
    9 F.3d 1433 (9th Cir. 1993) ............................................................................. 24

*Porter v. Osborn*
    546 F.3d 1131 (9th Cir. 2008) .................................................................... 25, 26

*Rice v. Morehouse*
    No. 18-35459, 2021 WL 853301 (9th Cir. Mar. 8, 2021) ................ 19, 22, 23, 24

*Reynolds v. County of San Diego*
    84 F.3d 1162 (9th Cir. 1996) ........................................................................... 18

*Sialoi v City of San Diego*
    823 F.3d 1223 (9th Cir. 2016) ......................................................................... 18

*Smith v. City of Hemet*
    394 F.3d 689 (9th Cir. 2005) ........................................................................... 17

*Tatum v. Moody*
    768 F.3d 806 (9th Cir. 2014) ........................................................................... 25

*United States v. Bautista*
    684 F.2d 1286 (9th Cir. 1982) ......................................................................... 20

United States District Courts

*AG. G. by & through Aquino v. City of Hayward*
    No. 19-CV-00697-DMR, 2019 WL 2929788 (N.D. Cal. July 8, 2019) ............... 25

*Chang v. City of Pacifica*
    No. C 15-4591 SBA, 2018 WL 10460280 (N.D. Cal. Mar. 30, 2018) ................ 26

*C.E.W. v. City of Hayward*
    No. 13–CV–04516–LB, 2015 WL 1926289 (N.D. Cal. Apr. 27, 2015) ............... 26

*C.R. v. City of Antioch*
    No. 16-CV-03742-JST, 2018 WL 3108982 (N.D. Cal. June 25, 2018) ............... 24

*Duenez v. City of Manteca*
    No. CIV. S-11-1820 LKK, 2013 WL 6816375 (E.D. Cal. Dec. 23, 2013) .......... 26

*East v. City of Richmond*
    No. C 10-2392 SBA, 2010 WL 4580112 (N.D. Cal. Nov. 3, 2010) .................... 30

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

**TABLE OF AUTHORITIES (cont.)**

<u>Page(s)</u>

*Garlick v. Cty. of Kern*
   167 F. Supp. 3d 1117 (E.D. Cal. 2016)..................................................24, 25, 26

*Green v. Taylor*
   No. C 12-5933 CRB (PR), 2014 WL 6693865 (N.D. Cal. Nov. 26, 2014).........................26

*Zeen v. Cty. of Sonoma*
   No. 17-CV-02056-LB, 2018 WL 2445518 (N.D. Cal. May 31, 2018) ...............................25

<u>STATUTES AND REGULATIONS</u>

42 U.S.C. § 1983.....................................................................................24, 27

42 U.S.C. § 12101 .........................................................................................19

<u>RULES</u>

Fed. R. Civ. P., rule 12 ....................................................................................18

Fed. R. Civ. P., rule 50 ....................................................................................18

Fed. R. Civ. P., rule 56 ....................................................................................18

Cal. Civil Code section 52.1 ................................................................................30

I.      **INTRODUCTION**

On August 1, 2018, Pleasanton Police Department (hereinafter "PPD") killed Jacob Bauer, a man in the throes of a mental health crisis, when they escalated what should have been a non-violent interaction into a protracted violent struggle. They engaged in unconstitutional excessive force with no justification whatsoever, failed to recognize that Jacob Bauer was in a medical emergency despite his pleas that he could not breathe, and failed to allow paramedics and failed to allow paramedics full access to Jacob Bauer for seven minutes once he lost consciousness.

The only crime Jacob Bauer was suspected of committing was a possible misdemeanor vandalism. He posed no safety risk. He was not assaultive towards officers and he was obviously mentally ill. Yet Pleasanton Police failed to follow their own policies and standard police training related to encounters with mentally ill people and related to the proper use of restraints in an investigative detention. They engaged in excessive use of force and failed to follow their own medical emergency policy. As a result, Jacob Bauer died at 38 years old leaving behind two devastated parents.

Jacob Bauer's death marked the third death of a mentally ill man by PPD in as many years. After the first two deaths, PPD made no changes to their training and did not discipline any officers. Jacob's parents, John and Rose Bauer ("Plaintiffs") notified PPD 4 times about Jacob's mental illness, but PPD failed to institute a policy that would notify officers of crucial information about individuals like Jacob. There is a demonstrable custom, policy, or practice of the failure to use de-escalation tactics and the use of unconstitutionally excessive force against mentally disabled individuals, ratified by Defendants City of Pleasanton and Chief Spiller.

Defendants' claim they handcuffed Jacob Bauer for purposes of officer safety, yet in their depositions not one officer could articulate any facts that reasonably supported that Jacob Bauer presented any danger to anyone at the time officers attempted to handcuff him. Following their unlawful attempts to handcuff him, Jacob was resistant to the unlawful force used against him but not assaultive towards officers. There was simply no justification for the violent escalation of the encounter, especially once up to thirteen officers and three supervisors had responded to the

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

scene.  Yet despite the presence of so many officers, PPD continued to pile on top of Jacob restricting his ability to breathe and ignored the fact that he was in a medical emergency.

Defendants further dispute that they caused Jacob's death by claiming he died of methamphetamine toxicity.  This allegation is not even supported by the Alameda County Coroner, Dr. Ferenc, and is hotly contested by Plaintiffs' experts, including Plaintiffs' epidemiologist who opines the chances of Jacob's death being caused by the small amount of meth in his system were 1 in 353,000.  Plaintiffs' medical experts include a forensic pathologist, epidemiologist and a cardiologist, who all agree that Jacob was asphyxiated due to the actions of the Pleasanton Police Officers on scene.

Because most – if not all – material facts are disputed, Defendants' motion for summary judgment/partial motion for summary judgment should be DENIED in its entirety.

## II.   STATEMENT OF FACTS

### A.   Plaintiffs Notified the Pleasanton Police Department Four Times That Jacob Was in a Mental Health Crisis, Including Three Days Before He Was Killed.

Jacob Bauer was a 38-year-old man residing with his parents, Plaintiffs John and Rose Bauer, in Pleasanton, California.  Unfortunately, during the last year or so of Jacob's life, he began to spiral into a mental health crisis.  He began to suffer from delusions and paranoia and was disconnected from reality.  Walker Decl. Ex A, John Bauer Depo. at 50:20-24, 51:24-52:10, 115:17-25; Walker Decl. Ex B, Rose Bauer Depo. at 36:9-20, 47:2-8.  Plaintiffs notified the Pleasanton Police Department ("PPD") of Jacob's condition four times and tried to have him committed for mental health evaluation and treatment. Ex. A at 50:2-24, 51:11-23.  They also expressed their concern that Jacob would be hurt or killed if he encountered police officers, as two other mentally ill individuals were killed by PPD in the two years prior.  Ex. B at 50:19-51:8, 97:11-98:22.

Three days after Plaintiffs last pleaded with PPD for help, Plaintiffs' worst fears were realized and Jacob Bauer was killed at the hands of PPD officers who used excessive, unconstitutional, deadly force on Jacob, who was displaying symptoms of mental illness, unarmed, and only suspected of misdemeanor vandalism.

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

**B.**   **Middleton and Chin Should Have Known That Jacob Was in a Mental Health Crisis.**

Defendants Middleton and Chin responded to a call for service involving Jacob Bauer by Raley's grocery in Pleasanton.  Before they ever contacted Jacob, it should have been clear to them that he was in a mental health crisis.  In the 911 call from Raley's to PPD, the emphasis was on Jacob's welfare and mental health.  Walker Decl. Ex. C-1, 911 Call, attached to Ryan Report at ¶¶ 49, 52-53.  The caller, Karen, described Jacob as: "deranged."  *Id*.  When the dispatcher asked, "Does he look more like he needs a welfare check or do you just want him off your property," Karen responded, "I don't know if he's, you know, drug intoxicated.  [] if maybe he's just bipolar" and that "someone should assess, maybe, if he needs some kind of assistance."  *Id*.

The Call for Service Detail ("CAD") Report, which the Defendant officers had access to prior to arriving at Raley's, stated that Jacob was "ranting to himself" and was negative for weapons.  Walker Decl. Ex. D-8 at PPD2470, attached to Middleton Depo. at 48:15-23.

When Middleton and Chin arrived, Raley's employees told them that Jacob was talking to himself and that he was either intoxicated, on drugs, or crazy.  Walker Decl. Ex. C-2, Middleton BWC, attached to Ryan Report at ¶¶ 49, 54.  When Middleton asked if they wanted to press charges for the alleged vandalism, an employee told Middleton and Chin that it was "not much."  Another joked, "yeah, public nuisance?"  *Id*.

All officers in California are trained on the California Peace Officer Standards and Training ("POST") as part of their base education.  POST training includes educating officers on thought disorders, such as bipolar disorder and schizophrenia.  Walker Decl. Ex. F-1, LD 37:4 at p. 4-7 to 4-8, attached to Harmening Report at pp. 6, 14-15.  Officers are instructed to approach a person in a mental health crisis and a person under the influence in the same manner – de-escalation.  *See*, *e.g.*, Walker Decl. Ex. D-7, PPD Policy 419, attached to Middleton Depo at 39:11-40:1.

When Middleton and Chin approached Jacob he was calm and cooperative.  Walker Decl. Ex. C-3, Middleton BWC, attached to Ryan Report, at ¶¶ 49, 56-57.  He responded to their questions, including providing his name and birthdate.  *Id*.  When Middleton ran this identifying

1   information, Jacob came back "clear and valid." *Id.*; *see also*, Ex. D-8.  Jacob then told Chin and

2   Middleton that he became upset because someone had stolen the glass, which gave him "bad

3   memories."  Ex. C-3 *and* Walker Decl. Ex. E-3, Chin BWC, attached to Chin Depo. at 73:17-23.

4           Supervisory officer Defendant Sergeant Marty Billdt agreed that this would likely be a

5   situation necessitating a welfare check rather than a criminal investigation, since Jacob was

6   displaying signs of mental illness.  Walker Decl. Ex. G, Billdt Depo. at 52:7-54:10, 54:20-55:19.

7   Supervisory officer Defendant Sergeant Jason Knight had also concluded that Jacob was in a

8   mental health crisis.  Walker Decl. Ex. H, Knight Depo. at 40:20-41:7.  **Middleton and Chin**

9   **admitted in their depositions that they recognized it was a possibility that Jacob was**

10  **mentally ill**.  Walker Decl. Ex. D, Middleton Depo. at 33:14-18, 34:24-35:4.  Ex. E, Chin Depo.

11  at 27:22-28:7, 30:10-15.

12          Notably, PPD failed to notify Middleton and Chin of Jacob's parents' – Plaintiffs – many

13  contacts with the department related to Jacob being mentally ill.  **Nonetheless, Middleton**

14  **testified knowing Jacob was mentally ill would not have changed how he responded to the**

15  **situation**.  Middleton Depo. at 53:15-24.

16          **C.    Middleton and Chin Unlawfully Attempted to Handcuffed Jacob Bauer and**

17          **Violently Escalated the Encounter.**

18          After being notified Jacob was clear and valid, Middleton asked Jacob if he had anything

19  illegal on him.  Jacob did not respond and just stared into the distance.  He did not attempt to flee.

20  Ex. C-3, Middleton BWC.  At this point, Defendants Middleton and Chin attempted to physically

21  detain Jacob in handcuffs.  Contrary to Defendants' assertions in their motion that Jacob was

22  handcuffed for officer safety purposes (see MSJ, ECF 73, p. 1:21-22), Middleton admitted that

23  Jacob made no indication that he was an imminent danger to anyone.  Ex. D, Middleton Depo. at

24  63:10-13; *see also*, Ex. F, Harmening Report at p. 11-12; Ex. C, Ryan Report at ¶ 380.  Chin and

25  Middleton turned a cooperative encounter with a mentally ill man into a violent one by unlawfully

26  handcuffing Jacob and taking him to the ground simply because he did not answer their question.

27  Chin Depo. at 43:10-44:8.

28          As confirmed by Plaintiffs' **unopposed experts**, William Harmening – crisis intervention

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

and psychology of policing expert – and Jack Ryan – police practices expert  – **Jacob was under no legal obligation to answer their questions, and his refusal to do so did not justify their use of force.**  Ex. C, Ryan Report at ¶¶ 374, 376; Ex. F, Harmening Report at p. 11.  Officers may only use handcuffs in an investigative detention if they can state specific facts that a person poses an articulable danger or if they attempt to flee.  *Id.*; Ryan Report at ¶¶ 374-381; *see also*, F-2, LD:15:3, "Laws of Arrest"), attached to Ex. F, Harmening Report, at p. 11.  As noted above, there was no danger, and Chin admitted, "[a]t that time, [Jacob] did not show any visible signs that he was trying to flee."  Ex. E, Chin Depo. at 71:14-20.

Defendants further testified that Jacob was handcuffed because he had not been searched and he had been acting "erratically."  Ex. D, Middleton Depo. at 76:4-2.  This is beyond insufficient and was in violation of California and national standards for police training for handcuffing a detainee and searching them.  Ryan Report at ¶ 377.  California POST, the California Penal Code section 853.6, and PPD policy all prohibit a warrantless arrest for a misdemeanor unless it is committed in the officer's presence.  *Id.* at ¶ 384.  Middleton admitted he did not have probable cause to arrest Jacob Bauer for any crime at the time he attempted to handcuff him.  Middleton Depo. at 123:8-22.  Since there was no probable cause to arrest Jacob for any crime and the only suspected crime was a misdemeanor that occurred outside officers' presence, there was no authority to attempt to arrest Jacob.  Therefore, no amount of force used to restrain Jacob in order to escalate the investigatory detention to an arrest was appropriate, nor was the arrest itself.  Ex. F, Harmening Report at p. 18.

**D.  Jacob Was Tased, Jabbed With a Baton, Hit with a Fist, Had Officers Weighing on his Head, Neck, and Back, and at Least Seven Officers on Top of Him, While Other Officers, including Supervisors Looked on.[1]**

Jacob passively resisted the unlawful use of handcuffs repeatedly asking, "what are you doing," "what's going on," and "please, please."  Ex. E-3, Chin BWC; Ex. C-3, Middleton BWC; *see also*, Ex. C, Ryan Report at ¶ 60.  Defendants violently responded to his resistance.  At the start of the struggle, Defendant Middleton ███████████████████████████

---

[1] See also, Ryan Report at p. 96-97, ¶ 390, list of force used on Jacob.

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

1   ███████   Walker Decl. Ex. D-9, Middleton Taser Report, attached to Middleton Depo. at 77:11-

2   22.  Upon his arrival, Defendant Trovao then ███████████████████████.  Walker Decl.

3   I-19, Trovao BWC, at timestamp 1:49-2:18, attached to Knight Depo. at 72:19-73:1, 102:22-25;

4   ████████████████████████████████.  Law

5   enforcement considers Tasers to be a "significant intermediate weapon" that "is a significantly

6   stressful event" for the person it is being used on.  Ryan Report at ¶¶ 389, 392.  Axon, the

7   manufacturer of the Taser, recommends that a Taser is not used longer than a total of fifteen

8   seconds.  Walker Decl. Ex. D-11, Axon Taser PowerPoint, attached to Middleton Depo at

9   100:21-101:9.  Jacob was ████████████████ the recommended time.

10  Harmening Report at pp. 20-21.

11         PPD Policy 309.5.4 and Axon also recommend that multiple Tasers are not deployed at

12  the same time.  Again, PPD officers did exactly the opposite; Middleton and Trovao Tased Jacob

13  simultaneously.  Ryan Report at ¶ 396 (photo below, two Tasers on Jacob); Walker Decl. Ex. D-

14  12, PPD Policy Use of Force at PPD 460, attached to Middleton Depo. at 118:13-20.



21         Axon's training further provides that a mentally ill individual is in a "higher risk

22  population" and that use of a Taser "could increase the risk of death or injury."  *Id.*; *see also*,

23  Walker Decl. Ex. I, Trovao Depo. at 119:20-120:5.  Almost immediately following the use of the

24  Taser against him, Jacob started screaming and never stopped.  He "exhibited symptoms of

25  excited delirium, an emergency medical condition that carries an increased risk of sudden death."

26  Walker Ex. F, Harmening Report at pp. 16-17, 34.  This created a deadly cycle.  As Jacob

27  increased his panicked efforts to escape, Defendants increased their efforts to restrain him,

28  resulting in the protracted physical struggle, the excessive use of Tasers, and the application of the

1   WRAP.  Harmening Report at pp. 16-17.

2          Rather than respond according to their policy to treat excited delirium as a medical

3   emergency, Defendants escalated their use of force.  Chin employed two closed fist strikes.

4   Walker Decl. Ex. H-18-A, BWC of Knight, attached to Knight Depo. at 56:20-23, 102:22-25.  At

5   the same time, Trovao used his baton and foot on Jacob.  Walker Decl. Ex. I-22, Billdt BWC,

6   attached 22 to Trovao Depo. at 76:1-10, 122:6-9.  At that point, at least seven officers were piled

7   on Jacob, who was lying in a prone position on his stomach with two Taser barbs in his side.  Ex.

8   C, Ryan Report at ¶¶ 62-63.  According to police expert Jack Ryan, "[t]hese tactics are

9   considered by law enforcement to be significant uses of force which are used when a subject



10  places an officer at risk through

11  violent active resistance." *Id*. at

12  ¶ 391  Jacob resisted the

13  unlawful use of force but was not

14  assaultive towards the officers.

15  He told them he was unable to

16  comply with their commands,

17  repeatedly telling them he could

18  not get his hand out.  *Id*. at ¶ 388.

19          Pressure was also placed on Jacob's head, neck, and upper chest throughout the struggle.

20  Ex. F, Harmening Report at p. 23 (photo, left, showing pressure put on Jacob's head, neck, back,

21  and arm).  The BWC footage shows Trovao pressing his knee on Jacob's head and neck for

22  almost four minutes while the WRAP was being applied.  Harmening Report at pp. 22-23; Walker

23  Decl. Ex. H-18-B, Clip from Knight BWC, attached to Knight Depo. at 56:20-23, 102:22-25.

24  Three and a half minutes after he began to apply pressure, Trovao began "using the ground for

25  leverage to apply even more pressure." *Id*.; Harmening Report at p. 24.  Trovao was not the only

26  officer who put pressure on Jacob – two other officers were "pinning Jacob tightly to the ground

27  by applying their weight on his upper back, neck, and head and another officer was pinning

28  Jacob's left arm and shoulder to the ground." *Id*. at p. 23.  While in the WRAP, Jacob was placed

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

1  in less than a ninety-degree angle with officers pressing down on his shoulders, leaning their

2  bodyweight on him, and pushing a knee in his back for at least five minutes. Walker Decl. Ex. J,

3  Freeman Report at pp. 8-9 (photo, below, showing hands and knee pressing on Jacob); Walker

4  Decl. Ex. K, Knight Report, at ¶ 27.



5       Law enforcement has long been aware of the

6  dangers of compressional, positional, and mechanical

7  asphyxia. Ex. F, Harmening Report at p. 26; Ex. C,

8  Ryan Report at ¶ 417. No officer training teaches

9  officers that it is ever appropriate to apply this

10  pressure after handcuffing a person. Id. A

11  reasonable officer would have known of the dangers

12  of leaving Jacob in restraints when he is in an

13  agitated state after a prolonged struggle during which he had been Tased and beaten and in a

14  prone position for ten to twelve minutes. Defendants should have known they should not be

15  pushing down on Jacob's head, neck, and back; and, should not have placed Jacob in a WRAP

16  and a spit mask if he was indicating he could not breathe. Ryan Report at ¶¶ 417-430.

17       It is unreasonable for PPD officers to confront a mentally ill man suspected of a minor

18  vandalism misdemeanor and use this many levels and types of force. In fact, all of the PPD's

19  own policies on factors used to determine whether the use of force was reasonable indicate that

20  the use of force was not reasonable. Ex. D-12, Use of Force Policy at PPD 441-442. This

21  includes, *inter alia*, Jacob's mental state and conduct (mental health crisis), the availability of

22  other options (e.g., de-escalation) and of weapons (Jacob had none); the seriousness of the

23  suspected offense (minor vandalism); and number of officers (a total of thirteen officers,

24  including three supervisory officers, responded to the struggle). *Id.*

25  ## E.   The Supervisory Officers Failed to Properly Supervise and/or Intervene in the Excessive Use of Force.

26

27       The two supervisory Defendants, Marty Billdt and Jason Knight, arrived approximately

28  two minutes after Chin called for backup. Walker Decl. Ex. F-3, PPD Timeline, attached to

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

Harmening Report at pp. 6-7. Sgt. Billdt was the incident commander, although no one on scene was aware of this. Ryan Report at ¶ 433; Ex. G, Billdt Depo. at 45:8-16. Sgt. Knight also considered himself a supervisor on scene. Ex. H, Knight Depo. at 29:22-30:20. They were present for essentially the entire incident, yet they only stood around watching. They did not suggest that officers pause to reassess Jacob's mental condition. Ryan Report at ¶ 415-416. They did nothing about the excessive force that was used on Jacob. In fact, at some point during the incident, Knight left the scene to purchase water at Raley's. Concurring with Plaintiffs' experts on the role of the supervisors, Officer Rudolfo Granados testified:

> [A] supervisor has several responsibilities. One, observation of the scene as it unfolds. It is a dynamic event. Making sure that everyone involved, including parties around us, the officers and the subject we're contacting or subjects we are contacting are safe; that the manner in which the techniques that are being applied to restrain or detain someone are appropriate; evaluate any other additional needs, such as if someone did sustain an injury, getting someone on scene to take care of that, meaning medical staff; and then conducting a continual evaluation of the event and make sure that everything that is being done is appropriate.

Walker Decl. Ex. M, Depo. of Granados at 35:2-18. Contrary to the testimony of their own subordinate, Defendants Knight and Billdt did not supervise, intervene, or control the officers' actions, but moved down the sidewalk to confer with each other. Ex. F, Harmening Report at p. 30-31; Ex. C, Ryan Report at ¶ 409, 434.

In fact, Defendants Knight and Billdt testified that they believed the officers' use of force was appropriate, and that de-escalation tactics need not have been considered. Ex. H, Knight Depo. at 46:14-18, 46:1-8. Sgt. Billdt did not try to de-escalate the situation and didn't recall if de-escalation ever crossed his mind. Ex. G, Billdt Depo. at 105:2-15 and 105:16-19. Billdt also said that the excessive use of tasers "never crossed [his] mind." *Id.* at 92:19-93:2. Billdt observed the so-called "distractionary blows" done by both Chin and Trovao and believed they were appropriate even though did not recall his training on "distractionary blows." Billdt Depo. at 121:25-122:11, 123:7-10. Billdt testified it was appropriate for Chin to hit Jacob with his fist while four or five officers had him on the ground. *Id.* at 123:23-124:7. Billdt also felt Trovao was justified in hitting Jacob with his baton while he was on the ground. *Id.* at 130:5-131:7. Billdt believed it was reasonable for Trovao to strike Jacob in the head. *Id.* at 136:18-24. **Then**

<u>**later admitted that this could be excessive force**</u>. *Id*. at 138:4-12.

Sergeants were not concerned about whether Jacob could breathe. Ex. G, Billdt Depo. at 116:24-117:4, 119:5-18, 146:13-20. The reason for the delay: it was more important to take Jacob into custody. Ex. H, Knight Depo. at 45:5-21.

Knight purportedly "didn't know" if Jacob was suffering from excited delirium "at the time," but he "possibly" was. Knight Depo. at 95:14-25. Whether Jacob was in a mental health crisis would be assessed later. *Id*. 44:19-23. In fact, at no point did Knight review the CAD or talk to anyone about the dispatch notes, which would have informed him of Jacob's mental state, because he forgot his laptop. Knight Depo. at 47:13-48:20. Billdt testified that he did not recall concerns about whether Jacob was in a mental health crisis or a state of excited delirium running through his mind." Ex. G, Billdt Depo at 75:11-19; 71:14-15.

Plaintiffs' experts Harmening and Ryan testify as follows regarding the failures of Sgts. Knight and Billdt:

- Did not know the nature of the call to dispatch or whether Jacob was suffering a mental health crisis, even though Knight told a Raley's store clerk that Jacob was suffering a crisis (Ex. H, Knight Depo. at 38:24-39:15).

- Failed to consider de-escalation tactics and to evaluate Jacob for a 5150.

- Failed to prevent the excessive use of force, including fist strikes and Trovao's foot pushing on Jacob; baton strikes; use of the WRAP and spit mask; officers piled on him and pressing down on Jacob's neck, head, and back; and allowing multiple Tasers to be deployed longer than fifteen seconds.

- Failed to intervene and stop officers from putting weight on Jacob in the prone position and failed to get him in a sitting position as soon as possible.

- Failed to consider Jacob was suffering from a medical emergency or excited delirium and failed to monitor his deteriorating condition.

- Rather than supervising the application of restraint devices, they moved down the sidewalk to talk and then allowed restraint devices that restricted Jacob's breathing further restricted paramedics' access to Jacob despite the fact that he was in a medical emergency.

Walker Decl. Ex. F, Harmening Report at pp. 27-31; Walker Decl. Walker Decl. Ex. C, Ryan Report, Ryan Report at ¶¶ 386-410.

Billdt testified he never had concerns about the use of the WRAP on Jacob and never considered whether it would be dangerous to Jacob's health. Ex. G, Billdt Depo. at 87:24-88:7.

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

1   Billdt agreed that the spit mask should not be placed on a subject if they were having difficulty

2   breathing.  *Id*. at 120:13-20.  However, he did not know whether Jacob was having difficulty

3   breathing when the mask was placed on him.  *Id*. at 120:22-121:4.

4          Even Sgt. Billdt agreed that the scene was chaotic.  Billdt Depo. at 106:9-13.  When asked

5   what he did to reduce the chaos, he responded, "I don't recall what I did."  *Id*. at 107:20-23.

6          Overall, Billdt and Knight's failures to properly supervise the scene, intervene in the

7   excessive force, and treat Jacob Bauer as a mentally ill man in the midst of a medical emergency,

8   directly contributed to Jacob Bauer's death.  Ex. F, Harmening Report at p. 35.

9          **F.**   **Jacob Was Placed in Numerous Restraints, Including a WRAP, Spit Hood,**
            **and Four Sets of Handcuffs.**

10         In addition to the extreme force applied to Jacob, he was unnecessarily placed in a WRAP

11  restraint, a spit hood, and four sets of handcuffs.  By the time the spit mask was applied, Jacob's

12  "breathing [was already] labored and distressed."  *Id*.; Harmening Report at p. 22.  Jacob

13  repeatedly begged officers, "[p]lease take off my mask."  Walker Decl. Ex. J-1, Sarasua BWC,

14  attached to Freeman Report at p. 7.  Officers ignored his pleas.

15         According to PPD policy 306.5, spit masks are used when "the person will bite or spit."

16  Ex. D-12, PPD Use of Force Policy at PPD 449-450; *see also*, Ex. F, Harmening Report at p. 22.

17  It is undisputed that spit masks should <u>not</u> be applied if the person is bleeding from the nose or

18  mouth, or "if it will impact breathing."  *Id*.; Ex. D-12 at PPD 449-450; Ex. G, Billdt Depo. at

19  120:13-20.  Although Billdt stated that the mask was placed on Jacob because he was bleeding –

20  in violation of PPD policies – and had allegedly tried to bite Chin, Sergeant Benjamin Sarasua

21  testified that he did not observe Jacob trying to spit on or bite anyone.  Ex. G at 119:20-120:2;

22  Ex. N at 71:12-19.

23          Plaintiffs' CIT police practices expert has opined that the use of the WRAP, "following a

24  protracted physical struggle and multiple Taser deployments, and after Bauer had obviously

25  entered a state of excited delirium—a medical emergency—and further, after Bauer had already

26  been secured in handcuffs, was inappropriate, excessive under the circumstances, and a violation

27  of the manufacturer's recommendations."  Walker Decl. Ex. F, Harmening Report at p. 35 ¶ 3.

28  The excessive, unreasonable use of the WRAP in addition to the use of the spit mask directly

1  contributed to Jacob Bauer's death. Ex. C, Ryan Report ¶¶ 424, 425, 428-430; Ex. F, Harmening

2  Report pp. 23-25, 30, 34-35; Ex. J, Freeman Report at pp. 16-18; Ex. K, Knight Report at ¶¶ 44,

3  47-48, 50; Ex. L Wohlgelernter Report, at pp. 3-4; Ex. O, Ferenc Depo. at 20:25-21:6.

### G.   Defendants Denied Paramedics Access to Jacob.

Officers trained in Crisis Intervention Tactics are trained that mentally ill individuals are

"at an increased risk for excited delirium and sudden death after a prolonged physical encounter."

Ex. D-12, Use of Force, PPD Policy 300.6 – PPD's own policy states as follows:

> Persons who exhibit extreme agitation, violent irrational behavior accompanied by
> profuse sweating, extraordinary strength beyond their physical characteristics and
> imperviousness to pain (sometimes called "excited delirium"), or who require a
> protracted physical encounter with multiple officers to be brought under control,
> may be at an increased risk of sudden death. **Calls involving these persons should
> be considered medical emergencies.   Officers who reasonably suspect a
> medical emergency should request medical assistance as soon as practicable**
> and have medical personnel stage away if appropriate.

At PPD 445 (emphasis added).

Defendants allege that medical attention was timely summoned.  However, despite the fact

that Jacob was clearly at risk of sudden death, medical personnel were not requested until six

minutes after the confrontation turned violent, when nine officers were already on the scene, and

only as officers began to apply the WRAP. See Ex. F-3 and Ex. R-1, Macfarlane Matrix 2 and Ex

R, McFarlane timeline.  When paramedics arrived on scene at approximately 15:11, they were not

given full access to Jacob Bauer for another fourteen minutes until an unconscious Jacob Bauer

was restrained on the gurney and when fire department officials finally attempted to check his

pulse (at approximately 15:25).  *Id.*

Despite denying paramedics access to Jacob, PPD officers failed to do anything to monitor

Jacob's physical health.  When Jacob pled with officers that he could not breathe, they told him

that he could because he was speaking. Ex. J-1, Sarasua BWC. This directly contradicts

California and national training; officers are specifically trained that a person is not necessarily

getting enough oxygen to survive just because they are speaking. Ex. C, Ryan Report. at ¶ 430;

Ex. F, Harmening Report at p. 27.  The supervisor on scene, Sgt Billdt, "did not know" whether

Jacob should have been re-assessed and given a chance to breathe. Ex. G at 146:13-20

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

1    Paramedic Kitchens told officers that, because she had administered the sedative, she

2 needed access to Jacob in order to monitor his breathing, but she was not given access to Jacob

3 for eight minutes from the time the sedative was administered.  Ex. O at 46:15-48:33.  Paramedics

4 also stated in their interviews that the spit hood prevented them from seeing that Jacob was blue.

5 The fact that officers were more concerned about securing restraints on an excessively restrained

6 and unconscious Jacob Bauer directly contradicts PPD's own Medical Consideration policy.  Ex.

7 D-12 at PPD 445.

8    **H.    Jacob's Death Was Caused by Officers' Use of Force, not Methamphetamine**
      **Intoxication.**

9

10    Dr. Ferenc determined that Jacob died of acute methamphetamine toxicity, but he also

11 noted other significant causes that contributed to Jacob's death including mechanical asphyxia

12 after being placed in police restraints.  Walker Decl. Ex. O-42, Coroner Report at p. 2, attached

13 to Ex. O, Ferenc Depo., at 64:20-25.  Defendants rely heavily on Dr. Ferenc's finding of

14 methamphetamine toxicity and ignore Dr. Ferenc's other findings.  Notably, Defendants do not

15 cite any expert testimony supporting their causation argument.

16    Plaintiffs' experts strongly dispute Dr. Ferenc's primary finding that Jacob died of acute

17 methamphetamine toxicity.  Ex. K, Knight Report at p. 9, ¶ 50.  Plaintiffs' pathologist, Dr. Laura

18 Knight opines "[b]ut for the interaction with police (and subsequent restraints and violent

19 struggle), Mr. Bauer would not have died when he did." *Id.*  She based her reasoning on the

20 "temporal relationship with the violent events immediately prior to" his death." *Id.*

21    In discussing the WRAP, Dr. Knight described how the WRAP could have impaired

22 Jacob's ability to breathe, particularly in conjunction with the simultaneous "pressure to his

23 back/shoulders that may have enhanced this hunched forward position," as he likely needed

24 "rapid/deeper breathing for post-exercise recovery after violent struggle." *Id*. at p. 8 ¶ 47.  Jacob

25 was placed in this position for nineteen minutes.  Ex. J, Freeman Report at p. 17.

26    Dr. Ferenc concurred in his deposition testifying that the restraints impaired Jacob ability

27 to breathe and caused the mechanical asphyxia when he was placed in the in the "jack-knife"

28 position, as well as the application of the spit mask and the officers pushing on Jacob's back

while he was restrained.  Ex. O, Ferenc Depo. at 26:20-27:8.

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

Plaintiffs' epidemiologist, Dr. Michael Freeman opines that "[t]here is no evidence that supports the implication that the very small amount of methamphetamine in Mr. Bauer's blood (0.42 mg/L) was even a *plausible* cause of his death in the absence of the violent restraint." Walker Decl. Ex. J, Freeman Report at p. 20.  According to Dr. Freeman "[a] comparison of the number of doses to the number of deaths each year yields a risk of 1 death per 353,000 doses of methamphetamine" such that "the risk of death from a single dose of methamphetamine is exceedingly small." *Id*. He also opines that the use of the Taser further increased his need for oxygen. *Id*. at p. 19.

Plaintiffs' cardiology expert, Dr. Daniel Wohlgelernter, also disputes Dr. Ferenc's determination that sudden cardiac arrest or methamphetamine toxicity were the cause of death. Rather, Dr. Wohlgelernter opines that the restraints applied to Jacob led to asphyxia which, "in conjunction with the heightened requirement for oxygen[,] created a lethal oxygen supply-oxygen demand imbalance for Mr. Bauer, with resultant hypoxia and subsequent PEA cardiac arrest." Ex. L, Wohlgelernter report at p. 4.

This is clearly disputed by the video evidence that shows Jacob unconscious at least four minutes before being placed on the gurney.  Still PPD failed to allow paramedics full access to Jacob Bauer for seven minutes once he lost consciousness. See Ex. F-3 and Ex. R-1, Macfarlane Matrix 2 and Ex R, McFarlane timeline and Freeman report at p 24.  Defendants ignore the fact that Jacob ceased speaking long before he was placed in the ambulance and lost consciousness long before they ever allowed paramedics access to him.   Dr. Knight noted that, once restrained in the WRAP, Jacob became quieter, eventually ceasing to speak.  Ex. K, Knight Report at ¶ 47; *see also*, Ex. O, Ferenc Depo. at 72:20-73:4, *and* Ex. J, Freeman Report at p. 18.  Dr. Freeman noted that Jacob's breathing became shallower, "**and his face began to turn blue**." Ex. J, Freeman Report p. 7 (emphasis in original).

Crucially, Drs. Ferenc, Knight, and Freeman also confirmed that none of the sedative given by Paramedic Kitchens was found in Jacob's circulatory system, which indicated that Jacob's "circulatory system already had collapsed or was in the process of collapsing when the dose was administered," six minutes before paramedics had access to him.  Ex. O, Ferenc Depo.

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

at 47:23-48:3; Ex. J, Freeman Report at pp. 10-11, 23; Ex. K, Knight Report at ¶ 41; Ex. R-1, MacFarlane.

## I.   Pleasanton Police Department's Policies Applicable to the Mentally Ill Are Plainly Deficient, as is Their Training of Officers.

The aforementioned facts demonstrate that PPD's training and policies are deficient or non-existent.  Clearly, officers lack the proper training for: de-escalation tactics; excited delirium; Taser usage; application of the WRAP; appropriate use of force; mechanical, positional, and compressional asphyxia and hypoxia.  Despite clear violations of policy and standard police training, PPD's administrative investigation determined ███████████████

████████████████████████████████

██  ████████████████████████████████████

████████████████████████████████████████

████████████   Chief Spiller agreed, ratifying all violations of policy and training and the excessive use of force used against Jacob Bauer and another mentally ill man, John Deming (discussed below).  Walker Decl. Ex. Q, Spiller Depo. at 72:8-73:8 (taser use in Deming); 83:13-25 (handcuffs on Bauer); 64:23-65:1 (supervision); 75:19-76:5 (finding no need for remedial training, administrative leave, etc.); and 78:8-20 (finding no training deficiency or even potential policy violations).

PPD's Taser policy is deficient as it does not limit the amount of time that officers can Tase an individual, even though national standards limit the time to fifteen seconds.  Ex. F, Harmening Report at p. 21.  Regarding PPD's lack of a policy, Harmening opined, "[i]n theory, as long as only a single Taser is deployed, [PPD policy would allow officers to deploy] electrical charge … to the individual until the battery runs dry." *Id.*

PPD has no policy concerning the use of the WRAP.  *Id*. at 22.  Clearly, Defendants were either untrained or inexperienced in the application of the WRAP, which is why it took them so long to apply it and so long to remove it once Jacob had coded.  *Id*. at p. 34.

2
██████████████████████████████████████
███████████████████████████████

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

1   Even where PPD policy exists, PPD's officers are insufficiently trained on those policies.

2   This includes policies and training on warrantless arrests.  Ex. C, Ryan Report at ¶ 380 ("there is

3   nothing in the video, or in the testimony of the officers that would support the facts necessary to

4   justify a pat-down or handcuffing of" Jacob).

5   They were further insufficiently training on use of spit masks; they placed a spit mask on

6   Jacob because he was bleeding even though he had labored breathing in violation of their own

7   policy.  Ex. F, Harmening Report at p. 22.

8   In addition, PPD officers lack training on the use of de-escalation tactics, having failed to

9   use them at every step of the encounter.  Harmening Report at p. 31.  They also failed to properly

10  consider whether Jacob was in a state of excited delirium and needed emergency medical care.

11  *Id.* at 31-32.  Even if the thought crossed their mind, it was not a priority, exacerbating the

12  situation with force and risking the sudden death of Jacob – exactly what happened.  *Id.*

13  As discussed in detail above, the supervisory officers Sgts. Billdt and Knight lacked

14  sufficient training on PPD's own policies as well as standard police training, as they did nothing

15  to intervene with the unlawful excessive force used on Jacob Bauer or treat his situation as a

16  medical emergency in accordance with PPD's own policies.

17  Most importantly, PPD's failure to implement a policy that facilitates the execution of a

18  proper administrative investigation prevents any real changes from being made, including to

19  officers' actions that result in death.  Ex. F, Harmening Report at p. 33; Ex. C, Ryan Report at

20  ¶ 437.  Instead, over and over again, PPD ratifies their officers' conduct.  *Id.*   CONFIDENTIAL

21  ███████████████████████████████████████████████

22  ███████████████████████████████████████████████

23  █████████████████████████████████████████████

24  ███   PPD has demonstrated the obvious deficiencies and problems here, particularly in light

25  of the Deming case, where no de-escalation tactics were used and a Taser and K-9 unit were

26  deployed, in violation of PPD policies and California and national standards, on a calm,

27  communicative Deming.  Harmening Report. at p. 33.

28  Finally, PPD has no policy about notifying officers of prior contacts with mentally ill

individuals or CIT unit.  Ex. F, Harmening Report at p. 9; Ex. E, Chin Depo. at 61:9-12.  Had these policies existed, Jacob's death could have been prevented.  Defendant Middleton was not even aware of the policy PPD did have regarding police contacts with mentally ill individuals.  Ex. D, Middleton Depo. at 37:14-38:4.

This is not surprising considering in the two years prior to Jacob's death, two other mentally ill individuals were killed by PPD.  John Deming, Jr. and Shannon Edward Estill were both suffering mental health crises and were killed by PPD officers. ████████████████████ ████████████████████.  Instead of employing de-escalation tactics, officers deployed lethal force, killing both. ████████████████████████████████ ████████████████████████.  In short, PPD did nothing, essentially telling officers that this conduct was acceptable, and they would suffer no repercussions.  Importantly, Defendant Middleton was an on-scene officer when Deming was killed.

All of these failures, led to a predictable outcome with regard to PPD's encounter with a third mentally ill man, Jacob Bauer.  Despite being on actual notice of his mental illness by the multiple prior contacts from his parents, PPD failed to treat him as mentally ill, used unlawful excessive force in their encounter which resulted in his untimely, preventable and tragic death.

## III.  LEGAL STANDARDS

### A.  Summary Judgment Standards.

The Ninth Circuit has "held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc).  "'Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'"  *Id*.

The Ninth Circuit has held that, where the force used has led to death, the Court must carefully consider all the evidence and inferences in favor of the decedent:

Cases involving an officer's use of deadly force can pose difficult problems for determining the reasonableness of the officer's conduct because the officer […] is often the only surviving eyewitness […].  In such cases, the court must examine all of the evidence in the record as well as expert testimony to determine if the officer's

1  story is internally consistent with and consistent with other known facts.

2  *Reynolds v. County of San Diego*, 84 F.3d 1162, 1169 (9th Cir. 1996).  In cases of deadly force,

3  the Court "cannot 'simply accept what may be a self-serving account by the police officer.'"

4  *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014).  It must also look at the

5  circumstantial evidence that, if believed, would tend to discredit the police officers' story, and

6  consider whether this evidence could convince a jury that the officers acted unreasonably.  *Id*.

7     **B.**      **Qualified Immunity Standards.**

8        To determine whether an officer is entitled to qualified immunity, courts apply a two-

9  prong test.  *Pearson v. Callahan*, 555 U.S. 233, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194,

10  201 (2001)).  First, the court will determine "whether the facts that a plaintiff has alleged or

11  shown make out a violation of a constitutional right."  *Id*. (citing *Saucier*, 533 U.S. at 201 and

12  Fed. R. Civ. P., rules 12, 50, 56).  If the plaintiff meets the first prong, the court will determine

13  "whether the right at issue was 'clearly established' at the time of defendant's alleged

14  misconduct."  *Id*. (citing *Saucier*, 533 U.S. at 201).  A right is clearly established when "[t]he

15  contours of the right [are] sufficiently clear that a reasonable official would understand that what

16  he is doing violates that right."  *Sialoi v City of San Diego*, 823 F.3d 1223, 1231 (9th Cir. 2016)

17  (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Under both prongs, the court "may

18  not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *Tolan v.*

19  *Cotton*, 572 U.S. 650, 656 (2014) (citations omitted) (per curiam).

20        The Supreme Court has affirmed that that "caselaw does not require a case directly on

21  point for a right to be clearly established."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).  The

22  "preexisting law [need only] provide 'fair warning.'"  *Pike v. Hester*, 891 F.3d 1131, 1141 (9th

23  Cir. 2018) (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1065 (9th Cir. 2006)).

24  Requiring facts of previous cases to be "materially similar" to the case at issue is a "rigid gloss on

25  the qualified immunity standard" and "not consistent with our cases."  *Hope v. Pelzer*, 536 U.S.

26  730, 739 (2002).

27         *Rice v. Morehouse*, No. 18-35459, 2021 WL 853301, *6 (9th Cir. Mar. 8, 2021) is a case

28  that was decided by the Ninth Circuit after Defendants filed this MSJ and is dispositive on the

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

1   issue of qualified immunity in this case.  In *Rice*, Officer Murakami pulled Rice over in a traffic

2   stop for failing to signal and believing that he was driving under the influence.  *Id*. at *2.  Rice

3   refused to show Murakami any documents aside from his license.  *Id*.  Murakami called for

4   "Code 3" cover and implied that she was in danger.  *Id*.  She told Rice to get out of the car

5   because he was under arrest, which Rice refused to do.  *Id*.  Morehouse and Shaffer arrived first.

6   In total, seventeen officers responded.  *Id*. at *7.  After Rice unlocked the car, "Murakami and

7   Morehouse pulled [Rice] out from the car" which Rice testified he did not resist.  When

8   Murakami was unable to grip Rice's arm, Morehouse and Schaffer took Rice down to the ground

9   causing him to land "face-first on the pavement."  *Id*.  Before Rice was handcuffed, the officers

10  "repeatedly struck and kneed [him], wrenching his arms and shoulders, and twisted his fingers"

11  while he lay on the ground.  *Id*.  The misdemeanor charge against Rice was later dismissed for

12  lack of reasonable suspicion or probable cause to stop him.  *Id*.

13    Reversing the trial judge, the Ninth Circuit found that defendants were not entitled to

14  qualified immunity because a jury could find that the officers used unreasonable and excessive

15  force against Rice in response to his possible commission of only a minor offense and the fact

16  that he had engaged in only passive resistance against the officers.  *Id*. at *7-10.  The *Rice*

17  court noted that the law has long distinguished between active and passive resistance and "[t]he right to

18  be free from the application of non-trivial force for engaging in mere passive resistance was

19  clearly established prior to 2008."  *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir.

20  2013).  Where a person does "not make any threats or resist the officer [until force is applied],

21  under our case law, the use of non-trivial force of *any kind* was unreasonable."  *Id*. at 1094

22  (emphasis in original).

23  **IV.** **ARGUMENT**

24    As a preliminary matter, we note that Defendants did not address Plaintiffs' Ninth Cause

25  of Action, violation of the Americans with Disabilities Act (42 U.S.C. § 12101, *et seq*.), which

26  Your Honor found to be sufficiently pled in the Order Granting in Part and Denying in Part

27  Defendant's Motion to Dismiss Second Amended Complaint.  *See* ECF 47 at pp. 7-8.

28    **A.** **Defendants Middleton and Chin Violated Jacob's Fourth Amendment Rights When They Unlawfully Seized him.**

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

1

2      Plaintiffs do not dispute that Defendants Middleton and Chin could detain Jacob in an

3  investigatory detention.  Rather, Middleton and Chin did not have the lawful right to handcuff

4  him, escalating the detention to a physical one.  Moreover, there were no facts that justified the

5  use of handcuffs in order to search for weapons. Defendants argue that they could place Jacob in

6  handcuffs for officer safety purposes, but, as stated in detail above, Jacob Bauer did not present

7  any danger to anyone at the time he was physically accosted by Defendants.

8           **a.     Defendants Middleton and Chin did not have reasonable suspicion to
                     handcuff Jacob**

9

10      Defendants acknowledge that handcuffing a person elevates the intrusiveness of an

11  investigatory detention and is not part of a typical search for weapons or *Terry* stop.  ECF 73 at

12  12:1-3 (citing *United States v. Bautista*, 684 F.2d 1286 (9th Cir. 1982)).  *Bautista* makes clear that

13  in order to escalate the investigative detention with the use of handcuffs there must be facts

14  showing the suspect was potentially dangerous or attempting to flee.  *Id.* at 1289.

15      The Supreme Court has affirmed that "[i]t must be recognized that whenever a police

16  officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."

17  *Terry v. Ohio*, 392 U.S. 1, 16 (1968).  "The scope of [an investigative] search must be 'strictly

18  tied to and justified by' the circumstances which rendered its initiation permissible.  *Id.* at 18.  A

19  court asks, "would the facts available to the officer at the moment of the seizure or the search

20  'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"  *Id.*

21  (quoting *Beck v. State of Ohio*, 379 U.S. 89, 97 (1964)).

22      To conduct a search for weapons, an officer must "ha[ve] reason to believe that he is

23  dealing with an armed and dangerous individual."  *Id.* at 30.  The test assesses "whether a

24  reasonably prudent man in the circumstances would be warranted in the belief that his safety or

25  that of others was in danger."  *Id.* at 27. If not, the Fourth Amendment is violated.

26      As articulated above, it is clear that no one's safety was in question.  Defendants cannot

27  articulate any facts that safety was an issue or that it was reasonably necessary to escalate the

28  detention. **Moreover, since there was not probable cause to arrest Jacob for any crime, no**

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

**use of force was warranted in trying to effect such an arrest.**

In *Blankenhorn v. City of Orange*, 485 F.3d 463, 472 (9th Cir. 2007) (overruled on other grounds), the court held that "any [] resistance (and corresponding probable cause) arose out of the initial arrest for trespassing.  "**If there was no probable cause to arrest Blankenhorn for trespassing in the first place, it makes no difference for the present purposes if he resisted arrest.**"  *Id.* (emphasis added); *see also*, *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 920 (9th Cir.2001) (where officers "arrived after the alleged battery occurred, they had no lawful basis to arrest "Arpin for the battery" and therefore could not arrest him.")  Further, the *Arpin* Court held that "gang-tackling **without first attempting a less violent means of arresting a relatively calm trespass suspect—especially one who had been cooperative in the past and was at the moment not actively resisting arrest**—" violated the Fourth Amendment.  *Id.* (emphasis added).

Similarly, here, escalating the detention when Jacob Bauer was calm and cooperative and forcefully seizing him in handcuffs was an unlawful violation of his Fourth Amendment rights.

> **b.      Defendants Middleton and Chin are not entitled to qualified immunity for the unlawful seizure**

Since the established law is clear that the seizure and arrest of Jacob was unlawful, Middleton and Chin are not entitled to qualified immunity.

Defendants reliance on *Edgerly v. City & Cty. of San Francisco*, 599 F.3d 946 (9th Cir. 2010) is misplaced.  There, the Court concluded that officers could arrest Edgerly without a warrant because the crime – trespass – was committed in their presence.  *Id.* at 956.  Here, it is undisputed that the alleged vandalism was committed outside of Middleton and Chin's presence and they had no probable cause to arrest him for it.  Ex. C, Ryan Report at ¶ 382-385.

Defendants are also mistaken in their reliance on *United States v. Santana*, 427 U.S. 38, 40, 43 (1976), which involved "a true 'hot pursuit,'" as Santana attempted to flee into her house as officers approached.  The Supreme Court of the United States thus specifically held "a suspect may not defeat an arrest which has been set in motion in a public place … by the expedient of escaping to a private place."  *Id.* at 43.  Here, Jacob was cooperative, merely staring off into space, and made no physical attempt to flee.  Ex. E., Chin Depo at 71:6-72:5.  *Santana* is

1  therefore inapplicable and does not support a finding of qualified immunity for Chin or

2  Middleton.  As such, Jacob's Fourth Amendment rights were violated and summary judgment on

3  this basis must be denied.

### B.   Defendant Officers Violated the Fourth Amendment by Using Unreasonable and Excessive Force Against Jacob.

In a claim for excessive force under the Fourth Amendment, the court assesses "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them" in a three-factor balancing test "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 397, 396 (1989) (citations omitted).  The court balances "(1) 'the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted,' (2) 'the government's interest in the use of force,' and (3) the balance between 'the gravity of the intrusion on the individual' and 'the government's need for that intrusion.'" *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc) (internal quotations omitted) (quoting *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011).

Again, *Rice v. Morehouse,* outlined above is particularly illustrative.  As to the severity of the intrusion on the individual, the *Rice* Court found that the take-down "involved a 'substantial' and 'aggressive use' of force," as they are generally considered "quite severe" and Rice suffered extreme, long-term pain as a result.  *Rice*, *supra*, 2021 WL 853301 at *6.

Regarding the government interest, the *Rice* Court found that the officers had only a minor interest related to their use of force, noting, *inter alia*, that: Rice was suspected of only minor offenses (driving under the influence); he was not "an immediate threat to the safety of the officers or others, the most important factor under *Graham*," particularly as there were seventeen officers on the scene; and he did not resist until after he was taken down. *Id.* at *7-8.

The Court noted Morehouse and Shaffer had "a duty to independently evaluate a situation when they arrive[d]" and "the officers did not apparently consider 'what other tactics if any were available' to effect the arrest," which they are 'required' to do.  The court then concluded the amount of force used against Rice was excessive.  *Id.* at *8 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010).

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

1    Importantly, the Ninth Circuit has held that "**[t]he problems posed by, and thus the**

2  **tactics to be employed against, an unarmed, emotionally distraught individual who is**

3  **creating a disturbance or resisting arrest are ordinarily different from those involved in**

4  **law enforcement efforts to subdue an armed and dangerous criminal who has recently**

5  **committed a serious offense.**" *Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001).

6  Thus, if an officer believes that an individual "was mentally disturbed he should have made

7  greater effort to take control of the situation through less intrusive means." *Bryan*, *supra*, 630

8  F.3d at 829. "[E]ven 'when an emotionally disturbed individual is 'acting out' and inviting

9  officers to use deadly force to subdue him, the governmental interest in using such force is

10  diminished by the fact that the officers are confronted … with a mentally ill individual.'" *Id.*

11  (quoting *Deorle*, *supra*, 272 F.3d at 1283). Thus, the court can presume that the interests of the

12  mentally ill individual outweigh that of the officers, particularly because the government also

13  has an interest in "providing assistance to a person in need of psychiatric care." *Id.*

14    Here, the intrusion on Jacob and the use of force against him was severe. Middleton and

15  Chin did a leg sweep and forcefully took Jacob to the ground. ███████████████████

16  ████████████     As additional officers arrived on scene, no one independently evaluated the use of

17  force. Chin hit Jacob with multiple closed-fist "distractionary blows". Trovao Tased Jacob

18  simultaneously as Middleton also Tased Jacob. Ex. C, Ryan Report ¶ 396; Ex. I-19 at 1:48-1:53.

19  Trovao stomped on Jacob and jabbed him with a baton. Ex. I-21 and Ex. I-22. No one used de-

20  escalation tactics. Defendants' actions went beyond those in *Rice*; Jacob did not just suffer

21  extreme pain – he died. With regard to the government interest involved, Jacob was suspected of

22  only a minor offense; he was not "an immediate threat to the safety of the officers or others"; he

23  did not resist until after he was taken down; and Defendants did not consider de-escalation despite

24  his mental health crisis. On balance, Jacob's interests clearly outweighed those of the Defendants

25  and the force used against him was unconstitutionally excessive.

26    **a.  Neither Defendants Middleton, Chin, nor Trovao are entitled to**
            **qualified immunity for their unreasonable and excessive force**

27    Under the two prong test for qualified immunity, Plaintiffs have properly demonstrated

28  that each officers' actions constituted a clear violation of Jacob's Fourth Amendment rights.

As to the second prong, the *Rice* Court held that the right to be free from the non-trivial use of force when a person is only engaged in passive resistance has long been clearly established. The *Rice* court cited six precedential cases where the individual refused to retreat or failed to comply, but the officer's use of force was nontrivial and thus qualified immunity was denied. *Rice*, *supra*, 2021 WL 853301, at *9–10 (citing *Gravelet-Blondin*, 728 F.3d at 1092–96 (Taser); *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993); *Deorle*, 272 F.3d at 1277, 1281 (shooting a beanbag projectile at a suicidal and irrational person who refused to put down his crossbow); and *Bryan*, *supra*, 630 F.3d at 805 ( use of taser during a traffic stop).

Moreover, in *C.R. v. City of Antioch*, No. 16-CV-03742-JST, 2018 WL 3108982, at *5 (N.D. Cal. June 25, 2018), the plaintiff told officers repeatedly that he could not breathe as officers pressed him face first to the ground. They told him that, if he stopped resisting, he would not breathe in dirt. *Id.* This Court emphasized that summary judgment is not the proper forum in which to address qualified immunity, noting that a jury could disbelieve the officers that "they did not hear Rucks complain of breathing difficulties, that they never pressed their full body weight into Rucks, and that they were applying only whatever pressure they felt was necessary to restrain a person who was resisting arrest and posed a safety risk." *Id.*

In addition, in *Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1154, 1158 (E.D. Cal. 2016), the court denied qualified immunity on claims regarding the use of impact blows and prolonged application of body weight to a person's back.

For all these reasons, Defendants Middleton, Chin, and Trovao are not entitled to qualified immunity for the excessive unconstitutional force used to restrain Jacob Bauer.

## C. Plaintiffs' Claims for Supervisory Liability Against Defendants Marty Billdt and Jason Knight Are Proper.

Supervisors are liable under section 1983 for:

1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others." In other words, a supervisor can be held liable in his individual capacity "if he set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury."

*Zeen v. Cty. of Sonoma*, No. 17-CV-02056-LB, 2018 WL 2445518, at *10 (N.D. Cal. May 31,

2018) (internal citations omitted). **Where an on-scene supervisor does nothing, supervisor liability is facially evident.** *See, e.g., AG. G. by & through Aquino v. City of Hayward*, No. 19-CV-00697-DMR, 2019 WL 2929788, at *3 (N.D. Cal. July 8, 2019) (this Court denied a motion to dismiss claims against supervisory officers on scene who made only one cautionary statement to their subordinates and "did nothing further to manage or supervise" them).

As is discussed in detail in section E above, Sgts. Billdt and Knight failed in their duties as supervisors at every turn. They failed to consider whether Jacob was in a mental health crisis. They failed to summon medical attention and failed to monitor whether Jacob was in a medical emergency. They failed to properly supervise the use of force and application of restraints to Jacob. In short, a reasonable supervisory officer would have recognized that the actions of the officers were excessive, but Defendants Knight and Billdt were either wholly ineffective or wholly disinterested. As such, they are liable for their failure to intervene and for allowing the unconstitutional conduct of their subordinates. *See also, Maxwell, supra,* 708 F.3d at 1086 (the Ninth Circuit denying summary judgment to two supervisors who were present on the scene but failed to intervene in their subordinates' constitutional violations).

### D.    Defendant Officers Demonstrated a Purpose to Harm Jacob in Violation of the Fourteenth Amendment's Mandate of Substantive Due Process.

In a claim for violation of substantive due process claim, Plaintiffs must show that the officer's conduct " 'shocks the conscience,' or 'violates the decencies of civilized conduct.' either "(1) by showing that the officer acted with "deliberate indifference," or (2) [...] 'that he acted with a purpose to harm.'" *Garlick, supra,* 167 F. Supp. 3d at 1164 (E.D. Cal. 2016) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) and *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Deliberate indifference applies where "actual deliberation is practical." *Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014) (internal citations omitted).

"[W]here a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* The totality of the circumstances governs which standard applies. A determination of which standard applies considers the totality of the circumstances. *Porter*, 546 F.3d 1131 at 1137. Generally, "the determination of which

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

situation [the officer] actually found himself in is a question of fact for the jury." *C.E.W. v. City of Hayward*, No. 13–CV–04516–LB, 2015 WL 1926289, at *13 (N.D. Cal. Apr. 27, 2015) (citing *Duenez v. City of Manteca*, No. CIV. S-11-1820 LKK, 2013 WL 6816375, at *14 (E.D. Cal. Dec. 23, 2013)).   The threshold question is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Fontana v. Haskin*, 262 F.3d 871, 882 n.7 (9th Cir. 2001) (quoting *Lewis*, 523 U.S. at 848 n.8).

Here, the purpose to harm standard applies.  Under the provocation doctrine, which is considered under this standard, **where the officer provokes the person's non-compliance and responds with an "unconstitutionally disproportionate response to a suspect's noncompliance," the court may find a violation of substantive due process**.  *Garlick*, 167 F. Supp. 3d at 1167 (citing *Porter*, 546 F.3d at 1131 (9th Cir.2008)).  In *Green v. Taylor*, No. C 12-5933 CRB (PR), 2014 WL 6693865, at *4 (N.D. Cal. Nov. 26, 2014), this Court noted that, "[e]ven if plaintiff's actions created a need for the responding officer defendants to use force to handcuff and/or otherwise control him, punching and hitting plaintiff while plaintiff was handcuffed and on his stomach supports the inference that the responding officer defendants used force for the malicious and sadistic purpose of causing harm."  Here, there was not a trivial amount of force applied.  Moreover, Middleton and Chin, not Jacob, initiated this struggle.  *See also*, *Porter*, 546 F.3d at 1141 ("[w]hen an officer creates the very emergency he then resorts to deadly force to resolve, he is not simply responding to a preexisting situation"; *Chang v. City of Pacifica*, No. C 15-4591 SBA, 2018 WL 10460280, at *14 (N.D. Cal. Mar. 30, 2018) (this Court denied summary judgement on substantive due process where officers exacerbated the conflict).

### E.  Defendant Officers did not Monitor Jacob's Physical Condition and Failed to Provide him With Medical Care.

Officers are liable under section 1983 and the Fourteenth Amendment for failure to provide medical care where:

(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018), cert. denied sub nom. *Cty. of Orange, Cal. v. Gordon*, 139 S. Ct. 794 (2019). Under the third element, plaintiffs must prove only that the officer's conduct was not objectively reasonable – "a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).) Under the Fourth Amendment, officers are obligated to promptly summon medical attention. *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986).

Here, Jacob entered into a state of excited delirium when the altercation began, yet officers delayed summoning medical attention until after he was being put in a WRAP. **No one monitored Jacob's vital signs. No one took seriously his pleas for air. No one did anything once he lost consciousness.** When paramedics did arrive, officers denied them access to Jacob until he was placed on the gurney – **approximately twenty-five minutes after the incident began** – except to allow them to give an unconscious Jacob a sedative. They then denied paramedics access to Jacob for another five minutes even though paramedics told them they needed to monitor his airway. Because of this excessive and extreme delay, Jacob died well before he left the scene.

Defendant officers are also not entitled to qualified immunity on this claim. *See*, *e.g.*, *Estate of Owensby v. City of Cincinatti*, 413 F.3d 596 (6th Cir. 2005) (denying qualified immunity to officers where the arrestee died from injuries inflicted by the officers).

### F.    **Plaintiffs' *Monell* Claims Against Defendants City of Pleasanton and Chief Spiller are Proper.**

Municipalities are liable for violations of constitutional rights where there is a custom or policy, including a failure to train or to enact a necessary policy, which is express, longstanding, or has been ratified by a final policymaker, which "amounts to deliberate indifference" and is the "moving force behind the constitutional violation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989); *see also*, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A plaintiff "need only show that the specific use of force […] violated the Constitution, and that

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

city policy caused the unconstitutional application of force in this instance." *Chew v. Gates*, 27 F.3d 1432, 1444 n. 12 (9th Cir. 1994). Deliberate indifference exists when the "need for more or different action 'is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1477–78 (9th Cir. 1992) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986)) (alterations in original).

As articulated above in detail in Section II(I), PPD's policies and its training are plainly deficient. Chief Spiller – the final policymaker – ratified the actions of all the Defendant officers. These failures directly caused the deaths of three (3) mentally ill individuals, and led to the violation of Jacob's constitutional rights.

### a.   PPD's policies are deficient.

As discussed in Section II.I, PPD does not have policies for crucial types of conduct that officers regularly, or can expect to, engage in. This includes asphyxia and hypoxia, prolonged use of the taser or the use of the WRAP device.

It has no policy by which officers are notified of prior contacts with mentally ill people.

PPD obviously does not have sufficient policies related to oversight of use of force incidents as repeated administrative investigations of deaths have found no serious policy violations.

### b.   PPD's training is deficient.

PPD's training regarding responding to calls involving the mentally ill is also clearly deficient. In the two years before Jacob's death, two other mentally ill people, John Deming, Jr. and Shannon Edward Estill, were killed at the hands of PPD. In those deaths and Jacob's, de-escalation tactics were not used because PPD officers lacked proper training on their use.

Former Chief David Spiller expected that officers "would use the training, tools and experience to manage the call [regarding an individual in a mental health crisis] as effectively as possible. That would include any previous CIT training." Ex. Q, Spiller Depo. at 23:24-24:11. He also expected that, per their training, officers would recognize that the person was in a mental

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

1   health crisis and use these techniques, "even if they also suspected that the person may also be
2   under the influence of [] of illegal drugs." *Id*. at 24:13-25:2.  Despite these expectations, officers
3   failed to use any CIT training or tactics.  In this case, Middleton and Chin, testified that they
4   would not use any of these techniques to respond to a call involving the mentally ill unless that
5   was the only issue.  Ex. E, Chin Depo. at 63:13-65:10 and Ex D, Middleton Depo 57:15-61:8.

6          With regard to the death of John Deming, Plaintiffs' CIT/police standards expert will
7   testify that officers "should have been attempting to de-escalate" the situation.  Ex. F, Harmening
8   Report at p. 33.  Instead, Gora, the on-scene supervisor, ordered officers to deploy a Taser while
9   Deming sat on top of a truck, was calm, and was communicating with officers.  *Id*. This is the
10  same PPD officer that investigated the death of Jacob Bauer. A reasonable person would
11  recognize that both Deming and Jacob Bauer were in the midst of a mental health crisis, but PPD
12  chose force over de-escalation.  Spiller saw no "training deficiency" in the Bauer or Deming
13  incidents; and no training or policy changes occurred after these or the Estill incident.  Deming
14  (Ex. Q, Spiller Depo. at 64:2-66:4, 72:18-73:8, 75:9-76:12, 77:18-78:4); Estill ▮▮▮▮▮▮▮
15  ▮▮▮▮▮▮▮▮▮▮▮▮▮

16         Finally, PPD is also clearly lacking in its training of supervisors.  As outlined in detail
17  above, Sgts. Billdt and Knight just stood around watching while officers used numerous types of
18  excessive force on Jacob.  They did not consider whether Jacob was in a mental health crisis,
19  they failed to summon medical attention, failed to monitor Jacob's vital signs, and failed to
20  supervise the application of restraints.

21              **c.      Defendants City and Spiller ratified officers' actions**

22         Contrary to Defendants' assertions, a "municipality also can be liable for **an isolated**
23  **constitutional violation** if [a] final policymaker 'ratified' a subordinate's actions." *Christie v.*
24  *Iopa*, 176 F.3d 1231, 1238 (9th Cir. 1999).

25         Chief Spiller is unquestionably the final policymaker.  After the deaths of Deming, Estill,
26  and Bauer, no officers were reprimanded or counseled.  *See*, *e.g.*, Ex. Q, Spiller Depo. at 73:6-8
27  (Deming); 77:18-78:4 (Bauer); *see also*, *East v. City of Richmond*, No. C 10-2392 SBA, 2010
28  WL 4580112, at *4 (N.D. Cal. Nov. 3, 2010) (the plaintiff's allegations that the Chief of Police

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612

1   "knew of other, repeated acts of misconduct by Officers [...], but yet, failed to take any corrective

2   action against these officers" were sufficient to "state a plausible claim for liability under

3   *Monell*").

4        By ratifying the conduct of the officers involved in the cases of Deming, Estill, and

5   Bauer, PPD accepts the conduct of officers who flout the Constitution; standard California and

6   national police training; relevant caselaw and statutes; and PPD's own policies.

7        **G.**    **Questions of Fact Preclude Summary Judgment of State Law Claims.**

8        Defendants' argument on Plaintiffs' state law claims – violations of the Bane Act (Cal.

9   Civil Code section 52.1), battery, negligence – rests on the assumption that Plaintiffs' Fourth

10  Amendment claims fail.  Because Plaintiffs have alleged facts sufficient to establish their claims,

11  Defendants are not entitled to summary judgment on these claims.  *See, e.g., Green v. City &*

12  *Cty. of San Francisco*, 751 F.3d 1039, 1053 (9th Cir. 2014) (because there was a triable issue of

13  material fact as to whether "Defendants' conduct was 'pursuant to a lawful investigatory stop,'"

14  state law claims for assault, negligence, and IIED, summary judgment was improper).

15  **V.**    **CONCLUSION**

16       For the foregoing reasons, Defendants are not entitled to judgment as a matter of law as

17  to any claims in this action and their motion for summary judgment/partial summary judgment

18  should be denied.

19

20  DATE:  March 26, 2021                              GWILLIAM IVARY CHIOSSO CAVALLI & BREWER

21

22                                                     /s/
                                                       _____
23                                                     J. Gary Gwilliam
                                                       Jayme L. Walker
24                                                     Attorneys for Plaintiffs
                                                       JOHN AND ROSE BAUER
25

26

27

28

GWILLIAM IVARY CHIOSSO CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
1999 Harrison St., Suite 1600, Oakland, CA 94612