EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| JOHN BAUER, an individual and as Successor in Interest of Jacob Bauer, Deceased; ROSE BAUER, an individual and as Successor in Interest of Jacob Bauer, deceased;<br><br>    Plaintiffs,<br><br>vs.<br><br>CITY OF PLEASANTON; BRADLEE MIDDLETON; JONATHAN CHIN; RICHARD TROVAO; STEVEN BENNETT; ALEX KOUMISS; DAVID SPILLER; and DOES 1 to 50, inclusive;<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 3:19-cv-04593-LB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

**Expert Report of John J. Ryan**

1.  My name is John Ryan.  I have been actively involved in police practices and law enforcement since 1981.  I was an active police officer for twenty years.  In the final year of my active career and since my retirement in June of 2002 from police services, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2.  My education includes a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island; a Master of Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island and; a Juris Doctor Degree from Suffolk University Law School.

3. From 1993 until 2002 I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island.  In that capacity I was responsible for graduate courses on Constitutional Issues in Law Enforcement; Police Misconduct/Civil Liability; Managing Police Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law; and Business Crime.

4. Since 2000, I have written several manuals for use by police officers.  Two of these manuals are extensively used by Rhode Island Law Enforcement agencies. These manuals are:  Rhode Island Law Enforcement Officers' Guide to Criminal Procedure, 2000, and Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings, 2000.  The other manuals are nationally distributed by the Public Agency Training Council as materials used in conjunction with training programs for public employees.  These manuals are: Legal and Liability Issues in the Public Schools, 2001; Policy Development for Public Safety Agencies, 2002, Civil Liability and Risk Management for Law Enforcement Agencies, 2003, Use of Force, 2004, Administrative Investigations In Law Enforcement Agencies, 2004, Legal and Liability Issues for Hostage Negotiators, 2005, Public Safety Media Relations (Manual and Guide) 2005, Arrest Search and Seizure, 2005, and Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks That Impact Law Enforcement Operations and Create Exposure to Liability Litigation 2007, 2010, 2013 and 2016 editions,  Legal and Liability Risk Management Manual Guide-The Law and Best Practices of Successful Jail/corrections Operations 2009 and 2016 editions.

5.  I also author an annual publication for law enforcement officers titled, <u>Case Law for Critical Tasks in Law Enforcement.</u> This field guide provides officers with a legal update on critical tasks such as search, seizure, use of force, pursuit, investigations and interrogations. This guide has been adopted by agencies around the United States for use by law enforcement personnel.

6.  I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, and Lou Reiter. In that capacity I author and edit the institute's legal update service for law enforcement. This update service and an archive of all articles that I have written can be found at www.patc.com and www.llrmi.com. Additionally, I provide multiple on-line video roll-call trainings annually for both the road and jail operations. This on-line roll-call series is a subscription service offered by the Legal & Liability Risk Management Institute.

7.  As part of the Legal and Liability Risk Management Institute I also conduct policy, training and operations reviews for law enforcement agencies and jails throughout the United States. These reviews focus on the manner in which agencies treat the critical tasks in law enforcement and jail operations. As part of these reviews I assist agencies in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement and jail operations.

8.  Since 1993, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, attorneys and judges. I have provided training in the following areas:

3

a. Policy development for public safety agencies.

b. Legal Issues in police use of force.

c. Legal Issues in internal affairs investigations.

d. Police misconduct/civil liability.

e. Legal/Liability Issues in Narcotics Operations.

f. Arrest, Search and Seizure, & Interrogation.

g. Racial profiling.

h. Legal issues in public schools.

i. Media relations for public safety agencies.

j. Constitutional update for law enforcement officers.

k. Basic training for detectives.

l. Law enforcement officers' bill of rights/due process in administrative investigations.

m. Legal/policy and decision-making factors in law enforcement pursuits including use of force/intervention tactics.

n. Legal and policy Issues for hostage negotiators.

o. Legal and liability issues for SWAT operations

p. Legal and liability issues for jails

q. High Risk Critical Tasks/Best Practices in Law Enforcement Operations.

9. I am a former police Captain of the Providence Police Department in Providence, Rhode Island where I served for twenty years before retiring in 2002. During my tenure as a police officer I served in the following capacities: patrol officer in both the Patrol Division and the Tactical Unit; a detective in the Detective Bureau; a

sergeant in the Patrol Division; a lieutenant in the Patrol Division; Director of Training; Director of the Department's Office of Public Affairs and; Director of the Department's Administrative Staff.  During most of my career I also took an active role in researching and authoring department policy.

10. Since my retirement in June of 2002 I have taught numerous courses on police policy and procedure, arrest, search and seizure, use of force, police pursuits, dealing with the mentally ill, emotionally disturbed, and suicidal, domestic violence, law enforcement's response to autism, law and best practices in the internal affairs process, civil liability for law enforcement agencies, and specialized courses for narcotics officers, SWAT commanders, and internal affairs officers.   Participants in these courses have come from thousands of law enforcement agencies around the United States.  Officers in attendance have come from departments with under ten sworn officers and departments with sworn officers numbering in the thousands.  These programs are conducted numerous times annually throughout the United States and also include on-line courses on these topics for law enforcement.

11. The course on policy and procedure focuses on critical tasks in law enforcement and includes, inter alia, policy issues relating to use of force; police pursuits; domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

12. The program on High Risk Critical Tasks/Best Practices in Law Enforcement includes instruction on Use of Force including inter alia: dealing with individuals of diminished capacity i.e. emotionally disturbed, mentally impaired; and suicidal, excited delirium, as well as persons with disabilities and use of electronic control devices; Search-Seizure and Arrest; Pursuit and Emergency Vehicle Operation; Care, Custody, Control, and Restraint of Prisoners; Domestic Violence; Off-Duty Conduct; Sexual Harassment, Discrimination, and Misconduct; Selection and Hiring; Internal Affairs; Special Operations; and Property and Evidence.

13. As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies and jails relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, arrest procedures, care, custody, and control of persons with disabilities, and dealing with the mentally ill. In addition, I write, record, produce, and distribute on-line training videos for law enforcement nationwide.

14. In 2002, I was a featured speaker at the national conference for the International Association of Law Enforcement Planners, which was held in Long Beach, California.

15. In 2002, I was a featured speaker at the National Internal Affairs Investigators Association conference, which was held in Tampa, Florida.

6

16. In 2004, I was a featured speaker at the Rhode Island Bar Association's Annual Meeting, speaking on Constitutional Issues related to Law Enforcement practices.

17. In 2005, I was a featured speaker at the National Sheriffs' Association Annual Conference, held in Louisville, Kentucky, where I presented training for legal advisors on Internal Affairs and Employee Discipline.

18. In 2005, I was a featured speaker at the annual national conference for Public Risk Managers (PRIMA) in Milwaukee where I conducted training for risk managers and attorneys representing police departments.  One of the trainings involved use of force while the second covered the high liability areas in law enforcement operations to include arrest, warrants, and other issues involving search and seizure, as well as police pursuits.

19. I have been a featured speaker annually, to include the 2011 session, of Georgetown Law Center's annual §1983 Civil Rights Litigation program.  I have regularly presented materials related to law enforcement policy, training and supervisory practices as well as use of force. In 2009 I presented materials for two sessions one of which was on the use of TASER and one which was a panel discussion on strip searches.  I have been published annually in materials from Georgetown Law Center related to this program.  The 2011 session was focused on reviewing current law enforcement practices and civil liability related to TASER.

20. In November of 2005, I was a featured speaker at the annual National Conference of the National Leagues of Cities & Towns in Seattle, Washington speaking on Contemporary Liability Risks for Law Enforcement Agencies.

21. In October of 2006, I was a featured speaker at the annual conference of National Internal Affairs Investigators' Association in Gatlinburg, Tennessee.

22. I have also provided lectures for attorneys on civil rights litigations relating to law enforcement operations, including a November of 2006 presentation for the Georgia Bar Association's ICLE program.

23. In 2007 I was a featured speaker at the annual conference for the International Municipal Lawyers Association.

24. In 2007, 2008, 2009, 2012 and 2013, I was a featured speaker at the Practising Law Institute's Annual Section 1983 Civil Rights Litigation program.  My 2007 presentation in this program resulted in a law review article in the Touro Law Review (Volume 24, Number 3, pages 569-600) "Recent Developments in the Use of Excessive Force by Law Enforcement" Karen Blum/Jack Ryan.  It is noted that my materials have been included in their annual publication related to this program.

25. In 2008 I was a featured speaker at the annual conference for the Association of American Law Schools, Civil Rights section, where I presented material on law enforcement policy, training, and generally accepted practices in pursuits and use of force.

26. In 2009 I was a featured speaker for the national conference for public risk managers.

27. In 2009 I conducted executive level training on law enforcement pursuit operations for the Utah Highway Patrol.

8

28. In 2009 I was certified with TASER by the Muncie Indiana Police Department by a TASER certified instructor.

29. In 2009, I was a featured speaker at the Annual Kentucky Tactical Officers' Association Conference where I lectured on high risk tasks in tactical operations including high risk entries.

30. In 2009 I was the featured speaker at the Alabama Attorney General's annual "Law Enforcement Summit" where I lectured on high risk critical tasks in law enforcement to include use of force, pursuit, arrest, search and care, custody and control of prisoners.

31. In 2010, I was a featured speaker at the annual national conference for PRIMA where I presented a law enforcement risk management program titled: "Promoting Professionalism while Reducing Liability; The Impact of Policy, Training, and Supervision and Auditing Strategies."

32. In 2010, I was a featured speaker at the National Internal Affairs Investigators Association annual conference held in Indianapolis, Indiana where I lectured on Bias Free Law Enforcement/Profiling.

33. In 2010, I was a featured speaker at the annual conference of the National Council of County Association Executives, where I spoke on law enforcement liability and strategies to reduce liability by increasing professionalism.

34. In 2012 I developed a training program for law enforcement and attorneys dealing with use of force; electronic control devices; and sudden custody death. This program, which I am presenting throughout the United States is accompanied by a text manual which I wrote and is also being distributed nationwide. As part of

this program I have trained thousands of officers with respect to the expected and appropriate response in dealing with persons who have been injured or otherwise shown physical distress during the subdual process.

35. In 2012, I was a featured speaker at the National Internal Affairs Investigators Association Annual Conference where I spoke on Use of Force and Sudden In-Custody Death.

36. In 2012 I was a featured speaker at the Texas Commission of Law Enforcement Officers Standards and Education where I presented to law enforcement trainers from throughout the State of Texas on training liability and the need for training in the high risk critical tasks in law enforcement.

37. In 2013, I was a featured speaker and panel member in a program titled "Policing in Trying Times" at Suffolk University Law School in Boston Massachusetts.

38. In 2013, I was a featured speaker at "Police K-9" magazine's national Handler Instructor Training Seminar, an annual conference for K-9 handlers and trainers. This presentation focused on the law and best practices for use of law enforcement K-9s as a tool of apprehension.

39. In 2015, I was a featured speaker at the spring conference as well as the annual conference of the International Municipal Lawyer's Association. The presentation topic was officer involved shootings and qualified immunity post Plumhoff.

40. In 2015, I was a featured speaker for the annual conference of IADLEST, International Association of Directors of Law Enforcement Standards and

Training.  My topics included "Training Liability" and "Emerging Liability Trends."

41. In 2015, I was a featured speaker at the Georgia Jail Association's Annual Conference in Savannah, Georgia where I presented topics relating to high-risk critical tasks in the jail operation.

42. In 2015, I was a featured speaker at the Arkansas Association of Chiefs of Police annual meeting where I presented materials on the Law and Best Practices for Policing in Trying Times.

43. In 2015, I was a featured speaker at the South Carolina Municipal Association's Annual Meeting for Elected Officials where I presented materials on Law Enforcement in Trying Times as well as covering issues related to law enforcement body cameras.

44. In 2015, I was a featured speaker for the Texas Commission on Law Enforcement where I provided training for 750 law enforcement trainers from throughout the State of Texas covering topics related to law enforcement liability and proper training.

45. In 2015, I was a featured speaker at the National Internal Affairs Investigators' Annual Conference where I presented training on emerging trends in law enforcement liability and the interplay of the Internal Affairs process with agency liability.

46. In 2016, I was a featured speaker at the annual conference of the Defense Research Institute in Austin, Texas.

47. Since 2002, I have been involved in the auditing of law enforcement operations throughout the United States conducting several audits annually based on either a need or as a proactive measure of agency performance in the high liability areas of the road and jail operation.   I have been involved in assisting dozens of departments nationally through these audits in developing policy, training, and enhancing operations for law enforcement services.

48. My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

49. I have reviewed the following materials to date regarding this case:

1)  Plaintiffs' Second Amended Complaint
2)  PPD 1-231 Investigation Reports
3)  PPD 234 - Raley's Phone Call
4)  Laura Knight, M.D. Report
5)  Taser Barbs Hospital Photo w Ruler
6)  CONF PPD 1159-1427 - Administrative Review of Incident 18-30256

*Depositions*
7)  Transcript of Erick Marty Billdt w/ Exhibits 14, 15 & 17
8)  Transcript of Jonathan Chin w/ Exhibits 1-6
9)  Transcript of Jason Knight w/ Exhibits 8, 12, 18 & 19
10) Transcript of Bradlee Middleton w/ Exhibits 7-13
11) Transcript of Richard Trovao w/ Exhibits 11, 11A, 12, 16, 19-24
12) Transcript of Steven Bennett
13) Transcript of Jorge Diaz
14) Transcript of Dr. Ferenc
15) Transcript of Erick Gora
16) Transcript of Rudolfo Granados
17) Transcript of Alex Koumiss
18) Transcript of Benjamin Sarasua
19) Transcript of Patrick Thomson
20) Transcript of John Bauer with exhibits
21) Transcript of Rose Bauer

*Videos*
22) PPD 273 - Trovao Bodycam
23) PPD 368 - Bennett Bodycam
24) PPD 370 - Middleton Bodycam
25) PPD 371 - Granados Bodycam

26) PPD 378 - Billdt Bodycam
27) PPD 382 - SpeeDee cell video
28) PPD 383 - Chin Bodycam
29) PPD 384 - Koumiss Bodycam
30) PPD 390 - Knight Bodycam
31) PPD 396 - Sarasua Bodycam
***Other Witness Videos***
32) PPD 336 - Video_2018-08-01_151738_263
33) PPD 337 - Video_2018-08-02_170431_303
***Interviews and Report***
34) Jorge Diaz Interview Transcript (interview took place during the investigation)
35) Patrick Thomson Interview Transcript (interview took place during the investigation)
36) Michael Freeman, M.D. Report

50. This expert report is based upon the materials provided to this date. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery. With this in mind I recognize that there may be additional documentation as the case progresses. In the event that additional material is produced I shall be prepared to supplement this report.

51. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

### 911 Call

52. The caller, Karen, reported that she was calling from Raley's in Pleasanton and indicated that the store had a "deranged" customer who had entered the store twice. Karen indicated that they were trying to escort the man out of the store but did not want to make a scene. Karen reported that the man had come in 45 minutes earlier and bought a soda at the self-checkout but then was standing and breathing hard. Karen said the man seemed frustrated. Karen said she gave him water and suggested he sit on the benches outside. Karen reported that the man left the store and was doing some karate moves outside.

53. Karen reported that the man had now returned to the store and had taken a shopping cart and slammed it down on the ground. Karen reported that the man had growled. Karen indicated that the man had taken some alcohol off the shelves and looked like he was going to open it. Karen said that she did not know if the man was impaired by drugs or if possibly, he was bi-polar. Karen reported that the man was speaking fine so it was not intoxication at all. The call taker asked whether they were seeking assistance in getting the man out of the store and the Karen indicated yes and that someone should assess whether the man needed some kind of assistance.

### Middleton Video-Meeting with Employees

54. The first employee to approach Officer Middleton pointed and said that the subject. Mr. Bauer was sitting on the curb. Another male employee and a female employee then joined the conversation with Middleton. The initial employee indicated that Bauer had broken a bunch of merchandise, bottles and had poured

liquid on the floor and was talking to himself. The female interjected that Bauer was really aggressive. The second male interjected that the man seemed to be on some really heavy drugs or something. The initial male then told Middleton that the man was either crazy or on drugs. The female indicated that it was the second time that Bauer had come to the store. Middleton then asked if the employees wanted Bauer arrested for breaking anything in the store. While initially non-committal, the initial employee said that Bauer was destroying stuff and was publicly impaired and then laughed and suggested that Bauer be arrested for public nuisance. Middleton said it was an option that Bauer could be arrested for vandalism for the damage at which point the second male indicated "it's not much, but it's like" at which the female interjected that they were afraid of his actions in that he might hurt somebody.

55. Middleton can then be seen pointing and referencing to a spot in the parking lot to someone (Officer Chin) and then walking at a normal pace toward where he had pointed. Upon turning onto the sidewalk of the adjoining street, Officer Middleton informed dispatch that he was going to be out with the subject.

56. Officer Middleton yelled out to Bauer, who was walking ahead of him, "Hey Bud" causing Bauer to stop and turn to face the officers. From a distance Officer Middleton asked: "What's going on man?" Bauer stayed in place on the sidewalk as the officers closed the distance. When the officers got close, Bauer showed the officer that he had glass or cup of some kind at which point Officer Middleton asked Bauer to set it down and Bauer complied. Middleton asked Bauer what was going on to which Bauer replied, "nothing." Middleton asked Bauer what

happened at the store at which point Bauer points; however, it is unclear due to background noise exactly what his verbal response it.  Middleton then indicated that the people at Raley's said that Bauer broke some stuff at which point Bauer shrugged as if not knowing anything about it and indicating either no or he did not know.  Officer Middleton asked Bauer if he had any identification to which Bauer replied no, pointed to his right and said, it's at my parent's house.

57. Officer Middleton then instructed Bauer to do Middleton a favor and keep his hands out of his pockets. Middleton then asked: "So what's going on today?" Bauer responded: "Nothing, it's a hot day."  Middleton asked Bauer his name and Bauer provided it and spelled it and then said like Bauer Ice Skate.  Bauer then provided his first name Jacob and spelled it.  Jacob provided a birthday of 6/27/80. Middleton asked Bauer if he was no probation or anything like that to which Bauer responded no.  Middleton asked Bauer if he lived right up the street and Bauer said I do.  Middleton asked Bauer if he had used drugs or alcohol "today" to which Bauer said no while shaking his head no.   Middleton explained why the officers were there and Bauer again indicated he did not know about Raley's and started to rest his hand by his pocket at which point Middleton told him to keep his hands out of his pocket at which point Bauer moved his hand away from his pocket while shaking his head affirmatively.  Middleton then got on the radio and checked Jacob Bauer for warrants.  While waiting for dispatch, Middleton asked Bauer where he was headed to at which point he responded that he was going to go back home.   Bauer then looked to where he put the glass down and indicated to Middleton that someone had stolen the glass from his house and that got him

==excited because it brought back some bad memories.  Bauer then said that's why he was crying.  The dispatcher then notified Middleton that Bauer was "Clear and Valid."==

58. Middleton then asked Jacob, "do you have anything illegal on you bud?"  At this point Jacob stared straight ahead without responding.  Officer Middleton again said "Jacob."  Middleton then signaled Officer Chin at which point both officers moved in and took ahold of Jacob.  It is noted that approximately 3 minutes had passed from the initial contact to the signal and decision to move in and take hold of Jacob Bauer.  As the officers took hold of Jacobs two arms he can be heard saying whoa, whoa, whoa.



59.

60. ==Officer Middleton told Bauer that he was just going to be detained until they figure out what's going on.  Bauer repeats "what's going on" followed by "please, please." Due to the proximity of Bauer to Middleton it is unclear who is causing==

movements however there is a pushing/pulling movement occurring and Bauer asks if he is free to leave to which Middleton responds no, you are being detained. The movement appears to stop and one of the officers tells Bauer to calm down at which point Bauer says he's not doing anything, "I'm literally not doing anything." Middleton then told Bauer to put his arms behind his back. At that point, one of the officers got on his radio and asked for another unit. Bauer asked, what are you doing? It is noted that it appears that Middleton's BWC fell from his uniform and landed in the grass. An officer said, "he's grabbing my microphone." An officer can be heard saying "stop,,,stop." A person, believed to be Bauer, can be heard asking Bro, what are you doing, don't touch me there, while an officer continues to say stop. An officer then directs, stop resisting, and Bauer responds that it is hurting. An officer then told Bauer that he was going to be "Tased." An officer yells TASER, TASER and several things are heard, Bauer can be heard screaming as if in pain, an officer initially says go, go, an officer then gives commands to Bauer such as roll over, while low level TASER arcing can be heard. There are also two references by an officer to drive-stun. An officer tells Bauer several times to roll over. Numerous sirens can then be heard signaling the arrival of other officers. It is noted that at one point Bauer screamed as if in pain and then an officer is heard saying don't bite me.

61. Verbal directives to put his hands behind his back can be heard along with the statement, you're going to get another one. An officer can be heard saying, let's flip him, before another officer shouts, put your hands behind your back. An officer can be heard saying "stop scratching me" while another officer continues

to suggest rolling Bauer.  Bauer is told to give up his other hand to which he responds that he can't.  An officer asks if someone (Sounds like Sarge) has a WRAP in there car, while another officer yells, stop resisting.  An officer is then heard screaming stop moving, stop resisting while another officer advises— "Cuffs are on."  Time on Middleton's BWC 22:01:07.  As officers again discuss getting the WRAP and Bauer can be heard screaming "help."

62. It is noted that when Middleton's camera is retrieved from the position on the grass and is directed toward the action, there are three officers putting pressure on Bauer's lower body and four officers putting pressure on Bauer's upper body.



63.

64. It appeared that Middleton's BWC was then placed on the cement sidewalk. When the BWC gets picked up again and put on an officer, presumably Middleton, it can be seen that several are now standing, however Bauer is still

prone with two and possibly three officer still holding him with one putting pressure on his legs, while the second is pulling his arms toward his head.

65.



66.





67.

68. Bauer can be heard shouting, "they're trying to rape me, as officers discuss how they are going to roll Bauer and place a spit mask on him.  Officers can be heard saying Bauer had blood on his face and indicating that they should put the spit mask on him now.   Bauer can be heard calling Mr. Trump and saying that he, Bauer, is going to die.

69. While an officer asks if someone can go back to Raley's, officers can still be seen with pressure on the prone Bauer, while a spit mask was put on him.



70.

71. After the spit mask was put on him, an officer directs that he will put his knee in

    Bauer's back so they can roll him.   Bauer was then brought to a seated position

    as officers prepared to transport him.  Bauer continued yelling for Mr. Trump and

    indicating that he was being murdered and that the officers were trying to kill him.

72. It is clear from the video that after officers completed the WRAP and had Mr.

    Bauer in a spit mask, he ceased making any sounds.   EMS arrived and minutes

    passed while officers, sometimes assisted by EMS made adjustments to the

    restraints and appeared to remove some of the officers' cuffs and place EMS wrist

    restraints on Jacob Bauer.  After Bauer is moved to the gurney and being moved

    to the waiting rescue truck, the a female EMT tells officers to remain until after

    she checks Bauer's vitals.  Middleton approached an employee of the store to get

    a "CA", and while talking to another officer about logistics and someone riding

with EMS to the hospital in case Bauer acts up again, Officer Middleton laughed and said: "He's night-night right now."

Deposition of Bradlee Middleton

73. Middleton is an officer with the Pleasanton Police Department and was hired in 2013. (17).

74. Middleton reported that he believes he has been the subject of three internal affairs investigations during his employment with Pleasanton. (21-22).

75. Middleton stated that he attended a 40-hour CIT training in 2016. (25). Middleton explained that the CIT training was provided by POST. (28).

76. Middleton testified that he did not receive any counseling or admonishment as a result of the incident with Jacob Bauer. (26-27).

77. Middleton reported that he has never been the subject of a citizen complaint regarding excessive force or regarding the mentally ill. (28).

78. Middleton testified to the following regarding the initial call he received on August 1, 2018: "I received a radio dispatch regarding an individual inside Raley's that was refusing to leave and acting somewhat erratic." (30).

79. Middleton stated that he was told the following by Raley's employees: "That there was a subject inside the store acting somewhat aggressively, breaking items and initially refused to leave and then had left the store, and they gave a general description and direction." (30). Middleton acknowledged that employees also told him that Bauer was talking to himself and was either intoxicated or crazy. (31).

80. Middleton acknowledged that based on the information he had, he thought the man was either high or possibly mentally ill. (32).

81. Middleton stated that he did not have a discussion with Officer Chin about how they were going to deal with or approach this individual who was possibly mentally ill. (33-34). Middleton testified that he did not consider contacting his supervisor before making contact with Bauer. (36-37).  Middleton explained that Pleasanton PD does not have a specific CIT unit. (39). Middleton reported that he was not specifically familiar with Policy 419 Crisis Intervention Incidents. (39). Middleton stated that he does not recall that it was communicated to him that Pleasanton PD adopted this policy on November 18, 2019. (40).

82. Middleton testified that when he first contacted Bauer he did not have enough information to make a preliminary determination on whether Bauer was in the middle of a mental health crisis. (43). Middleton stated that Bauer was acting strange during their conversation. (43).

83. Middleton testified that as part of his CIT training he was trained to be aware that people with mental health issues may respond negatively to physical contact. (45).

84. Middleton reported that Bauer was calm and cooperative when Middleton first made contact with him. (46-47).

85. Middleton stated that Bauer gave him his name and date of birth and it came back over the radio that Bauer was clear of warrants and probation and had a valid driver's license. (47).

86. Middleton testified that when he asked if Bauer had anything illegal on him, Bauer stopped responding and stared off into space. (52).

87. Middleton stated that when he initially contacted Bauer there was nothing to indicate that Bauer was an immediate threat to anyone. (63).

88. Middleton stated the following about an exigent safety concern: "The concern from the Raley's employees, yes, that he was aggressive, breaking things, and somebody was concerned for the safety of him -- somebody else or himself. I can't recall exactly what she told me." (67).

89. Middleton testified to the following about why he felt it was appropriate to detain Bauer in handcuffs: "The fact that he was a suspect in a crime who had been seen acting erratically, aggressive. Obviously, he scared some of the employees there. The fact that he's bigger than a lot of individuals who we contact. He was well over 200 pounds and bigger than myself or Officer Chin. The fact that he had not been searched." (76). Middleton stated that he did not consider asking Bauer if they could pat him down. (97).

90. Middleton reported that he used his TASER on Bauer and that according to the administrative report the Taser was activated four times. (98).

91. Middleton testified that he has done the normal TASER training with Axon. (99).

92. Middleton stated that he does not recall if the TASER training indicates that you should not use the Taser on someone who is experiencing a mental health crisis. (99-100).

93. Middleton explained that he was using the TASER on Bauer, "To overcome his resistance in an attempt to detain him in handcuffs." (100). Middleton explained that at one point he was using the TASER as a pain compliance measure. (100).

94. Middleton stated that he does TASER training every year during annual qualifications. (101). Middleton testified that he does not recall being trained on whether a TASER should be used on someone who is mentally ill. (102-103).

95. Middleton stated the following about his TASER use: "The reason I deployed or used my Taser, initiated the cycle, several times was trying to complete the circuit to make the -- to get the desired effect of the Taser itself. That was during a struggle as well, so I don't know if it even made contact four times. The trigger was pulled four times." (105).

96. Middleton explained the following about why he did not back off and try to deescalate the situation: "At that point, again, my concern was the safety of myself, Officer Chin, and Mr. Bauer, to put him in handcuffs, not knowing if he did have a weapon, I'm not going to let go, the fact that he was being detained for a possible crime. We don't have a duty to back away in that instance. We have the right to detain him and that's what we were trying to do." (107).

97. Middleton testified that he does not believe he tased Bauer four times. (111). Middleton stated, "I know I tased him at least twice." (111). Middleton testified that he does not dispute the TASER documentation which indicates that the Taser trigger was pulled four times. (111-112).

98. Middleton stated that he does not recall being trained that an officer should avoid situations where an individual is being tased by more than one officer. (117).

99. Middleton acknowledged that at the time he handcuffed Bauer there was not probable cause for a misdemeanor arrest. (123).

100.   Middleton stated that he believes excited delirium was mentioned in the CIT training. (126). Middleton stated that it did not cross his mind that Bauer was in a state of excited delirium. (126).

101.   Middleton testified that the supervisor on scene requested medical attention. (129).

102.   Middleton testified that he does not recall who requested the spit mask. (129). Middleton stated that he did not have any concerns about the spit mask being placed on Bauer. (130).

103.   Middleton stated that he has had specific training as it applies to the wrap restraint. (133).

104.   Middleton testified that it was not recommended that he undergo additional training with regard to dealing with the mentally ill. (138).

<u>Deposition of Jonathan Chin</u>

105.   Chin is a police officer with the Pleasanton Police Department and has been employed by Pleasanton PD since 2009. (13).

106.   Chin stated that he has not been the subject of any discipline during his time at the Pleasanton Police Department. (16). Chin stated that he is not aware of any citizen's complaints against him for excessive force. (17). Chin stated that he has not had any citizen complaints involving his treatment of the mentally ill other than the instant case. (17).

107.   Chin testified about how he initially got the call in this case: "Officer Middleton and I received a call for service of a male subject at Raley's acting oddly, breaking things inside the store and yelling." (22).

108.   Chin explained that he did not talk to store employees and that Officer Middleton was already speaking with the store employees. (25). Chin stated that he overhead employees tell Officer Middleton the following: "They said a male subject was inside the store acting erratically, breaking some bottles of alcohol inside the store, throwing, I believe it was, a shopping cart around in the store, and that he had left prior to our arrival." (25).

109.   Chin described his initial contact with Bauer as follows: "Okay. We contacted him. He seemed forthcoming with information. When asked, he would answer the questions coherently. He put a -- I believe it was a glass -- a shot glass, commonly referred to, down on the ground right when we arrived. He identified himself verbally to us when asked." (26). Chin further described Bauer as calm and cooperative. (26).

110.   Chin stated that he has received training on how to identify people with mental illness. (30-31). Chin stated that he had done the 40-hour POST CIT training and had also done a CIT training update. (31).

111.   Chin stated that Raley's employees did not say that Bauer had a weapon, had hurt anyone, or had made any threats. (40). Chin acknowledged that when Bauer was initially contacted there was nothing to indicate a safety issue. (40).

112.   Chin testified that Bauer's name and date of birth came back over the radio as clear and valid.

113.   Chin testified as follows about what Bauer was suspected of when officers first contacted him: "At that time, it was possible public intoxication, and I think at that time, it was vandalism inside the Raley's store." (42).

114.   Chin stated the following about why he put his hands on Bauer: "At that point, we had enough to legally detain him for further investigation, and then we could search him for other dangerous weapons at that time, too." (43).

115.   Chin explained the following about why Bauer was handcuffed: "Because at that point when we asked if he had any weapons on him, he did not answer that." (44). Chin testified further about the handcuffing: "We handcuffed him because at that time, we didn't know, and he was being detained for the vandalism and the public intoxication at that time." (44).

116.   Chin stated that Officer Middleton was the lead officer. (47).

117.   Chin acknowledged that he did not consider asking Bauer if he could just pat him down for weapons. (48).

118.   Chin testified to the following regarding his training on dealing with someone who has a schizophrenia type illness: "So when we're contacting someone that we know suffers from schizophrenia or something similar to that, it would be -- the questioning would be slow and clear to gauge on where their mindset is at at that time, and it would continue from there, depending on which way the questions are answered and kind of the actions of the person." (50).

119.   Chin stated that Pleasanton PD does not have a designated CIT unit. (61).

120.   Chin testified to the following about whether Bauer was trying to flee: "At that time, he did not show any visible signs that he was trying to flee, as far as body movements or anything like that. He was -- like I said, in my training and experience, sometimes people who are preparing to flee are looking at open space

that they can flee to. And he was not looking at us, he was looking straight ahead, which was open space between me and Officer Middleton." (71-72).

121.    Chin stated that following about his training on dealing with individuals who are mentally ill and who may be big in size: "In the training that we receive, we're taught that officer safety is first and paramount when it comes to dealing with people that are bigger in size and possibly suffering from a mental health crisis. Until we make that scene safe for us and are able to evaluate him while he's suffering from the crisis, we're to make the subject safe for us." (78).

122.    Chin testified to the following about whether officers ever considered de-escalating the situation: "I think that we did. We made numerous comments for him to just calm down and stop resisting. I believe Officer Middleton at one point said, you're being detained at this point, so he was clearly explaining what was going on. You know, we tried to communicate with him. There was no verbal response back from him to us that after multiple attempts, he was complying with what we were saying." (83).

123.    Chin stated that when he called for cover he did not consider asking the cover officers to respond with their sirens off because, "That would be a violation of our policy, as well as the vehicle code, if we did." (85).

124.    Chin explained that he has had POST training on the use of TASER. (88).

125.    Chin acknowledged that he suggested that Officer Middleton deploy his TASER on Bauer. (89).

126.    Chin stated that he is uncertain of the exact number of times that Middleton deployed the TASER on Bauer. (89). Chin stated that he can confirm Middleton's TASER was deployed at least once because Chin felt the effects of it. (89).

127.    Chin explained the following about whether he and Middleton ever considered waiting for backup instead of deploying the TASER: "We attempted to in the beginning, once Mr. Bauer was on the ground. We'd asked for Code 3 cover, but once he resisted more and broke free of Officer Middleton's hold, that's when we knew, off of what we had, just our hands in itself, we couldn't overcome his resistance at that time." (89-90).

128.    Chin explained the following about whether he ever considered that Bauer was suffering from excited delirium: "That would be a possibility. We wouldn't know until we could determine whether or not he was under the influence of a controlled substance or if he was having a crisis moment at that time." (90).

129.    Chin stated the following about why he suggested that Middleton use the TASER: "At that point, he was overcoming our physical resistance to restrain him until other units arrived. And for us, that would be – for what the tools that we had and the close proximity we had to each other, that would be the next nonlethal tool that we would have to deploy." (91).

130.    Chin stated that department policy recommends no more than five TASER deployments on one person in one incident. (92-93).

131.    Chin testified to the following about whether there was any indication that Bauer was a danger to the public: "We didn't know if he was or was not going to

be violent towards anyone in the public, based off the information that we had."

(95).

132.   Chin stated that he believes he saw Middleton use the TASER to drive stun

Bauer once. (98).

133.   Chin testified that he did not see Officer Trovao deploy his TASER on Bauer.

(102). Chin explained that he now knows that Trovao used his TASER on Bauer.

(102).

134.   Chin stated that he did not hit Bauer with his baton, but Chin did acknowledge

that he hit Bauer with his fists. (102). Chin stated the following about why he hit

Bauer: "At the time when I did that, he was scratching and clawing at my hands

that were on his hands to the point where they were bleeding. To get him to stop,

I verbally told him not to do it. He continued. So I gave him two distractionary

blows, if I remember correctly." (102-103).

135.   Chin testified that he did not believe deadly force was needed during the

encounter with Bauer. (106).

136.   Chin stated that he believes Bauer bit Chin's right bicep and was scratching

Chin's hands. (106). Chin stated that Bauer was trying to attack him, "When he

bit me and when he continued to scratch my hands, and when he continued to try

to throw us off of him, specifically when it was just me and Officer Middleton. I

believe at some point, he grabbed Officer Middleton's Taser and he grabbed

Officer Middleton's microphone so he couldn't put out radio traffic to responding

units, as well as dispatch." (107).

137.   Chin stated that he did not know what specific acts of vandalism Bauer had committed when Chin made contact with him. (109).

138.   Chin stated that he has not had training on the term compressional asphyxia. (117). Chin stated that he cannot recall if he has had training on hypoxia. (117).

139.   Chin testified that he has had training on restricting a person's ability to breathe. (117).  Chin stated that he has been trained not to put pressure on the very front of the neck where a person's airway is. (118).

140.   Chin testified to the following about policy on the wrap restraint: "So it might be under the restraint section of the policy. It's up to the discretion of the officer and the supervisor, if they're also there. If the subject is physically a danger to themselves, a danger to others while being detained, the wrap can be applied. At any point if -- obviously, if a supervisor is on scene and they think it's not necessary, then it can be taken off just as quick as it's put on, or we could be told that it isn't to be used." (137).

141.   Chin stated the following about when the wrap restraint should be used: "We don't show up on scene and place just anybody into a safe wrap. The criteria would be, is the person physically resisting to the point that handcuffs are not controlling the subject in and by itself. So the wrap is designed to immobilize so the person can't kick their feet and that their movements are restrained from further possible act of violence against themselves or any other person." (138).

142.   Chin testified as follows about training on the use of the wrap restraint: "As far as the application of it, we are told that -- I mean, the feet are immobilized, that there is an upper body piece that goes onto the subject so that they're not laying

flat on the ground and their upper body is thrashing about. The only -- the safety protocol that we're taught is to make sure that the upper body piece or chest piece that we state, that when it is applied, it's not flat against the person's chest. There is space between the chest piece and the person's chest as to not restrict their breathing that way." (138-139).

143.   Chin stated that he was not notified that he violated any policies during this incident. (148). Chin explained that he does not know if anyone was disciplined for the incident with Bauer. (148).

144.   ███████████████ CONFIDENTIAL ███████████████
████████████████████████ .

### Deposition of Jason Knight

145.   Knight has been a sergeant with the Pleasanton Police Department since March of 2017. (18).

146.   Knight stated that on the date of the incident he first became aware of the situation with Bauer when he heard a radio call for code 3 cover. (25). Knight was in the sergeant's office at the time he heard this call. (25). Knight believes he was supervising Team 1 on the date of the incident with Bauer. (25).

147.   Knight testified that he does not recall having any disciplinary issues with Officer Trovao prior to August 1st. (27).

148.   Knight stated that when he heard the code 3 call he immediately got in the car and went to the scene and was there in less than five or three minutes. (28-29).

149.   Knight testified as follows about the supervisors on scene: "I mean, we're all supervisors on scene, myself, Sara Sua, and Billdt. We were the ones that are

going to continue to communicate with each other, and we're all the same rank, and we're going to communicate with each other to make decisions. That -- during the fluid situation." (30).

150.  Knight stated the following about what he did to assess the scene: "I arrived and saw a struggle on the ground, and my main concern was the safety of the subject, as well as the safety of the officers.  Until that subject's -- I did not know the type of call it was. So I didn't know what they were struggling with. I didn't know if there was a weapon involved. I didn't know if there was some sort of -- well, basically, a weapon that the subject can use. And my concern was getting the subject handcuffed as quickly and safely as possible." (32-33).

151.  Knight stated that he believes Sergeant Billdt told him that the underlying call was concerning vandalism. (38).

152.  Knight stated the following about his assessment of whether or not there was mental illness involved: "I wouldn't say I made a determination it was severe mental illness. I know I mentioned to a lady walking into the grocery store about a -- that he could be mentally ill, but I also asked an officer -- I remember that on the video -- saying, "What kind of drug do you think is on board?" So we're always actively investigating, but I'm not a doctor, and we're looking at all those scenarios." (39).

153.  Knight testified that at the time he arrived on scene he did not have access to the information that was on dispatch because he did not have his laptop with him. (47).

154.   Knight acknowledged that at one point on video he was trying to put Bauer in a rear wrist lock, "To be able to get his hand to be able to hold it so we can take him into custody." (60).

155.   Knight acknowledged that he saw Chin hit Bauer in the back with his fist on the video. (61-62). Knight doesn't recall if he saw this at the time of the incident. (62). Knight testified that he thought Chin's action was appropriate and stated the following about the purpose of Chin's action: "The purpose is to distract him, to be able to get his hand out, to take him into custody." (62).

156.   Knight stated that he has been trained on TASER through departmental training. (68). Knight described the training as follows: "We do powerpoints. We do lectures. We do discussions. We do – you know, it can be in a briefing discussion. (68-69).

157.   Knight stated that he does not know whether there was an inappropriate use of TASER deployments on Bauer at the scene on the date of the incident. (71). Knight testified that he does not recall if he aware that Bauer was being tased at the time. (71).

158.   Knight stated that he does not know if anyone used their baton on Bauer. (84). Knight testified that he did not learn later that Officer Trovao had used his baton on Bauer. (84).

159.   Knight stated that he thinks Bauer was possibly exhibiting excited delirium as it is described in policy. (94-95).

160.   Knight stated that he contacted medical personnel. (96). Knight stated that he called for medical, "Because there was an actively resisting subject who was

trying to be taken into custody, and we were going to need to have him cleared by medical personnel immediately following him being in custody." (96).

161.    Knight stated that, "An officer should not arrest somebody for a misdemeanor committed outside their presence." (100). Knight testified that there are exceptions to this. (101).

<u>Richard Trovao Deposition</u>

162.    Trovao became a police officer with the Pleasanton PD in June of 2005. (16).

163.    Trovao stated that he was in the report writing room on the day of the incident when he first heard about the situation with Bauer. (25). Trovao explained that he heard a code 3 cover request on the radio. (25). Trovao went to his patrol car and responded to the scene. (25).

164.    Trovao stated that he does not recall if he looked at the dispatch notes and information before he got on scene. (27).

165.    Trovao described the first things he saw on scene as follows: "I saw a motorcycle, a police motorcycle, on the street. I saw Officer Bennett, because he was the motor officer, with his white helmet near one part of Mr. Bauer. I believe it was near his legs. And I saw Officer Middleton and Officer Chin struggling. And then just ahead of me, walking up or going up to Mr. Bauer, was Officer Koumiss, and then myself." (27).

166.    Trovao next described what he first did when he got on scene: "When I first arrived, I went to his -- Mr. Bauer's left arm that was tucked underneath. And I don't recall why I went to that arm. I don't know if I was told to go to that arm, but it was obvious that they were struggling with his right arm, and appeared to

have one cuff on, but his left arm they couldn't get removed from underneath Mr. Bauer." (28).

167.    Trovao stated the following about his knowledge of what Bauer had done: "At the time, I don't recall what the initial call for service was or why they were struggling with him. I don't." (28).

168.    Trovao stated that at some point while on scene he did learn what led to the contact with Bauer and described the following: "I don't recall who told me. I don't recall. There were a few officers out there. I don't recall who told me. I do know that, from what I understand, is that at the time, that the officers responded to Raley's, that was right there in that shopping center, about someone either throwing some bottles down or doing something. And that's what led to their contact." (29-30).

169.    Trovao testified to the following about whether he determined that Bauer was suffering from mental illness: "I don't know -- excuse me. At the time -- are you -- I don't know what he was suffering -- I don't know what was going on with Mr. Bauer. I don't. And I didn't -- I don't have enough to decide whether it was a mental health issue or if it was an under-the-influence issue. I don't know." (34).

170.    Trovao did testify to the following about Bauer's behavior: "One of the things is he was yelling, "Mr. Trump, Mr. Trump, they're trying to" -- I think he said, "They're trying to kill me," I believe. I don't recall exactly. And yelling "Mr. Trump." And it was -- that's -- appeared odd, since Mr. Trump wasn't around at that point. And so that was odd to me." (35).

171.   Trovao testified that Bauer was resisting strongly at the time that officers were trying to restrain him. (36).

172.   Trovao stated the following about whether he felt that Bauer was in physical distress: "Was he in physical distress?  You know, that -- at the time, that didn't cross my mind. Like I said, it was -- we were trying to detain him, and he was actively resisting, and we were trying to use just the amount of reasonable force to detain him where we could put handcuffs on him." (38).

173.   Trovao testified that Bauer could have had excited delirium. (40). Trovao testified that per policy Bauer could have been at an increased risk for sudden death. (40).

174.   Trovao testified to the following about whether he considered Bauer's situation to be a medical emergency, "During the time we were struggling with him and trying to put -- bring -- put handcuffs on him, no, I did not think it was a medical emergency." (41). Trovao then continued, "I think it became a situation where we needed medical assistance as soon as we got him detained with the handcuffs on and began putting the wrap on." (41).

175.   Trovao does not recall who made the call for medical help. (41).

176.   Trovao stated that he does not recall when Bauer first lost consciousness. (42).

177.   Trovao stated the following about whether he ever thought about deescalating before putting Bauer in the wrap: "At the time, once we put handcuffs on him, he was still kicking with his feet. And the restraint system we have to minimize that is the wrap. And so we had to put the wrap on him in order to minimize that." (43).

178.    Trovao testified to the following about the number of handcuffs on Bauer: "I
don't know how many sets of handcuffs were on him. I know there was more than
one. I know there was at least a couple." (44).

179.    Trovao testified that there was one other incident where he tased someone that
occurred before the incident with Bauer. (48).

180.    Trovao stated that he has had department training on TASER and described it
as follows: "It involves the discussion of taser policy, to actually using the taser
on a -- like a cardboard cutout or something, a square, and how to use the taser,
what distances and whatnot." (51-52).

181.    Trovao testified to the following about why he used the TASER on Bauer: "I
was trying to use it to gain compliance, to release -- so he can release his arm that
we were trying to remove from under him." (53).

182.    Trovao stated that he drive-stunned Bauer with the TASER. (54). Trovao stated
that he had never done this in the field before, but that he had done it during
training on a cardboard cut-out. (54-55).

183.    Trovao stated that he's never been accused of excessive force. (56).

184.    Trovao acknowledged that he saw Chin hit Bauer on the video but Trovao
stated that he did not see it at the time. (58).

185.    Trovao acknowledged a point in the video where he put his foot on Bauer. (64).
Trovao stated that he thought it was appropriate for him to put his foot on Bauer.
(64). Trovao further stated, "So I wasn't stomping. I was trying to use his leverage
to shove him back over, because he's trying to roll over towards us onto his back
at this point." (64).

186.   Trovao further described how he used his foot against Bauer, "I was shoving him with my foot. It wasn't a stomp. It was shoving him with my foot, trying to shove him back over to the position he was at earlier, because he's trying to roll back over towards us." (65).

187.   Trovao testified that Middleton did not tase Bauer at the same time as Trovao did. (67-68).

188.   Trovao stated the following about why he used his baton on Bauer: "So we were trying to remove his left arm from underneath Mr. Bauer. And I tried initially to try to pull his arm. That didn't work, so I tried the distraction blows with -- by jabbing, by using my baton in the closed position, hoping that that would release his grip, or whatever he was doing to hold his arm underneath him. And as you could see, it didn't have any effect either." (72).

189.   Trovao stated that he struck Bauer with the baton in the left side under his arm. (72).

190.   Trovao testified that he thinks he put his left knee on Bauer's right shoulder at one point during the encounter. (88-89). Trovao stated that he used his knee in this manner: "Because he was trying to get up. As we saw in one of the videos where he was trying to roll over to the side, I was trying -- we were trying to still get the handcuffs on him. We were trying to keep him contained and from trying to get back up." (89).

191.   Trovao stated the following when asked if other officers put their knees on Bauer: "I don't know -- I believe so. I believe Officer -- I want to say it was Officer

Bennett, when I first got there, was near his feet. I believe he may have had his knees maybe on his feet or his legs, by his feet." (89).

192.   Trovao stated that he agrees it would be a high-risk use of the TASER to deploy it on a mentally ill person. (119).

<u>Deposition of Eric Billdt</u>

193.   Billdt is currently a sergeant with the Pleasanton Police Department. (7-8). Billdt testified that he became a sergeant in July of 2018. (17).

194.   Billdt stated the following about his training on mental health: "I've been to the CIT training in 2016. I believe we had an update on that in, like, 2017. I was a school resource officer, so I've had some trainings going through school -- going through school resource officer training, I guess. There's a week-long class where a portion of that is dealing with mental illness generally in youth. And I've had -- I've been to a couple of other conferences for -- as a school resource officer where I -- where there's -- that topic has come up." (20).

195.   Billdt explained that Officers Middleton and Chin were reporting to him on the date of the incident with Bauer. (27).

196.   Billdt testified that he heard Middleton and Chin responding to a call of a suspicious person at Raley's and then Billdt recalled hearing a garbled Code 3 response for officer needs assistance. (32).

197.   Billdt stated that Code 3 means the following: "My understanding is the officer -- or need to respond with lights and sirens. So per vehicle Code 21055. So we're exempt if we have our lights and sirens on. So it means basically get here as soon as you can, officer needs assistance." (41).

198.   Billdt estimated that it took him less than a minute to get to the scene because it was right down the street. (42).

199.   Billdt explained the following about whether he was the incident commander on scene: "I was -- I would say, yeah, I was made the incident commander. I knew that it was my officers, because it was my team that initially responded. But I also knew I had two senior sergeants there to help me through. This would have been one of my first major use of force incidents, so I knew I could rely on them to walk me through." (45).

200.   Billdt stated the following about whether he looked at the dispatch report while he was at the scene: "I don't know when I went to my computer. I don't know if I went to my computer. I don't recall when I reviewed it or saw." (51).

201.   Billdt testified to the following about what he thought Bauer was suffering from: "I don't know what he was suffering from, whether -- because I know excited delirium and meth psychosis could mask the same signs and symptoms. I don't know what -- I don't know what he was suffering from." (61).

202.   Billdt testified that prior to August 1st 2018 he had only had experience with excited delirium through training. (71).

203.   Billdt stated it did not cross his mind at the time he was on scene that Bauer might be suffering from excited delirium. (71).

204.   Billdt testified that he did have concern about the health and welfare of Bauer at the scene. (73). Billdt further testified, "I couldn't give you specifics. I know as a supervisor, we want to render medical aid as soon as possible. Fire was

summoned, they were staged to come in as soon as it was safe to do so. And once it was deemed safe for them to come in, we had them come to Mr. Bauer." (74).

205.   Billdt acknowledged that it did not cross his mind that Bauer was severely mentally ill at any point before the paramedics came. (75).

206.   Billdt stated that when he arrived on scene there were already five people in contact with Bauer. (78).

207.   Billdt stated that at one point he became involved with trying to help detain Bauer. (81-82).

208.   Billdt explained that at one point he made a suggestion to "put the baton in between his arm to wedge it out." (83). Billdt explained that he thought this was necessary, "Because they were struggling to get his arm out and to use it as leverage." (83).

209.   Billdt testified as follows about when he became involved physically: "I believe I just helped transition his arm up, push his arm up, and then once they grabbed hold of it, I let go." (86). Billdt stated he was only involved for a very short time. (86).

210.   Billdt testified that it was Officer Granados' decision to put the WRAP restraint on Bauer. (87)  Billdt explained that he agreed with this decision. (87). Billdt stated that he did not have concerns about using the wrap restraint on Bauer. (88).

211.   Billdt stated that it did not cross his mind to be concerned that people might be kneeling on Bauer while Bauer was on his stomach. (88).

212.   Billdt stated the following: "Once he was placed in a wrap, my concern was that it was placed properly, that he was in the correct position to make sure that the airway was open." (90).

213.   Billdt stated that he did not see Officer Trovao kneeling Bauer's neck. (90). Billdt further testified, "I recall possibly some officers kneeling on extremities, but I don't recall anyone kneeling on him -- on his back or neck as you're asking." (91).

214.   Billdt reported the following about when he became aware of the TASER use: "I was aware that he had been tased once because I heard that upon walking up by Officer Trovao, because I heard him say the Taser was ineffective." (91).

215.   Billdt testified that he did have concerns about the use of TASERs on Bauer and was concerned "That he receive medical attention, as part of our policy." (92).

216.   Billdt stated that he observed that the TASER was not being effective at bringing Bauer under control. (93).

217.   Billdt testified to the following about whether he had concerns about the use of the TASERs: "I believe I stated I only saw one use of the Taser applied at that time. I was -- I can't -- and I know that someone recommended a Taser and they said no. So at that time, I can't specifically tell you exactly specifically what I'm thinking, but I do not recall any thoughts of concern, other than the one application was reasonable." (100-101).

218.   Billdt acknowledged that he did not think that yelling at Bauer was effective. (103).

219.   Billdt stated that he does not recall if it crossed his mind to try to de-escalate the situation. (105).  Billdt agreed that the scene was fluid and chaotic. (107).  At the same time, he could not recall what he did to reduce the chaos up until the paramedics were on scene. (107).

220.   Billdt testified that from the time he arrived on scene until the paramedics arrived he did not have any concern that excessive force was being used on Bauer. (112).

221.   Billdt stated that he does not remember if he had concerns that officers were putting too much pressure on Bauer's head and torso area. (116).

222.   Billdt described the following training restraints and breathing: "Well, I know one of our specific trainings is in regards to the carotid, which we are no longer using, where we must maintain an airway and be cognizant of the airway. Other training is obviously with application of the wrap, to make sure they're in an upright position." (118).

223.   Billdt stated that a spit mask was placed on Bauer because he was bleeding and had tried to bite Officer Chin. (119). Billdt described the following about the use of the spit mask: "So there's some parameters. One is make sure it's placed in a position so you still breathe. Obviously, you're not going to apply it to someone who is throwing up or you need to remove it to not restrict their breathing. Those are some -- without looking at probably specific, but come to the top of my mind." (120).

224.   Billdt testified that he observed Officers Chin and Trovao use distractionary blows. (122).

225.   Billdt denied that he saw Officer Trovao hit Bauer with his baton. (128).

226.   Billdt agreed that as the supervising officer on scene it was his job to make

sure oversee officers and make sure that they did not use excessive force. (137-

138).

227.   Billdt stated that he believes Sergeant Knight was the one who called for

medical. (140).

228.   Billdt testified that he thought they used four or five sets of handcuffs on Bauer.

(153).

229.   Billdt stated that he believes it was fire personnel that said Bauer coded. (172).

230.   Billdt stated that in performance reviews he indicated that Chin and Middleton

remained calm and professional during the encounter with Bauer. (180).

231.   <span>██████████ CONFIDENTIAL ██████████</span>

<span>███████████████</span>

Officer Chin BWC

232.   According to the AXON clock on Officer Chin's Body-Worn Camera, Chin

and Middleton went hands on with Bauer in their attempt to handcuff him at

21:56:10.[1] At 21:57:12, Officer Chin had a handcuff attached to Bauer's wrist.

---

[1] Note: The timestamp on the video does not match the actual time of day in this case and is being used for duration only.  AXON cameras in the 3rd generation can be adjusted to actual time, previous models could not. https://help.axon.com/hc/en-us/articles/115002746247-Axon-Camera-Video-Watermark-Timestamp "Axon Body 3, Axon Body 2, and Fleet system cameras have the ability to embed a visual watermark containing the date, time, model and serial number of the camera in the upper-right corner of captured videos. The watermark date and time information uses the ISO 8601 international standard to indicate time in a 24-hour format and adds a *Z* zone designator directly after the time to denote zero offset from Coordinated Universal Time (UTC) time. This is also know as *Zulu time*, since *Zulu* is the NATO phonetic alphabet word for *Z*.  Axon Body 3 cameras have the option to set the watermark to the agency's local time zone. Axon Body 2, Axon Flex 2, and Fleet system cameras do not support customization of the watermark to match an agency's local time zone.'\"

While Bauer is saying "Don't touch me there." At 21:58:03 Middleton has his TASER out and is warning Jacob, who is flat on his back that he is going to be tased.

233.


234.




235.

236.  Based on the shadows on the ground and the fact that no hand is in Jacob's

arm, it is clear that Officer Chin moved away and took one hand off Jacob just

before Officer Middleton warned TASER-TASER and drive-stunned Jacob with

the TASER.



237.



238.

239.   The arcing of the TASER can be heard while Middleton presses the TASER to

Jacob's upper body at 21:58:25. Within seconds, multiple sirens can be heard as

other officers arrive at the scene.



240.

241.   At 21:59:27 an officer says to the effect of, let's flip him, I can see his hands.

At 21:59:37 an officer directs the others to put another set of cuffs on Jacob.  At

21:59:44 two officers can be seen pressuring Jacob's upper body/head area to the

ground.  There also appears to be a knee on Jacob as well. An officer mentions

that they have to move Jacob to get his arm out because it is all the way across.

Meanwhile the video is clear that officers are holding Jacob to the ground.



242.

243.    As the officers continued to hold Jacob down, two batons are used as leverage

    tools to leverage his arm out from under his weight and the pressure being put on

    him.



244.

245.   At 22:00:07 an additional set of cuffs were added while at the same time
       Bauer's left arm can be seen completely under the weight of his body.



246.

247.   At 22:00:22 Bauer is being directed to pull his left arm out and he tells officers
       that he can't. At 22:00:57 an officer asks another officer if he has a WRAP in his
       car.

248.   At 22:01:07, Bauer's second hand is cuffed, thus accomplishing the restraint
       of both hands.



249.

250.   At 22:01:20, an officer begins removing the WRAP restraint system from its

carry bag, while at the same time officers verbally indicated they were going to

shorten the leverage on the handcuffs.  Officers are seen re-positioning handcuffs

while discussing shortening the leverage.



251.

252.   It is clear that a number of officers continued to put pressure on Jacob, who was now handcuffed with shortened leverage and in a prone position on his stomach.



253.



254.

Deposition of Sergeant Benjamin Sarasua

255.    Sarasua started his employment with Pleasanton Police Department in January

of 2007. (21). Sarasua was promoted to sergeant in late 2015. (22).

256.    Sarasua testified to the following about how he became aware of the incident

with Bauer: "From what I remember, it was an officer -- I believe it was Chin who

made a call over the radio asking for assistance or a second unit, and then shortly

after that asking for, I believe, code three cover." (24).

257.    Sarasua reported the following about why he went to the scene: "So I -- there

was a few officers that were in the report writing room when I heard this come

out and, to my recollection, I remember them leaving and going to the scene. I

later learned that Officer Bennett also responded; so being his direct supervisor, I

decided it would be in my best interest to go in the event something did happen

with -- with him." (26-27).

258.    Sarasua described the following about who was on scene when he arrived:

"There was quite a few people. I think I was one of the last ones to arrive there. I

remember seeing Officer Middleton, Officer Chin. I remember seeing Sergeant

Billdt, Sergeant Knight, and a handful of other folks that were -- that were there.

I believe there was Officer Granados as well." (31).

259.    Sarasua acknowledged that the Sergeant Billdt and Sergeant Knight were the

senior officers at the scene. (31). Sarasua stated that when he got to the scene it

was pretty chaotic and he did not know who the incident commander was. (31).

260.    Sarasua reported the following about whether he considered himself to be a

supervisor during this incident: "I would say I was more of -- because I was

working in traffic, I was more assisting with the duties of patrol. But I would -- I mean, as a supervisor, I would say yes. I was a supervisor on scene, but it was a patrol-related call; so I -- I wouldn't say that I was the direct supervisor for that incident, no." (35-36).

261.    Sarasua described what he considered to be his duties as a supervisor: "Well, I would say that first and foremost is to ensure that everyone was safe, specifically officers and Mr. Bauer; to control the scene as best as possible to make sure that proper care was given to anybody if they were injured; to make sure that this was properly documented; things of that sort." (36).

262.    Sarasua stated the following about when he arrived on scene: "When I arrived I remember seeing Mr. Bauer on the ground. I don't remember exactly what -- his body position, but I do remember seeing officers around him what appeared to be in the attempt to try to detain him, yes." (37).

263.    Sarasua testified to the following regarding whether he thought Bauer was mentally ill: "I didn't know exactly what I had at the time. I mean, that was always a possibility, but I didn't know specifically if I was thinking that right away. But I -- again, what I said, he was acting in a bizarre behavior, it could have been multiple things. But yes. Mental illness could have possibly been one of them. I wasn't sure." (40-41).

264.    Sarasua reported the following about his training on wrap restraints: "I attended training courses with regards to the wrap itself and the application of the wrap, more specifically how to put it on and how to take it off, how to appropriately secure it so it is ready for use, if needed." (44). Sarasua

57

acknowledged that an officer would want to be careful that the wrap does not affect an individual's breathing. (45).

265.   Sarasua described the following about how he tried to calm Bauer down: "From what I recall, it was me speaking with him in a calm, collective manner, asking him simple questions, trying to redirect his attention on me so that he could, in fact, calm down." (48).

266.   Sarasua acknowledged that within a few minutes of arriving on scene he saw a TASER cartridge on the ground and recognized that Bauer might need medical assistance. (56). Sarasua testified to the following about medical assistance: "Well, based on my training and experience, you know, I -- I would say from the beginning that with the assistance call for a code three cover, there may have been some type of struggle. When I got on scene, I did see officers interacting with Mr. Bauer, and then I did remember seeing a deployed -- I believe it was a deployed Taser cartridge on the ground, which led me to believe that a Taser was used; so with all those -- all those things, I would say that medical attention for anybody involved, if injured, would be appropriate." (57). Sarasua does not remember if he personally made the call for medical assistance. (58).

267.   Sarasua described the following about his TASER training: "I have had -- been trained on the Taser, I believe, at my previous agency as well -- as well as -- definitely for the City of Pleasanton, and I have attended training classes and have qualified -- I guess that is the correct term to use -- with the use of the Taser device." (60).

268.   Sarasua testified that he did recall seeing a spit mask on Bauer. (70). Sarasua testified that he doesn't know if Bauer tried to spit on anyone. (71). Sarasua reported that he does not believe that he observed Bauer trying to spit on anyone or bite anyone. (71).

269.   Sarasua acknowledged that he asked Bauer if he was hurt multiple times. (86-87). Sarasua testified, "I didn't know specifically what I had, if Mr. Bauer was exhibiting any injuries or had any injuries, but yes. I was asking those questions." (87).

270.   Sarasua stated the following about whether he thought Bauer was suffering from excited delirium as defined in policy: "I didn't know what I had -- or what Mr. Bauer was exhibiting specifically at those times, even though he had some of those signs or symptoms as indicated in the policy. But I didn't know." (91).

### Deposition of Officer Rodolfo Cesar Granados

271.   Granados has been working for the Pleasanton Police Department since 2008. (19).

272.   Granados stated the following regarding how he became aware of this call: "I heard an officer asking for additional units, and I believe they had said they needed officers to respond code three." (22).

273.   Granados testified as follows about the officers on scene when he arrived: "There were numerous officers on scene. To my recollection, the ones that I observed there were Officer Bennett, Officer Trovao, Officer Chin, Officer Middleton, I believe Sergeant Billdt, Sergeant Knight. And I can't recall who was actually on the scene or who arrived after from there." (22-23).

274.    Granados explained what he did when he arrived at the scene, "I parked behind other patrol units. There were numerous units already on scene. I approached the area where the officers were contacting Mr. Bauer. Based on my view, a little further distance away from the scene and the officers actually involved, I made some adjustments to one of the ways one of the officers was attempting to restrict Mr. Bauer's leg movement to prevent him from kicking. I applied gloves, and then I started assisting with the manipulation of the restraints on Mr. Bauer." (23-24).

275.    Granados averred that he has had the department training on wrap restraints. (24). Granados stated the following about his involvement was with the wrap restraint: "I requested the wrap, if memory serves me properly. I assisted in controlling Mr. Bauer's -- I believe it was his right arm, and then adjusting the amount of restraints that were on Mr. Bauer. the time there were several handcuffs, which is understandable, given the resistance and just attempting to get him in a secured position. And I started minimizing the number of handcuffs that were on him to get rid of ones that may be loose or could cause injury or just were not serving a purpose at the time."

276.    Granados stated that to his recollection a TASER was not deployed while Granados was on scene. (24). Granados explained further, "I did hear discussion that a Taser had been deployed at some point. I'm just unaware of when that Taser was deployed." (25). Granados stated that he does not know who deployed the TASER and he is not aware if multiple officers deployed TASERs. (25).

277.    Granados testified as follows about his impression of Bauer: "I guess I would say -- as far as his physical condition or the manner in which he was behaving, I

would just say he was aggressively resisting, argumentative, and at times just non-

-- making nonsensical statements." (26).

278.    Granados further stated the following about his conclusions on what was going

on with Bauer: "I didn't make a specific determination. I did believe it could be

one of two causes: That he was under the influence of a controlled substance

which was causing his irrational and aggressive behavior, and that he could be

suffering from some type of mental crisis. But I didn't in any way have an

opportunity at that time to make enough of an assessment to determine which one

I believed it was." (28-29).

279.    Granados stated that he does not recall hearing Bauer make any threats to

officers. (29).

280.    Granados reported the following about who was the incident commander: "As

far as I am concerned, I know there were multiple supervisors on the scene, but I

wouldn't be able to tell you which one of them at the time of the incident was

taking, I guess, command of the actual event." (34).

281.    Granados testified as follows regarding Bauer's breathing: "And when you --

when you say did I try to assess, I'm trying to think of how to qualify that answer.

I was routinely in contact with him through most of the scenario; so I was able to

see that he was breathing. And when he has a spit mask applied, I have to make

sure that it is not disturbing or disrupting his ability to breathe. Say the subject in

this case, Mr. Bauer, starts to chew on it or try to pull it into his mouth or it is

applied improperly or they are profusely bleeding from their mouth or their nose,

it could restrict their airway; so it is something that we routinely observe to make sure that his breathing isn't impaired." (41).

282.   Granados further testified about Bauer's breathing, "I wouldn't say I assessed him and believe that he was in labored breathing. I did believe I actually commented to him at one point that he needed to calm down as the more energy that he exerts, it can make it more difficult to catch his breath or breathe at the normal rate." (42).

283.   Granados stated that he is familiar with the term "excited delirium" and has had experience with individuals who have symptoms of excited delirium. (58). Granados testified as follows regarding whether Bauer was suffering from excited delirium: "I mean, I do believe that he was exhibiting some of the symptoms, the agitation, irrational behavior. He was sweating. It was a very hot day, but he was sweating profusely. And he wasn't able to keep his hand from being restrained to an extent for a significant amount of time with numerous officers; so yes. I do believe he showed some of the symptoms that would be associated with excited delirium." (59). Granados further stated, "I don't believe I specifically started discussing excited delirium while I was on the scene, no." (64).

<u>Deposition of Officer Alex Koumiss</u>

284.   Koumiss has been a police officer with the Pleasanton Police Department since 1997. (10).

285.   Koumiss stated that he has had TASER training as part of firearms training curriculum. (12-13).

286.    Koumiss testified to the following about when he first of the situation with Bauer: "I knew that there was a couple officers out on a suspicious person detail at Raley's. I didn't know all the details. At that time, I had just heard it over the radio. It's a common call that we go to. It's called a 10-66 suspicious person. We go to these calls routinely several times a day. I happened to be at the police station, so I know I was pretty close by when I heard Officer Chin request a Code 3 cover." (16-17).

287.    Koumiss reported that he saw the following when he arrived on scene: "Yeah. When I first got on scene, I saw the officers on the ground. It looked like it was pretty dynamic, rapidly unfolding, looked like there was a violent struggle going on with a large gentleman. I saw Officer Bennett arrive just before I did. He went over to assist, and by the time I got out of my vehicle, I went over to do what I can to assist as well." (19-20).

288.    Koumiss testified further, "I knew Officer Chin to be a very fit person. I was one of his training officers. I just know him, working shifts with him. When I initially heard him call for Code 3 cover, I could hear the stress in his voice. Code 3 cover is not something we use very often, and the rare occasions it's used, it's obviously taken seriously. And just me, personally, knowing Chin and hearing the – his voice calling for Code 3 cover, the stress, and when I arrived, seeing the struggle he was in, my number one priority is to try to help and try to get -- gain control of that situation." (22).

289.    Koumiss next testified about Bauer's positioning, "Once I arrived and was approaching them, I noticed he was on his stomach. Officer Chin was -- if he -- if

Mr. Bauer -- as Mr. Bauer's laying down, facing the -- on the grass, I believe Officer Chin was on his right side, had handcuffs on his right wrist. I noticed that his -- Mr. Bauer's left arm and left hand was underneath his -- near his waistband. And just from my training and experience, I know that's a dangerous area for someone's hands to be, while they are resisting police, because there may be weapons there that they are trying to gain access to, so my number one concern was to try to get that left arm removed and under control." (22-23).

290.   Koumiss testified to the following about whether he heard anything about a weapon while he was trying to get Bauer's arm under control: "No, I did not hear that. I heard plenty of orders of "stop resisting," and "relax," and, "stop scratching me," things of that sort. But again, based on my years of experience and, mostly, being out in the field, I do know that suspects do reach for weapons in their waistband." (23).

291.   Koumiss further stated the following about his actions with respect to Bauer's arm: "So when I observed that, as I was approaching the scene, I got onto Mr. Bauer's right side. I knelt down on the right side of his body. I reached over and tried to push and grab onto his left arm. And I could feel his resistance of not allowing me to, so then I did not think that would work. It was a hot day. We were all sweating. He was very sweaty. It was hard to get a good grasp of him, so I went to the next step of trying to get his arm removed." (24-25).

292.   Koumiss then stated the following: "In my process -- thought process at the time, I thought of using my baton as an improvised device. Because I was on the

opposite side of him, I thought I could wedge it between his elbow and his body and lock it with that leverage, use that leverage to get his arm removed." (25).

293.   Koumiss reported that he did not see anyone use distractionary baton strikes on Bauer. (26). Koumiss explained that he learned about the distractionary strikes through reading police reports. Koumiss reported that he did not see Trovao try to hit Bauer with his baton. (26). Koumiss further reported that he did not see Chin hit Bauer with his fists. (26-27). Koumiss next stated the following about his own actions with his baton: "I was unsuccessful getting his arm out with my baton. I tried a couple times. I believe, because of, again, him being so sweaty, my baton kept slipping out, and so I wasn't able to be successful at that." (27).

294.   Koumiss then testified as to what occurred next: "By now, there were several other officers on scene. I had disengaged to try to reassess on what else I could do. And when I disengaged, I realized I did not have my medical gloves on. I put those on, and by the time I was standing by Mr. Bauer's feet at that time, I -- once I reassessed the situation, they were already able to -- they had his left hand out, and it was in handcuffs, and I saw the wrap starting to be applied, so I helped." (27-28).

295.   Koumiss acknowledged that his body camera was not activated when he first arrived on scene. (28). Koumiss provided the following explanation: "Again, I knew I was pretty close to the scene, being at the station. Raley's is, maybe, a quarter or half mile, at most, away, two or three blocks. When I heard that, the stress Code 3 cover, again, we don't receive those too often. My only concern was to try -- I knew I was close, and I knew I can get there pretty close -- or pretty fast.

I just ran out to my car, turned on my lights and siren, and responded to the scene, and saw the struggle, and immediately tried to, you know, gain control of the situation. It wasn't until that first time I disengaged and got my medical gloves, when I looked down, I realized my camera was not activated, so I immediately activated it at that time." (28-29).

296.   Koumiss acknowledged that in theory it would have been police practice to have his body camera on from the moment he arrived at the scene. (29).

297.   Koumiss stated the following about what experience he has had with excited delirium: "Not much. I can't even think of a specific situation where, at the end, it was determined to be excited delirium. However, I have been, at times, where it's taken a couple of officers or three or four to get somebody under control." (32). Koumiss testified further about excited delirium: "That wasn't my immediate concern. My immediate concern was to get control of this guy. Part of the excited delirium is to get medical in there, but they would not go in there unless Mr. Bauer's under control, so the sooner we can get him under control, the sooner he can get professional medical care." (34). Koumiss does not recall if he talked to anyone at the scene about excited delirium. (34). Koumiss does not recall that Bauer ever threatened any of the police officers at the scene. (40).

298.   Koumiss stated that he observed, Sergeant Billdt, Sergeant Knight, and Sergeant Sarasua as the supervisors at the scene. (41). Koumiss testified that he was not sure who the incident commander was. (41).

299.   Koumiss testified that he never heard an order given from the supervisors to disengage with Bauer in order to evaluate his mental condition. (43). Koumiss

testified, "I never said he was suffering from excited delirium. I mentioned that could have been a possibility. But the way we are trained, once we physically engage with someone, we are not going to give up ground, because, at that point, there is a lot more dangerous variables that come into play. That person could be more upset, try to harm an officer, try to harm themselves, try to harm a public -- there is a senior center across the street. There is public grocery store right next to us. There is a lot of variables that come into play, once you come into physical contact with someone. So we are not trained to back off at that point. We are trained to get control of that person." (43-44).

300.  Koumiss reported the following about Bauer's breathing: "As far as I was concerned, he was breathing properly, because he kept yelling at us. And if you are yelling, you can -- you are breathing." (45). Koumiss stated that he does not recall Bauer ever saying that he couldn't breathe. (45).

301.  Koumiss stated that he has heard of positional asphyxia and described that, "It's essentially when someone's body is in a position where it cuts off their airway and makes breathing difficult." (50). Koumiss stated that he did not observe Bauer to be in positional asphyxia at the scene. (50).

302.  Koumiss reported that he did not observe any officers using TASERs on Bauer, and that he specifically did not observe Officer Trovao tase Bauer. (53). Koumiss further explained, "I knew he was tased, because I saw a couple Taser probes along his left side, but I – I don't know who -- who tased him to cause the wire -- the barbs to be in his body." (53). Koumiss stated that he did not know of anyone

performing distraction blows on Bauer at the time, but he later learned of it from the reports. (56).

303.    Bennett stated the following about his Taser training: "The training consisted of all -- what we call in-house training with a Pleasanton police department instructor." (19). Bennett next stated, "We have had, obviously, more than one session as it relates to the use. It usually involves either PowerPoint presentations or hands-on training in the field, which would be, basically, engaging -- I don't know exactly what we call them, but basically not humans, obviously, for the circumstances, but targets and situations we would require -- would justify using a Taser." (20).

<u>Deposition of Officer Steven Bennett</u>

304.    Bennett stated that over the years he had more than five sessions of TASER training. (20). Bennett reported that prior to the incident with Bauer he has had to use his TASER twice in the field. (21).

305.    Bennett reported the following about how he first became involved in this incident: "The first indication was a call for service that came out of the radio regarding a suspicious person at Raley's." (24).

306.    Bennett testified to the following about when he became aware of what officers were trying to arrest Bauer for: "I would say it wasn't until the restraint was placed around the lower portion of the legs, and I backed away from the attempt to put on the rest of the wrap is when I realized or was instructed to go find out other reasons why – or correction -- to go contact other witnesses. So once I made contact with the witnesses across the street and then came back and made contact

with the staff at Raley's is when I began to understand the full extent of what the incident was." (28-29).

307.    Bennett reported that when he arrived at the scene Bauer was laying on his left side. (34). Bennett then stated, "When I arrived, I was able to take hold of his legs and put him in the prone position." (34).

308.    Bennett testified about his involvement with the body wrap: "I was involved in assisting with putting the lower extremity portion of the wrap, which consisted of the Velcro strap that goes around the lower shins and upper ankles and with the – I guess you would call it the restraint that goes around the knees and thighs." (35).

309.    Bennett stated the following about his training on the use of the wrap: "We have had numerous trainings, which included advanced officer training, as well as in briefing training, when we would go through the process of putting on the wrap in briefing. I have been placed in the wrap myself, numerous times." (36).

310.    Bennett then explained what he thought the purpose of using the wrap on Bauer was: "The purpose would have been to maintain positive control of the situation, to restrain and prevent any more struggle, to prevent him from kicking or fleeing, I would say." (37).

311.    Bennett testified about mental illness training, "We have had training in some of the, I guess you would say, factors in which to evaluate whether or not somebody has or is displaying some form of mental illness." (40). Bennett does not recall Bauer ever saying anything threatening to the police officers on scene. (41).

312.   Bennett explained the following regarding why he disengaged: "So I'm six-foot-four. With all my gear on, I'm probably pushing somewhere around 240 or 250. At that point, during the application of the wrap, one of the other officers had actually collided his head with my helmet, because of the struggle. So at that point, being that I was starting to have my coworkers bounce their heads off of me, I felt it was appropriate, because we had the legs under control, to extricate myself from the situation and stand back." (43-44).

313.   Bennett next testified about Bauer's breathing, "At the time of my involvement, he was still struggling and, I would say, shouting very loudly. And at the time, there was no concerns that I would have had for his -- his ability to breathe." (44-45). Bennett testified that he recalls overhearing Bauer say he couldn't breathe on one of the videos, but Bennett does not recall directly hearing it. (45). Bennett further stated the following about Bauer's breathing: "At the time we were putting the leg restraints on through the duration of them applying the chest harness to the wrap, I recall he was very loud and continuing to yell, and because of those reasons, I did not have any concern for him at the time of not having any -- or having any kind of restriction for his breathing." (45-46). Bennett explained the following about Bauer and concerns for positional asphyxia: "At the time, I did not. I was not involved with the application of the chest harness. And when I had seen him post application, it did appear that he was sitting upright." Bennett stated that he is familiar with positional asphyxia but not compressional asphyxia. (47-48). Bennett testified regarding training on positional asphyxia, "Nothing in specifics, I would say. I don't recall any

situational training as – you know, obviously, these are the things you want to look to avoid. Obviously, you don't want to put somebody in a compromised position such as, you know, if you are trying to take somebody in custody on a bed, you don't want to have their head in the – you know, in the pillows or in a couch, et cetera, and so those are things, I think, are common sense to look for." (48).

314.   Bennett testified to the following about officers leaning on Bauer: "So I can recall that Officer Chin was laying across him when he was on his left side. As I arrived, I do recall that after I pulled him into a prone position, that Officer Chin was attempting to obtain his left arm, to apply into a handcuff, and that -- I believe I described it as being sprawled out, with his legs out straight. And Officer Chin was leaning with his left shoulder on the back -- upper left portion of Mr. Bauer's back in order to obtain his arm.  Beyond that, I would say was, maybe, two officers, perhaps three, up in his upper area that were trying to control, but I don't recall anybody laying across his back besides Officer Chin at the very onset." (49-50).

315.   Bennett further explained the following about officers kneeling on Bauer: "I would say kneeling on or next to him, but not directly on -- on his back. More or less on the upper portions of the shoulders." (50). Bennett further stated, "I recall -- as far as kneeling on him, I can't recall any specifics. I do recall Officer Middleton on the upper right portion, and, I believe, Officer Chin on his direct left, and Officer Trovao, at some point, on the upper left portion of Mr. Bauer." (50).

316.  Bennett testified that he recalled Officer Chin delivering two distraction blows to Bauer. (51). Bennett then stated, "Under the circumstances, I believe it was appropriate for Officer Chin to apply the distractionary strikes in order to try and obtain control of Mr. Bauer's left arm." (52). Bennett next described what he observed regarding baton strikes: "I recall Officer Trovao jabbing twice with his baton upon arrival in order to also effect distractionary strikes in order to obtain the left arm from under his torso." (52). Bennett then explained what he observed regarding TASER use: "So upon my arrival, I recall hearing a Taser being activated. As far as the effectiveness of whether or not it made contact, I was not aware. After I was able to obtain the legs for control and put Mr. Bauer in a prone position, I do recall it was either Offer Middleton or Officer Trovao administering a -- what's called a drive stun." (53).

317.  Bennett stated the following about whether he had concerns that Bauer had excited delirium: "I believe Mr. Bauer obviously demonstrated some of those characteristics, which would have prompted medical response as practical – as quickly as practical, which was provided." (58). Bennett further stated the following about any concerns regarding excited delirium: "At the time, during the incident, it was not one of the primary concerns I had. It was more or less taking him into custody as quickly and safely as possible." (60).

<u>Deposition of Patrick Thomson</u>

318.  Thomson is a fire engineer with Livermore-Pleasanton Fire Department. (10). Thomson is also a paramedic. (11).

319.    Thomson testified to the following about the initial stages of the call for service involving Bauer: "So typically -- what I remember is that we got a call for medical emergency, which is very routine, and we were advised to stage, which is also routine whenever there is potential for harm from a -- from a patient or when a patient is acting unstable. And what "staging" means is that we will drive relatively close to the scene, and usually we will park about a block away or, you know, safe distance away and wait for the police department to give us notification that it's safe to enter the scene." (13-14).

320.    Thomson stated they staged very close to the actual scene and it was only about ten seconds from when they were called into the scene to when they actually arrived on the scene. (15).

321.    Thomson stated the following about what he saw when he entered the scene: "The first thing I recall is when we were staged. Because of where we were at, we -- we could see a lot of police cars and police motorcycles. We could see the police officers, but we couldn't actually see any -- we couldn't see the patient or what was going on. Once we were cleared into the scene and we walked up, that's when we were able to see the patient in PD custody or something of that matter." (15-16).

322.    Thomson then explained, "So we were cleared to come in on scene. However, we still didn't actually go right up and make patient contact because PD were still having difficulty getting him completely restrained or stabilized or in a -- in a safe -- restraints for us to be able to actually make patient contact." (16).

323.    Thomson then stated the following about his initial recollections of Bauer: "To the best of my memory, I remember him on the ground, on the grass. He was handcuffed. However, he was still screaming, yelling, and trying to get up, and there was one officer that was keeping him on the ground. So he was, like, in a sitting position, so the officer was basically standing next to him and kind of keeping him from getting up." (17-18).

324.    Thomson next reported the following about what he observed: "So in that time, the ambulance arrived on scene, and we were still waiting for the patient to be restrained enough for PD to then call us in to actually make patient contact. I remember that they pulled out what's called the wrap because he was still very agitated and resisting, not following the police officers' orders. So then the -- and I cannot remember how many police officers it took, but it took several to get him into the wrap, which is typical. It's a device that keeps them -- essentially secures their feet as well as their hands. So it makes it so they can't get up and run or kick or -- you know, reduces the ability to cause harm." (18-19).

325.    Thomson further reported the following about Bauer: "He was screaming very loudly. I just remember feeling that he was -- he was very agitated and that he just wasn't complying with the police department, with the police officers." (20).

326.    Thomson stated the following about his recollection of the spit mask: "That, I can't remember, if he initially had it on or not. I do remember very vividly that he did have a spit mask on. I can't recall when it was put on or if it was already on by the time we got there." (21).

327.   Thomson acknowledged that he examined Bauer's pupils and found that the pupils were dilated. (25). Thomson does not recall the sequence when he did this. (25).

328.   Thomson stated the following about when he noticed that Bauer needed immediate medical care: "That was when it became clear that he needed immediate medical care, was right around the time we were loading him into the ambulance." (27). Thomson further stated, "Prior to that, there was nothing substantial or jumping out to trigger us to think that he needed immediate medical care right away." (27).

329.   Thomson testified as follows about Bauer's breathing and sweating: "He was sweating profusely and, yeah, breathing pretty hard. And I -- if -- I can't remember the -- the outside temperature that day. I – you know. So there was -- I do remember there wasn't indication for him to be sweating that profusely by the ambient temperature, meaning that it was probably from the -- the ordeal with what was going on with the police prior to us getting there." (29).

330.   Thomson recalled that the paramedics provided Bauer with a sedative called Versed. (31). Thomson believes that he checked for a pulse and found a pulse on Bauer before the sedative was given. (32). Thomson can't remember if he checked for a pulse after the sedative was given. (32).

331.   Thomson reported the following about Bauer's face coloration: "I remember that Diaz had asked me if I thought he looked -- if his face looked blue, which is an indication that maybe somebody might be apneic, or not breathing adequately. And I told him, you know, "I can't tell because of the spit mask." It was a black,

very thick mesh, and I said, "I can't tell if he's blue or if that's just the mask." But I didn't see any other indication of any other discoloration or changes to his skin signs elsewhere." (33).

332.    Thomson stated that he felt it was appropriate that Bauer had the spit mask on. (36).

333.    Thomson recalled the following about what happened when Bauer was put in the ambulance: "I remember once we got loaded up, once the gurney was loaded into the ambulance, something just didn't feel right. Something didn't seem right. And I remember Captain Smith saying something; like, asking me if he was -- you know, "Is he breathing," you know, something. And I remember looking closely and taking the -- like, I don't remember who took the spit plastic off. I believe it may have been the ambulance paramedic, but, again, I -- that part is fuzzy. But once the spit mask was taken off, I think we all realized that he wasn't breathing because he was looking cyanotic." (44-45).

334.    Thomson stated that he did the following once he realized Bauer wasn't breathing: "Yes. I -- I believe I told Captain Smith to get police officers to remove the wrap so we can render treatment. I believe the gurney -- because we -- because the wrap keeps him sitting up in an up position, you can't really do CPR or breathe for them, you know. So we had to have them release the wrap. And I -- I think I ran back and got the LUCAS device, which is a CPR -- mechanical CPR machine that we have on the fire engine, and Jorge Diaz and the ambulance personnel were in the back of the ambulance still and initiating whatever care they could with the

wrap on and removing the wrap. And I believe I helped remove some of the wrap as well, but, again, it's fuzzy." (45-46).

335.  Thomson testified that he believes it was appropriate to put Bauer in the wrap restraint. (50). Thomson testified that he believes it was appropriate to put Bauer in the four point soft restraints to restrain Bauer to the gurney. (51).

<u>Deposition of Fire Captain Jorge Diaz</u>

336.  Diaz has been employed by the Livermore-Pleasanton Fire Department for eighteen years. (10).

337.  Diaz testified to the following: "We were told to stand by, so we went in – just to clarify things, we went in and told to stand by. Okay? So we stood by. When we made contact with Pleasanton PD, they told us, "We don't want you touching the patient. We are going to move the patient once, from the ground over -- straight to the gurney, and get him to the hospital." And that was -- that was understood by everybody at scene; we're awaiting the gurney to get there. So my crew and I stood by on the sidewalk, and I never actually physically touched Mr. Bauer. I did at one point do a 360 just to kind of get a generalized observation of him to make sure there wasn't any life-threatening injuries that were -- that were present, and I didn't notice any. So seeing as how I never actually touched Mr. Bauer, I never really assumed patient care for him." (21).

338.  Diaz stated that when he got to the scene, Bauer appeared to be agitated and was screaming and yelling. (22). Diaz stated that he was aware that Bauer was given a sedative and Diaz did not have concerns that Bauer was given the sedative. (26).

339.    Diaz testified further about what occurred at the scene: "So I mentioned once before that when we showed up, we were told by Captain Smith to just stand by. The plan was to wait for the gurney to show up and then move the patient from the gurney -- or from the ground over to the gurney. But because we were EMS standby, just to get a better idea as to what was going on, I did a 360, never once made contact with Mr. Bauer. I stood, roughly, about 6 to 8 feet away from him as I did a 360, only looking for any life-threatening injuries. Had I noticed any life-threatening injuries, I would have overruled what Pleasanton PD had requested and initiated patient care. At that point, I didn't recognize anything that seemed to me would be of concern to where I needed to intervene." (27).

340.    Diaz stated that he was looking for the following when he did his observation: "So you look to see if they are breathing. Obviously, if he is yelling, you know, he's -- he's breathing. People talking, that is a pretty good indicator that they're breathing. You are looking for any bleeding, arterial bleeds or anything like that that looks uncontrolled that needs to be addressed, amputations, or any other injuries. I didn't see any." (28).

341.    Diaz reported that Bauer had the spit mask on when Diaz was on scene. Diaz stated that he was still able to observe Bauer's face and determine that he was breathing. (31). Diaz reported that he observed the process of the officers lifting Bauer onto the gurney and placing Bauer in soft restraints. (33). Diaz reported that he did not notice any life-threatening issues with Bauer at this time. (33).

342.    Diaz testified to the following about when he first noticed a medical issue with Bauer: "I noticed there was a medical issue with Mr. Bauer when we were starting

to put our gear back on the rig and somebody caught my attention. I'm not sure if it was Captain Smith or -- somebody caught my attention. As I looked to my left, I noticed Mr. Bauer going limp in the back of the -- in the back of the ambulance, so I walked over to go -- to go assist, see if they needed help with him." (34). Diaz testified about his observations as he moved towards the ambulance: "The only observation I made was -- the only observation I noticed was when, I mentioned earlier, he had seemed like he had gone limp. I seen him going limp, and that was the only observation I noticed." (35).

343.    Diaz stated that the spit mask was still on Bauer when Diaz got back to the ambulance and that somebody took the spit mask off of Bauer in the ambulance. (35).

344.    Dias stated the following about putting Bauer in soft restraints: "Mr. Bauer, nonetheless, had -- he was placed in soft restraints. I was assisting to place him in soft restraints. In other words, I was holding his arm down while they put the restraints on him, and he was actively fighting us and resisting. I was, I think, in control of his left arm, and he was pulling and kicking, trying to get free. So that was my last interaction with Mr. Bauer prior to ensuing CPR." (36).

345.    Diaz explained that when Bauer got the sedative he appeared to start to calm down and be less aggressive. (38-39). Diaz stated that he is not trained to make observations about whether Bauer was under the influence of some drug or substance. (56-57). Diaz testified that he observed some officers to be sweaty and fatigued. (96).

Deposition of Sergeant Eric Gora

346. **CONFIDENTIAL**

).

347. **CONFIDENTIAL**

348. **CONFIDENTIAL**

349. **CONFIDENTIAL**

350. **CONFIDENTIAL**

351. **CONFIDENTIAL**

352. **CONFIDENTIAL**

354. CONFIDENTIAL

355. CONFIDENTIAL

356. CONFIDENTIAL

357. CONFIDENTIAL

**CONFIDENTIAL**

**CONFIDENTIAL**

359.   **CONFIDENTIAL**

360.   **CONFIDENTIAL**

361.   **CONFIDENTIAL**

CONFIDENTIAL

362. CONFIDENTIAL

363. CONFIDENTIAL

364. CONFIDENTIAL

365. 

366.    CONFIDENTIAL

Deposition of Dr. Michael Joseph Ferenc

367.    Dr. Ferenc performed the autopsy on Bauer and listed the cause of death as

acute methamphetamine toxicity with other conditions associated. (13-14).  Dr.

Ferenc listed the other conditions as probable mechanical asphyxia while being

placed in the restraint device, cardiac hypertrophy, and morbid obesity. (19).

368.    Dr. Ferenc explained the following about the level of methamphetamine: "I

don't think it is a low use, but it is a lower end of the scale use. And whoever said

that to you is correct. It is on the lower end. It is not an enormous amount of

methamphetamine. But, again, methamphetamine is an unpredictable drug . . . And, number two, it doesn't really work well and play well with others when the others are things like compression of the torso and enlarged heart, things of that nature." (101-102). Dr. Ferenc stated the following about whether Bauer would have died solely from the methamphetamine: "I think -- I think it would be much less likely he would die. But I have seen perfectly healthy people die at these levels. It is possible. That is why the drug is so damn unpredictable and dangerous. But it wasn't alone by itself." (103).

369. Dr. Ferenc testified to the following about the wrap: "The wrap itself was used the way it was designed to. It wasn't, in my opinion, monitored correctly, and it should have been applied in a lesser fashion if they decide it was still the best thing to use." (105-106).

<u>Deposition of John Bauer</u>

370. Bauer testified that he previously he told Officer Mike Mirazzo that Jacob was disconnected from reality. (115).

371. Bauer testified to the following about his discussion with Officer Mike Mirazzo: "That's exactly what I said. Actually no, no. I'm going to back up and say from what I remember, and obviously we have the footage to to see what exactly what I say, I remember saying here's my prediction. You're going to end up in an encounter with Jacob and here's my prediction: it's going to end badly for Jacob. I don't remember saying killed. I just remember saying it's going to end up badly for Jacob when you encounter -- when your department encounters Jacob." (164).

372.   Bauer stated that he thought that Jacob would have a bad encounter with the Pleasanton P.D. because of, "The history of Pleasanton police and going back to 2015 with the killing of John Deming, Jr." (164).

Opinions

373.   It is my opinion, based upon my specialized background, training education and experience, as well as my continued research, authoring, consulting, auditing, and training of law enforcement practices nationwide that the decision to place Jacob Bauer in handcuffs by Officer Middleton and Officer Chin was inconsistent with generally accepted policies, practices, training and legal mandates trained to officers for application in field operations.

374.   Officers throughout the United States are trained that there are two distinct justifications for depriving a citizen of liberty relating to the investigation of criminal activity.   The first of these justifications is commonly referred to as a "Terry Stop" or investigative detention.   Officers are trained that these stops do not require probable cause to believe the person has committed a crime, but rather are justified on a lesser degree of proof, specifically "reasonable suspicion."[2]   It is noted that, during a reasonable suspicion based detention, officers are trained that the purpose is to confirm their suspicion through the development of probable cause or dispel their suspicion.[3]   California POST Learning Domain 15 instructs: "Reasonable suspicion is the standard used to justify a detention.   It exists when

_____

[2] See e.g. The Law Enforcement Officer's Pocket Manual 2008 Edition, Miles, Richardson, and Scudellari, Bureau of National Affairs Arlington Va. 2008. § 2:8; See also Quick Reference Legal Guide for Law Enforcement, Critical Legal Tasks in Law Enforcement 2008-2009, Jack Ryan, PATC Books, 2009 P. 10.
[3] See, The Law Officer's Pocket Manual 2008 Edition, Miles, Richardson, and Scudellari, The Bureau of National Affairs, Inc. Arlington, Va. 2008. §2.14.

an officer has sufficient facts and information to make it reasonable to suspect that criminal activity may be occurring, and the person to be detained is connected to the activity."   Based on the reports of the store employees, the description provided, and their direction to the officers of Bauer's conduct and location, would be adequate to justify a stop of Bauer to identify him and confirm or dispel the suspicion of criminal activity.  It is noted that Bauer stopped for the officers when Middleton called out to him.  Bauer stood in place and followed instructions including putting the glass down and keeping his hands from his pockets.  Bauer identified himself.  Bauer answered questions regarding where he was planning on going.  It was not until Bauer remained silent after being asked whether he had anything illegal on him that Officer Middleton signaled Officer Chin that he wanted to move in and take custody of Bauer.  Consistent with training given to officers nationwide, California POST Learning Domain 15:3 instructs officers: "A detainee is not obligated to answer any question an officer may ask during a lawful detention.  The refusal to answer questions alone does not provide probable cause for escalating a detention to an arrest."  It is noted that in states where there is a stop and identify statute, a person lawfully detained may face criminal charges for refusing to identify themselves.

375.   Officers are further instructed that when articulable facts support a suspicion that the subject is armed and dangerous, officers may conduct a limited pat-down of the subject's outer clothing in order to protect themselves from the suspected weapon while they conduct their investigation.  California POST LD 15:3 notes: "Usually, searches are not permitted during a detention.  If officers have a factual

basis to suspect that the person is carrying a concealed weapon, dangerous instrument or an object that can be used as a weapon, the officers are justified in conducting a cursory/pat search to protect the officers from an assault.  It is noted that Mr. Bauer was compliant with all of the questions over the course of minutes, with the officers taking no steps to indicate an articulated fear that Mr. Bauer was armed and dangerous.

376.   While officers may be justified in handcuffing or placing a person in law enforcement vehicle while they carry out the detention, doing so requires some facts that would support this escalation.  Officer are trained that when the person attempts to leave or is uncooperative, handcuffing or placing in a law enforcement vehicle may be justified.   As noted, Mr. Bauer identified himself and cooperatively answered a number of questions.  Also as noted, he was not required to answer questions.  There is nothing in the video that would indicate that he was trying to leave.   It is noted that Officer Middleton acknowledged that when he initially made contact with Jacob Bauer there was no reason to believe that Bauer posed an imminent threat to anyone.

377.   As previously noted, Middleton testified to the following about why he felt it was appropriate to detain Bauer in handcuffs: "The fact that he was a suspect in a crime who had been seen acting erratically, aggressive. Obviously, he scared some of the employees there. The fact that he's bigger than a lot of individuals who we contact. He was well over 200 pounds and bigger than myself or Officer Chin. The fact that he had not been searched." (76)  It would be contrary to law enforcement training for an officer to wait through minutes of a detention,  to

handcuff or frisk a subject where factors, known to the officer at the initiation of a contact indicated an articulated belief that the subject was armed and dangerous or attempting to flee.  Officer Middleton's reasoning, that the subject had been previously acting erratically and aggressively prior to the arrival of officers and was bigger than the two armed officers and had not been searched would not, in accord with law enforcement training and practice support handcuffing or frisking the subject, particularly when the objective video shows that Jacob Bauer had been totally compliant with the officers and the detention was for, at best, for vandalism.

378.   As noted, Chin stated that Raley's employees did not say that Bauer had a weapon, had hurt anyone, or had made any threats. (40). Chin acknowledged that when Bauer was initially contacted there was nothing to indicate a safety issue. (40). It is also noted that Officer Chin testified that he did not see any safety issues when he and Middleton first made contact with Jacob and also testified to Jacob's cooperation and compliance with officers as well his coherence in answering questions.

379.   As noted, Officer Chin's justification for escalating the event by, without warning grabbing Jacob to handcuff him was: "Because at that point when we asked if he had any weapons on him, he did not answer that." (44). Chin testified further about the handcuffing: "We handcuffed him because at that time, we didn't know, and he was being detained for the vandalism and the public intoxication at that time." (44).   It is clear from the video that any information regarding vandalism or public intoxication was present from the moment the officers made

contact with Jacob, thus the decision to handcuff was made only after Jacob remained silent when he was asked, not if he had any weapons on him, but instead whether he had anything illegal on him.

380.   While Officer Middleton and Officer Chin's stop of Mr. Bauer to investigate further was proper, there is nothing in the video, or in the testimony of the officers that would support the facts necessary to justify a pat-down or handcuffing of Mr. Bauer while the investigation was carried out.  It is clear from the initial video at the store that Middleton had not secured a request from the store for a citizen's arrest.

381.   Officers throughout the United States are trained that the second justification for deprivation of liberty of a citizen is when an officer has probable cause to believe that the subject has committed a criminal offense.  Additionally, training and texts make clear that: "All arrests-whether with or without a warrant –must be based on probable cause.  You must have sufficient knowledge of facts and circumstances that would lead a reasonable police officer to conclude that the suspect probably committed the crime."[4]  Officers are informed that the way to ensure that the facts they have developed meet the generally accepted policies, practices, training and legal mandates trained to officers is to seek an arrest warrant before physically making the arrest.   As noted by California POST Learning Domain 15:4 "Peace officers must know and comply with the statutory rules of arrest in order to properly exercise their authority and responsibility while avoiding liability in making arrests.

---

[4] See, The Law Officer's Pocket Manual 2008 Edition, Miles, Richardson, and Scudellari, The Bureau of National Affairs, Inc. Arlington, Virginia 2008.  at §4:2

382. At the outset it is noted that Officer Middleton, himself testified that at the point when he decided to put Jacob Bauer in handcuffs, he did not have probable cause to arrest Jacob.

383. The officers took no steps to simply maintain the detention of Bauer without handcuffs while sending an officer to Radley's to further investigate the nature of damage that Bauer had caused and whether the store wanted to pursue this matter. It is clear based on the number of officers that responded to the call for backup that sufficient resources were available to conduct an appropriate investigation rather than escalate the event by attempting to place Bauer in handcuffs.

384. As noted by California POST LD 15:4, and consistent with what is trained to officers throughout the United States, "Penal Code Section 836 establishes the legal basis for an arrest by peace officers. Officers may make an arrest pursuant to a warrant or without a warrant whenever they have probable cause to believe the person to be arrested has committed a public offense (felony or misdemeanor) in their presence; when the person has committed a felony, although not in the officer's presence; whenever they have probable cause to believe the person to be arrested has committed a felony, whether or not a felony has in fact been committed."

385. It is noted that California POST LD 15:4 does instruct officers similarly to training around the country with respect to Citizen's Arrest or as referred to by California POST as a "Private Person Arrest" and notes that a private person can make an arrest for a misdemeanor that occurs in their presence and then the private person must, without unreasonable delay "take the person before a magistrate" or

"deliver the person to a peace officer."  It is noted that in examples provided, the private person has taken custody of the person and the person is then turned over to law enforcement when law enforcement arrives at the scene. I would note that the manner in which the officers were using the "CA". private person arrest here, is contrary to the generally accepted practice and industry standard and would render the requirement that the misdemeanor occur in the officer's presence meaningless if all the officer had to do was go back to the reporting citizen and ask them to make the arrest so that the officer could get around the "in the officer's presence" requirement.

386.   It is my opinion, based upon my specialized background, training education and experience, as well as my continued research, authoring, consulting, auditing, and training of law enforcement practices nationwide that the use of force used by the officers involved in the event with Mr. Jacob Bauer was inconsistent with generally accepted policies, practices, training, and legal mandates with respect to use of force.  It is also my opinion that any officer who was present during this event had a recognized obligation in accordance with law enforcement policies, practices, training, and legal mandates to intervene in the force which was taking place.

387.   Officers throughout the United States are trained in various formulas with respect to use of force decision making and justification.   The first of these formulas is a three-part test which parallels the mandates announced by the United

States Supreme Court in *Graham v. Connor.*[5]  The three-part test directs officers to consider the seriousness of offense; whether or not the subject poses a physical threat to the officer or anyone else; and finally whether the subject is actively resisting or attempting to evade arrest by flight.

388.    In dealing with proper levels of force several factors are considered to include: Officer/Offender size and ability; number of persons present i.e. number of deputies versus number of hostile subjects; availability of weapons; environment; and threat to third parties.  It is noted that California POST Learning Domain 20 on use of force specifically cites factors such as the availability of assistance i.e. the number of officers present and the availability of backup units as factors with respect to an officer's consideration on force.  From the outset of the contact with Jacob, there were two officers to a single subject.  Within a short timeframe there were multiple officers, many using force options from empty-hand control include putting pressure on Jacob to hold him in a prone position, to baton and TASER deployments as well as hard-hand strikes.   Most of the force, used by most of the officers was in response to the officers' inability to get Jacob's left arm from underneath his body, which one officer described as fully extended under his body. It is noted that in addition to having Jacob's full weight over the arm, there was also the pressure of the officers further holding the arm under the body as they used body weight and hands to hold Jacob in the prone position.  When told to get his hand out, Jacob clearly responded indicating that he was unable to.

---

[5] This formula is derived from *Graham v. Connor,* 490 U.S. 386 (1989) and can be found in law enforcement training lesson plans as well as Use of Force policies throughout the United States.  See e.g. International Association of Chiefs of Police, Use of Force Model Policy 2005, IACP Model Policy Center, Virginia 2005.

There is no indication in any of the materials to indicate that Jacob was committing any assaultive act upon any officer at this scene.

389.   The second formula was the "Use of Force Continuum."  While agencies utilized different force continuum models, all of the models recognize that officers have various subject control tactics available to them and that these tactics range from a low-level intrusions, such as officer presence and verbal commands, to the highest level which is deadly force. It should be recognized that even in those agencies which still use of force continuum, the continuum is not a ladder which must be climbed step by step.  Instead it is a presentation of various force options, each of which must be objectively reasonable under the circumstances with which the officer is faced.  It is noted that due to confusion over application of such continuums, law enforcement is moving away from this concept and simply train "force options."  It is recognized that many law enforcement agencies are moving away from the so-called "continuum" and moving toward a "Graham" decision making model.  It is noted that hard hand strikes such as punches and kicks are considered significant force options and TASER is considered a significant intermediate weapon.

390.   The acknowledged use of force established by officer testimony included:

a.   Officer Middleton deploying his TASER four times
b.   Officer Chin using two hard hand fist strikes
c.   Sergeant Knight attempting a rear wrist lock
d.   Trovao
  1.   TASER drive stun
  2.   Put a foot on Bauer to push him back over when Bauer tried to roll onto back
  3.   Deployment of Baton using jab strikes to Bauer
  4.   Left knee on Bauer's Shoulder (Trovao-believed others had their knees on Bauer also.

e.  Officer Bennett took hold of his legs and put Bauer in a prone position
f.  Office Koumiss
    1.  Pushed and Grabbed Left Arm
    2.  Used baton as leverage device
g.  Sergeant Knight attempted rear wrist lock
h.  Officer Granados assisted with manipulation of restraints and asked for WRAP
i.  Combination of Officers Putting Bauer in WRAP

391.   Officer Chin employed two hard hand control tactics including closed fist strikes, while Officer Trovao used his foot on Mr. Bauer which would also be a hard hand control tactic. These tactics are considered by law enforcement to be significant uses of force which are used when a subject places an officer at risk through violent active resistance.  The use of a baton, even in a jabbing motion as described by Trovao would be even more significant than hard-hand control.

392.   It is well known and trained to law enforcement that being subjected to a TASER deployment is a significantly stressful event. It is also well known that when dealing with a person who is in an agitated state due to a medical, mental, health, or substance related crisis, the impact can be even more severe.[6] Officers are taught to minimize the number of cycles and therefore the exposure to all individuals.  This general warning is further emphasized in the training when the deputy is dealing with a subject who is an agitated state or crisis.  TASER training emphasizes that each cycle of the TASER is a window of opportunity to accomplish restraint, particularly when used with the probes.  It is noted that Mr. Bauer was hit with a probe deployment during this event.

---

[6] TASER Training Version 14 in discovery- "Especially when dealing with persons in a health crisis such as excited delirium, it is advisable to minimize the physical and psychological stress to the subject to the greatest degree possible."

393.    It is noted that there are three types of TASER deployments.  The first type in which darts are shot into the subject causing complete neuromuscular disruption when successfully deployed.  The second type, referred to as the drive-stun or touch-stun is where the cartridge with the darts are removed and the front of the TASER touches the person.  This second type does not cause neuromuscular disruption but instead is used for pain compliance.  The third type is really a combination of the first two.  Under this hybrid, the darts are deployed into the subject at which point, with wire(s) connected the officer moves the TASER a distance from where a dart or darts is connected and drives the TASER to this other spot thereby causing a connection that will, where successful cause neuromuscular disruption.

394.    It is also noted that officers throughout the United States are trained that two officers should not simultaneously be deploying TASERs.[7]  It is clear from Officer Trovao's BWC that Officer Middleton and presumably Trovao were both deploying their TASERs at the same time in close proximity to one another.

---

[7] "Electronic Control Weapons" International Association of Chiefs of Police, National Model Policy Center (2018) "Absent exigent circumstances, officers shall not intentionally activate more than one ECW complete circuit at a time against a subject. Officers shall energize a subject no longer than objectively reasonable to overcome resistance and bring the subject under control."



395.



396.



397.

398.    While the TASER (presumably Trovao-his BWC) was still being deployed two

officers can be seen with their hands by Bauer's neck.



399.



400.

401.   Officer Chin can be seen maintaining pressure on Bauer's back while other

   officers continued with pressure on Bauer's neck area.



402.

403.   It is noted that in the prior freeze frame Officer Chin while pressuring Bauer's
back and with his other hand pulling Bauer's right handcuffed hand while two
officers are holding the area of  Bauer's neck, Chin almost immediately follows
with a hard-hand strike to Bauer while Bauer is in this prone position with at least
three officers holding him down.  It is noted that at this point, Officer Chin was
ordering Bauer to not scratch him.



404.

405.   As officers struggled to get Jacob Bauer's one free hand from underneath his
body, using various tactics, at least two officers, one of whom was a supervisor
did not find it necessary to physically assist the officers.



406.

407.   Sergeant Sarasua BWC provides a viewpoint of the number of officers holding

Jacob Bauer and the number of officers standing by as the officers kept Bauer in

the prone position while putting him in the WRAP.



408.

409.   Rather than supervising the restraint process and the condition of Jacob Bauer the three supervisors moved down the sidewalk and began conferring on the sidewalk.  This is contrary to generally accepted law enforcement supervisory practices.

410.   While my opinions as to the excess force do not rely on the fact that the deputies knew or should have known that Jacob Bauer was in crisis, the fact that it should have been obvious makes the force used in this case even more egregious.  It is noted that from the initial call and interview of employees prior to contact with Bauer, employees of the store recognized that Mr. Bauer was "deranged," "possibly bi-polar," "crazy" or on drugs.  In fact while the initial complainant, Karen, indicated that they wanted Bauer out of the store and did not indicate that they wanted Bauer arrested, she also said that someone should come an assess whether Bauer needed assistance.  Thus, even untrained store employees recognized that Jacob Bauer was in some type of crisis related either to mental health or drugs and the caller recognized and told the 911 caller that Jacob may need assistance, yet the trained professional police officers not only disregarded information that had been received, they did not recognize and take the appropriate response to a crisis event. Instead the officers fixated on a questionable minor crime of vandalism and failed to follow training and practice for dealing with persons in crisis.

411.  Law enforcement is well aware that officers will come into contact with persons suffering from impairments relating to mental illness, substance abuse,

104

alcoholism and medical impairments.  In any use of force instance where the officer has such information, additional factors and options should be considered.

412.    Law enforcement training throughout the United States recognizes that officers are often called to deal with persons who are emotionally disturbed or mentally impaired.  Officers are trained to recognize such persons and utilize an approach which de-escalates the event.  One of the common principles trained to officers is that persons who are in this condition may be provoked by certain law enforcement conduct to include aggressive commands, closing on the subject's personal space, or touching the person.  In training these are often referred to as triggers which may escalate the event.  Law enforcement agencies throughout the United States direct officers through policy and training how such persons should be approached and dealt with in order to avoid escalating the event.[8]

---

[8] See e.g. Peoria Arizona Police Department Manual section 4.24: The following guidelines detail how to approach and interact with a person who may have mental illnesses and who may be a crime victim, witness or suspect. These guidelines should be followed in all contacts, whether on the street or during more formal interviews and interrogations.  Officers, while protecting their own safety, the safety of the person with mental illnesses, and others at the scene should: (41.2.7.c)

1.    Remain calm and avoid overreacting;
2.    Be helpful and professional;
3.    Provide or obtain on-scene emergency aid when treatment of an injury is urgent;
4.    Check for and follow procedures indicated on medical alert bracelets or necklaces;
"Our Community…Our Commitment"
5.    Indicate a willingness to understand and help;
6.    Speak simply and briefly, and move slowly;
7.    Remove distractions, upsetting influences and disruptive people from the scene;
8.    Understand that a rational discussion may not take place;
9.    Recognize that sensations, thoughts, frightening beliefs, sounds ("voices"), or the environment may overwhelm the person;
10.  Be friendly, patient, accepting, and encouraging, but remain firm and professional;
11.  Be aware that their uniform, gun, and/or handcuffs may frighten the person with mental illnesses and attempt to reassure him or her that no harm is intended;
12.  Recognize and acknowledge that a person's delusional or hallucinatory experience is real to him or her;
13.  Announce actions before initiating them;
14.  Gather information from family or bystanders;
15.  If the person is experiencing a psychiatric crisis, contact the Maricopa County designated crisis provider.

413.   Training on dealing with the mentally ill, those in crisis, or the emotionally disturbed instructs officers to communicate with each other in developing a plan of approach; to coordinate this plan; to contain the subject, and to slow down before taking action where possible.

414.   One of the commonly taught tactics for dealing with persons in crisis, particularly when the subject does not have a weapon is the Rule of 4 which involves using a soft-empty hand tactic by four officers with one officer being responsible for one limb based on pre-planned assignments.  In the ideal, a fifth officer protects and stabilizes the subject's head while trying to deescalate the subject's agitation verbally with a calm tone.  It is clear from the video that the resources were available for such an approach in this case.

415.   As with the other law enforcement practices discussed in this report, California POST has a learning domain covering the topic of Persons with Disabilities which is consistent with the generally accepted policies, practices, and training nationwide.  For example Learning Domain 37:4 instructs officers: Move slowly; When possible eliminate emergency lights and siren and disperse any crowd that may have gathered; Assume a quiet nonthreatening manner when approaching

---

E.  While each incident will be different when dealing with a person who may have mental illnesses, officers should be aware that their own actions might have an adverse effect on the situation. Actions that officers should generally avoid include: (41.2.7.c)
1.     Moving suddenly, giving rapid orders or shouting;
2.     Forcing discussion;
3.     Direct, continuous eye contact;
4.     Touching the person (unless essential to safety);
5.     Crowding the person or moving into his or her zone of comfort;
6.     Expressing anger, impatience, or irritation;
7.     Assuming that a person who does not respond cannot hear;
8.     Using inflammatory language, such as "mental" or "mental subject";
9.     Challenging delusional or hallucinatory statements;
10.  Misleading the person to believe that officers on the scene think or feel the way the person does.

and conversing with the individual;   If possible, avoid physical contact if no violence or destructive acts have taken place; If possible, explain intended actions before taking action; Take time to assess the situation; Provide reassurance that officers are there to help; and Give the person time to calm down."

416.   While officers in this case indicated that they had received CIT training, not a single officer applied the training to an event where even the untrained citizen who called the police recognized that Jacob Bauer was in some kind of crisis and needed to be assessed to determine if he needed assistance.

417.   Officers throughout the United States are trained on the concepts of positional asphyxia, compression asphyxia, and mechanical asphyxiation as the three relate to the restraint process.  Positional asphyxia includes leaving a person in a prone position (on their stomach) while restrained.  Officers are taught that persons who have been involved in a prolonged struggle with law enforcement and persons who are overweight are more susceptible being deprived of oxygen if left in this position for a prolonged period of time.  Officer are instructed to get such persons off their stomach as quickly as possible once there subject is restrained or when there are a sufficient number of officers present to minimize danger from the subject if he or she is not yet restrained.  Any reasonable and well-trained officer would have recognized that Jacob Bauer, who was clearly in an agitated state, should not have been maintained in a position on his stomach for approximately 10-12 minutes from the time he was taken to the ground by Middleton and Chin, until the time he was rolled off his stomach and sat up to complete the process of placing the WRAP restraint system on him.  I note that from the cell video taken

from across the street there is a short period of time in the initial time on the ground that Bauer was on his back while being subjected to the initial TASER deployments.

418.   Compression asphyxia as identified in law enforcement refers to putting weight or pressure on the rear of a subject's torso while they are in a prone position.   It is clear from the videos of this event that officers were placing pressure on Jacob Bauer's rear torso.   In addition to prior freeze frames in this report, officers can be seen on Trovaso's BWC putting pressure on Jacob's back.



419.



420.

421.   The pressure on Jacob's torso was continued and an officer kneeled on Jacob's

head.



422.



423.

424.   Any reasonable and well-trained officer would have recognized as the untrained citizens who called the trained police officers that something was wrong with Jacob Bauer and that he was in need of assessment and possibly assistance. It is my opinion that the officers' actions from the time they decided to handcuff Jacob, was inconsistent with generally accepted policies, practices, training and legal mandates trained to officers for application in field operations.  The use of the TASERs, the hard hand strikes, and the prone restraint of Jacob Bauer were all contrary to generally accepted law enforcement policies, practices, training and legal mandates trained to officers for application in field operations.

425.   It is my opinion, based upon my specialized background, education, training and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that the manner in which

the WRAP was applied would also be recognized in law enforcement as having the potential to compromise breathing.

426.   I would note that it took the officers several minutes to apply the WRAP during which time Bauer was largely in a prone position with pressure on his body.  Once the WRAP was applied and Bauer was moved to the upright position, the officers kept pressure on Bauer's back pushing him forward so that his legs were flat, but his upper body was pushed forward over his stomach.



427.

428.   It is my opinion, based upon my specialized background, education, training and experience as well as my continued research, authoring, auditing, consulting and training on law enforcement training that the use of the spit hood on Jacob Bauer was contrary to generally accepted policies, practices, training, and legal mandates trained to officers for application in field operations.

429.   There is no indication in any of the materials indicating that Jacob Bauer was threatening or attempting to spit on officers.  Instead, the officers cited the reason the spit mask was used was because Jacob was bleeding.   Law enforcement policies from around the United States caution against using a spit mask when someone is bleeding from the face or head due to the danger of aspirating on their own body fluids.

430.   I would also note that policies, training and practice around the United States indicate that a spit mask should not be used on a person that is having difficulty breathing.  Jacob Bauer informed officers that he could not breathe.  As noted in testimony outlined above, some of the officers, for example Officer Koumiss believe, contrary to law enforcement training from medical professionals, that if a person is talking then they are not having trouble breathing.  Law enforcement training has recognized that just because someone is talking does not mean that they are getting enough oxygen to survive.   Training on restraint asphyxia as well as training on excited delirium includes discussion on hypoxia, where a person deprived of oxygen during a prolonged struggle is not getting enough oxygen to survive.  In providing training, audits and policy consultation for jails, I always recommend the purchase of a pulse oximeter for the jail operation for this very reason.

431.   It is my opinion, based upon my specialized background, education, experience and training as well as my continued research, authoring, auditing, consulting and training on law enforcement practices nationwide that there was a complete failure

112

of supervision during the interaction between the Pleasanton Police Department and Jacob Bauer.

432.    Billdt explained the following about whether he was the incident commander on scene: "I was -- I would say, yeah, I was made the incident commander. I knew that it was my officers, because it was my team that initially responded. But I also knew I had two senior sergeants there to help me through. This would have been one of my first major use of force incidents, so I knew I could rely on them to walk me through." (45).

433.    In accord with testimony from the officers themselves, no one knew who the incident commander was.  It is not a surprise since based on the objective video no one exerted incident command.  Koumiss testified that he did not know who the incident commander was; Granados testified that he did not know who the incident commander was, and even Sergeant Sarasua testified that he was unaware as to who was incident commander. Meanwhile Billdt and Sarsua both testified to the chaotic nature of this event.  The video shows officers restraining Jacob Bauer for 10-12 minutes, with much of the time in a position that is well known to law enforcement to put the person at risk of sudden death.  Sergeant Billdt, who acknowledged that he was the incident commander could not recall anything he did to reduce that chaos that was occurring at this scene.  Even the decision to place Jacob in the WRAP was made by a patrol officer.

434.    The failure of the supervisors at the scene to intervene and control the actions of the officers during this restraint process was contrary to generally accepted supervisory practices in the field of law enforcement where supervisors are taught

==to lead from the front.  Moving down the sidewalk to have a meeting and confer about what reports would have to be done and what follow-up should occur was inconsistent with the most basic tenets of proper supervision.==

435.   It is my opinion, based upon my specialized background, education, training, and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that the policies and practices of the Pleasanton Police Department are contrary to generally accepted policies, practices, training and legal mandates trained to Chiefs and Sheriffs nationwide for application in law enforcement operations as well as accountability.

436.   At the outset I would note that Jacob Bauer's family informed the Pleasanton Police Department of Jacob's condition, fearing the possibility that there could be an encounter between Jacob and the police.  There is no indication in the materials to indicate that the Pleasanton Police Department took steps to notify officers either through roll-call briefings, an alert with his name in the department records or any steps whatsoever based on the notice provided by his family.

437.   **CONFIDENTIAL**

**CONFIDENTIAL**

438.   At this stage of my review, I do not know if I may be asked to review additional documents.  Should I be asked to review any additional documents, I will be prepared to render additional opinions or supplement the opinions stated within this report.

439.   At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

440.   My fees for these professional services are outlined in the attached retainer agreement.

This report is signed under penalty of perjury on this 19th day of February 2021, in Greenville, R.I.

*s/John J. Ryan*
John J. Ryan