EXHIBIT D

1          UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3              SAN FRANCISCO DIVISION
4                    --oOo--
5   JOHN BAUER, an individual
    and as Successor in Interest
6   of Jacob Bauer, deceased;
    ROSE BAUER, an individual
7   and as Successor in Interest
    of Jacob Bauer, deceased;
8
                    Plaintiffs,
9
    vs.                          Case No.
10                               3:19-cv-04593-LB
    CITY OF PLEASANTON; BRADLEE
11  MIDDLETON; JONATHAN CHIN;
    RICHARD TROVAO; STEVEN
12  BENNETT; ALEX KOUMISS; JASON
    KNIGHT; MARTY BILLDT; DAVID
13  SPILLER; and DOES 1 to 50,
    inclusive;
14
                    Defendants.
15  _____/
16
17
18      CONTAINS CONFIDENTIAL MATERIAL WHERE NOTED
19
20    VIDEO-RECORDED DEPOSITION OF BRADLEE MIDDLETON
21          WEDNESDAY, SEPTEMBER 2, 2020
22
23  Reported by:
24  Anrae Wimberley, CSR No. 7778
25  Job No.  4227606

                                        Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4                    --oOo--
 5   JOHN BAUER, an individual
     and as Successor in Interest
 6   of Jacob Bauer, deceased;
     ROSE BAUER, an individual
 7   and as Successor in Interest
     of Jacob Bauer, deceased;
 8
                    Plaintiffs,
 9
     vs.                          Case No.
10                                3:19-cv-04593-LB
     CITY OF PLEASANTON; BRADLEE
11   MIDDLETON; JONATHAN CHIN;
     RICHARD TROVAO; STEVEN
12   BENNETT; ALEX KOUMISS; JASON
     KNIGHT; MARTY BILLDT; DAVID
13   SPILLER; and DOES 1 to 50,
     inclusive;
14
                    Defendants.
15   _____/
16
17      CONTAINS CONFIDENTIAL MATERIAL WHERE NOTED
18
19           Transcript of video-recorded deposition
20   of BRADLEE MIDDLETON, taken at Gwilliam, Ivary,
21   Chiosso, Cavalli & Brewer, 1999 Harrison Street,
22   Suite 1600, Oakland, California 94612, beginning at
23   10:10 a.m. and ending at 1:12 p.m. on Wednesday,
24   September 2nd, 2020, before Anrae Wimberley,
25   Certified Shorthand Reporter No. 7778.
```

                                                    Page 2

```
 1   APPEARANCES:

 2   For Plaintiffs John and Rose Bauer:

 3            GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER

 4            BY:  J. GARY GWILLIAM, ESQ.

 5                 JAYME L. WALKER, ESQ.

 6            1999 Harrison Street, Suite 1600

 7            Oakland, California 94612

 8            (510) 832-5411

 9            ggwilliam@giccb.com

10            jwalker@giccb.com

11

12   For Defendants:

13            McNAMARA LAW FIRM

14            BY:  NOAH G. BLECHMAN, ESQ.

15            3480 Buskirk Avenue, Suite 250

16            Pleasant Hill, California 94523

17            (925) 939-5330

18            noah.blechman@mcnamaralaw.com

19

20   Also present:

21            JENNIFER McKAY, VIDEOGRAPHER

22            VERITEXT LEGAL SOLUTIONS

23

24            BRITTANY SMITH, LAW CLERK

25            GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
```

Page  3

1    Also present (cont'd):

2

3            THE FOLLOWING APPEARED VIA ZOOM

4            VIDEOCONFERENCE:

5            SERGEANT ERIC (MARTY) BILLDT, DEFENDANT

6            SERGEANT JASON KNIGHT, DEFENDANT

7            OFFICER JONATHAN CHIN, DEFENDANT

8                    --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page  4

```
1                           I N D E X
2     EXAMINATION BY:                              PAGE
3     MS. WALKER                                      8
4
5                          --oOo--
6                       E X H I B I T S
7
8     EXHIBIT            DESCRIPTION                 PAGE
9     Exhibit 7          Pleasanton Police Department   39
10                       Policy Manual - Crisis
11                       Intervention Incidents;
12                       6 pages
13
14    Exhibit 8          Call for Service Detail      48
15                       Report; Bates PPD002468
16                       thru 486
17
18    Exhibit 9          [CONFIDENTIAL]               77
19                       Summary of Statement of
20                       Officer Middleton; Bates
21                       PPD001172 thru 174
22
23    Exhibit 10         LD 15: Chapter 3 -           84
24                       Detentions; 5 pages
25
```

Page 5

```
 1             E X H I B I T S  (Cont'd)

 2    EXHIBIT          DESCRIPTION                PAGE

 3    Exhibit 11       PowerPoint Slides from Axon    100

 4                     Academy TASER Training;

 5                     6 pages

 6

 7    Exhibit 12       Pleasanton Police Department   127

 8                     Policy Manual - Use of Force;

 9                     25 pages

10

11    Exhibit 13       [CONFIDENTIAL]                 139

12                     Employee Performance

13                     Evaluation of Officer

14                     Middleton, 1/13/18 to 1/11/19;

15                     6 pages

16                          --oOo--

17    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

18                         (None)

19

20    TESTIMONY REQUESTED TO BE MARKED CONFIDENTIAL:

21    From page 19, line 1 through to page 28, line 16

22    From page 135, line 4 through to page 141, line 7

23

24                          --oOo--

25
```

Aiken Welch, A Veritext Company
510-451-1580

```
 1                WEDNESDAY, SEPTEMBER 2, 2020;

 2                   OAKLAND, CALIFORNIA;

 3                      10:10 A.M.

 4                        -  -  -

 5        THE VIDEOGRAPHER:  Good morning.  We are going        10:10:56

 6   on the record at 10:11 on September 2nd, 2020.  This

 7   is Media Unit 1 of the video-recorded deposition of

 8   Bradlee Middleton in the matter of Bauer, et al.

 9   versus Pleasanton, et al. filed in the United States

10   District Court, Northern District of                       10:11:22

11   San Francisco -- United States District Court,

12   Northern District of California, San Francisco

13   Division.  Case No. is 3:19-cv-04593.

14           This deposition is being held at Gwilliam

15   Ivary in Oakland, California located at 1999             10:11:40

16   Harrison Street, Suite 1600.  My name is Jennifer

17   McKay from the firm Veritext, and I am the

18   videographer.  Your court reporter today is Anrae

19   Wimberley, also from Veritext.

20           Counsel, please identify yourselves and         10:11:59

21   state whom you represent.

22        MS. WALKER:  Jayme Walker for the plaintiff,

23   and I'm here with my partner, Gary Gwilliam, and our

24   associate, Brittany Smith.

25        MR. BLECHMAN:  Noah Blechman on behalf of the       10:12:07
```

Page 7

```
 1    defendants, and I believe via Zoom are some of the        10:12:10

 2    other defendants that are attending:  Officer Chin,

 3    Sergeant Knight, and Sergeant Billdt.

 4        THE VIDEOGRAPHER:  Will the reporter please

 5    swear in the witness.                                     10:12:21

 6                    BRADLEE MIDDLETON,

 7          sworn as a witness by the Certified

 8        Shorthand Reporter, testified as follows:

 9                       EXAMINATION

10    BY MS. WALKER:                                            10:12:39

11        Q.   Good morning, Officer Middleton.

12        A.   Good morning.

13        Q.   I understand this is your first

14    deposition?

15        A.   Yes.                                             10:12:44

16        Q.   Okay.  So we'll go over some of the ground

17    rules to remind you.  First thing I want to tell you

18    is, speak out loud and in words so the court

19    reporter can hear you.

20        A.   Okay.                                            10:12:53

21        Q.   You're a little soft spoken and I speak a

22    little fast, so I'm sure she will admonish us both.

23        A.   All right.

24        Q.   But the first and most important rule in a

25    deposition is just to tell the truth.  Okay?  The        10:13:04
```

Page 8

```
 1        Q.   So you knew before you ever responded to        10:36:32

 2   Jacob Bauer or had contact with him that this is a

 3   possibility that someone was seriously mentally ill?

 4        A.   No.

 5        MR. BLECHMAN:  Hold on.                               10:36:42

 6            Objection, calls for speculation, lacks

 7   foundation, argumentative as to "seriously mentally

 8   ill."

 9            Go ahead.

10   BY MS. WALKER:                                            10:36:50

11        Q.   Your answer was no.  So my question -- on

12   what basis can you answer no, that you knew --

13        A.   'Cause I didn't know.

14        Q.   Well, my question was:  Before you ever

15   contacted Jacob Bauer, you knew it was a possibility      10:36:59

16   that you were dealing with someone who was mentally

17   ill?

18        A.   Yes.

19        Q.   Yes.

20            Okay.  At that point, Officer Chin was           10:37:08

21   with you; right?

22        A.   Correct.

23        Q.   And you go to contact Jacob Bauer.  Did

24   you have any discussions with Officer Chin about how

25   you were going to approach this individual or deal        10:37:20
```

Page 33

```
 1    with somebody who was possibly mentally ill?              10:37:22

 2        A.    No.

 3        Q.    Based on your experience with the John

 4    Deming, Jr. case and your subsequent training in

 5    crisis intervention techniques, didn't you think it      10:37:35

 6    was a good idea to formulate a plan of how you were

 7    going to deal with someone who was possibly mentally

 8    ill?

 9        MR. BLECHMAN:   Argumentative as phrased,

10    incomplete hypothetical.                                  10:37:45

11            But go ahead.

12        THE WITNESS:   It's always a possibility that an

13    individual we contact is going to have a mental

14    illness.  We didn't know that was this incident.

15    BY MS. WALKER:                                            10:37:57

16        Q.    And so if it's always a possibility that

17    somebody you contact may have a mental illness, do

18    you try to accommodate that in your response to that

19    person?

20        MR. BLECHMAN:   Incomplete hypothetical.              10:38:15

21            Go ahead.

22        THE WITNESS:   Can you restate the question?

23    BY MS. WALKER:

24        Q.    Sure.  You said it's always a possibility

25    that someone you contact may have a mental illness.       10:38:21
```

Page 34

1       In this case, you were told by the reporting          10:38:23

2       witnesses that this person was possibly crazy;

3       right?   Yes?

4           A.   Yes.

5           Q.   So in this case, it wasn't just anybody        10:38:33

6       you could come in contact with was -- could possibly

7       be mentally ill.  In this case you had some facts to

8       alert you prior to the contact that you were

9       possibly dealing with someone in a mental crisis; is

10      that true?                                              10:38:50

11          A.   In somebody's opinion -- it was this

12      gentleman's opinion that he thought this individual

13      could be crazy.  I'm not -- I can't say that he knew

14      for certain.  He was a store employee.  He wasn't a

15      doctor.                                                 10:39:05

16          Q.   Well, you had 40 hours of crisis

17      intervention training; right?

18          A.   Yes.

19          Q.   Okay.  So you knew, as a police officer,

20      that your encounter with a mentally ill individual     10:39:09

21      could be dangerous for you; right?

22          A.   Correct.

23          Q.   You knew it could be dangerous for the

24      person who's mentally ill; right?

25          A.   Yes.                                           10:39:21

                                                         Page 35

```
 1    supervisor prior to making contact with Jacob Bauer?      10:40:39

 2       A.   No.

 3       Q.   Who was your supervisor at the time?

 4       A.   That would have been Sergeant Billdt.

 5       Q.   Was there any sort of protocol or policy      10:40:50

 6    of the Pleasanton Police Department on August 1st,

 7    2018 that would have informed your actions in

 8    responding to people who are mentally ill?

 9       MR. BLECHMAN:  Vague and ambiguous, overbroad,

10    incomplete hypothetical.                                 10:41:03

11          Go ahead.

12       THE WITNESS:  Sorry.  Once more.

13    BY MS. WALKER:

14       Q.   Was there any sort of protocol or policy

15    of the Pleasanton Police Department that would have      10:41:10

16    informed -- helped to inform your actions on

17    August 1st, 2018 when you responded to Raley's to a

18    person who was possibly mentally ill?

19       MR. BLECHMAN:   Same objections and

20    argumentative as well.                                   10:41:23

21          Go ahead.

22       THE WITNESS:   No.

23    BY MS. WALKER:

24       Q.   Is there currently a policy that informs

25    your actions when you're dealing with mentally ill       10:41:31
```

Page 37

1    people?                                            10:41:34

2         A.   A policy?

3         Q.   A policy or a protocol.

4         A.   No.

5         Q.   Were you aware on August 1st, 2018 of any    10:41:40

6    mental health organizations that you could have

7    reached out to to assist you with someone who is

8    mentally ill?

9         A.   There are county services and stuff that

10   we sometimes reach out to if given a situation that    10:41:54

11   would meet that criteria, yeah.

12        Q.   Okay.  What are some of the county

13   organizations that you reach out to if you're

14   responding to a person you believe is in a mental

15   health crisis?                                         10:42:08

16        A.   I would need to refer to my notes on that.

17   I don't -- I don't know off the top of my head.

18        Q.   Okay.  Where do you keep your notes on

19   that?

20        A.   We have pamphlets and stuff with phone      10:42:20

21   numbers for county services in our duty bags.

22        Q.   In your duty bag?

23        A.   Yeah.

24        Q.   Does the Pleasanton Police Department have

25   a CIT unit?                                            10:42:30

                                            Page 38

Aiken Welch, A Veritext Company
510-451-1580

```
 1        A.   Not a specific CIT unit, no.              10:42:33

 2        Q.   Are there any officers at all that are

 3   part of a CIT team that you could contact for

 4   assistance in dealing with somebody who's mentally

 5   ill?                                                10:42:43

 6        A.   No.

 7        Q.   There weren't at the time in August of

 8   2018 and there aren't now; is that true?

 9        A.    Specific to CIT, no.

10        MS. WALKER:   Let's mark this as Exhibit 7.    10:43:16

11             (Plaintiffs' Exhibit 7 was marked.)

12   BY MS. WALKER:

13        Q.   You're certainly welcome to review the

14   whole thing, Officer Middleton, but I'm going to

15   direct you to sections and give you an opportunity  10:43:43

16   to read them before you answer questions.   Okay?

17        A.   Sure.

18        Q.   Are you familiar with this policy 419,

19   Crisis Intervention Incidents?

20        A.   Not specifically, no.                     10:43:56

21        Q.   This is a policy that I just pulled off of

22   the Pleasanton Police Department's website.   It's

23   dated at the bottom November 18, 2019.   It says

24   "Copyright Lexipol."   Do you know what Lexipol is?

25        A.   The company we use for policy management,  10:44:18
```

Page 39

1        yes.                                                    10:44:21

2            Q.    Okay.  So was it ever communicated to you

3    by the Pleasanton Police Department that they had

4    adopted this crisis intervention incident policy as

5    of November 18th, 2019?                                    10:44:29

6            A.    Not that I specifically recall.

7            Q.    So it defines in the definitions of

8    "person in crisis" as "A person whose level of

9    distress or mental health symptoms have exceeded

10   that person's internal ability to manage his or her       10:44:50

11   behavior or emotions."  It talks about how a crisis

12   can be precipitated, and part of it says:   "Any

13   other circumstance or event that causes the person

14   to engage in erratic, disruptive or dangerous

15   behavior that may be accompanied by impaired              10:45:08

16   judgment."

17            Do you see that?

18            A.    Yes.

19            Q.    Do you believe Jacob Bauer was a person in

20   crisis, based on this definition?                          10:45:16

21        MR. BLECHMAN:   Calls for speculation, calls

22   for -- incomplete hypothetical, lacks foundation.

23            Go ahead.

24            It's also vague as to time.

25            But go ahead.                                     10:45:30

                                                    Page 40

```
1    radio that he was negative for weapons; true?        10:53:21

2        MR. BLECHMAN:  Hold on.

3            Calls for speculation, lacks foundation.

4            Go ahead.

5        MS. WALKER:  Let's mark this as Exhibit 8.        10:53:33

6            (Discussion off the record.)

7    BY MS. WALKER:

8        Q.   At the time you contacted Jacob Bauer and

9    you spoke with him and he gave you his

10   identification, at that time you knew he was        10:53:55

11   negative for weapons; isn't that true?

12       MR. BLECHMAN:  Same objections.

13           Go ahead.

14       THE WITNESS:  No.

15           (Plaintiffs' Exhibit 8 was marked.)        01:41:32

16   BY MS. WALKER:

17       Q.   I put in front of you what's Exhibit 8.

18   It says Call For Service Detail Report.  Do you know

19   what this is?

20       A.   Yes.                                        10:54:17

21       Q.   What is it?

22       A.   These are the dispatch notes that are

23   entered into our computer aided dispatch system.

24       Q.   Okay.  And if you turn to page -- see,

25   there's little Bates numbers on the bottom?        10:54:28
```

Page 48

```
 1    testimony.                                        10:58:31

 2         Go ahead.

 3       THE WITNESS:  No.

 4    BY MS. WALKER:

 5       Q.   If you had known at that stage, if it had   10:58:37

 6    become clear to you, based on your training or

 7    experience or whatever, that Jacob Bauer had a

 8    schizophrenia-like mental illness, would you, at

 9    that point, have put your hands on him?

10       MR. BLECHMAN:  It's an incomplete hypothetical.   10:58:49

11    It calls for speculation.

12         You can respond.

13       THE WITNESS:  Sorry.  One more time.

14    BY MS. WALKER:

15       Q.   At that point, if you had known that Jacob   10:58:58

16    Bauer had a thought disorder or a serious mental

17    illness or a schizophrenia-like mental illness,

18    based on your training or experience, would you have

19    put your hands on him?

20       A.   Yes.                                         10:59:11

21       Q.   So whether he was mentally ill or not, you

22    would have approached the situation in the same

23    manner?

24       A.   Yes.

25       Q.   Let's turn back to Exhibit 7.  Section       10:59:41
```

Page 53

Aiken Welch, A Veritext Company
510-451-1580

| | | |
|---|---|---|
| 1 | If you turn back to the beginning of that | 11:04:13 |
| 2 | section 419.5, it says: "It is important to | |
| 3 | recognize that individuals under the influence of | |
| 4 | alcohol, drugs or both may exhibit symptoms that are | |
| 5 | similar to those of a person in a mental health | 11:04:26 |
| 6 | crisis." | |
| 7 | So whether he was under the influence or | |
| 8 | experiencing a mental health crisis, you still | |
| 9 | should have assessed -- tried to assess that; true? | |
| 10 | MR. BLECHMAN:  Argumentative as phrased, | 11:04:39 |
| 11 | incomplete hypothetical. | |
| 12 | You can respond. | |
| 13 | THE WITNESS:  One more time. | |
| 14 | BY MS. WALKER: | |
| 15 | Q.   Whether he was under the influence or | 11:04:50 |
| 16 | experiencing a mental health crisis, according to | |
| 17 | this policy, you should have still tried to assess | |
| 18 | the situation to determine whether you were dealing | |
| 19 | with an individual in a mental health crisis? | |
| 20 | A.   Which we did. | 11:05:05 |
| 21 | MR. BLECHMAN:   Belated same objections to that | |
| 22 | question. | |
| 23 | BY MS. WALKER: | |
| 24 | Q.   What did you do to determine whether you | |
| 25 | were dealing with an individual in a mental health | 11:05:11 |

Page 57

1   crisis?                                                    11:05:13

2        MR. BLECHMAN:   Argumentative as phrased.

3             Go ahead.

4        THE WITNESS:   Again, tried to ask some

5   questions, have a conversation.                            11:05:21

6   BY MS. WALKER:

7        Q.   Okay.   And he responded in a strange

8   manner; true?

9        A.   Correct.

10       Q.   So didn't that indicate to you that you          11:05:29

11  probably were dealing with someone in a mental

12  health crisis?

13       MR. BLECHMAN:   Calls for speculation, lacks

14  foundation, argumentative, incomplete hypothetical.

15            You can respond.                                 11:05:39

16       THE WITNESS:   Again, we didn't know what we

17  were dealing with at the time.

18  BY MS. WALKER:

19       Q.   Have you ever been trained that you should

20  consider taking no action or just monitoring the           11:05:47

21  situation, rather than putting your hands on

22  someone?

23       A.   While investigating a crime?

24            Sorry.

25       MR. BLECHMAN:   It's incomplete, broad                11:05:56

Aiken Welch, A Veritext Company
510-451-1580

1      hypothetical, overbroad.                          11:05:58

2              Go ahead.

3          THE WITNESS:   While investigating a crime?

4      BY MS. WALKER:

5          Q.   At any time.   When you're dealing with a    11:06:04

6      person with a mental health crisis.

7          MR. BLECHMAN:   Incomplete hypothetical.

8              Go ahead.

9          THE WITNESS:   If it was strictly a mental

10     health crisis that we were aware of, sure.          11:06:14

11     BY MS. WALKER:

12         Q.   Well, you regularly come into contact with

13     the mentally ill when you're patrolling the streets;

14     true?

15         A.   Yes.                                       11:06:24

16         Q.   And often, people who were committing sort

17     of minor crimes, talking to themselves, knocking a

18     bottle over in a grocery store, often those kind of

19     people are mentally ill; true?

20         A.   True.                                      11:06:38

21         Q.   And for that reason, it's important for

22     you to employ your crisis intervention techniques,

23     not only for your safety, but for their safety as

24     well; true?

25         A.   True.                                      11:06:48

                                                    Page 59

```
 1        Q.    So have you ever been trained that you        11:06:49

 2   should try to consider taking no action or passively

 3   monitoring a situation, especially if it involves a

 4   really minor crime and a person in a mental health

 5   crisis?                                                  11:07:02

 6        MR. BLECHMAN:   It's an incomplete hypothetical,

 7   it's overbroad, calls for speculation.

 8            Go ahead.

 9        THE WITNESS:   That wasn't this case.

10   BY MS. WALKER:                                           11:07:16

11        Q.    That's not my question.   Okay?  So listen

12   closely.   Have you ever been trained that you should

13   try to consider taking no action or passively

14   monitoring a situation, especially when it involves

15   a minor crime committed by a person in a mental         11:07:33

16   health crisis?

17        MR. BLECHMAN:   Same objections.

18            Go ahead.

19        THE WITNESS:   One more time.

20   BY MS. WALKER:                                           11:07:42

21        Q.    All right.  Based on your training,

22   whether it's from POST, the Pleasanton Police

23   Department, your training in crisis intervention

24   techniques, have you ever been trained that you

25   should passively monitor or consider taking no          11:07:55
```

Page 60

1    action when you're dealing with a person with a                11:07:59

2    mental health crisis, even if they considered --

3    even if they've committed some minor crime?

4        MR. BLECHMAN:   Same objections.   Add to that

5    vague and ambiguous as to minor crime or crimes.              11:08:09

6            Go ahead.

7        THE WITNESS:   Thank you.

8            Every situation is different.

9    BY MS. WALKER:

10       Q.   I understand that.   But I'm not asking you          11:08:16

11   to apply it to any situation.   I'm asking have you

12   ever been trained, ever in your career, whether you

13   should passively monitor or consider doing nothing

14   when you're dealing with a person with a mental

15   health crisis, even if they've committed a minor           11:08:33

16   crime?   Have you ever been told that?

17       MR. BLECHMAN:   Same objections as previously

18   stated to the last two similar questions.

19           Go ahead.

20   BY MS. WALKER:                                               11:08:42

21       Q.   Yes or no.

22       A.   Yes.

23       Q.   Okay.   When the reporting party -- when

24   you mentioned something about a vandalism, okay, the

25   reporting party said to you, "It's not much"; right?        11:08:56

Page 61

```
 1        MR. BLECHMAN:  Hold on.                      11:10:05

 2          Vague as to time in terms of calm and

 3   cooperative.

 4          You can respond.

 5   BY MS. WALKER:                                     11:10:10

 6       Q.   When you initially contacted him.

 7       A.   Yes.

 8       Q.   He didn't try to run; right?

 9       A.   No.

10       Q.   There was nothing about the situation when    11:10:21

11   you initially contacted him that was an imminent

12   threat to anyone; true?

13       A.   True.

14       Q.   Turn to page 355 of Exhibit 7.  This goes

15   on, under the section of Deescalation, what an    11:10:48

16   officer should do in a situation where they're

17   dealing with an individual possibly experiencing a

18   mental health crisis.

19          It says:  "Responding officers generally

20   should not:  Use stances or tactics that can be    11:11:01

21   interpreted as aggressive."

22          But that's not what you did; right?

23       A.   That is one --

24       MR. BLECHMAN:  Hold on a second.

25          Vague and ambiguous as to "that."  It's    11:11:14
```

Page 63

```
1    I had at the time, I felt it was necessary to detain       11:38:55

2    Mr. Bauer in handcuffs.

3    BY MS. WALKER:

4         Q.   What information did you have at the time

5    that made you feel it was appropriate to detain            11:39:06

6    Mr. Bauer in handcuffs?

7         A.   The fact that he was a suspect in a

8    crime --

9         Q.   That -- committed outside of your

10   presence; right?                                           11:39:15

11      MR. BLECHMAN:   Can you just let him answer the

12   questions before you ask a follow-up?   I think

13   you're interrupting him a little bit.

14           Go ahead and finish.

15      THE WITNESS:   The fact that he was a suspect in        11:39:28

16   a crime who had been seen acting erratically,

17   aggressive.   Obviously, he scared some of the

18   employees there.   The fact that he's bigger than a

19   lot of individuals who we contact.   He was well over

20   200 pounds and bigger than myself or Officer Chin.         11:39:48

21   The fact that he had not been searched.

22   BY MS. WALKER:

23        Q.   Anything else?

24        A.   No.

25        Q.   Okay.   You said in preparation for your         11:40:05
```

Page 76

```
 1    deposition that you reviewed the administrative        11:40:18

 2    investigation?

 3        A.   Yes.

 4        Q.   And you reviewed the summary of your

 5    statement?                                             11:40:26

 6        A.   Yes.

 7        Q.   Anything in it that you thought was

 8    inaccurate?

 9        A.   Not that I recall.

10        MS. WALKER:  9.                                    11:40:42

11            (Plaintiffs' Exhibit 9 was marked.)

12        MR. BLECHMAN:  Jayme, this is confidential

13    record.  How do you want to handle that?

14        MS. WALKER:  I can make it a confidential

15    exhibit.  I'm not going to ask him very many           11:41:07

16    questions about it.

17    BY MS. WALKER:

18        Q.   Exhibit 9 is a portion of the

19    administrative investigation which is your

20    statement, a summary of your statement in the          11:41:22

21    investigation; right?

22        A.   Right.

23        Q.   And you reviewed that in preparation for

24    this deposition?

25        A.   Yes.                                          11:41:31
```

Page 77

```
 1    BY MS. WALKER:                                      12:04:10

 2         Q.   You don't recall?

 3         A.   No.

 4         Q.   Are you aware that somebody who's

 5    experiencing a mental health crisis is at a higher   12:04:25

 6    risk from sudden death from repeated Taser use than,

 7    say, the average person?

 8         MR. BLECHMAN:   Lacks foundation, calls for

 9    expert testimony.

10              Go ahead.                                  12:04:39

11         THE WITNESS:   I'm not, no.

12    BY MS. WALKER:

13         Q.   Why were you using the Taser on Jacob

14    Bauer?

15         A.   To overcome his resistance in an attempt   12:04:45

16    to detain him in handcuffs.

17         Q.   Were you using it as a pain compliance

18    measure?

19         A.   At one point, yes.

20         MS. WALKER:   Let's mark this as Exhibit 11.    12:04:57

21              (Plaintiffs' Exhibit 11 was marked.)

22    BY MS. WALKER:

23         Q.   So this is -- looks like probably -- I'm

24    not sure if this is the most recent version, but

25    this is the -- excerpts from a PowerPoint from the   12:05:29
```

Page 100

1    Axon Academy TASER Training.                          12:05:32

2              Do you know if you completed this

3    training?

4         MR. BLECHMAN:   Vague and ambiguous as to "this

5    training."                                            12:05:42

6         MS. WALKER:   The Axon Academy TASER Training,

7    Version 21, effective January 14th, 2019.

8         THE WITNESS:   I don't know if I've completed

9    this specific training.

10   BY MS. WALKER:                                        12:05:56

11        Q.   When's the last time you did the Axon

12   Academy TASER Training?

13        A.   I would have to refer to my training

14   record.

15        Q.   Give me your best estimate.                 12:06:04

16        A.   It would have been at the previous

17   advanced officer school which, at that point, 2017.

18        Q.   When's the last time you had Taser

19   training?  Do you do it every year?

20        A.   Yes.  During our annual qualifications.     12:06:25

21        Q.   Okay.  So do you think -- did you see a

22   PowerPoint presentation given by anybody from the

23   Axon Academy in the last year?

24        A.   I don't recall.

25        Q.   Does it change -- you've taken it every     12:06:47

Page 101

```
 1    Officer Middleton, before we went off the record is        12:41:33
 2    I was wondering if you'd been trained to avoid
 3    circumstances where more than one officer was using
 4    a Taser on a person at the same time.  Have you been
 5    trained about that?                                         12:41:44
 6         A.   I don't recall specific training on.
 7         Q.   Okay.  In Pleasanton Police Department's
 8    use of force policies on the Taser, have you had any
 9    recent training on Pleasanton's own policies?
10         A.   I don't recall the last time I read the          12:42:05
11    Taser policy.  We get periodic updates.  I'm not
12    sure when the last one was.
13         Q.   In the Taser policy for Pleasanton Police
14    Department 309.5.2, it says at the very bottom:
15    "Officers should generally not intentionally apply         12:42:24
16    more than one CED at a time against a single
17    subject."
18              Does that refresh your recollection that's
19    part of Pleasanton's policies?
20         A.   Yes.                                             12:42:34
21         Q.   And you deployed your Taser against Jacob
22    Bauer, and Officer Trovao, he also deployed his
23    Taser against Jacob Bauer.  Do you know how soon
24    after Officer Trovao arrived on the scene did he
25    deploy his Taser?                                           12:42:51
```

Page 118

```
 1    Jacob Bauer a citation and releasing him?          12:46:57

 2         MR. BLECHMAN:  Incomplete hypothetical and

 3    argumentative.

 4             Go ahead.

 5         THE WITNESS:  We didn't even know what we had   12:47:05

 6    at the time.

 7    BY MS. WALKER:

 8         Q.   So you had no probable cause to arrest

 9    him, you'd agree; right?

10         MR. BLECHMAN:  Vague as to time.              12:47:13

11             Go ahead.

12         THE WITNESS:  At the time we contacted him, no,

13    not for an arrest.

14    BY MS. WALKER:

15         Q.   At the time you handcuffed him, you didn't  12:47:20

16    have any probable cause for even a misdemeanor

17    arrest; true?

18         A.   We had reason to detain him.

19         Q.   But that's not the question.  The question

20    is:  At the time you handcuffed him, you didn't have  12:47:33

21    probable cause for a misdemeanor arrest?

22         A.   Correct.

23         Q.   And you never considered just issuing a

24    citation and releasing him; is that true?

25         MR. BLECHMAN:  Argumentative as phrased, it's   12:47:44
```

Page 123

1        MS. WALKER:   Let's mark this as Exhibit 12.        12:51:16

2            (Plaintiffs' Exhibit 12 was marked.)

3    BY MS. WALKER:

4        Q.   This is long, I don't expect you to read

5    the whole thing, we're not going to go through the        12:51:33

6    whole thing, but I want you to turn to page -- the

7    Bates number is 445.   The very last paragraph, it's

8    policy 300.6, Medical Consideration.

9        A.   Yes.

10       Q.   The very last paragraph says:  "Persons        12:51:56

11   who exhibit extreme agitation, violent irrational

12   behavior accompanied by profuse sweating,

13   extraordinary strength beyond their physical

14   characteristics, impervious to pain (sometimes

15   called 'excited delirium') or who require a        12:52:12

16   protracted physical encounter with multiple officers

17   to be brought under control, may be at an increased

18   risk of sudden death."

19           Do you see that?

20       A.   Yes.        12:52:23

21       Q.   Does that refresh your recollection on

22   policies of Pleasanton that mention excited

23   delirium?

24       A.   Yes.

25       Q.   Does that paragraph sort of sum up what        12:52:32

Page 127



Page 139

1
2
3
4
5
6
7
8
9

CONFIDENTIAL

CONFIDENTIAL

Page 140

1          I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby

3   certify:

4          That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that any witnesses in the foregoing proceedings,

7   prior to testifying, were administered an oath; that

8   a record of the proceedings was made by me using

9   machine shorthand which was thereafter transcribed

10  under my direction; that the foregoing transcript is

11  a true record of the testimony given.

12         Further, that if the foregoing pertains to

13  the original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review

15  of the transcript ( ) was (X) was not requested.

16         I further certify that I am neither

17  financially interested in the action nor a relative

18  or employee of any attorney of any party to this

19  action.

20         IN WITNESS WHEREOF, I have this date

21  subscribed my name.

22  Dated:  September 17, 2020

23

24

25         ANRAE WIMBERLEY, CSR No. 7778

Page 147