EXHIBIT D-12

appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.

Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.

It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.

While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.

### 300.3.1   USE OF FORCE TO EFFECT AN ARREST
Any peace officer may use reasonable force to effect an arrest, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape or to overcome resistance (Penal Code § 835a).

### 300.3.2   FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE
When determining whether to apply force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit. These factors include, but are not limited to:

(a) Immediacy and severity of the threat to officers or others.

(b) The conduct of the individual being confronted, as reasonably perceived by the officer at the time.

(c) Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects).

(d) The effects of drugs or alcohol.

(e) Subject's mental state or capacity.

(f) Proximity of weapons or dangerous improvised devices.

(g) The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

(h) The availability of other options and their possible effectiveness.

- (i) Seriousness of the suspected offense or reason for contact with the individual.
- (j) Training and experience of the officer.
- (k) Potential for injury to officers, suspects and others.
- (l) Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the officer.
- (m) The risk and reasonably foreseeable consequences of escape.
- (n) The apparent need for immediate control of the subject or a prompt resolution of the situation.
- (o) Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.
- (p) Prior contacts with the subject or awareness of any propensity for violence.
- (q) Any other exigent circumstances.

### 300.3.3  PAIN COMPLIANCE TECHNIQUES
Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:

- (a) The degree to which the application of the technique may be controlled given the level of resistance.
- (b) Whether the person can comply with the direction or orders of the officer.
- (c) Whether the person has been given sufficient opportunity to comply.

The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.

### 300.3.4  CAROTID CONTROL HOLD
The proper application of the carotid control hold may be effective in restraining a violent or combative individual. However, due to the potential for injury, the use of the carotid control hold is subject to the following:

- (a) The officer shall have successfully completed department-approved training in the use and application of the carotid control hold.
- (b) The carotid control hold may only be used when circumstances perceived by the officer at the time indicate that such application reasonably appears necessary to control a person in any of the following circumstances:
    1. The subject is violent or physically resisting.

*Use of Force*

- (d) The individual indicates intent to pursue litigation.
- (e) Any application of a CED or control device.
- (f) Any application of a restraint device other than handcuffs, shackles or belly chains.
- (g) The individual subjected to the force was rendered unconscious.
- (h) An individual was struck or kicked.
- (i) An individual alleges any of the above has occurred.

### 300.5.2   REPORTING TO CALIFORNIA DEPARTMENT OF JUSTICE
Statistical data regarding all officer-involved shootings and incidents involving use of force resulting in serious bodily injury is to be reported to the California Department of Justice as required by Government Code § 12525.2. See the Records policy.

### 300.6   MEDICAL CONSIDERATION
Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.

Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.

The on-scene supervisor or, if the on-scene supervisor is not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).

Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.

**Pleasanton Police Department**

Pleasanton PD Policy Manual

*Handcuffing and Restraints*

determination that such restraints are necessary for the safety of the arrestee, officers or others (Penal Code § 3407; Penal Code § 6030).

### 306.3.3   RESTRAINT OF JUVENILES

A juvenile under 14 years of age should not be restrained unless he/she is suspected of a dangerous felony or when the officer has a reasonable suspicion that the juvenile may resist, attempt escape, injure him/herself, injure the officer or damage property.

### 306.3.4   NOTIFICATIONS

Whenever an officer transports a person with the use of restraints other than handcuffs, the officer shall inform the jail staff upon arrival at the jail that restraints were used. This notification should include information regarding any other circumstances the officer reasonably believes would be potential safety concerns or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration) that may have occurred prior to, or during transportation to the jail.

### 306.4   APPLICATION OF HANDCUFFS OR PLASTIC CUFFS

Handcuffs, including temporary nylon or plastic cuffs, may be used only to restrain a person's hands to ensure officer safety.

Although recommended for most arrest situations, handcuffing is discretionary and not an absolute requirement of the Department. Officers should consider handcuffing any person they reasonably believe warrants that degree of restraint. However, officers should not conclude that in order to avoid risk every person should be handcuffed, regardless of the circumstances.

In most situations handcuffs should be applied with the hands behind the person's back. When feasible, handcuffs should be double-locked to prevent tightening, which may cause undue discomfort or injury to the hands or wrists.

In situations where one pair of handcuffs does not appear sufficient to restrain the individual or may cause unreasonable discomfort due to the person's size, officers should consider alternatives, such as using an additional set of handcuffs or multiple plastic cuffs.

Handcuffs should be removed as soon as it is reasonable or after the person has been searched and is safely confined within a detention facility.

### 306.5   APPLICATION OF SPIT HOODS/MASKS/SOCKS

Spit hoods/masks/socks are temporary protective devices designed to prevent the wearer from biting and/or transferring or transmitting fluids (saliva and mucous) to others.

Spit hoods may be placed upon persons in custody when the officer reasonably believes the person will bite or spit, either on a person or in an inappropriate place. They are generally used during application of a physical restraint, while the person is restrained, or during or after transport.

Officers utilizing spit hoods should ensure that the spit hood is fastened properly to allow for adequate ventilation and that the restrained person can breathe normally. Officers should provide assistance during the movement of restrained individuals due to the potential for impaired or

distorted vision on the part of the individual. Officers should avoid comingling individuals wearing spit hoods with other detainees.

Spit hoods should not be used in situations where the restrained person is bleeding profusely from the area around the mouth or nose, or if there are indications that the person has a medical condition, such as difficulty breathing or vomiting. In such cases, prompt medical care should be obtained. If the person vomits while wearing a spit hood, the spit hood should be promptly removed and discarded. Persons who have been sprayed with oleoresin capsicum (OC) spray should be thoroughly decontaminated including hair, head and clothing prior to application of a spit hood.

Those who have been placed in a spit hood should be continually monitored and shall not be left unattended until the spit hood is removed. Spit hoods shall be discarded after each use.

### 306.6  APPLICATION OF AUXILIARY RESTRAINT DEVICES

Auxiliary restraint devices include transport belts, waist or belly chains, transportation chains, leg irons and other similar devices. Auxiliary restraint devices are intended for use during long-term restraint or transportation. They provide additional security and safety without impeding breathing, while permitting adequate movement, comfort and mobility.

Only department-authorized devices may be used. Any person in auxiliary restraints should be monitored as reasonably appears necessary.

### 306.7  APPLICATION OF LEG RESTRAINT DEVICES

Leg restraints may be used to restrain the legs of a violent or potentially violent person when it is reasonable to do so during the course of detention, arrest or transportation. Only restraint devices approved by the Department shall be used.

In determining whether to use the leg restraint, officers should consider:

(a) Whether the officer or others could be exposed to injury due to the assaultive or resistant behavior of a suspect.

(b) Whether it is reasonably necessary to protect the suspect from his/her own actions (e.g., hitting his/her head against the interior of the patrol unit, running away from the arresting officer while handcuffed, kicking at objects or officers).

(c) Whether it is reasonably necessary to avoid damage to property (e.g., kicking at windows of the patrol unit).

#### 306.7.1  GUIDELINES FOR USE OF LEG RESTRAINTS

When applying leg restraints the following guidelines should be followed:

(a) If practicable, officers should notify a supervisor of the intent to apply the leg restraint device. In all cases, a supervisor shall be notified as soon as practicable after the application of the leg restraint device.

- (e) Individuals who have been recently sprayed with a flammable chemical agent or who are otherwise in close proximity to any known combustible vapor or flammable material, including alcohol-based oleoresin capsicum (OC) spray.
- (f) Individuals whose position or activity may result in collateral injury (e.g., falls from height, operating vehicles).

Because the application of the CED in the drive-stun mode (i.e., direct contact without probes) relies primarily on pain compliance, the use of the drive-stun mode generally should be limited to supplementing the probe-mode to complete the circuit, or as a distraction technique to gain separation between officers and the subject, thereby giving officers time and distance to consider other force options or actions.

The CED shall not be used to psychologically torment, elicit statements or to punish any individual.

### 309.5.3  TARGETING CONSIDERATIONS
Reasonable efforts should be made to target lower center mass and avoid the head, neck, chest and groin. If the dynamics of a situation or officer safety do not permit the officer to limit the application of the CED probes to a precise target area, officers should monitor the condition of the subject if one or more probes strikes the head, neck, chest or groin until the subject is examined by paramedics or other medical personnel.

### 309.5.4  MULTIPLE APPLICATIONS OF THE CONDUCTED ENERGY DEVICE
Officers should apply the CED for only one standard cycle and then evaluate the situation before applying any subsequent cycles. Multiple applications of the CED against a single individual are generally not recommended and should be avoided unless the officer reasonably believes that the need to control the individual outweighs the potentially increased risk posed by multiple applications.

If the first application of the CED appears to be ineffective in gaining control of an individual, the officer should consider certain factors before additional applications of the CED, including:

- (a) Whether the probes are making proper contact.
- (b) Whether the individual has the ability and has been given a reasonable opportunity to comply.
- (c) Whether verbal commands, other options or tactics may be more effective.

Officers should generally not intentionally apply more than one CED at a time against a single subject.

### 309.5.5  ACTIONS FOLLOWING DEPLOYMENTS
Officers shall notify a supervisor of all CED discharges. Confetti tags should be collected and the expended cartridge, along with both probes and wire, should be submitted into evidence.