EXHIBIT E

```
1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3               SAN FRANCISCO DIVISION
4                     --oOo--
5    JOHN BAUER, an individual
     and as Successor in Interest
6    of Jacob Bauer, deceased;
     ROSE BAUER, an individual
7    and as Successor in Interest
     of Jacob Bauer, deceased;
8
                    Plaintiffs,
9
     vs.                           Case No.
10                                 3:19-cv-04593-LB
     CITY OF PLEASANTON; BRADLEE
11   MIDDLETON; JONATHAN CHIN;
     RICHARD TROVAO; STEVEN
12   BENNETT; ALEX KOUMISS; JASON
     KNIGHT; MARTY BILLDT; DAVID
13   SPILLER; and DOES 1 to 50,
     inclusive;
14
                    Defendants.
15   _____/
16
17
18      CONTAINS CONFIDENTIAL MATERIAL WHERE NOTED
19
20      VIDEO-RECORDED DEPOSITION OF JONATHAN CHIN
21            TUESDAY, SEPTEMBER 1, 2020
22
23   Reported by:
24   Anrae Wimberley, CSR No. 7778
25   Job No.  4227597
```

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3              SAN FRANCISCO DIVISION
 4                     --oOo--
 5   JOHN BAUER, an individual
     and as Successor in Interest
 6   of Jacob Bauer, deceased;
     ROSE BAUER, an individual
 7   and as Successor in Interest
     of Jacob Bauer, deceased;
 8
                  Plaintiffs,
 9
     vs.                          Case No.
10                                3:19-cv-04593-LB
     CITY OF PLEASANTON; BRADLEE
11   MIDDLETON; JONATHAN CHIN;
     RICHARD TROVAO; STEVEN
12   BENNETT; ALEX KOUMISS; JASON
     KNIGHT; MARTY BILLDT; DAVID
13   SPILLER; and DOES 1 to 50,
     inclusive;
14
                  Defendants.
15   _____/
16
17      CONTAINS CONFIDENTIAL MATERIAL WHERE NOTED
18
19           Transcript of video-recorded deposition
20   of JONATHAN CHIN, taken at Gwilliam, Ivary, Chiosso,
21   Cavalli & Brewer, 1999 Harrison Street, Suite 1600,
22   Oakland, California 94612, beginning at 10:14 a.m.
23   and ending at 2:44 p.m. on Tuesday, September 1,
24   2020, before Anrae Wimberley, Certified Shorthand
25   Reporter No. 7778.
```

Page 2

```
1    APPEARANCES:

2    For Plaintiffs John and Rose Bauer:

3             GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER

4             BY:  J. GARY GWILLIAM, ESQ.

5                  JAYME L. WALKER, ESQ.

6             1999 Harrison Street, Suite 1600

7             Oakland, California 94612

8             (510) 832-5411

9             ggwilliam@giccb.com

10            jwalker@giccb.com

11

12   For Defendants:

13            MCNAMARA, NEY, BEATTY, SLATTERY, BORGES &

14            AMBACHER, LLP

15            BY:  NOAH G. BLECHMAN, ESQ.

16            3480 Buskirk Avenue, Suite 250

17            Pleasant Hill, California 94523

18            (925) 939-5330

19            noah.blechman@mcnamaralaw.com

20

21   Also present:

22            JENNIFER McKAY, VIDEOGRAPHER

23            VERITEXT LEGAL SOLUTIONS

24

25
```

Page  3

```
 1    Also present (cont'd):
 2              BRITTANY SMITH, LAW CLERK
 3              GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
 4
 5              THE FOLLOWING APPEARED VIA ZOOM
 6              VIDEOCONFERENCE:
 7              SERGEANT JASON KNIGHT, DEFENDANT
 8              SERGEANT ERIC (MARTY) BILLDT
 9              OFFICER BRADLEE MIDDLETON, DEFENDANT
10                        --oOo--
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                          I N D E X
2   EXAMINATION BY:                              PAGE
3   MS. WALKER                                 8, 108
4
5                         --oOo--
6                      E X H I B I T S
7
8   EXHIBIT          DESCRIPTION                  PAGE
9   EXHIBIT 1        Transcript of Radio Traffic;   28
10                   13 pages
11
12  EXHIBIT 2        Body cam video from Officer    32
13                   Chin in contact with Raley's
14                   Employees; 1 MP4 file
15
16  EXHIBIT 3        Body cam video from Officer    73
17                   Chin's initial contact
18                   with Jacob Bauer; 1 MP4 file
19
20  EXHIBIT 4        Body cam video from Officer   104
21                   Chin's distractionary blows;
22                   1 MP4 file
23
24  EXHIBIT 5        Body cam video from Officer   114
25                   Knight; 1 MP4 file
```

Page 5

```
 1              E X H I B I T S  (Cont'd)

 2   EXHIBIT          DESCRIPTION                    PAGE

 3                    [CONFIDENTIAL DOCUMENT]

 4   EXHIBIT 6        Employee Performance            161

 5                    Evaluation of Jonathan Chin;

 6                    7 pages

 7

 8                        --oOo--

 9

10   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

11             (None)

12                        --oOo--

13

14   TESTIMONY REQUESTED TO BE MARKED CONFIDENTIAL:

15

16   From page 16, line 13 through to page 18, line 16

17   From page 147, line 14 through to page 149, line 2

18   From page 161, line 7 through to page 163, line 8

19

20                        --oOo--

21

22

23

24

25

                                              Page  6
```

```
 1                 TUESDAY, SEPTEMBER 1, 2020;

 2                   OAKLAND, CALIFORNIA;

 3                      10:14 A.M.

 4                         - - -

 5      THE VIDEOGRAPHER:  Good morning.  We are going        10:14:38

 6   on the record at 10:14 a.m. on September 1st, 2020.

 7          This is Media Unit 1 of the video recorded

 8   deposition of Jonathan Chin in the matter of Bauer

 9   et al versus City of Pleasanton et al, filed in

10   United States District Court, Northern District of       10:15:02

11   California, San Francisco Division.  Case No. is

12   3:19-cv-04593.

13          This deposition is being held at Gwilliam

14   Ivary in Oakland, California at 1999 Harrison

15   Street, Suite 1600.  My name is Jennifer McKay from      10:15:22

16   the firm Veritext and I am the videographer.  Our

17   court reporter today is Anrae Wimberley, also from

18   Veritext.

19          Counsel, please identify yourselves and

20   state whom you represent.                                10:15:37

21      MS. WALKER:  Jayme Walker for the plaintiffs.

22      MR. BLECHMAN:  And Noah Blechman for the

23   defendants.  And also appearing via Zoom are some of

24   the other defendants:  Bradlee Middleton, Jason

25   Knight, and Marty Billdt.                                10:15:52
```

Page 7

1          THE VIDEOGRAPHER:  Will the reporter please          10:15:54

2     swear in the witness.

3                        JONATHAN CHIN,

4          sworn as a witness by the Certified

5     Shorthand Reporter, testified as follows:          10:15:57

6                        EXAMINATION

7     BY MS. WALKER:

8          Q.   Good morning, Officer Chin.

9          A.   Good morning.

10          Q.   Could you state your full name for the          10:16:19

11     record, please.

12          A.   My first name is Jonathan.  Last name is

13     Chin, C-h-i-n.

14          Q.   Okay.  And should I address you as

15     Officer Chin?  Is that your current role -- title?          10:16:28

16          A.   Yes, ma'am.

17          Q.   Have you ever had your deposition taken

18     before?

19          A.   One previous time.

20          Q.   Okay.  In what context was that?          10:16:35

21          A.   It was for a fall on City property.

22          Q.   Okay.  You were a witness?

23          A.   Yes, ma'am.

24          Q.   Have you ever been a defendant in a

25     lawsuit before?          10:16:42

```
 1        Q.    Is there anything that the Raley's people      10:36:04
 2   told you or dispatch told you that would alert you
 3   that you were dealing with somebody who might have a
 4   mental disorder?
 5        MR. BLECHMAN:   Calls for speculation, lacks          10:36:13
 6   foundation.
 7            Go ahead.
 8        THE WITNESS:   Just based off his behavior
 9   inside the store, it was unknown whether or not he
10   had a mental disorder.                                    10:36:21
11   BY MS. WALKER:
12        Q.    Okay.  Did you hear anything that Jacob
13   said about the shot glass that he was holding?
14        A.    I believe he said something about bad
15   memories.                                                 10:36:36
16        Q.    Anything that he did in the first few
17   seconds or so that you had contact with him that
18   made you suspect you were dealing with someone who
19   was either under the influence of something or
20   subject of a mental disorder?                             10:36:50
21        A.    Within the first few seconds, no.
22        Q.    Before you go approach him to detain him,
23   is there anything that he did that would make you
24   suspect he was either under the influence or
25   mentally ill?                                             10:37:06
```

                                                          Page 27

1      A.   He did give an answer of a glass gave him          10:37:10

2    a bad memory of something, without being prompted

3    and asked what it was for.  Upon further

4    questioning, when we asked if he had anything on him

5    that he wasn't supposed to -- I can't remember the          10:37:26

6    words exactly that were used -- he didn't answer.

7    That was the first question he did not answer to us.

8      Q.   Did you and Officer Middleton discuss any

9    sort of plan of action prior to contacting Jacob

10   Bauer?                                                      10:37:54

11     A.   Prior to contacting, no --

12     Q.   Over the radio?

13     A.   -- action or anything like that.

14     MS. WALKER:  I want to mark this as Exhibit 1.

15          (Plaintiffs' Exhibit 1 was marked.)               10:38:23

16   BY MS. WALKER:

17     Q.   You don't need to review this whole thing,

18   Officer Chin, but Exhibit 1 I've marked is a

19   transcript of the radio traffic, and I just want you

20   to take a look at the first page and then let me          10:38:37

21   know when you're ready.

22     A.   Yes, ma'am.

23     Q.   You're ready?

24     A.   Yes, ma'am.

25     Q.   Okay.  So the first page of the radio          10:38:42

Page 28

```
 1   control -- under the influence of alcohol or a          10:39:58

 2   controlled substance?

 3       MR. BLECHMAN:  Incomplete hypothetical.

 4          Go ahead.

 5       THE WITNESS:  That would depend on the              10:40:05

 6   information provided at the time and the

 7   surrounding -- kind of all the information provided

 8   at the time of the call.

 9   BY MS. WALKER:

10       Q.   Well, at the time of this call, you're         10:40:11

11   provided with information that someone is inside a

12   business ranting to himself.  Did you think to

13   yourself, I might be dealing with somebody with a

14   mental illness?

15       A.   A possibility.                                 10:40:21

16       Q.   You knew that was a possibility?

17       MR. BLECHMAN:  Calls for speculation, lacks

18   foundation to that last question.

19          But go ahead.

20       THE WITNESS:  It's always a possibility.  It's      10:40:29

21   kind of -- we have a broad scope until we can narrow

22   it down further when the scene is safe and the

23   person is under control.

24   BY MS. WALKER:

25       Q.   And you've received training on how to         10:40:39
```

Page 30

```
 1   your questions, and then he doesn't answer one        10:54:38

 2   question; right?

 3        A.   Yes, ma'am.

 4        Q.   Why -- so why did you put your hands on

 5   him at that time?                                      10:54:56

 6        A.   At that point, we had enough to legally

 7   detain him for further investigation, and then we

 8   could search him for other dangerous weapons at that

 9   time, too.

10        Q.   Did you have any indication that he had     10:55:11

11   any dangerous weapons on his person?

12        MR. BLECHMAN:   Asked and answered, lacks

13   foundation, and calls for speculation.

14            But go ahead.

15        THE WITNESS:   That was unknown until he was     10:55:21

16   searched.

17   BY MS. WALKER:

18        Q.   Why didn't -- was your intent -- when you

19   say you were going to legally detain him, your

20   intent was to put handcuffs on him?                   10:55:30

21        A.   Yes, ma'am.

22        Q.   So to you, a legal detention is the same

23   as handcuffing?

24        MR. BLECHMAN:   Misstates the witness'

25   testimony, calls for legal conclusion.                10:55:38
```

Page  43

Aiken Welch, A Veritext Company
510-451-1580

```
 1              Go ahead.                                   10:55:40

 2         THE WITNESS:   Depending on the situation, a

 3    legal detention could be no handcuffs or with

 4    handcuffs, depending on the situation.

 5    BY MS. WALKER:                                        10:55:48

 6         Q.   Why did you handcuff him?

 7         A.   Because at that point when we asked if he

 8    had any weapons on him, he did not answer that.

 9         Q.   So you handcuffed him because he wouldn't

10    answer your question; is that right?              10:55:59

11         MR. BLECHMAN:   Misstates the witness'

12    testimony.

13              Go ahead.

14         THE WITNESS:   We handcuffed him because at that

15    time, we didn't know, and he was being detained for   10:56:06

16    the vandalism and the public intoxication at that

17    time.

18    BY MS. WALKER:

19         Q.   What facts did you have at that time to

20    indicate he was publicly intoxicated?             10:56:16

21         A.   Based off the statement from the Raley's

22    employees.

23         Q.   That they thought he was intoxicated?

24         A.   Yes, ma'am.

25         Q.   Did you hear them say he's either          10:56:24
```

Page 44

1      Q.    Okay.   In all of your CIT training that          11:07:15

2   you've had, have they ever instructed you that you

3   should deescalate a situation, even if there's a

4   minor crime, provided that public safety is not an

5   issue?                                                     11:07:33

6      MR. BLECHMAN:   Incomplete hypothetical.

7          Go ahead.

8      THE WITNESS:   What we're taught in the class is

9   the primary goal first is officer safety and then

10  evaluation of the subject.                                 11:07:42

11  BY MS. WALKER:

12      Q.   But there was no indication at the time

13  that you decided to handcuff Jacob Bauer that you

14  were in danger?

15      MR. BLECHMAN:  Misstates the witness' prior            11:07:50

16  testimony.

17          Go ahead.

18      THE WITNESS:  Other than him refusing to answer

19  whether or not he had any weapons on him, he didn't

20  show any physical -- any actions that would               11:08:00

21  indicate.

22  BY MS. WALKER:

23      Q.   Okay.  Are there policies at the

24  Pleasanton Police Department about when it's

25  appropriate to handcuff someone?                          11:08:20

                                                              Page 56

```
 1   Let's go off and take a quick break.  Restrooms are      11:12:56

 2   out to the left.

 3        THE VIDEOGRAPHER:  Going off the record.  The

 4   time is 11:13.

 5             (Recess taken.)                                 11:13:06

 6        THE VIDEOGRAPHER:  Back on the record.  The

 7   time is 11:30.

 8   BY MS. WALKER:

 9        Q.   Okay.  Welcome back, Officer Chin.

10             Does Pleasanton have a designated CIT           11:30:16

11   unit?

12        A.   No, ma'am.

13        Q.   So when you come into contact with someone

14   that you suspect is mentally ill, is there anybody

15   in the Pleasanton Police Department that you can          11:30:27

16   call for assistance?

17        A.   Other than a supervisor for guidance, no.

18        Q.   Do you know if there's any plans to

19   establish a CIT team at the Pleasanton Police

20   Department?                                               11:30:46

21        A.   As presented to us, I believe that there

22   is.

23        Q.   So in your role as patrol officer, we

24   talked about you regularly coming into contact with

25   people who you suspect are mentally ill and you're        11:31:00
```

Page 61

```
 1    hospital; right?                                    11:32:11

 2          A.   Yes, ma'am.

 3          Q.   So if you encounter someone on the street

 4    that you suspect is mentally ill, are there any

 5    resources that you can reach out to, as a police     11:32:19

 6    officer, on how to deal with that situation?

 7          A.   While on scene, no, ma'am.

 8          Q.   In your experience as a police officer at

 9    the Pleasanton Police Department, have you regularly

10    contacted people who you suspect are mentally ill     11:32:38

11    that may have committed minor crimes?

12          A.   Yes, ma'am.

13          Q.   And in your training, mentally ill people

14    do often commit minor crimes, whether it's, you

15    know, crimes of poverty, such as homelessness,        11:32:53

16    trespassing, public nuisance, you know,

17    intoxication, whatever it is, that's something that

18    you're trained that almost can kind of go hand in

19    hand, that you'll be contacting mentally ill people

20    who also may have committed minor crimes?             11:33:13

21          A.   Sometimes, yes, ma'am.

22          Q.   Okay.  And do you ever -- have you ever

23    been trained or ever -- where you would not want --

24    strike this.  Let me start over.

25                Have you been trained that when you       11:33:29
```

Page 63

```
 1   respond to situations where you're dealing with          11:33:35
 2   somebody who's mentally ill and you suspect that
 3   they're mentally ill and they have committed some
 4   sort of minor crime, that you don't want to put your
 5   hands on them?                                            11:33:46
 6          MR. BLECHMAN:   Incomplete hypothetical.
 7              Go ahead.
 8          THE WITNESS:   Depending on the situation,
 9   ma'am, that would determine -- and their actions,
10   that would determine whether or not we will be           11:33:56
11   physically detaining them or not.
12   BY MS. WALKER:
13          Q.   Okay.   And certainly, in some
14   circumstances, you've been trained that when you
15   come into contact with someone who's mentally ill,       11:34:05
16   who may have a schizophrenia-like mental disorder,
17   the last thing you want to do is escalate the
18   situation by physically detaining them?
19          MR. BLECHMAN:   Incomplete hypothetical,
20   argumentative.                                           11:34:20
21              Go ahead.
22          THE WITNESS:   If that's the only thing in place
23   with no other added things to the incident, then
24   yes, ma'am.
25   BY MS. WALKER:                                           11:34:28
```

Page 64

1       Q.    I just want to make sure I understand your          11:34:33

2   answer.  You have some training that you want to

3   avoid putting your hands on someone who you believe

4   has a mental illness, where it may escalate the

5   situation?                                                     11:34:46

6       MR. BLECHMAN:   Incomplete hypothetical,

7   misstates the witness' testimony.

8           But go ahead.

9       THE WITNESS:   If that is the sole reason for

10  the contact, then yes, ma'am.                                  11:34:54

11  BY MS. WALKER:

12      Q.    If what is the sole reason for the

13  contact?

14      A.    Just a welfare check of someone who may be

15  experiencing a crisis moment at that time.                     11:35:04

16      Q.    Okay.  But that's not -- that wasn't quite

17  my question.  So my question is:  You contact a

18  mentally ill person on the street and, as often

19  happens, they've also committed some sort of minor

20  crime, nonviolent, public safety is not an issue.              11:35:19

21  Have you had training that it's preferable to

22  deescalate the situation and avoid putting your

23  hands on them?

24      MR. BLECHMAN:   Incomplete hypothetical, vague

25  and ambiguous as to deescalate the situation.                  11:35:35

Page 65

```
 1   looking at us at the time and he was looking        11:41:27

 2   straight forward and not physically and visually

 3   responding to our questioning, we didn't know if he

 4   was going to try to flee or not.

 5   BY MS. WALKER:                                       11:41:40

 6        Q.   But he didn't try to flee.  There was no

 7   indication that he was going to try to flee, did he?

 8        A.   Other than refusing to answer our

 9   questions and no longer cooperating with our

10   questioning.                                         11:41:49

11        Q.   So that wasn't trying to flee; right?

12        A.   At that point, it would be no longer

13   cooperative.

14        Q.   Okay.  But I didn't ask if he was

15   cooperating.  I asked if he was trying to flee.      11:41:56

16      MR. BLECHMAN:   Vague as to time.

17          Go ahead.

18      THE WITNESS:   At that time, he did not show any

19   visible signs that he was trying to flee, as far as

20   body movements or anything like that.  He was --     11:42:10

21   like I said, in my training and experience,

22   sometimes people who are preparing to flee are

23   looking at open space that they can flee to.  And he

24   was not looking at us, he was looking straight

25   ahead, which was open space between me and           11:42:23
```

Page 71

1    Officer Middleton.                                    11:42:26

2    BY MS. WALKER:

3        Q.    Before you put your hands on him, he did

4    not move from the space that he was in, did he?

5        A.    In that process, no, ma'am.                11:42:33

6        Q.    And you mentioned in your training and

7    experience, sometimes people that have weapons may

8    not answer a question immediately.

9            That's not what you said in your interview

10   that you gave right after this incident.  You said    11:42:55

11   normally, in your experience, people either answer

12   the question or they lie to you; right?  So this was

13   unusual, what Jacob Bauer was doing, wasn't it?

14       MR. BLECHMAN:  Hold on.

15           It's compound, there's four or five           11:43:09

16   questions in there and statements as well.

17           You can answer the last question, which

18   was, what Mr. Bauer was doing was unusual.

19       THE WITNESS:  Yes, it was unusual.

20   BY MS. WALKER:                                         11:43:19

21       Q.    And so at that point, did you consider

22   whether you should just ask him if you could pat him

23   down for weapons?

24       MR. BLECHMAN:  Asked and answered.

25           But go ahead.                                 11:43:35

Page 72

```
 1          THE WITNESS:  No, ma'am.  When he refused to        11:43:38

 2     answer whether or not he had any weapons on him, it

 3     was assumed that he may have a weapon him at that

 4     time.

 5     BY MS. WALKER:                                           11:43:46

 6          Q.   And so you decided to handcuff him; you

 7     didn't consider any other techniques or options that

 8     you had?

 9          MR. BLECHMAN:  Argumentative, misstates the

10     witness' prior testimony.                               11:43:57

11          Go ahead.

12          THE WITNESS:  Because we had a legal authority

13     to detain him at that time, we decided to handcuff

14     him.

15     BY MS. WALKER:                                           11:44:05

16          Q.   All right.

17          So I think what I want to do is just show

18     you a little bit -- I want to show you the initial

19     interaction and then I'm going to skip to another

20     part of it once you kind of take him to the ground.     11:44:38

21     Okay?

22          A.   Yes, ma'am.

23          (Plaintiffs' Exhibit 3 was marked.)

24     BY MS. WALKER:

25          Q.   So let's watch the initial interaction and    11:44:42
```

Page 73

```
 1          THE WITNESS:  Depending on the situation.  If I        11:55:47

 2   was by myself, it would depend on the situation.

 3   BY MS. WALKER:

 4       Q.   So if you were by yourself, you may employ

 5   some deescalation tactics?                                    11:56:00

 6       A.   There may be some further actions,

 7   depending on the subject and the time of day and the

 8   situation surrounding.  I may have to reassess on

 9   his level of resistance and my abilities at that

10   time and his physical stature.                                11:56:16

11       Q.   When you encounter someone who's possibly

12   mentally ill, you understand that they may not be

13   acting rationally.  Did you ever -- have you had any

14   training on whether to consider the fact that they

15   can't rationally follow your commands and techniques         11:56:33

16   that you may employ to deescalate the situation,

17   rather than escalate it?

18       MR. BLECHMAN:  Argumentative, it's an

19   incomplete hypothetical.

20       THE WITNESS:  I'm sorry --                                11:56:57

21   BY MS. WALKER:

22       Q.   Do you need the question back?

23       A.   -- is that a go ahead?  No, I didn't know

24   if I was supposed to answer or not.

25       Q.   So unless he tells you don't answer, you            11:57:01
```

Page 81

Aiken Welch, A Veritext Company
510-451-1580

1   still answer.                                                          11:57:03

2        A.   As far as a mental health issue, until we

3   can confirm it is specifically a crisis moment or if

4   the person is under the influence of a controlled

5   substance or alcohol, we are to -- for officer          11:57:12

6   safety reasons, we're to make the scene safe first.

7        Q.   And when you say "make the scene safe,"

8   that's physically detain them in handcuffs and

9   search for weapons?

10       A.   In this situation, yes, ma'am.               11:57:27

11       Q.   And in this situation, when Jacob Bauer

12  resisted putting his hands behind his back and being

13  handcuffed, you never considered whether you and

14  Officer Middleton should step back and try to

15  deescalate the situation?                              11:57:45

16       MR. BLECHMAN:   It's asked and answered.

17            But go ahead.

18  BY MS. WALKER:

19       Q.   And I think that's just a yes or no.

20            So do you want me to repeat the question?    11:57:51

21       A.   Yes, please.

22       Q.   In this situation, when Jacob Bauer

23  resisted putting his hands behind his back and being

24  handcuffed, you never considered whether you and

25  Officer Middleton should step back and deescalate      11:58:01

                                                           Page 82

```
 1    Officer Middleton tried to gain his attention again      01:21:41

 2    by calling his name, Jacob, he did not respond to

 3    his name as well.  At that point, we had enough to

 4    legally detain him for further investigation and

 5    then we decided to do that.                             01:21:55

 6    BY MS. WALKER:

 7        Q.   So I'm going to show you another video and

 8    mostly the purpose of what I want to do is I want to

 9    ask you who these people are so I can make sure I've

10    got the right person, because it was hard for me to     01:22:17

11    identify everybody.

12        A.   Yes, ma'am.

13        Q.   So I'm hoping you can help me with that.

14        A.   Can I stand up?  I'm getting a glare.

15        Q.   Oh, yeah, absolutely.  However you need        01:22:25

16    to.  Because I'm going to stand up and point at

17    them.  So you do what you need to do.  Try to stay

18    six feet away from everybody else.   Okay?

19        A.   Yes, ma'am.

20        MS. WALKER:  I've got it on my screen.              01:22:40

21            (Discussion off the record.)

22        MR. BLECHMAN:  This is No. 5, Jayme, then?

23        MS. WALKER:  So now if it blares out the sound.

24    So yeah, this -- we're going to mark this as

25    Exhibit 5.  This is another excerpt from body cam       01:23:36
```

1     video and this is -- I don't know how to call it.          01:23:42

2              (Plaintiffs' Exhibit 5 was marked.)

3         MR. BLECHMAN:   This is Officer Knight's camera.

4         MS. WALKER:   It's PPD-390, an excerpt from

5     that.   And now I don't have sound again.   That's          01:23:59

6     okay.   I don't need it.

7              (Video played.)

8     BY MS. WALKER:

9         Q.   So let me just pause.

10        A.   Yes, ma'am.                                         01:24:09

11        Q.   And can you tell me, who's this

12    (indicating)?  Can you see?  Let's play the video

13    from the beginning and see if that helps you.

14             (Video played.)

15        THE WITNESS:   Looks like Officer Trovao.               01:24:27

16    BY MS. WALKER:

17        Q.   And who's that?

18        THE REPORTER:   I'm sorry, can you take the mask

19    off?  Because I'm not going to hear you, Jonathan.

20    Sorry.                                                      01:24:47

21             (Video played.)

22    BY MS. WALKER:

23        Q.   Can you tell who that is?

24        A.   I believe it's Officer Granados.

25        Q.   And this is you; right?                            01:25:00

                                                    Page 114

```
 1   the lower portion of the safe wrap was applied        01:26:54

 2   correctly.

 3   BY MS. WALKER:

 4       Q.   Have you had training on compressional

 5   asphyxia?                                              01:27:02

 6       A.   I'm sorry?

 7       Q.   Compressional asphyxia.

 8       A.   I would probably need that in layman's

 9   terms, if you have them.

10       Q.   I'm just wondering if you've had training     01:27:10

11   on that term, compressional asphyxia.

12       A.   On that term specifically?  No, ma'am.

13       Q.   Have you had training on hypoxia?

14       A.   I couldn't recall right now.

15       Q.   Have you had training on how to ensure        01:27:24

16   that when you're restraining a subject, or a person,

17   that you're not restricting their ability to

18   breathe?

19       A.   Yes, ma'am, an open airway.  That's . . .

20       Q.   Can you tell me, part of that training is     01:27:41

21   to avoid putting pressure on certain parts of their

22   body; right?

23       A.   Yes, yes, ma'am.

24       Q.   Okay.  And what parts of the body are you

25   trained to avoid putting pressure on?                  01:27:51
```

```
 1        Q.   Okay.  Welcome back, Officer Chin.  I'm          02:39:29

 2   going to mark this as Exhibit 6.  I think this is

 3   confidential portion.

 4           (Defendants' Exhibit 6 was marked.)

 5      MS. WALKER:  And a confidential exhibit.            02:39:51

 6      MR. BLECHMAN:   Agreed.

 7           (The following testimony is marked

 8            confidential but not separately bound:)

 9                       * * *
```

CONFIDENTIAL



CONFIDENTIAL

Page 162

1        I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby

3   certify:

4        That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that any witnesses in the foregoing proceedings,

7   prior to testifying, were administered an oath; that

8   a record of the proceedings was made by me using

9   machine shorthand which was thereafter transcribed

10  under my direction; that the foregoing transcript is

11  a true record of the testimony given.

12       Further, that if the foregoing pertains to

13  the original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review

15  of the transcript ( ) was (X) was not requested.

16       I further certify that I am neither

17  financially interested in the action nor a relative

18  or employee of any attorney of any party to this

19  action.

20       IN WITNESS WHEREOF, I have this date

21  subscribed my name.

22  Dated:  September 18, 2020

23

24

25       ANRAE WIMBERLEY, CSR No. 7778

Page 165