EXHIBIT F

# FORCE ANALYSIS

Name of Victim: Jacob Bauer
Department involved: Pleasanton CA Police Dept.
Date of incident: August 1, 2018
Time of incident: 2:40 p.m.
Location: 5420 Sunol BLVD, Pleasanton CA

William M. Harmening
February 15, 2021

STATEMENT OF QUALIFICATION

My qualifications for providing expert witness testimony in the area of police practices and use of force derive from two sources, one occupational, and the other academic. I have been a law enforcement officer for approximately 36 years, both in a patrol and investigative capacity. I am a graduate of the Illinois State Police Academy (1982), and from 2001 to my retirement in September 2018, served in the capacity of Chief Special Agent for the Illinois Securities Department. I am a former police academy instructor in Illinois and was responsible for all behavioral science instruction to Illinois police cadets completing their initial basic training. This instruction included the psychology of force, especially deadly force. Additionally, I was a member of the Central Illinois Critical Debriefing Team and became a member after my own officer-involved shooting.

Over the course of my law enforcement career I have attended many different types of training, including investigative methods, violent and property crimes investigation, and crime scene processing and analysis. My investigative methods training included techniques related to trajectory analysis, blood stain analysis, and crime scene analysis, among others. I later became a police academy instructor in crime scene processing and analysis. I was also one of the first fifteen officers in the State of Illinois to receive C.I.T. training ("crisis intervention team"). Those of us who received this training were trained as trainers. Additionally, I have qualified annually with my duty weapon, and have periodically attended law updates on the use of force. I have also participated in many different types of police training as an instructor or co-instructor, and routinely teach in an academic setting on the subject of force, particularly the psychology of force. This instruction is evidence-based using peer-reviewed research.

In terms of academic qualifications, until my retirement from teaching in Spring '19, I served as the program coordinator of the Forensic Psychology certificate program at Washington University in St. Louis, one of the Nation's top research universities. In this capacity I also served as lead instructor for the following courses:

- Introduction to Forensic Psychology (includes a comprehensive treatment of the use of force by the police)
- Crisis Intervention (includes a comprehensive treatment of the use of force by the police).
- Criminology
- Correctional Psychology
- Investigative Psychology

Two of these courses, Introduction to Forensic Psychology and Crisis Intervention, deal extensively with the subject of police use of force. Additionally, I have authored four peer-reviewed textbooks, as follows:

- Forensic Psychology (2015, Pearson Publishing). This widely used textbook includes an extensive treatment of the subject of force using the most current research.
- Crisis Intervention: The Criminal Justice Response to Mayhem, Chaos, and Disorder (2014, Prentice Hall). Also includes an extensive treatment of the subject of force.
- Serial Killers: The Psychosocial Development of Humanity's Worst Offenders (2014, Charles C. Thomas).
- The Criminal Triad: Psychosocial Development of the Criminal Personality Type (2010, Charles C. Thomas).

I have reviewed and/or investigated approximately 100 police use-of-force cases, and have testified in the following depositions and trials:

- Deposition (04/17) – Estate of Dontre Hamilton v. City of Milwaukee, Eastern Division of Wisconsin, 16-CV-507.
- Deposition (08/17) – Estate of Darren Billy Wilson v. Bartow County GA, Northern District of Georgia, 4:17-CV-00018.
- Deposition (12/17) – Estate of Nicholas Dyksma v. Harris County GA, Southern District of Georgia.

3

- Deposition (05/18) – Estate of Javier Gaona v. City of Santa Maria CA, Central District of California, no. 217-CV-01983.

- Deposition (05/18) – Estate of Rafael Cruz v. City of Chicago IL, Circuit Court of Cook County, no. 16 L 00823.

- Deposition (07/18) – Estate of Nicholas Thomas v. City of Smyrna GA, Northern District of GA, 1:17-CV-01036.

- Deposition (07/18) – Estate of Destry Meikle v. City of Republic MO, Western District of Missouri, 6:17-CV-3194-DPR.

- Deposition (07/18) – Estate of Jason Fanning v. City of St. Joseph MO, Western District of Missouri, 17-06073-CV-SJ-SWH.

- Deposition (08/18) – Estate of Jason Alderman v. City of Bakersfield CA, Eastern District of California, 1:16-CV-00994-DAD-JLT.

- Deposition (09/18) – Estate of Miguel Gonzales v. Bernalillo County NM, District of New Mexico, 18-CV-00125-KG-LF.

- Deposition (09/18) – Gerald Cole v. City of Indianapolis, Southern District of Indiana, 1:16-cv-03081-WTL-MJD.

- Deposition (10/18) – Matthew Schantz v. Appling County GA, Southern District of Georgia, 2:17-cv-157.

- Deposition (10/18) – Estate of Aaron Siler v. City of Kenosha WI, Eastern District of Wisconsin, 2:17-CV-01324-DEJ.

- Deposition (11/18) – Estate of Donte Johnson v. City of Dolton IL, Northern District of Illinois, 17-CV-2888.

- Deposition (12/18) – Estate of Lori Knowles v. Henry County GA, Northern District of Georgia, 1:18-CV-01394-TWT.

- Deposition (01/19) – Antwon Golatte v. City of Chicago IL, Northern District of Illinois, 17-CV-00929.

- Deposition (01/19) – Estate of Andre Green v. City of Indianapolis IN, Southern District of Indiana, 1:17-CV-02673-JPH-TAB.

- Deposition (01/19) – Estate of Casimero Casillas v. City of Fresno CA, Eastern District of California, 1:16-CV-1042-AWI-SAB.

- TRIAL (03/19) Estate of Casimero Casillas v. City of Fresno CA, Eastern District of California, 1:16-CV-1042-AWI-SAB.

- Deposition (03/19) – Estate of Tommy Le v. King county WA Sheriff's Dept., Western District of Washington, 2:18-CV-00055-TSZ.

- Deposition (04/19) – Estate of Donnie Robertson v. Corporal C.J. Deitz, Western Division of Virginia, 5:18-CV-00067-EKD.

- TRIAL (05/19) - Estate of Dontre Johnson v. City of Dolton IL, Northern District of Illinois, 17-CV-2888.

- Deposition (07/19) – Wuenschel et al. v. Columbus GA, Middle District of Georgia, 4:18-CV-220-CDL.

- Deposition (07/19) – Estate of Jacai Colsen v. Prince George's County MD, Circuit Court of Prince George's county, CAL-18-19598.

- Deposition (09/19) – Estate of Donald Sneed v. Jackson County MO, Circuit Court of Jackson County, 1816-CV-25106.

- Deposition (09/19) – Estate of Hector Arreola v. City of Columbus GA, Middle District of Georgia, 4:19-CV-00005-CDL.

- Deposition (10/19) – Deliah Hampton v. San Joaquin County CA, Eastern Division of California, 2:16-CV-01816-MCE-AC.

- Deposition (10/19) – Tina Boyer v. Pulaski county KY, Eastern District of Kentucky, 6:18-CV-00090-DLB-HLI.

- Deposition (10/19) – Estate of Anthony Soderberg v. Los Angeles CA, Central District of California, CV18-03861 FMO (JPRx).

- Deposition (11/19) – Jason Sears v. Pulaski County KY, Eastern District of KY, 6:18-CV-00234-REW-HAI.

- Deposition (12/19) – Kristine Hendrix v. City of St. Louis MO, Missouri Circuit Court, 1722-CC01430.

- Deposition (12/19) – Demontel Hendricks v. City of Griffith IN, Northern District of Indiana, 1:17-CV-412-RL-JEM.
- Deposition (12/19) – Estate of Mario Guevara v. City of Colton CA, Central District of California, 5:18-CV-02386-RGK (SPx).
- Deposition (06/20) – Estate of Isaiah Murrietta-Golding v. City of Fresno CA, Eastern District of California, 1:18-CV-00314-AWI SKO.
- Deposition (08/20) - Estate of Eric Logan v. South Bend IN, Federal District court, Northern district of IN, 3:19-CV-495.
- Deposition (10/20) – Estate of Ricky Starks v. Los Angeles County, Superior Court of the State of California, Central District, 19STCV38462
- Deposition (11/20) – Estate of Reuban Galindo v. City of Charlotte N.C. et al., Federal District Court, Western District of NC, 3:19-CV-491-RJC-DCK.*
- Deposition (12/20) – Rivera v. City of Chicago, Circuit Court of Cook County, 19 L 2076.
- Deposition (02/21) – McDade vs. City of Kent WA.


The report that follows was completed using the following:


Reports of all officers at the scene

Interviews of officers involved

Body cams videos recovered

Citizen cell phone video

Autopsy report

User's manual for body wrap device

California P.O.S.T. Learning Domains (4, 15, 20, 33, 37)

DOJ national Guidelines for Taser use

X26P User's manual

Lab reports

Reports of prior contacts with Bauer

Investigative reports

6

Second autopsy report

PPD Policies

Taser event logs

Trovao deposition transcript

Chin deposition transcript

Middleton deposition transcript

Billdt deposition transcript

John and Rose Bauer report and deposition

Koumiss deposition

Dr. Ferenc deposition


My fees for this service are $150 hr. for drafting the report, and $200 hr. for deposition or trial testimony.

INTRODUCTION

On August 1, 2018, at approximately 2:40 p.m., Officers Middleton and Chin were dispatched to
Raley's Supermarket on a call of vandalism. They initially met outside the store with three
employees who stated that Bauer had been inside the store breaking things and acting erratically.
One of the employees described him as either crazy or on drugs. They stated that he was talking
to himself inside the store. Officer Middleton asked the employees if they wanted Bauer arrested
for vandalism. One of the male employees answered, "if he's intoxicated, yeah." Middleton
advised them that pressing charges was an option and to let them know if they wanted to do
that. The two officers then walked to where Bauer was standing approximately one block away.
Prior to walking away from the store, the officers made no effort to determine the extent of the
vandalism or damage inside the store, nor did they ask the employees if Bauer had physically or
verbally threatened anyone.

During their interaction with Bauer the two officers made an effort to apply handcuffs. Bauer
resisted their efforts but was not assaultive toward the officers. The officers took Bauer to the
ground as additional officers began to arrive at the scene. The officers deployed two Tasers
against Bauer, and he very quickly began exhibiting the symptoms of excited delirium. After a
protracted physical struggle and multiple Taser deployments, hand strikes, and strikes with an
expandable baton ("ASP"), Bauer was eventually handcuffed and secured in a spit mask and full
body wrap. Immediately after being sedated and loaded into an ambulance, Bauer "coded." He
was pronounced dead at a local hospital.

The purpose of the analysis and report to follow is to reach an informed opinion about the
appropriateness of the officers' use of physical force, multiple Taser deployments, the use of an
expandable baton, and the use of multiple forms of restraint on Bauer. This analysis is conducted
in the context of PPD policies, California P.O.S.T. training standards (4, 20, 33, 37), National
guiding principles and standards of practice related to the use of the Taser and interacting with

8

an individual exhibiting excited delirium, and the manufacturer's guidelines for the proper use of the full body wrap. No medical or legal opinions are offered.

INITIAL CONTACT

*Antecedent Knowledge*

Jacob Bauer was not unknown to the Pleasanton Police Department. His parents, John and Rose Bauer, had contacted the Department in the past seeking their help with an involuntary commitment. They believed that would be the only way Jacob would receive the treatment he needed. They had multiple contacts with the PPD, including at least one 911 response, and explained to the officers on the phone or in person that Jacob would not voluntarily go with them. They described various instances of Jacob acting irrationally and aggressively. Among others they spoke to was Officer Jorge Garcia. The Bauers were informed with each contact, including by Officer Garcia, that Jacob did not meet the criteria for a 5150, and that he had to demonstrate that he was a danger to himself or others.

The important thing about these contacts is that the information should have been provided to Officers Chin and Middleton before they attempted to restrain Bauer. Bauer had given them his name and identifiers, and Middleton provided it to a dispatcher to search for active warrants. The vast majority of police departments maintain their own local computer system that interfaces with those maintained by the State (driver's license info) and the FBI (criminal histories). These local systems are a storehouse of data about specific individuals or addresses developed during police interactions. A local system will include each response to a particular address and the reason for that response. It may include information related to gang affiliation. It may also include information related to any type of risk or danger a specific person may pose to responding officers.  Certainly, the contacts the PPD had with Jacob or his parents should have caused some type of notations in their local system about Bauer's diagnosed schizophrenia, his irrational behavior, and his likely response to any effort by the police to affect a 5150 hold.

9

Chin and Middleton were both CIT trained (crisis intervention). That training alone should have provided them the knowledge that putting their hands on Bauer and attempting to apply handcuffs would lead to a negative, and possibly violent reaction. But had the information about the PPD's past contacts with Bauer and his parents been provided, they surely would have known that more officers were needed before any attempt to detain him, notwithstanding the fact that the detention itself was likely unlawful, as discussed below. They also would have known that a supervisor was needed at the scene and to specifically request one before taking any action. A supervisor may have asked a local mental health professional to respond to the scene, assuming such a protocol exists, to evaluate Bauer for services, including a 5150. The officers were not at a point where a detention was necessary or lawful (see discussion below). More investigation was needed, Bauer's mental condition was a primary consideration, and a course of action should have been followed to avoid a prolonged struggle regardless of arrest, commitment, or some other alternative.

It is unclear if the PPD has a local system for this purpose, but if it does, and if that information was not provided—there is no evidence that it was—then that was a failing of the Department that may have contributed to the deadly outcome.

*Nature of Contact*

The two officers located Bauer approximately one block from the store. He was initially cooperative and non-aggressive. The officers did not place Bauer under arrest when they made contact, nor did they tell him he was being arrested. They were clearly detaining him to complete an investigation. Bauer answered Middleton's questions but denied causing any problems in the store. Middleton confirmed through his dispatch center that Bauer had no outstanding warrants. He then asked Bauer if he had anything illegal on his person. At that point Bauer looked straight ahead without speaking. In response to his silence, the two officers grabbed Bauer's arms to place him in handcuffs. It was at that point when the physical altercation began.

In the context of police training and best practices, it is questionable whether the officers were justified in attempting to apply handcuffs when they did. Handcuffs may be used during an investigative detention, but officers are instructed that they can only do so if the suspect poses some articulable danger, or if they attempt to leave. Bauer never attempted to leave, so the only question here is whether Bauer's refusal to answer a question represented a threat of danger that necessitated the use of the handcuffs. In California, police officer training on this issue is guided by California P.O.S.T. Learning Domain 15 ("Laws of Arrest"). Regarding the use of restraints during an investigative detention, the standard is as follows:

> "If a person attempts to leave during a detention, officers may use reasonable force and/or physical restraints to compel the person to remain. The use of force does not necessarily escalate the detention to an arrest. Uncooperative individuals may be 1) handcuffed, and/or 2) placed in a control vehicle."[1]

The standard only applies to suspects who attempt to leave. Again, Bauer was completely cooperative and made no effort to walk away from the officers. If a suspect demonstrates some level of violence during an investigative detention (prior to the attempted restraint), or a weapon is discovered at any point in the encounter, then restraints can be applied for officer safety or to escalate the detention to an arrest. Short of one of these two situations, no restraints or physical force can be used. A review of Middleton's body cam video clearly shows that the decision to apply handcuffs was precipitated by Bauer's refusal to answer questions, but only after properly identifying himself with his name and personal identifiers. The training standards addresses this issue as follows:

> "A detainee is not obligated to answer any questions an officer may ask during a lawful detention. The refusal to answer questions alone does not provide probable cause for escalating a detention to an arrest."[2]

[1] Learning Domain 15, Chapter 3:16.
[2] Learning domain 15, Chapter 3:12.

11

Bauer's refusal to answer the question, *"do you have anything illegal on you?"* did not justify placing Bauer under arrest. The question is whether his refusal to answer that question justified a pat-down for weapons. If not, then no amount of physical force or restraint was justified at that point. The training standards state the following:

> *"Peace officers must be able to articulate specific facts which caused them to reasonably believe the person might be carrying a weapon or dangerous instrument."*[3]

The above standard identifies various factors that can contribute to a reasonable suspicion that the suspect is carrying a weapon or poses a danger. They include:

- The person's clothing (e.g., bulge, heavy coat on a hot day)
- The person's actions (e.g., trying to hide something, nervousness)
- Prior knowledge of the person carrying weapons or being armed.
- Isolated location/ lack of back-up.
- Time of day (e.g., dark, moonless night)
- Reason for detention (e.g., serious, violent, or armed offense)
- Cursory/pat search of detainee's companion revealed a weapon.
- Ratio of individuals to officers.

None of these factors were present in this case. Bauer was cooperative and calm. He was not fidgeting or looking around nervously, and he clearly was not trying to hide anything on his person. Also, as previously stated, the store employees provided no information about Bauer having weapons or being verbally or physically aggressive or threatening toward anyone.

The final question is whether the initial interaction can be described as an *arrest*. Aside from the fact that Middleton's own words and actions clearly framed the initial encounter as an

---

[3] Learning Domain 15, Chapter 3:13-14.

investigative detention, the California P.O.S.T. standards allow for a warrantless probable cause arrest for a misdemeanor offense only if the offense is committed in the officer's presence. For a felony, this requirement is removed.[4] Without having determined the extent of the damage inside the store—one of the employees described it as *"not that much"*—the officers had no ability to know if Bauer had committed a felony, and thus no ability to make an without further investigation. This restriction on misdemeanor arrests is also the law in California, which states that *"when a person is arrested for a misdemeanor, and does not demand to be taken before a magistrate, that person shall be released via a notice to appear (AKA: a citation)."*[5]

In summary, police training standards in California—specifically, LD15, Chapter 3—clearly support the conclusion that at the point when the officers first contacted Bauer, pursuant to their training they had no justification for a custodial arrest. The officers did not have enough information to determine whether a felony arrest was warranted, and they were precluded from making a warrantless misdemeanor arrest because the offense was not committed in their presence. In fact, the information provided by the store employees would lead a reasonable officer to conclude that the vandalism did not rise to the level of a felony. The officers thus had three options after identifying Bauer and confirming that he had no outstanding warrants: (possible changes     ).

1. Allow Bauer to leave and take no further action.

2. Allow Bauer to leave, and after confirming that the store's owner/ manager wishes to pursue charges, seek a misdemeanor or felony warrant after a proper investigation to determine the extent of the damage.

3. Detain Bauer at the scene while additional investigation is completed to determine the extent of the damage. If evidence of a misdemeanor offense is developed, then issue

---

[4] Learning Domain 15, Chapter 4:8.
[5] California Penal Code, Section 853.6.

Bauer a summons and allow him to leave. If evidence of a felony is developed, then escalate the detention to an arrest and transport him to jail.

At the point when the officers put their hands on Bauer to place him in handcuffs, pursuant to their training they had no justification to escalate their detention to an arrest based solely on his refusal to answer a question, especially after cooperating fully with his name and personal identifiers. Furthermore, there was absolutely no indication that Bauer was armed with a weapon or posed a danger, and thus the officers had no justification to conduct a pat-down search. And if no arrest or pat-down was warranted, since Bauer made no effort to leave the area, no amount of force or restraint was justified in response to his refusal to answer a question.

The policies of the Pleasanton Police Department are consistent with and mirror the California P.O.S.T. standards, and thus a violation of one is necessarily a violation of the other. Specific violations of PPD policy by Officers Middleton and Chin will be discussed in more detail below.

PHYSICAL ALTERCATION

When the two officers grabbed Bauer's arms, not only was his resistance predictable, but so too was his increased resistance in response to their escalation of force. The officers should reasonably have known, based on their training, that Bauer was suffering from some level of mental illness, specifically, thought disorder. They had information that he was talking to himself inside the store while acting erratically; his appearance and subdued emotional demeanor were peculiar; and his eventual explanation for his actions—he got excited and upset because he saw a glass that was stolen from his house—was a bit removed from reality. Police officers in California receive significant training on the issue of mental illness, including the proper way to respond to a situation where an individual is demonstrating such behaviors. California P.O.S.T. Learning Domain 37 specifically describes the symptoms and behaviors indicative of a thought disorder (i.e., schizophrenia).[6] They include:

---

[6] Learning Domain 37, Chapter 4:8.

- Bizarre delusional thinking
- Hallucinations
- Incoherent, disconnected thoughts and speech
- Expression of irrational fear
- Deteriorated self-care
- Poor reasoning
- Strange and erratic behaviors

The standard points out, *"When frightened, a person with this disorder may act out with even more bizarre or paranoid behavior."* This training, as well as the more advanced 40-hour Crisis Intervention Team ("C.I.T.") training that all California officers eventually complete,[7] teaches officers to know and expect the following:

- A thought-disordered suspect will almost always demonstrate high levels of paranoia.
- They will respond negatively to being physically touched and will resist any attempt at restraint.
- They will demonstrate poor judgement, and once emotionally escalated, attempts to de-escalate will almost always fail.
- They are at an increased risk for excited delirium and sudden death after a prolonged physical encounter.

*Excited Delirium/ Sudden Death*

Excited delirium has been defined as *"a state of extreme mental and physiological excitement, characterized by extreme agitation, hyperthermia, epiphoria, exceptional strength and endurance without apparent fatigue."*[8] Simply put, it is a condition in which the suspect being

---

[7] Bureau of Justice Assistance: *Effective Community Responses to Mental Health Crises: A National Curriculum for Law Enforcement Based on best practices from CIT programs Nationwide* (Instructor Guide).
[8] Morrison, A., & Sadler, D. (2001). Death of a Psychiatric Patient during Physical Restraint. Excited Delirium — A Case Report. Medicine, Science and the Law, 41(1), 46–50. https://doi.org/10.1177/002580240104100109

restrained escalates from resistance to panicked escape. They become impervious to pain and will increase their physical exertion as the officers increase their efforts to restrain them. It leads to a deadly cycle where the officers' use of force increases the suspect's level of resistance, which in turn increases the officers' level of force even more, and so on.[9]

The officers had two decision points in this case where their training, had it been followed, could have prevented the deadly outcome. The first was before they ever laid their hands on Bauer. Even assuming an arrest was appropriate, which was not the case, the officers should have reasonably known that Bauer would resist, and that given his size, it would be difficult, if not impossible to get him restrained with just two officers. All training suggests that when restraining an individual who may resist in this manner, it must be done quickly and with an overwhelming amount of appropriate force. A prolonged physical altercation must be avoided. The officers had every opportunity to attempt to communicate with Bauer without escalating him. They could have simply asked for his compliance in allowing them to conduct a pat down for weapons. If they intended to place him under arrest, they could have communicated that to Bauer and again asked for his compliance in putting his hands behind his back prior to touch him. Communication is always the key, and in this case, Bauer was calm and non-aggressive, which would have facilitated effective communication. Instead, the officers chose the worst possible course by grabbing his arms without any explanation. Again, his resistance was predictable, and given their training, should have been to them.

The second decision point was after they took Bauer to the ground and it became obvious that they would be unable to get him restrained. At that point, the officers had two options, either release their pressure and attempt to de-escalate, or increase their use of force through the use of the Taser. It is apparent from the audio from Middleton's body cam (his camera had fallen to the ground) that at this point Bauer was not yet experiencing excited delirium, though obviously resisting. He was still asking them what they were doing, telling them to stop, and was not yet

---

[9] While there is no consensus among the medical community regarding the use of "excited delirium" as a medical diagnosis, it is universally used in police training to represent a series of symptoms, as described.

screaming. That all changed at 7:10 in Middleton's body cam video when the sound of a Taser being deployed is heard. At that point Bauer began screaming and never stopped. The onset of excited delirium, as well as an escalation in the officers' use of force, was now apparent. Based on their training, and with no other officers yet assisting, they should have reasonably known that the combined risk factors of Bauer's weight, his mental condition, the use of the Taser, and applying their own weight to keep him pinned on the ground, all increased the possibility of sudden death if their efforts continued.

*Use of the Taser*

All police training on the use of Taser devices has incorporated standards established jointly by the U.S. Dept. of Justice and the Police Executive Research Forum ("PERF").[10] Additionally, like all police training, Taser training is informed by relevant case law. The Courts have ruled that the use of the Taser represents an intermediate level of force. Most often cited is *Armstrong v. Village of Pinehurst*,[11] which established that *"Taser use is unreasonable force in response to resistance that does not raise a risk of immediate danger."* Similarly, in *Bryan v. McPherson et al.*,[12] the court held that *"Tasers are an intermediate, significant level of force that must be justified by a strong government interest that compels the employment of such force, and that this government interest is best described as the suspect [posing] an immediate threat to the officer or some other person."* While it is beyond the scope of this report to offer legal analysis, it is important to point out the cases that have informed the law enforcement community's understanding of the level of force a Taser represents.

There are two questions relating to the use of the Taser in this case. The first is whether its use was appropriate at all; and the second is whether it should have been used to the extent it was. To the first question, if in fact the officers had no reasonable suspicion that Bauer possessed a

---

[10] Electronic control Weapon Guidelines (March 2011), a joint publication of the U.S. Department of Justice (COPS) and the Police Executive Research Forum.
[11] *Armstrong v. Village of Pinehurst*, 810 F.3d 892 (4th Cir. 2016)
[12] *Bryan v. McPherson et al.*, 590 F.3d 767 (9th Cir. 2009).

dangerous weapon, then no amount of force was appropriate to restrain him for that purpose. And if California P.O.S.T., the California Penal Code, and PPD policy prohibits a warrantless arrest for a misdemeanor unless it is committed in the officer's presence, then no amount of force used to restrain Bauer in order to escalate their investigatory detention to an arrest was appropriate, nor was the arrest itself. So, in this case the use of the Taser was inappropriate and excessive regardless of the extent to which it was used. There is one exception. Even when an arrest is improper, an officer may still use necessary force to protect themselves and others from harm. That was not the case here. The Taser was clearly used multiple times against Bauer for the sole purpose of gaining his compliance.

Assuming the officers were justified in deploying the Taser, there are still restrictions imposed on its use. The DOJ/PERF guidelines discussed above include the following standard:

> *"Personnel should use an ECW (electronic control weapon) for one standard cycle (five seconds) and then evaluate the situation to determine if subsequent cycles are necessary. Personnel should consider that exposure to the ECW for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury. Any subsequent application should be independently justifiable, and the risks should be weighed against the other force options."* (guideline no. 21)

In the model policy of the International Association of Chiefs of Police ("IACP"), the predominant model use-of-force policy in use in the U.S., this warning is repeated. In their concepts and issues paper that accompanies their policy, it states the following:

> *"Limiting the number of energy cycles, the use of continuous cycling of more than 15 seconds, and instances of multiple officer deployments against the same person can help to prevent tetany (muscle spasms) or exhaustion of muscles of respiration and the development of acidosis. Such respiratory impairments, as noted in the*

*previously cited from British Columbia, becomes crucial when the [ECW] weapon is used, or restraint is applied during or at the end of a prolonged physical struggle."*

*The inability of some subjects to regain free breathing is critical "as the body tries to return to homeostasis and compensate for increased levels of $CO_2$." According to the report, the state of hypoventilation means the subject can still breathe, just not at a level their body requires to return to equilibrium. Police may be misled by the fact the subject can still speak, indicating a clear airway, which does not necessarily mean they can breathe at an adequate rate."[13]*

And finally, officers who are trained to carry and use a Taser are required to complete annual re-certification training. This training is provided by instructors who are certified by Axon Corp. to serve as instructors. The annual training reinforces this restriction on the Taser's use (see figure no. 1):



**AVOID REPEATED/EXTENDED CEW DURATIONS**

- Minimize the number and duration of CEW exposures
- CEW exposure is a physically and psychologically stressful event
- Use the shortest duration of CEW exposure objectively reasonable to accomplish lawful objectives
- Avoid repeated or continuous exposures beyond 15 seconds absent reasonably perceived immediate threat and increased justification
- Reassess the subject's behavior before repeating or continuing the exposure, and provide time for compliance

V.21 Update 01-14-19                                              © 2019 Axon Enterprise, Inc.

*Figure 1: PowerPoint slide from Axon annual Taser training.*

---

[13] Electronic Control Weapons: Model Police. International Association of chiefs of Police, August 1, 2005, pg. 11.

In this case, the officers clearly violated these standards. A review of the data logs from the Tasers used against Bauer found the following:

- Officer Middleton deployed his Taser against Bauer four times in 24 seconds for a cumulative charge of 21 seconds. His trigger pulls lasted for 6, 5, 5, and 5 seconds. The Pleasanton Police Department inappropriately reported this as one probe deployment and three drive stuns without sufficient explanation. Middleton carried an X26P model Taser. With this model, if the probes have been deployed and then a drive stun is attempted, the weapon will create a circuit between the drive stun electrodes at the end of the weapon and the previously deployed probes, thus delivering the full force of a probe deployment. There is no indication in the record, including Middleton's interview by Detective Pittl on August 2, 2018, that he removed the probe cartridge prior to drive stunning Bauer. His use of the Taser then must be viewed as 21 continuous seconds of full charge, which by itself exceeds the standard of 15 seconds.

- Officer Trovao deployed his Taser twice, delivering 10 seconds of charge. The Department inappropriately reported these deployments as drive stuns that were ineffective. First of all, it is not possible to tell if a drive stun is "ineffective." It is a pain compliance tool and does not produce a visible NMI like a probe deployment. And given that Bauer's movements were so severely restricted on the ground, it is simply not possible to make the statement that the drive stuns were ineffective. If he felt any pain at all, then they were effective. Furthermore, Trovao too carried the X26P model Taser. It is not possible to deliver a drive stun with this model unless the probes have already been deployed or the cartridge has been removed. There is nothing in the record, including Trovao's interview by Det. Pittl on August 1, 2018, indicating that he had removed the cartridge. It must be assumed that Trovao did in fact deploy his probes and then administered a follow up drive stun. Even if the probes were deployed too close to induce NMI, it still would have delivered a painful charge, and then like Middleton, any follow-up drive stun would have completed a circuit between the drive stun electrodes and the deployed probes to

deliver the full force of a probe deployment. Middleton and Trovao had now delivered a total of 31 seconds of continuous charge, double the standard of 15 seconds max.

In his interview with Det. Pittl, Trovao stated that he delivered one drive stun, and then turned the Taser sideways and pulled the trigger to see if it was working since it seemed to have little effect on Bauer. This statement makes little sense. He has to account for the probes somehow. He would not have turned the Taser sideways and pulled the trigger unless the probes had already been deployed. Otherwise pulling the trigger would have deployed the probes toward other officers since Bauer was essentially surrounded. And if the probes had been deployed with the first trigger pull, then it cannot be described as a drive stun. Again, there is no indication in the case record that Trovao removed his cartridge before the two trigger pulls.

It is important to point out that the Pleasanton Police Department's policy guiding the use of the Taser[14] is deficient on one important issue. While it does generally prohibit the number of Tasers that can be deployed against a single individual to one[15], there is no limitation on the duration of continuous charge that can be delivered as set forth in the National standards discussed above (15 seconds). In theory, as long as only a single Taser is deployed, electrical charge can be delivered to the individual until the battery runs dry. There is no policy prohibiting it. This is a dangerous deficiency that manifested itself in this case.

*Use of Restraints*

During the encounter, once Bauer was handcuffed, and after he had entered an agitated state of delirium, both a full body restraint and a spit mask were applied. PPD Policy 300.6 (Medical Consideration) states the following:

---

[14] PPD Policy 309 – Conducted Energy Device.
[15] PPD Policy 309.5.4. It must be assumed that the use of the Taser by Middleton and Trovao occurred concurrently and in violation of this policy. To determine otherwise would have required that the PPD download the event log with the necessary time correction immediately after the incident. They failed to do this until two months after the incident. At that time Middleton's Taser was found to be off by nearly 15 minutes. Trovao's was off by 26 seconds.

*"Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these individuals should be considered a medical emergency. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate."*

The officers at the scene made the decision to apply additional restraints to Bauer, and thus further restrict his ability to breath freely, during what should have been recognized and addressed as a medical emergency. Regarding the spit mask, the PPD's own policy (306.5) precludes the use of the spit mask where the individual is either bleeding profusely from the mouth or nose, or there is an indication of a medical condition, including difficulty breathing. By this time, as is clearly seen and heard at 10:57 on body cam video 390 when the spit mask is applied, Bauer is still in a highly agitated state and his breathing is labored and distressed.



*Figure 1: Officers pinning Bauer to the ground as the body wrap is applied.*

Regarding the full body wrap, it must first be pointed out that the PPD does not appear to have a policy specifically related to the use of the full body wrap. This would appear to be another deficiency in their policy. They maintain a policy related only to "leg restraints," however this term typically refers to leg shackles or plastic ties, something much different from a full body wrap that completely restricts the movement of the lower body by wrapping it in a cocoon-like

device. The safety of the body wrap has been questioned in multiple lawsuits, including a number involving Bay Area departments (Hayward, Berkeley, BART).

In reviewing the body cam video (video no. 390), it is notable how long it took to apply the leg portion of the body wrap while multiple officers pinned Bauer to the ground in a prone position. The application begins at 4:27 in the video when a female officer begins to apply the ankle strap. As she does, three other male officers can be seen pinning Bauer tightly to the ground by applying their weight on his upper back, neck, and head. Figure no. 1 shows the officers restraining Bauer as they begin to apply the body wrap. One officer (Trovao) can clearly be seen applying his full weight to Bauer's head and neck. This is after a lengthy struggle during which Bauer began to show the symptoms of excited delirium. And while it will require a medical opinion by a qualified physician, it can be assumed, based on what we know about excited delirium, and by the information provided during police training on this issue, that by this time Bauer's body temperature and heart rate were elevated and his breathing distressed.

At 6:06, nearly two minutes after they began to apply the lower portion of the body wrap, an officer can be seen cinching it tight (see figure no. 2). At this time, the same officer (Trovao) can be seen continuing to apply his full weight to Bauer's head and neck. Another officer is pinning his left arm and shoulder to the ground. And yet



*Figure 2: The moment when the body wrap appears to be secured.*

another appears to have a knee on his back. Bauer has no ability at this point to breath freely for respiratory recovery following a protracted struggle and Taser deployments.

At 7:56, now 3.5 minutes after beginning the body wrap application, the officer still has a knee on Bauer's head and neck, only now he is using the ground for leverage to apply even more pressure (see figure no. 3). By now, Bauer is handcuffed with his legs secured by the body wrap. It appears however that the officers are having trouble properly securing the wrap. It is unknown why they are continuing to fumble with it at this time. It appears that they are more focused on properly applying the device than with Bauer's medical condition at this point. It is clear from the video's audio that Bauer's



Figure 3: Bauer is now in handcuffs with the leg portion of the body wrap secured. The officers continue to hold him to the ground.

breathing is greatly distressed. It is also important to note that multiple supervisors are now at the scene and observing the use of the restraints.

It is not until 8:23 when Officer Trovao removed his knee from Bauer's head and neck. This is almost 4 minutes after he began applying that pressure, which was preceded by a protracted struggle with multiple officers and multiple Taser deployments. Unbelievably, they continued holding Bauer to the ground even after this while they double locked his handcuffs. During this time Bauer continues to scream incoherently. His voice is obviously weakening. At 10:54, while still holding Bauer to the ground, the spit mask is applied apparently because Bauer had blood on his face. He is then finally set up. At 17:00 Bauer grows quiet and his head drops. He has still received no medical attention as the officers continue to fumble with the body wrap.[16]

The officer wearing body cam 390 left the scene to get a case of water for the officers. By the time he returned at 28:30 (his body cam continued to run), Bauer still had not been put in the ambulance. By this time, it is believed that EMTs had also administered a sedative even though Bauer had already become unresponsive. It is not until 29:55 that EMTs are seen putting Bauer

---

[16] In his deposition of February 9, 2021, Dr. Michael Ferenc, who performed the autopsy of Jacob Bauer, testified that he should have indicated the cause of death as "mechanical asphyxiation" related to the use of the body wrap (21:2).

in the ambulance. At 32:30 the EMTs ask the officers to remove the restraints because Bauer had coded. It is not until 37:33 when the ambulance finally left the scene.

Specifically, regarding the use of the body wrap in this case, the following is noted:

- There was never a clear purpose for using it since Bauer was already secured in handcuffs, and EMTs had the ability to administer a sedative, which they ultimately did.[17]

- It was obvious that the officers were not experienced or even trained to use the body wrap. It took nearly 4 minutes to apply the leg portion of the wrap, during which Bauer received no medical attention.

- The officers should have reasonably known that Bauer was experiencing excited delirium and that any restraint, specially, a full body restraint, would increase the risk of sudden death. The manufacturer of the body wrap, Safe Restraints, Inc., recommends as a medical precaution that the restraint be applied as early as possible in the encounter. These officers knew that Bauer had already been involved in a protracted physical struggle and had received multiple charges from two different Tasers. Applying it at the time they did was dangerous and against the recommendation of the manufacture.

- As stated above, the PPD appears to have no policy guiding the use of the body wrap. Applying and removing leg and ankle restraints is relatively quick and uncomplicated. Also, those restraints still allow for movement by the legs. The PPD policy relating to leg restraints should in no way also guide the use of the body wrap, a much different device. It demands a separate policy that outlines when it can be used, medical considerations, when it should be removed, and the conditions under which it should not be used.

*Compressional/ Positional Asphyxia*

---

[17] It is only an observation that Bauer was administered a sedative after he had already become unresponsive and his head had fallen forward.

==The law enforcement community in the U.S. has long been aware of the dangers of applying weight to an individual's neck, head, or back while they are lying face down on the ground.== One police training entity defined *compressional asphyxiation* as follows:

> *"Compressional asphyxia is a preventable danger. With sufficient time and weight on the upper body, the suspect's ability to breathe is so limited that suffocation is possible. Like an anaconda snake killing its prey; every time the suspect breathes out, the body weight of the officers prevents the suspect from reinflating his lungs fully—eventually the lung capacity is so limited it cannot support life. If enough weight is kept on the upper torso, oxygen levels become critical and the body dies."[18]*

==There is NO police training that instructs officers that it is appropriate to apply significant weight to a suspect's back, head, or neck after the handcuffing process, whether with their knee or their hand.== As early as 1996, the FBI was alerting police trainers to the dangers of compressional/ positional asphyxia, and providing direction for the proper instruction of police officers:

> *"Instructors must stress vigilance in monitoring the subject's condition. The process of hypoxia is insidious, and subjects might not exhibit any clear symptoms before they simply stop breathing. Generally, it takes several minutes for significant hypoxia to occur, but it can happen more quickly if the subject has been violently active and is already out of breath. If the subject experiences extreme difficulty breathing or stops breathing altogether, officers must take steps to resuscitate the subject and obtain medical care immediately."[19]*

Compression of one or both sides of neck may trigger *bradycardia* or *asystole*. The former is a slowing of the heartrate and the latter is a complete absence of ventricular contraction.

---

[18] Williams, G.T. (2013). *A new idea in safely restraining the proned handcuffed prisoner*. Cutting Edge Training. Accessed at http://www.cuttingedgetraining.org/?tag=/positional+asphyxia.
[19] Reay, D.T, MD (1996). *Suspect restraint and sudden death,* FBI Law Enforcement Bulletin, May 1996.

Additionally, *Vagus nerve* stimulation will slow the heart rate.[20] This information too is provided in police training, particularly in the context of handcuffing and physical restraint. Any use of force that includes the head or neck is generally considered deadly force given the dangers associated with it. Officers are specifically instructed that just because a suspect may be speaking during and after their restraint does not mean they are breathing freely at an acceptable level, nor does it mean they are not at risk of sudden death related to asphyxia. The foregoing is not intended as a medical opinion, which is beyond the scope of this summary. It is provided only to illustrate the content of police training on these medical issues.

All police officers in California receive training on the issue of compressional/ positional asphyxia. Officers not only receive training on the dangers of asphyxiation during and after restraint but are also trained in proper handcuffing and restraint techniques specifically designed to avoid this deadly outcome. California P.O.S.T. has established standards that instruct officers to use one of four control positions—back mount, top mount, side control, and guard.[21] In none of these techniques does the officer(s) restrict the head, compress the neck, or apply significant body weight to the subject's back. This standard further states that *"if the peace officer is unable to establish or maintain control in a ground position, the peace officer should attempt to move to a standing position of advantage which would allow the peace officer access to other force options."*

Throughout this encounter, even when other officers arrived to help, Bauer was inappropriately and dangerously pinned to the ground for a significant period of time and in a manner that violated the officers' training and the California P.O.S.T. standards guiding that training.

ON-SCENE SUPERVISION

---

[20] Handbook of Forensic Medicine (2014). Madea Burkhard (ed.). Wiley Publishing, pg. 531.
[21] Learning Domain 33, Chapter 8:3-4.

It is critical that any multi-officer response include an incident supervisor whose responsibility it is to maintain the safety of all participants in the incident—suspects, officers, and witnesses—as well as the general public. Additionally, a major role of the incident supervisor is to ensure that the officers involved act according to department policy and accepted standards of conduct.

The first supervisor at the scene during this incident was Sergeant Eric Billdt. He was deposed on September 3, 2020. A number of issues were raised during his testimony. He considered himself the incident commander throughout the encounter with Jacob Bauer (pg. 45). His testimony was inconsistent at times and evasive at others. He admitted that Chin and Middleton should have "possibly" assessed Bauer for an involuntary mental health commitment ("5150") prior to attempting to handcuff him (pg. 59), but then admitted that the thought of de-escalation during the struggle did not cross his mind (pg. 105). He also admitted that he did not consider any of the force used against Bauer to be unreasonable. He believed the closed fist strikes by Chin were appropriate (pg. 125), and that it was appropriate to strike him with an expandable baton (pg. 131). With regard to the officers putting their weight on Bauer's back, Billdt stated that he either did not see it, or that he was unconcerned about what he did see (pg. 116). Most striking, Billdt stated that he did not consider Bauer to be suffering from a medical emergency as that condition is described in PPD policy (pg. 70), and while he stated that he does understand the condition of "excited delirium," in this case that possibility did not cross his mind (pg. 71).

The second sergeant to arrive at the scene was Jason Knight. He was deposed on October 8, 2020. Knight was particularly evasive. He denied knowing the nature of the original call or whether Bauer was having a mental health crisis (pg. 42). When confronted with the fact that he told a woman at the store that Bauer was having a mental health crisis, he explained that he only told her that to get rid of her and could not recall why he chose those words (pg. 44). He stated that he believed everything that was done by the officers was appropriate, and there was no need for de-escalation. He stated that officers had the "right" to restrain Bauer and to overcome his resistance (pg. 46). During the incident he saw nothing that concerned him, including the use of the Taser, baton, spit mask, and body wrap. And while he believed that all three of the sergeants

==were acting in the capacity of incident commander, he did not believe it was his responsibility to evaluate Bauer's mental condition until after he was finally restrained (pg. 53).==

The last of the three sergeants to arrive on-scene was Joseph Sarasua Jr. Sarasua Jr. was deposed on January 25, 2021, and previously provided a statement following the incident. A number of issues were raised during his deposition. Sarasua Jr. admitted that he would have been considered a supervisor during the incident but denied knowing who acted in the capacity of incident commander, or if anyone did (pg. 32). He believed he assigned the role of incident commander to one of the other two sergeants (pg. 32) and denied acting in that capacity himself (pg. 36). He admitted that while he was on-scene, Bauer was acting bizarrely, making incoherent sounds, and was flailing around with his body. When asked if he believed Bauer's breathing was labored, he stated that he did not since he was talking and yelling (pg. 46). He did not recall who ordered that the spit mask be used, nor did he observe Bauer actually spitting (pg. 71). ==He admitted that he knew pursuant to PPD policy that when a suspect demonstrates the symptoms of excited delirium, it should be considered a medical emergency and that Bauer was in fact demonstrating some of those symptoms (pg. 91).==

One final individual who had a duty to supervise was Officer Alex Koumiss. Although Koumiss was not a supervisory level officer, until the sergeants arrived on scene, he was the senior officer present. Koumiss testified in a deposition on January 31, 2021 that only three officers—Chin, Middleton, and Bennett—were present and on the ground struggling with Bauer when he arrived. It was his responsibility as the senior officer, pursuant to accepted police practices, to take control of the scene. By the time he arrived, Bauer was already exhibiting excited delirium. De-escalation and officer safety should have been his primary considerations. The two were never mutually exclusive. There were a sufficient number of officers at the scene to safely de-escalate their use of force without allowing Bauer to escape or attack the officers, notwithstanding the fact that Bauer at no time during the incident attacked the officers. It would have been appropriate, and in fact necessary by that point, for Koumiss to order the officers to take their weight on Bauer, discontinue their efforts to apply the handcuffs, and certainly to

discontinue the use of the Taser. Koumiss needed to focus on verbal de-escalation and Bauer's safety.

Koumiss's mindset at the scene comes across clear in his deposition answers. When asked about Bauer exhibiting signs of excited delirium, Koumiss responded, "*That wasn't my immediate concern. My immediate concern was to get control of this guy. Part of the excited delirium is to get medical in there, but they would not go in there unless Mr. Bauer's under control. So, the sooner we can get him under control the sooner he can get professional medical care*" (Dep. pg. 31). Koumiss also testified that the possibility Bauer might be suffering from some type of mental illness never crossed his mind (Dep. Pg. 35). And regarding Bauer's distressed breathing, Koumiss testified, "*As far as I was concerned, he was breathing properly because he kept yelling at us, and if you are yelling, then you are breathing*" (Dep. Pg. 41). This of course is a dangerous misunderstanding that any C.I.T. trained police officer should know. And finally, Koumiss denied seeing anyone deploy a Taser, use a distracting blow, strike Bauer with an expandable baton, or put their weight on Bauer. Ultimately, he provided no value as a supervisor prior to the sergeants arriving at the scene.

It is obvious from the above testimony that the incident was not actively supervised. None of the three sergeants recognized this case as a medical emergency and acted according to PPD policy. Done properly, and with as many officers that were present, the sergeants would have ordered the officers to stop what they were doing, take their weight off Bauer, and get him in a sitting position as quickly as possible. They would have evaluated him for 5150 and had medical personnel also evaluate him. Even losing sight of all options but completing the restraint of Bauer, the sergeants still failed in their duty to protect his well-being by allowing the spit mask and body wrap to be applied. Even when they were, they failed to insure that the restraints were applied in a proper and timely manner that allowed for unrestricted breathing and quick access to medical care.

The lack of supervision in this case represents a failure of the Pleasanton Police Department to ensure that all PPD supervisory personnel be properly trained to supervise a mental health emergency. It is not enough for supervisors to complete only standard CIT training. They must be prepared to supervise CIT-trained officers in the stress of the moment when such training is often set aside by officers for the offender-arrest mindset that guides most of their daily activities. That was the case here. All three sergeants lost all sight of Bauer's mental condition, as well as his rapidly deteriorating medical condition, and focused only on the singular goal of getting him restrained.

DE-ESCALATION

There is practically no other issue today's police officers receive more training on than the concept of de-escalation. This training, which occurs during an officer's initial academy training[22], and later during advanced C.I.T. training, teaches officers how to de-escalate an emotionally agitated individual with their words and actions, and just as importantly, how to avoid having the opposite effect and escalating a calm individual with their words and actions. De-escalation, or a lack of, was a critical issue in this case. There were two points in the encounter when the officers failed to follow their de-escalation training and made the situation worse. First, was when Chin and Middleton put their hands on Bauer to place in handcuffs. Notwithstanding the fact that a custodial detention at that point was unlawful, they reasonably should have known that their actions would have a negative and possibly violent result. The second point was when none of the officers present, especially Koumiss initially, and then the three sergeants later, failed to order all of the officers present to discontinue their use of force and efforts to handcuff Bauer and immediately move him into a sitting position so he could breathe freely while they attempted de-escalation in a manner consistent with their training. Instead, as outlined above, de-escalation was never even considered during this encounter. Given what is known about excited delirium,

---

[22] At the time of this incident, de-escalation training was provided pursuant to California P.O.S.T. learning domain 37 (People with Disabilities) and learning domain 4 (Victimology and Crisis Intervention). The curriculum has now been updated to include de-escalation training pursuant to learning domain 20 (Use of Force).

especially when mental illness, drug use, and the use of a Taser are present, by not attempting de-escalation, the officers almost guaranteed a deadly outcome.

ADMINISTRATIVE INVESTIGATION

In any case involving an officer using force there is some level of administrative review to determine what discipline or remedial training is necessary. These reviews are carried out by one or more supervisory level officers who are focused on determining whether the officer(s) violated department policy or standards of conduct. In this case, the administrative review was completed by Sergeant Eric Gora. He submitted his final report of the investigation on February 19, 2020. This was a complex situation, and there were a number of policy and training issues that Gora had to review and evaluate. They included policies and training standards related to the following:

- Excited delirium
- Compressional/ positional asphyxia
- Crisis Intervention/ De-escalation
- Use of the Taser
- Use of the expandable baton ("ASP")
- Distraction blows
- Restraint devices (handcuffs, body wrap, spit mask)
- On-scene supervision
- Arrest and detention

Gora found that none of the officers involved in this matter, including the three supervisors, violated any department policy except for the minor infraction by at least one of the officers of failing to conduct a spark test on their Taser prior to their duty shift. This infraction is irrelevant to the matter of Jacob Bauer.

This lack of findings when major infractions of PPD policy and training standards are so obvious is a cycle that has repeated itself in the Pleasanton Police Department. Sergeant Gora himself has been the beneficiary of such inaction in the past. In the matter of John Deming Jr., a young mentally ill man who shot and killed by a Pleasanton police officer on July 5, 2015, Gora was the on-scene supervisory.[23] At a time when the officers should have been attempting to de-escalate Deming Jr., it was Gora who ordered one of his officers to deploy a Taser while Deming Jr. was in an elevated position on top of a truck, a clear violation of policy and training standards. This was done at a time when Deming Jr. was calm and talking to the officers. The Taser strike caused him to run from the area and out through a broken window where a PPD officer had set up a perimeter. The officer shot and killed Deming Jr. after deploying his own Taser at Deming Jr.'s back as ran away. It was Gora who failed to properly supervise the incident as a mental health/medical emergency and who failed any attempt to de-escalate Deming Jr. when the opportunity was clearly present.

When a department fails to conduct administrative reviews that lead to real consequences, then the review itself has little value in terms of deterring inappropriate behavior by the department's officers. In this case, by having someone conduct the review who had himself benefitted from a poorly conducted administrative review, only continued the cycle of inaction that led to no findings in this matter.

SUMMARY & OPINIONS

The officers' use of force in this case began when they inappropriately attempted to place handcuffs on Bauer when they had insufficient probable cause for a warrantless felony arrest; when they were precluded by PPD policy and California law from making a warrantless misdemeanor custodial arrest; and when there was no demonstrated behavior on Bauer's part justifying the application of handcuffs during an investigative detention. Bauer immediately resisted their efforts but never demonstrated any assaultive behavior toward the officers. Once

---

[23] I also served as the plaintiff's expert in this matter and submitted a Rule 26 report dated November 16, 2017.

they had him pinned on the ground, with multiple other officers arriving to assist, two of the officers, Middleton and Trovao, violated PPD policy, their own training, and National standards when they deployed two Tasers against Bauer for compliance purposes only and delivered over twice the recommended maximum duration of charge. Bauer almost immediately exhibited symptoms of excited delirium, an emergency medical condition.

Once it was obvious that Bauer was suffering from excited delirium, the officers knew from their training that it was critical to get him out of a prone position as quickly as possible to avoid a case of sudden death. The officers made no effort to do this, and even after securing Bauer in handcuffs, inappropriately spent a significant duration of time applying a full body wrap in violation of the manufacturer's medical precautions. Not only did they keep Bauer pinned to the ground, thus restricting his ability to breath freely, but at least one, as discussed above, applied his body weight to Bauer's head and neck and held it there for a significant period of time. The officers applying the body wrap clearly were inexperienced or untrained in the use of this device, as evidenced by the significant amount of time it required to get it secured. Only then, and only after another officer inappropriately applied a spit mask, did they set Bauer upright. He very quickly became unresponsive with little notice taken by the officers and even the EMTs present at the scene (see footnote no. 16).

Once Bauer was loaded onto a gurney, already mostly unresponsive and restrained with handcuffs and the body wrap, he was given a sedative by one of the EMTs. He was then loaded into the ambulance, however he quickly "coded." One of the EMTs advised the officers that Bauer had coded and asked them to remove the restraints. Unbelievably, it took nearly 5 additional minutes for the restraints to be removed and for the ambulance to depart the scene for the hospital. From the beginning of this encounter to the very end, it appeared that no one at the scene—police, firemen, EMTs—had Bauer's health at the forefront of their focus. Even when medical personnel arrived, they made no effort, as they should have, to take control of Bauer, and instead stood back for a significant amount of time while the officers continued to fumble with the body wrap.

In the context of accepted police training and standards of practice...

1. The use of physical force by Officers Middleton and Chin to restrain Jacob Bauer at a time when there were no specific facts supporting a reasonable suspicion that Bauer was armed, and lacking probable cause for a warrantless felony arrest, was inappropriate and excessive under the circumstances.

2. The decision by Officers Middleton and Trovao to concurrently deploy their Tasers against Jacob Bauer only to force compliance and for an aggregate duration of 31 seconds was a violation of PPD policy and Axon training standards, and thus it was inappropriate and excessive under the circumstances.

3. The use of the body wrap restraint following a protracted physical struggle and multiple Taser deployments, and after Bauer had obviously entered a state of excited delirium—a medical emergency—and further, after Bauer had already been secured in handcuffs, was inappropriate, excessive under the circumstances, and a violation of the manufacturer's recommendations.

4. The use of the spit mask at a time when Bauer was exhibiting symptoms of excited delirium with distressed breathing following a protracted physical struggle with multiple Taser deployments, was inappropriate and excessive, especially given that the only stated reason for applying it was because Bauer had blood on his face.

5. The tragic outcome in the case was facilitated by a lack of proper supervision by Sergeants Billdt, Knight, and Sarasua, who failed to recognize or even consider Jacob Bauer's medical and psychological distress while multiple officers continued to use various forms of force against him.

William M. Harmening
02/15/2021