EXHIBIT G

```
 1                 UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                   SAN FRANCISCO DIVISION
 4                         --oOo--
 5   JOHN BAUER, an individual
     and as Successor in Interest
 6   of Jacob Bauer, deceased;
     ROSE BAUER, an individual
 7   and as Successor in Interest
     of Jacob Bauer, deceased;
 8
                     Plaintiffs,
 9
     vs.                              Case No.
10                                    3:19-cv-04593-LB
     CITY OF PLEASANTON; BRADLEE
11   MIDDLETON; JONATHAN CHIN;
     RICHARD TROVAO; STEVEN
12   BENNETT; ALEX KOUMISS; JASON
     KNIGHT; MARTY BILLDT; DAVID
13   SPILLER; and DOES 1 to 50,
     inclusive;
14
                     Defendants.
15   _____/
16
17
18      CONTAINS CONFIDENTIAL MATERIAL WHERE NOTED
19
20    VIDEO-RECORDED DEPOSITION OF ERIC (MARTY) BILLDT
21            THURSDAY, SEPTEMBER 3, 2020
22
23   Reported by:
24   Anrae Wimberley, CSR No. 7778
25   Job No.  4227616
```

Page 1

```
1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3               SAN FRANCISCO DIVISION
4                      --oOo--
5  JOHN BAUER, an individual
   and as Successor in Interest
6  of Jacob Bauer, deceased;
   ROSE BAUER, an individual
7  and as Successor in Interest
   of Jacob Bauer, deceased;
8
                   Plaintiffs,
9
   vs.                         Case No.
10                             3:19-cv-04593-LB
   CITY OF PLEASANTON; BRADLEE
11 MIDDLETON; JONATHAN CHIN;
   RICHARD TROVAO; STEVEN
12 BENNETT; ALEX KOUMISS; JASON
   KNIGHT; MARTY BILLDT; DAVID
13 SPILLER; and DOES 1 to 50,
   inclusive;
14
                   Defendants.
15 _____/
16
17     CONTAINS CONFIDENTIAL MATERIAL WHERE NOTED
18
19          Transcript of video-recorded deposition
20 of ERIC (MARTY) BILLDT, taken at Gwilliam, Ivary,
21 Chiosso, Cavalli & Brewer, 1999 Harrison Street,
22 Suite 1600, Oakland, California 94612, beginning at
23 10:05 a.m. and ending at 3:01 p.m. on Thursday,
24 September 3rd, 2020, before Anrae Wimberley,
25 Certified Shorthand Reporter No. 7778.
```

Page 2

```
 1   APPEARANCES:
 2   For Plaintiffs John and Rose Bauer:
 3            GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
 4            BY:  J. GARY GWILLIAM, ESQ.
 5                 JAYME L. WALKER, ESQ.
 6            1999 Harrison Street, Suite 1600
 7            Oakland, California 94612
 8            (510) 832-5411
 9            ggwilliam@giccb.com
10            jwalker@giccb.com
11
12   For Defendants:
13            McNAMARA NEY BEATTY SLATTERY BORGES &
14            AMBACHER LLP
15            BY:  NOAH G. BLECHMAN, ESQ.
16            3480 Buskirk Avenue, Suite 250
17            Pleasant Hill, California 94523
18            (925) 939-5330
19            noah.blechman@mcnamaralaw.com
20
21   Also present:
22            JENNIFER McKAY, VIDEOGRAPHER
23            VERITEXT LEGAL SOLUTIONS
24
25
```

Page  3

```
 1   Also present (cont'd):
 2            LINDA LIM, PARALEGAL
 3            GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
 4
 5            SERGEANT JASON KNIGHT, DEFENDANT
 6
 7            THE FOLLOWING APPEARED VIA ZOOM
 8            VIDEOCONFERENCE:
 9            OFFICER JONATHAN CHIN, DEFENDANT
10            OFFICER BRADLEE MIDDLETON, DEFENDANT
11
12            BRITTANY SMITH, LAW CLERK
13            GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
14                       --oOo--
15
16
17
18
19
20
21
22
23
24
25
```

Page  4

```
 1                    I N D E X
 2   EXAMINATION BY:                              PAGE
 3   MR. GWILLIAM                               7, 114
 4                    --oOo--
 5                E X H I B I T S
 6   EXHIBIT          DESCRIPTION                 PAGE
 7   Exhibit 14       Interview of Sergeant Billdt;    6
 8                    37 pages
 9
10   Exhibit 15       Pleasanton Police Department    61
11                    Policy Manual - Mental
12                    Illness Commitments; 3 pages
13
14   Exhibit 16       Complete Body Cam Video of      76
15                    Sergeant Billdt, No. 378;
16                    MP4 file
17
18   Exhibit 17       Still Frame from Sergeant      114
19                    Knight's Body Cam Video,
20                    No. 390; 1 page
21                    --oOo--
22   TESTIMONY REQUESTED TO BE MARKED CONFIDENTIAL:
23   From page 128, line 22 through page 130, line 1
24   From page 179, line 3 through page 187, line 1
25                    --oOo--
```

Page 5

```
 1              THURSDAY, SEPTEMBER 3, 2020;

 2               OAKLAND, CALIFORNIA;

 3                 10:05 A.M.

 4                  - - -

 5         (Plaintiffs' Exhibit 14 was marked.)

 6       THE VIDEOGRAPHER:  Good morning.  We are going

 7   on the record at 10:05 a.m. on September 3rd, 2020.

 8          This is Media Unit 1 of the video-recorded

 9   deposition of Marty Billdt in the matter of Bauer,

10   et al. versus the City of Pleasanton, et al., filed      10:05:26

11   in the United States District Court, Northern

12   District of California, San Francisco Division, Case

13   No. is 3:19-cv-04593.

14          This deposition is being held at Gwilliam

15   Ivary in Oakland, California, located at 1999          10:05:45

16   Harrison Street, Suite 1600.

17          My name is Jennifer McKay from the firm

18   Veritext and I'm the videographer.  Your court

19   reporter today is Anrae Wimberley, also from

20   Veritext.                                              10:06:00

21          Counsel, please identify yourselves and

22   state whom you represent.

23       MR. GWILLIAM:  Yes, I'm Gary Gwilliam.  I

24   represent Mr. and Mrs. Bauer in this action.

25          My paralegal, Linda Lim, is present and my     10:06:09
```

Page 6

```
 1    partner, Jayme Walker, will likely come into the           10:06:14

 2    room before the deposition is completed, so . . .

 3         MR. BLECHMAN:  Noah Blechman on behalf of the

 4    defendants.  Also present is Defendant Sergeant

 5    Jason Knight.  And there may be some defendants that         10:06:30

 6    pop in our Zoom shortly.

 7         MR. GWILLIAM:  Fair enough.

 8         THE VIDEOGRAPHER:  Would the reporter please

 9    swear in the witness.

10                 ERIC (MARTY) BILLDT,                            10:06:39

11            sworn as a witness by the Certified

12         Shorthand Reporter, testified as follows:

13                      EXAMINATION

14    BY MR. GWILLIAM:

15         Q.   Would you state your full name and address        10:06:53

16    for the record, Sergeant Billdt.

17         A.   And address?

18         Q.   Please.

19         A.   Full name is Eric Martin Billdt.  My

20    nickname is Marty.                                          10:07:04

21         Q.   You can give your work address.

22         A.   My work address is 4833 Bernal Avenue,

23    Pleasanton, California 94566.

24         Q.   And you're currently a sergeant at the

25    Pleasanton Police Department; is that correct?              10:07:15
```

Page 7

```
 1    specific date.                              10:21:10

 2         Q.   In your advanced officer training, was

 3    that specific training in order to become a

 4    sergeant?

 5         A.   No.                                10:21:17

 6         Q.   Tell me about your advanced officer

 7    training.

 8         A.   It's just the scenarios that we all go

 9    through as police officers.

10         Q.   Up until August 1st, '18, what kind of   10:21:26

11    specific training had you had in how to deal with

12    mentally ill people that you might encounter in the

13    city?

14         A.   I've been to the CIT training in 2016.  I

15    believe we had an update on that in, like, 2017.  I   10:21:47

16    was a school resource officer, so I've had some

17    trainings going through school -- going through

18    school resource officer training, I guess.  There's

19    a week-long class where a portion of that is dealing

20    with mental illness generally in youth.          10:22:08

21          And I've had -- I've been to a couple of

22    other conferences for -- as a school resource

23    officer where I -- where there's -- that topic has

24    come up.

25         Q.   Can you be more specific about what       10:22:23
```

Page 20

1    exactly you've been trained in your -- let's say,          10:22:26

2    your CIT training as it relates to how to deal with

3    mentally ill people that you might encounter in the

4    streets?

5        MR. BLECHMAN:  Overbroad, incomplete              10:22:35

6    hypothetical.

7            Go ahead.

8        THE WITNESS:  Well, a lot -- to be specific, I

9    would probably need a specific example.  But to be

10    general, I would say every situation is different.       10:22:47

11    You may not know that you're dealing with a mentally

12    ill person.  You may be dispatched to a call

13    where -- like at a hospital, where you obviously

14    know there's a mental illness going on or some signs

15    and symptoms of that.                                    10:23:13

16            But generally, a lot of the training is --

17    it's very -- it's not specific.  It's generalized,

18    because every situation is different.  And first and

19    foremost, they always teach in these trainings that

20    officer safety and the safety of others is               10:23:36

21    paramount.

22    BY MR. GWILLIAM:

23        Q.  Have you been specifically trained, up

24    until August 1st, '18, on how to assess or evaluate

25    whether someone might be suffering from a mental        10:23:46

Page 21

```
 1   And I know that at some stage during the            10:52:54

 2   investigation, let's call it, or during the time

 3   that you were at the scene, you began to look at

 4   witnesses and this sort of thing, and you considered

 5   yourself as a supervisor at the scene.  Do I         10:53:07

 6   understand that correctly?

 7        A.   That's correct.

 8        Q.   So as far as you were concerned, were you

 9   the incident commander at that scene?

10        A.   I was -- I would say, yeah, I was made the  10:53:16

11   incident commander.  I knew that it was my officers,

12   because it was my team that initially responded.

13   But I also knew I had two senior sergeants there to

14   help me through.  This would have been one of my

15   first major use of force incidents, so I knew I      10:53:35

16   could rely on them to walk me through.

17        Q.   Okay.  Well, I know you did have contact

18   with the previous sergeant and to a certain extent

19   with Sergeant Saragusa.

20             Is that how you pronounce his name?        10:53:51

21        A.   Sarasua.

22        Q.   Sarasua, okay.  Close enough.

23             So you would rely on those.  But from a

24   command standpoint, you would have been the incident

25   commander because both Chin and Middleton were       10:54:04
```

                                             Page 45

```
 1    Middleton, was that one of the options he had when          11:01:11

 2    he was first encountering Jacob Bauer, before they

 3    decided to put handcuffs on him, was that he might

 4    call his supervisor.

 5           Do you recall that he testified to that?           11:01:22

 6       A.   I don't recall him saying that.

 7       Q.   Well, let's assume that that was an

 8    option.  What I want to do is, I want to ask you --

 9    and it is sort of a hypothetical question --

10    assuming for a minute that Middleton had decided to         11:01:35

11    call you in the office before he decided to detain

12    and put handcuffs on Jacob Bauer, you would have

13    been glad to talk to him about what options he had

14    available at that time; correct?

15       A.   Correct.                                           11:01:52

16       Q.   Okay.  And let's assume that he called you

17    with information that he had about the dispatch and

18    that there was a man that was wandering around and

19    talking to himself and was exhibiting signs that the

20    Raley's department said could be bipolar or could be       11:02:09

21    signs of mental illness.

22           If he had called you and said, hey, I've

23    got a guy looks like he's exhibiting signs of mental

24    illness, do you have any idea what advice you might

25    have been able to give him at that time?                   11:02:26
```

1        MR. BLECHMAN:   Incomplete hypothetical,                    11:02:28

2   misstates some of the record.

3             But go ahead.

4        THE WITNESS:   I would ask him what other

5   information do you have.                                         11:02:34

6   BY MR. GWILLIAM:

7        Q.   But let's just say that he's got the

8   information we have here, which is that -- and that

9   he was there -- that the guy was ranting to himself,

10   he was walking around, he was -- they were following   11:02:44

11   him.  By the time they got to him, he appeared

12   strange, that he was talking about being concerned

13   about bad thoughts, and that he was exhibiting signs

14   that Middleton said, hey, I think he's showing signs

15   of some mental illness.  Do you have any -- what        11:03:05

16   options would you have had to give him at that time,

17   Sergeant Billdt?

18        MR. BLECHMAN:   Incomplete hypothetical,

19   misstates the record.

20             Go ahead.                                             11:03:16

21        THE WITNESS:   Well, it sounds like, based on

22   what you're telling me, someone who may be suffering

23   possibly from a mental illness, could possibly be

24   suffering from drug intoxication.  If that's the

25   only information, obviously conduct a welfare check     11:03:36

Page 53

1    on the subject, try to engage in conversation, see          11:03:39

2    what you can learn from him, see what kind of

3    resources we can provide.

4            Maybe if he is under the influence, you

5    can go that route.  If he is suffering from mental          11:03:51

6    illness, we can provide him with assistance and

7    possibly get him to the hospital for treatment.

8    BY MR. GWILLIAM:

9        Q.   Okay.  Would that be under a 5150?

10       A.   Correct.                                            11:04:04

11       Q.   Okay.  When you said something about we

12   could do something for a welfare check, what did you

13   mean by that, Sergeant Billdt?

14       A.   Welfare check is just go and check on that

15   person's welfare, find out -- you know, ask            11:04:15

16   questions, see what's going on.  Go ahead.

17       Q.   You learned later that Jacob Bauer was

18   living with his parents, I presume?

19       A.   I learned that later.

20       Q.   You learned that later.  But let's assume,          11:04:29

21   again, we're in this situation where Middleton says,

22   hey, I want to call the supervisor, I want to call

23   Billdt and say, hey, I need some help about how to

24   deal with this guy, would you have recommended that

25   maybe he see if he can contact his family and see           11:04:43

```
 1   what was going on with this guy?  Particularly after    11:04:48

 2   they found out he didn't have any warrant.

 3        MR. BLECHMAN:  Incomplete hypothetical,

 4   misstates the record.

 5           Go ahead.                                         11:04:58

 6        THE WITNESS:  That's always an option, because

 7   sometimes people with mental illness are already

 8   under the care of a doctor, maybe they're already on

 9   medications, maybe they have an appointment that

10   day.  I mean, these are all hypotheticals that we're    11:05:11

11   doing here.

12            So sometimes, in my experience, if you

13   place someone on a 5150 hold, they might lose out on

14   essential appointments.  So sometimes it might be

15   best to self commit, sometimes it might be best to      11:05:29

16   give them to a family member, sometimes if it's

17   immediate need, you just transport them right there.

18   I mean, these are all -- a long response to your

19   question, it's possible.

20   BY MR. GWILLIAM:                                         11:05:43

21        Q.  If they were to call somebody to the scene

22   to assist them for a 5150, would they call an

23   ambulance?  Let me rephrase that.

24            If there was a 5150 to be done with this

25   guy, would that go to Valley Memorial Hospital?  Is     11:05:57
```

Page 55

```
 1          THE VIDEOGRAPHER:  Back on the record.  The        11:27:14

 2     time is 11:27.

 3     BY MR. GWILLIAM:

 4          Q.   Sergeant Billdt, while we were off the

 5     record, I did two things:  I gave you a previously       11:27:20

 6     marked Exhibit 12, which starts with the use of

 7     force policy, although it does have a lot more in

 8     it.  And I gave you a newly marked Exhibit 15, which

 9     is Policy 420, Mental Illness Commitments.

10          Are you familiar with these Pleasanton            11:27:35

11     Police Department policies?

12          A.   Yes.

13          Q.   Okay.  Let's start with Exhibit 15, which

14     is the Mental Illness Commitments, and we were

15     talking a little bit about this before.  What is the     11:27:46

16     purpose of this policy, as far as you are concerned,

17     Sergeant Billdt?

18          A.   It's a guideline for mental illness

19     commitments.

20          Q.   Okay.  Is it also a guideline for how to      11:27:56

21     deal with mentally ill people under certain

22     circumstances when officers may encounter them?

23          A.   I think that's more -- a little bit

24     more -- you mean crisis or -- in crisis or just

25     mentally ill -- dealing with mentally ill --            11:28:16
```

```
 1   paramedics, who have a higher level of care, to make        11:37:09

 2   that determination.

 3       Q.   Had you had any experience with so-called

 4   excited delirium in your peace officer experience

 5   before August 1st, '18?                                       11:37:22

 6       A.   Only through training.

 7       Q.   Okay.  Did you consider at any time while

 8   you were at the scene, before the paramedics arrived

 9   on the scene, that Jacob Bauer might be suffering

10   from excited delirium?                                        11:37:37

11       MR. BLECHMAN:  Calls for expert testimony,

12   lacks foundation, and calls for speculation.

13           Go ahead.

14       THE WITNESS:  That thought did not cross my

15   mind at that time.                                            11:37:50

16   BY MR. GWILLIAM:

17       Q.   Has it since crossed your mind since you

18   look back on the situation?

19       MR. BLECHMAN:  Incomplete hypothetical, calls

20   for expert testimony, and lacks foundation.                   11:37:59

21           Go ahead.

22       THE WITNESS:  It's possible.

23   BY MR. GWILLIAM:

24       Q.   It's probable, wouldn't you agree?

25       MR. BLECHMAN:  It's argumentative, asked and               11:38:07
```

Page 71

```
 1        Q.   What's your best estimate?   15 minutes?        11:42:06

 2   15, 20 minutes?

 3        A.   Until the phone call was made?

 4        Q.   Yeah.

 5        A.   I believe it was -- the request was made        11:42:14

 6   within five minutes.

 7        Q.   Okay.  Well, maybe we'll be able to tell

 8   when we go through the video, you think?

 9             One more general question before we get

10   into the video.                                           11:42:32

11             At any time up until the time the

12   paramedics came and were evaluating him, did you

13   consider that Jacob Bauer was severely mentally ill?

14        MR. BLECHMAN:   Calls for speculation and lacks

15   foundation, vague and ambiguous as to severely           11:42:53

16   mentally ill, calls for expert testimony.

17             Go ahead.

18        THE WITNESS:   I don't recall that thought

19   crossing my mind.

20   BY MR. GWILLIAM:                                          11:43:03

21        Q.   At any time, even now, have you ever

22   thought that, in looking back on it, he was

23   exhibiting signs of severe mental illness?

24        MR. BLECHMAN:   Calls for expert testimony, it's

25   an incomplete hypothetical, vague and ambiguous as       11:43:14
```

Page 75

```
 1    him; correct?                                    11:56:10

 2        A.   Yes.

 3        MR. GWILLIAM:  Okay.  Let's go on for a while

 4    then.

 5             (Video played.)                         11:56:17

 6        MR. GWILLIAM:  Stop here.

 7    BY MR. GWILLIAM:

 8        Q.   I was curious, you're walking away from

 9    the scene here.  Where are you going?

10        A.   I'm going to get the leg restraint, the  11:56:50

11    wrap device.

12        Q.   The wrap.  So whose -- was it your

13    decision to put a wrap on him at that time?

14        A.   No.  It was -- I agreed with the decision,

15    but I went to go retrieve it for the officers.     11:57:02

16        Q.   Whose idea was it to put the wrap on him?

17        A.   Officer Granados.

18        Q.   And how did that come about?  Did he just

19    say let's go get a wrap and everybody agrees or did

20    he confer with you about it or Knight or what?      11:57:19

21        A.   It's typical for us, with a subject that

22    is resisting, violently resisting, to place them

23    into a wrap for their safety and officer safety.

24        Q.   At any time, did you have any concerns

25    about the use of a wrap on Jacob Bauer, as you      11:57:38
```

                                                    Page 87

1    understood his situation at that time?                    11:57:42

2         A.   At that time?

3         Q.   Yeah.

4         A.   No.

5         Q.   Did you have any concerns that the wrap          11:57:48

6    might be considered a danger to his health?

7         A.   No.

8         Q.   So you went -- you're going to get the

9    wrap here.  Is that what you're doing?

10        A.   That's correct.                                  11:58:02

11        MR. GWILLIAM:  Okay, let's move forward.

12             (Video played.)

13        MR. GWILLIAM:  Let's stop it here at 3:08.

14   There you go.  This is 3:07.

15   BY MR. GWILLIAM:                                           11:58:30

16        Q.   Now, I want to ask you at this point, did

17   you, at this point, have any specific concerns about

18   the health of Jacob Bauer or his safety?

19        A.   I can't recall.

20        Q.   Were you concerned that people might be          11:58:42

21   kneeling on him when he was on his stomach?

22        A.   At that time?  The thought didn't cross my

23   mind at that time.

24        Q.   Did the thought ever cross your mind that

25   he might have difficulty breathing with all these          11:59:00

                                                        Page 88

```
 1        Q.   How many times was he ultimately tased, to      12:01:59

 2   your understanding?

 3        MR. BLECHMAN:   Calls for speculation and lacks

 4   foundation.

 5           Go ahead.                                          12:02:06

 6        THE WITNESS:   From officers' statements that --

 7   four times, but my understanding is that the Taser

 8   was deployed more times.

 9   BY MR. GWILLIAM:

10        Q.   At any time while you were the supervising       12:02:17

11   officer on the scene, did you have any concerns

12   about the use of Tasers on Jacob Bauer?

13        A.   Absolutely.

14        Q.   What were your concerns in that regard?

15        A.   That he receive medical attention, as part       12:02:28

16   of our policy.

17        Q.   Because he had been tased?

18        A.   Correct.

19        Q.   Did you have any concerns that the tasing

20   process might cause him serious health issues at the       12:02:39

21   scene?

22        MR. BLECHMAN:   Hold on.

23           May call for expert testimony, lacks

24   foundation, calls for speculation.

25           Go ahead.                                          12:02:58
```

1          THE WITNESS:  Again, that -- that thought        12:02:59

2    didn't cross my mind at that time.

3    BY MR. GWILLIAM:

4          Q.   Okay.  When we talked about this before,

5    you were under the impression that the Tasers were      12:03:08

6    not being effective on bringing him under control;

7    is that correct?

8          A.   That's what I observed, correct.

9          Q.   All right.  And why do you think that was?

10         MR. BLECHMAN:  Calls for speculation and lacks     12:03:21

11   foundation of this witness, it calls for expert

12   testimony.

13             You can respond.

14         THE WITNESS:  Again, I don't know what it was.

15   I don't know what was causing him -- for it to be       12:03:32

16   nonresponsive to the tase.

17   BY MR. GWILLIAM:

18         Q.   Were you aware, at the time you were on

19   the scene, that if, in fact, he was suffering from

20   an excited delirium, that the Tasers might not be       12:03:50

21   effective because of his mental situation?

22         MR. BLECHMAN:  Calls for expert testimony,

23   incomplete hypothetical, lacks foundation, calls for

24   speculation of this witness.

25             Go ahead.                                      12:04:03

Page 93

1      A.   No.                                        12:15:36

2      Q.   I want to ask you this question,

3  Sergeant Billdt.   At any time -- we're going to

4  continue to go through this video, but at any time,

5  did you feel that you should try to deescalate this    12:15:45

6  situation?

7      MR. BLECHMAN:   Vague as to time, vague as to

8  "deescalate this situation."

9         Go ahead.

10      THE WITNESS:   Deescalate.   At this time, again,   12:15:57

11  the goal was to safely render the scene safe, and

12  that's what they were doing.

13  BY MR. GWILLIAM:

14      Q.   Is the answer to my question no?

15      A.   No.                                         12:16:12

16      Q.   You never considered deescalation at any

17  time?

18      A.   I don't recall if that came across my

19  mind.

20      Q.   Did anybody at the scene ever say anything    12:16:19

21  about, hey, let's step back and assess this

22  situation and deescalate?

23      MR. BLECHMAN:   Vague as to time.

24  BY MR. GWILLIAM:

25      Q.   Let me rephrase that.                       12:16:28

Page 105

```
 1              Did anybody at any time say, hey, let's      12:16:28

 2    step back and try and assess this situation?

 3         MR. BLECHMAN:  Vague as to time, calls for

 4    speculation and lacks foundation as to other people.

 5              Go ahead.                                     12:16:34

 6         THE WITNESS:  I don't recall that conversation

 7    occurring.

 8    BY MR. GWILLIAM:

 9         Q.   Would you describe the scene we were

10    watching as chaotic?                                   12:16:40

11         MR. BLECHMAN:  Argumentative.

12              But go ahead.

13         THE WITNESS:  Looks chaotic.

14    BY MR. GWILLIAM:

15         Q.   Did that concern you, that you were          12:16:47

16    observing a situation that was chaotic?

17         A.   Yes, it was a concern.

18         Q.   What concerns did you have about that?

19         A.   Well, obviously, I think I've stated is

20    safely taking him into custody, rendering medical      12:17:11

21    aid, making sure officers are okay, making sure -- I

22    mean . . .

23         Q.   Finished with your answer?

24         A.   Yes.

25         Q.   What, if anything, did you do to see if      12:17:27
```

Page 106

```
 1    you could reduce the chaos at the scene there?         12:17:30

 2        MR. BLECHMAN:  Vague as to time.

 3            Go ahead.

 4        THE WITNESS:  At this point, I didn't -- at

 5    this point, that thought hadn't crossed my mind,       12:17:43

 6    so . . .

 7    BY MR. GWILLIAM:

 8        Q.  We're going to go through the whole video,

 9    but at any point, I'm looking at the whole time you

10    were there, it was pretty chaotic right up until the   12:17:51

11    time they got the wrap on him, wouldn't you agree?

12        MR. BLECHMAN:  Vague and ambiguous as to

13    chaotic.

14            Go ahead.

15        THE WITNESS:  It was very fluid, yes.            12:18:01

16    BY MR. GWILLIAM:

17        Q.  Does "fluid" mean the same as chaotic?

18        A.  Well, I mean, there are a lot of moving

19    parts.  It looks chaotic, so yes.

20        Q.  All right.  My question, again is, what,     12:18:10

21    if anything, did you consider to try and reduce that

22    chaos up until the time that the paramedics arrived?

23        A.  I don't recall what I did.

24        MR. GWILLIAM:  Let's move it along.

25            (Video played.)                             12:18:25
```

Page 107

```
 1    his head and neck like that at some stage during the      01:23:59

 2    encounter?

 3         A.   I don't recall seeing that.

 4         Q.   Did you have concerns that these officers

 5    might be putting too much pressure on his head and        01:24:08

 6    torso area, where he might not be able to breathe?

 7         A.   Again, a lot of things are going through

 8    my mind.  I don't remember if that went through my

 9    mind at the time.

10         Q.   So as far as you're concerned, you don't        01:24:23

11    remember ever having any concerns or anything going

12    through your mind about whether Jacob Bauer could

13    breathe adequately; is that correct?

14         MR. BLECHMAN:  Misstates the witness'

15    testimony.                                                01:24:35

16             But go ahead.

17         THE WITNESS:  No, that's not what I said.  I

18    said I don't recall seeing or having that thought go

19    through my mind, about them having pressure on his

20    head or neck like -- I think that's what the              01:24:52

21    question was before.

22    BY MR. GWILLIAM:

23         Q.   Let me try the question again.

24             At any time during the encounter, up until

25    the time the paramedics came on, did you have any         01:25:02
```

Page 116

1    concern about pressure being placed on Jacob Bauer's          01:25:09
2    body, head, or neck that might impede his breathing?
3        A.   Again, I can't remember what was going
4    through my mind at that time.
5        Q.   Okay.  So you don't know one way or            01:25:22
6    another whether you thought about that.  Is that
7    your testimony?
8        A.   Again, I don't remember that going through
9    my mind.
10       Q.   Are you trained in circumstances where         01:25:32
11   there might be pressure on a person's neck or body
12   that they have to be concerned about whether they
13   can breathe?
14       A.   Could you be specific about what kind of
15   training?                                              01:25:48
16       Q.   Well, have you had any training about --
17   concerning a subject who is being restrained by
18   police having concerns about being able to breathe?
19       A.   Absolutely.  There's always a concern for
20   that.                                                  01:26:03
21       Q.   And that's something you've been trained
22   on?
23       A.   That's something we're trained on.
24       Q.   Tell me a little more about what your
25   recollection is about your training as it regards to   01:26:12

Page 117

```
 1        Q.   I mean, that's the kind of thing you would      01:27:20

 2   be trained to avoid, the George Floyd situation.

 3             Would you agree with that?

 4        A.   Agree.

 5        Q.   Okay.  But again, getting back to here,         01:27:27

 6   you never had any specific concern about whether

 7   Jacob Bauer could breathe up until the time he was

 8   in the care of the paramedics.

 9             Am I correct about that?

10        A.   What I said was, I do not recall if one of      01:27:42

11   those thoughts came to my mind at the time.

12        Q.   Well, you certainly didn't do anything

13   about it; correct?

14        MR. BLECHMAN:  Argumentative.

15             Go ahead.                                       01:27:54

16             Vague and ambiguous as to "it."

17        THE WITNESS:  At the -- based on your question,

18   no.

19   BY MR. GWILLIAM:

20        Q.   All right.  Was a spit mask placed on him?      01:28:09

21        A.   Yes.

22        Q.   Why was that placed on him?

23        A.   Because he was bleeding and he had bitten

24   Officer Chin.

25        Q.   Are there certain restrictions and rules        01:28:21
```

Page 119

1    about the appropriate placing of spit masks on          01:28:23

2    subjects?

3         A.   Yes.

4         Q.   And what are those, as you understand it,

5    in terms of any counter considerations to using it?     01:28:30

6         A.   So there's some parameters.  One is make

7    sure it's placed in a position so you still breathe.

8    Obviously, you're not going to apply it to someone

9    who is throwing up or you need to remove it to not

10   restrict their breathing.  Those are some -- without    01:28:55

11   looking at probably specific, but come to the top of

12   my mind.

13        Q.   Would you consider that one of the

14   considerations that would indicate you should not

15   place a spit mask on a subject is if, in fact,          01:29:06

16   they're having difficulty breathing?

17        MR. BLECHMAN:   Incomplete hypothetical, vague

18   and ambiguous as to "difficulty breathing."

19           Go ahead.

20        THE WITNESS:   Yes, it could.                       01:29:19

21   BY MR. GWILLIAM:

22        Q.   Okay.  And do you know whether or not, at

23   the time the spit mask was placed on Jacob Bauer,

24   whether he had had any difficulty breathing up to

25   that point?                                             01:29:27

                                                    Page 120

1          MR. BLECHMAN:  Calls for speculation, calls for        01:29:28

2     expert testimony.

3               Go ahead.

4          THE WITNESS:  I don't know.

5     BY MR. GWILLIAM:                                            01:29:33

6          Q.   Wasn't it pretty obvious that his

7     breathing was labored and difficult as a result of

8     this encounter by the time you put the spit mask on

9     him?

10         MR. BLECHMAN:  Calls for expert testimony,             01:29:44

11    calls for speculation and lacks foundation of this

12    witness.

13         THE WITNESS:  Again, I don't -- I don't know

14    what the -- whether or not it was labored.

15    BY MR. GWILLIAM:                                            01:29:58

16         Q.   Well, you were watching him.

17              Didn't you -- couldn't you tell that he

18    was having labored and difficult breathing at some

19    stage during this encounter?

20         MR. BLECHMAN:  Same objections.                        01:30:07

21              Go ahead.

22         THE WITNESS:  I don't recall him having.

23    BY MR. GWILLIAM:

24         Q.   Okay.  Let me change the subject.

25              During the time that you were supervising        01:30:15

Page 121

1   the scene out there, did any of the officers under        01:30:17

2   your supervision employ what you call distractionary

3   blows?

4        A.   Yes.

5        Q.   And who did that?                                01:30:29

6        A.   Officer Chin and Officer Trovao.

7        Q.   Did you observe those distractionary

8   blows?

9        A.   I did.

10        Q.   Both of them?                                    01:30:44

11        A.   I believe I recall both of them, but . . .

12        Q.   Have you been trained in the use of

13   so-called distractionary blows and how they should

14   be used?

15        MR. BLECHMAN:   Incomplete hypothetical.              01:31:01

16            Go ahead.

17        THE WITNESS:   With distractionary blows, we can

18   use, per our use of force, tools which can be other

19   tools that we have on our -- it could be hands,

20   feet, it could be a flashlight, it could be           01:31:21

21   different --

22   BY MR. GWILLIAM:

23        Q.   All right.   Up until August 1st --

24        A.   I wasn't done.

25        Q.   I'm sorry.                                       01:31:31

                                              Page 122

```
 1        A.   So with these tools we have, we can, at        01:31:31

 2   times, use these as other means to gain compliance

 3   of a subject.

 4        Q.   Are they -- is the purpose of them to

 5   distract from something, as the term would imply?        01:31:46

 6        A.   Yes.

 7        Q.   All right.  And you've been trained in the

 8   appropriate use of these so-called distractionary

 9   blows; correct?

10        A.   I can't recall specific training.             01:32:02

11        Q.   Is not the appropriate use of a

12   distractionary blow to be a palm blow?

13        A.   Again, I can't recall specific --

14        Q.   Do you think it's appropriate that

15   somebody should hit somebody like Jacob Bauer with       01:32:16

16   their fists?

17        MR. BLECHMAN:  Incomplete hypothetical, vague

18   and ambiguous as to hit with the fist.

19             But go ahead.

20        THE WITNESS:  It depends on the situation and       01:32:27

21   it depends on the reasonableness of that force.

22   BY MR. GWILLIAM:

23        Q.   Do you think, under the circumstances of

24   this situation, Jacob Bauer being on the ground, at

25   least four or five officers on him at the time you       01:32:40
```

1    arrived, that it was appropriate for somebody to hit          01:32:43

2    him with their fist at that time?

3         MR. BLECHMAN:   Calls for expert testimony, it's

4    incomplete hypothetical, misstates the record, vague

5    and ambiguous, calls for speculation as well.                 01:32:55

6         Go ahead.

7         THE WITNESS:   At the time, yes.

8    BY MR. GWILLIAM:

9         Q.   Okay.  But in fact, Chin hit him directly

10   on his torso with his fist, did he not?                       01:33:08

11        A.   I don't recall directly where he hit him.

12        Q.   Well, I don't have that video pulled up,

13   but I'm pretty sure it's in Bennett's video where I

14   saw him directly hit him with the fist.  If that

15   happened, that would be inappropriate.  Would you             01:33:26

16   agree with that?

17        MR. BLECHMAN:   Calls for expert testimony,

18   lacks foundation, calls for speculation, incomplete

19   hypothetical.

20        Go ahead.                                                01:33:33

21        THE WITNESS:   I don't agree with that.

22   BY MR. GWILLIAM:

23        Q.   It was okay to hit him with the fist?

24        MR. BLECHMAN:   Same objections.

25        Go ahead.                                                01:33:40

                                                        Page 124

```
 1            (The following testimony is              01:38:15

 2            non-confidential:)

 3                        * * *

 4   BY MR. GWILLIAM:

 5       Q.   Do you think -- you're the supervisor at   01:38:17

 6   the situation out there.   Given the situation of

 7   Jacob Bauer being on the ground where he was, and

 8   where Trovao was, do you think he had any

 9   justification to hit Jacob Bauer with his baton?

10       MR. BLECHMAN:   Calls for expert testimony, it's  01:38:30

11   an incomplete hypothetical, calls for speculation of

12   this witness.

13            Do you want to do this part out of the

14   confidential?

15       MR. GWILLIAM:   Yeah, it is out of the          01:38:41

16   confidential.

17       MR. BLECHMAN:   This last question and answer is

18   now out of the confidential.

19            You can respond.

20   BY MR. GWILLIAM:                                    01:38:46

21       Q.   Do you need the question read to you

22   again?

23       A.   Do I believe it was justified that he

24   struck Mr. Bauer --

25       Q.   With a baton --                            01:38:54
```

Page 130

1        A.   -- with a baton?                                01:38:55

2        Q.   -- under the circumstances that it

3    happened.

4        A.   That it happened.

5        MR. BLECHMAN:  Same objection.                        01:38:59

6             Go ahead.

7        THE WITNESS:  Under the circumstances, yes.

8    BY MR. GWILLIAM:

9        Q.   Why?

10       A.   Because he was actively resisting.  He was       01:39:07

11   combative.

12       Q.   And what do you think that hitting him

13   with --

14       MR. BLECHMAN:  Were you finished?

15   BY MR. GWILLIAM:                                          01:39:15

16       Q.   I'm sorry.  I didn't mean to interrupt

17   you.  Apologize.  I don't want to interrupt you.  I

18   want to hear your testimony.

19       A.   That's all right.  I lost my train of

20   thought.                                                  01:39:25

21       Q.   Had you finished your answer?

22       A.   I did now.

23       Q.   What purpose was there to be accomplished

24   by Trovao hitting him with his baton?

25       MR. BLECHMAN:  Calls for speculation of this          01:39:34

                                                  Page 131

```
1    testified to.  This is a -- a baton to the head, and        01:43:48

2    I don't know if Officer Trovao said he struck him in

3    the head.  So is it appropriate, a head strike?  I

4    don't know.  Based on what was going on, what he

5    saw, what his frame of mind was.  Was it accidental?        01:44:07

6    There's a lot of things that come into play.  Was he

7    aiming for the shoulder?  I can't answer that

8    question.

9    BY MR. GWILLIAM:

10        Q.   Well, you used the word "head strikes" in         01:44:19

11   your statement.

12             Didn't you mean by that that he hit him in

13   his head?

14        A.   Again, I'm not referring to his baton.

15        Q.   So you think he hit him with his fist in         01:44:31

16   his head?

17        A.   Possibly.

18        Q.   Do you know what he hit him with in his

19   head?

20        A.   I did not see him hit him with the baton.        01:44:41

21   Like I said previously in my statement, I believe he

22   was using -- he used his hands.  And I said it looks

23   like he gave him two head strikes, distraction

24   blows.

25        Q.   How many of the videos have you reviewed          01:44:57
```

Page 136

Aiken Welch, A Veritext Company
510-451-1580

```
 1    and make sure that they did not use excessive force.        01:46:20

 2            Would you agree with me?

 3        A.    I agree.

 4        Q.    Okay.   And if, in fact, Officer Trovao hit

 5    him in the head with a baton, that would be               01:46:29

 6    excessive force, would it not?

 7        A.    It could be, yes.

 8        MR. BLECHMAN:   Hold on.

 9            Calls for expert testimony, incomplete

10    hypothetical, lacks foundation.                          01:46:38

11            Go ahead.

12        THE WITNESS:   Yes, it could be.

13    BY MR. GWILLIAM:

14        Q.    Okay.   Do you think that you did a good

15    job in overseeing these officers at the scene here,      01:46:47

16    in retrospect?

17        A.    In retrospect, I think I did a good job

18    for a three-week supervisor.   Having the luxury of

19    having two senior officers, yes.

20        Q.    Would you have done anything different,        01:47:05

21    now that you've kind of had a chance to think back

22    on it and have a little more experience?

23        MR. BLECHMAN:   Calls for speculation.

24    BY MR. GWILLIAM:

25        Q.    In terms of overseeing these officers?         01:47:14
```

Page 138

```
 1              (Video played.)                          01:55:37

 2        MR. GWILLIAM:  Okay, stop it there.

 3   BY MR. GWILLIAM:

 4        Q.   They appear to be trying to roll him over.

 5   Do I understand what they're doing there?          01:56:05

 6        A.   Yeah, I believe they're trying to roll him

 7   over to get him into the leg restraint.

 8        Q.   Okay.  Why would they need to roll him

 9   over to get him into the wrap restraint?

10        A.   Well, I'm not sure if it's applied at this  01:56:21

11   point or not.  So you apply knees down and then you

12   roll them over to apply the support chest piece.

13        Q.   So about this point, which the video says

14   it's 8:10, do you think it would have been a good

15   idea to step back and maybe just let this guy sit up  01:56:44

16   and breathe and reassess the situation?

17        MR. BLECHMAN:  Calls for speculation,

18   incomplete hypothetical.

19            Go ahead.

20        THE WITNESS:  I don't know.                    01:56:57

21        MR. GWILLIAM:  Okay, let's move it along.

22            (Video played.)

23        MR. GWILLIAM:  Stop here.

24   BY MR. GWILLIAM:

25        Q.   This is you speaking?                     01:57:29
```

                                                    Page 146

```
 1              I, the undersigned, a Certified Shorthand
 2     Reporter of the State of California, do hereby
 3     certify:
 4              That the foregoing proceedings were taken
 5     before me at the time and place herein set forth;
 6     that any witnesses in the foregoing proceedings,
 7     prior to testifying, were administered an oath; that
 8     a record of the proceedings was made by me using
 9     machine shorthand which was thereafter transcribed
10     under my direction; that the foregoing transcript is
11     a true record of the testimony given.
12              Further, that if the foregoing pertains to
13     the original transcript of a deposition in a Federal
14     Case, before completion of the proceedings, review
15     of the transcript ( ) was (X) was not requested.
16              I further certify that I am neither
17     financially interested in the action nor a relative
18     or employee of any attorney of any party to this
19     action.
20              IN WITNESS WHEREOF, I have this date
21     subscribed my name.
22     Dated:  September 22, 2020
23
24
25              ANRAE WIMBERLEY, CSR No. 7778
```

Page 188