EXHIBIT H

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                San Francisco Division

4

5   JOHN BAUER, an individual and

6   as Successor in Interest of

7   Jacob Bauer, deceased; ROSE

8   BAUER, an individual and as

9   Successor in Interest of Jacob

10  Bauer, deceased,

11                    Plaintiffs,

12      vs.                    No. 3:19-cv-04593-LB

13  CITY OF PLEASANTON; BRADLEE

14  MIDDLETON; JONATHAN CHIN;

15  RICHARD TROVAO; STEVEN BENNETT;

16  ALEX KOUMISS; JASON KNIGHT;

17  MARTY BILLDT; DAVID SPILLER;

18  and DOES 1 to 50, inclusive,

19                    Defendants.
    _____/

20              DEPOSITION OF JASON KNIGHT

21                 Oakland, California

22              Thursday, October 8, 2020

    Reported by:

23  Natalie Y. Botelho

24  CSR No. 9897

25  Job No. 4262017

                                        Page 1

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                San Francisco Division

4

5    JOHN BAUER, an individual and

6    as Successor in Interest of

7    Jacob Bauer, deceased; ROSE

8    BAUER, an individual and as

9    Successor in Interest of Jacob

10   Bauer, deceased,

11                   Plaintiffs,

12      vs.                      No. 3:19-cv-04593-LB

13   CITY OF PLEASANTON; BRADLEE

14   MIDDLETON; JONATHAN CHIN;

15   RICHARD TROVAO; STEVEN BENNETT;

16   ALEX KOUMISS; JASON KNIGHT;

17   MARTY BILLDT; DAVID SPILLER;

18   and DOES 1 to 50, inclusive,

19                   Defendants.
     _____/

20           Videotaped deposition of JASON KNIGHT,

21   taken on behalf of Plaintiffs, at 1999 Harrison

22   Street, Suite 1600, Oakland, California, beginning

23   at 9:43 a.m. and ending at 11:54 a.m. on Thursday,

24   October 8, 2020, before NATALIE Y. BOTELHO,

25   Certified Shorthand Reporter No. 9897.

                                           Page 2

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:

 4            GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
                BY:  J. GARY GWILLIAM, ESQ.

 5            1999 Harrison Street, Suite 1600
                Oakland, CA  94612

 6            (510)832-5411
                ggwilliam@giccb.com

 7

 8    For Defendants:

 9            McNAMARA, NEY, BEATTY, SLATTERY, BORGES &
                AMBACHER, LLP

10            BY:  NOAH BLECHMAN, ESQ.
                3480 Buskirk Avenue, Suite 250

11            Pleasant Hill, CA  94523
                (925)939-5330

12            noah.blechman@mcnamaralaw.com

13    ALSO PRESENT:

14            BRITTANY SMITH, law clerk

15            LINDA LIM, paralegal

16            TED HOPPE, Videographer

17            RICHARD TROVAO

18

19                    ---oOo---

20

21

22

23

24

25
```

Page 3

```
 1                         INDEX
 2   WITNESS                                    PAGE
 3   Jason Knight
 4
 5   EXAMINATION
 6   By Mr. Gwilliam                              6
 7
 8                      ---oOo---
 9
10                   E X H I B I T S
11   NUMBER              DESCRIPTION           PAGE
12   Exhibit 18    The body cam video of Sergeant   102
                   Knight, PPD 390
13
     Exhibit 19    A video clip, PPD 273         102
14
15                      ---oOo---
16
17      REFERENCE TO PREVIOUSLY MARKED EXHIBITS
18   NUMBER              DESCRIPTION           PAGE
19   Exhibit 8     Pleasanton Police Department,    46
                   Call For Service Detail
20                 Report - DFS 287, Bates
                   PPD002468 through PPD002486
21
     Exhibit 12    Pleasanton Police Department,    92
22                 Pleasanton PD Policy Manual,
                   Use of Force, Bates PPD000440
23                 through PPD000464
24
25                      ---oOo---
```

Page  4

| | | |
|---|---|---|
| 1 | Oakland, California, Thursday, October 8, 2020 | 09:20:55 |
| 2 | 9:43 a.m. | 09:20:55 |
| 3 | | 09:20:55 |
| 4 | PROCEEDINGS | 09:20:55 |
| 5 | THE VIDEOGRAPHER:  Video is rolling, so | 09:43:04 |
| 6 | let's begin.  Good morning.  We are going on the | 09:43:06 |
| 7 | record.  The time now is 9:43 on October 8th, 2020. | 09:43:09 |
| 8 | This is media unit 1 in the video recorded | 09:43:15 |
| 9 | deposition of Jason Knight, in the matter of John | 09:43:18 |
| 10 | Bauer, et al. versus the City of Pleasanton, et al., | 09:43:23 |
| 11 | filed in the United States District Court, Northern | 09:43:26 |
| 12 | District of California, San Francisco Division, Case | 09:43:32 |
| 13 | No. 3:19-CV-04593-LB.  This video deposition is | 09:43:36 |
| 14 | taking place at 1999 Harrison Street in Oakland, | 09:43:47 |
| 15 | California. | 09:43:50 |
| 16 | Counsel, could you please voice identify | 09:43:53 |
| 17 | yourselves and state whom you represent. | 09:43:55 |
| 18 | MR. GWILLIAM:  Yes.  I'm Gary Gwilliam, | 09:43:58 |
| 19 | representing the plaintiffs in this matter.  And | 09:44:00 |
| 20 | with me I have Linda Lim and Brittany Smith from my | 09:44:02 |
| 21 | office. | 09:44:06 |
| 22 | MR. BLECHMAN:  Noah Blechman, on behalf of | 09:44:08 |
| 23 | the defendants, and also present is Defendant | 09:44:10 |
| 24 | Officer Trovao. | 09:44:12 |
| 25 | THE VIDEOGRAPHER:  Very good.  My name is | 09:44:17 |

| | | |
|---|---|---|
| 1 | Ted Hoppe.  I'm the videographer. | 09:44:18 |
| 2 | Natalie, could you please swear the | 09:44:19 |
| 3 | witness in. | 09:44:21 |
| 4 | | 09:44:21 |
| 5 | JASON KNIGHT, | 09:44:21 |
| 6 | having been administered an oath, was examined and | 09:44:21 |
| 7 | testified as follows: | 09:44:21 |
| 8 | | 09:44:21 |
| 9 | THE VIDEOGRAPHER:  Please proceed. | 09:44:30 |
| 10 | EXAMINATION BY MR. GWILLIAM | 09:44:30 |
| 11 | MR. GWILLIAM:  Q.  Would you state your | 09:44:31 |
| 12 | full name and address for the record, Sergeant | 09:44:32 |
| 13 | Knight? | 09:44:33 |
| 14 | A.      Jason Jonathan Knight. | 09:44:36 |
| 15 | (Address was stated by the witness and | 09:44:38 |
| 16 | redacted per stipulation of counsel). | 09:44:38 |
| 17 | MR. BLECHMAN:  Well, let's strike that. | 09:44:42 |
| 18 | THE WITNESS:  Sorry. | 09:44:44 |
| 19 | MR. BLECHMAN:  That could be his personal | 09:44:44 |
| 20 | address.  That's -- | 09:44:46 |
| 21 | THE WITNESS:  Correct. | 09:44:46 |
| 22 | MR. BLECHMAN:  -- not appropriate.  So why | 09:44:46 |
| 23 | don't you -- going to move to strike that part of | 09:44:48 |
| 24 | the record.  Do you agree with we can strike his | 09:44:50 |
| 25 | address? | 09:44:52 |

Page 6

| | | |
|---|---|---|
| 1 | A.        Less than five.  Maybe less than three. | 10:07:17 |
| 2 | Q.        Okay.  And when you arrived at the scene, | 10:07:19 |
| 3 | who was there? | 10:07:22 |
| 4 | A.        Middleton, Chin. | 10:07:28 |
| 5 | Q.        Trovao? | 10:07:34 |
| 6 | A.        I'd have to watch the video again.  I | 10:07:36 |
| 7 | don't remember that. | 10:07:38 |
| 8 | Q.        Okay.  Was Marty Billdt there at the time | 10:07:39 |
| 9 | you arrived? | 10:07:42 |
| 10 | A.        We got there about the same time. | 10:07:43 |
| 11 | Q.        All right. | 10:07:45 |
| 12 | A.        Sorry. | 10:07:45 |
| 13 | MR. BLECHMAN:  It's okay.  Just let him | 10:07:45 |
| 14 | finish his question before you answer, and he'll do | 10:07:47 |
| 15 | the same -- | 10:07:50 |
| 16 | THE WITNESS:  My bad. | 10:07:51 |
| 17 | MR. BLECHMAN:  -- for you.  That's okay. | 10:07:53 |
| 18 | We're going a little fast, so... | 10:07:53 |
| 19 | MR. GWILLIAM:  If we're speaking too fast, | 10:07:55 |
| 20 | let us know. | 10:07:55 |
| 21 | (Discussion off the record.) | 10:08:19 |
| 22 | MR. GWILLIAM:  Q.  How would you describe | 10:08:26 |
| 23 | your role at the scene?  When I read your statement, | 10:08:27 |
| 24 | I thought at one time you said you were sort of a | 10:08:32 |
| 25 | supervisor or co-supervisor.  Can you describe for | 10:08:34 |

Page 29

| | | |
|---|---|---|
| 1 | me in your own words what you felt your role was | 10:08:36 |
| 2 | there at the scene from the time you arrived until | 10:08:40 |
| 3 | the time they put Mr. Bauer in the ambulance? | 10:08:42 |
| 4 | A.        Well, I'm obviously supervisor on scene. | 10:08:48 |
| 5 | However, on that situation, I believed that we were | 10:08:50 |
| 6 | going to have a use-of-force issue.  I mean, we | 10:08:55 |
| 7 | were.  And that it would have been a good | 10:08:57 |
| 8 | opportunity for Sergeant Billdt to do the | 10:08:59 |
| 9 | administrative review. | 10:09:02 |
| 10 | Q.        Well, who would be the commander?  Who | 10:09:07 |
| 11 | would be the person in charge, as far as you're | 10:09:10 |
| 12 | concerned, if there was one person in charge of the | 10:09:12 |
| 13 | scene, from the time you arrived until the time he | 10:09:15 |
| 14 | died or he coded? | 10:09:19 |
| 15 | A.        I mean, we're all supervisors on scene, | 10:09:22 |
| 16 | myself, Sara Sua, and Billdt.  We were the ones that | 10:09:24 |
| 17 | are going to continue to communicate with each | 10:09:28 |
| 18 | other, and we're all the same rank, and we're going | 10:09:30 |
| 19 | to communicate with each other to make decisions. | 10:09:34 |
| 20 | That -- during the fluid situation. | 10:09:38 |
| 21 | Q.        Did you perceive that Marty Billdt was the | 10:09:41 |
| 22 | primary commander at the scene there? | 10:09:43 |
| 23 | MR. BLECHMAN:  Vague and ambiguous as to | 10:09:48 |
| 24 | "commander," but go ahead. | 10:09:49 |
| 25 | THE WITNESS:  Like I said, I think that | 10:09:52 |

Page 30

| | | |
|---|---|---|
| 1 | A.        I believe I asked him what type of call it | 10:17:15 |
| 2 | was. | 10:17:16 |
| 3 | Q.        And what point was this?  In the -- had | 10:17:18 |
| 4 | they handcuffed him at that stage? | 10:17:22 |
| 5 | A.        I don't know. | 10:17:24 |
| 6 | Q.        What did Billdt tell you about what kind | 10:17:27 |
| 7 | of call it was? | 10:17:28 |
| 8 | A.        I don't know.  I believe something to the | 10:17:31 |
| 9 | fact of vandalism. | 10:17:34 |
| 10 | Q.        Do you have any better recollection than | 10:17:39 |
| 11 | that? | 10:17:41 |
| 12 | A.        No, but I wasn't concerned at that time. | 10:17:41 |
| 13 | I remember that because we were dealing with a | 10:17:42 |
| 14 | subject who was in violation of 148, which is | 10:17:44 |
| 15 | actively resisting our officers.  So I looked at it | 10:17:47 |
| 16 | as we had a -- that crime going on. | 10:17:51 |
| 17 |         So we trust our officers to make decisions | 10:17:53 |
| 18 | on the street, and the officers made a decision.  I | 10:17:56 |
| 19 | responded from the station.  When I got there, there | 10:18:00 |
| 20 | was an active struggle.  They were trying to get him | 10:18:02 |
| 21 | into custody as safely and quickly as possible.  And | 10:18:04 |
| 22 | then we'll investigate after that where we're at. | 10:18:07 |
| 23 | Get him the medical attention and move forward. | 10:18:11 |
| 24 | Q.        Okay.  At any point up until he was put | 10:18:13 |
| 25 | into the ambulance, did you make your own assessment | 10:18:16 |

Page 38

| | | |
|---|---|---|
| 1 | as to whether or not he might have some severe | 10:18:20 |
| 2 | mental illness? | 10:18:23 |
| 3 | MR. BLECHMAN:   Calls for speculation, | 10:18:25 |
| 4 | lacks foundation, calls for expert testimony, vague | 10:18:26 |
| 5 | and ambiguous as to "severe mental illness."  Go | 10:18:29 |
| 6 | ahead. | 10:18:32 |
| 7 | THE WITNESS:   I wouldn't say I made a | 10:18:33 |
| 8 | determination it was severe mental illness.  I know | 10:18:35 |
| 9 | I mentioned to a lady walking into the grocery store | 10:18:38 |
| 10 | about a -- that he could be mentally ill, but I also | 10:18:43 |
| 11 | asked an officer -- I remember that on the video -- | 10:18:47 |
| 12 | saying, "What kind of drug do you think is on | 10:18:48 |
| 13 | board?"  So we're always actively investigating, but | 10:18:52 |
| 14 | I'm not a doctor, and we're looking at all those | 10:18:54 |
| 15 | scenarios. | 10:18:58 |
| 16 | MR. GWILLIAM:  Q.  I'm just getting into | 10:18:58 |
| 17 | your state of mind. | 10:19:00 |
| 18 | A.      Yeah. | 10:19:01 |
| 19 | Q.      You said you mentioned a lady.  Was that | 10:19:01 |
| 20 | when you went up to Raley's? | 10:19:03 |
| 21 | A.      Yes, sir. | 10:19:05 |
| 22 | Q.      Why did you go up to Raley's? | 10:19:05 |
| 23 | A.      To get water. | 10:19:07 |
| 24 | Q.      And was that after he was -- did he have | 10:19:08 |
| 25 | his wrap on?  What was going on at the time you went | 10:19:12 |

Page 39

| | | |
|---|---|---|
| 1 | up to Raley's for the water? | 10:19:16 |
| 2 | A.      I believe he had his wrap on and | 10:19:17 |
| 3 | paramedics were on scene. | 10:19:19 |
| 4 | Q.      And who was the lady you talked to at | 10:19:21 |
| 5 | Raley's? | 10:19:24 |
| 6 | A.      I don't know. | 10:19:25 |
| 7 | Q.      But did -- was it your encounter with that | 10:19:28 |
| 8 | woman at Raley's that first led you to believe that | 10:19:31 |
| 9 | you might be dealing with somebody that had a mental | 10:19:35 |
| 10 | illness? | 10:19:38 |
| 11 | A.      I think it was just a very generic | 10:19:39 |
| 12 | statement at the time. | 10:19:41 |
| 13 | Q.      What was the -- what's your best | 10:19:42 |
| 14 | recollection of what she said? | 10:19:44 |
| 15 | A.      She asked me, "What's going on?"  And we | 10:19:47 |
| 16 | get that a lot from citizens, and it's a fine line | 10:19:50 |
| 17 | between just giving a generic statement of "He's | 10:19:53 |
| 18 | having a mental crisis or he's going through a | 10:19:57 |
| 19 | mental issue." | 10:19:59 |
| 20 | Q.      So she said something about he seemed to | 10:20:01 |
| 21 | be in mental crisis or having a mental illness?  Is | 10:20:03 |
| 22 | that what you remember her saying? | 10:20:06 |
| 23 | A.      Some -- no.  I said that. | 10:20:07 |
| 24 | Q.      Why did you say that? | 10:20:09 |
| 25 | A.      She asked, "What's going on?" | 10:20:10 |

Page 40

| | | |
|---|---|---|
| 1 | Q.       She asked, "What's going on?" | 10:20:12 |
| 2 | A.       Mm-hmm. | 10:20:13 |
| 3 | Q.       And then you said there seemed to be a | 10:20:14 |
| 4 | mental illness issue? | 10:20:15 |
| 5 |          MR. BLECHMAN:   Misstates the witness's | 10:20:17 |
| 6 | testimony, but go ahead. | 10:20:18 |
| 7 |          THE WITNESS:   Something to that effect. | 10:20:19 |
| 8 |          MR. GWILLIAM:   Q.   Why did you say that? | 10:20:21 |
| 9 | A.       It was a generic statement at the time to | 10:20:22 |
| 10 | give her something, but be able to continue on my | 10:20:25 |
| 11 | day. | 10:20:28 |
| 12 | Q.       Let me see if I can do it again.   If I | 10:20:30 |
| 13 | understand correctly -- and again, if I'm wrong | 10:20:34 |
| 14 | about this, please -- I'm not trying to trick you or | 10:20:36 |
| 15 | put words in your mouth.   I'm just trying to | 10:20:38 |
| 16 | understand what's going -- you go up to Raley's for | 10:20:41 |
| 17 | water, you talk to this woman, and you tell her that | 10:20:45 |
| 18 | there's something going on that may involve a | 10:20:47 |
| 19 | mentally ill person?   Do I understand that | 10:20:50 |
| 20 | correctly? | 10:20:52 |
| 21 | A.       No, sir. | 10:20:53 |
| 22 | Q.       Okay.   What's -- what have I misstated | 10:20:53 |
| 23 | about that? | 10:20:56 |
| 24 | A.       As I'm walking in, I remember a lady | 10:20:57 |
| 25 | saying something about, "What's going on?"   I didn't | 10:21:00 |

Page 41

| | | |
|---|---|---|
| 1 | remember it at the time.  I watched my video and saw | 10:21:02 |
| 2 | it.  And I said something to the effect -- which I'm | 10:21:04 |
| 3 | sure you've seen -- that "He's going through a | 10:21:06 |
| 4 | mental crisis." | 10:21:08 |
| 5 | Q.      Okay. | 10:21:10 |
| 6 | A.      Something to that effect.  I don't know | 10:21:11 |
| 7 | the exact quote. | 10:21:12 |
| 8 | Q.      All right.  So Sergeant Knight, what I'm | 10:21:13 |
| 9 | trying to understand is, what made you believe in | 10:21:16 |
| 10 | your mind, when you talked to that woman, that Jacob | 10:21:18 |
| 11 | Bauer was having a mental crisis?  What had led you | 10:21:22 |
| 12 | to that conclusion? | 10:21:26 |
| 13 | A.      I didn't know for sure.  I'm not a doctor. | 10:21:27 |
| 14 | What I said was that was a generic statement to kind | 10:21:28 |
| 15 | of -- sometimes we let citizens -- we just kind of | 10:21:31 |
| 16 | push it away.  So they ask us a question, we say | 10:21:34 |
| 17 | "None of your business," that's very rude.  So | 10:21:37 |
| 18 | sometimes I'm not going to -- I didn't do a drug | 10:21:39 |
| 19 | test on him yet, so I'm not going to say he's on | 10:21:42 |
| 20 | drugs.  There was some sort of mental crisis at that | 10:21:45 |
| 21 | point that was possibly going on.  There was also | 10:21:48 |
| 22 | some sort of drug-induced issue that was possibly | 10:21:50 |
| 23 | going on, but I'm not going to -- I'm going to be | 10:21:52 |
| 24 | very generic for her because there's an ambulance | 10:21:55 |
| 25 | there. | 10:21:57 |

Page 42

| | | |
|---|---|---|
| 1 | Q. Well, I'm less interested in what you told | 10:21:58 |
| 2 | her -- | 10:22:00 |
| 3 | A. I get it. | 10:22:01 |
| 4 | Q. -- than what led you to believe there may | 10:22:01 |
| 5 | be a mental crisis. What had you observed or what | 10:22:04 |
| 6 | had anybody said to you that made you think there -- | 10:22:07 |
| 7 | that Jacob Bauer may be in a mental crisis? | 10:22:11 |
| 8 | A. I'm a almost 20-year police officer. | 10:22:14 |
| 9 | Q. Okay. But what facts? What did you | 10:22:17 |
| 10 | observe or see or hear that made you think he may be | 10:22:20 |
| 11 | in a mental crisis? | 10:22:23 |
| 12 | MR. BLECHMAN: I think it lacks foundation | 10:22:27 |
| 13 | that he believed he was in -- having a mental crisis | 10:22:28 |
| 14 | or whatnot, but you can respond. | 10:22:31 |
| 15 | THE WITNESS: I didn't believe it was a | 10:22:33 |
| 16 | mental crisis, nor did I believe it was | 10:22:34 |
| 17 | drug-induced. I believe it could have been both. | 10:22:36 |
| 18 | It could have been anything. The possibilities were | 10:22:38 |
| 19 | one of those two things. | 10:22:40 |
| 20 | MR. GWILLIAM: Q. What facts led you to | 10:22:41 |
| 21 | that conclusion? | 10:22:45 |
| 22 | A. The strength of the subject. How long it | 10:22:46 |
| 23 | took to handcuff him. | 10:22:47 |
| 24 | Q. Anything else? | 10:22:48 |
| 25 | A. There was a lot of factors. I mean, it's | 10:22:50 |

Page 43

| | | |
|---|---|---|
| 1 | not normal behavior to struggle with police officers | 10:22:52 |
| 2 | giving you lawful commands. | 10:22:56 |
| 3 | Q.      Okay.  Anything else? | 10:22:58 |
| 4 | A.      I'm sure there is.  Just not coming to my | 10:23:00 |
| 5 | head right now. | 10:23:03 |
| 6 | Q.      Does the fact that he was screaming and | 10:23:04 |
| 7 | yelling about Trump and killing him, did those | 10:23:06 |
| 8 | thoughts lead you to the conclusion you might be | 10:23:09 |
| 9 | dealing with somebody that was mentally ill? | 10:23:12 |
| 10 | A.      Possible. | 10:23:15 |
| 11 | Q.      I'm interested in something more than | 10:23:16 |
| 12 | possibilities.  I want to know if you came to that | 10:23:18 |
| 13 | conclusion in your mind before you went to Raley's, | 10:23:19 |
| 14 | that you were dealing with somebody who's mentally | 10:23:21 |
| 15 | ill, in part because of the way he was screaming and | 10:23:24 |
| 16 | yelling. | 10:23:27 |
| 17 | A.      I didn't make any conclusions in my mind | 10:23:28 |
| 18 | at that time, no. | 10:23:29 |
| 19 | Q.      Did you think that it was important for | 10:23:30 |
| 20 | you to make a decision as to whether you were | 10:23:32 |
| 21 | dealing with somebody who was mentally ill or some | 10:23:34 |
| 22 | violent felon? | 10:23:37 |
| 23 | A.      We were going to get to that point, yes. | 10:23:38 |
| 24 | Q.      When do you get to that point? | 10:23:41 |
| 25 |         MR. BLECHMAN:  Argumentative, but go | 10:23:44 |

Page 44

```
 1    ahead.  You can respond.  It's also incomplete        10:23:45

 2    hypothetical.                                          10:23:49

 3              THE WITNESS:  Please ask the question        10:23:52

 4    again.                                                 10:23:53

 5              MR. GWILLIAM:  Q.  Yeah, you said, "We're     10:23:53

 6    going to get to that point later."  I want to know     10:23:54

 7    when -- did you intend to get to that point after he   10:23:56

 8    was taken to the hospital?  Is that when you --        10:23:59

 9    A.        So the first -- I'm sorry.  Are you done?    10:24:02

10    Q.        Please go ahead.                             10:24:03

11    A.        So the first step, again, is to get him      10:24:04

12    into custody as quickly and safely as possible.  The   10:24:06

13    second step is to get medical attention there, which   10:24:09

14    was there monitoring him at the time.  And then the    10:24:11

15    third step would be whether or not we're going to      10:24:13

16    have a criminal act, which is going to be based on      10:24:15

17    investigating the vandalism, investigating the 148,    10:24:18

18    which is -- you know, the 148 issue.  And then after   10:24:23

19    that, while this is all going on and we're             10:24:26

20    investigating, we're also going to deal with this --   10:24:30

21    doing a psychiatric evaluation.                        10:24:31

22    Q.        So when did you think that you needed to     10:24:35

23    do that so-called psychiatric evaluation?             10:24:37

24    A.        Psychiatric evaluation is going to be done   10:24:43

25    once the scene is secure.                              10:24:46
```

                                              Page 45

| | | |
|---|---|---|
| 1 | Q.        At any time up until the time he was put | 10:24:55 |
| 2 | in the ambulance, did you feel, as a supervisor at | 10:24:59 |
| 3 | the scene, that you needed to do anything to | 10:25:03 |
| 4 | deescalate the acts of the officers that were | 10:25:05 |
| 5 | working -- that were trying to restrain him? | 10:25:11 |
| 6 |         MR. BLECHMAN:   Vague and ambiguous as to | 10:25:15 |
| 7 | "deescalate."  Vague as to time.  Go ahead. | 10:25:15 |
| 8 |         THE WITNESS:   No, sir. | 10:25:24 |
| 9 |         MR. GWILLIAM:   Q.   Why not? | 10:25:26 |
| 10 | A.        Because they have a right to, you know, | 10:25:28 |
| 11 | prevent escape.  They have a right to effect an | 10:25:30 |
| 12 | arrest and to overcome his resistance, and that's | 10:25:34 |
| 13 | what they were doing. | 10:25:36 |
| 14 | Q.        All right.  Well, up until the time that | 10:25:37 |
| 15 | he was placed into the ambulance, did you observe | 10:25:40 |
| 16 | anything that concerned you about the use of force | 10:25:43 |
| 17 | on Jacob Bauer? | 10:25:46 |
| 18 | A.        No, sir. | 10:25:47 |
| 19 | Q.        Okay.  The first exhibit that I want to | 10:25:58 |
| 20 | just go over with you for a minute is the -- this is | 10:26:00 |
| 21 | an Exhibit 8 that we've used before.  You said | 10:26:04 |
| 22 | you've looked at it.  I'm going to -- this is -- for | 10:26:07 |
| 23 | the record, this is Exhibit 8 we've used in another | 10:26:09 |
| 24 | deposition. | 10:26:11 |
| 25 |         It doesn't need to be remarked.  We're | 10:26:26 |

Page 46

```
 1    using the same one.  It's got the Exhibit 8 stamp on      10:26:27

 2    it, so..                                                   10:26:27

 3            You guys -- you're okay with this?                 10:26:30

 4            MR. BLECHMAN:  Yeah.  I'll take an extra           10:26:31

 5    copy, if you don't mind, actually, since you have          10:26:36

 6    one handy.  Thank you.                                     10:26:38

 7            MR. GWILLIAM:  Q.  You said you've                 10:26:43

 8    reviewed Exhibit 8 before; is that right?                  10:26:44

 9    A.      It's been several weeks, sir.                      10:26:46

10    Q.      Okay.  From your perspective, tell me what         10:26:49

11    Exhibit 8 is, as you would describe it.                    10:26:53

12    A.      Computer-aided dispatch notes.                     10:26:59

13    Q.      Okay.  At the time you arrived at the              10:27:01

14    scene, did you have access to the information that         10:27:04

15    was on the dispatch?                                       10:27:07

16    A.      No, sir.                                           10:27:09

17    Q.      Could you have had access to it if you             10:27:11

18    wanted at that time?                                       10:27:13

19    A.      No, sir.                                           10:27:14

20    Q.      Why not?                                           10:27:15

21    A.      I didn't have my laptop with me.                   10:27:16

22    Q.      Do you need to have your laptop to access          10:27:20

23    this information?                                          10:27:22

24    A.      Possibly could access it from another             10:27:25

25    vehicle.                                                   10:27:26
```

Aiken Welch, A Veritext Company
510-451-1580

1    Q.        Why did you not have your laptop with you?            10:27:28

2    A.        Because it was a Code 3 cover call, and my            10:27:30

3    main concern at that point was the safety of the               10:27:32

4    officers.                                                       10:27:34

5    Q.        Did you ever review this up until the time           10:27:36

6    he was put in the ambulance?                                   10:27:38

7    A.        No, sir.                                             10:27:40

8    Q.        When was the first time you reviewed the            10:27:40

9    dispatch information on Exhibit 8?                             10:27:43

10   A.        I don't recall.                                     10:27:46

11   Q.        Did you ever talk to anybody about what            10:27:49

12   was -- what dispatch had said about Jacob Bauer's             10:27:51

13   conduct?                                                      10:27:59

14   A.        No, sir.                                            10:27:59

15   Q.        Before he was put in the ambulance?   No?          10:28:01

16   A.        Say it again.                                      10:28:05

17   Q.        Before Jacob Bauer was put in the                  10:28:06

18   ambulance, did you talk to anybody about the                 10:28:08

19   information in the dispatch?                                  10:28:11

20   A.        Not that I recall.                                 10:28:17

21   Q.        So, for example, if you look at this on            10:28:19

22   page -- there's -- 2470, there's a comment down              10:28:23

23   there, 2:45.  It's just at the bottom.  It says,             10:28:26

24   "Subject is ranting to himself."  Do you see that?           10:28:30

25   A.        How many lines down?  I'm sorry.                   10:28:35

Page 48

```
 1    Q.        It's your job to understand that.  You've      10:31:34

 2    been trained about learning about whether people         10:31:37

 3    might be mentally ill on the streets.  Isn't that        10:31:39

 4    part of what your job is?                                10:31:42

 5    A.        Yes, sir.                                      10:31:43

 6    Q.        Okay.  And did you believe it was part of      10:31:43

 7    your job on August 1st, '18 to determine whether or      10:31:46

 8    not you were dealing with somebody that might be         10:31:48

 9    mentally ill?                                            10:31:51

10    A.        It's always --                                 10:31:52

11             MR. BLECHMAN:  Incomplete hypothetical,         10:31:53

12    but go ahead.                                            10:31:54

13             THE WITNESS:  It's always part of our job,      10:31:55

14    but it depends on the situation.  Like I mentioned       10:31:56

15    before, getting the subject into custody as quickly      10:32:00

16    and safely as possible is the No. 1 concern.  After      10:32:04

17    that, medical, and then after that, the evaluation.      10:32:07

18             MR. GWILLIAM:  Q.  You've said that.  Let       10:32:11

19    me ask my question again.                                10:32:12

20    A.        I'm --                                         10:32:13

21    Q.        Did you feel on August 1st, '18, before he     10:32:16

22    was put in the ambulance, that it was your job, as a     10:32:18

23    supervising sergeant on the scene, to make your own      10:32:21

24    determination as to whether you were dealing with        10:32:25

25    somebody that you thought was mentally ill?              10:32:27
```

                                                    Page 52

```
 1            MR. BLECHMAN:  Incomplete hypothetical, it    10:32:29
 2    calls for speculation, lacks foundation of this       10:32:31
 3    witness, vague and ambiguous as to "mentally ill."    10:32:34
 4    But go ahead.                                         10:32:37
 5            THE WITNESS:  I'm going to need it again,      10:32:38
 6    sir.  I'm sorry.                                       10:32:39
 7            MR. GWILLIAM:  Q.  Well, your counsel is       10:32:41
 8    making a lot of objections, and I think I've said     10:32:43
 9    before, you should ignore those objections, unless    10:32:48
10    he specifically instructs you not to answer.  So      10:32:50
11    he's making a lot of objections for the record,       10:32:55
12    which is his right, but I want to make sure you       10:32:57
13    understand the question.  So I'd like the reporter,   10:33:01
14    if she could, to read the question back to you.       10:33:02
15        (Record read.)                                    10:33:22
16            THE WITNESS:  No.                              10:33:24
17            MR. BLECHMAN:  Same objections, and vague     10:33:24
18    as to time.                                           10:33:25
19            THE WITNESS:  No, sir.                         10:33:26
20            MR. GWILLIAM:  Q.  Why not?                    10:33:27
21    A.      I need you to ask -- I'm sorry.  Can you       10:33:35
22    ask it again?                                          10:33:37
23        (Record read.)                                     10:33:56
24            THE WITNESS:  No, sir.                          10:33:57
25            MR. GWILLIAM:  Q.  Why not?                     10:33:58
```

Page 53

| | | |
|---|---|---|
| 1 | MR. GWILLIAM:  Okay.  I think you're | 10:36:17 |
| 2 | right. | 10:36:17 |
| 3 | MR. BLECHMAN:  Because I keep pretty | 10:36:17 |
| 4 | decent notes on that, let the record reflect. | 10:36:19 |
| 5 | MR. GWILLIAM:  All right.  So for the | 10:36:23 |
| 6 | record, then, we're -- we'll be referring to it as | 10:36:24 |
| 7 | Exhibit 18 for the video, which we can talk about | 10:36:26 |
| 8 | the logistics of how you take that. | 10:36:29 |
| 9 | MS. LIM:  Do we mind going off the record | 10:36:34 |
| 10 | so we can chat?  The reason is that the deposition, | 10:36:36 |
| 11 | the reporter marked -- | 10:36:39 |
| 12 | MR. BLECHMAN:  Let's go off the record. | 10:36:40 |
| 13 | That's fine. | 10:36:40 |
| 14 | THE VIDEOGRAPHER:  Give me a second. | 10:36:47 |
| 15 | Going off the record, the time now is 10:36. | 10:36:47 |
| 16 | (Recess taken from 10:36 a.m. to | 10:50:08 |
| 17 | 10:51 a.m.) | 10:50:08 |
| 18 | THE VIDEOGRAPHER:  Video is rolling.  Back | 10:51:20 |
| 19 | on the record.  The time now is 10:51. | 10:51:21 |
| 20 | MR. GWILLIAM:  Okay.  For the record, we | 10:51:25 |
| 21 | were right.  This will be Exhibit 18.  So it will be | 10:51:27 |
| 22 | a new exhibit number for Sergeant Knight's video | 10:51:31 |
| 23 | from his video cam.  Okay? | 10:51:39 |
| 24 | Q.    All right.  So let's get started on this. | 10:51:42 |
| 25 | You probably saw me do with this Marty Billdt, but | 10:51:44 |

Page 56

```
 1    video.                                          11:06:24

 2              (Whereupon the video marked as Exhibit 18   11:06:25

 3         was played.)                                11:06:25

 4              MR. GWILLIAM:  Stop it.  So the taser shot  11:07:10

 5    was before -- let me go off the record for a second.  11:07:13

 6              THE VIDEOGRAPHER:  Going off the record,  11:07:17

 7    the time now is 10 -- or 11:07.                 11:07:17

 8              (Discussion off the record.)           11:10:45

 9              THE VIDEOGRAPHER:  Video is rolling.  Back  11:10:48

10    on the record.  The time now is 11:10.          11:10:50

11              MR. GWILLIAM:  Q.  So Sergeant Knight,  11:10:52

12    what we've done when we were off the record is we  11:10:53

13    have taken one clip of video 273, which we think may  11:10:56

14    be Officer Trovao's video.  But I want to show you  11:11:01

15    that.  It shows some of the use of the tasers.  So  11:11:05

16    we'll just go through this and then I'll ask you a  11:11:07

17    few questions about that.  Okay?                11:11:09

18    A.        Yes, sir.                             11:11:11

19    Q.        That's where we are.  Okay.           11:11:11

20              So let's go ahead, then, and then run  11:11:13

21    this.  For the record, this will be Exhibit 19.  And  11:11:15

22    we'll send you that video clip.  And we'll get that  11:11:19

23    clip to you in the same form, Noah.  Okay?      11:11:22

24              MR. BLECHMAN:  Okay.                   11:11:25

25              (Whereupon the video marked as Exhibit 19   11:11:54
```

Page 72

1          was played.)                                    11:11:54

2                  MR. GWILLIAM:  Stop it right there.      11:12:24

3    Q.      Now, do you see -- this is -- for the          11:12:25

4    record, this is 1 point -- 1 and 51 seconds into       11:12:28

5    this video 273.  Do you see the tasers being used      11:12:33

6    there?  Were you present when that happened,           11:12:36

7    Sergeant Knight; do you know?                          11:12:38

8                  MR. BLECHMAN:  Well, hold on.  It assumes 11:12:40

9    facts not in evidence, that tasers are being used      11:12:42

10   there.  You can respond.                               11:12:44

11                 MR. GWILLIAM:  Q.  Do you agree that this 11:12:47

12   appears to show the use of some tasers on Jacob        11:12:49

13   Bauer?                                                 11:12:52

14   A.      No, sir.                                       11:12:53

15   Q.      What do you think it shows?  You don't         11:12:53

16   think it shows --                                      11:12:54

17   A.      I don't know if the trigger's pulled or        11:12:55

18   what's going on.                                       11:12:57

19   Q.      Did you -- were you able to observe            11:12:59

20   these -- this incident that we're watching here?       11:13:00

21   A.      I don't think I watched this video, no.        11:13:04

22   Q.      Were you present at the time it happened?      11:13:07

23   A.      I don't recall.                                11:13:09

24                 (Whereupon the video marked as Exhibit 19 11:13:19

25                 was played.)                             11:13:19

                                                      Page 73

| | | |
|---|---|---|
| 1 | MR. GWILLIAM:   Q.   I don't understand what | 11:15:49 |
| 2 | you mean.   It's a yes or no question.   Either you | 11:15:50 |
| 3 | thought your job was to determine that the tasers | 11:15:53 |
| 4 | were being used appropriately or it didn't.   So I | 11:15:57 |
| 5 | just want to know whether, in your job as a | 11:16:01 |
| 6 | supervising sergeant at the scene at this time, you | 11:16:03 |
| 7 | felt it was job or your role to make sure that | 11:16:05 |
| 8 | supervisors were -- that tasers were being used | 11:16:08 |
| 9 | appropriately so there wouldn't be an excessive use | 11:16:12 |
| 10 | of force. | 11:16:14 |
| 11 | A.       I believe your question is vague in the | 11:16:15 |
| 12 | fact of when I -- when you're talking about the | 11:16:16 |
| 13 | taser, are you talking about the aftermath, or are | 11:16:18 |
| 14 | you talking about while it's occurring? | 11:16:20 |
| 15 | Q.       While it's occurring. | 11:16:22 |
| 16 | A.       I don't recall seeing the taser while it | 11:16:24 |
| 17 | was occurring.   I believe I've stated that in the | 11:16:25 |
| 18 | past. | 11:16:28 |
| 19 | Q.       You didn't hear the tasers go off at any | 11:16:28 |
| 20 | time? | 11:16:30 |
| 21 | A.       I don't recall. | 11:16:31 |
| 22 | Q.       All right.   Do you think you needed to | 11:16:33 |
| 23 | hear or see the tasers in order to determine whether | 11:16:36 |
| 24 | they were being used appropriately? | 11:16:41 |
| 25 | MR. BLECHMAN:   It's an incomplete | 11:16:43 |

Page 76

| | | |
|---|---|---|
| 1 | showing up, canceling ones we don't need.  My job is | 11:21:56 |
| 2 | very evolving and fluid during this time. | 11:22:00 |
| 3 | Q.      Okay.  Well, let me be more specific.  If | 11:22:03 |
| 4 | I understand your testimony, at this point where we | 11:22:06 |
| 5 | see you in this video, one of your jobs at that time | 11:22:09 |
| 6 | is to make sure as a supervisor that there is no | 11:22:13 |
| 7 | excessive force used on Jacob Bauer, correct? | 11:22:16 |
| 8 | A.      Yes, sir. | 11:22:20 |
| 9 | Q.      Now, what exactly, if anything, did you do | 11:22:21 |
| 10 | to make that determination, that there would be no | 11:22:24 |
| 11 | excessive force this time? | 11:22:26 |
| 12 | A.      I watched. | 11:22:32 |
| 13 | Q.      What else?  Anything? | 11:22:32 |
| 14 | A.      No, sir. | 11:22:37 |
| 15 | Q.      We talked before about deescalation.  At | 11:22:39 |
| 16 | any time did it occur to you that it might be a good | 11:22:42 |
| 17 | idea to pull some of these officers back and see if | 11:22:46 |
| 18 | you could sit this guy up and talk to him? | 11:22:48 |
| 19 | A.      No, sir. | 11:22:51 |
| 20 |         MR. BLECHMAN:  Hold on. | 11:22:51 |
| 21 |         MR. GWILLIAM:  Q.  Why not? | 11:22:52 |
| 22 |         MR. BLECHMAN:  Incomplete hypothetical. | 11:22:53 |
| 23 |         THE WITNESS:  It's a rapidly evolving | 11:22:55 |
| 24 | situation.  My job is to -- our job is to make sure | 11:22:56 |
| 25 | he's in custody as quickly and safely as possible. | 11:22:59 |

Page 82

| | | |
|---|---|---|
| 1 | was played.) | 11:23:56 |
| 2 | MR. GWILLIAM:  All right.  Let's stop. | 11:24:02 |
| 3 | Q.      Do you know whether there was any use of a | 11:24:04 |
| 4 | baton, other than just trying to pry his arm open, | 11:24:06 |
| 5 | when you were at the scene there? | 11:24:10 |
| 6 | A.      No, sir. | 11:24:12 |
| 7 | Q.      Do you know if anybody hit him with a | 11:24:12 |
| 8 | baton? | 11:24:14 |
| 9 | A.      No -- | 11:24:15 |
| 10 | MR. BLECHMAN:  Hold on.  Vague and | 11:24:16 |
| 11 | ambiguous as to "hit," but go ahead. | 11:24:16 |
| 12 | THE WITNESS:  No, sir. | 11:24:18 |
| 13 | MR. GWILLIAM:  Q.  Do you know anybody -- | 11:24:18 |
| 14 | do you know if anybody used their baton on Jacob | 11:24:20 |
| 15 | Bauer? | 11:24:22 |
| 16 | A.      No, sir. | 11:24:24 |
| 17 | Q.      Have you learned later that Officer Trovao | 11:24:24 |
| 18 | did, in fact, use his baton on Jacob Bauer? | 11:24:27 |
| 19 | A.      No, sir. | 11:24:31 |
| 20 | Q.      You don't know that even up until today? | 11:24:33 |
| 21 | A.      No, sir. | 11:24:36 |
| 22 | Q.      You think it would have been appropriate, | 11:24:36 |
| 23 | in terms of the appropriate use of force, to use a | 11:24:38 |
| 24 | baton to hit him at this time? | 11:24:42 |
| 25 | MR. BLECHMAN:  It's an incomplete | 11:24:46 |

Page 84

```
1    ahead.                                            11:35:10

2            THE WITNESS:  Possibly.                   11:35:11

3            MR. GWILLIAM:  Q.  Okay.  Have you had any 11:35:12

4    experience with somebody suffering from excited   11:35:13

5    delirium before Jacob Bauer?                      11:35:16

6    A.        Possibly.                               11:35:20

7    Q.        Anything you can remember?              11:35:21

8    A.        Super strength, yeah.                   11:35:26

9    Q.        But if he was suffering from excited    11:35:29

10   delirium, the policy says that he might be at an  11:35:30

11   increased risk of sudden death.  Do you agree with 11:35:34

12   that?                                             11:35:37

13   A.        Yes.                                    11:35:37

14   Q.        Did you feel that way at the scene, that 11:35:38

15   he was suffering from excited delirium?           11:35:41

16   A.        I don't know what he was suffering from at 11:35:46

17   the time.                                         11:35:47

18   Q.        Well, he exhibited all the behaviors shown 11:35:49

19   in this policy, did he not?                       11:35:51

20   A.        These behaviors are similar to          11:35:54

21   drug-induced possibilities as well.               11:35:55

22   Q.        Okay.  But do you agree, then, that he  11:35:59

23   was, according to your policy, quote, "at an      11:36:03

24   increased risk of sudden death," unquote?         11:36:06

25   A.        Possibly, which is why medical was called. 11:36:11
```

Page 95

| | | |
|---|---|---|
| 1 | so I knew that he had -- was at least dealing with | 11:40:45 |
| 2 | that.  What was going to be the consequence of | 11:40:48 |
| 3 | Jacob, as far as criminally or psychiatric | 11:40:50 |
| 4 | detention, hadn't been determined yet, but medical | 11:40:52 |
| 5 | personnel were on scene and actively watching him | 11:40:55 |
| 6 | and taking care of him, was my mindset at the time. | 11:40:59 |
| 7 | Q.       Right.  To be more specific, did -- up | 11:41:02 |
| 8 | until the time he was put in the ambulance, did you | 11:41:05 |
| 9 | ever understand what had happened at Raley's that | 11:41:07 |
| 10 | had led to the call to come into the dispatch? | 11:41:13 |
| 11 | A.       Not fully. | 11:41:17 |
| 12 | Q.       Do you agree that a police officer in the | 11:41:24 |
| 13 | city of Pleasanton should not arrest someone for a | 11:41:28 |
| 14 | misdemeanor that's not committed in their presence? | 11:41:31 |
| 15 | MR. BLECHMAN:  Calls for a legal | 11:41:35 |
| 16 | conclusion, incomplete hypothetical.  Go ahead. | 11:41:35 |
| 17 | THE WITNESS:  Can you ask that question | 11:41:41 |
| 18 | again?  Do I believe an officer should not arrest | 11:41:43 |
| 19 | someone for a misdemeanor not committed in their | 11:41:45 |
| 20 | presence? | 11:41:48 |
| 21 | MR. GWILLIAM:  Q.  Correct. | 11:41:48 |
| 22 | A.       Correct.  An officer should not arrest | 11:41:49 |
| 23 | somebody for a misdemeanor committed outside their | 11:41:51 |
| 24 | presence. | 11:41:53 |
| 25 | Q.       Let me do this.  I'm going to take a break | 11:41:53 |

Page 100

Aiken Welch, A Veritext Company
510-451-1580

| | | |
|---|---|---|
| 1 | can have a restraining order-type violation.  And | 11:53:22 |
| 2 | there's a few others that might find out, but there | 11:53:25 |
| 3 | are certain ones you can arrest not in your | 11:53:29 |
| 4 | presence. | 11:53:32 |
| 5 | Q.       Okay.  So you just had to check the Penal | 11:53:32 |
| 6 | Code out there for -- | 11:53:35 |
| 7 | A.       No. | 11:53:37 |
| 8 | Q.       I'm just teasing.  That's all right.  I | 11:53:37 |
| 9 | don't have any further questions. | 11:53:38 |
| 10 | A.       I completely understand the Penal Code. | 11:53:40 |
| 11 | It's just I misunderstood the question. | 11:53:41 |
| 12 | Q.       I don't have any problem with that.  So | 11:53:45 |
| 13 | thank you very much.  I don't have any further | 11:53:46 |
| 14 | questions at this time. | 11:53:47 |
| 15 | A.       Thank you. | 11:53:50 |
| 16 |         MR. BLECHMAN:  We're done. | 11:53:51 |
| 17 |         MR. GWILLIAM:  Okay. | 11:53:52 |
| 18 |         THE VIDEOGRAPHER:  Okay.  Going off the | 11:53:54 |
| 19 | record, the time now is 11:54. | 11:53:54 |
| 20 |         (Whereupon the deposition concluded at | 11:54:07 |
| 21 |         11:54 a.m.) | 11:54:07 |
| 22 |         (Whereupon, subsequent to the conclusion | 11:54:07 |
| 23 |         of the deposition, Exhibit 18 and | 11:54:07 |
| 24 |         Exhibit 19 were marked for | 11:54:07 |
| 25 |         identification.) | 11:54:07 |

Page 102

```
 1              CERTIFICATE OF REPORTER

 2

 3          I, Natalie Y. Botelho, a Certified

 4     Shorthand Reporter, hereby certify that the witness

 5     in the foregoing deposition was by me duly sworn to

 6     tell the truth, the whole truth, and nothing but the

 7     truth in the within-entitled.

 8          The said deposition was taken down in

 9     shorthand by me, a disinterested person, at the time

10     and place therein stated, and that the testimony of

11     said witness was thereafter reduced to typewriting,

12     by computer, under my direction and supervision;

13          That before completion of the deposition,

14     review of the transcript [ ] was|[X] was not

15     requested.  If requested, any changes made by the

16     deponent (and provided to the reporter) during the

17     period allowed are appended hereto.

18          I further certify that I am not of counsel

19     or attorney for either or any of the parties to the

20     said deposition, nor in any way interested in the

21     event of this cause, and that I am not related to

22     any of the parties thereto.

23          DATED: October 22, 2020

24

25          Natalie Y. Botelho, CSR No. 9897

                                        Page 103
```