EXHIBIT Q

```
 1                UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4
 5   John Bauer, an individual and  )NO 3:19-cv-04593-LB
     as Successor in Interest of    )
 6   Jacob Bauer, deceased; ROSE    )
     BAUER, an individual and as    )
 7   Successor in Interest of Jacob )
     Bauer, deceased,               )
 8                                  )
                   Plaintiffs       )
 9                                  )
          v.                        )
10                                  )
     CITY OF PLEASANTON, et al.,    )
11                                  )
                   Defendants.      )
12   _____)
13
14
15
16      REMOTE VIDEOTAPED DEPOSITION OF DAVID SPILLER
17               Livermore, California
18             Friday, January 29, 2021
19
20
21   Reported by:
     Heidi Hummel-Grant
22   CSR No. 12556
23   Pages 1 - 89
24
25
                                              Page 1
```

1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4

5    John Bauer, an individual and  )NO 3:19-cv-04593-LB
     as Successor in Interest of    )
6    Jacob Bauer, deceased; ROSE    )
     BAUER, an individual and as    )
7    Successor in Interest of Jacob )
     Bauer, deceased,               )
8                                    )
                  Plaintiffs        )
9                                    )
          v.                        )
10                                   )
     CITY OF PLEASANTON, et al.,     )
11                                   )
                  Defendants.        )
12   _____)

13

14

15

16        Remote videotaped deposition of

17   DAVID SPILLER, taken on behalf of Plaintiff,

18   at Livermore, California, beginning at 1:07 p.m.

19   and ending at 3:19 p.m., on Friday, January 29,

20   2021, before Heidi Hummel-Grant, Certified

21   Shorthand Reporter No. 12556.

22

23

24

25

                                          Page  2

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:

 4         GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER

 5         BY:  JAYME L. WALKER

 6              J. GARY GWILLIAM

 7         1999 Harrison Street

 8         Suite 1600

 9         Oakland, California 94612

10         510.832.5411

11         jwalker@giccb.com

12

13    For Defendants:

14         MCNAMARA, NEY, BEATTY, SLATTERY, BORGES &

15    AMBACHER, LLP

16         BY:  NOAH BLECHMAN

17         3480 Buskirk Avenue

18         Suite 250

19         Pleasant Hill, California 94523

20         925.939.5330

21         noah.blechman@mcnamaralaw.com

22

23    Also present:

24         TED HOPPE, VIDEOGRAPHER

25         BRITTANY SMITH
```

Page 3

1                             INDEX

2     Witness:

3     DAVID SPILLER

4

5     Examination:                        Page

6     MS. WALKER                          6

7

8                           EXHIBITS
                 Description                    Page

9

      Exhibit 7    Crisis Intervention Incidents      32

10                 (Previously Marked)

11    Exhibit 40   Danville San Ramone Article        27

12

      Exhibit 41   Video                              73

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page  4

```
 1                    Livermore, California

 2          Friday, January 29, 2021, 1:07 p.m. - 3:19 p.m.

 3

 4            THE VIDEOGRAPHER:  Good afternoon.  We are

 5      going on the record.  The time now is 1:07 on      01:07

 6      January -- I'm sorry, yeah 1:07, on January 29th,

 7      2021.

 8            This is Media Unit 1 in the video recorded

 9      deposition of Chief David Spiller in the matter --

10      in the matter of John Bauer, et al., versus the City  01:07

11      of Pleasanton, et al., filed in the United States

12      District Court, Northern District of California,

13      Case Number 3:19-cv-40493-LB.

14            This video deposition is being hosted

15      remotely, services provided by Veritext Legal       01:07

16      Solutions.

17            My name Ted Hoppe from the firm Veritext.

18      I'm the videographer.

19            Counsel, could please voice identify

20      yourselves for the record?                          01:07

21            MS. WALKER:  Jayme Walker for the

22       plaintiffs, and I'm here with my partner

23       Gary Gwilliam and our associate Brittany Smith.

24            MR. BLECHMAN:  Noah Blechman on behalf of

25       the defendants.                                    01:08
```

Page 5

```
 1           THE VIDEOGRAPHER:  Excellent.              01:08
 2         Heidi, could please swear the witness in?
 3
 4                    DAVID SPILLER,
 5      called as a witness by and on behalf of       01:08
 6    Plaintiff, having been first duly sworn by the
 7    Certified Shorthand Reporter, was examined and
 8    testifies as follows:
 9
10                    EXAMINATION                      01:08
11
12         BY MS. WALKER:
13         Q   Good afternoon, Chief Spiller.  My name
14    is Jayme Walker.  I represent John and Rose Bauer
15    for the death of their son Jacob Bauer.          01:08
16         Could you state your full name for the
17    record, please?
18         A   Sure.  My name is David Charles Spiller,
19    S-P-I-L-L-E-R.
20         Q   Okay.                                   01:08
21         Have you ever had your deposition taken
22    before, Chief Spiller?
23         A   I believe I have years -- it's been a
24    long time, in a previous civil matter.  And I think
25    it was a traffic -- a fatal traffic collision.   01:08
```

Page 6

1        Q    And -- and sometimes you don't know, one        01:28

2    way or the other, whether someone's mentally ill or

3    under the influence; true?

4        A    Yes.

5        Q    Okay.                                            01:29

6             Was it your intent as -- in making the

7    crisis intervention techniques a priority for it to

8    apply in situations for your officers on the street

9    where they suspect someone might be under the

10   influence of illegal drugs or they could possibly be   01:29

11   mental ill, was your intent that they would apply

12   the crisis intervention techniques in that

13   situation?

14             MR. BLECHMAN:  It's vague and ambiguous.

15    It's also an incomplete hypothetical.                  01:29

16             You can respond.

17             THE WITNESS:  My objective or my goal was to

18     provide tools to the front-line first responders so

19     they could effectively manage calls for service and

20     effectively deal with somebody who's experiencing     01:29

21     either a mental health crisis or history of mental

22     illness.

23             MS. WALKER:  Okay.

24        Q    And you would expect -- and -- and you

25   would expect them to use those tools effectively as     01:29

                                            Page 23

1    a first-line responder even if the person                01:30

2    experiencing a mental health crisis may also have

3    been engaged in the commission of minor crime?   A

4    minor nonviolent crime?

5             MR. BLECHMAN:   Incomplete hypothetical.          01:30

6      Vague and ambiguous.

7             Go ahead.

8             THE WITNESS:   I -- I would hope that they

9      would use the training, tools and experience to

10     manage the call as effectively as possible.   That      01:30

11     would include any previous CIT training.

12            MS. WALKER:   Okay.

13            Q   And -- and that's the case -- that's the

14     case whether the person experiencing the mental

15     health crisis may also be suspected to be under the     01:30

16     influence of illegal drugs, you would -- you would

17     hope they would use the training tools for crisis

18     intervention techniques for dealing with the

19     mentally ill even if they also suspected that the

20     person may be under the influence of -- of illegal      01:30

21     drugs?

22            MR. BLECHMAN:   It's overbroad.   And I think

23      it's an incomplete hypothetical as phrased.

24            But go ahead.

25            THE WITNESS:   Yes, I would hope that they        01:31

                                              Page  24

1    would recognize that based on their training that        01:31
2    they received.

3           MS. WALKER:

4        Q   And -- and when you referred -- I -- I

5    think in your previous answer to you'd hope they'd      01:31

6    use the training, tools and experience to manage the

7    call as effectively as possible, what sort of tools

8    were you -- were referring to?

9        A   As I had previously mentioned, a

10   component of the CIT training, as an example, is,       01:31

11   you know, communication, interaction, and that would

12   apply whether it's a person who's in mental health

13   crisis or not in a mental health crisis.

14   Communication, you know, establishing a rapport, you

15   know, developing observations based on their           01:31

16   training and experience of what may be going on not

17   only with the individual but all of the -- the

18   totality of what's involved in the incident that

19   they're involved in.

20       Q   And -- and have you heard of a -- of         01:32

21   using sort of time and distance to de-escalate a

22   situation with somebody who might be mentally ill so

23   that you don't force a confrontation where one --

24   maybe there doesn't need to be one?

25          MR. BLECHMAN:  It's vague and ambiguous.       01:32

                                              Page 25

```
 1    investigations, Captain Craig Eicher.                    02:37
 2          Do you know who it was that reviewed the
 3    administrative investigation to determine whether
 4    any remedial training would be useful in the
 5    John Deming situation following the administrative    02:37
 6    investigation?
 7          A    I don't recall.
 8          Q    Did you yourself review the
 9    administrative investigation and body camera videos
10    and determine whether you believed remedial training   02:37
11    was needed?
12          A    I did review the case, the
13    administrative investigation, I did review body cams
14    associated -- I think it was a different generation
15    of body cams, as I recall -- and I -- I don't        02:38
16    remember any specific areas for remedial training.
17          Q    Okay.
18          And whether or not policies were violated in
19    that situation, did you have any -- I don't want to
20    say criticism, but maybe advice and counsel for the  02:38
21    way Sargeant Gora, as the officer in charge,
22    responded in that situation?
23          A    Could you reframe that question?  Did I
24    have any concerns about the supervisory actions?
25          Q    Yes.                                        02:38
```

Page 64

1        A    No, I did not.                                      02:38

2        Q    A much better way to state it than I

3   did.   Thank you.

4        A    No, I did not.

5        Q    Okay.                                               02:38

6             As I -- I want to show you a portion of the

7   body camera -- well, maybe I'll -- I'll summarize

8   it, and if you don't recall it, I can certainly show

9   it to you.

10            But as I saw it, Sergeant Gora and other           02:39

11  officers entered the car dealership with a K9, and

12  John Deming, Jr. sat on top of a -- a car and put

13  his hands up and seemed to be -- he wasn't violent

14  toward the officers at that stage, he was sitting on

15  top of a car, he had his hands up, and the situation  02:39

16  at that stage seemed like a perfect opportunity for

17  Sergeant Gora to employ some de-escalation and

18  crisis intervention techniques.

19            Did you have any criticism of the way that

20  it -- the officer response failed to use crisis       02:39

21  intervention or de-escalation techniques at that

22  stage in the John Deming incident?

23            MR. BLECHMAN:   It's an incomplete

24   hypothetical as phrased.   It's argumentative as

25   phrased.   Misstates the evidence in relation to     02:39

                                            Page 65

```
 1          A    No, I did not.                          02:38

 2          Q    A much better way to state it than I

 3    did.  Thank you.

 4          A    No, I did not.

 5          Q    Okay.                                   02:38

 6               As I -- I want to show you a portion of the

 7    body camera -- well, maybe I'll -- I'll summarize

 8    it, and if you don't recall it, I can certainly show

 9    it to you.

10               But as I saw it, Sergeant Gora and other  02:39

11    officers entered the car dealership with a K9, and

12    John Deming, Jr. sat on top of a -- a car and put

13    his hands up and seemed to be -- he wasn't violent

14    toward the officers at that stage, he was sitting on

15    top of a car, he had his hands up, and the situation  02:39

16    at that stage seemed like a perfect opportunity for

17    Sergeant Gora to employ some de-escalation and

18    crisis intervention techniques.

19               Did you have any criticism of the way that

20    it -- the officer response failed to use crisis      02:39

21    intervention or de-escalation techniques at that

22    stage in the John Deming incident?

23          MR. BLECHMAN:  It's an incomplete

24     hypothetical as phrased.  It's argumentative as

25     phrased.  Misstates the evidence in relation to     02:39
```

1    that incident.                                              02:39

2         You can respond.

3         THE WITNESS:   I did not have any concerns

4    about the supervisory oversight of that incident.

5         MS. WALKER:   Okay.                                    02:40

6         I -- I do want to show you that video, just

7    so we can all be on same the page.   So -- especially

8    because there's been an objection.   So I'm going to

9    queue it up to that point that I was just

10   referencing, and then I'll play it for you.   Share     02:40

11   my screen and play it for you.   Okay.   So let's see

12   if I can make this work.

13        I guess I have to -- I have to queue it up

14   after I share my screen, seems to be the issue.

15        And, Madame Court Reporter, you're not going     02:40

16   to really be able to hear any of the voices.   So I

17   think you don't have to try take down anything

18   that's said.

19        THE REPORTER:   Thank you.

20        MS. WALKER:   Let's see.   It's not giving me     02:41

21   the option to share the video for some reason.   Why?

22   All right.   Here we go.   So I'm going to move it

23   along.   Let's see.

24        Can you all see the video right now?   Can

25   you see it Chief Spiller?                                  02:42

                                              Page 66

```
 1    clip?                                              02:48
 2           MR. BLECHMAN:  Argumentative.  Misstates the
 3      record.
 4           Go ahead.
 5           THE WITNESS:  I did observe the taser       02:48
 6      deployment in the video.
 7           MS. WALKER:
 8           Q    And at that time Pleasanton Police
 9      Department had a taser policy in which officers
10      should at least consider whether they should deploy  02:48
11      a taser when a person could fall from a height;
12      right?
13           A    Yes.
14           Q    And it was still determined at that time
15      that there was no violation of that policy by      02:49
16      Sergeant Gora or by Officer Bennett?
17           A    Yes.
18           Q    And you can't recall as you sit here
19      today whether any remedial training was done
20      following the -- the John Deming, Jr. incident     02:49
21      specifically with regard to crisis intervention
22      incidents?
23           MR. BLECHMAN:  I think it's asked and
24      answered.
25           But go ahead.                                02:49
```

Page 72

1      THE WITNESS:  I don't believe so, no.      02:49

2      MS. WALKER:

3      Q   You don't believe there were any

4   remedial training?

5      A   That's correct.                        02:49

6      Q   Was anybody disciplined as a result of

7   the John Deming, Jr. situation?

8      A   No.

9      MS. WALKER:  I -- I do want to mark that

10   video as Exhibit 41.  So we'll upload that to the      02:49

11   Exhibit Share.

12      (Exhibit 41 was marked for identification, a

13   copy of which is attached hereto.)

14      MS. WALKER:

15      Q   I'm going to move on to the Jacob Bauer

16   situation on August 1st, 2018.

17      And we've already established that you were

18   the chief of police on August 1st, 2018.  I

19   understand you had retired by the time the

20   administrative investigation was completed, which      02:50

21   was sometime in early 2020.

22      And is it typical, in your experience,

23   Sergeant Spiller [sic], that an administrative

24   investigation of an officer-involved death or an

25   in-custody death would take well over a year to      02:50

                                                Page 73

```
 1      it doesn't create issues from an administrative        02:51
 2       investigation.
 3              The administrative investigation determines
 4       whether it was with -- within policy or not, and it
 5       could create some substantive problems if the DA was   02:52
 6       going to file charges or needed further
 7       investigation.
 8              MS. WALKER:  Okay.
 9          Q   Did you have any role at all in
10       reviewing the incident of -- of Jacob Bauer's death?   02:52
11          A   I had a very limited role in reviewing
12       the incident.
13          Q   As chief of police when that death
14       occurred, did you watch any of the body-worn camera?
15          A   My role as reviewing the incident and        02:52
16       watching any videos was with counsel in -- in the
17       wake of the critical incident.  City attorney,
18       excuse me.  It was with the City attorney.
19          Q   So you didn't undertake any review of
20       that incident simply as the chief of police to        02:53
21       determine whether you believed there was a need for
22       remedial training or officers being put on
23       administrative leave or anything like that?
24          A   That's not my role.  I did not -- I
25       assigned the investigation to be reviewed.  My role    02:53
```

Page 75

```
 1    would be to objectively review the investigation.    02:53
 2    And others who read it would make those
 3    determinations in terms of training opportunities
 4    that either were remedial or for an advanced officer
 5    training opportunity.                                 02:53
 6           Q   I thought when we talked earlier about
 7    administrative reviews -- or the administrative
 8    investigations, that you said it would be the
 9    command staff and possibly the use of force training
10    team and yourself who would make recommendations for  02:53
11    officer discipline and -- or remedial training.
12           A   That's true, yes.
13           Q   So I guess I'm confused on what you just
14    testified that it would not be your role.
15           A   It would be my role in the              02:54
16    administrate -- forgive me if I misunderstood.
17           It would be my role to review once an
18    administrative investigation was completed.  It
19    was --
20           Q   I --                                     02:54
21           A   -- not my job or my role to investigate
22    it myself --
23           Q   I --
24           A   -- which would have -- which would have
25    created an objectivity issue when the administrative  02:54
```

Page 76

```
 1              You can answer that again.              02:55
 2              THE WITNESS:  I did not make a determination
 3       that there was a deficiency or that there was a --
 4       a policy violation.
 5              MS. WALKER:  Okay.                       02:55
 6         Q   And I just want to -- I don't mean to
 7       ask again or -- I just want to make sure I'm clear.
 8              Is that because you were withholding that
 9       judgment for the completion of the administrative
10       investigation, or did you actually make a          02:55
11       determination that no training or discipline was
12       warranted?
13         A   Based on the information that I had at
14       the point when I was reviewing the video or any
15       detail with the City attorney I did not have the   02:56
16       opinion that there was any training deficiency or
17       potential policy violations.  But I should be clear
18       that I was not conducting the investigation and did
19       not have the entirety of the evidence at my
20       disposal.                                          02:56
21         Q   Have you had any involvement in review
22       of this incident since the time that the
23       administrative investigation was completed?
24         A   None.
25         Q   Have you had any communications with --   02:56
```

Page 78

```
 1              THE WITNESS:  That is true.  But my response    03:01
 2    was centered on it totally depends on what the
 3    officers are confronted with or what is involved in
 4    the incident itself, what the totality of the
 5    circumstances were.                                      03:01
 6              MS. WALKER:
 7         Q    Did you review a point in Jacob Bauer's
 8    situation where Officer Middleton tried to handcuff
 9    him?  Have you reviewed that section of the video?
10         A    I reviewed that section of the video          03:02
11    with counsel.
12         Q    Okay.
13              Did you make a determination on own,
14    irrespective of counsel, as to whether
15    Officer Middleton appropriately should have            03:02
16    handcuffed Jacob Bauer at that stage of the
17    investigative detention?
18              MR. BLECHMAN:  Incomplete hypothetical.
19     It's argumentative as phrased.  I think it's asked
20    and answered about whether he made any                 03:02
21    determinations.
22              But go ahead.
23              THE WITNESS:  I did not make a determination
24    that it was inappropriate based on the
25    circumstances that the officer was confronted with.    03:02
```

Page 83

```
1        Certification of Court Reporter Federal Jurat

2

3            I, the undersigned, a Certified Shorthand

4    Reporter of the State of California do hereby

5    certify:

6            That the foregoing proceedings were taken

7    before me remotely at the time herein set forth;

8    that any witnesses in the foregoing proceedings,

9    prior to testifying, were placed under oath; that a

10   verbatim record of the proceedings was made by me

11   using machine shorthand, which was thereafter

12   transcribed under my direction; further, that the

13   foregoing is an accurate transcription thereof.

14           That before completion of the deposition a

15   review of the transcript was not requested.

16           I further certify that I am neither

17   financially interested in the action nor a relative

18   or employee of any of the parties.

19           IN WITNESS WHEREOF, I hereby subscribe my

20   name this 16th day of February 2021.

21

22

23

             Heidi Hummel-Grant

24           Certified Shorthand Reporter No. 12556

25
```

Page 91