

EXHIBIT D

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4                        --oOo--
 5   JOHN BAUER, an individual
     and as Successor in Interest
 6   of Jacob Bauer, deceased;
     ROSE BAUER, an individual
 7   and as Successor in Interest
     of Jacob Bauer, deceased;
 8
                       Plaintiffs,
 9
     vs.                             Case No.
10                                   3:19-cv-04593-LB
     CITY OF PLEASANTON; BRADLEE
11   MIDDLETON; JONATHAN CHIN;
     RICHARD TROVAO; STEVEN
12   BENNETT; ALEX KOUMISS; JASON
     KNIGHT; MARTY BILLDT; DAVID
13   SPILLER; and DOES 1 to 50,
     inclusive;
14
                       Defendants.
15   _____/
16
17
18       CONTAINS CONFIDENTIAL MATERIAL WHERE NOTED
19
20     VIDEO-RECORDED DEPOSITION OF BRADLEE MIDDLETON
21             WEDNESDAY, SEPTEMBER 2, 2020
22
23   Reported by:
24   Anrae Wimberley, CSR No. 7778
25   Job No.  4227606
```

                                          Page 1

<pre>
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4                        --oOo--
 5   JOHN BAUER, an individual
     and as Successor in Interest
 6   of Jacob Bauer, deceased;
     ROSE BAUER, an individual
 7   and as Successor in Interest
     of Jacob Bauer, deceased;
 8
                      Plaintiffs,
 9
     vs.                          Case No.
10                                3:19-cv-04593-LB
     CITY OF PLEASANTON; BRADLEE
11   MIDDLETON; JONATHAN CHIN;
     RICHARD TROVAO; STEVEN
12   BENNETT; ALEX KOUMISS; JASON
     KNIGHT; MARTY BILLDT; DAVID
13   SPILLER; and DOES 1 to 50,
     inclusive;
14
                      Defendants.
15   _____/
16
17      CONTAINS CONFIDENTIAL MATERIAL WHERE NOTED
18
19           Transcript of video-recorded deposition
20   of BRADLEE MIDDLETON, taken at Gwilliam, Ivary,
21   Chiosso, Cavalli & Brewer, 1999 Harrison Street,
22   Suite 1600, Oakland, California 94612, beginning at
23   10:10 a.m. and ending at 1:12 p.m. on Wednesday,
24   September 2nd, 2020, before Anrae Wimberley,
25   Certified Shorthand Reporter No. 7778.
</pre>

Aiken Welch, A Veritext Company
510-451-1580

```
 1    APPEARANCES:

 2    For Plaintiffs John and Rose Bauer:

 3              GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER

 4              BY:  J. GARY GWILLIAM, ESQ.

 5                   JAYME L. WALKER, ESQ.

 6              1999 Harrison Street, Suite 1600

 7              Oakland, California 94612

 8              (510) 832-5411

 9              ggwilliam@giccb.com

10              jwalker@giccb.com

11

12    For Defendants:

13              McNAMARA LAW FIRM

14              BY:  NOAH G. BLECHMAN, ESQ.

15              3480 Buskirk Avenue, Suite 250

16              Pleasant Hill, California 94523

17              (925) 939-5330

18              noah.blechman@mcnamaralaw.com

19

20    Also present:

21              JENNIFER McKAY, VIDEOGRAPHER

22              VERITEXT LEGAL SOLUTIONS

23

24              BRITTANY SMITH, LAW CLERK

25              GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
```

```
 1    Also present (cont'd):

 2

 3            THE FOLLOWING APPEARED VIA ZOOM

 4            VIDEOCONFERENCE:

 5            SERGEANT ERIC (MARTY) BILLDT, DEFENDANT

 6            SERGEANT JASON KNIGHT, DEFENDANT

 7            OFFICER JONATHAN CHIN, DEFENDANT

 8                      --oOo--

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Aiken Welch, A Veritext Company
510-451-1580

```
1                  I N D E X

2    EXAMINATION BY:                        PAGE

3    MS. WALKER                               8

4

5                   --oOo--

6              E X H I B I T S

7
```

```
8    EXHIBIT          DESCRIPTION            PAGE

9    Exhibit 7        Pleasanton Police Department   39

10                    Policy Manual - Crisis

11                    Intervention Incidents;

12                    6 pages

13

14   Exhibit 8        Call for Service Detail        48

15                    Report; Bates PPD002468

16                    thru 486

17

18   Exhibit 9        [CONFIDENTIAL]                 77

19                    Summary of Statement of

20                    Officer Middleton; Bates

21                    PPD001172 thru 174

22

23   Exhibit 10       LD 15: Chapter 3 -            84

24                    Detentions; 5 pages

25
```

Aiken Welch, A Veritext Company
510-451-1580

```
 1              E X H I B I T S  (Cont'd)

 2   EXHIBIT           DESCRIPTION                    PAGE

 3   Exhibit 11        PowerPoint Slides from Axon      100

 4                     Academy TASER Training;

 5                     6 pages

 6

 7   Exhibit 12        Pleasanton Police Department     127

 8                     Policy Manual - Use of Force;

 9                     25 pages

10

11   Exhibit 13        [CONFIDENTIAL]                   139

12                     Employee Performance

13                     Evaluation of Officer

14                     Middleton, 1/13/18 to 1/11/19;

15                     6 pages

16                          --oOo--

17   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

18                        (None)

19

20   TESTIMONY REQUESTED TO BE MARKED CONFIDENTIAL:

21   From page 19, line 1 through to page 28, line 16

22   From page 135, line 4 through to page 141, line 7

23

24                          --oOo--

25
```

Aiken Welch, A Veritext Company
510-451-1580

```
 1            WEDNESDAY, SEPTEMBER 2, 2020;

 2               OAKLAND, CALIFORNIA;

 3                  10:10 A.M.

 4                   - - -

 5        THE VIDEOGRAPHER:  Good morning.  We are going          10:10:56

 6    on the record at 10:11 on September 2nd, 2020.  This

 7    is Media Unit 1 of the video-recorded deposition of

 8    Bradlee Middleton in the matter of Bauer, et al.

 9    versus Pleasanton, et al. filed in the United States

10    District Court, Northern District of                       10:11:22

11    San Francisco -- United States District Court,

12    Northern District of California, San Francisco

13    Division.  Case No. is 3:19-cv-04593.

14            This deposition is being held at Gwilliam

15    Ivary in Oakland, California located at 1999             10:11:40

16    Harrison Street, Suite 1600.  My name is Jennifer

17    McKay from the firm Veritext, and I am the

18    videographer.  Your court reporter today is Anrae

19    Wimberley, also from Veritext.

20            Counsel, please identify yourselves and            10:11:59

21    state whom you represent.

22        MS. WALKER:  Jayme Walker for the plaintiff,

23    and I'm here with my partner, Gary Gwilliam, and our

24    associate, Brittany Smith.

25        MR. BLECHMAN:  Noah Blechman on behalf of the          10:12:07
```

Aiken Welch, A Veritext Company
510-451-1580

```
 1    defendants, and I believe via Zoom are some of the        10:12:10

 2    other defendants that are attending:  Officer Chin,

 3    Sergeant Knight, and Sergeant Billdt.

 4        THE VIDEOGRAPHER:  Will the reporter please

 5    swear in the witness.                                     10:12:21

 6                    BRADLEE MIDDLETON,

 7          sworn as a witness by the Certified

 8          Shorthand Reporter, testified as follows:

 9                       EXAMINATION

10    BY MS. WALKER:                                            10:12:39

11        Q.   Good morning, Officer Middleton.

12        A.   Good morning.

13        Q.   I understand this is your first

14    deposition?

15        A.   Yes.                                             10:12:44

16        Q.   Okay.  So we'll go over some of the ground

17    rules to remind you.  First thing I want to tell you

18    is, speak out loud and in words so the court

19    reporter can hear you.

20        A.   Okay.                                            10:12:53

21        Q.   You're a little soft spoken and I speak a

22    little fast, so I'm sure she will admonish us both.

23        A.   All right.

24        Q.   But the first and most important rule in a

25    deposition is just to tell the truth.  Okay?  The        10:13:04
```

Aiken Welch, A Veritext Company
510-451-1580

```
 1        Q.   So you knew before you ever responded to          10:36:32

 2   Jacob Bauer or had contact with him that this is a

 3   possibility that someone was seriously mentally ill?

 4        A.   No.

 5        MR. BLECHMAN:  Hold on.                                 10:36:42

 6             Objection, calls for speculation, lacks

 7   foundation, argumentative as to "seriously mentally

 8   ill."

 9             Go ahead.

10   BY MS. WALKER:                                               10:36:50

11        Q.   Your answer was no.  So my question -- on

12   what basis can you answer no, that you knew --

13        A.   'Cause I didn't know.

14        Q.   Well, my question was:  Before you ever

15   contacted Jacob Bauer, you knew it was a possibility         10:36:59

16   that you were dealing with someone who was mentally

17   ill?

18        A.   Yes.

19        Q.   Yes.

20             Okay.  At that point, Officer Chin was            10:37:08

21   with you; right?

22        A.   Correct.

23        Q.   And you go to contact Jacob Bauer.  Did

24   you have any discussions with Officer Chin about how

25   you were going to approach this individual or deal          10:37:20
```

```
 1    with somebody who was possibly mentally ill?        10:37:22

 2        A.   No.

 3        Q.   Based on your experience with the John

 4    Deming, Jr. case and your subsequent training in

 5    crisis intervention techniques, didn't you think it  10:37:35

 6    was a good idea to formulate a plan of how you were

 7    going to deal with someone who was possibly mentally

 8    ill?

 9        MR. BLECHMAN:  Argumentative as phrased,

10    incomplete hypothetical.                            10:37:45

11            But go ahead.

12        THE WITNESS:  It's always a possibility that an

13    individual we contact is going to have a mental

14    illness.  We didn't know that was this incident.

15    BY MS. WALKER:                                      10:37:57

16        Q.   And so if it's always a possibility that

17    somebody you contact may have a mental illness, do

18    you try to accommodate that in your response to that

19    person?

20        MR. BLECHMAN:  Incomplete hypothetical.         10:38:15

21            Go ahead.

22        THE WITNESS:  Can you restate the question?

23    BY MS. WALKER:

24        Q.   Sure.  You said it's always a possibility

25    that someone you contact may have a mental illness.  10:38:21
```

Page 34

1    In this case, you were told by the reporting          10:38:23

2    witnesses that this person was possibly crazy;

3    right?  Yes?

4         A.    Yes.

5         Q.    So in this case, it wasn't just anybody     10:38:33

6    you could come in contact with was -- could possibly

7    be mentally ill.  In this case you had some facts to

8    alert you prior to the contact that you were

9    possibly dealing with someone in a mental crisis; is

10   that true?                                            10:38:50

11        A.    In somebody's opinion -- it was this

12   gentleman's opinion that he thought this individual

13   could be crazy.  I'm not -- I can't say that he knew

14   for certain.  He was a store employee.  He wasn't a

15   doctor.                                               10:39:05

16        Q.    Well, you had 40 hours of crisis

17   intervention training; right?

18        A.    Yes.

19        Q.    Okay.  So you knew, as a police officer,

20   that your encounter with a mentally ill individual    10:39:09

21   could be dangerous for you; right?

22        A.    Correct.

23        Q.    You knew it could be dangerous for the

24   person who's mentally ill; right?

25        A.    Yes.                                        10:39:21

Page 35

```
 1    supervisor prior to making contact with Jacob Bauer?      10:40:39

 2        A.   No.

 3        Q.   Who was your supervisor at the time?

 4        A.   That would have been Sergeant Billdt.

 5        Q.   Was there any sort of protocol or policy      10:40:50

 6    of the Pleasanton Police Department on August 1st,

 7    2018 that would have informed your actions in

 8    responding to people who are mentally ill?

 9        MR. BLECHMAN:  Vague and ambiguous, overbroad,

10    incomplete hypothetical.                               10:41:03

11            Go ahead.

12        THE WITNESS:  Sorry.  Once more.

13    BY MS. WALKER:

14        Q.   Was there any sort of protocol or policy

15    of the Pleasanton Police Department that would have    10:41:10

16    informed -- helped to inform your actions on

17    August 1st, 2018 when you responded to Raley's to a

18    person who was possibly mentally ill?

19        MR. BLECHMAN:  Same objections and

20    argumentative as well.                                 10:41:23

21            Go ahead.

22        THE WITNESS:  No.

23    BY MS. WALKER:

24        Q.   Is there currently a policy that informs

25    your actions when you're dealing with mentally ill     10:41:31
```

Aiken Welch, A Veritext Company
510-451-1580

```
 1    people?                                          10:41:34
 2         A.   A policy?
 3         Q.   A policy or a protocol.
 4         A.   No.
 5         Q.   Were you aware on August 1st, 2018 of any    10:41:40
 6    mental health organizations that you could have
 7    reached out to to assist you with someone who is
 8    mentally ill?
 9         A.   There are county services and stuff that
10    we sometimes reach out to if given a situation that   10:41:54
11    would meet that criteria, yeah.
12         Q.   Okay.  What are some of the county
13    organizations that you reach out to if you're
14    responding to a person you believe is in a mental
15    health crisis?                                    10:42:08
16         A.   I would need to refer to my notes on that.
17    I don't -- I don't know off the top of my head.
18         Q.   Okay.  Where do you keep your notes on
19    that?
20         A.   We have pamphlets and stuff with phone    10:42:20
21    numbers for county services in our duty bags.
22         Q.   In your duty bag?
23         A.   Yeah.
24         Q.   Does the Pleasanton Police Department have
25    a CIT unit?                                       10:42:30
```

Page 38

1    A.   Not a specific CIT unit, no.                    10:42:33

2    Q.   Are there any officers at all that are

3  part of a CIT team that you could contact for

4  assistance in dealing with somebody who's mentally

5  ill?                                                  10:42:43

6    A.   No.

7    Q.   There weren't at the time in August of

8  2018 and there aren't now; is that true?

9    A.   Specific to CIT, no.

10   MS. WALKER:  Let's mark this as Exhibit 7.          10:43:16

11        (Plaintiffs' Exhibit 7 was marked.)

12  BY MS. WALKER:

13    Q.   You're certainly welcome to review the

14  whole thing, Officer Middleton, but I'm going to

15  direct you to sections and give you an opportunity   10:43:43

16  to read them before you answer questions.  Okay?

17    A.   Sure.

18    Q.   Are you familiar with this policy 419,

19  Crisis Intervention Incidents?

20    A.   Not specifically, no.                          10:43:56

21    Q.   This is a policy that I just pulled off of

22  the Pleasanton Police Department's website.  It's

23  dated at the bottom November 18, 2019.  It says

24  "Copyright Lexipol."  Do you know what Lexipol is?

25    A.   The company we use for policy management,      10:44:18

Page 39

1     yes.                                           10:44:21

2          Q.   Okay.   So was it ever communicated to you

3     by the Pleasanton Police Department that they had

4     adopted this crisis intervention incident policy as

5     of November 18th, 2019?                         10:44:29

6          A.   Not that I specifically recall.

7          Q.   So it defines in the definitions of

8     "person in crisis" as "A person whose level of

9     distress or mental health symptoms have exceeded

10    that person's internal ability to manage his or her   10:44:50

11    behavior or emotions."   It talks about how a crisis

12    can be precipitated, and part of it says:   "Any

13    other circumstance or event that causes the person

14    to engage in erratic, disruptive or dangerous

15    behavior that may be accompanied by impaired     10:45:08

16    judgment."

17          Do you see that?

18          A.   Yes.

19          Q.   Do you believe Jacob Bauer was a person in

20    crisis, based on this definition?               10:45:16

21          MR. BLECHMAN:   Calls for speculation, calls

22    for -- incomplete hypothetical, lacks foundation.

23          Go ahead.

24          It's also vague as to time.

25          But go ahead.                             10:45:30

                                                  Page 40

```
 1    radio that he was negative for weapons; true?          10:53:21

 2         MR. BLECHMAN:  Hold on.

 3              Calls for speculation, lacks foundation.

 4              Go ahead.

 5         MS. WALKER:  Let's mark this as Exhibit 8.         10:53:33

 6              (Discussion off the record.)

 7    BY MS. WALKER:

 8         Q.   At the time you contacted Jacob Bauer and

 9    you spoke with him and he gave you his

10    identification, at that time you knew he was           10:53:55

11    negative for weapons; isn't that true?

12         MR. BLECHMAN:  Same objections.

13              Go ahead.

14         THE WITNESS:  No.

15              (Plaintiffs' Exhibit 8 was marked.)          01:41:32

16    BY MS. WALKER:

17         Q.   I put in front of you what's Exhibit 8.

18    It says Call For Service Detail Report.  Do you know

19    what this is?

20         A.   Yes.                                         10:54:17

21         Q.   What is it?

22         A.   These are the dispatch notes that are

23    entered into our computer aided dispatch system.

24         Q.   Okay.  And if you turn to page -- see,

25    there's little Bates numbers on the bottom?           10:54:28
```

                                                    Page 48

```
 1    testimony.                                    10:58:31

 2         Go ahead.

 3       THE WITNESS:  No.

 4    BY MS. WALKER:

 5       Q.   If you had known at that stage, if it had   10:58:37

 6    become clear to you, based on your training or

 7    experience or whatever, that Jacob Bauer had a

 8    schizophrenia-like mental illness, would you, at

 9    that point, have put your hands on him?

10       MR. BLECHMAN:  It's an incomplete hypothetical.   10:58:49

11    It calls for speculation.

12         You can respond.

13       THE WITNESS:  Sorry.  One more time.

14    BY MS. WALKER:

15       Q.   At that point, if you had known that Jacob   10:58:58

16    Bauer had a thought disorder or a serious mental

17    illness or a schizophrenia-like mental illness,

18    based on your training or experience, would you have

19    put your hands on him?

20       A.   Yes.                                    10:59:11

21       Q.   So whether he was mentally ill or not, you

22    would have approached the situation in the same

23    manner?

24       A.   Yes.

25       Q.   Let's turn back to Exhibit 7.  Section   10:59:41
```

```
 1            If you turn back to the beginning of that        11:04:13
 2    section 419.5, it says:  "It is important to
 3    recognize that individuals under the influence of
 4    alcohol, drugs or both may exhibit symptoms that are
 5    similar to those of a person in a mental health        11:04:26
 6    crisis."
 7            So whether he was under the influence or
 8    experiencing a mental health crisis, you still
 9    should have assessed -- tried to assess that; true?
10       MR. BLECHMAN:  Argumentative as phrased,           11:04:39
11    incomplete hypothetical.
12            You can respond.
13       THE WITNESS:  One more time.
14    BY MS. WALKER:
15       Q.   Whether he was under the influence or         11:04:50
16    experiencing a mental health crisis, according to
17    this policy, you should have still tried to assess
18    the situation to determine whether you were dealing
19    with an individual in a mental health crisis?
20       A.   Which we did.                                 11:05:05
21       MR. BLECHMAN:   Belated same objections to that
22    question.
23    BY MS. WALKER:
24       Q.   What did you do to determine whether you
25    were dealing with an individual in a mental health    11:05:11
```

```
 1    crisis?                                          11:05:13

 2         MR. BLECHMAN:  Argumentative as phrased.

 3           Go ahead.

 4        THE WITNESS:  Again, tried to ask some

 5    questions, have a conversation.                  11:05:21

 6    BY MS. WALKER:

 7        Q.   Okay.  And he responded in a strange

 8    manner; true?

 9        A.   Correct.

10        Q.   So didn't that indicate to you that you 11:05:29

11    probably were dealing with someone in a mental

12    health crisis?

13        MR. BLECHMAN:  Calls for speculation, lacks

14    foundation, argumentative, incomplete hypothetical.

15           You can respond.                          11:05:39

16        THE WITNESS:  Again, we didn't know what we

17    were dealing with at the time.

18    BY MS. WALKER:

19        Q.   Have you ever been trained that you should

20    consider taking no action or just monitoring the 11:05:47

21    situation, rather than putting your hands on

22    someone?

23        A.   While investigating a crime?

24           Sorry.

25        MR. BLECHMAN:  It's incomplete, broad         11:05:56
```

Aiken Welch, A Veritext Company
510-451-1580

1    hypothetical, overbroad.                              11:05:58

2            Go ahead.

3        THE WITNESS:  While investigating a crime?

4    BY MS. WALKER:

5        Q.  At any time.  When you're dealing with a      11:06:04

6    person with a mental health crisis.

7        MR. BLECHMAN:  Incomplete hypothetical.

8            Go ahead.

9        THE WITNESS:  If it was strictly a mental

10   health crisis that we were aware of, sure.            11:06:14

11   BY MS. WALKER:

12       Q.  Well, you regularly come into contact with

13   the mentally ill when you're patrolling the streets;

14   true?

15       A.  Yes.                                           11:06:24

16       Q.  And often, people who were committing sort

17   of minor crimes, talking to themselves, knocking a

18   bottle over in a grocery store, often those kind of

19   people are mentally ill; true?

20       A.  True.                                          11:06:38

21       Q.  And for that reason, it's important for

22   you to employ your crisis intervention techniques,

23   not only for your safety, but for their safety as

24   well; true?

25       A.  True.                                          11:06:48

```
 1        Q.   So have you ever been trained that you        11:06:49

 2   should try to consider taking no action or passively

 3   monitoring a situation, especially if it involves a

 4   really minor crime and a person in a mental health

 5   crisis?                                                11:07:02

 6        MR. BLECHMAN:   It's an incomplete hypothetical,

 7   it's overbroad, calls for speculation.

 8             Go ahead.

 9        THE WITNESS:   That wasn't this case.

10   BY MS. WALKER:                                         11:07:16

11        Q.   That's not my question.   Okay?   So listen

12   closely.   Have you ever been trained that you should

13   try to consider taking no action or passively

14   monitoring a situation, especially when it involves

15   a minor crime committed by a person in a mental       11:07:33

16   health crisis?

17        MR. BLECHMAN:   Same objections.

18             Go ahead.

19        THE WITNESS:   One more time.

20   BY MS. WALKER:                                         11:07:42

21        Q.   All right.   Based on your training,

22   whether it's from POST, the Pleasanton Police

23   Department, your training in crisis intervention

24   techniques, have you ever been trained that you

25   should passively monitor or consider taking no        11:07:55
```

1    action when you're dealing with a person with a          11:07:59

2    mental health crisis, even if they considered --

3    even if they've committed some minor crime?

4         MR. BLECHMAN:  Same objections.  Add to that

5    vague and ambiguous as to minor crime or crimes.          11:08:09

6              Go ahead.

7         THE WITNESS:  Thank you.

8              Every situation is different.

9    BY MS. WALKER:

10        Q.   I understand that.  But I'm not asking you       11:08:16

11   to apply it to any situation.  I'm asking have you

12   ever been trained, ever in your career, whether you

13   should passively monitor or consider doing nothing

14   when you're dealing with a person with a mental

15   health crisis, even if they've committed a minor        11:08:33

16   crime?  Have you ever been told that?

17        MR. BLECHMAN:  Same objections as previously

18   stated to the last two similar questions.

19              Go ahead.

20   BY MS. WALKER:                                            11:08:42

21        Q.   Yes or no.

22        A.   Yes.

23        Q.   Okay.  When the reporting party -- when

24   you mentioned something about a vandalism, okay, the

25   reporting party said to you, "It's not much"; right?     11:08:56

```
 1        MR. BLECHMAN:  Hold on.                    11:10:05

 2          Vague as to time in terms of calm and

 3  cooperative.

 4          You can respond.

 5  BY MS. WALKER:                                   11:10:10

 6      Q.  When you initially contacted him.

 7      A.  Yes.

 8      Q.  He didn't try to run; right?

 9      A.  No.

10      Q.  There was nothing about the situation when  11:10:21

11  you initially contacted him that was an imminent

12  threat to anyone; true?

13      A.  True.

14      Q.  Turn to page 355 of Exhibit 7.  This goes

15  on, under the section of Deescalation, what an    11:10:48

16  officer should do in a situation where they're

17  dealing with an individual possibly experiencing a

18  mental health crisis.

19          It says:  "Responding officers generally

20  should not:  Use stances or tactics that can be    11:11:01

21  interpreted as aggressive."

22          But that's not what you did; right?

23      A.  That is one --

24      MR. BLECHMAN:  Hold on a second.

25          Vague and ambiguous as to "that."  It's    11:11:14
```

```
 1    I had at the time, I felt it was necessary to detain      11:38:55

 2    Mr. Bauer in handcuffs.

 3    BY MS. WALKER:

 4        Q.   What information did you have at the time

 5    that made you feel it was appropriate to detain          11:39:06

 6    Mr. Bauer in handcuffs?

 7        A.   The fact that he was a suspect in a

 8    crime --

 9        Q.   That -- committed outside of your

10    presence; right?                                         11:39:15

11        MR. BLECHMAN:   Can you just let him answer the

12    questions before you ask a follow-up?   I think

13    you're interrupting him a little bit.

14            Go ahead and finish.

15        THE WITNESS:   The fact that he was a suspect in     11:39:28

16    a crime who had been seen acting erratically,

17    aggressive.   Obviously, he scared some of the

18    employees there.   The fact that he's bigger than a

19    lot of individuals who we contact.   He was well over

20    200 pounds and bigger than myself or Officer Chin.       11:39:48

21    The fact that he had not been searched.

22    BY MS. WALKER:

23        Q.   Anything else?

24        A.   No.

25        Q.   Okay.   You said in preparation for your        11:40:05
```

Aiken Welch, A Veritext Company
510-451-1580

```
 1    deposition that you reviewed the administrative        11:40:18

 2    investigation?

 3         A.   Yes.

 4         Q.   And you reviewed the summary of your

 5    statement?                                             11:40:26

 6         A.   Yes.

 7         Q.   Anything in it that you thought was

 8    inaccurate?

 9         A.   Not that I recall.

10         MS. WALKER:   9.                                  11:40:42

11              (Plaintiffs' Exhibit 9 was marked.)

12         MR. BLECHMAN:   Jayme, this is confidential

13    record.   How do you want to handle that?

14         MS. WALKER:   I can make it a confidential

15    exhibit.   I'm not going to ask him very many          11:41:07

16    questions about it.

17    BY MS. WALKER:

18         Q.   Exhibit 9 is a portion of the

19    administrative investigation which is your

20    statement, a summary of your statement in the          11:41:22

21    investigation; right?

22         A.   Right.

23         Q.   And you reviewed that in preparation for

24    this deposition?

25         A.   Yes.                                         11:41:31
```

Page 77

```
 1   BY MS. WALKER:                                    12:04:10

 2       Q.   You don't recall?

 3       A.   No.

 4       Q.   Are you aware that somebody who's

 5   experiencing a mental health crisis is at a higher   12:04:25

 6   risk from sudden death from repeated Taser use than,

 7   say, the average person?

 8       MR. BLECHMAN:  Lacks foundation, calls for

 9   expert testimony.

10           Go ahead.                                 12:04:39

11       THE WITNESS:  I'm not, no.

12   BY MS. WALKER:

13       Q.   Why were you using the Taser on Jacob

14   Bauer?

15       A.   To overcome his resistance in an attempt   12:04:45

16   to detain him in handcuffs.

17       Q.   Were you using it as a pain compliance

18   measure?

19       A.   At one point, yes.

20       MS. WALKER:  Let's mark this as Exhibit 11.     12:04:57

21           (Plaintiffs' Exhibit 11 was marked.)

22   BY MS. WALKER:

23       Q.   So this is -- looks like probably -- I'm

24   not sure if this is the most recent version, but

25   this is the -- excerpts from a PowerPoint from the   12:05:29
```

Aiken Welch, A Veritext Company
510-451-1580

1    Axon Academy TASER Training.                    12:05:32

2            Do you know if you completed this

3    training?

4        MR. BLECHMAN:    Vague and ambiguous as to "this

5    training."                                      12:05:42

6        MS. WALKER:    The Axon Academy TASER Training,

7    Version 21, effective January 14th, 2019.

8        THE WITNESS:    I don't know if I've completed

9    this specific training.

10   BY MS. WALKER:                                  12:05:56

11       Q.    When's the last time you did the Axon

12   Academy TASER Training?

13       A.    I would have to refer to my training

14   record.

15       Q.    Give me your best estimate.           12:06:04

16       A.    It would have been at the previous

17   advanced officer school which, at that point, 2017.

18       Q.    When's the last time you had Taser

19   training?  Do you do it every year?

20       A.    Yes.  During our annual qualifications.  12:06:25

21       Q.    Okay.  So do you think -- did you see a

22   PowerPoint presentation given by anybody from the

23   Axon Academy in the last year?

24       A.    I don't recall.

25       Q.    Does it change -- you've taken it every  12:06:47

1    Officer Middleton, before we went off the record is

2    I was wondering if you'd been trained to avoid

3    circumstances where more than one officer was using

4    a Taser on a person at the same time.  Have you been

5    trained about that?                                    12:41:44

6        A.   I don't recall specific training on.

7        Q.   Okay.  In Pleasanton Police Department's

8    use of force policies on the Taser, have you had any

9    recent training on Pleasanton's own policies?

10       A.   I don't recall the last time I read the      12:42:05

11   Taser policy.  We get periodic updates.  I'm not

12   sure when the last one was.

13       Q.   In the Taser policy for Pleasanton Police

14   Department 309.5.2, it says at the very bottom:

15   "Officers should generally not intentionally apply    12:42:24

16   more than one CED at a time against a single

17   subject."

18            Does that refresh your recollection that's

19   part of Pleasanton's policies?

20       A.   Yes.                                          12:42:34

21       Q.   And you deployed your Taser against Jacob

22   Bauer, and Officer Trovao, he also deployed his

23   Taser against Jacob Bauer.  Do you know how soon

24   after Officer Trovao arrived on the scene did he

25   deploy his Taser?                                      12:42:51

                                                    Page 118

```
 1   Jacob Bauer a citation and releasing him?          12:46:57

 2        MR. BLECHMAN:  Incomplete hypothetical and

 3   argumentative.

 4            Go ahead.

 5        THE WITNESS:  We didn't even know what we had   12:47:05

 6   at the time.

 7   BY MS. WALKER:

 8        Q.   So you had no probable cause to arrest

 9   him, you'd agree; right?

10        MR. BLECHMAN:  Vague as to time.                12:47:13

11            Go ahead.

12        THE WITNESS:  At the time we contacted him, no,

13   not for an arrest.

14   BY MS. WALKER:

15        Q.   At the time you handcuffed him, you didn't  12:47:20

16   have any probable cause for even a misdemeanor

17   arrest; true?

18        A.   We had reason to detain him.

19        Q.   But that's not the question.  The question

20   is:  At the time you handcuffed him, you didn't have  12:47:33

21   probable cause for a misdemeanor arrest?

22        A.   Correct.

23        Q.   And you never considered just issuing a

24   citation and releasing him; is that true?

25        MR. BLECHMAN:  Argumentative as phrased, it's    12:47:44

                                              Page 123
```

1      MS. WALKER:  Let's mark this as Exhibit 12.    12:51:16

2       (Plaintiffs' Exhibit 12 was marked.)

3  BY MS. WALKER:

4    Q.  This is long, I don't expect you to read

5  the whole thing, we're not going to go through the    12:51:33

6  whole thing, but I want you to turn to page -- the

7  Bates number is 445.  The very last paragraph, it's

8  policy 300.6, Medical Consideration.

9    A.  Yes.

10    Q.  The very last paragraph says:  "Persons    12:51:56

11  who exhibit extreme agitation, violent irrational

12  behavior accompanied by profuse sweating,

13  extraordinary strength beyond their physical

14  characteristics, impervious to pain (sometimes

15  called 'excited delirium') or who require a    12:52:12

16  protracted physical encounter with multiple officers

17  to be brought under control, may be at an increased

18  risk of sudden death."

19      Do you see that?

20    A.  Yes.    12:52:23

21    Q.  Does that refresh your recollection on

22  policies of Pleasanton that mention excited

23  delirium?

24    A.  Yes.

25    Q.  Does that paragraph sort of sum up what    12:52:32

Aiken Welch, A Veritext Company
510-451-1580

```
 1       Q.   Additional training related --                01:04:45

 2       A.   Additional training, yeah, related to

 3  incidents.

 4       Q.   The spark tests?

 5       A.   No, no, no, I'm sorry.  The -- you were       01:04:50

 6  talking about the mental health training, ongoing

 7  training.

 8       Q.   Okay.  But I'm not asking what the report

 9  said.  I'm asking, do you recall being told as a

10  department that as a result of the investigation in    01:05:04

11  Jacob Bauer encounter, the entire department was

12  going to undergo additional training?  Did that ever

13  happen?

14       A.   No.

15       Q.   It didn't?                                    01:05:13

16       A.   No.

17       Q.   In fact, you were commended in a

18  performance review for your actions in the Jacob

19  Bauer encounter; true?

20       A.   I would have to refer to my . . .             01:05:22

21       MS. WALKER:   We'll make it Exhibit 13.

22            (Plaintiffs' Exhibit 13 was marked.)

23       MR. BLECHMAN:   I think we're ending the

24  confidential section, but this is a confidential

25  document, so we're going to maintain that as part of   01:05:57
```

```
 1    the transcript, please.                          01:06:00

 2         MS. WALKER:  We've marked as Exhibit 13 your

 3    employee performance evaluation for the period

 4    1/13/18 to 1/11/19.  And if you turn to the last

 5    page under adaptability, if you review the first    01:06:15

 6    paragraph.

 7              (Witness reviews document.)

 8         THE WITNESS:  Okay.

 9    BY MS. WALKER:

10         Q.  That first paragraph says:  "Brad remained  01:06:39

11    calm and professional throughout the incident,

12    performed extremely well, taking the subject into

13    custody, directly officers to the scene."

14              That refers to the encounter with Jacob

15    Bauer; is that true?                              01:06:54

16         A.  Yes.

17         Q.  Did you have any involvement in the

18    Shannon Estill fatality?

19         A.  No, I did not.

20         Q.  Any investigation of it or --            01:07:07

21         A.  No.

22         Q.  Okay.  Do you recall whether any training

23    or policy recommendations were made to the

24    department officers after that incident?

25         A.  As a result of that case, no, I don't.   01:07:19
```

Page 140

```
 1            I, the undersigned, a Certified Shorthand
 2    Reporter of the State of California, do hereby
 3    certify:
 4            That the foregoing proceedings were taken
 5    before me at the time and place herein set forth;
 6    that any witnesses in the foregoing proceedings,
 7    prior to testifying, were administered an oath; that
 8    a record of the proceedings was made by me using
 9    machine shorthand which was thereafter transcribed
10    under my direction; that the foregoing transcript is
11    a true record of the testimony given.
12            Further, that if the foregoing pertains to
13    the original transcript of a deposition in a Federal
14    Case, before completion of the proceedings, review
15    of the transcript ( ) was (X) was not requested.
16            I further certify that I am neither
17    financially interested in the action nor a relative
18    or employee of any attorney of any party to this
19    action.
20            IN WITNESS WHEREOF, I have this date
21    subscribed my name.
22    Dated:  September 17, 2020
23
24
25            ANRAE WIMBERLEY, CSR No. 7778
```

Page 147