# EXHIBIT L

DANIEL WOHLGELERNTER, M.D

2299 Century Hill
Los Angeles, CA. 90067

phone (310) 729-2202
Fax (310) 492-9793
Email: drdan@iheartdrdan.com

February 17, 2021

J Gary Gwilliam
1999 Harrison St. Suite 1600
Oakland, California 94612

RE: Bauer v City of Pleasanton
Decedent: Jacob Bauer
Date of Death: August 1, 2018 (38 years old)
Date of Birth: June 27, 1980

Dear Mr. Gwilliam :

I am a board-certified cardiologist with substantial experience in sudden cardiac arrest and sudden cardiac death, including my service as the director of the ICU and CCU at Providence- St. John's Hospital in Santa Monica, CA, and in my current position as Section Chief of Cardiology at Providence-St. John's.

I am knowledgeable about peer-reviewed medical and scientific research on the topics of pathophysiology of cardiac arrest and the specific type of cardiac arrest known as PEA (pulseless electrical activity). The knowledge base that I utilize has been formed by my 35 years of clinical practice and experience, and my previous and ongoing review of clinical and experimental literature.

On February 3, 2021, I was retained as an expert to review relevant materials and provide expert opinion on this matter, date of incident, August 1, 2018, and to consider and to render expert opinion on whether the restraining process was contributory to Mr. Jacob Bauer's death.

I have reviewed the following materials:

- Autopsy photos subpoenaed from the Coroner's Office
- Medical records (prior records of Jacob Bauer, LPFD incident report, records from Stanford, and the EMS report)
- Confidential Administrative Review
- Investigation Report
- Reports from Dr. Cyril Wecht
- Coroner Report
- Death Certificate
- Plaintiffs' Second Amended Complaint
- Bodycam footage of interview with LPFD Fire Captain Jorge Diaz
- Bodycam Footage of interview with LPFD Fire Engineer Patrick Thomson

*paramedic depositions taken on February 2, 2021:
Witness – Patrick Thomson

Witness – Captain Jorge Diaz
*Dr. Ferenc's deposition transcript

PERTINENT MEDICAL HISTORY:

Jacob Bauer was a 38-year-old man with a history of mental health issues, morbid obesity and methamphetamine use.
Mr. Bauer was behaving erratically in a grocery store in the city of Pleasanton, CA. on 8/1/2018 in the afternoon. Mr. Bauer was asked to leave the store and staff called the police.
Police officers made contact with Mr. Bauer and decided to detain Mr. Bauer, and a struggle ensued in which officers attempted to subdue and handcuff Mr. Bauer who physically resisted. The officers initially restrained Mr. Bauer in a prone (face down) position while attempting to handcuff him. Blows were applied to his back, and he was restrained with pressure on his back. Taser electroshock was utilized multiple times, once in Taser mode and the rest of the applications in stun drive mode. Mr. Bauer's legs and lower torso were restrained in the "Wrap" restraint device. He was turned supine (face up) and the "Wrap" restraint device was applied to his torso. and photos demonstrate that Mr. Bauer's position in the device was with torso hunched forward and head/neck bent forward. A spit hood was applied over his head. After the WRAP was fastened and Mr. Bauer was seated in an upright position, handcuffed, and completely bound, an officer continued to hold Mr. Bauer's legs down by kneeling on them. Two officers were holding Mr. Bauer's shoulders down. The officer holding Mr. Bauer's right shoulder placed a knee on his back, and leaned part of his bodyweight on him, in addition to pressing his shoulders down with his hands, forcing Mr. Bauer's torso into a less than 90-degree angle. This position was maintained for at least 5 minutes. Mr. Bauer's breathing became shallower, his movements lethargic, and his face began to turn blue. An ambulance arrived on scene . Mr. Bauer was not medically evaluated, but rather was first given a 4 mg dose of the sedative midazolam intramuscularly, at approximately 8.5 minutes after the paramedics arrived on scene. Multiple officers and paramedics loaded Mr. Bauer onto a gurney 12 minutes after the ambulance arrived. One paramedic noted that Mr. Bauer's "pupils [were] huge." Three minutes after being loaded on the gurney, one paramedic felt for Mr. Bauer's pulse via the carotid artery but did not state whether he found a pulse or not. Once in the ambulance, paramedic/EMT personnel remove the spit hood and noted Mr. Bauer to appear "bluish" and then noted that he was apneic and pulseless. Resuscitative efforts were initiated, including intubation and application of an automated chest compression device, and he was transported to the hospital. At the emergency room, esophageal intubation was noted and the tube was removed and a physician re-intubated the patient endotracheally. Resuscitative efforts at the hospital were unsuccessful, and Mr. Bauer was pronounced dead. Asystole and pulseless electrical activity were recorded on cardiac monitoring during resuscitative efforts.

On August 2, 2018, an autopsy was conducted by Dr. Ferenc.21 The external examination revealed injuries to the head, neck, torso, and limbs, including abrasions to the head, conjunctival petechiae, contusions to the anterior fatty tissues and fat and muscle of the back, and abrasions and contusions of the wrists and arms. Mr. Bauer was 5'9" tall and weighed 274 pounds, with a BMI of 40.5, indicative of severe, morbid obesity. He was found to have cardiac hypertrophy and dilation, foam in bronchi, pulmonary congestion, an enlarged spleen and liver, and a toxicology screen positive for methamphetamine (0.42 mg/L).
Notably, the 4 mg of midazolam that was administered to Mr. Bauer intramuscularly was not detected in his postmortem blood. This finding led Dr. Ferenc to conclude that Mr. Bauer's "circulatory system had already collapsed or was in the process of collapsing when the dose was administered."

Dr. Ferenc concluded that the cause of death was due to acute methamphetamine toxicity, and that other significant conditions included probable mechanical asphyxia while being placed in restraint device by police, cardiac hypertrophy, and morbid obesity. The manner of death was ruled as an accident.
A second autopsy was performed on September 12, 2018 at 9:30 by Dr. Cyril Wecht (forensic pathology), at the request of Mr. Bauer's family. In his report, Dr. Wecht concluded that the cause of Mr. Bauer's death was a result of asphyxia during physical restraint by police, including blunt force pressure and impacts, handcuffing behind the back, encasement in the WRAP, and spit mask. He added that acute methamphetamine intoxication, TASER shocks, and morbid obesity were contributing factors to Mr. Bauer's death.

ANALYSIS & OPINIONS:

It is my opinion, with a reasonable degree of medical certainty, that Mr. Bauer's death was due to restraint/compressive asphyxia with mechanical obstruction of respiration, secondary to compressive force applied to his torso by the police officers, in conjunction with the WRAP device creating restriction of ventilatory activity, with resultant respiratory compromise and subsequent development of hypoxia/hypoxemia causing PEA cardiac arrest.

The combination of compressive asphyxia and the physiologic effects of violent struggle including lactic acidosis, increased oxygen demand, catecholamine surge, hyperthermia, and generalized exhaustion created an overwhelming oxygen debt, causing hypoxia and cardiac arrest. The modest amount of methamphetamine in Mr. Bauer's circulation may have augmented these effects by producing elevated blood pressure and elevated heart rate.

Pulseless electrical activity (PEA), also known as electromechanical dissociation, refers to cardiac arrest in which the electrocardiogram shows a heart rhythm that should produce a pulse, but does not. The rhythm strips obtained at the time of the cardiac arrest demonstrated PEA.

The following medical literature is informative regarding PEA cardiac arrest: 2005 American Heart Association Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care (December 2005). "Part 7.2: Management of Cardiac Arrest". Circulation. 112 (24 Suppl): IV 58–66. doi:10.1161/CIRCULATIONAHA.105.166557.

As is documented in the cardiology literature, PEA may be caused by many conditions, but its most frequent causes are hypovolemia and hypoxemia. "Hypoxia secondary to respiratory failure is probably the most common cause of PEA, with respiratory insufficiency accompanying 40-50% of PEA cases." emedicine.medscape.com/article/161080-overview#a6-updated 11/20/17.

In reviewing the literature and as confirmed by my extensive experience as a cardiologist, the only plausible and possible cause of PEA cardiac arrest in Mr. Bauer was hypoxia/hypoxemia, secondary to restraint/compressive asphyxia. No other cause of PEA is plausible or relevant in the case of Mr. Bauer.

I totally reject the contention that the cause of the sudden cardiac arrest and death in Mr. Bauer was a methamphetamine overdose. The fact that the cardiac rhythm at the time the Paramedics confirmed cardiac arrest was PEA is incompatible with the theory that methamphetamine was the culprit. The hypothesis that methamphetamine caused the cardiac arrest would only be plausible if the cardiac monitor that confirmed this cardiac arrest showed ventricular tachycardia or ventricular fibrillation.

Methamphetamine, even at lethal levels of intoxication, does NOT cause PEA. The only acceptable pathophysiologic explanation of the PEA in this case is hypoxia/hypoxemia due to asphyxia.

This restraint asphyxia in conjunction with the heightened requirement for oxygen created a lethal oxygen supply-oxygen demand imbalance for Mr. Bauer, with resultant hypoxia and subsequent PEA cardiac arrest.

Under penalty of perjury, I hereby swear that the opinions stated above are true and correct within a reasonable degree of medical probability. I also reserve the right to review the reports of other expert witnesses retained in this case by all parties, and review other materials as they become available in the case, and provide additional opinions as appropriate.

Sincerely yours,

DANIEL WOHLGELERNTER, MD, FACC