UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

JOHN BAUER et al.,

Plaintiffs,

v.

CITY OF PLEASANTON et al.,

Defendants.

Case No. 19-cv-04593-LB

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

Re: ECF No. 73

## INTRODUCTION

In August 2018, two police officers responded to a 911 call about a disturbance at a grocery store. Store employees told the officers that Jacob Bauer had been breaking bottles and was mentally ill or on drugs. (These are possible misdemeanors.) The officers approached Mr. Bauer, who by then was halfway down the block, talked with him calmly, and checked whether he had outstanding warrants. (He did not.) Then, after Mr. Bauer did not respond to the question, "do you have anything illegal on you?," the officers detained him forcibly. Backup officers arrived. Ultimately, seven officers used force (including tasers) to restrain and handcuff Mr. Bauer. After the altercation, Mr. Bauer died.

The plaintiffs are Mr. Bauer's parents, who claim (1) an unlawful seizure and excessive force in violation of 42 U.S.C. § 1983 and the Fourth Amendment to the U.S. Constitution, (2) supervisory liability against two sergeants who did not stop the force, (3) a deprivation of their right to familial association, in violation of § 1983 and the substantive due-process clause of Fourteenth Amendment

ORDER – No. 19-cv-04593-LB

conduct (by conduct that shocks the conscience), (4) deliberative indifference to the provision of medical care, in violation of § 1983 and the Fourth Amendment, (5) municipal liability under *Monell v. Department of Social Services*, (6) failure to reasonably accommodate Mr. Bauer's disability, in violation of Title II of the Americans with Disabilities Act (ADA), and (6) state-law claims of negligence, battery, and a violation of California's Bane Act. The parties dispute whether the police acted reasonably by using force to detain Mr. Bauer and whether the police caused his death, which the coroner concluded resulted in part from methamphetamine intoxication. The defendants moved for summary judgment on all claims on the grounds that (1) the officers used reasonable force and otherwise have qualified immunity, (2) there is no conduct that shocks the conscience, denied medical care, or violated the ADA, and (3) there is no supervisory or *Monell* liability.

The court cannot decide as a matter of law whether the seizure was lawful, the force was reasonable, or the officers have qualified immunity because there are fact disputes about the reasonableness of the officers' use of force during a *Terry* stop for misdemeanors committed outside of their presence. That conclusion precludes dismissal of the state-law claims against the police officers who used force. The court grants the motion for summary judgment on the remaining claims for the following reasons. First, the sergeants have qualified immunity for the supervisory-liability claim because they were not involved in the initial detention, seizure, and use of force. The court grants summary-judgment to the sergeants on the state claims, which also are predicated on the use of force. Second, the officers have qualified immunity on the Fourteenth Amendment claim and the Fourth Amendment claim for denial of medical care because existing precedent does not put the constitutional questions squarely beyond debate. Third, there is no deficient policy, pattern of constitutional violations suggesting training deficits, or endorsement of the officers' actions to support the *Monell* claim. Finally, there is no evidence that the police officers acted because of Mr. Bauer's disability or with the requisite scienter for an ADA claim.

## STATEMENT

On August 1, 2018, an employee from the Raley's grocery store in Pleasanton, California called 911 to report that that a deranged customer (later identified as Jacob Bauer) was in the store

causing a scene, and they needed help escorting him out of the store. The dispatcher asked whether the man needed a welfare check or whether the manager wanted him off the property, and the manager replied that she did not know whether he was "drug intoxicated" or "maybe just bipolar." She said he was "speaking fine, so it [wasn't] intoxication," and that someone should assess him to see whether he needed "some kind of assistance." She confirmed that she wanted him out of the store.[1] The dispatch report — accessible to the officers in their car — said that Mr. Bauer was "ranting to himself," "has been asked to leave the store and is refusing," and was "neg[ative for] weapons," and that the store was "req[esting] ass[istance] with escorting him out of store."[2]

The video footage from the officers' body-worn cameras shows the following events.

Officer Bradlee Middleton responded to the 911 call at around 2:50 p.m. and spoke to three Raley's employees, outside, in front of the entrance. One employee described Mr. Bauer (purple hair, "a little bit overweight") and his conduct (breaking bottles, talking to himself), and said he left the store. A second employee described Mr. Bauer as "really aggressive." A third employee said that Mr. Bauer was on some heavy drugs, and the first employee added that he was either crazy or on drugs. Officer Middleton asked if the employees "wanted him arrested for breaking things in there," and the first employee said, "he's destroying stuff, intoxicated, yeah, public nuisance or something," and the three employees chuckled. Officer Middleton then said, "if you want to press charges for the vandalism, let us know." The third employee responded, "it's not much," and the second employee said that they were more scared of his actions and whether he might hurt somebody. The employees then went back in the store.[3]

Officer Jonathan Chin then arrived. The two officers walked about 50 steps to the parking lot exit (past four shops). This is about 125 feet (based on 2.5 feet per step for an average stride, according to conversion tables). At the exit, they turned left on the sidewalk. At this point, Officer Middleton's

---

[1] Dispatch Report, Ex. B to Blechman Decl. – ECF No. 73-1; 911 Call, Ex. C-1 to Walker Decl. – ECF No. 96-5. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Dispatch Report, Ex. D-8 to Walker Decl. – ECF No. 96-10.

[3] Video Matrix 1, Ex. C-1 to Blechman Decl. – ECF No. 73-1 (14:51:13, 14:51:28–14:51:57).

camera shows Mr. Bauer on the sidewalk, halfway down the block. Officer Middleton radioed, "we're going to be out with him on Mission and Sonoma." The officers walked toward Mr. Bauer and, when they were a quarter of the way down the block, Officer Middleton called, "hey bud, what's going on man." Mr. Bauer stopped, turned toward the officers, and put his hands out, apparently to show what was in them: a glass in one hand and a cell phone and something else in the other. The officers walked about 20 steps (around 50 feet). When they were a few steps from Mr. Bauer, Officer Middleton said, "could you set it down for me," and Mr. Bauer put down the glass.[4]

Mr. Bauer was 38, 5'9", and 274 pounds.[5] He was calm and kept his hands straight down at his side, slightly away from his body. Officer Middleton asked what happened at Raley's, and Mr. Bauer shrugged and said, "nothing." Officer Middleton responded, "they said you broke some stuff," and Mr. Bauer said, "no." Officer Middleton asked whether Mr. Bauer had any identification, and Mr. Bauer responded that it was at his parents' house (pointing to his right).[6]

Officer Middleton said, "do me a favor and keep your hands out of your pockets," and Mr. Bauer said, "okay." Officer Middleton asked, "what's going on today," and Mr. Bauer replied, "nothing . . . just a hot day." Officer Middleton asked for his last name, and Mr. Bauer said and spelled his name, adding, "Bauer, like Eddie Bauer . . . or Bauer ice skates." Officer Middleton laughed. In response to Officer Middleton's questions, Mr. Bauer gave his first name and date of birth, said that he was not on probation, confirmed that he lived right up the street, and said that he had not used drugs or alcohol that day. Officer Middleton repeated Mr. Bauer's version of events and reiterated that the officers were speaking to him because Raley's employees had reported a disturbance at the store. Mr. Bauer shrugged and shook his head as if he didn't know about the Raley's incident and put his hand

---

[4] *Id.* (14:52:47–14:53:06). The videos show the steps. Non-expert testimony about perceived distance is permissible under Rule 701 of the Federal Rules of Evidence. *Asplundh Mfg. Div. v. Benton Harbour Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995) (distance is a "prototypical example of the type of evidence contemplated by the adoption of Rule 701") The court can consider evidence at summary judgment if the underlying evidence can be provided in an admissible form at trial. *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 110 (9th Cir. 2016).

[5] Coroner Report, Ex. N-1 to Blechman Decl. – ECF No. 73-1 at 248.

[6] Video Matrix 1, Ex. C-1 to Blechman Decl. – ECF No. 73-1 (14:53:07–14:53:20).

near his pocket. Officer Middleton again asked him to keep his hand out of his pocket, and Mr. Bauer nodded and moved his hand away. The interaction remained calm.[7]

Officer Middleton radioed Mr. Bauer's identifying information to dispatch to check for warrants. He asked where Mr. Bauer was headed, and Mr. Bauer said that he was going home. Mr. Bauer then said, "you know what it was? I found my glass" (presumably the glass that he put down at Officer Middleton's request). He said that someone had stolen it from his house, it had gotten him excited "or something like that," it brought back bad memories," and it was the reason he was crying. (He brushed his eyes in a manner consistent with crying.) Officer Middleton responded, "that's why you are upset? Understandable." Then, everyone was silent for about 18 seconds until dispatch relayed, "your suspect is clear and valid."[8]

At this point, about three minutes into their encounter, Officer Middleton asked, "do you have anything illegal on you, bud?" Mr. Bauer did not respond and instead gazed straight ahead. (Officer Middleton was standing in front of Mr. Bauer, to the left, perhaps 45 degrees from Mr. Bauer's center.) Officer Middleton said, "Jacob?" Mr. Bauer continued looking straight ahead and did not respond. Officer Middleton looked at Officer Chin, flipped his hand in Mr. Bauer's direction, and said, "detain him." Then, the officers each grabbed one of Mr. Bauer's arms.[9] At his deposition, Officer Middleton said that nothing suggested that Mr. Bauer was an imminent danger to anyone.[10]

Mr. Bauer said, "whoa, whoa, whoa, whoa, whoa, whoa, whoa," and Officer Middleton told him that he was being detained until they "figure[d] out what was going on." Mr. Bauer said, "what's going on" and "please, please, please." The video shows pushing and pulling, but it's unclear who caused it. Mr. Bauer asked whether he was free to leave, and Officer Middleton told him no because he was being detained. The officers told him to calm down and to relax several times. Mr. Bauer responded, "I'm not doing anything," and — after a second admonition to relax — "I'm literally not doing anything" (all in a reasonably calm voice). Officer Middleton told him to put his arm behind

---

[7] Id. (14:53:20–14:54:15).

[8] Id. (14:54:22–14:55:46).

[9] Id. (14:55:51–14:56:05).

[10] Middleton Dep., Ex. D to Walker Decl. – ECF No. 96-8 at 24 (p. 63:10–13).

his back. Mr. Bauer asked three times, "what are you doing?," and each time, Officer Middleton told him to put his arm behind his back.[11]

Officer Chin then used a leg sweep to bring Mr. Bauer to the ground. Officer Middleton's body camera fell to the ground. Mr. Bauer asked again, "what are you doing," and an officer told him to put his arms behind his back. Mr. Bauer responded, "I can't put my arms behind my back." Officer Chin put a handcuff on Mr. Bauer's right wrist. At this point, the video depicts Mr. Bauer face down on the ground and then shifts to one side, showing only his cuffed wrist. An officer radioed for two backup units.[12] Officer Chin's body camera was too close to show the events, but a spectator began filming from across the street.[13] The officers and Mr. Bauer were on the ground, and Mr. Bauer's leg moved up (though it is hard to see much). An officer said, "stop, stop, stop, stop resisting," and Mr. Bauer responded that it was hurting. Officer Chin exclaimed, "he bit me," and Mr. Bauer said, "I'm not trying to bite you."[14]

At 2:58 p.m., Officer Middleton yelled "you're going to get tased" and "taser, taser, taser" and used his taser on Mr. Bauer's left hip. Mr. Bauer exclaimed (presumably in pain). The taser did not lead to neuromuscular incapacitation because of the small spread between the probes. Officer Middleton said, "drive-stun," and used his taser a second time in drive-stun mode on Mr. Bauer's left shoulder. In total, he tased Mr. Bauer four times for a total of 21 seconds. One of the officers told Mr. Bauer to roll over, and they rolled him onto his stomach and tried to handcuff him.[15]

Seven backup officers arrived between 2:58 p.m. and 2:59 p.m. (Three are defendants (in addition to Officers Middleton and Chin): Officer Richard Trovao and Sergeants Eric Billdt and Jason Knight.) Officer Steven Bennett used a figure-four lock to prevent Mr. Bauer from kicking.

---

[11] Video Matrix 1, Ex. C-1 to Blechman Decl. – ECF No. 73-1 (14:56:10–14:56:40).

[12] *Id.* (14:56:42–14:57:20, 14:57:25).

[13] Video Matrix 1 with Bystander Video, Ex. C-1(b) to Blechman Decl. – ECF No. 73-1 (14:57:31).

[14] Video Matrix 1, Ex. C-1 to Blechman Decl. – ECF No. 73-1 (14:57:25–14:57:59).

[15] *Id.* (14:58:03–14:58:28); Middleton Taser Report, Exhibit D-9 to Walker Decl. – ECF No. 96-11 at 2; Mot. – ECF No. 73 at 10 (citing the video to support the conclusion about the lack of neuromuscular incapacitation). The darts (lodged in the hip) are shown in the video at 14:59:44.

Officer Trovao used his taser for 10 seconds until another officer said "he's been tased, no effect."[16] In combination, Officers Middleton and Trovao tased Mr. Bauer for 30 seconds, twice the national standard.[17] The video shows both officers' tasers on Mr. Bauer's back at the same time.[18]

Officer Chin yelled "do not scratch me" and used two "distraction blows" to Mr. Bauer's lower back and shoulder area.[19] Officers Trovao and Koumiss used their batons to try to pry Mr. Bauer's left arm from under his body.[20] The officers told Mr. Bauer to put his hands behind his back, and an officer said, "you're going to get another one." Another officer said, "let's flip him," and another said, "put your hands behind your back." Mr. Bauer repeatedly moaned and called for help. An officer told Mr. Bauer to "give up his other hand," and he responded that he could not. At one point, Officer Trovao pushed his foot against Mr. Bauer's back to push him onto his stomach.[21]

At 3:00 p.m., an officer asked if anyone had a WRAP (a restraining device). An officer said, "stop resisting," a second officer said, "stop moving, stop resisting," and a third said, "cuffs are on." The officers began putting the WRAP on Mr. Bauer's legs at 3:02 p.m. Mr. Bauer was face down on the ground, with his hands cuffed behind him (in four sets of cuffs), and he continued to moan and say, "help."[22] During the process of applying the WRAP, seven officers restrained Mr. Bauer: three restrained his lower body, and four restrained his upper body. Officer Trovao applied pressure to Mr. Bauer's head and neck for approximately four minutes.[23]

At 3:08 p.m., Mr. Bauer shouted, "they are trying to rape me," yelled for "Mr. Trump," and said (among other things) that the officers were trying to kill him and that he was going to die. The

---

[16] Video Matrix 1, Ex. C-1 to Blechman Decl. – ECF No. 73-1 (14:58:31–14:59::44); Trovao Taser Report, Exhibit I-24 to Walker Decl. – ECF No. 96-32 at 2.

[17] Middleton Taser Report, Exhibit D-9 to Walker Decl. – ECF No. 96-11 at 2; Trovao Taser Report, Exhibit I-24 to Walker Decl. – ECF No. 96-32 at 2; Harmening Report, Ex. F to Walker Decl. – ECF No. 96-19 at 21.

[18] Trovao Video, Ex. I-19 to Walker Decl. – ECF No. 96-29 (14:59:10–14:59:25).

[19] Knight Video, Ex. H-18-A to Walker Decl. – ECF. 96-25 (14:59:38).

[20] Trovao Video, Ex. I-19 to Walker Decl. – ECF No. 96-29 (15:00:00–15:00:15).

[21] Billdt Video, Ex. I-22 to Walker Decl. – ECF No. 96-31 (15:00:26).

[22] Video Matrix 1, Ex. C-1 to Blechman Decl. – ECF No. 73-1 (15:00:55–15:02:25).

[23] Knight Video, Ex H-18-B to Walker Decl. – ECF No. 96-26 (15:02:30–15:06:27).

officers again discussed rolling Mr. Bauer, and, mentioning the blood on Mr. Bauer's face, discussed putting a spit mask on him.[24] The officers put a spit mask on Mr. Bauer at 3:09 p.m., rolled him onto his back, and put him in an upright position.[25] Sergeant Billdt testified that the officers applied the spit mask because Mr. Bauer "was bleeding and he had bitten Officer Chin."[26] At the same time, they tilted him back into a position slightly less than 90 degrees and put the WRAP on his upper body, completing the process at around 3:10 p.m.. Starting at 3:11 p.m., an officer had his hands on Mr. Bauer's shoulders and his knee in his back for approximately five minutes. At 3:12 p.m., Mr. Bauer continued to yell for "Mr. Trump" and said "I'm getting murdered right now." An officer told Mr. Bauer to "calm down," and he replied, "I can't, you're suffocating me." At 3:14 p.m., an officer said, "you can breathe, that's why you're yelling still." Mr. Bauer began to calm down, and at 3:15 p.m., responded to questions from the officers, telling them his name, birthday, and where he lived. At 3:16 p.m., Mr. Bauer stopped saying anything or moving.[27]

The officers called for medical help at 3:02 p.m. Paramedics and firefighters — who were waiting nearby — arrived at about 3:11 p.m.[28] After they arrived, they did not interact with Mr. Bauer until 3:19 p.m., when a paramedic injected him with Versed (a brand of the sedative Midazolam).[29] At 3:22 p.m., the officers removed the WRAP and helped the paramedics and firefighters put Mr. Bauer on a gurney.[30] At 3:25 p.m., medical personnel began medically assessing Mr. Bauer.[31] At 3:28 p.m., when they loaded him into the ambulance, and after they removed the spit mask, they saw that his face had

---

[24] Video Matrix 1, Ex. C-1 to Blechman Decl. – ECF No. 73-1 (15:04:10–15:09:00).

[25] PPD Narrative, Ex. F-3 to Walker Decl. – ECF No. 96-22 at 3; Video Matrix 1, Ex. C-1 to Blechman Decl. – ECF No. 73-1 (15:09:00–15:09:55).

[26] Billdt Dep., Ex. G to Walker Decl. – ECF No. 96-23 at 28 (p. 119:22–24).

[27] Video Matrix 2, Ex. C-2 to Blechman Decl. – ECF No. 73-1 (15:11:05–15:16:30).

[28] Video Matrix 1, Ex. C-1 to Blechman Decl. – ECF No. 73-1 (15:02:13); Video Matrix 2, Ex. C-2 to Blechman Decl. – ECF No. 73-1 (15:11:05).

[29] Video Matrix 2, Ex. C-2 to Blechman Decl. – ECF No. 73-1 (15:19:06).

[30] *Id*. (15:22:32).

[31] PPD Narrative, Ex. F-3 to Walker Decl. – ECF No. 96-22 at 5; McFarlane Matrix 2, Ex. R-1 to Walker Decl., – ECF No. 96-44 (15:25:45).

turned blue, he did not have a pulse, and he was not breathing.[32] They transported Mr. Bauer to the Stanford Valley Care Hospital, where the hospital pronounced him dead.[33]

The coroner's report identified the minor physical injuries that Mr. Bauer suffered (abrasions, contusions, minor external injuries, and taser barbs embedded in his abdomen). The toxicology report showed that methamphetamine and amphetamine were present in Mr. Bauer's blood (0.42 mg/L of methamphetamine and 0.04 mg/L of amphetamine). The cause of death was "acute methamphetamine toxicity." Other conditions contributed to death including "probable mechanical asphyxia while being placed in [a] restraint device by police[,] cardiac hypertrophy[, and] morbid obesity." The paramedics had injected Mr. Bauer with four milligrams of Midazolam, but the toxicologist did not find the drug in his blood, suggesting that Mr. Bauer's "circulatory system already had collapsed or was [in] the process of collapsing when the dose was administered."[34] The coroner testified that the WRAP restraint and the ninety-degree angle impaired Mr. Bauer's ability to breathe and caused the asphyxia.[35]

The plaintiffs dispute that the cause of death was methamphetamine. Their three experts — a forensic pathologist, an epidemiologist, and a cardiologist — agree that the primary cause of death was asphyxiation that resulted from the police officers' conduct.[36]

The pathologist attributes the cause of death to the "combined physiologic effects of violent struggle . . . and restraint by police." Other contributing conditions included "methamphetamine toxicity, obesity, and cardiac hypertrophy." The physiologic effects of the struggle and restraint were "additive upon underlying . . . pre-existing morbid obesity, cardiac hypertrophy, and

---

[32] Smith Dep., Ex. K to Blechman Decl., – ECF No. 73-1 at 168–69 (pp. 45:2–46:1); PPD Narrative, Ex. F-3 to Walker Decl. – ECF No. 96-22 at 5.

[33] PPD Narrative, Ex. F-3 to Walker Decl. – ECF No. 96-22 at 5.

[34] Coroner Report, Ex. N-1 to Blechman Decl. – ECF No. 73-1 at 241–42.

[35] Ferenc Dep., Ex. O to Walker Decl. – ECF No. 96-39 at 8–9 (pp. 26:6–27:8).

[36] Opp'n – ECF No. 96 at 20–22. The defendants object to some of the plaintiffs' evidence (mostly about the experts). Reply – ECF No. 84 at 20–21. Most of the challenges are moot: except for modest citations to expert opinions (for context), the court cites only evidence in this order. Any issues about the foundation for the expert opinions can be addressed through the pretrial process.

methamphetamine use." "But for the interaction with police . . . Mr. Bauer would not have died when he did. He did not die primarily of methamphetamine toxicity."[37]

The epidemiologist opined that "the very small amount of methamphetamine" in Mr. Bauer's blood was not "a plausible cause of death in the absence of the violent restraint."[38] Instead, the restraints applied to Mr. Bauer and the pressure on his back were "the only apparent cause of the asphyxia signs observed . . . and served as a highly plausible cause of cardiopulmonary arrest that resulted in his death."[39]

The cardiologist similarly disputed the coroner's determination that methamphetamine toxicity and sudden cardiac arrest caused Mr. Bauer's death. The restraints led to asphyxia that, "in conjunction with the heightened requirement for oxygen[,] created a lethal oxygen supply–oxygen demand imbalance for Mr. Bauer, with resultant hypoxia and subsequent PEA cardiac arrest."[40]

In the month before the incident, Mr. Bauer's parents reported Mr. Bauer's mental-health issues to the Pleasanton Police Department. On June 29, 2018, a police officer spoke with Mr. Bauer's mother about Mr. Bauer's car accident in San Francisco. She reported that he was suffering from a mental-health crisis, had paranoid and delusional thoughts that the police were after him, and would not cooperate with her attempts to get him psychiatric help.[41] The next day, Mr. Bauer's father told a police officer that Mr. Bauer had paranoia and "delusional psychosis," might need to be institutionalized, and would react negatively if officers approached him in uniform.[42] On July 26, 2018, Mr. Bauer's parents reported his undiagnosed schizophrenia, his paranoia and paranoid statements (including his fear that the police were after him), his refusal to get help, his mental-health crisis, and his "concerning" emails.[43] On July 29, 2018, Mr. Bauer's father reported his son's

[37] Knight Report, Ex. K to Walker Decl. – ECF No. 96-35 at 9–10.

[38] Freeman Report, Ex. J to Walker Decl. – ECF No. 96-33 at 21.

[39] Id. at 19.

[40] Wohlgelernter Report, Ex. L to Walker Decl. – ECF No. 96-36 at 5.

[41] Incident Report, Ex. A to Stipulation – ECF No. 91-1 at 3.

[42] Incident Report, Ex. B to Stipulation – ECF No. 91-2 at 3; Murazzo Video, Ex. C to Stipulation – ECF No. 91-3; Rose Bauer Dep., Ex. B to Walker Decl. – ECF No. 96-3 at 8–9 (pp. 50:19–51:8).

[43] Incident Report, Ex. D to Stipulation – ECF No. 91-4 at 3.

mental breakdown (after an argument about car insurance) and his desire to have him evaluated for a welfare check under California Welfare and Institutions Code § 5150.[44]

The California Peace Officer Standards and Training (POST) has training modules for police officers, including the officers here, on mental-health issues and de-escalation techniques for persons suffering a mental-health crisis or who are under the influence.[45] During his deposition, Sergeant Billdt testified that in a hypothetical situation similar to this case (a man "ranting to himself," "appear[ing] strange," and "showing signs of some mental illness"), officers should conduct a welfare check to "engage in conversation, see what [they] can learn from him, [and] see what kind of resources [they] can provide."[46] Officers Middleton and Chin recognized that it was possible that Mr. Bauer was mentally ill.[47]

The police department's Crisis Intervention Training (CIT) instructs officers on handling persons under the influence or experiencing a mental-health crisis. CIT emphasizes de-escalation tactics, including refraining from "tactics that can be interpreted as aggressive" and "corner[ing] a person who is not believed to be armed, violent[,] or suicidal."[48] Officers Middleton and Chin completed CIT.[49] In his deposition, Officer Middleton testified that he was not aware of any policy or protocol concerning interactions with mentally ill people and that based on his training, he would have approached Mr. Bauer the same way, mentally ill or not.[50]

The police department's use-of-force policy provides that "calls involving [mentally ill] persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable." Persons showing signs of "excited

---

[44] Incident Report, Ex. E to Stipulation – ECF No. 91-5 at 3.

[45] POST Training Materials, Ex. F-1 to Walker Decl. – ECF No. 96-20 at 4–5.

[46] Billdt Dep., Ex. G to Walker Decl. – ECF No. 96-23 at 12–15 (pp. 52:7–55:19).

[47] Middleton Dep., Ex. D to Walker Decl. – ECF No. 96-8 at 11–12 (pp. 34:24–35:4); Chin Dep., Ex. E to Walker Decl. – ECF No. 96-15 at 12 (p. 30:10–15).

[48] Crisis Intervention Training Policy, Ex. D-7 to Walker Decl. – ECF No. 96-9 at 4–5.

[49] Middleton Dep., Ex D to Blechman Decl. – ECF No. 73-1 at 52 (p. 107:20–22); Chin Dep., Ex E to Walker Decl. – ECF No. 96-15 at 15 (p. 56:1–10).

[50] Middleton Dep., Ex. D to Walker Decl. – ECF No. 96-8 at 13–14 (pp. 37:24–38:4), 18 (p. 59:15–24).

delirium" or who "require a protracted physical encounter with multiple officers to be brought under control" may be at an increased risk of sudden death.[51] The policy generally limits taser use to one full cycle and forbids simultaneous deployment, but it does not provide a time limit on use, which — according to the plaintiffs' evidence — is inconsistent with the national standard of a fifteen-second limit.[52] Under the policy, spit hoods should not be used "in situations where the restrained person is bleeding profusely from the area around the mouth or nose, or if there are indications that the person has a medical condition, such as difficulty breathing."[53] The policy does not address the WRAP.[54]

The police department's use-of-force investigation concluded that the officers acted within policy (with only minor violations). Sergeant Eric Gora — who was responsible for the investigation — testified that the following uses of force were compliant with the policy: the use of tasers, Officers Middleton's and Chin's use of handcuffs, and the use of the WRAP and spit hood. He did not recall any policy about the use of pressure — like that used by Officer Trovao — to the neck and upper back.[55] Former Police Chief David Spiller did not conduct the investigation but thought that there were no training deficiencies or policy violations.[56] Officers Middleton and Chin received positive performance evaluations for their conduct during the incident.[57]

The plaintiffs base their *Monell* claim of a deficient policy in part on the police department's history of use of lethal force against other mentally ill persons. The plaintiffs identify two persons: John Deming, Jr. and Shannon Edward Estill, who allegedly were suffering mental-health crises when police officers shot and killed them (in 2015 and 2017 respectively).[58] In 2015, officers

---

[51] Use-of-Force Policy, Ex. D-12 to Walker Decl. – ECF No. 96-13 at 4.

[52] *Id.* at 7; Harmening Report, Ex. F to Walker Decl. – ECF No. 96-19 at 21; Taser User Update, Ex. D-11 to Walker Decl. – ECF No. 96-12 at 2.

[53] Use-of-Force Policy, Ex. D-12 to Walker Decl. – ECF No. 96-13 at 6–7.

[54] Harmening Report, Ex. F to Walker Decl. – ECF No. 96-19 at 23–24.

[55] Gora Dep., Ex. P to Walker Decl. – ECF No. 96-41 at 11 (p. 50:3–21), 12 (p. 68:3–16), 13–14 (pp. 93:15–94:23).

[56] Spiller Dep., Ex. Q to Walker Decl. – ECF No. 96-42 at 19 (p. 78:8–20).

[57] Chin Performance Evaluation, Ex. E-6 to Walker Decl. – ECF No. 96-18 at 6; Middleton Performance Evaluation, Ex. D-13 to Walker Decl. – ECF No. 96-14 at 7.

[58] Gora Dep., Ex. P to Walker Decl. – ECF No. 96-41 at 22 (p. 128:6–24).

tased Mr. Deming — a mentally ill man sitting on top of a car — even though he was calm and talking to the officers. He then ran, and an officer shot and killed him.[59] (The parties did not provide any evidence about the Estill shooting.) The plaintiffs assert that after the two shootings, the department did not change its policies (except that officers now wear and activate body cameras). No officers were reprimanded or had remedial training.[60]

Following two motions to dismiss and the stipulated dismissal of some defendants, the following claims remain in the case against the following defendants:[61]

| # | Claim | Against Defendants |
|---|-------|--------------------|
| 1 | Battery — Wrongful Death | City, Chin, Middleton, and Trovao |
| 2 | Negligence — Wrongful Death | City, Chin, Middleton, Trovao, Billdt, and Knight |
| 3 | Unlawful Seizure and Excessive Force — Fourth Amendment — 42 U.S.C. § 1983 | Chin, Middleton, and Trovao |
| 4 | Supervisor Liability — 42 U.S.C. § 1983 | Billdt and Knight |
| 5 | Denial of Medical Care — Fourth Amendment — 42 U.S.C. § 1983 | Chin, Middleton, Trovao, Billdt, and Knight |
| 6 | Due Process — Parent-Child Relationship — Substantive Due Process — Fourteenth Amendment | Chin, Middleton, Trovao, Billdt, and Knight |
| 7 | *Monell* — 42 U.S.C. § 1983 | City and Spiller |
| 8 | Unlawful Seizure and Excessive Force — Bane Act — Cal. Civ. Code § 52.1 | City, Chin, Middleton, Trovao, Billdt, and Knight |
| 9 | Disability Discrimination under the ADA — 42 U.S.C. §§ 12101–12213 | City |

The defendants moved for summary judgment on all claims.[62] The court allowed supplemental briefing to address the ADA claim that the defendants omitted inadvertently from their motion and raised only in their reply brief.[63] *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). The parties consented to magistrate-judge jurisdiction.[64] The court held a hearing on May 20, 2021.

---

[59] Harmening Report, Ex. F to Walker Decl. – ECF No. 96-19 at 34.

[60] Spiller Dep., Ex. Q to Walker Decl. – ECF No. 96-42 at 15–16 (pp. 72:8–73:8).

[61] Second Am. Compl. – ECF No. 36.

[62] Mot. – ECF No. 73.

[63] Reply – ECF No. 86; Sur-Reply – ECF No. 87.

[64] Consents – ECF Nos. 27, 38.

## SUMMARY-JUDGMENT STANDARD

The court must grant a motion for summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, the burden then shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, the court does not make credibility determinations or weigh conflicting evidence. Instead, it views the evidence in the light most favorable to the non-moving party and draws all factual inferences in the non-moving party's

favor. *E.g.*, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991).

### ANALYSIS

The defendants move for summary judgment on all claims: (1) the seizure and excessive-force claims under the Fourth Amendment; (2) the supervisory-liability claim; (3) the Fourteenth Amendment claim for a substantive due-process violation; (4) the Fourth Amendment claim for denial of medical care; (5) the ADA claim; and (6) the state-law claims. For the claims against Officers Middleton, Chin, and Trovao, the court denies summary judgment on the seizure and excessive-force claims and the related state-law claims. For the claims against Sergeants Billdt and Knight, the court grants summary judgment on the supervisory-liability claim and the related state-law claims. The court also grants summary judgment on the Fourteenth Amendment claim, the Fourth Amendment claim for denial of medical care, the *Monell* claim, and the ADA claim.

### 1. Wrongful Seizure and Excessive Force — Fourth Amendment — 42 U.S.C. § 1983

The plaintiffs claim that Officers Middleton and Chin seized him unlawfully, and Officers Middleton, Chin, and Trovao used unreasonable excessive force, in violation of 42 U.S.C. § 1983 and the Fourth Amendment. The defendants moved for summary judgment on the grounds that the detention was lawful, the force was reasonable, and they in any event have qualified immunity. The court denies summary judgment because it cannot decide as a matter of law that the seizure was lawful, the force was reasonable, or the officers have qualified immunity.

#### 1.1 *Terry* Stop

A police officer may conduct a brief investigatory stop of a person if the officer has a reasonable suspicion supported by articulable facts that "criminal activity may be afoot," even if the officer lacks probable cause. *Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968). "[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective reasonable inferences, form a basis for particularized suspicion." *United States v. Montero–Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000); *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

The parties agree that Officers Middleton and Chin had reasonable suspicion to stop Mr. Bauer to investigate the Raley's incident. They dispute whether they had cause to handcuff him and whether the officers' subsequent force was unreasonable and violated the Fourth Amendment.[65]

An officer making a *Terry* stop may conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry*, 392 U.S. at 27. "Under ordinary circumstances, drawing weapons and using handcuffs are not part of a *Terry* stop." *United States. v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001). Although there are no bright-line rules governing the use of intrusive means of effecting a *Terry* stop, they may be used only in "special circumstances." *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1047 (9th Cir. 2014). Special circumstances include the following: (1) when a suspect is "uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight;" (2) when police have "information that the suspect is armed;" (3) when the stop "closely follows a violent crime;" and (4) when police have information that a violent crime is about to occur. *Id.*

Officer Middleton testified that he wanted to detain Mr. Bauer to do a show-up with the Raley's employees to verify that he was responsible for the vandalism.[66] Officer Chin testified that Mr. Bauer's refusal to answer a question about whether he had any weapons suggested that he might have a weapon or was about to flee.[67] Thus, they argue, their use of handcuffs was warranted because Mr. Bauer's "sudden refusal to answer questions pertaining to whether or not he had anything illegal on him and then his bizarre staring behavior posed a credible threat to officer safety and created a fear that [Mr. Bauer] may be armed or may attempt to flee or fight."[68] These grounds do not compel summary judgment.

---

[65] Opp'n – ECF No. 96 at 27.

[66] Middleton Dep., Ex. D to Blechman Decl. – ECF No. 73-1 at 53 (p. 141:10–20).

[67] Chin Dep., Ex. E to Blechman Decl. – ECF No. 73-1 at 64–65 (pp. 70:1–71:4).

[68] Mot. – ECF No. 73 at 18.

First, Officer Middleton made the decision to detain Mr. Bauer. He provided no reason except that he wanted to do a show-up. Also, although the officers argue in their motion that the store wanted to press charges, the employees were at best equivocal.

Second, Officer Middleton told Mr. Bauer that he was not free to go.[69] A *Terry* stop is a brief investigatory detention. Custody, or a formal arrest, is when a reasonable innocent person would not feel free to go after brief questioning. *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981). At minimum, there are fact questions about whether detaining Mr. Bauer in handcuffs pending a show-up was a formal arrest. (The defendants do not contend that they had probable cause for a formal arrest and instead assert only that they had grounds to handcuff Mr. Bauer during the *Terry* stop.[70]) Moreover, the conduct at Raley's — breaking bottles and acting intoxicated or mentally ill — at best are misdemeanors. Even if the officers had probable cause, they cannot arrest for misdemeanors that are not committed in their presence. Cal. Penal Code § 836; *Barry v. Fowler*, 902 F.2d 770, 772 (9th Cir. 1990).

Third, Mr. Bauer was calm and responsive throughout the officers' interactions with him, and the dispatch report reflected that he was "negative" for weapons. He answered all of the officers' questions until — after he cleared for warrants through dispatch — Officer Middleton asked, "do you have anything illegal on you, bud?"[71] At that point, Officer Middleton could ask that question (because the detention had not ripened to a formal arrest), but Mr. Bauer had no obligation to answer. The defendants contend that Mr. Bauer's silence — several minutes into the encounter — suggested that he was a danger or flight risk that justified handcuffing.[72] But Officer Middleton testified in his deposition that there was no reason to believe that Mr. Bauer posed an imminent

---

[69] Video Matrix 1, Ex. C-1 to Blechman Decl. – ECF No. 73-1 (14:56:10–14:56:40).

[70] Mot. – ECF No. 73 at 18 (citing only *Terry* authority and no probable-cause authority). In arguing that they had grounds to use the handcuffs, the defendants contend that they had reasonable suspicion and "even arguably probable cause for an arrest." *Id.* But they cite only the law on *Terry* stops and say explicitly in their reply that Mr. Bauer was not under arrest and instead was being detained for an investigation of the call for service. Reply – ECF No. 84 at 5.

[71] Video Matrix 1, Ex. C-1 to Blechman Decl. – ECF No. 73-1 (14:52:48–14:55:52).

[72] Mot. – ECF No. 73 at 18.

threat to anyone.[73] Officer Chin also testified that — other than not responding to Officer Middleton's questions — Mr. Bauer did nothing that suggested that he was a danger to the officers.[74] A *Terry* frisk for weapons usually happens at the beginning of a stop (though it can happen later if facts develop to support it). The same is true for an unusual circumstance justifying handcuffs. Here, the only fact that changed during the encounter was Mr. Bauer's silence. That does not justify the officer's conduct as a matter of law. There thus are no exceptional circumstances that justify the use of handcuffs during a *Terry* stop.

There is no qualified immunity either.

"[T]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "The purpose of qualified immunity is to strike a balance between the competing 'need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Id.* (quoting *Pearson*, 555 U.S. at 231). Qualified immunity "is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Under qualified immunity, an officer will be protected from suit when he or she 'makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

"[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (quotation omitted). "The doctrine of qualified immunity gives officials 'breathing room to make reasonable but mistaken judgments about open

---

[73] Middleton Dep., Ex. D to Walker Decl. – ECF No. 96-8 at 24 (p. 63:10–13).

[74] Chin Dep., Ex. E to Walker Decl. – ECF No. 96-15 at 15 (p. 56:12–21).

legal questions.'" *Id.* at 1866 (quotation omitted). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful[,] then the officer is immune from liability." *Id.* at 1867.

In determining whether an officer has qualified immunity, courts consider (1) whether the officer violated a constitutional right of the plaintiff, and (2) whether that constitutional right was "clearly established in light of the specific context of the case" at the time of the events in question. *Mattos*, 661 F.3d at 440. Courts may exercise their sound discretion in deciding which of these two prongs should be addressed first. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Regarding the second prong, the Supreme Court has cautioned that "'clearly established law' should not be defined 'at a high level of generality'" but instead "must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). "Although th[e Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

Here, a jury could conclude from the video — showing Mr. Bauer's cooperativeness and his refusal to answer a question calling for an incriminating response — that the officers' justifications for handcuffs were pretextual and that Mr. Bauer posed no danger or flight risk. It has long been established that officers must have reasonable suspicion that a suspect is armed, poses a danger to officers, or is a flight risk before using handcuffs during a *Terry* stop. *Green*, 751 F.3d at 1047.

### 1.2 Use of Force

The issue then is whether the officers' subsequent use of force was reasonable. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. O'Connor*, 490 U.S. 386, 396 (1989) (cleaned up). A court must evaluate "the facts and circumstances of each particular case, including [(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The *Graham* factors are not exhaustive. *George v. Morris*, 736 F.3d 829, 837–38 (9th Cir. 2013). Because "there are no per se rules in the Fourth Amendment excessive force context," *Mattos*, 661 F.3d at 441, courts must

"examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*," *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (cleaned up). Other factors relevant to the analysis include the availability of less intrusive alternatives to the force used and giving proper warnings before using force, if feasible. *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (cleaned up). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

"Because the excessive-force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Ninth Circuit has "held on many occasions that "summary judgment . . . in excessive force cases should be granted sparingly." *Glenn*, 673 F.3d at 871 (cleaned up). "This principle applies with particular force where the only witness other than the officers was killed during the encounter." *Gonzales v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc). The Ninth Circuit has said: "We are mindful that cases in which the victim of alleged excessive force has died pose a particularly difficult problem in assessing whether the police acted reasonably, because the witness most likely to contradict the officers' story is unable to testify." *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008) (cleaned up). "[T]he court may not simply accept what may be a self-serving account by the police officer." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). "In cases where the best (and usually only) witness who could offer direct testimony for the plaintiff about what happened before a shooting has died, [Ninth Circuit] precedent permits the decedent's version of events to be constructed circumstantially from competent expert and physical evidence, as well as from inconsistencies in the testimony of law enforcement." *George*, 736 F.3d at 834 (citations omitted). "Accordingly, [the court] carefully examine[s] all the evidence in the record, such as medical

reports, contemporaneous statements by the officer[s,] and the available physical evidence, to determine whether the officer[s'] story is internally consistent and consistent with other known facts.'" *Gonzales*, 747 F.3d at 795 (cleaned up). The court "must also examine circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Id.*

The officers contend that Mr. Bauer's resistance to being handcuffed — in the face of their commands to stop resisting — justified their force.[75] But the video does not establish that Mr. Bauer was resisting in a way that justified the force. Mr. Bauer said — in response to commands — "I'm not doing anything," "I'm literally not doing anything," and (three times) "what are you doing?"[76] Issues of fact thus preclude determining (for example) whether Officer Chin's leg sweep or Officer Middleton's and Officer Trovao's use of tasers were objectively reasonable.

Even after the leg sweep, a jury could conclude that Mr. Bauer was not ignoring commands. For example, while officers attempted to handcuff Mr. Bauer's left wrist, an officer told him to put his left arm behind his back, and he responded, "I can't put my arms behind my back."[77] In response to commands to stop resisting, Mr. Bauer responded that the officers were hurting him. The videos do not confirm the officers' testimony, which must be heard to be credited. The court thus cannot determine as a matter of law that Officer Middleton's use of a taser — an intermediate use of force — was reasonable. Moreover, Officers Middleton and Trovao both used their tasers, which is contrary to training standards and the department's use-of-force policy.[78] Officers Middleton and Chin also knew that Mr. Bauer potentially had mental-health issues, and they had training in de-escalation techniques.[79] Under the *Graham* factors, the alleged misdemeanors (public intoxication and breaking

---

[75] Mot. – ECF No. 73 at 21.

[76] Video Matrix 1, Ex. C-1 to Blechman Decl. – ECF No. 73-1 (14:56:29).

[77] *Id.* (14:56:51).

[78] Trovao Video, Ex. I-19 to Walker Decl. – ECF No. 96-29 (14:59:10–14:59:25); Use-of-Force Policy, Ex. D-12 to Walker Decl. – ECF No. 96-13 at 7; Ryan Report, Ex. C to Walker Decl. – ECF No. 96-4 at 99 & n.7.

[79] Middleton Dep., Ex. D to Walker Decl. – ECF No. 96-8 at 10 (p. 33:14–18), 11–12 (pp. 34:24–35:4), 19–23 (pp. 57:15–61:8); Chin Dep., Ex. E to Walker Decl. – ECF No. 96-15 at 12 (p. 30:10–15), 15 (p. 56:1–10), 17–19 (pp. 63:13–65:10).

bottles) were not severe, the facts arguably show no immediate threat (as discussed in the *Terry* section), and there are fact disputes about the extent of any resistance. *Graham*, 490 U.S. at 396.

Even if Mr. Bauer were resisting, a jury could conclude that it was passive resistance. The Ninth Circuit has "long distinguished between passive and active resistance," *Rice v. Morehouse*, 989 F.3d 1112, 1123 (9th Cir. 2021), and the "right to be free from the application of non-trivial force for engaging in mere passive resistance." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013). In *Rice*, for example, the court held that fact disputes existed about whether a motorist was actively resisting before police officers took him to the ground. 983 F.3d at 1123 (dash-cam video did not contradict the plaintiff's account). Thus, a reasonable jury could find that the state had a minimal interest in the officers' use of substantial force to arrest him for a minor traffic violation, which precluded summary judgment about whether the force was reasonable. *Id.*; *accord Bryan*, 828 F.3d at 828–31 (minimal governmental interest in use of taser during a traffic stop). Similarly, a jury could find here that the government had a minimal interest in the officers' use of substantial force.

The defendants contend that they nevertheless have qualified immunity.[80] "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1153. As discussed above, the standards for use of handcuffs during *Terry* stops are clearly established. "The principle that it is unreasonable to use significant force against a suspect who was suspected of a minor crime, posed no apparent threat to officer safety, and could be found not to have resisted arrest" is clearly established too. *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1168 (9th Cir. 2011); *Rice*, 989 F.3d at 125–26; *Jones*, 873 F.3d at 1131–32 (use of substantial force against a passively resisting person is beyond debate.)

The defendants' citation to *O'Doan v. Sanford* does not change this conclusion. 991 F.3d 1027 (9th Cir. 2021). There, a police officer — responding with another police officer to a 911 call about a man who had a seizure in the shower and left the house — used a "reverse reap throw," meaning, they tripped and guided the man to the ground. The man was naked, did not stop when

---

[80] Mot. – ECF No. 73 at 18–19.

the officers told him to stop, and instead turned to face the officers, balled his fists, and raised his arms slightly. *Id.* at 1032–33. The court found that the force was reasonable and upheld the district court's grant of qualified immunity to the officer. By contrast, Mr. Bauer cooperated with Officers Middleton and Chin, did not flee, and did not threaten them.

*      *      *

In sum, the court denies the defendants' motion for summary judgment on the Fourth Amendment claims of wrongful seizure and excessive force.

### 2. Supervisory Liability — 42 U.S.C. § 1983

The plaintiffs claimed that Sergeants Billdt and Knight — the supervisors on the scene — are liable because they did not stop the excessive force, properly supervise the officers, or timely request medical assistance.[81]

"A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (cleaned up); *see Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000) (supervisors can be liable for "1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others.").

Like the officers who arrived after Officer Trovao, the sergeants were not involved in the initial detention, seizure, and use of force, and there is no causal connection between their conduct and the alleged constitutional violation. *Starr*, 652 F.3d at 1207. Moreover, the police requested medical assistance within three minutes after their arrival on the scene.[82] At minimum, they have qualified immunity, and the court grants summary judgment to them.

---

[81] Second Am. Compl. – ECF No. 36 at 16–18 (¶¶ 72–79).

[82] Video Matrix 1, Ex. C-1 to Blechman Decl. – ECF No. 73-1 (15:02:13).

### 3. Due Process — Parent-Child Relationship — Fourteenth Amendment — 42 U.S.C. § 1983

The defendants moved for summary judgment on the grounds that the officers did not act with a purpose to harm that was unrelated to a legitimate law-enforcement purpose, and they in any event have qualified immunity.[83] The court grants summary judgment based on qualified immunity.

The Fourteenth Amendment's substantive due-process clause protects against the arbitrary or oppressive exercise of government power. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998). Parents may assert a Fourteenth Amendment substantive due-process claim if they are deprived of their liberty interest in the companionship and society of their child through official conduct. *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013).

The standard that a plaintiff must satisfy to establish a due-process violation under the Fourteenth Amendment is higher than the standard for excessive-force claim under the Fourth Amendment. An alleged Fourth Amendment violation is evaluated under a reasonableness standard, *Ohio v. Robinette*, 519 U.S. 33, 39 (1996), but "the substantive component of the Due Process Clause is violated by executive action only when it can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense," *Lewis*, 523 U.S. at 847 (cleaned up). *Accord Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (citing *Lewis*, 523 U.S. at 846). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013). If the deliberate-indifference standard applies, then the plaintiffs must show that the officers acted with "conscious or reckless disregard of the consequence[s] of [their] acts or omissions." *Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014). "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Hayes*, 736 F.3d at 1230.

---

[83] Mot. – ECF No. 73 at 24–25.

The parties agree that deliberation was impractical and the more stringent purpose-to-harm standard applies.[84] Thus, the plaintiffs must demonstrate that the officers acted with a "purpose to harm unrelated to legitimate law enforcement objectives." *Id*. No facts suggest that the officers acted with that scienter. The plaintiffs cite *Green v. Taylor* to support an argument that the officers provoked Mr. Bauer's non-compliance and then responded with a constitutionally disproportionate response. No. C-12-5933 CRB, 2014 WL 6693865, at *4 (N.D. Cal. Nov. 26, 2014). In *Green*, correctional officers allegedly punched and hit the plaintiff after he was "subdued and handcuffed." *Id.* There thus was no legitimate law-enforcement objective, and the court held that the correctional officers used force maliciously and sadistically to cause harm. *Id.* This case is different: the officers' actions were administered to gain control of Mr. Bauer and were not for a purpose unrelated to legitimate law-enforcement objectives. The officers in any event have qualified immunity. The court grants summary judgment.

### 4. Denial of Medical Care — Fourth Amendment — 42 U.S.C. § 1983

The plaintiffs contend that by delaying the medics' access to Mr. Bauer, the officers violated his Fourth Amendment right to medical care.[85] The officers summoned help before they restrained Mr. Bauer fully, and no case puts the subsequent delay beyond constitutional debate. The officers thus have qualified immunity.

The Fourth Amendment requires officers to provide "objectively reasonable post-arrest care" to an apprehended suspect. *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006). "[A] police officer who promptly summons . . . necessary medical assistance has acted reasonably for purposes of the Fourth Amendment, even if the officer did not administer CPR." *Id.*

The police officers called for medical assistance at 3:02 p.m. (about six minutes after the altercation became physical), and the medics arrived at 3:11 p.m.[86] When they arrived, the police

---

[84] *Id.* at 24; Opp'n – ECF No. 96 at 32–33.

[85] Opp'n – ECF No. 96 at 33–34.

[86] Video Matrix 1, Ex. C-1 to Blechman Decl. – ECF No. 73-1 (15:02:13); Video Matrix 2, Ex. C-2 to Blechman Decl. – ECF No. 73-1 (15:11:05).

had restrained Mr. Bauer with the WRAP device. At first Mr. Bauer was shouting, and by 3:15 p.m., he had calmed down and was responding to officers' questions about his name, birthday, and where he lived.[87] The paramedics gave him the sedative at 3:19 p.m., the officers removed the WRAP at 3:22 p.m., and the medics began attending to Mr. Bauer at 3:25 p.m.[88]

Here, the officers radioed for medical help appropriately. Mr. Bauer was yelling and then talking with them after the medics arrived. The delay between the administration of the sedative and the medics' rendering medical care was minutes. The delay is similar to that in *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1097-98 (N.D. Cal. 2017). There, like here, the officers struggled with the decedent, handcuffed him, and used a WRAP. Then, they noticed he was unconscious. *Id.* at 1097. Within 30 to 60 seconds after the paramedics arrived, the officers removed the WRAP, and minutes later, the paramedics began administering CPR. *Id.* at 1097–98. The argument in *Greer* was that the officers should have administered CPR themselves as soon as they knew the decedent was unconscious. *Id.* at 1107. The court held that because "the officers promptly summoned medical care," they "acted reasonably for purposes of the Fourth Amendment." *Id.*; *accord Tatum*, 441 F.3d at 1097–99.

The timeline here is like the timeline in *Greer*. Because existing precedent does not place the constitutional question squarely beyond debate, the officers have qualified immunity.

### 5. *Monell* Claim — 42 U.S.C. § 1983

The plaintiffs assert the following grounds for their *Monell* claim: (1) the police department has no policies regarding asphyxia and hypoxia, prolonged use of the taser, use of the WRAP device, or notifying officers of prior contacts with mentally ill people; (2) the department's use-of-force policy is insufficient, which is demonstrated by the department's consistently finding no serious policy violations; (3) the training is deficient; and (4) the police department and former

---

[87] Video Matrix 2, Ex. C-2 to Blechman Decl. – ECF No. 73-1 (15:14:45–15:16:20).

[88] Smith Dep., Ex. K to Blechman Decl. – ECF No. 73-1 at 168–69 (pp. 45:2–46:1); PPD Narrative, Ex. F-3 to Walker Decl. – ECF No. 96-22 at 5.

Police Chief David Spiller ratified the force here.[89] The court grants summary judgment because the policy is not deficient, there is no pattern of constitutional violations that sufficiently put the defendants on notice about training deficits, and Chief Spiller did not endorse the officers' actions.

Local governments can be sued under § 1983 if the public entity maintains a custom, practice, or policy that amounts to deliberate indifference to a plaintiff's constitutional rights, and the policy results in a violation of a plaintiff's constitutional rights. *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 690–91 (1978). There are three ways to show a policy or custom:

> (1) by showing a longstanding practice or custom which constitutes the standard operating procedure of the local government entity; (2) by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (cleaned up). The practice or custom must be more than "random acts or isolated events" and instead must be a "permanent and well-settled practice." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443–44 (9th Cir. 1988), *overruled on other grounds by Bull v. City and Cnty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010). Thus, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy. . . ." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985).

### 5.1 Policies

First, the plaintiffs challenge the force policies as deficient, pointing to their failure to address asphyxia and hypoxia, prolonged use of the taser, use of the WRAP device, and notifying officers of prior contacts with mentally ill people.[90] But the department has a use-of-force policy that required reasonable force.[91] In a case involving similar policies, the court found no *Monell* violation. *Alegrett v. City & Cnty. of San Francisco*, No. 12-cv-05538-MEJ, 2014 WL 1911405, at *8 (N.D. Cal. May

---

[89] Second Am. Compl. – ECF No. 36 at 20–23 (¶¶ 98–106); Opp'n – ECF No. 96 at 34–36.

[90] Opp'n – ECF No.96 at 35.

[91] Use-of-Force Policy, Ex. D-12 to Walker Decl. – ECF No. 96-13 at 4.

13, 2014). No case holds that a use-of-force policy must be granular to the point that it defines the officers' specific responses with specific tools to specific situations. Instead, those requirements are met through training (such as the training that the officers in this case received on the use of tasers or on recognizing and responding to mental illness). An officer's failure to follow training may be relevant to the claim of excessive force, but it does not mean that the policy was constitutionally deficient. Similarly, the plaintiffs cite no case that suggests that a failure to notify the police officers about reports about mentally ill people — like the reports that Mr. Bauer's parents made to the police — can establish a *Monell* claim.

### 5.2 Training

Second, the plaintiffs limit their deficient-training challenge to the department's training about interactions with the mentally ill.[92] "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id.* (cleaned up). Only then can such a shortcoming be properly through of as a city policy or custom that is actionable under § 1983." *Id.* (cleaned up).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61. "The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Id.* at 61–62 (cleaned up). "A less stringent standard of fault for a

---

[92] Opp'n – ECF No. 96 at 35–36.

failure-to-train claim would result in de facto respondeat superior liability on municipalities. . . ." *Id.* at 62 (cleaned up). Thus, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* (cleaned up). "Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action — the deliberate indifference — necessary to trigger municipal liability." *Id.* (cleaned up). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

The plaintiffs predicate their failure-to-train claim on two incidents in 2015 and 2017 involving the shooting of two persons with mental-health issues and contend that both incidents involve the police's similar failure to use de-escalation techniques.[93] The issue is whether that is a pattern that demonstrates deliberate indifference.

The earlier incidents do not establish triable issues of fact about liability for a failure to train. They involved shootings (and thus very different facts). Also, while Officer Middleton apparently was present at the Deming incident, the officers here were not otherwise involved. Moreover, as the Statement summarizes, the officers here had CIT and use-of-force training, including training on interacting with mentally ill individuals. In sum, the plaintiffs did not show a pattern of constitutional violations that sufficiently put the defendants on notice about training deficits.

### 5.3   Ratification

Third, the plaintiffs contend that the City and former police chief David Spiller ratified the officers' conduct because after its use-of-force investigation, the police department found that the force used here — and in the shootings of Mr. Deming and Mr. Estill — did not violate policy.[94]

To plead a *Monell* claim through ratification, "a plaintiff must show that the 'authorized policymakers approve[d] a subordinate's decision and the basis for it.'" *Dasovich v. Contra Costa*

---

[93] *Id.*

[94] *Id.* at 36–37.

*Cnty. Sheriff's Dep't*, No. 14-cv-00258-MEJ, 2014 WL 4652118, at *6 (N.D. Cal. Sept. 17, 2014) (quoting *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004)). "The policymaker must have knowledge of the constitutional violation and actually approve of it." *Id.* (citing *Lytle*, 382 F.3d at 987). "A mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." *Id.* (citing *Lytle*, 382 F.3d at 987); *accord, e.g., Estate of Adomako v. City of Fremont*, No. 17-cv-06386-DMR, 2018 WL 2234179, at *3 (N.D. Cal. May 16, 2018) ("A police department's 'mere failure to discipline its officers does not amount to ratification of their allegedly unconstitutional actions.'") (cleaned up) (quoting *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd in part, cert. dismissed in part*, 135 S. Ct. 1765 (2015)).

The plaintiffs do not dispute that the police department investigated the use-of-force incidents or that it followed its normal procedures in the three cases. They instead contend that the department rubber-stamps and approves its officers' conduct. Evidence of three incidents does not raise a triable issue on the *Monell* claim that the police department has a custom of approving its officers' actions, whatever they are. As discussed above, the shooting incidents are dissimilar to this case. That makes this case different than *East v. City of Richmond*, where the plaintiff plausibly pleaded *Monell* liability by alleging that the chief of police "knew of other repeated acts of misconduct by [o]fficers . . . but yet, failed to take any corrective action against these officers." No. C 10-02392-SBA, 2010 WL 4580112, at *4 (N.D. Cal. Nov. 3, 2010). Moreover, there is no evidence in the record that policymakers ''made a deliberate choice to endorse'' the officers' actions. *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992). Finally, Chief Spiller retired before the department completed its investigation.[95]

*   *   *

In sum, the court grants summary judgment on the *Monell* claim.

---

[95] Spiller Dep., Ex. P to Blechman Decl. – ECF No. 73-1 at 309 (p. 14:6–19).

### 6. Disability Discrimination under the ADA

The plaintiffs claim that the City violated Mr. Bauer's rights under Title II of the ADA, 42 U.S.C. § 12132, because they knew — or should have known —that he was mentally ill, and they failed to reasonably accommodate his disability during their investigation.[96] The court grants the City's summary-judgment motion because there is no evidence that the police officers acted because of his disability or with the requisite scienter.

"Courts have recognized at least two types of Title II claims applicable to arrests: (1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Sheehan*, 743 F.3d at 1232.

The plaintiffs raise the second type of claim: the officers' failure to reasonably accommodate Mr. Bauer's disability. To state a claim, they must show the following: (1) Mr. Bauer "was an individual with a disability; (2) []he was otherwise qualified to participate in or receive the benefit of a public entity's services, programs or activities; (3) []he was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of his disability." *Id.* at 1232. "In a Title II claim grounded in a public entity's alleged failure to provide a reasonable accommodation under 28 C.F.R. § 35.130(b)(7), the plaintiff bears the initial burden of producing evidence of the existence of a reasonable accommodation. A public entity may defeat a reasonable accommodation claim by showing 'that making the modifications would fundamentally alter the nature of the service, program, or activity.'" *Id.* at 1232–33 (quoting 28 C.F.R. § 35.130(b)(7)).

---

[96] Sur-Reply – ECF No. 86 at 2–5.

"To recover monetary damages under Title II of the ADA, a plaintiff must prove intentional discrimination on the part of the defendant." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) (cleaned up). To prove intentional discrimination, the plaintiff must show that the defendant acted with deliberate indifference. *Id*. at 1139. "When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Id*. "[D]eliberate indifference does not occur where a duty to act may simply have been overlooked, or a complaint may reasonably have been deemed to result from events taking their normal course." *Id*. "Rather, in order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness." *Id*.

The plaintiffs contend that, like the officers in *Sheehan*, the officers could have used de-escalation techniques.[97] But the facts in *Sheehan* are very different than the facts here. In *Sheehan*, a social worker for a schizophrenic resident of a group home — concerned about the resident's deteriorating condition and the potential harm she posed to herself and others because she was not taking her medication — called the police for help transporting the resident for a 72-hour involuntary commitment for an evaluation and treatment under California Welfare and Institutions Code § 5150. When officers arrived, they entered the house (without a warrant) to confirm the social worker's assessment. The resident grabbed a knife, said that she did not want to go, forced the officers into the hallway, and remained in her bedroom behind a closed door. The officers called for backup but instead of waiting, and without using de-escalation techniques, they forced their way into her bedroom. The resident threatened them with her knife again, and the officers shot her. The resident survived and sued the officers, raising claims like those in this case, including a claim under the ADA. 743 F.3d at 1215–16, 1218–20. *Id.* at 1233. The court recognized that the officers were forced to make split-second decisions but held that a reasonable jury could find that the situation had been defused sufficiently to allow the officers to wait for

---

[97] *Id*. at 3–4.

1    backup and to use less confrontational techniques. The reasonableness of that accommodation was

2    a question of fact that precluded judgment as a matter of law.

3        Unlike *Sheehan*, the need for an accommodation in this case was not obvious. The plaintiff in

4    *Sheehan* was schizophrenic and agitated, and the call to the police was for help with an

5    involuntary commitment. Mr. Bauer, by contrast, was calm and cooperative, and the call to the

6    police was, in part, for his vandalism and possible public intoxication (in addition to the mental-

7    health concern). The plaintiffs nonetheless contend that Officer Middleton never intended to

8    evaluate Mr. Bauer, and this is evidence of deliberate indifference.[98] Officer Middleton testified

9    that his intent was not to determine if Mr. Bauer was in a mental-health crisis but instead was to

10   investigate a possible crime.[99] That does not establish a failure to act. At best, a duty to act may

11   have been overlooked. *Duvall*, 260 F.3d at 1139.

12       The plaintiffs also contend that the police department's training deficits establish an ADA

13   claim.[100] Assuming that a failure-to-train claim is cognizable, the training claim fails for the reasons

14   that it fails under *Monell. Cf. Green v. Tri-City Metro. Transp. Dist.*, 909 F. Supp. 2d 1211, 1220

15   (D. Or. 2012) (analogizing an ADA claim for failure-to-train with a claim brought under § 1983

16   because the Ninth Circuit has not set out a standard for failure-to-train claims under the ADA).

17       In sum, there are no triable issues of fact about the ADA claim.

18

19   **7. State-Law Claims: Bane Act, Battery, and Negligence**

20       For the reasons that the Fourth Amendment claim for excessive force survives against Officers

21   Middleton, Chin, and Trovao, the state law claims — the Bane Act, battery, and negligence —

22   survive against them too. Because Sergeants Billdt and Knight were not involved in the initial use

23   of force, the court grants them summary judgment.

24

25

26   ———————————————

[98] *Id*. at 4.

27   [99] Middleton Dep., Ex. D. to Blechman Decl. – ECF No. 73-1 at 46 (p. 74:1–4).

28   [100] Sur-Reply – ECF No. 86 at 2–3.

The Bane Act prohibits interference or attempted interference with a person's rights under the U.S. or California Constitutions and laws by "threats, intimidation, or coercion." Cal. Civ. Code § 52.1(a)–(b). To state a Bane Act claim, the plaintiffs do not need to establish a threat, intimidation, or coercion that is "transactionally independent" from the constitutional violation. *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (citing *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 799–802 (2017)). Stating a claim for excessive force in violation of the Fourth Amendment states a claim for excessive force under the Bane Act. *Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013).

Similarly, a negligence claim may be predicated on a use of excessive force. *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013); *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1263 (2006) (elements of a wrongful-death claim are the tort (negligence or other wrongful act), the death, and resulting damages). A battery claim also requires the plaintiff to prove that the officer "used unreasonable force." *Munoz v. Union City*, 120 Cal. App. 4th 1077, 1102 (2004) (citation omitted). The test for reasonableness for a state-law battery claim against a police office is the same as the test for a § 1983 claim alleging a Fourth Amendment claim. *Id.*; *see Hayes*, 736 F.3d at 1232.

In sum, the court grants summary judgment in favor of Sergeants Billdt and Knight on the state-law claims and otherwise denies summary judgment.

## CONCLUSION

The court (1) grants summary judgment on the supervisory-liability and state-law claims to Sergeants Billdt and Knight, (2) grants summary judgment on the Fourteenth Amendment claim, the Fourth Amendment claim for denial of medical care, the *Monell* claim, and the ADA claim, (3) and otherwise denies summary judgment.

This disposes of ECF No. 73.

**IT IS SO ORDERED.**

Dated: June 2, 2021

_____
LAUREL BEELER
United States Magistrate Judge